1   BROWNE GEORGE ROSS LLP
Peter Obstler (State Bar No. 171623)
2      pobstler@bgrfirm.com
44 Montgomery Street, Suite 1280
3   San Francisco, California   94104
Telephone:  (415) 391-7100
4   Facsimile:  (310 275-5697

5   Eric M. George (State Bar No. 166403)
   egeorge@bgrfirm.com
6   Debi A. Ramos (State Bar No. 135373)
   dramos@bgrfirm.com
7   Keith R. Lorenze (State Bar No. 326894)
   klorenze@bgrfirm.com
8   2121 Avenue of the Stars, Suite 2800
Los Angeles, California 90067
9   Telephone: (310) 274-7100
Facsimile: (310) 275-5697
10
Attorneys for Plaintiffs Kimberly Carleste Newman, Lisa
11  Cabrera, Catherine Jones and Denotra Nicole Lewis

12                  UNITED STATES DISTRICT COURT

13          NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

14

15  Kimberly Carleste Newman, Lisa Cabrera,        Case No.
Catherine Jones, and Denotra Nicole Lewis,
16                                                 **CLASS ACTION COMPLAINT FOR**
                Plaintiffs,                        **DECLARATORY JUDGMENT,**
17                                                 **RESTITUTION AND DAMAGES**
          vs.
18
Google LLC, YouTube LLC, Alphabet Inc,
19  and DOES 1 through 100, inclusive,
                                                   Trial Date:  None Set
20                Defendants.

21

22

23

24

25

26

27

28

1605366.1

Case No.

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION AND PREFATORY STATEMENT OF THE CASE ............................. 1

II.     PARTIES ................................................................................................................. 14

III.    JURISDICTION AND VENUE ............................................................................... 17

IV.     FACTS COMMON TO ALL CLAIMS ................................................................... 17

    A.      The Governing Agreements ......................................................................... 18

        1.      The General Terms Of Use And Contract-Based Promises ......................... 20

        2.      The License Provisions ................................................................... 23

    B.      Defendants Are Engaged In Anti-Competitive, Unlawful, Deceptive And Unfair Business Practices ............................................................................ 25

    C.      Defendants' Tool Kit For Unlawful Conduct .............................................. 27

        1.      Artificial Intelligence Algorithm Restrictions ............................... 27

        2.      Excluding Channels And Videos From Full Revenue Generation .............. 30

        3.      Misapplying "Restricted Mode" ..................................................... 31

        4.      Shadow Banning Channels And Videos .......................................... 36

        5.      Delegating Content Review And Regulation To Racists And White Supremacists .................................................................................. 38

        6.      Interfering With Livestream Broadcasts ......................................... 39

        7.      Excluding Videos From "Trending" And "Up Next" Video Recommendations ......................................................................... 40

        8.      Freezing Channel Analytics Re Subscribers And Viewers ............. 41

        9.      Promoting And Profiting From Hate Speech ................................... 42

        10.     Interfering With, Obstructing, Ignoring And Delaying Appeals .................. 43

    D.      Defendants Have Violated And Continue To Violate The Rights Of Plaintiffs And The Class .......................................................................................... 45

        1.      Kimberly Carleste Newman ........................................................... 45

        2.      Lisa Cabrera ................................................................................... 50

        3.      Catherine Jones .............................................................................. 56

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

**TABLE OF CONTENTS**
(Continued)

Page

    4.    Denotra Nicole Lewis.................................................................56

V.    CLASS ALLEGATIONS.................................................................60

VI.    INDIVIDUAL CAUSES OF ACTION.................................................64

FIRST CAUSE OF ACTION  REQUEST FOR A DECLARATORY JUDGMENT THAT SECTION 230(c)  IMMUNITY IS INAPPLICABLE TO DISCRIMINATION CLAIMS (On Behalf Of Each Plaintiff Individually And The Class).................................64

    A.    Procedural Background Facts..............................................64

    B.    Justiciable Legal Controversies Currently Exist Regarding The Construction And Constitutionality Of 47 U.S.C. § 230(c)...........................................71

        1.    An Actual Controversy Exist As To Whether The Provisions Of Section 230(c) Immunize Defendants From Race, Personal Identity, or Viewpoint Discrimination In Filtering And Blocking On line Content And Access ........................................72

        2.    An Actual Controversy Exists As To Whether Section 230(c) Immunizes Defendants For Conduct That Violates .....................................72

        3.    The Provisions And/or Application Of Any Part Of Section 230(c) To Claims Arising Out Of Race, Identity, Or Viewpoint Discrimination Is Unconstitutional .........................................72

        4.    The Executive Order Precludes The Government From Arguing Or Enforcing Section 230(c) To Claims Based On Intentional Identity Or Viewpoint Discrimination. ..................................73

    C.    Plaintiffs Served Rule 5.1 Notice On The U.S. Attorney General ..........................74

SECOND CAUSE OF ACTION  FOR BREACH OF CONTRACT (On Behalf Of Each Plaintiff Individually And The Class) ..............................................75

THIRD CAUSE OF ACTION  FOR BREACH OF THE IMPLIED COVENANT  OF GOOD FAITH AND FAIR DEALING (On Behalf Of Each Plaintiff Individually And The Class)................................................77

FOURTH CAUSE OF ACTION  FOR PROMISSORY ESTOPPEL (On Behalf Of Each Plaintiff Individually And The Class) ..............................................79

FIFTH CAUSE OF ACTION  FOR DISCRIMINATION IN CONTRACT IN VIOLATION OF 42 U.S.C. § 1981 (On Behalf Of Each Plaintiff Individually And The Class) ..............80

SIXTH CAUSE OF ACTION  FOR UNLAWFUL DISCRIMINATION  IN VIOLATION OF THE UNRUH CIVIL RIGHTS ACT (On Behalf Of Each Plaintiff Individually And The Class).................................................83

**<u>TABLE OF CONTENTS</u>**
(Continued)

<u>Page</u>

SEVENTH CAUSE OF ACTION  FOR FALSE ADVERTISING IN VIOLATION OF
THE LANHAM ACT, U.S.C. § 1125, *et seq.* (On Behalf Of Each Plaintiff
Individually And The Class) ....................................................................... 85

EIGHTH CAUSE OF ACTION  FOR UNLAWFUL, DECEPTIVE, AND UNFAIR
BUSINESS PRACTICES  CAL. BUS. & PROFS. CODE §17200, *et seq.* (On
Behalf Of Each Plaintiff Individually And The Class) ........................................ 87

NINTH CAUSE OF ACTION  FOR VIOLATION OF CALIFORNIA CONSTITUTION
ARTICLE I, SECTION 2 (On Behalf Of Each Plaintiff Individually And The Class) ........ 88

TENTH CAUSE OF ACTION  FOR FREEDOM OF SPEECH UNDER THE FIRST
AMENDMENT,  UNITED STATES CONSTITUTION, AMENDMENT 1 (On
Behalf Of Each Plaintiff Individually And The Class) ........................................ 93

    A.     Procedural Background ................................................................ 93

    B.     Permissive Endorsement Allegations Of State Action ............................. 96

    C.     State Action Allegations Under The Public Function Test ....................... 98

    D.     Defendants' Conduct Violates The First Amendment ............................. 99

VII.     PRAYER FOR RELIEF .................................................................... 101

VIII.    JURY TRIAL DEMAND ................................................................... 103

Plaintiffs, Kimberly Carleste Newman, Lisa Cabrera, Catherine Jones, and Denotra Nicole Lewis, bring this lawsuit (the "Lawsuit"), individually and on behalf of a putative class of similarly situated persons, against Defendant YouTube  LLC ("YouTube"), and its parent companies, Google LLC ("Google") and Alphabet Inc. (collectively referred to as "Google/YouTube" or "Defendants," unless otherwise specified).

Substantial overlaps exists between the claims, allegations, putative classes and issues in this Lawsuit with case pending before this Court captioned *Divino Group, LLC et al., v. Google, LLC, et al*, Case No. 5:19-cv-004749 – VKD (N.D. Cal.) ("*Divino*").  After reviewing Civil L.R. 3-12 governing related cases, it is unclear whether this Lawsuit technically meets the specific criteria and elements required for relation under Local Rule 3-12.  Specifically, this Lawsuit does not involve *all* of "the same parties," or the identical "property" owned by the same parties in *Divino*. It is also unclear whether the "transactions" are the same within the meaning of Local Rule 3-12 or whether the "events" consist of the identical unlawful conduct of restricting of access to the YouTube platform based on the profiling and discriminatory use of a person's personal identity or viewpoint in *Divino* that may be different from the racial identity profiling and discrimination against Plaintiffs and the members of the Class in this Lawsuit.  Consequently, while Plaintiffs do not believe that all of the requirements for designating the Lawsuit "related" come within the definition of Local Rule 3-12, Plaintiffs are not opposed to having this Lawsuit related to, or otherwise coordinated with, the pending proceedings in *Divino*.

## I.        INTRODUCTION AND PREFATORY STATEMENT OF THE CASE

1.        Plaintiffs are African American content creators, viewers, and consumers who bring this Lawsuit to redress overt, intentional, and systematic racial discrimination perpetrated by Google/YouTube to deny them and other members of a protected racial classification under the law equal access to YouTube, the most "ubiquitous" provider of public video content and internet access services in the history of the world.

2.        Defendants are members of the largest business enterprise, private or public, in the world.  Through this enterprise, Defendants exercise complete, absolute, and "unfettered" control over access to approximately 95% of all video content that is available to the public.  This includes

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

1   absolute control over any and all posting, viewing, engagement, advertising, personal data, and

2   revenue monetization rights of the 2.3 billion consumers who access and use YouTube.

3       3.      Defendants are also the largest creators, promoters, and sponsors of video content on

4   YouTube.  Thus, in addition to hosting and regulating video content and services on YouTube,

5   Defendants compete directly with Plaintiffs and their content for the same access, audiences,

6   viewership, advertising, marketing, and revenue based services on YouTube.

7       4.      In exercising these unprecedented powers, Defendants contract with Plaintiffs and

8   all persons similarly situated to provide equal access to YouTube and all of its related services,

9   subject only to viewpoint neutral content rules and criteria that apply equally to all.

10      5.      In reality, however, Defendants' access restrictions and denials imposed on

11  Plaintiffs and all persons similarly situated are not the result of an identity and viewpoint blind

12  review and application of the rules to actual video material.  Instead, Defendants have an

13  irreconcilable commercial conflict of interest: on the one hand, Defendants act as content creators

14  or sponsors of video content, competing directly with Plaintiffs and all persons similarly situated

15  for the same services, audiences, advertisers, and revenue streams on the YouTube platform; on the

16  other hand, Defendants act as absolute regulators and monetizers of all YouTube content and

17  services, and exercise unfettered authority to determine viewer and service access by enforcing

18  their Community Guidelines and Terms of Service (the "TOS") against their competitors, based on

19  the identity or viewpoint of Plaintiffs and all other persons similarly situated.

20      6.      Under the pretext of honest content and service regulation, Defendants rig the game,

21  by using their power to restrict and block Plaintiffs and other similarly situated competitors, based

22  on racial identity or viewpoint discrimination for profit.  Defendants also abuse their power by not

23  subjecting their own videos to the same Community Guidelines and TOS that they apply to all

24  other YouTube users.  As a result, Defendants are not subject to filtering or blocking restrictions,

25  even where Defendants' videos contain material that violates their own rules.

26      7.      Among the many abuses that Defendants have perpetrated against Plaintiffs and all

27  other persons similarly situated, are Defendants' practices of allowing racist hate speech to go

28  unregulated on Plaintiffs' channels, resulting in lost subscribers and viewership, and the

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

surreptitious "bugging" of Plaintiffs' videos by the insertion, attachment, appending, or embedding of metadata and other signals that allow Defendants' filtering tools to target Plaintiffs and all other persons similarly situated, based on race, identity and/or the viewpoint of the creator, her channel subscribers, and viewers.

8.      This intentional and systematic racial discrimination violates Defendants' legal obligations under the contract(s), and is unlawful under federal and state antidiscrimination laws, false advertising, unlawful business practices, and free speech laws.  It is unlawful whether it is done for profit, or out of ideological animus.

9.      Interfering with the contractual and legal rights of Plaintiffs and all persons similarly situated to access and use YouTube based in any way, part, or degree on their race, identity or viewpoint, violates YouTube's TOS and is unlawful under the strict prohibitions against racial discrimination in contract and business practices enshrined in federal and California law.  That is racism, overt intentional and systematic.

10.      Defendants knowingly, intentionally, and systematically employ artificial intelligence ("A.I."), algorithms, computer and machine based filtering and review tools to "target" Plaintiffs and all other persons similarly situated, by using information about their racial, identity and viewpoint to restrict access and drive them off YouTube.

11.      Under the pretext of finding that videos violate some vague, ambiguous, and non-specific video content rule, Defendants use computer driven racial, identity and viewpoint profiling and filtering tools to restrict, censor, and denigrate Plaintiffs and all persons similarly situated on YouTube, wholly or in part, because they are African American, black, members of a protected racial classification under the law, or identify as such, or with a related viewpoint.

12.      Since at least 2017, Defendants' filtering and review tools and procedures are embedded with computer code or other machine based "triggers" that profile the personal racial identity or viewpoint of the user.  Defendants admit that their filtering tools use information about the identity of the YouTube creators, subscribers and viewers to "target" members of protected racial classifications under the law and impose access restrictions on them that are not racially, identity or viewpoint neutral; nor are they based on, or supported by actual material in the videos;

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

1  and Defendants treat such videos as if they violate YouTube's content based Community

2  Guidelines and TOS, by denying full YouTube platform access and related services.

3       13.     On March 19, 2017, Defendants publicly admitted that they improperly censored

4  videos using their "Restricted Mode" filtering that were posted or produced by members of the

5  LGBTQ+ Community, based upon the identity and orientation of the speaker, rather than upon the

6  content of the video.  Defendants also promised to remove all restricted filtering on videos posted

7  or produced by LGBTQ+ members and groups, and changed their filtering algorithm, and manual

8  review policies and practices to address the risk that videos posted by LGBTQ+ vloggers were

9  being censored because of the identity or viewpoint of the speaker.

10      14.     On April 27, 2017, Johanna Wright, Vice President of Product Management for

11 Google/YouTube, took to the airwaves and news media to promise the global "YouTube

12 Community," that Defendants would ensure that "Restricted Mode" would not "filter out content

13 belonging to individuals or groups based on certain attributes like gender, gender identity, political

14 viewpoints, race, religion or sexual orientation."  While Ms. Wright conceded that "Restricted

15 Mode will never be perfect, [Google/YouTube] hope to build on [their] progress so far to continue

16 making [their] systems more accurate and the overall "Restricted Mode" experience better over

17 time."

18      15.     On September 14, 2017, Defendants invited independent YouTubers and content

19 creators to address concerns that the platform's video review algorithm and practices discriminated

20 against certain minority groups, including LGBTQ+, African American, and other users of color or

21 vulnerable minorities.  At the meeting, Defendants admitted that their content filtering and review

22 tools were "targeting" African American, LGBTQ+, and other "minority" users.  They further

23 admitted that this resulted in the application of erroneous or unwarranted blocking restrictions and

24 access denials for users that were based, at least in part, on the user's racial or sexual identity or

25 viewpoints, rather than a content violation of YouTube's rules or Terms of Service.

26      16.     Defendants also represented that they were working on a "fix," and that neither user

27 identity nor viewpoint has any role in the application of YouTube's content based access rules and

28

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

1  restrictions or should otherwise interfere with a user's right to access the myriad of services that

2  Defendants offer to users.[1]

3       17.     But things have only gotten worse with respect to Defendants' racial profiling and

4  "targeting" of African American and members of other protected racial classifications under the

5  law who use YouTube.

6       18.     In January 2018, Defendants got caught red handed.  During a recorded call between

7  a user and a supervisor, who Defendants now identify as the "Floor Manager" for their customer

8  service advertising services center in Bangalore, India, Defendants represented to the user that its

9  "holiday special" video was not eligible for advertising services because the filtering tools had

10 identified the user as being involved with the "gay thing."  Under what the manager expressly

11 stated was "company policy," the filtering algorithm determined that the video contained

12 "shocking" or "sexually explicit" content, not because of any actual material in the video, but

13 because the "company" considered video content created by a "gay" user or content that discussed

14 the "gay thing" as ineligible for advertising or promotion.  Defendants considered content created

15 or viewed by "gay" persons to be "shocking" or "sexually explicit."

16      19.     This pattern and practice or "policy" of denying users equal access to YouTube

17 based on their racial, sexual, or other individual identities or viewpoints occurred  to the same user

18 after the January 2018 call with Defendants, on at least five other occasions.  The pattern and

19 practice has become so pervasive that many prominent and quality content creators have lost more

20 than 90% of their viewers, advertisers, revenue, and other access rights in the last 24 months solely

21

22

---

23 [1] One of the persons who attended the meeting is Stephanie Frosch, a prominent and popular LGBTQ+ content creator on YouTube. Ms. Frosch is a named plaintiff in another class action lawsuit pending in this District, captioned *Divino Group, et al. v. Google LLC, et al.*, Case No.

24 5:19-cv-004749-VKD (N.D. Cal.).  In that case, Ms. Frosch testified under oath the she and the other attendees were required to execute multiple non-disclosure agreements (the "NDAs") before

25 and at the event. The NDAs prevented her, and any anyone else who attended the meeting, from disclosing any information about the meeting.  On March 23, 2020, after Plaintiffs threatened to

26 move to set aside the NDAs as void and unenforceable, Defendants agreed to release her from her obligations under the NDAs.  *See* Declaration of Stephanie Frosch Submitted in Support of

27 Plaintiffs' Application to File a Sur Reply to Address New Authority.  A true and correct copy of the Declaration of Stephanie Frosch (Dkt. #40) is attached as Exhibit A.

28

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

1  because they are identified as African American, LGBTQ+ or other protected racial classifications

2  under the law.

3      20.      The Plaintiffs in this Lawsuit also face the same sort of overt, intentional, and

4  systemic identity and viewpoint discrimination, with one important difference:  Defendants do not

5  discriminate against Plaintiffs only because of sex based identity or viewpoint profiling, but

6  primarily because they identify as African American, or with other protected racial classifications

7  under the law.

8      21.      This is unlawful race discrimination.  Unlike any other form of prohibited

9  discrimination, it has been outlawed in the United States since 1865, when Congress enacted

10  section 1981 and other civil rights laws intended to wipe out, prohibit, and make any and all racial

11  discrimination in contracts and business practices unlawful.

12      22.      Defendants know and admit that they discriminate, including admissions that since

13  at least 2017, they use content based filtering and access review tools, systems, and practices that

14  "target" African Americans and other members of protected racial classifications under the law.

15      23.      Nonetheless, Defendants have failed to "fix" the discriminatory defects in their

16  content and access review systems and stop the "targeting" as promised.  Defendants continue to

17  knowingly, intentionally, and systematically block, demonetize, and deny Plaintiffs and other

18  persons similarly situated, their contractual and other legal rights to access YouTube based on the

19  color of their skin or other protected racial traits, rather than the material in their videos.

20      24.      Defendants also abuse their dual roles as content reviewers and content creators on

21  YouTube. Specifically, under the pretext of unfettered "discretion" to serve as sole "censors" of

22  content on the YouTube platform, Defendants use racial profiling to restrict the reach and access of

23  Plaintiffs and other third party users who compete directly with Defendants and their sponsored

24  video content for click per minute ("CPM"), advertising, and other revenue stream and services on

25  YouTube.

26      25.      Instead of "fixing" the digital racism that pervades the filtering, restricting, and

27  blocking of user content and access on YouTube, Defendants have decided to double down and

28  continue their racist and identity based practices because they are profitable.  By utilizing their

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

1    unilateral control over 95% of the world's public video content, Defendants unlawfully

2    misappropriate viewers, CPM, advertising, and other revenues that belong to, or would otherwise

3    be available to, Plaintiffs and other third party users, but for the discriminatory restrictions that

4    unlawfully restrict and block Plaintiffs' content and access to YouTube services.

5           26.     This is race discrimination. It is knowing and intentional.  Defendants knowingly

6    used and continue to use discriminatory content filtering review tools and procedures that "target"

7    Plaintiffs and other persons similarly situated, for access restrictions because they are African

8    American, persons of color, or are identified by Defendants as having an ethnicity or other personal

9    immutable traits and/or viewpoints, not because the actual video content or material violates

10    YouTube's purportedly neutral content rules.

11           27.     Defendants' racist profiling and practices are also systematic.  By using A.I.,

12    algorithms and other computerized machine based filtering tools (in lieu of having humans perform

13    the "ubiquitous" task of reviewing and deciding whether the material or content in billions of hours

14    of videos uploaded daily to YouTube) to sanction Plaintiffs, Defendants engage in a knowing and

15    intentional practice that unlawfully discriminates against users based on race or other protected

16    racial classifications under the law, or viewpoints.

17           28.     Defendants' conduct is knowing, intentional, and systematic, regardless of whether

18    Defendants are motivated by ideological animus towards black and members of other protected

19    racial classifications under the law, or they merely use racial and identity profiling to restrict access

20    for profit, and/or to save costs, resources, labor, and time necessary to lawfully review actual video

21    content and determine, in a viewpoint neutral manner, whether a rule violation has occurred that

22    triggers a content based access restriction or sanction on YouTube.  In short, Defendants' use of

23    racism for profit is every bit unlawful as ideological racism, since, in either case, it discriminates

24    against Plaintiffs because they are African Americans or members of other protected racial

25    classifications under the law.

26           29.     Defendants do not disagree. Susan Wojcicki, YouTube's CEO, has taken to the

27    airwaves over the last three years to repeatedly and unequivocally deny that Defendants

28    discriminate against anyone when it comes to content or access restrictions to YouTube, while

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

1  insisting that all decisions, wrong or right, are the product of good faith, viewpoint neutral, and

2  identity blind content reviews and decisions.

3      30.    On or about June 14, 2020, Wojcicki publicly announced that in conjunction with

4  Alphabet, Defendant YouTube was starting a $100 million fund "dedicated to amplifying and

5  developing the voices of Black creators and artists and their stories." In a blog post Thursday,

6  Wojcicki said, "At YouTube, we believe Black lives matter and we all need to do more to

7  dismantle systemic racism." *See* https://www.marketwatch.com/story/youtube-is-starting-a-100-

8  million-fund-for-black-creators-artists-2020-06-11.

9      31.    Given Defendants' stated concerns regarding systemic racism, Defendants have

10  some serious explaining to do when it comes to the Plaintiffs and the other persons similarly

11  situated using YouTube.  Plaintiffs would prefer that Defendants spend their money to stop the

12  racist practices that pervade the YouTube platform, including:

13      a.    **Abusing Artificial Intelligence Programs, Algorithms and Other**

14  **Filtering Tools** to digitally profile, redline, and target Plaintiffs and all persons similarly situated

15  on the YouTube platform, for access restrictions, blocking, demonetization, suspensions and

16  removals from the platform based on the racial identity or viewpoint of the video creator, her

17  subscribers, and/or the viewers of her videos by inserting or appending to individual videos race,

18  identity or viewpoint based metadata, thereby forcing Plaintiffs to self-censor and refrain from

19  posting videos regarding issues and current events which are important to the African American

20  community, such as requiring Plaintiffs to avoid or hide references to abbreviations like "BLM,"

21  "KKK;" terms such as "Black," "White," "Racism," "Boogaloo," "White Supremacy," "Racial

22  Profiling," "Police Shootings," "Police Brutality," "Black Lives Matter;" names of individuals such

23  as those killed by law enforcement, "Bill Cosby," "Louis Farrakhan;" names of organizations such

24  as "Ku Klux Klan," "Nazi," "Neo-Nazi," "Aryan Brotherhood," and/or other euphemisms that are

25  known and particular to the African American community, despite the fact that the videos involved

26  do not contain any hate speech, profanity, or nudity, and at most, contain very short references or

27  quotations from recognized news sources, which are properly attributed.

28

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

b.   **Preventing Full Revenue Generation** for videos of Plaintiffs and all persons similarly situated who are not afforded full monetization, Channel Membership and Livestream donations for videos that are otherwise eligible under Defendants' rules, but have been demonetized or limited in monetization because of Defendants' addition of metadata and use of algorithms and filtering tools that profile creators, subscribers and viewers based on their race or viewpoint, rather than on the actual content of the video.

c.   **Misapplying "Restricted Mode"** to the videos of Plaintiffs and all persons similarly situated, which address or discuss issues of importance to their communities, merely because the videos have titles or tags which include "abbreviations like "BLM," "KKK;" terms such as "Black," "White," "Racism," "Boogaloo," "White Supremacy," "Racial Profiling," "Police Shootings," "Police Brutality," "Black Lives Matter;" names of individuals such as those killed by law enforcement, "Bill Cosby," "Louis Farrakhan;" names of organizations such as "Ku Klux Klan," "Nazi," "Neo-Nazi," "Aryan Brotherhood," and/or other euphemisms that are known and particular to the African American community, despite the fact that the videos do not contain materials which discuss drug use or the abuse or drinking of alcohol; overly detailed conversations about or depictions of sexual activity; graphic depictions of violence, violent acts; natural disasters or tragedies or violence in the news; specific details about events related to terrorism, war, crime and political conflicts that resulted in death or serious injury, even if no graphic imagery is shown; inappropriate language, including profanity, or content that is gratuitously incendiary, inflammatory, or demeaning toward an individual or group.

d.   **Shadow Banning Entire Channels And Individual Videos** of Plaintiffs and all persons similarly situated on the YouTube platform based on the race, identity or viewpoint of the video creator, her subscribers, and/or the viewers of her videos, so that the channel and/or individual videos do not appear in searches using the YouTube search application, and viewers cannot locate new videos which discuss issues and current events that are important to the communities of African Americans and members of other protected racial classifications under the law.

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

1    e.    **Deputizing Other YouTube Users To Flag Channels And Videos** on the

2  YouTube platform in order to restrict, block, and/or censor the videos of Plaintiffs and all persons

3  similarly situated, and then, in acting on false or unconfirmed complaints of purported rule

4  violations, Defendants remove, restrict, and/or demonetize, individual videos and/or suspend the

5  channels without first verifying that the flagged video contains material that violates a specific

6  Community Guideline or Term of Service.

7    f.    **Interfering With Livestream Broadcasts** of Plaintiffs and all persons

8  similarly situated by inserting new voice content and/or visual images into the video stream,

9  unrelated to the Livestream topic; throttling, interrupting or cutting off the Livestream broadcast

10  while in progress; deleting positive viewer comments; and promoting, sponsoring, allowing and/or

11  inserting offensive, misogynistic, racist, or obscene comments or engagement in direct violation of

12  YouTube's Community Guidelines based on the race of the creators, channel subscribers and/or

13  viewers, or their viewpoints.

14    g.    **Excluding From "Trending" And "Up Next" YouTube Video**

15  **Recommendations** the videos of Plaintiffs and all persons similarly situated which, even though

16  they comply with Defendants' Community Guidelines and TOS, are excluded from Defendants'

17  promotional applications based on the race, identities, and viewpoints of the creators, channel

18  subscribers and/or viewers.  Defendants' practices muffle the voices of Plaintiffs and all persons

19  similarly situated on the YouTube platform and reduce the racial diversity of the opinions and

20  information posted on the platform.

21    h.    **Freezing Analytic Numbers Of Subscribers And Viewers** for the channels

22  of Plaintiffs and all persons similarly situated.  In suspending the accurate analytic information for

23  the channels of Plaintiffs and all persons similarly situated, Defendants prevent them from

24  qualifying for YouTube Partnership benefits such as monetization, mobile Livestreaming, Channel

25  Membership, and SuperChat; as well as deprive them of the opportunity to grow their channels and

26  generate revenue.

27    i.    **Promoting And Profiting From Hate Speech** by allowing racist and

28  misogynist hate speech videos that target Plaintiffs and all persons similarly situated on the

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

1  YouTube platform in direct violation of Defendants' Community Guidelines and TOS, and

2  affording such videos monetization, despite the fact that such videos have been flagged by

3  Plaintiffs and/or their subscribers as violating Defendants' standards, and despite having received

4  repeated complaints regarding those videos.

5        j.    **Interfering With, Obstructing, Delaying And Ignoring Appeals** to

6  prevent Plaintiffs and all persons similarly situated from obtaining a timely manual review of video

7  content and reversal of Defendants' erroneous decisions to suspend their channels and to remove,

8  restrict monetization, or restrict access to videos deprives them of their rights to communicate with

9  their intended audience and/or to earn revenue, unless and until, Defendants lift the suspension,

10  removal, and/or restriction, if ever.

11        32.    Regardless of what Defendants' internal motivations are, Defendants are not above

12  the law nor are they too big to "self-regulate" by complying with the law, including the long

13  established prohibition on race discrimination in contract.

14        33.    Until such time as Defendants make good on their promises, representations, and

15  obligations to "fix" this racism and compensate Plaintiffs and other similarly situated victims of

16  Defendants' unlawful and repugnant discriminatory conduct, Defendants will continue to engage in

17  intentional race discrimination that violates their agreements with Plaintiffs, as well as established

18  federal and state laws that govern the relationship between the parties.

19        34.    Plaintiffs can no longer wait for Defendants to implement the "fix" they promised

20  years ago.  Nor should they have to.  Whether Defendants' "motive" for refusing to do so is based

21  on profit, ideology, or "no reason at all," the knowing use of a person's, race, skin color or some

22  other immutable personal trait or viewpoint to filter and review access to YouTube, is digital racial

23  profiling, redlining, and discrimination.  It is illegal.

24        35.    It is time for Ms. Wojcicki, and the other senior officers of Google YouTube, to put

25  up or shut up.  If Defendants truly believe that they are engaged in good faith, viewpoint neutral

26  content regulation on YouTube, then Defendants should produce the computer code and permit an

27  expert review of that code to examine the "triggers" for review and restriction of content.

28  Defendants can then, under oath in deposition and other sworn testimony, and through other

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

1    discovery, explain to Plaintiffs, the Court, and the public why their prior admissions and other

2    evidence of "targeting" African Americans and members of other protected racial classifications

3    under the law, are not true.

4        36.    Until that time, Defendants' unsupported denials, or recent portrayal of the

5    discriminatory conduct as "mistakes" or the result of a "he said, she said" misunderstanding

6    between its employees and officers, is not a lawful reason to deny Plaintiffs their day in court.

7        37.    Despite a whole lot of "telling," Defendants have made no attempt to "show" that

8    their actions do not discriminate based on the race, identity or viewpoint of Plaintiffs or the

9    hundreds of millions of other users who fall victim to discrimination by Defendants.

10       38.    Defendants' refusal to do so is mystifying, if not damning.  The computer code and

11   information about how Defendants' A.I., algorithms, and other machine based filtering operate,

12   developed and have changed since Defendants purchased YouTube in 2007.  Such evidence will

13   resolve the extent to which Defendants use filtering tools to profile and discriminate against

14   YouTube users based on their race, identity or viewpoints.

15       39.    For whatever reason, Defendants do not deny they are engaged in intentional and

16   systematic racial discrimination on YouTube, but only that they can be held to account under the

17   law.  Despite informal and formal legal requests for the computer code and information about how

18   content filtering works on YouTube, Defendants claim that section 230(c) of the Communication

19   Decency Act (47 U.S.C., § 230(c)) ("Section 230(c)") is both a sword and a shield to hide the

20   computer code and other evidence that will show, once and for all, whether Ms. Wojcicki's denials

21   of unlawful conduct are in fact true, or are just another in a line of false, misleading, and deceptive

22   statements to the YouTube Community.

23       40.    Defendants' use of Section 230(c) to immunize them from having to account for

24   intentional discrimination against African Americans and other members of protected racial

25   classifications under the law, based on  the users' race, sex, or other identity or viewpoint, is itself

26   unlawful.

27       41.    Under the First Amendment, the United States Supreme Court in *Denver Area*

28   *Educational Telecommuns. Consortium, Inc. v. Federal Communications Comm'n*, 518 U.S. 727,

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

766-67 (1996), confirmed the obvious: a congressional law that permits a private party to regulate speech is unlawful and unconstitutional unless the law (i) is applied in a viewpoint neutral manner, (ii) is narrowly tailored so as not to create a risk of an erroneous private veto over speech, **and** (iii) does not interfere with or otherwise alter or obstruct the parties' existing legal relationship, obligations, and rights or the enforcement of those rights and obligations in a court of law.

42.     Defendants' assertion that Section 230(c) permits them to use a person's race, identity or viewpoint to block access to YouTube is unconstitutional because, at least as applied to this Lawsuit, the law is neither (i) viewpoint neutral, (ii) narrowly tailored to prevent against an erroneous veto of speech by Defendants under its rules, and/or (iii) interferes with and eviscerates Defendants' preexisting legal obligations to Plaintiffs under state and federal law, including antidiscrimination, false advertising, consumer protection, and the express and implied promises set forth in Defendants' operative contract(s) with Plaintiffs.

43.     Plaintiffs file this lawsuit, therefore, to hold Defendants to account for their intentional and systemic racist conduct and practices, by asserting claims for legal and equitable relief:

(i.) Breach of contract, implied breach of contract covenant, and promissory estoppel;

(ii.)  Racial discrimination in contract in violation of federal law under 42 U.S.C. § 1981;

(iii.) Racial discrimination in violation of the Unruh Civil Rights Act, Cal. Civ. Code § 51, *et seq.*;

(iv.) Unlawful, deceptive, and unfair discriminatory business practices in violation of the Unfair Competition Laws under California Business and Professions Code § 17200, *et seq.*;

(v.) False advertising and commercial disparagement in violation of the Lanham Act, 15 U.S.C. § 1125, *et seq.*;

(vi) Discrimination in violation of the Liberty of Speech Clause under Article I, Section 2 of the California Constitution; and

(vii) Discrimination in violation of First Amendment of the U.S. Constitution arising from Defendants' use of Section 230(c) to immunize them from liability for discrimination.

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

44.     In addition, Plaintiffs also seek a declaratory judgment that: either (i) the plain language Section 230(c) does not apply to racial profiling and discriminatory access restrictions that are based on a person's race, identity, or viewpoints, rather than the "on line material" that actually appears on YouTube; or (ii) if Section 230(c) is construed to permit on line racial, identity or viewpoint based discrimination restrictions against YouTube users, Section 230(c) is unconstitutional because it violates the First Amendment's limits on permissive private party speech regulation.

II.     PARTIES

45.     Plaintiff Kimberly Carleste Newman, also known as Kimberly Santana ("Plaintiff Newman"), is an African American woman residing in the State of California who is the creator and owner of "The True Royal Family," and "True Royal," two YouTube channels dedicated to developing and posting videos that discuss and present information regarding issues and current events which are important to the African American community.  Plaintiff Newman created "The True Royal Family" channel in 2015, followed by "True Royal," in 2016.  Since its creation, Plaintiff Newman's "The True Royal Family" channel has posted more than 1654 separate videos, only 954 of which are still posted because Defendants removed 700 or more individual videos and have refused to restore them; the "True Royal" channel has posted 209 videos.  "The True Royal Family" channel has garnered a total of 4.4 million views since creation, and the "True Royal" channel has garnered 583,000 views since creation.  Plaintiff Newman is a YouTube "partner," and has generated total revenue of $2,672.68 for videos posted on "The True Royal Family," and $123.96 for videos posted on "True Royal."

46.     Plaintiff Lisa Cabrera ("Plaintiff Cabrera") is an African American woman residing in the State of New Jersey who is the creator and owner of "Lisa Cabrera" and "Lisa C," two YouTube channels dedicated to developing and posting videos that discuss and present information regarding issues and current events which are important to the African American community. Plaintiff Cabrera created the "Lisa Cabrera" channel in 2015.  Since creation, Plaintiff Cabrera's "Lisa Cabrera" channel has posted 4,423 videos (68 of which Defendants archived for unknown

1  reasons and can no longer be viewed by anyone), which have garnered 20 million views.  Plaintiff

2  Cabrera is a YouTube partner who has generated a total of $25,500 for videos posted on the "Lisa

3  Cabrera" channel.

4         47.     Plaintiff Catherine Jones ("Plaintiff Jones") is an African American woman residing

5  in the State of Vermont who is the creator and owner of "Cooking with Carmen Caboom," a

6  YouTube cooking channel for African Americans, and "Carmen Caboom," and "Carmen Caboom

7  Reloaded," two YouTube channels dedicated to developing and posting both parodies and serious

8  videos that discuss and present information about issues and current events which are important to

9  the African American community.  Plaintiff Jones created the "Carmen Caboom" channel in 2010,

10  a backup "Carmen Caboom" channel in 2014, the "Cooking with Carmen Caboom" channel in

11  2015 and the "Carmen Caboom Reloaded," channel in 2018.  Defendants improperly removed the

12  original "Carmen Caboom" channel for purported nudity when no video posted to the channel

13  included any nudity.  Plaintiff Jones is a YouTube partner.  Since creation, Plaintiff Jones' 2014

14  "Carmen Caboom" channel has posted numerous videos, several of which Defendants improperly

15  removed as hate speech, the remaining videos have garnered approximately 500 -1,200 views per

16  video overall which have generated approximately $500 per year.

17         48.     Plaintiff Denotra Nicole Lewis ("Plaintiff Lewis") is an African American woman

18  residing in the State of Texas who is the creator and owner of "Nicole's View," a YouTube channel

19  dedicated to developing and posting videos that discuss and present information regarding issues

20  and current events which are important to the African American community.  Plaintiff Lewis

21  created the "Nicole's View" channel in 2006.  She became a YouTube partner sometime between

22  2016 and 2017.  Plaintiff Lewis has uploaded 748 videos to the "Nicole's View" channel, 17 of

23  which Defendants wrongly removed or archived for unknown reasons, the remainder of which have

24  generated 10.6 million views and has generated approximately $6,000-7,000 in revenue per year,

25  approximately $25,000 over the life of the channel.

26         49.     Defendant YouTube, LLC is a for-profit limited liability corporation, wholly owned

27  by Google LLC, and organized under the laws of the State of Delaware.  YouTube's principal place

28  of business is Mountain View, California and it regularly conducts business throughout California,

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

including Santa Clara County, California.  Defendant YouTube, LLC operates the largest and most popular internet video viewer site, platform, and service in California, the United States, and the world, and holds itself out as one of the most important and largest public forums for the expression of ideas and exchange of speech available to the public.  Plaintiffs are informed and believe that at all relevant times Defendant YouTube, LLC acts as an agent of Defendant Google LLC and uses, relies on, and participates with Defendant Google LLC in restricting speech on the YouTube site, platform, or service.

50.     Defendant Google LLC is a for-profit, limited liability company organized under the laws of the State of Delaware, with its principal place of business in Mountain View, California; it regularly conducts business throughout California, including Santa Clara County.  Plaintiffs are informed and believe, and thereon allege that, at all relevant times, Defendant Google LLC has acted as an agent of Defendant YouTube, LLC, and controls or participates in censoring and restricting speech on the YouTube service or platform.

51.     Defendant Alphabet Inc. is a for-profit American multinational corporation conglomerate incorporated under the laws of the State of Delaware, with its principal place of business in Mountain View, California.  According to Defendants, Alphabet Inc. was created as art of a corporate restructuring of Defendants Google, YouTube, and other subsidiary or affiliate entities on October 2, 2015. At that time, Alphabet Inc. became the parent company of Google and other former Google subsidiary or affiliated entities, including Defendant YouTube.  Defendants also claim that the creation and establishment of Alphabet Inc. was prompted by the desire to make Defendants' core businesses "cleaner and more accountable" while allowing greater autonomy to group companies that operate in businesses other than internet services.

52.     The true names and capacities, whether individual, corporate, associate, or otherwise, of Defendants Does 1 through 100, inclusive, are presently unknown to Plaintiffs, and for that reason these Defendants are sued by such fictitious names.  Plaintiffs are informed and believe and thereon allege that each of the Doe Defendants is in some way legally responsible for the violations of law, injuries, and harm caused, as alleged herein.  If, and when appropriate,

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

1   Plaintiffs will seek leave of the Court to amend this Complaint when the true names and capacities

2   of said defendants are known.

3   **III.     JURISDICTION AND VENUE**

4          53.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§

5   1331, 1337(a), and 2201.  The Complaint includes Federal questions, and the amount in

6   controversy arising from the claims asserted on behalf of Plaintiffs and all other persons similarly

7   situated exceeds $5 million, exclusive of interest and costs.  Plaintiffs and all other persons

8   similarly situated also challenge the construction and constitutionality of 47 U.S.C. § 230(c)(1) and

9   (2), and seek a declaratory judgment that this statute does not immunize Defendants for overt

10  intentional and systematic racial discrimination on the YouTube platform.

11         54.     Venue is proper in the Northern District of California (San Jose Division) under 28

12  U.S.C. § 1391.  Defendants reside and/or transact business in the County of Santa Clara, and are

13  within the jurisdiction of this Court for purposes of service of process.  Defendants' TOS require

14  that  Plaintiffs and all other persons similarly situated file this Lawsuit in a court of competent

15  jurisdiction located within Santa Clara County.

16  **IV.     FACTS COMMON TO ALL CLAIMS**

17         55.     On June 2, 2020, this Court held a hearing on Defendants' Motion to Dismiss in

18  *Divino*.  At the hearing, the Court asked Defendants if they were claiming immunity from liability

19  for denying access to YouTube based on the user's race.  In response, Defendants' counsel

20  conceded that a case involving intentional race discrimination by an ISP may not be covered by

21  Section 230(c):

22         I THINK THERE COULD BE SOME STARK CASES WHERE A COURT MIGHT FIND

23         UNDER A PARTICULAR SET OF CIRCUMSTANCES THAT SOME ALLEGED

24         DISCRIMINATION DIDN'T TAKE THE FORM OF A PUBLISHER OF ACTUALLY

25         TARGETING PUBLISHER CONDUCT, AND, THEREFORE, DIDN'T COME WITHIN

26         (C)(1).

27         *   *   *   *

28

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

1       I CAN IMAGINE SOME COURTS TAKING THE POSITION THAT A PROPERLY

2       PLEADED CLAIM OF THE SORT THAT YOU DESCRIBE AS SORT OF FACIAL

3       RACE DISCRIMINATION CLAIM MAY NOT BE GOOD FAITH UNDER (C)(2), I

4       CAN IMAGINE A COURT TAKING THAT POSITION.

5 Attached as Exhibit E is a true and correct copy of the June 2, 2020-Transcript of Oral Argument

6 before the Hon. Virginia DeMarchi; Exhibit E at  10:45 15-22.

7      56.      This Lawsuit is that "stark case."  Defendants are engaged in intentional race

8 discrimination against Plaintiffs and other persons similarly situated, that violates Defendants'

9 contractual promises not to discriminate, and also violates long established laws that prohibit

10 racism for profit.

11      57.     The central allegation in this Lawsuit is that Defendants engage in identity and

12 viewpoint-based filtering and service access restrictions that utilize and base access restrictions on

13 Plaintiffs' race, identity, and/or viewpoints.

14      58.     Defendants profile, use, and consider Plaintiffs' race, personal identity, or

15 viewpoint, in order to interfere with, restrict, or block video viewing, promotion, advertising,

16 engagement, and/or monetization services because Plaintiffs are African American.  This is

17 unlawful and cannot be immunized by Congress.

18      59.     Defendants' profiling, review, use, and consideration of  Plaintiffs' race, ethnicity,

19 religion, political affiliations or personal identity or viewpoints is prohibited not only under

20 Defendants' TOS and other related agreements with Plaintiffs, but it also violates laws dating back

21 to the Civil War which prohibit racial discrimination in contract and business relationships.

22      **A.**      **The Governing Agreements**

23      60.     Each time that Plaintiffs (or any other member of the public) access the YouTube

24 user interface, Plaintiffs and Defendants execute binding contract(s) that govern the parties

25 respective rights and obligations on YouTube, including the TOS.

26      61.     The provisions in the TOS and other agreements are part of a uniform consumer

27 contract that every one of YouTube's 2.3 billion users must execute and agree to upon accessing

28 the website.

1          62.     The TOS and other agreement(s) are governed by California law.

2          63.     Under the agreement(s), Defendants designate YouTube as a "passive website," that

3    is open to the public, provided that any person who "uses or visits" the YouTube website or "any

4    YouTube products software, data feeds, and services provided" consents and legally agrees to

5    YouTube's "TOS," "Google's Privacy Policy," and "Community Guidelines," as "incorporated by

6    reference" and are further clarified or modified by Defendants "without notice" (collectively the

7    "Agreement").

8          64.     The contract(s) allow Defendants not only collect, store, analyze, and organize the

9    personal, financial, political, and other data for each of the YouTube Platform users, but

10   Defendants also use and sell that data to third parties on the open market.

11         65.     In 2018, Defendants' authorized representatives testified under oath to Congress and

12   confirmed that YouTube is "a neutral public forum" in which Defendants "enforce [their] policies

13   in a politically neutral way."

14         66.     Among other statements, Defendants affirmatively represent to the public and

15   YouTube users that all access rules and restrictions apply equally to all without consideration of the

16   race, personal identity, or viewpoint of the user and that YouTube is a "forum" where the public

17   can engage in "freedom of expression," to communicate and interact with other users subject to

18   viewpoint neutral content based filtering and regulations that apply equally to all.

19         67.     As of the filing date of this lawsuit, YouTube's CEO and other senior officers of

20   Defendants continue to represent and insist to the public that YouTube's regulation and restriction

21   of access to its services is undertaken solely by "viewpoint neutral" application of specific content

22   based rules limited to actual video content and does not use, consider, or take into account the

23   user's race, sexual identity, political or religious association, or any other personal identity trait or

24   viewpoint of the user.

25         68.     Based on Plaintiffs' experience, and the experience of other YouTube users who are

26   members of other protected racial classifications under the law, that is a lie.  And Defendants have

27   admitted as much on multiple occasions dating back to at least 2017.

28

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

1          **1.      The General Terms Of Use And Contract-Based Promises**

2          69.     As with many large public consumer businesses, Defendants contract with users

3   through the use of an online, consumer form service contract(s).

4          70.     Like many other consumer service contracts, the TOS and other related

5   agreement(s) that govern the consumer's respective obligations and rights is not a beacon of clarity.

6   Specifically, Defendants utilize a myriad of confusing, ambiguous, vague, overbroad, overlapping,

7   interconnected, and inconsistent provisions to govern the parties' respective rights and obligations,

8   including integrating or incorporating service and access provisions that are not specific to the

9   YouTube platform, but apply to any service or product that Defendant Google provides or markets

10  to the public.

11         71.     In or about December 2019, Defendant Google merged its general terms of service

12  for its products and services with that of YouTube's TOS for all purposes.  Consequently, access

13  actions, restrictions, or blocking that occur on YouTube may also be used by Defendants to review,

14  restrict, block, or deny any service that either entity provides, including Android devices and use,

15  personal email, publisher advertising, confidential health record data storage and access, all

16  applications sold in Google's Android App store, election monitoring services, public health and

17  law enforcement services search, and any and all other communication or information services that

18  Google, YouTube, or their affiliates provide to consumers or the public.

19         72.     The result is a complex and indecipherable web of service provisions that are not

20  readily available to users and require each user to locate and navigate as part of a convoluted,

21  confusing and complicated disclosure process, which may not be functionally accessible to the

22  user.

23         73.     The user is also required to figure out what agreements and provisions govern what

24  conduct and restrictions, and which agreements are in place at the time to govern the specific

25  conduct.

26         74.     This is virtually impossible, because as is the case here, Defendants routinely

27  change or amend the provisions of these agreements and do so unilaterally, without adequate notice

28  to users.

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

75.     Because each Plaintiff executed a new TOS agreement every time they access YouTube on their internet browsers, only Defendants know what versions of the agreements and policies apply to the conduct at issue during the period of time governing the claims in this Lawsuit.

76.     The TOS and other agreement(s) exist as electronic, on line documents.  The agreements are executed electronically from drop down menus.  Consequently, users often do not have access to or understand the TOS or agreement(s), let alone which version of the TOS and other agreement(s) may govern a particular action or conduct that occurs on a particular date.

77.     One fundamental provision of the TOS and agreement(s), however, has not changed. In every TOS or agreement during the relative period of this Lawsuit, Defendants promise users equal and full access to all YouTube services, subject only to viewpoint neutral content-based rules that apply equally to all.

78.     On January 17, 2018, Defendants testified to Congress under oath that access to all services offered by Defendants in connection with YouTube are available to Plaintiffs, and all users, subject only to viewpoint neutral content-based rules that apply equally to all users:

**Senator Cruz**: Thank you Mr. Chairman.  Welcome to each of the witnesses.  I'd like to start by asking each of the company representatives a simple question, which is: do you consider your companies to be neutral public fora?

* * * *

**Senator Cruz**: I'm just looking for a yes or no whether you consider yourself to be a neutral public forum.

**Senator Cruz**: Ms. Downs?

**Ms. Downs**: Yes, our goal is to design products for everyone, subject to our policies and the limitations they impose on the types of content that people may share on our products.

**Senator Cruz**: So, you're saying you do consider YouTube to be a neutral public forum?

**Ms. Downs**: *Correct.* We enforce our policies in a politically neutral way.  Certain things are prohibited by our Community Guidelines, which are spelled out and provided publicly to all of our users.

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

1        * * * *

2        **Ms. Downs**: *As I mentioned, we enforce our policies in a politically neutral way.*  In terms

3        of the specifics of Prager University, it's a subject of ongoing litigation so I'm not free to

4        comment on the specifics of that case.

5   See https://www.c-span.org/video/?439849-1/facebook-twitter-youtube-officials-testify-combating-

6   extremism and https://www.c-span.org/video/?448566-1/house-judiciary-committee-examines-

7   social-media-filtering-practices at 02:34:28 – 02:35:29 of the full hearing recording (emphasis

8   added).

9        79.    Before and after that date, up to the time of the filing of this lawsuit, YouTube's

10  CEO Susan Wojcicki and other senior officers of Defendants have repeatedly reaffirmed and

11  maintained that all of access decisions are based on viewpoint neutral application of the content

12  based rules governing the service that apply equally to all.

13       80.    Thus, whatever ambiguity exists in their agreements with Plaintiffs, Defendants

14  admit that all of the agreements and the application of the provisions in those agreements are

15  governed by a core and fundamental promise: access to the YouTube platform and all services is

16  open and available to any member of the public who uses YouTube, subject only to viewpoint

17  neutral content based rules that apply equally to all.

18       81.    That promise governs all of a user's content based rights and obligations associated

19  with YouTube and all services.  It applies not only to Plaintiffs and to all public users, but also to

20  Defendants, who sponsor video content that competes directly with Plaintiffs and other public users

21  for CPMs, viewer reach and expansion, promotion and advertising, and monetization of revenue

22  generated by each video that is posted on the YouTube platform and/or is available through viewer

23  subscription services.

24       82.    Defendants' core, fundamental promise of ensuring equal access to YouTube, under

25  neutral content-based rules is illusory, false, and unenforceable.

26       83.    Defendants exercise "unfettered discretion" when applying YouTube's content-

27  based service rules and provisions and determining what access to give each user.  Defendants

28

admit that at least since 2016, the exercise of this "unfettered discretion" by Defendants is not viewport or identity neutral.

84.     Since at least 2017, Defendants have grudgingly admitted that they "target" and deny access or services to Plaintiffs based, not on the video content posted by a Plaintiff, but "for any reason, or no reason," including the race, personal identity, or personal viewpoint, of YouTube content creators, viewers, and users.

85.     The practice of using its "discretion" to deny access to any Plaintiffs, or any user, based on race, identity, or viewpoint, rather than video content, violates and breaches the express and implied promises set forth in YouTube's TOS and other service or access agreements, because those agreements are governed in their entirety by California law, and expressly limit the exercise of Defendants' "discretion" to that "permitted" by law.

86.     Thus, Defendants' admissions that they are engaged in identity and viewpoint based access denials and targeting, breach the express and implied promises that discretionary access decision must be viewpoint neutral in application and comply with all federal and state laws prohibiting discrimination in contract, including 42 U.S.C. § 1981, the Unruh Act, and §§17200, *et seq.* of the California Business & Professions Code.

### 2.     The License Provisions

87.     The current (and/or prior versions) of YouTube's TOS at issue in this discrimination case require Plaintiffs to "grant" Defendants a renewable, "irrevocable" and "perpetual" license to any and all video content or communication that occurs on YouTube.  This includes, but is not limited to, the property rights for all personal data and other revenue streams that Plaintiffs hold an interest in or otherwise derive from the posting, viewing, advertising, or monetization of their videos on YouTube.

88.     Under the TOS, Plaintiffs "grant" Defendants a "worldwide, non-exclusive, royalty-free, sublicensable and transferable license to use that Content . . . in connection with the Service and YouTube's . . . . business . . . ."

89.     The TOS also grant other YouTube "users" a "non-exclusive, royalty-free license to access" content, "reproduce, distribute, prepare derivative works, display, and perform it . . . as enabled by a feature of the Service."

90.     This license includes the right of Defendants and other users to post and monetize Plaintiffs' "[c]ontent or other material" that makes Plaintiffs (i) "solely responsible for" the content and its "consequences," including (ii) all intellectual property rights and restrictions on the video content, and (iii) not posting content or seeking access to services in a manner that is "contrary to the YouTube Community Guidelines."

91.     In applying these provisions, Defendants reserve "the right to decide whether Content violates these Terms," including, "but not limited to, pornography, obscenity, or excessive length," and, "in so doing, remove such Content and/or terminate a user's account" if, "in its sole discretion . . . submitting such material is determined to be "in violation of these Terms."

92.     Defendants' acquisition of the licensing rights to 95% of the world's public video content along with the personal and financial information data that belongs to the 2.3 billion users who post or view the content is not free or a gift to the largest and most powerful tech enterprise in the history of the world.  Rather, the license rights are obtained through for tangible and valuable consideration: the right of the licensor or user to equal access to the YouTube platform and all of its services, subject to and limited only by the viewpoint neutral application of YouTube's content-based rules.

93.     Thus, under the TOS, Defendants' license agreement binds and requires them to apply and impose access restrictions for viewpoint neutral content based violations of a third party's intellectual property rights, Defendants' Community Guidelines, and other content based terms of YouTube's service, and to do so in a manner "permitted" by the law.

94.     Defendants' past, present, and continuing violations of the TOS is a fundamental and material breach of the trillion dollar licensing provisions by which Defendants obtained perpetual" and "irrevocable" right to use, display, and monetize 95% of the public's video content that exists or has ever existed in the world, as well as the personal and proprietary data of the 2.3 billion people who use or access the site.

**B.    Defendants Are Engaged In Anti-Competitive, Unlawful, Deceptive And Unfair Business Practices**

95.    Defendants shuffle between three conflicting and irreconcilable roles in connection with YouTube:

a.    When Defendants put on their "ISP" hat, Defendants host, review, curate, and monetize the video content of third party users who license their content, and the personal data property rights of these users, in return for providing equal access to YouTube content and services, subject only to viewpoint neutral rules that apply equally to all.

b.    When Defendants put on their "creator" hat, Defendants create videos and partner with hand-picked creators to sponsor their content, and both operate and act as the largest and most powerful of YouTube users to compete directly and aggressively with Plaintiffs and other third party users for views, reach, engagements, CPM revenue, advertisers, and a host of other user based revenue streams on YouTube.

c.    When Defendants put on their "advertiser" hat, Defendants review, categorize, and classify the video content of third party users for purposes of selling advertisements on the YouTube platform in connection with individual videos and/or YouTube channels, based on demographic information in the form of Defendants' metadata that they generate for individual videos which is gleaned from video titles and tags (posted by Plaintiffs when the individual videos are posted to the platform), Plaintiffs' channel profiles (which were input when the channels were first created), the profiles of Plaintiffs' subscribers (which individual subscribers input when they first registered with Defendants) and the subscribers' video viewing histories (which Defendants gather, analyze and summarize in the form of metadata), as well as the profiles of other users who view Plaintiffs' videos (which were input when they first registered with Defendants) and the viewers' video viewing histories (which Defendants also gather, analyze and summarize in the form of metadata).  Using the enormous wealth of information Defendants have about the Plaintiffs, their subscribers and the viewers of their videos, Defendants can identify, price and sell advertising space on the YouTube platform in connection with individual videos posted, based on the demographics of the channel subscribers and video viewers.  In this way, Defendants can

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

1   identify, market and sell advertising based on the race, identity and viewpoints of the YouTube

2   users and generate revenue for Defendants, their affiliated creators, and affluent white YouTube

3   creators, without ever reviewing any of the millions of individual videos posted on the YouTube

4   platform.  In short, Defendants divvy up the video content on the platform by race, identity and

5   viewpoint in order to sell advertisements to third parties without regard to the actual content of

6   videos; moreover, Defendants fully monetize those creators whose subscribers and viewers fit the

7   "right demographic," paying them collectively millions of dollars each month regardless of whether

8   their individual videos comply with Defendants' own Community Guidelines and TOS.

9       96.     Defendants' multiple roles create platform wide conflicts of interest, in which

10  Defendants utilize their unfettered authority to curate third party content on YouTube as a pretext

11  to impose access and content restrictions on Plaintiffs and all other persons similarly situated, that

12  are not imposed on content posted or sponsored directly or derivatively by Defendants or other

13  parties with whom they contract with for sponsorship.

14      97.     In the last four years, Defendants have invested in and expanded their business to

15  become the largest a production and media company in the world.  *See*

16  https://www.feedough.com/youtube-business-model-how-does-youtube-make-money/.

17      98.     Among other things, Defendants announced that "[t]he company has partnered with

18  its top content creators who wanted to charge a subscription rental or purchase fees for their content

19  and made their uploaded content as paid content which requires users to pay for a subscription or

20  purchase fees to access the content of the channel." Furthermore, Defendants decided to partner

21  with "affiliates" whose "related product" advertisements are placed with some videos on YouTube.

22  These products link to the affiliate partners, which pay a commission to Defendants if their

23  products are purchased.

24      99.     Defendants understand that the YouTube Platform has effectively surpassed its user

25  saturation point, and that monetizing and profiting from YouTube by merely hosting content on the

26  platform is no longer financially feasible to satisfy Defendants' insatiable lust for revenue and

27  profits.

28

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

100.     Thus, in addition to hosting their own video channels on YouTube, Defendants have entered into lucrative preferred provider production deals with other global media companies, including PBS, MSNBC, HBO, Fox News, Breitbart, and other media and entertainment conglomerates.

101.     Defendants have also entered the digital TV market with the advent of YouTube TV.  Defendants use their control over third party user content, on and access to the YouTube platform to induce consumers to purchase their TV and entertainment services by using the YouTube hosting platform, user interface to that platform, and content curation powers to induce consumers to use YouTube for all digital based TV or video content, including movies, music, sports, and entertainment.

102.     Defendants compete for that public audience or viewership unfairly and unlawfully, in a manner which gives their "preferred content" a competitive advantage, by among other things, using their filtering tools and criteria to restrict the access and reach of the smaller third-party users it hosts on YouTube. Thus, under the pretext of making the site safe for their users, Defendants arbitrarily, capriciously, and deceptively restrict access and audience reach to the videos of their competitors on the platform, like Plaintiffs, while at the same time allowing their own content to avoid those same restrictions and restraints -- even when that content violates their own guidelines. In so doing, Defendants effectively clear space on the platform for content which they, or their preferred users supply, to better reach the sites' 2.3 billion users, by censoring the content of their competitors.

**C.     Defendants' Tool Kit For Unlawful Conduct**

103.     Defendants utilize a series of discriminatory, anticompetitive and unlawful suppression practices and conduct to grow their profits, financial, interests, and unprecedented consolidation and control over information, speech, advertising, expression, and internet viewership.

### 1.     Artificial Intelligence Algorithm Restrictions

104.     The central mechanism used by Defendants to achieve these objectives are A.I. based algorithms ("A.I."), and computer driven filtering tools that profile, regulate, restrict, flag,

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

1  and block creator content and access on YouTube.  Defendants surreptitiously collect information

2  regarding Plaintiffs and all other persons similarly situated, their subscribers, and the viewers of

3  their videos, and generate metadata that is embedded, appended or associated with individual

4  videos to facilitate Defendants' unlawful discriminatory and anticompetitive filtering and review

5  tools to restrict or block the video content and access to the YouTube platform by Plaintiffs and all

6  other persons similarly situated, both as YouTube creators and as viewers.

7  105.   Defendants *claim* that these algorithms are viewpoint and identity neutral, and that

8  they ensure that the "same standards apply equally to all" when it comes to the content regulation

9  of speech on YouTube. Defendants claim that their employees conduct "manual reviews" to

10  supplement the electronic filtering and regulation of video content.

11  106.   But the evidence, including statements by Defendants' employees familiar with both

12  electronic and manual filtering and regulation of speech that takes place on the YouTube Platform,

13  suggests that Defendants' representations of neutral viewpoint and identity-based content

14  regulation are *also* false. The A.I. and algorithmic filtering tools are embedded with code that

15  regulates content based on purely subjective, viewpoint, topic, and identity animus, and other

16  unlawful criteria. Even before October 2016, Defendants' engineers began making changes to the

17  code and operations of the algorithms and filtering tools in order to ensure that Defendants could

18  filter videos and regulate access to video content based upon overt discrimination based on race,

19  sexual or gender orientation, ethnic, political or religious animus, as well as for financial and/or

20  anticompetitive purposes.

21  107.   Similarly, Defendants' viewpoint bias, animus, and discrimination towards the

22  user's identity or viewpoint is institutionally and culturally rampant in Defendants' work place and

23  employment practices. Among other things, Defendants operate and administer "Restricted Mode"

24  through employees, including engineers and content reviewers, and independent contractors.  These

25  people work in what has been widely reported and acknowledged as a dysfunctional work

26  environment and often work outside of the United States in countries and cultural settings where

27  discrimination against Plaintiffs and all other persons similarly situated is not only condoned but is

28  deeply embedded in social mores.

108.    Internal emails by and between Defendants' employees show that many employees are routinely subjected to harassment, threats, blacklisting, discipline, and hazing based on their race, or political or religious viewpoints.  The dysfunction and viewpoint bias emanate from, and are enforced at, the highest ranks of Defendants' upper management, and drive the actions of employee supervisors, co-workers, third-party affiliates, and advertisers.

109.    Consequently, even when manual employee reviews of video content are used to check and audit restrictions on videos generated from the digital algorithms or from flagging by other YouTube users, Defendants apply "Restricted Mode" and other discretionary and vague content based criteria, to restrict access to Plaintiffs' videos using vague and undefined terms such as "mature" or "sensitive" for certain audiences, solely because the video discusses a topic involving abbreviations like "BLM," "KKK;" terms such as "Black," "White," "Racism," "Boogaloo," "White Supremacy," "Racial Profiling," "Police Shootings," "Police Brutality," "Black Lives Matter;" names of individuals such as those killed by law enforcement, "Bill Cosby," "Louis Farrakhan;" names of organizations such as "Ku Klux Klan," "Nazi," "Neo-Nazi," "Aryan Brotherhood," and/or other euphemisms that are known and particular to the African American Community, or the video's title or tag words includes these trigger words.

110.    Defendants' conduct creates censorship, restraint of speech, and discrimination based on the race, identity, and/or viewpoint of Plaintiffs and all other persons similarly situated, not based upon video content which might violate a narrow, neutral, objective, and specifically verifiable criteria that furthers a compelling and legitimate public interest.

111.    Defendants' conduct also forces Plaintiffs and all other persons similarly situated to self-censor and to avoid not only using abbreviations like "BLM," "KKK;" terms such as "Black," "White," "Racism," "Boogaloo," "White Supremacy," "Racial Profiling," "Police Shootings," "Police Brutality," "Black Lives Matter;" names of individuals such as those killed by law enforcement, "Bill Cosby," "Louis Farrakhan;" names of organizations such as "Ku Klux Klan," "Nazi," "Neo-Nazi," "Aryan Brotherhood," and/or other euphemisms that are known and particular to the African American Community in video titles and tag words, but to avoid mentioning these in the video content, in order to avoid having Defendants remove videos or issue a "strike" against the

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

channel, purportedly for posting "hate speech" or violating one or more of Defendants' unidentified Community Guidelines and TOS.

112.    Defendants' A.I. tools and practices effectively silence the voices of Plaintiffs and all other persons similarly situated concerning some of the most important issues and current events affecting their communities.

113.    Because Defendants' A.I. tools and practices single out the videos of Plaintiffs and all other persons similarly situated for adverse treatment (e.g., removal, restricted access if any, and/or limited or no monetization), the Plaintiffs and class members cannot generate sufficient viewers or subscribers to grow their channels so as to qualify for all of the Defendants' special programs and perks, such as YouTube partnership, Channel Membership, mobile Livestreaming, or SuperChat applications, resulting in the creation of a ghetto tier of YouTube creators based on their race, identity and/or viewpoints, who are doomed to create videos for very limited audiences for little to no money.

## 2.    Excluding Channels And Videos From Full Revenue Generation

114.    In addition to creating and using metadata to racially profile Plaintiffs and all other persons similarly situated, as well as their subscribers and viewers, for purposes of restricting access to the YouTube platform, Defendants use the same or similar metadata to limit the revenue which can be generated from individual videos.  Defendants use A.I., algorithms, and filtering tools and practices in conjunction with the metadata they create, to prevent Plaintiffs and other persons similarly situated from earning money from videos merely because the metadata reflects the video title and/or tags include abbreviations like "BLM," "KKK;" terms such as "Black," "White," "Racism," "Boogaloo," "White Supremacy," "Racial Profiling," "Police Shootings," "Police Brutality," "Black Lives Matter;" names of individuals such as those killed by law enforcement, "Bill Cosby," "Louis Farrakhan;" names of organizations such as "Ku Klux Klan," "Nazi," "Neo-Nazi," "Aryan Brotherhood," and/or other euphemisms that are known and particular to the African American Community.  Defendants also use the same or similar metadata to limit or prevent revenue generation from videos posted by Plaintiffs or other persons similarly situated, simply because the videos were created by Plaintiffs or members of other races, by other similar

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

communities, or by those sharing the same viewpoints, or because the videos were posted on channels that are popular with members of Plaintiffs' communities, or are widely viewed by viewers who share Plaintiffs' race, identity, and/or viewpoints.

115.    Because Defendants use metadata based on video titles and tags to flag videos for limited monetization or demonetization, Plaintiffs and other persons similarly situated self-censor and either avoid posting videos regarding issues and current events that are important to their community (e.g., videos regarding the deaths of unarmed African Americans at the hands of law enforcement, healthcare providers' refusals to test or treat African Americans for the Covid-19 virus, the disparate infection, death and unemployment rates experienced by African Americans as a result of the Covid-19 pandemic), or they misspell key words like "Black," "White," "Race," "Racist," and "Racism," or they rely on euphemisms known only to the African American community.

116.    Defendants' conduct and practices cause Plaintiffs and other persons similarly situated to lose revenue which their fully compliant videos would otherwise have generated, as well to lose subscribers and viewers, and the opportunity to grow their channels and to qualify for full access to  all of the perks that Defendants offer others.

### 3.    Misapplying "Restricted Mode"

117.    Defendants also use the same or similar metadata to restrict access to the full YouTube platform and related benefits by misapplying "Restricted Mode" to the videos of Plaintiffs and all persons similarly situated.  "Restricted Mode" is one of Defendants' primary tools for platform control and curation.  "Restricted Mode" affects tens of millions of YouTube users every single day.

118.    According to Alice Wu, a Senior Manager of Trust & Safety at YouTube, LLC, about 1.5 percent of YouTube's daily views (or approximately 75 million of the nearly 5 billion views every single day) come from people who have activated Defendants' "Restricted Mode."

119.    According to Defendants, "Restricted Mode" is supposed to function much like a curtain that blocks access to the hardcore pornography section at the corner video rental shop,

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

1  limiting viewer access by younger, sensitive audiences to video content that contains certain

2  specifically enumerated "mature" aspects.

3      120.   Defendants assert that "Restricted Mode" is a tool "to help institutions like schools

4  as well as people who wanted to better control the content they see on YouTube with an option to

5  choose an intentionally limited YouTube experience."  "Restricted Mode" also can be activated by

6  system administrators to restrict all access on computer networks to all users and electronic devices

7  connected to the network, including viewers who seek to access video content in public libraries,

8  schools, and other public institutions or private workplaces.

9      121.   While Defendants claim that viewers control the use of "Restricted Mode," and can

10  choose to turn on "Restricted Mode" for their personal accounts, there is growing evidence that it

11  sweeps more broadly.  In certain instances, for viewers who do not have YouTube accounts and

12  seek to view videos posted on YouTube by Plaintiffs and other persons similarly situated,

13  Defendants have applied "Restricted Mode" to prevent those viewers from accessing videos

14  through links posted on other social media platforms that are not owned or controlled by

15  Defendants, as well as to prevent YouTube users who have not activated "Restricted Mode" from

16  accessing those videos.

17      122.   According to Defendants, "Restricted Mode" can be applied to videos in three ways.

18          a.     First, Defendants examine certain "signals" like the video's metadata, title,

19  and tag words associated with the video.  When creators post videos, Defendants invite them to

20  include certain information in the title or to input "tag" words which are purportedly designed to

21  help viewers find videos in which they are interested, such as a title reflecting the subject of the

22  video, and tag words indicating the video's themes or content.  Plaintiffs and other persons

23  similarly situated unwittingly provide Defendants with such titles and tag words along with their

24  posted videos.  Defendants then generate metadata which is additional content that they insert into,

25  append to, or associate with the videos that are posted, which allows Defendants apply A.I.,

26  algorithms and other filtering tools to profile Plaintiffs, their subscribers and viewers, as well as

27  other persons similarly situated, and to sort them by race, identity and viewpoints.  Defendants

28  ultimately apply "Restricted Mode" to the otherwise compliant videos posted by Plaintiffs and

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

1  other persons similarly situated, because the videos have titles or tag words that reflect issues of

2  importance to African American or other racial communities, and those who simply watch videos

3  popular in such communities – essentially relegating these videos to a limited audience which

4  excludes white, conservative and/or "more sensitive viewers," simply because the videos were

5  made by or for members of protected racial classifications under the law.

6     b.  Second, Defendants claim that such metadata "signals" identify videos

7  which violate Defendants' Community Guidelines or TOS.  However, these "signals" are used by

8  Defendants as a pretext to segregate disfavored content using "Restricted Mode," regardless of

9  whether the video contains material which is unsuitable for children, younger audiences or more

10  sensitive viewers.  Defendants themselves create all such metadata and insert, embed or associate

11  that metadata which reflects demographic information regarding the video creators, channel

12  subscribers and viewers, along with individual videos to create more "signals" for A.I., algorithms,

13  and filtering tools to utilize.  Thus, in certain cases, videos that would otherwise pass through the

14  filtering process without incident, are flagged for restrictions by Defendants; not because of

15  anything in the video content, but because of metadata or other "signal" information that

16  Defendants themselves have inserted, embedded or associated with the video.  These signals

17  include information about the race, identity and/or individual viewpoint of the video creator, her

18  subscribers, and her viewers.

19     c.  Third, Defendants also purportedly use "Restricted Mode" to passively

20  restrict a video if it is "flagged" as "inappropriate" by anyone in the "community" of YouTube

21  users.  According to Defendants, the so-called "flagged" videos are subsequently reviewed by a

22  "team" of human reviewers for "violations" of Community Guidelines and/or TOS.  But flagged

23  videos are subject to Defendants' own internal review procedures that are race, identity and

24  viewpoint based, so that many flagged videos posted by Plaintiffs and other persons similarly

25  situated may never receive an independent content review by a human being, much less a YouTube

26  employee.

27     123. As shown below, when a network administrator or an individual viewer activates

28  "Restricted Mode," each video subject to "Restricted Mode" appears with Defendant's  custom

1605366.1        -33-        Case No.

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

stamp of disapproval, including a red face including a red square bearing a foreboding facial expression, together with text showing "This video is unavailable with Restricted Mode enabled. To view this video, you will need to disable Restricted Mode."

124.   Defendants' stamp of disapproval thus makes a specific and falsifiable misrepresentation to viewers of videos posted by Plaintiffs and other persons similarly situated, that the specific video that they have attempted to access contains content that is so inappropriate, shocking and outrageous, that the viewer must be protected from that content and that the YouTuber creator who has posted that content is responsible for having created and uploaded such inappropriate, shocking, and outrageous content.

125.   These specific and falsifiable factual representations are by no means limited to Defendants' "Restricted Mode" stamp of disapproval.  Viewers who attempt to ascertain why a particular video has been subjected to "Restricted Mode" are told by Defendants that videos are eliminated from "Restricted Mode" when they include specific pieces of content, including content (1) talking about drug use or abuse, or drinking alcohol in videos; (2) overly detailed conversations about or depictions of sex or sexual activity; (3) graphic descriptions of violence, violent acts, natural disasters and tragedies, or even violence in the news; (4) videos that cover specific details about events related to terrorism, war, crime, and political conflicts that resulted in death or serious injury, even if no graphic imagery is shown; (5) inappropriate language, including profanity; and (6) video content that is gratuitously incendiary, inflammatory, or demeaning towards an individual or group.

126.   In reality Defendants' definition of "Restricted Mode" is applied in a significantly over inclusive and under inclusive manner, which has caused significant damage to Plaintiffs and other persons similarly situated.  Even the most simple examination of Plaintiffs' videos subject to "Restricted Mode" shows that Defendants are not only dead wrong in their representations to the public concerning African American videos that Defendants subject to the "Restricted Mode" stamp of disapproval, but Defendants are hiding from the public valuable content and are doing so in bad faith.

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

127.     To the extent that videos which have titles or tags which include "abbreviations like "BLM," "KKK;" terms such as "Black," "White," "Racism," "Boogaloo," "White Supremacy," "Racial Profiling," "Police Shootings," "Police Brutality," "Black Lives Matter;" names of individuals such as those killed by law enforcement, "Bill Cosby," "Louis Farrakhan;" names of organizations such as "Ku Klux Klan," "Nazi," "Neo-Nazi," "Aryan Brotherhood," and/or other euphemisms that are known and particular to the African American Community," Defendants apply the "Restricted Mode" filter to these videos and limit viewer access to many compliant videos posted by Plaintiffs and other persons similarly situated, which contain content of interest to the African American community.  Defendants do so, despite the fact that the videos do not contain materials which discuss drug use or abuse or drinking alcohol; overly detailed conversations about or depictions of sexual activity; graphic depictions of violence, violent acts; natural disasters or tragedies or violence in the news; specific details about events related to terrorism, war, crime and political conflicts that resulted in death or serious injury even if no graphic imagery is shown; inappropriate language, including profanity, or content that is gratuitously incendiary, inflammatory, or demeaning toward an individual or group.

128.     Defendants effectively use "Restricted Mode" as a damper to quiet the voices of Plaintiffs and other persons similarly situated, from being heard by all YouTube users and to limit Plaintiffs' reach, thereby preventing them from growing their channels, increasing subscribers and viewers, generating revenue, and meeting minimum participation standards to qualify for Defendants' other benefits such as YouTube partnership, Channel Membership, Mobile Streaming and SuperChat.

129.     Once Defendants apply "Restricted Mode" to a video, Plaintiffs and other persons similarly situated are then forced to spend time and effort to appeal Defendants' decision and persuade a human being to actually look at the content of the video.  Even when the appeal is won, Plaintiffs and other persons similarly situated lose the opportunity to generate interest in and revenue from the new video for a period of weeks to months, and to thereby grow their channel during the period that the video is restricted.  Defendants never compensate for the erroneous

1    application of "Restricted Mode," regardless of the length of time it takes for Defendants to

2    actually review the restricted video content.

3        130.    Defendants impose these restrictions to justify anticompetitive and unlawful actions

4    intended to gain a competitive advantage for their own video content and/or to ensure that their

5    sponsored creators, content partners, and advertisers have an unfair competitive advantage in the

6    YouTube video market.  By placing no restrictions on the monetization of their own videos or those

7    of Defendants' sponsored creators, content partners and preferred advertisers, Defendants gain a

8    competitive advantage by restricting the financial reach of Plaintiffs and other disfavored users,

9    while simultaneously ensuring that their own video content (and those of their sponsored creators,

10   content partners and preferred advertisers) are not subjected to the same (or any) Advertising

11   Restrictions.

12       131.    Defendants also impose these restrictions to facilitate their advertising practices,

13   whereby they profile videos by the race, identity and viewpoint of creators, subscribers and viewers

14   so as to identify the videos with the most valuable demographics which command the highest

15   prices from most advertisers, without regard to whether there are any advertisers which are willing

16   to purchase spots associated with videos posted by Plaintiffs and other persons similarly situated.

17       132.    Defendants' actual practices unlawfully provide Defendants with monopoly power

18   over the video posting and viewership market, the video advertising market, and the ability to

19   manipulate, bully, and falsely denigrate legitimate YouTube users, like Plaintiffs and other persons

20   similarly situated, by subjectively designating their speech as "inappropriate," because Defendants

21   do not like or agree with the speakers' race, identity or point of view; or because Defendants are

22   too cheap to actually review the videos posted to the platform, and desire to rely on inexpensive

23   A.I., algorithms, and other filtering tools for purposes of selling advertisements and curating videos

24   on YouTube.

25               **4.    Shadow Banning Channels And Videos**

26       133.    Defendants treat videos that present or discuss serious issues and current events that

27   are important to the communities of the Plaintiffs and all other persons similarly situated as "not

28   family friendly," and as if they are inappropriate for all audiences simply because they were

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

1  uploaded by creators whose races, identities, and/or viewpoints are disfavored by Defendants.

2  Defendants are not merely removing, restricting access to or limiting monetization for videos

3  posted by Plaintiffs and all other persons similarly situated, Defendants are making those videos,

4  and some channels invisible on the YouTube Platform, despite the fact that the videos comply with

5  all of Defendants' Community Guidelines and TOS.

6         134.   In shadow banning videos, Defendants effectively prevent Plaintiffs' subscribers

7  and potential viewers from locating new videos which discuss issues and current events that are

8  followed by the African American community; by excluding such videos from the YouTube search

9  function on the platform, Defendants are preventing creators like Plaintiffs and all other persons

10  similarly situated from growing their channels by securing the necessary subscriber and viewer

11  numbers required to qualify for Defendants' special programs and perks, such as YouTube

12  partnership, channel membership, mobile Livestreaming, or SuperChat applications, and are

13  preventing them from generating revenue from their videos.

14         135.   Defendants also shadow ban entire channels belonging to Plaintiffs and other

15  similarly situated persons, by making the channels unsearchable on the platform.  Without a link to

16  Plaintiffs' channels, subscribers and viewers cannot access Plaintiffs' videos.  As a result of

17  shadow banning of channels, many Plaintiffs and other persons similarly situated can only attract

18  new subscribers or viewers by "word of mouth," and referrals from other members of their

19  community, or from other social media platforms where links to Plaintiffs' YouTube channels are

20  posted.

21         136.   Defendants' shadow bans not only impair the growth of channels belonging to, and

22  revenue generated from videos posted by Plaintiffs and other persons similarly situated,

23  Defendants' conduct both effectively reduces the audience for videos posted by Plaintiffs and

24  muffles their voices across the platform, making it impossible for new YouTube viewers to locate

25  video content that is important to their specific communities.  As a result, Plaintiffs, as African

26  American creators, and other persons similarly situated, cannot expand subscriber and viewer

27  numbers sufficient to grow their channels and fully enjoy full access to the YouTube platform and

28  all of the benefits Defendants offer others.

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

### 5. Delegating Content Review And Regulation To Racists And White Supremacists

137. Defendants have configured the YouTube platform to allow any user to "report" or "flag" videos which they believe violate the Google/YouTube Community Guidelines or TOS, e.g., video content which contains hate speech, nudity, profanity, graphic depictions of sexuality or violence, disparaging remarks, content which violates existing copyrights or trademarks held by persons other than the creator posting the video, or descriptions of violent events and scenes which may disturb younger or more sensitive viewers. Defendants not only allow users to "report" or "flag" videos posted by Plaintiffs and other persons similarly situated, Defendants take action based on those third-party reports and flags and proceed to remove, restrict, and/or demonetize individual videos; issue community "strikes;" and to suspend, and/or remove whole channels of Plaintiffs and other persons similarly situated. Defendants do so without first verifying that the flagged video violates a specific Community Guideline or Term of Service. In effect, Defendants deputize YouTube users, including racists, sexists, white supremacists, Neo-Nazis, and other hate speech trolls. These delegated and affiliated users, exercise censorship powers on YouTube, including reporting, flagging, bullying and threatening creators whenever Plaintiffs and other persons similarly situated post content with which Defendants' racist agents disagree.

138. In allowing third parties to wield the power to report or flag a video as violating the applicable Community Guidelines and TOS, Defendants have deprived Plaintiffs and other persons similarly situated, of equal access to the YouTube platform and all of the services Defendants make available to others by creating the presumption that any flagged video does in fact contain content which violates the Community Guidelines and/or TOS. After being flagged by a third party, Plaintiffs and other persons similarly situated are forced to spend substantial time and effort to appeal the flag in order to restore the channel/video, remove the restriction, or obtain full monetization for channel/video, which, but for the flag, would have reached a wide audience and would have generated substantial revenue.

139. Because of Defendants' conduct and practices, trolls regularly appear on the channels of Plaintiffs and other persons similarly situated, threaten to shut down the channels – and

1   within a few days, the trolls succeed in getting Defendants to suspend the channels.  As a result,

2   Plaintiffs and other persons similarly situated engage in self-censorship and avoid posting videos

3   that address issues of historical, political, cultural, and educational significance to their

4   communities.  Recently, Plaintiffs and other persons similarly situated have avoided timely topics

5   such as the denial of Covid-19 testing and treatment to African American healthcare workers, the

6   inability of African American businesses to apply for CARE loans, and the disparate enforcement

7   of stay at home orders against African American communities.  Defendants' conduct therefore

8   encourages and enables the agendas of racists, white supremacists, and Neo-Nazis on YouTube, by

9   silencing the voices of Plaintiffs and other persons similarly situated.

10                **6.**      **Interfering With Livestream Broadcasts**

11        140.    Livestream broadcasts are videos that are posted in a streaming live format which

12   are controlled exclusively by creators or by the moderators designated and authorized by individual

13   creators to review, edit, and remove viewer comments which appear as the video progresses over

14   time.  Livestream broadcasts allow real time viewer participation in discussions on YouTube

15   channels and often involve hundreds of people all making comments regarding important issues,

16   current events, or topics.  YouTube's Livestream broadcast application allows the video creator and

17   her designated moderators to control the content of the broadcast.  They control the viewer

18   participation in the comments section of the screen while the Livestream is played.

19        141.    Because Defendants routinely restrict viewer access to and revenue generation from

20   videos posted by Plaintiffs and other persons similarly situated, depressing subscriber and viewer

21   numbers, many African American channels do not generate significant income from advertising or

22   Channel Membership.  They must rely on other applications to generate revenue, such as

23   Defendants' SuperChat, Livestream Donations or Patreon Donations.  As a result, Livestream

24   broadcasts have become a primary revenue generator.

25        142.    Defendants regularly interfere with the Livestream broadcasts by Plaintiffs and all

26   persons similarly situated, either using employees or independent contractors which Defendants

27   hire.  Defendants' Livestream interference includes such tactics as:  (a) stopping Livestream

28   broadcasts, and forcing the creator to restart the broadcast, at the loss of viewers and to the

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

1   irritation of subscribers; (b) throttling (intentionally slowing ) broadcasting speeds during

2   Livestream which distorts the oral discussion and disrupts viewer comments on the screen; (c)

3   inserting new voice content and/or visual images into the video which are entirely unrelated to the

4   decisions and choices of the channel creator and her chosen moderators, often such new voice

5   overs and images are unrelated to the Livestream topic, and are offensive, misogynistic, racist, or

6   obscene; (d) removing positive comments from viewers; and (e) disconnecting individual viewers

7   who are in the process of leaving positive comments, thereby silencing viewers who would

8   otherwise support the video or make monetary donations on the Livestream broadcast.

9          143.   For the past two years, until stay at home orders for nonessential businesses were

10   imposed in the Bay Area in March of this year, Defendants' Livestream broadcast interference was

11   relentless, causing Plaintiffs either to suspend Livestream broadcasts, to self-censor and refrain

12   from discussing issues or current events of interest to the African American community, or to

13   conduct them at odd hours without prior announcements.  Defendants' conduct in interfering with

14   Livestream broadcasts has reduced subscriber and viewer numbers for the channels of Plaintiffs

15   and other persons similarly situated, has reduced revenue generated from Livestream broadcasts

16   and from the channels overall, and has prevented the African American community from receiving

17   information about and discussing issues and current events which are important to members of that

18   community.

19          144.   Notably, for the weeks while stay at home orders were in place for the Bay Area,

20   Plaintiffs were able to conduct Livestream broadcasts unmolested.  However, Defendants'

21   interference has recommenced with the lifting of stay at home orders.  Defendants' interference is

22   now ongoing.

23              **7.    Excluding Videos From "Trending" And "Up Next" Video
                        Recommendations**

24

25          145.   Defendants routinely exclude videos posted by Plaintiffs and all persons similarly

26   situated from YouTube's "Trending" and "Up Next" Recommendations which appear on users'

27   screens when they watch videos on YouTube.  While Defendants exclude the videos of Plaintiffs

28   and other persons similarly situated, they include in the "Trending" and "Up Next" applications

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

both reaction videos which copy, pirate, or parody the videos of Plaintiffs, and videos which violate Defendants' Community Guidelines and/or TOS in so far as the videos contain hate speech, obscene, misogynistic, violent, threatening, or disparaging content which is directed specifically at Plaintiffs and other persons similarly situated.  Defendants have continued to include these videos posted by third parties over the repeated flags, written objections, and complaints by Plaintiffs and their subscribers, and they have fully monetized many such videos despite having received flags, objections and complaints that the videos violate Defendants' Community Guidelines and TOS.

### 8.    Freezing Channel Analytics Re Subscribers And Viewers

146.    Defendants have stopped reporting accurate current data on the "Analytics" pages for the channels of Plaintiffs and other persons similarly situated.  For the past two years, many of the Plaintiffs' "Analytics" have remained the same or have varied by very small increments with respect to the number of subscribers, viewers, and view time.  This has been the case regardless of the number of videos posted or the number of Livestream events broadcast on the channel.

147.    As with the Defendants' interference with Livestream broadcasts, during the period of time that stay at home orders were in effect in the Bay Area in the Spring of 2020, new and larger numbers have been appearing on the "Analytics" pages for some of the channels of Plaintiffs and other persons similarly situated.  Whether the "Analytics" pages will continue to be updated after the lifting of stay at home orders remains to be seen.

148.    Because Defendants stopped reporting accurate data regarding the number of subscribers, viewers and view time for the channels of Plaintiffs and other persons similarly situated, Plaintiffs have been unable to grow their channels, to demonstrate that they qualify for Defendants' additional benefits and perks such as monetization, Channel Membership, Mobile Access, or SuperChat.  Plaintiffs and other persons similarly situated have also lost revenue as they are unable to prove to Defendants the number of viewers for their videos which have at least limited monetization.

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

### 9.    Promoting And Profiting From Hate Speech

149.    Defendants regularly promote and monetize hate speech targeting Plaintiffs and all persons similarly situated on the YouTube platform in direct violation of Defendants' Community Guidelines and TOS, and ignore repeated flags, reports and complaints regarding those videos.

150.    Many hate speech videos targeting the African American community on YouTube include identifying information regarding Plaintiffs and other persons similarly situated, including without limitation their telephone numbers, residential addresses, registered trademarks, original copyrighted material, or personal likenesses, in direct violation of Defendants' Community Guidelines and TOS.  Plaintiffs and other persons similarly targeted on the YouTube platform have followed Defendants' published procedures to remove the hate speech, including flagging the videos, reporting the violations of Defendants' Community Guidelines and Terms of Use by email, and sending follow up emails complaining of both the videos and the channels on which the videos are posted.  The subscribers of Plaintiffs have reported that they too have flagged, reported and written follow up emails to Defendants complaining of the hate speech videos and their related channels.

151.    Despite having received repeated, multiple flags, reports and written complaints over a period of months concerning specific hate speech videos posted by Defendants' favored partners, Defendants have refused to do anything to enforce their own published Community Guidelines and TOS and have not removed the videos or suspended the channels posting such videos.  To this day, many hate speech videos remain posted without restriction, and fully monetized to generate revenue for their creators, despite having content that is patently false, racist, and/or sexist, violent, abusive or obscene.  Some of the hate speech videos include threats of bodily harm or death specifically directed at the Plaintiffs and other persons similarly situated.  Some hate speech videos are posted in a way that falsely indicates that it was posted by Plaintiffs.

152.    Among the many YouTube channels which Defendants insulate for enforcement of Community Guidelines and TOS, the channels of Tommy Sotomayor and Candace Owens particularly stand out for their hateful, racist, and misogynist video content. Tommy Sotomayor regularly posts videos which promote violence against members of the African American

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

1  community.  Candace Owens regularly posts videos disparaging male members of the African

2  American community.  Though Plaintiffs, their subscribers and other persons similarly situated

3  repeated flagged, reported and complained about these two channels and their posted videos, as

4  wells as their trolls who engage in abusive, bullying conduct directed to YouTube users who

5  mention Sotomayor or Owens, Defendants nonetheless regularly include videos posted by

6  Sotomayor and by Owens in the "Trending," and "Up Next" recommendation applications on the

7  screens of African American viewers.  Defendants have rendered "flag proof" the channels of

8  Sotomayor and Owens, and videos posted there.

9          153.     Defendants' refusal to enforce their own Community Guidelines and TOS equally to

10  all YouTube users to eliminate hate speech videos; Defendants' continued promotion of hate

11  speech videos by including them in the "Trending," and "Up Next" applications; and Defendants'

12  continued monetization of hate speech videos and profiting from the sale of advertisements in

13  connection with such videos have substantially reduced racial diversity on the YouTube platform

14  and have endangered YouTube users like Plaintiffs and other persons similarly situated.

15  Defendants' conduct has stifled the voices of Plaintiffs and other persons similarly situated, who

16  are unable to reach their intended audiences or to post videos which address or discuss issues and

17  current events of concern to the African American community because while Plaintiffs' compliant

18  videos are wrongly removed, restricted and demonetized as "hate speech," Defendants protect,

19  promote and profit from vile, vicious, hate speech, and personal attacks on Plaintiffs and other

20  persons similarly situated.  Plaintiffs have received harassing telephone calls and written

21  communications, forcing them to change their telephone numbers and to move from their homes.

22  They have also lost subscribers, viewers and revenue as a result of Defendants' failure and refusal

23  to enforce their own Community Guidelines and TOS equally on all YouTube users.

24          **10.     Interfering With, Obstructing, Ignoring And Delaying Appeals**

25          154.     Following Defendants' actions to limit monetization or demonetize a video, or to

26  remove or restrict a video, or to issue a strike against or to suspend a channel, Plaintiffs and other

27  persons similarly situated are forced to spend time and effort to appeal Defendants' decision and to

28  persuade a human being to actually look at the otherwise compliant video(s) in question.  Often,

1  appeals by Plaintiffs and other persons similarly situated drag on for months before Defendants

2  respond to the appeal, but Defendants often do not even respond to Plaintiffs' appeals and either

3  ignore them entirely or confirm the action out of hand, without having a human being review the

4  video content that was the basis for Defendants' actions.  In reality, Plaintiffs and other persons

5  similarly situated often have no real appeal at all.

6        155.    On those rare events when an appeal filed by Plaintiffs or other persons similarly

7  situated are successful, after a human being actually review the video content in question and

8  concludes that Defendants' action was wrongly imposed, Defendants do not reimburse the creator

9  for lost revenue from the video(s) or the channel during the appeal process.  Defendants therefore

10  have a perverse incentive built in their platform regulation, filtering and curation process:  by

11  automating the application of "Restricted Mode," the monetization limitation process, and

12  authorizing members of the YouTube community to flag videos and channels following, which

13  Defendants automatically rely and act on those flags without first verifying videos/channels are in

14  violation of Community Guidelines or TOS, Defendants don't have to pay the affected creators for

15  the use of their video content, and can withhold payment unless and until a success appeal occurs.

16  At each step of the appeal process, Defendants continue to withhold payment of revenue generated

17  by the affected videos, profiting from their own improper decisions.  Defendants absolutely control

18  the process:  they can ignore an appeal, delay the process by weeks, months or even years, or

19  simply confirm the adverse action without ever examining the offending video content – there is no

20  oversight, no higher authority, no way to force Defendants to follow their own Community

21  Guidelines or TOS.

22        156.    Defendants' conduct in interfering with, obstructing, ignoring and/or delaying

23  appeals has deprived Plaintiffs and all persons similarly situated of the use of hundreds of their own

24  videos which Defendants have wrongly removed from the YouTube platform or placed in archives

25  where they cannot be viewed by anyone, have deprived Plaintiffs and all persons similarly situated

26  of subscriber and viewer numbers generated from their channels which Defendants have wrongly

27  suspended or removed from the YouTube platform, and have deprived Plaintiffs and all persons

28  similarly situated of the full financial benefits from all of their otherwise compliant videos which

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

Defendants have improperly removed, restricted or demonetized for any period of time. Defendants operate the YouTube platform like a Las Vegas casino, ensuring that "the house always wins," no matter how much time, effort, or value Plaintiffs and other persons similarly situated contribute to the platform because in the end, Defendants pick the winners based on race and other immutable identity traits, and viewpoints; Defendants write and rewrite the Community Guidelines and TOS; Defendants determine which users are exempt from those Community Guidelines and TOS; and Defendants define the appeal process to be whatever they want for any given YouTube user.

### D.    Defendants Have Violated And Continue To Violate The Rights Of Plaintiffs And The Class

#### 1.    Kimberly Carleste Newman

157.    Plaintiff Newman has been a registered YouTube user since 2015, creating and posting approximately 1,654 videos on her "The True Royal Family" YouTube channel; and since 2016, creating and posting 209 videos on her "True Royal" YouTube channel. Plaintiff Newman is an African American woman who identifies as such.

158.    Plaintiff Newman makes and posts videos that discuss and present information regarding issues and current events which are important to the African American community, from a Black perspective. While her videos are pro-Black, they are not intended solely to inform and entertain the African American Community; they are suitable for members of other communities who are sympathetic to or curious about issues and current events as perceived from a Black perspective. "The True Royal Family" channel has generated approximately 1 million views annually. The "True Royal" channel has generated approximately 200,000 views annually. Notwithstanding the substantial annual viewer numbers generated by her channels, Plaintiff Newman has only generated total revenues of $2,672.68 for videos posted on "The True Royal Family," and $123.96 for videos posted on the "True Royal" channel.

159.    Plaintiff Newman is informed and believes that Defendants have gathered extensive information in order to generate metadata and then insert, embed, append, or associate such metadata with the videos posted to "The True Royal Family," and "True Royal."  Defendants

gathered information regarding her race (Defendants know that Plaintiff Newman is an African American woman); that she makes and posts videos which have as a subject, relate to or discuss issues and current events that are important to members of the African American community; her subscribers either self-identify as members of the African American community or watch many videos posted by other creators who have self-identified as members of the African American community; and many of those who view her videos either self-identify as members of the African American community or watch videos posted by other creators who have self-identified as members of the African American community.

160.     Plaintiff Newman is informed and believes that Defendants have applied "Restricted Mode" and have limited monetization for videos she posted to "The True Royal Family" and "True Royal" because Defendants have a policy and practice of using A.I., algorithms, and other filtering tools to classify, curate, censor, and sell advertisements for YouTube videos based on metadata Defendants create from information regarding the race, identity and viewpoint of creators, subscribers and viewers, rather than the content of the videos posted to the YouTube platform.

161.     Defendants have applied "Restricted Mode" and have limited monetization to nearly all of the videos which remain visible to viewers on "The True Royal Family," and nearly all of the videos posted to "True Royal," despite the fact that each of the videos fully complies with all of Defendants' Community Guidelines and TOS, and contain no nudity, sexualized scenes or language, graphic depictions of sex or violence, drug abuse, or alcohol consumption.  Defendants have applied "Restricted Mode" to most of the videos posted, and have allowed only very limited monetization for some videos, without any explanation or rationale for doing so.  Plaintiff Newman is informed and believes that the sole reason that Defendants have acted in this fashion is that Defendants discriminate against Plaintiffs and other persons similarly situated based on race, e.g., the videos were created by an African American; the videos relate to issues and events of concern to the African American community, and the videos are viewed by large numbers of members of the African American community.

162.     For various periods, off and on, throughout the past five years, Defendants have shadow banned both individual videos posted by Plaintiff Newman, and her channels, "The True

1   Royal Family," and "True Royal."  Viewers have informed Plaintiff Newman that they were unable

2   to locate individual videos using YouTube search applications and terms such as "Kimberly

3   Santana," "The True Royal Family," "True Royal," or using as search terms the names of

4   individual videos posted by Plaintiff Newman.  Viewers have further informed Plaintiff Newman

5   that when they searched for "African American" video content, YouTube search applications

6   produced videos posted by Tommy Sotomayor consisting of hate speech and content which

7   disparages members of the African American Community.

8        163.    Defendants do not provide any receipt or record of any kind when YouTubers

9   "flag," report, or complain about videos posted by other YouTube creators.  Because of

10  Defendants' practices regarding such YouTube users' efforts to obtain redress for violations of

11  their rights, individual creators like Plaintiffs and other persons similarly situated are not able to

12  prove that they, in fact, flagged any individual video or channel.  For those users whom Defendants

13  disfavor, the videos and channels are not automatically removed, restricted or demonetized, and the

14  injured YouTube user cannot prove that she flagged the noncompliant or infringing video or

15  channel.  Rather, disfavored users like Plaintiffs and other persons similarly situated are left to

16  make repeated written reports and complaints regarding the noncompliant or infringing video or

17  channel, often, to no effect whatsoever.  Defendants merely ignore those written reports and

18  complaints too.

19       164.    Plaintiff Newman registered "The True Royal Family" name and an associated

20  image as trademarks.  As part of the channel creation process, Defendants ask YouTube creators if

21  they are using marks which have been registered as a trademark.  When she created "The True

22  Royal Family" channel, Plaintiff Newman informed Defendants that she had registered her channel

23  name and a specific image used with thumbnail tiles as trademarks.  Nonetheless, Defendants

24  refused to remove videos using Plaintiff Newman's registered trademark image from the channels

25  of other YouTube creators in response to Plaintiff's repeatedly flagging such videos, reporting the

26  trademark infringement for the mark by the channel, and repeated unauthorized uses of "The True

27  Royal Family" name.  For a period of years, Defendants have ignored Plaintiff Newman's

28

1  complaints and allowed other YouTube users to infringe on her trademarks with impunity, in

2  violation of Defendants' own Community Guidelines and TOS.

3       165.   While Defendants refuse to protect the intellectual property of Plaintiffs and other

4  persons similarly situated, Defendants routinely flag or remove videos, and suspend channels for

5  violating the intellectual property of others.  Defendants flagged a video posted by Plaintiff

6  Newman in which she personally sings acapella a song written by Stevie Wonder on grounds that

7  she was infringing the copyright for the song.  Plaintiff's channel was suspended for two weeks for

8  the purported infringement.

9       166.   In September 2019, a third party hacked "The True Royal Family" channel and

10  removed over 600 of Plaintiff Newman's videos so that neither the public nor Plaintiff Newman

11  could view, access, or download any of the videos or portions thereof.  Plaintiff Newman promptly

12  applied to Defendants, asking that they restore the videos to "The True Royal Family" channel.

13  Defendants agreed to return the videos, but has not done so.

14       167.   Months later, in 2020, rather than restoring the original 600+ videos, Defendants

15  removed another group of videos from the channel totaling more than 100 individual videos.

16  Plaintiff Newman again appealed to Defendants to restore or return all of the 700+ missing videos

17  removed from "The True Royal Family," but Defendants have failed and refused to do so without

18  any explanation as to why the original 600+ videos have not been restored, why the additional

19  100+ videos were removed, or why they have not been restored or returned.

20       168.   Plaintiff Newman has been deprived of subscribers, viewers and revenue from the

21  700+ missing videos for more than nine months, and Defendants have done nothing to address her

22  ongoing injury or lost revenue.

23       169.   Defendants have used A.I., algorithms, and filtering tools to restrict the reach of her

24  videos and to prevent her from increasing subscriber and viewer numbers to grow her channels and

25  generate revenue.  For the past several years, the analytics page reflecting subscriber and viewer

26  numbers for "The True Royal Family" channel have remained steady, varying little from month to

27  month regardless of the number of new videos posted or the Livestream broadcasts.  To avoid the

28  impact of Defendant' A.I., algorithms and filtering tools on Defendants' metadata generated from

video titles and tags, Plaintiff Newman intentionally self-censors:  (a) she avoids using controversial video titles; (b) she avoids using abbreviations like "BLM," "KKK;" terms such as "Black," "White," "Racism," "Boogaloo," "White Supremacy," "Racial Profiling," "Police Shootings," "Police Brutality," "Black Lives Matter;" names, such as those of individuals such as those killed by law enforcement, "Bill Cosby," "Louis Farrakhan;" names of organizations such as "Ku Klux Klan," "Nazi," "Neo-Nazi," "Aryan Brotherhood," and euphemisms that are known and particular to the African American Community; she intentionally misspells terms such as "Black," "White," "Race," "Racism," and "Racial Profiling," because Defendants routinely flags such terms.

170.    Despite her efforts to self-censor and avoid the reach of Defendants' A.I., algorithms, and filtering tools, most of the videos posted on "The True Royal Family" and "True Royal" have only limited monetization, if any, and produce next to no revenue.

171.    Plaintiff Newman has increasingly turned to Livestream broadcasts to generate revenue from her video content.  Viewers can make monetary donations to YouTube creators like Plaintiffs using SuperChat during Livestream broadcasts.  However, for the past two years, Defendants have been interfering with Livestream broadcasts on "The True Royal Family." Subscribers to "The True Royal Family" have informed Plaintiff Newman that their favorable comments have been interrupted or removed, they have been booted off of the Livestream or prevented from posting comments, and they have been prevented from making donations during Livestream broadcasts.  The subscribers' experiences, as related to Plaintiff Newman, involve conduct which is the exclusive province of the channel owner or their designated moderator(s). Plaintiff Newman had not designated any moderator for the Livestream broadcasts which were the subjects of subscriber complaints.  Defendants also have been throttling, interrupting and even cutting off Livestream video broadcasts in the middle of the event.  Additionally, Defendants have been inserting voice and visual content which blocks out that which Plaintiff Newman is posting live.

172.    Defendants' conduct during "The True Royal Family" Livestream broadcasts have reduced subscriber participation and interest in such events, have reduced new viewer participation,

1  and have reduced the number and size of viewer donations to "The True Royal Family" channel

2  depriving Plaintiff Newman of new subscribers and revenue.

3  173.    Plaintiff Newman has also experienced significant and extended bullying,

4  harassment, disparaging remarks and threats of physical violence on YouTube, both in the form of

5  trolls leaving comments on "The True Royal Family" channel, and in the form of abusive and

6  threating videos posted by other YouTube creators.  Videos bearing Plaintiff Newman's name, and

7  containing profanity and obscene content have been posted on the YouTube platform.  A video

8  threating to kill her was also posted on the platform.  Such videos violate Defendants' Community

9  Guidelines and TOS, and should be removed as such.  However, Defendants' A.I., algorithm, and

10  other filtering tools not only failed to identify these violations of the applicable rules, Defendants

11  failed and refused to respond to efforts by Plaintiff and her subscribers to flag the videos, or to

12  written reports and complaints regarding the disparaging and threatening videos, much less to

13  enforce Defendants' own public standards and remove the videos or suspend the channels

14  responsible for posting the videos.

15  174.    As a direct and proximate  result of Defendants' racial discrimination and wrongful

16  conduct, "The True Royal Family" and "True Royal" have not substantially increased their

17  respective subscriber and viewer numbers in recent years.  Plaintiff Newman has suffered, and

18  continues to suffer from the loss of 700+ individual videos, improper application of Defendants'

19  A.I., algorithms, and other filtering tools resulting in the shadow banning of her videos and her

20  channels, the misapplication of "Restricted Mode," the improper limitations on monetization for

21  most of her videos, violations of her intellectual property rights and personal disparagement and

22  threats to her person.  Defendants' conduct is willful, intentional and unlawful in discriminating

23  against Plaintiff based on her race, identity and viewpoints, and those of her subscribers and

24  viewers in limiting access to the YouTube platform, related benefits, and opportunities to generate

25  revenue.

26  **2.    Lisa Cabrera**

27  175.    Plaintiff Cabrera has been a registered YouTube creator since 2015 when she

28  created the "Lisa Cabrera" channel.  Plaintiff Cabrera registered "Lisa Cabrera" as a trademark in

connection with her YouTube channel.  4,423 individual videos have been posted to the "Lisa Cabrera" channel, 68 of those videos were archived by Defendants.  The "Lisa Cabrera" videos have generated more than 20 million views, with 830,000 views in just the past 28 days.

176.     Plaintiff Cabrera is a YouTube partner.  She creates and posts videos about current events and news on her channels, displaying pictures and news clips in her videos with original voice over commentary and narration accompanying the visual images.  Despite the substantial number of total and monthly views generated by the "Lisa Cabrera" channel, it has only generated revenue totaling $25,500 over the past four years.

177.     Plaintiff Cabrera is informed and believes that Defendants have gathered extensive information in order to generate metadata and then insert, embed, append, or associate such metadata with the videos posted to "Lisa Cabrera," and "Lisa C."  Defendants gathered information regarding her race (Defendants know that Plaintiff Cabrera is an African American woman); that she makes and posts videos which have as a subject, relate to or discuss news and current events that are important to members of the African American community; her subscribers either self-identify as members of the African American community or watch many videos posted by other creators who have self-identified as members of the African American community; and many of those who view her videos either self-identify as members of the African American community or watch videos posted by other creators who have self-identified as members of the African American community.

178.     Plaintiff Cabrera is informed and believes that Defendants have applied "Restricted Mode" and have limited monetization for videos she posted to "Lisa Cabrera" and "Lisa C" because Defendants have a policy and practice of using A.I., algorithms, and other filtering tools to classify, curate, censor, and sell advertisements for YouTube videos based on metadata Defendants create from information regarding the race, identity and viewpoint of creators, subscribers and viewers, rather than the content of the videos posted to the YouTube platform.

179.     Defendants have applied "Restricted Mode" and have limited monetization to most of the videos on "Lisa Cabrera," despite the fact that each of the videos fully complies with all of Defendants' Community Guidelines and TOS, and contains no nudity, sexualized scenes or

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

1   language, graphic depictions of sex or violence, drug abuse, or alcohol consumption.  Defendants

2   have applied "Restricted Mode" to most of the videos posted, and have allowed only very limited

3   monetization for some videos, without any explanation or rationale for doing so.  Plaintiff Cabrera

4   is informed and believes that the sole reason that Defendants have acted in this fashion is that

5   Defendants discriminate against Plaintiffs and other persons similarly situated based on race, e.g.,

6   Defendants restrict and demonetize the videos because they were created by an African American;

7   they relate to issues and events of concern to the African American community, and they are

8   viewed by large numbers of members of the African American community.

9        180.    In addition to the Defendants' efforts to reduced Plaintiff Cabrera's reach by

10  misapplication of "Restricted Mode," for various periods, off and on, throughout the past five

11  years, Defendants have shadow banned both individual videos posted by Plaintiff Cabrera, and her

12  channels, "Lisa Cabrera," and "Lisa C" in their entirety.  Viewers have informed Plaintiff that they

13  were unable to locate individual videos using YouTube search applications and terms such as "Lisa

14  Cabrera," "Lisa C," or using as search terms the names of individual videos posted by Plaintiff

15  Cabrera.

16       181.    Because Defendants single out Plaintiffs and other persons similarly situated for

17  rigorous enforcement of Defendants' Community Guidelines and TOS, to avoid receiving a

18  "strike" for copyright infringement and related channel suspension, Plaintiff Cabrera is careful

19  about complying with 'fair use' rules when using clips from someone else's videos:  she keeps

20  news clips short, averaging 1-4 minutes in length; she does not alter the original material in any

21  way; she always gives full credit in the video to the source of the original material of others.

22       182.    Sometimes, Plaintiff Cabrera posts identical videos both on the "Lisa Cabrera"

23  channel and the "Lisa C" back up channel to see if they generate similar viewer numbers and are

24  treated the same by Defendants' A.I., algorithms and other filtering tools.  Sometimes, the identical

25  videos posted on the "Lisa C" channel generate more viewers and revenue than those posted on the

26  "Lisa Cabrera" channel.  On six different occasions, Defendants flagged the "Lisa C" channel for

27  posting "100% of the video of another YouTube creator, despite the fact that the video was created

28  by Plaintiff Cabrera, registered owner of both channels, and despite Plaintiff Cabrera's written

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

1  communications to Plaintiffs notifying them that she had given permission to "Lisa C" to repost

2  each of the videos.  Ultimately, Plaintiff was forced to archive each of the six videos that

3  Defendants had flagged on the "Lisa C" channel simply because Defendants claimed that she was

4  violating her own copyright on her own channel.

5       183.    Defendants removed 68 of Plaintiff Cabrera's videos without notice, explanation or

6  justification other than the videos involved copyright infringements.  Though she promptly

7  appealed each removal, she was unable to have Defendants resolve the removal of the videos.

8  Defendants permanently archived those 68 videos.  Now they cannot be viewed, accessed or copied

9  by anyone.  They are simply "lost" to Plaintiff Cabrera.  Defendants never informed Plaintiff

10  whether someone had flagged any of these videos; who, if anyone, asserted a copyright interest in

11  any content of any individual video; what, if anything, in the video triggered the Defendants'

12  conduct.  Without such information, Plaintiff Cabrera could neither understand the Defendants'

13  strike against any one video or attempt to resolve the strike for any video.

14       184.    Defendants wrongly suspended the "Lisa Cabrera" channel for "hate speech in

15  connection with a video Plaintiff posted commenting on a report by NBC regarding the purchase of

16  illicit narcotics on the dark web.  Plaintiff Cabrera promptly appealed the suspension.  Defendants

17  rejected the appeal and refused to actually watch the video.  It was only after Plaintiff Cabrera filed

18  a case against Defendants in small claims court that Defendants finally contacted Plaintiff Cabrera

19  and informed her that the suspension was erroneous.  In all, "Lisa Cabrera" was suspended and

20  fully demonetized for six weeks due to Defendants' error.

21       185.    Following the lifting of the suspension for the "Lisa Cabrera" channel, the channel

22  remained demonetized, without the SuperChat application, and with 0 subscribers listed for the

23  channel.  Defendants waited two additional weeks to restore monetization for individual videos,

24  SuperChat and the prior existing subscribers for the channel.  In all, Plaintiff Cabrera lost 8 weeks

25  of revenue due to Defendants' wrongful conduct and refusal to even look at the video content that

26  they had improperly flagged as "hate speech."  Defendants never offered to compensate her for the

27  lost revenue they caused.

28

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

186.     Defendants deputize YouTube users (those who are not members of disfavored groups like those to which Plaintiffs and other persons similarly situated belong) to flag videos and channels that purportedly violate Defendants' Community Guidelines and TOS, and then automatically remove, restrict, or demonetize flagged videos, and suspend or remove flagged channels, without verifying that the videos or channels in question actually violate any published standard.  As a result of Defendants' abdication to anonymous YouTubers of responsibility for enforcing applicable standards, Plaintiffs and other persons similarly situated are subjected to racist, misogynist, abusive trolls who target Plaintiffs' videos and channels for adverse action by Defendants.

187.     In January of this year, Defendants again suspended  all monetization for videos posted to "Lisa Cabrera" following a threat made by YouTube user, Oxyman, during a Livestream broadcast on his channel where he vowed, "I'm gonna make sure [Lisa Cabrera's] channel gets demonetized."  Plaintiff Cabrera is informed and believes that Oxyman flagged her channel purportedly for violating Defendants' Community Guidelines or TOS.  Without taking any steps to verify the flag or reported violation, Defendants then demonetized the "Lisa Cabrera" channel in January of this year without any prior notification or explanation given to Plaintiff.

188.     Thereafter, Plaintiff Cabrera promptly appealed the Defendants' action.  Defendants informed her that she could reapply for access to monetization only after waiting 30 days.

189.     After 60 days, Defendants restored monetization for the "Lisa Cabrera" channel videos without any explanation as to why they had demonetized the channel to begin with.  Defendants never offered to compensate her for the lost revenue they caused by blindly assuming the validity of Oxyman's flag on the "Lisa Cabrera" channel.

190.     To compound the financial injury to Plaintiff Cabrera, during this same period, Defendants were running advertisements for the World Health Organization regarding Covid-19 prevention, and receiving advertising revenue at the same time that "Lisa Cabrera" was completely demonetized.

191.     Plaintiff Cabrera has also been the subject of improper posts by YouTube creator, Michael Anderson, a known white supremacist.  Michael Anderson posted a false video which had

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

1   as a subject Plaintiff Cabrera and disparaged her personally.  Mr. Anderson also posted Plaintiff's

2   name and residential address in the comments section of his video.  After recording an image of the

3   video displaying Lisa Cabrera's name and address in the comments section; Mr. Anderson then

4   removed the video and reposted it without Lisa Cabrera's address.

5        192.    Following Mr. Anderson's posting of the video and Plaintiff Cabrera's residential

6   address, numerous additional copies of the video with the address in the comments section

7   appeared on multiple additional YouTube channels.

8        193.    Plaintiff Cabrera used Defendants' reporting tool, which sent links to the video to

9   Defendants.  Defendants never responded to Plaintiff.  Approximately fifty of the subscribers to the

10  "Lisa Cabrera" channel informed Plaintiff that they too had reported links to the video to

11  Defendants using the reporting tool.  Defendants took no apparent steps to remove the disparaging

12  video featuring Plaintiff Cabrera's name and false information regarding her, despite the fact that

13  the video clearly violated Defendants' Community Guidelines and TOS, while ignoring dozens of

14  reports with links flagging the Michael Anderson video.

15       194.    On another occasion, Michael Anderson made and posted another video which had

16  Plaintiff Cabrera as the subject, and "Lisa Cabrera" in the video's title.  This video featured an

17  image of Mr. Anderson in a car brandishing a revolver and talking about Plaintiff Cabrera.  Again,

18  Plaintiff Cabrera used Defendants' reporting tool and sent to Defendants a link to the video which

19  communicated a clear threat of violence by Mr. Anderson against Plaintiff Cabrera.  Again multiple

20  subscribers to "Lisa Cabrera" communicated to Plaintiff that they too had flagged the video using

21  Defendants' reporting tool.  And again, Defendants did absolutely nothing to remove the video, or

22  to suspend or remove Michael Anderson's channel for violating Defendants' Community

23  Guidelines or TOS.

24       195.    As a direct and proximate result of Defendants' blatant and overt racial

25  discrimination and wrongful conduct, "Lisa Cabrera" has not grown in subscriber numbers, viewer

26  numbers or view times as the channel would have otherwise grown absent Defendants' conduct.

27  Plaintiff Cabrera has been subjected to public disparagement, racist and misogynist abuse, public

28  posting of her private contact information and overt threats of physical violence – all of which has

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

1    occurred with the tacit, if not overt, approval of Defendants who have repeatedly refused to enforce

2    their own Community Guidelines and TOS.  Plaintiff Cabrera has suffered lost revenue directly due

3    to Defendants' racist profiling, A.I., algorithms and other filtering tools, while her channel was

4    demonetized, while her channel was suspended, while Defendants have held her 68 videos in

5    "archive," and Defendants continue to misapply "Restricted Mode" and limited monetization to

6    individual videos she has posted.

7                       **3.      Catherine Jones**

8            196.    Plaintiff Catherine Jones ("Plaintiff Jones") is an African American woman residing

9    in the State of Vermont who is the creator and owner of "Cooking with Carmen Caboom," a

10   YouTube cooking channel for African Americans, and "Carmen Caboom," and "Carmen Caboom

11   Reloaded," two YouTube channels dedicated to developing and posting both parodies and serious

12   videos which discuss and present information regarding issues and current events which are

13   important to the African American community.

14           197.    Plaintiff Jones created the "Carmen Caboom" channel in 2010, a backup "Carmen

15   Caboom" channel in 2014, the "Cooking with Carmen Caboom" channel in 2015 and the "Carmen

16   Caboom Reloaded," channel in 2018.  Defendants improperly removed the original "Carmen

17   Caboom" channel for purported nudity when no video posted to the channel included any nudity.

18           198.    Plaintiff Jones is also a YouTube partner.  Since creation, Plaintiff Jones" 2014

19   "Carmen Caboom" channel has posted many videos, several of which Defendants improperly

20   removed as hate speech, the remaining videos have garnered approximately 500 -1,200 views per

21   video overall which have generated approximately $500 per year.

22                       **4.      Denotra Nicole Lewis**

23           199.    Plaintiff Lewis has been a registered YouTube user since 2006 and has posted her

24   own videos on her YouTube channel, "Nicole's View" since 2016.  When she registered "Nicole's

25   View," Plaintiff Lewis answered Defendants' online questionnaire and self-identified as African

26   American or Black.  Had Defendants not requested that she provide personal information about

27   herself for her profile, Plaintiff Lewis would not have done so.  When she provided this

28   information, she had no idea that Defendants would use information about her race to generate

metadata about her, the videos she watched, and the videos she posted or that Defendants would insert, embed or associate such metadata with videos she posted, with her subscribers or with her viewers, much less that Defendants would do so to sell advertising based on race, identity or viewpoint; or that Defendants would filter, censor or restrict her videos based on information regarding her race, identity or viewpoint.

200.    Plaintiff Lewis creates and posts videos to inform and entertain the African American community with respect to current events and issues of import to Black Americans.  To date, she has posted 748 videos to her channel, some of which Defendants have removed from the platform, leaving only 731 of which remain available to be viewed by the public.  While "Nicole's View" has generated in excess of 10.6 million views since 2016, she has generated approximately $25,000 in all from those views.

201.    Plaintiff Lewis is informed and believes that Defendants have gathered extensive information in order to generate metadata based on that information, and then insert, embed, append, or associate such metadata with videos posted on "Nicole's View."  Defendants gathered information regarding her race (Defendants know that Plaintiff Lewis is an African American woman); that she makes and posts videos which have as a subject, relate to or discuss issues and current events that are important to members of the African American community; her subscribers either self-identify as members of the African American community or watch many videos posted by other creators who have self-identified as members of the African American community; and many of those who view her videos either self-identify as members of the African American community or watch videos posted by other creators who have self-identified as members of the African American community.

202.    Plaintiff Lewis is informed and believes that Defendants have applied "Restricted Mode" and have limited monetization for the videos she posted to "Nicole's View" because Defendants have a policy and practice of using A.I., algorithms, and other filtering tools to classify, curate, censor, and sell advertisements for YouTube videos based metadata Defendants create from information regarding the race, identity and viewpoint of creators, subscribers and viewers, rather than the content of the videos.

203.     Defendants routinely limit viewer access by applying "Restricted Mode" and by limiting monetization to most of the videos posted on the "Nicole's View" channel, despite the fact that the videos fully comply with all of Defendants' Community Guidelines and TOS, and contain no nudity, sexualized scenes or language, graphic depictions of sex or violence, drug abuse, or alcohol consumption.  Defendants have applied "Restricted Mode" to most of the videos posted, and have allowed only limited monetization to some videos, without any explanation or rationale other than to indicate that the "content identified is unsuitable for most advertisers."  Plaintiff Lewis is informed and believes that the sole reason that Defendants find the content is "unsuitable for most advertisers," is because Defendants discriminate against Plaintiffs and other persons similarly situated based on race, e.g., the content was created by an African American, relates to issues and events of concern to the African American community, and is viewed by many members of the African American community.

204.     For certain periods over the past four years, Defendants have shadow banned certain individual compliant videos posted by Plaintiff Lewis on "Nicole's View."  During various periods of time, those videos did not appear in YouTube searches using the terms "Nicole Lewis," or "Nicole's View," or using their individual video titles as search terms.

205.     "Nicole's View" video content consists roughly of 75% pre-recorded videos and 25% Livestream broadcasts.  For Livestream broadcasts, she sometimes has as many as 1000 viewers participating.  Plaintiff Lewis employs designated moderators to monitor, control and censor viewer comments to ensure compliance with Defendants' Community Guidelines and TOS, promptly removing any non-compliant comments and blocking offending participants.

206.     For the past two years, Defendants have used A.I., algorithms, and filtering tools to restrict the reach of videos posted on "Nicole's View," resulting in stagnant subscriber and viewer numbers.  "Nicole's View" is no longer growing.  The channel's analytics page from month to month reflects only minor changes to the numbers of subscribers, viewers, and view times.  To avoid the impact of Defendant' A.I., algorithms and filtering tools on Defendants' metadata generated from video titles and tags, Plaintiff Lewis intentionally self-censors:  (a) she avoids using controversial video titles; (b) she avoids using abbreviations like "BLM," "KKK;" terms such as

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

1  "Black," "White," "Racism," "Boogaloo," "White Supremacy," "Racial Profiling," "Police

2  Shootings," "Police Brutality," "Black Lives Matter;" names, such as those of individuals such as

3  those killed by law enforcement, "Bill Cosby," "Louis Farrakhan;" names of organizations such as

4  "Ku Klux Klan," "Nazi," "Neo-Nazi," "Aryan Brotherhood," and euphemisms that are known and

5  particular to the African American Community; she intentionally misspells terms such as "Black,"

6  "White," "Race," "Racism," and "Racial Profiling," because Defendants routinely flags such terms.

7  207.    Despite Plaintiff Lewis' efforts to self-censor and avoid the reach of Defendants'

8  A.I., algorithms, and filtering tools, most of the videos posted on "Nicole's View" have only

9  limited monetization, if any.

10  208.    On February 11, 2020, Plaintiff Lewis received an email from Defendants indicating

11  that "SuperChat was disabled," purportedly because "Nicole's View" was using the original

12  content of other YouTubers.  However, after a week, it became apparent that Defendants had not

13  merely disabled SuperChat, but had completely demonetized the entire "Nicole's View" channel.

14  Defendants did so without notice or explanation.  Plaintiff Lewis promptly filed an appeal of the

15  decision to disable SuperChat and to demonetize the entire channel.

16  209.    Mindful of the stringent standards which Defendants have always applied to the

17  channels of Plaintiffs and other persons similarly situated, Plaintiff Lewis has always followed

18  Defendants' Community Guidelines, and TOS.  Whenever she uses a news clip, she limits the clip

19  to several minutes and generates her own original commentary as video content to accompany the

20  clip.  The originators of all news clips incorporated into videos posted by Plaintiff Lewis are always

21  accorded full proper and credit in the video so that there is no possibility of viewers confusing the

22  news clip with her original commentary or content.

23  210.    Defendants did not respond to Plaintiff Lewis' appeal.  On or about June 7, 2020,

24  she suddenly noticed that Defendants had resumed placing advertisements on videos posted to

25  "Nicole's View."  When she checked the channel's analytics page, it reflected that her monetized

26  videos were again generating revenue and her Livestream broadcasts were generating donations.

27  Defendants have neither explained why the channel was fully demonetized for nearly two months,

28

1   nor why it was remonetized; nor have they offered compensation for the revenue which the channel

2   lost during that period.

3       211.    As a direct and proximate result of Defendants' racial discrimination and wrongful

4   conduct, "Nicole's View" has not grown in subscriber numbers, viewer numbers or view times and

5   it would have grown otherwise and Plaintiff Lewis has been deprived of significant revenue from

6   Defendants' sale of advertising, SuperChat and Livestream donations over the life of her channel.

7   Plaintiff Lewis' videos were all fully demonetized between February 11, 2020 and June 7, 2020,

8   during which period "Nicole's View" generated no income whatsoever.

9   **V.    CLASS ALLEGATIONS**

10      212.    Plaintiffs bring this action on behalf of themselves and a putative class of similarly

11   situated persons who use or have used YouTube or any of the services that Defendants offer in

12   connection with YouTube and who come within the definition or classification of a protected class

13   of persons under 42 U.S.C. 1981 (the "Class").

14      213.    Each and every claim alleged in this case is also alleged on behalf of every member

15   of the Class.

16      214.    The Class seeks both monetary damages, restitution, and/or other injunctive relief on

17   behalf of any persons who fall within the Class Definition:

18          All persons or entities in the United States who are or were:

19              (i) a person or entity defined or classified as a protected class or

20              person under 42 U.S.C. §1981; and

21              (ii) are members, users and or consumers of YouTube who uploaded,

22              posted, or viewed video content on YouTube subject to

23              Google/YouTube's Terms of Service, Mission Statement,

24              Community Guidelines, and/or any other content-based filtering,

25              monetization, distribution, personal data use policies, advertising or

26              regulation and practices any other regulations or practices that are

27              related to the YouTube Platform on or after January 1, 2015 and

28              continuing through to June 16, 2020 (the "Class Period").

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

1    Excluded from the Class are Defendants and their employees,

2    affiliates, parents, subsidiaries, and co-conspirators, whether or not

3    named in this Complaint, and the United States government.

4    215.    Class certification for the Class is authorized under Federal Rule of Civil Procedure

5    23 and applies to both claims for injunctive and equitable relief, including restitution, under Rule

6    23(b) (2) and for monetary damages under Rule 23(b)(3).

7    216.    There are at least 42 million members of the Class.

8    217.    The number of persons who fall within the definitions of the Class are so numerous

9    and geographically dispersed so as to make joinder of all members of the Class or Subclass in their

10   individual capacities impracticable, inefficient, and unmanageable, and without class wide relief,

11   each member of the Class would effectively be denied his, her, its, or their rights to prosecute and

12   obtain legal and equitable relief based on the claims and allegations averred in this Complaint.

13   218.    There are questions of law and fact common to the Class that relate to and/or are

14   dispositive of the nature and allegations of unlawful conduct alleged in the Complaint, and the

15   nature, type and common pattern of injury and harm caused by that unlawful conduct and sustained

16   by the putative members of the Class and Subclass including, but not limited to:

17   a.    Whether Defendants' regulations and content-based restrictions violate the

18   free speech, antidiscrimination, consumer fraud and unfair competition, and contractual rights of

19   the members of the Class with respect to each cause of action averred by the Plaintiffs below.

20   b.    Whether Defendants concealed, misrepresented or omitted to disclose

21   material policies and practices regarding the unlawful regulation of video content, advertising,

22   distribution, monetization, contractual obligations, and characteristics of the YouTube Platform to

23   the members of the Class;

24   c.    Whether Defendants use or have used unlawful, discriminatory,

25   anticompetitive and fraudulent, deceptive, unfair, and/or bad faith filtering tools and practices, in

26   the code and operation of their machine based, algorithmic, or A.I. filtering tools, and/or other

27   practices and procedures to review, regulate, and restrict content, and/or regulate and restrict the

28   advertising, monetization, distribution, and property rights of the Class;

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

1         d.     Whether Defendants are or have engaged in discriminatory practices against

2 the members of the Class based on protected characteristics under 42 U.S.C § 1981 or the Unruh

3 Civil Rights Act;

4         e.     Whether Defendants breached or are in breach of their form consumer

5 contracts and obligations to the Class;

6         f.     Whether Defendants have or are engaged in unlawful, deceptive, unfair, or

7 anticompetitive practices that violate federal or California law, and harmed and injured the Class;

8         g.     Whether the conduct of Defendants, as alleged in this Complaint, caused

9 injury to the business and property of Plaintiffs and the members of the Class;

10         h.     Whether Defendants' alleged regulations, practices, and conduct have caused

11 or threaten to cause irreparable harm to the speech of the Class so as to warrant the issuing of

12 temporary, preliminary and/or final injunctive relief and corresponding declaratory relief with

13 respect to the legal rights of the Class;

14         i.     The scope, nature, substance, and enforcement of injunctive and equitable

15 relief sought by the Class;

16         j.     Whether Defendants were unjustly enriched or obtained profits or ill-gotten

17 financial gains as a result of the unlawful, discriminatory, deceptive, unfair, or anticompetitive

18 practices perpetrated against the Class;

19         k.     Whether Defendants breached or are in breach of their contractual

20 obligations, implied duty of good faith and fair dealing, and or other promises under the consumer

21 form contracts entered into with members of the Class during the Class Period;

22         l.     Whether Defendants' content-based regulations and filtering practices, on

23 their face and/or as applied, violate the free speech rights of Plaintiffs and the Class under

24 California or federal law; and

25         m.     whether the Class is entitled to declaratory and other relief based on

26 Defendants' assertion of immunity from liability under the Communications Decency Act, 15

27 U.S.C. § 230 (c) (the "CDA"), with respect to any of the claims or allegations asserted by Plaintiffs

28 and the Class in this Lawsuit.

219.    Each of individual named Plaintiffs is a person protected under 42 U.S.C. § 1981, and a member of the Class.

220.    The claims of Plaintiffs are typical of and identical to those of the Class.

221.    Plaintiffs will fairly and adequately protect the interests of the members of the Class.

222.    Plaintiffs are represented by counsel who are competent and experienced in the prosecution and defense of similar claims and litigation, including class actions filed, prosecuted, defended, or litigated in under California and federal law, in California and federal courts, in connection with claims and certification of consumer and civil rights classes composed of members who reside in California and/or the United States.

223.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications.

224.    The questions of law and fact common to the members of the Class predominate over any questions of law or fact affecting only individual members of the Class or Subclass, including legal and factual issues relating to liability and the nature of the harm caused by Defendants' unlawful actions.

225.    The questions of law and fact common to the members of the Class also predominate over any questions of law or fact affecting only individual members of the Class because all claims in this Lawsuit are governed under California or controlling federal law, including legal and factual issues relating to liability and the nature of the harm caused by Defendants' unlawful actions.

226.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without the duplication of effort and expense that numerous individual actions would engender.

227.    Certification of the Class is also superior to other available methods for the fair and efficient adjudication of this controversy because and all claims in this Lawsuit must be brought and venued in a court of competent jurisdiction located Santa Clara County.

228.    The Class are readily definable and are categories for which records should and do exist in the files of Defendants.

229.    The prosecution as a class action will also eliminate the possibility of repetitious litigation.

230.    Class treatment will also permit the adjudication of smaller claims by members of the Class who otherwise could not afford to litigate or assert the claims asserted by Plaintiffs in this Lawsuit.

## VI.    INDIVIDUAL CAUSES OF ACTION

**FIRST CAUSE OF ACTION**
**REQUEST FOR A DECLARATORY JUDGMENT THAT SECTION 230(c)**
**IMMUNITY IS INAPPLICABLE TO DISCRIMINATION CLAIMS**
**(On Behalf Of Each Plaintiff Individually And The Class)**

231.    Plaintiffs re-allege and incorporate herein by reference, as though set forth in full, each of the allegations set forth in paragraphs 1 through 230 above.

### A.    Procedural Background Facts

232.    The CDA provides "**Protection for 'Good Samaritan' blocking and screening of offensive material:**"

(1) **Treatment of publisher or speaker**

No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

(2) **Civil liability**

No provider or user of an interactive computer service shall be held liable on account of —

(A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or (B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1). 47 U.S.C. § 230(c).

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

233.    On November 19, 2019, the Honorable Brian C. Walsh, Judge of the Superior Court of the County of Santa Clara (the "State Court"), ruled in *Prager University v. Google LLC*, Santa Clara County Superior Court Case No. 19CV340667,that 47 U.S.C. § 230(c) "immunizes service providers [such as Defendants] who endeavor to restrict access to material deemed objectionable," by employing filters to remove users' content from their platforms based on the political, religious, or other personal identity or viewpoint of the user rather than the actual online content posted by the user on the platform.  2019 WL 8640569, at *7 (Cal. Super. Ct. Nov. 19, 2019).

234.    Furthermore, the State Court ruled that, notwithstanding the express good faith language in Section 230(c)(2)(A), the content filtering and restrictions that internet service providers like Defendants engage in are not subject to any good faith, objective judicial review of the underlying content, or the internet providers filtering or restriction practices, but reside within and are left to the sole, unfettered discretion of the internet provider who acts to filter and restrict content at its whim.  2019 WL 8640569, at *10-11.

235.    In *Prager*, therefore, at least one state trial court has construed Section 230(c) as granting Defendants absolute immunity for all content curation decisions, including decisions based not on the actual on line material, but on the race, sex, or other identity and dismissing plaintiffs' claims without leave to amend despite detailed factual allegations, evidence, and party admissions of identity and viewpoint based discrimination and animus in regulating and filtering speech on YouTube).  2019 WL 8640569, at *10-12.

236.    A true and correct copy of the November 19, 1919-Order issued by the Hon. Brian Walsh, granting Defendants' immunity and dismissing all of plaintiffs' claims for relief without leave to amend is attached as Exhibit B hereto.

237.    On December 19, 2019, plaintiff timely filed a notice of appeal.  The notice of appeal rendered state court decision uncitable and of no precedential or legal value unless and until the California appellate courts affirm the application of Section 230(c) to intentional discrimination and the federal courts, which are the final authority on federal questions of law, concur in that decision.

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

238.     On May 18, 2020, the United States Department of Justice intervened in the *Divino* case and filed a brief defending the application of Section 230(c) to ISP's who filter, review, restrict, bock, or censor on line speech based on a user's racial, sexual, or other identity or viewpoint without regard to whether the online speech of the user violated the content based rules of the internet site or the provisions of Section 230(c).  A true and correct copy of the United States Department of Justice's Notice of Intervention (Dkt.# 46) and Memorandum of Law in Support (Dkt.#47) are attached as Exhibit C.

239.     On May 28, 2020 the President of The United States issued an Executive Order repudiating both the State Court decisions in *Prager* and contradicting the United States' position that Section 230(c) applies or can be applied to an ISP who engages in intentional race , sex or other identity or viewpoint based discrimination alleged in this Lawsuit and *Divino*.

240.     In the May 28 Order, the President directed the U.S. Department of Justice ("DOJ") and other Article 2 agencies or departments to enforce the "policy of the United States" that immunity law may not be applied or enforced with respect to any on line, publishing, filtering, blocking, or censorship conduct undertaken by an Internet Service Provider (ISP) that was based in any part on the user's race, sex, or other personal identity or viewpoint.

241.     The May 28 Executive Order states in pertinent part:

**Section 2 Protections Against Online Censorship.**

**(a)** It is the policy of the United States to foster clear ground rules promoting free and open debate on the internet. Prominent among the ground rules governing that debate is the immunity from liability created by section 230(c) of the Communications Decency Act (section 230(c)). 47 U.S.C. 230(c).  It is the policy of the United States that the scope of that immunity should be clarified: the immunity should not extend beyond its text and purpose to provide protection for those who purport to provide users a forum for free and open speech, but in reality use their power over a vital means of communication to engage in deceptive or pretextual actions stifling free and open debate by censoring certain viewpoints.  * * * *

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

242.    In particular, subparagraph (c)(2) expressly addresses protections from "civil liability" and specifies that an interactive computer service provider may not be made liable "on account of" its decision in "good faith" to restrict access to content that it considers to be "obscene, lewd, lascivious, filthy, excessively violent, harassing or otherwise objectionable."  It is the policy of the United States to ensure that, to the maximum extent permissible under the law, this provision is not distorted to provide liability protection for online platforms that -- far from acting in "good faith" to remove objectionable content -- instead engage in deceptive or pretextual actions (often contrary to their stated TOS) to stifle viewpoints with which they disagree. Section 230 was not intended to allow a handful of companies to grow into titans controlling vital avenues for our national discourse under the guise of promoting open forums for debate, and then to provide those behemoths blanket immunity when they use their power to censor content and silence viewpoints that they dislike.  When an interactive computer service provider removes or restricts access to content and its actions do not meet the criteria of subparagraph (c)(2)(A), it is engaged in editorial conduct.  It is the policy of the United States that such a provider should properly lose the limited liability shield of subparagraph (c)(2)(A) and be exposed to liability like any traditional editor and publisher that is not an online provider.

**(b)** To advance the policy described in subsection (a) of this section, all executive departments and agencies should ensure that their application of section 230(c) properly reflects the narrow purpose of the section and take all appropriate actions in this regard.  In addition, within 60 days of the date of this order, the Secretary of Commerce (Secretary), in Case 5:19-cv-04749-VKD Document 57 Filed 06/01/20 Page 6 of 8 consultation with the Attorney General, and acting through the National Telecommunications and Information Administration (NTIA), shall file a petition for rulemaking with the Federal Communications Commission (FCC) requesting that the FCC expeditiously propose regulations to clarify:

(i) the interaction between subparagraphs (c)(1) and (c)(2) of section 230, in particular to clarify and determine the circumstances under which a provider of an interactive computer service that restricts access to content in a manner not

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

specifically protected by subparagraph (c)(2)(A) may also not be able to claim

protection under subparagraph (c)(1), which merely states that a provider shall not

be treated as a publisher or speaker for making third-party content available and

does not address the provider's responsibility for its own editorial decisions; (ii) the

conditions under which an action restricting access to or availability of material is

not "taken in good faith" within the meaning of subparagraph (c)(2)(A) of section

230, particularly whether actions can be "taken in good faith" if they are:

**(A)** deceptive, pretextual, or inconsistent with a provider's terms of service; or **(B)** taken

after failing to provide adequate notice, reasoned explanation, or a meaningful opportunity

to be heard; and **(iii)** any other proposed regulations that the NTIA concludes may be

appropriate to advance the policy described in subsection (a) of this section. **(c)** The

Department of Justice shall review the viewpoint-based speech restrictions imposed by each

online platform identified in the report described in subsection (b) of this section and assess

whether any online platforms are problematic vehicles for government speech due to

viewpoint discrimination, deception to consumers, or other bad practices. * * * *

**Sec. 4. Federal Review of Unfair or Deceptive Acts or Practices.** (a) It is the

policy of the United States that large online platforms, such as Twitter and

Facebook, as the critical means of promoting the free flow of speech and ideas

today, should not restrict protected speech. The Supreme Court has noted that social

media sites, as the modern public square, "can provide perhaps the most powerful

mechanisms available to a private citizen to make his or her voice heard."

*Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017).  Communication

through these channels has become important for meaningful participation in

American democracy, including to petition elected leaders.  These sites are

providing an important forum to the public for others to engage in free expression

and debate. *Cf. PruneYard Shopping Center v. Robins*, 447 U.S. 74, 85-89 (1980).  *

* *Sec. 5. State Review of Unfair or Deceptive Acts or Practices and Anti-

Discrimination Laws.

**(a)** The Attorney General shall establish a working group regarding the potential enforcement of State statutes that prohibit online platforms from engaging in unfair or deceptive acts or practices.  The working group shall also develop model legislation for consideration by legislatures in States where existing statutes do not protect Americans from such unfair and deceptive acts and practices.  The working group shall invite State Attorneys General for discussion and consultation, as appropriate and consistent with applicable law.

**(b)** Complaints described in section 4(b) of this order will be shared with the working group, consistent with applicable law.  The working group shall also collect publicly available information regarding the following:

(i) increased scrutiny of users based on the other users they choose to follow, or their interactions with other users;

(ii) algorithms to suppress content or users based on indications of political alignment or viewpoint;

(iii) differential policies allowing for otherwise impermissible behavior, when committed by accounts associated with the Chinese Communist Party or other anti-democratic associations or governments;

(iv) reliance on third-party entities, including contractors, media organizations, and individuals, with indicia of bias to review content; and

(v) acts that limit the ability of users with particular viewpoints to earn money on the platform compared with other users similarly situated.

A true and correct copy of the President's Executive Order is attached as Exhibit D to this Complaint.

243.     In *Divino*, the "related" case to this Lawsuit, the LGBTQ+ plaintiffs asserted a claim for a declaratory judgment under 28 U.S.C. § 2201, *et seq*. asking this Court to declare that the immunity provision of Section 230(c) does not extend to intentional identity or viewpoint discrimination conduct by an ISP and, if not so construed, the law is unconstitutional, both as applied and on its face, under *Denver Area* and progeny.

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

244.     On June 2, 2020, this Court held a hearing in the *Divino* case on, among other things, the extent to which Section 230(c) applies, if at all, to intentional identity or viewpoint based discrimination by Defendants.

245.     Defendants argued that Section 230(c)(1) immunizes them from identity and viewpoint based discrimination because such discrimination is "publishing conduct" that Congress enacted Section 230(c)(1) to protect.

246.     Defendants contended that Section 230(c)(1) grants absolute immunity to an ISP for "publishing conduct" that includes discriminating against user based on the person's racial or sexual identity to filter, review, or block the access of the online user or its content on a website that is otherwise open to the general public.

247.     Although Defendants conceded at the oral argument that immunity might not be available in limited but unspecified "circumstances" involving race discrimination, Defendants maintained that intentional and systematic discrimination used to profile, review, and block the access and content of LGBTQ+ users was a traditional publishing function that comes within the conduct that Congress intended to protect under Section 230(c)(1).

248.     The LGBTQ+ plaintiffs in *Divino* argued that Section 230(c)(1) does not prevent the enforcement of contractual promises and other preexisting legal relationships between an ISP and user, including contractual based promises that Defendants may only filter, review and impose access restrictions on users based on the content of the video under specific rules that apply equally to all without reference or consideration of the user's identity or viewpoint.

249.     The breaching of these legally enforceable promises and obligations, express or implied, in a contract and license agreements between a user and an the ISP, and the other obligations and rights codified in the state or federal laws that regulate businesses that prohibit discrimination based on identity are neither specific or unique to publishers or traditional editorial function, and do not implicate liability for third party defamation or wrongs, but are legal obligations that apply to all business under contract and other legal obligations imposed on any business and its customer or consumer.

250.    The *Divino* plaintiffs also argued, as the Plaintiffs and all persons similarly situated argue in this Lawsuit, that Section 230(c) applies only to the filtering, reviewing, restricting, or blocking of on line "material" not to or based upon a person's identity or viewpoint, because racial profiling and identity or viewpoint censorship has nothing to do with and does not further the express statutory purpose of protecting minors from "offensive material" on the internet.

251.    The extension of Section 230(c)(1) beyond a limited immunity for defamation and other liabilities that arise from the failure to block unlawful third party content also renders Section 230(c)(2) statutory limits prohibiting bad faith or discriminatory filtering and blocking of on line appropriate content unenforceable, meaningless, and pure statutory surplussage.

252.    Finally, as in *Divino*, the application of either Section 230(c)(1) or (2) to immunize an ISP that uses identity or viewpoint discrimination to regulate on line speech is an unconstitutional permissive speech regulation law violates the First Amendment under *Denver Area* and progeny.

253.    The use of Section 230(c) to censor users based on their race, identity, or viewpoint is not viewpoint neutral, narrowly tailored to protect children from "offensive" material without creating a risk of erroneous private veto over otherwise appropriate speech, and eviscerates the pre-existing legal relationships, including the contractual and statutory obligations, and rights of the parties that would otherwise be enforceable in a court of law.

254.    The Court has taken the arguments under submission.

255.    A true and correct copy of the transcript of the Section 230(c) arguments recorded at the hearing in *Divino* is attached as Exhibit E to this complaint.

**B.    Justiciable Legal Controversies Currently Exist Regarding The Construction And Constitutionality Of 47 U.S.C. § 230(c).**

256.    At least four actual controversies now exist between the parties regarding the proper construction, scope, application, and constitutionality of the CDA statutory immunity granted to internet service providers given the unique allegations and claims asserted against Defendants in this case.

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

257.    Each of the controversies arise from a dispute about the extent to which Section 230(c) immunizes an internet service provider that discriminates against users because of the user's race, personal identity or viewpoints, including any profiling or consideration of Plaintiffs' race in making access decisions on YouTube

### 1. An Actual Controversy Exist As To Whether The Provisions Of Section 230(c) Immunize Defendants From Race, Personal Identity, or Viewpoint Discrimination In Filtering And Blocking On line Content And Access

258.    A justiciable controversy exist as to whether Section 230(c)(1) or (2) grants immunity to an ISP that breaches and express or implied contractual promises not to discriminate against users based on a person's identity, or viewpoint when reviewing, restricting, or denying access to YouTube under license and use agreements between the user and the ISP.

### 2. An Actual Controversy Exists As To Whether Section 230(c) Immunizes Defendants For Conduct That Violates

259.    A second justiciable controversy exists as to whether the provisions of Section 230(c)(1) or (2) permit Defendants to engage unlawful conduct that uses person's race, identity, or viewpoint to restrict on line material and access in contravention of established federal and state laws prohibiting such discrimination in contract, 42 U.S.C. § 1981 and Unruh Civil Rights Act, Cal. Civ. Code §§51, *et seq.*, unlawful, deceptive or anticompetitive business practices, including conduct prohibited under section 1124 of the Lanham Act and section 17200 of the California Business and Professions Code, and discriminatory censorship in violation of the Liberty of Speech Clause enshrined in Article 1, Section 2 of the California Constitution.

### 3. The Provisions And/or Application Of Any Part Of Section 230(c) To Claims Arising Out Of Race, Identity, Or Viewpoint Discrimination Is Unconstitutional

260.    As a third justiciable controversy exists as to whether Section 230(c) is unconstitutional because it violates the First Amendment and/or Equal Protection clause of the U.S. Constitution on its face and/or as applied to this Lawsuit.

261.    Construing any provision of the  "Good Samaritan Immunity For Blocking On line Material" under Section 230(c) as permitting an ISP to use a person's race, identity, or viewpoint to

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

1   filter, review, or block on line access or content is unconstitutional under the test governing the

2   constitutionality of permissive private party speech laws.

3       262.    Section 230(c) (1) and (2) is congressional law that was enacted to permit a private

4   party to regulate on line speech.  Consequently, under *Denver Area*  and progeny, the law cannot be

5   applied in a manner that is NOT identity or viewpoint neutral, must be narrowly tailored and

6   applied to avoid the risk of erroneous private censorship, and may not be used to interfere or alter

7   the pre-existing legal relationships between the parties.

8           **4.      The Executive Order Precludes The Government From Arguing Or
            Enforcing Section 230(c) To Claims Based On Intentional Identity Or
9           Viewpoint Discrimination.**

10      263.    A fourth justiciable controversy exists as to legal effect of the President's Executive

11  Order on the application of Section 230(c) to on line content and access regulation based on a

12  user's identity and viewpoint, as is set forth in this Lawsuit.

13      264.    In the Order, the President declares that is the policy of the United States to ensure

14  that Section 230(c) must be applied in a manner that is viewpoint neutral and does not permit ISPs

15  to censor on line content or block on line user access based on the identity or viewpoint of the user.

16  If given full legal affect, the Executive Order mandates the obvious: Section 230(c) applies only to

17  filtering and blocking "offensive material," not the persons who use the internet.

18      265.    The Executive Order provides that its application does not create a substantive legal

19  right that did not exist before, or otherwise alter the parties' relationships.  But that language begs

20  the question as to what rights and relationships already exist under Section 230(c) in this Lawsuit.

21  The Executive Order directs the United States to enforce the law and promulgate regulations that

22  preclude what Defendants want to use its provisions for in this Lawsuit:  to discriminate against

23  Plaintiffs based on their race, identity and viewpoints.

24      266.    Consequently, the Executive Order also creates a conflict of interest for the

25  Department of Justice under Rule 5.1.  The Order specifically instructs DOJ to take all steps,

26  including, but not limited to, promulgating regulations to ensure that Section 230(c) is not and will

27  never be used to permit identity or viewpoint discrimination in the regulation of on line content.

28

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

267.    At the same time, DOJ has intervened and formally taken the opposite position before this Court regarding the application of Section 230(c) to the very identity and viewpoint discrimination that the President has instructed DOJ to prohibit.  That position effectively precludes DOJ or any agency of the United States from promulgating and enforcing the very regulations and other steps in the Order that preclude identity and viewpoint discrimination.

268.    Furthermore, because of the conflicting positions taken by DOJ in *Divino*, the United States may be judicially estopped from enforcing or giving any affect to the President's Executive Order.

**C.      Plaintiffs Served Rule 5.1 Notice On The U.S. Attorney General**

269.    In challenging the Constitutionality of the CDA, Plaintiffs must comply with Federal Rule of Civil Procedure 5.1 which requires that "[A] party . . . promptly [] file a notice of constitutional question stating the question and identifying the paper that raises," where "a federal statute is questioned and the parties do not include the United States, one of its agencies, or one of its officers or employees in an official capacity." Fed. R. Civ. P. 5.1. Under Rule 5.1 "statute" means any congressional enactment that would qualify as an "Act of Congress."

270.    Rule 5.1 requires more than the court certification provided by 28 U.S.C. § 2403; Rule 5.1 requires notice and certification to the United States Attorney General of any constitutional challenge to a federal statute, not merely to challenges of laws "affecting the public interest." 28 U.S.C. § 2403.

271.    The CDA constitutes a federal statute under Rule 5.1.

272.    Plaintiffs have served the Rule 5.1 Notice on the United States Attorney General stating that Plaintiffs are challenging the constitutionality of 47 U.S.C. § 230(c), identifying the CDA, and attaching a copy of this Complaint, and a copy of Judge Walsh's November 19, 2019Order.

273.    Plaintiffs have served the Rule 5.1 Notice and attachments by certified mail and have sent a copy of the Notice and attachments to the United States Attorney General by overnight delivery service.

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

274.    28 U.S.C. § 2403 also requires that the Court notify the United States Attorney

General of Plaintiffs' First Cause of Action set forth in this Complaint: "In any action, suit or

proceeding in a court of the United States to which the United States or any agency, officer or

employee thereof is not a party, wherein **the constitutionality of any Act of Congress affecting**

**the public interest is drawn in question, the court shall certify such fact to the Attorney**

**General**, and shall permit the United States to intervene for presentation of evidence, if evidence is

otherwise admissible in the case, and for argument on the question of constitutionality.  The United

States shall, subject to the applicable provisions of law, have all the rights of a party and be subject

to all liabilities of a party as to court costs to the extent necessary for a proper presentation of the

facts and law relating to the question of constitutionality."  28 U.S.C. § 2403(a) (emphasis added).

275.    Accordingly, Plaintiffs respectfully request that the Court certify to the United

States Attorney General of the United States that 48 U.S.C. § 230(c), a federal statute, has been

challenged by Plaintiffs on the grounds averred below.

276.    At this time, United States has a potentially unwaivable conflict of interest under the

applicable law and ethics rules governing conflicts of interest and divided duty of loyalty.

277.    In complying with the notice requirements under Rule 5.1, Plaintiffs are not waiving

but are expressly reserving their rights to assert that the United States has a conflict of interest that

may preclude intervention under Rule 5.1, and/or to seek other appropriate relief, including

disqualification, and oppose intervention, in this Lawsuit or any other proceeding that conflicts

with the policy of the United States that Section 230(c) does not permit or immunize identity or

viewpoint discrimination.

**SECOND CAUSE OF ACTION**
**FOR BREACH OF CONTRACT**
**(On Behalf Of Each Plaintiff Individually And The Class)**

278.    Plaintiffs re-allege and incorporate by reference in whole or in part the allegations

alleged in paragraphs 1 through 277.

279.    The TOS and agreement(s) between Defendants and Plaintiffs governing filtering,

review and access to content and services on YouTube provide that the right and obligations under

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

1  those agreements are governed and subject to California law, including federal law that California

2  is obligated to enforce under the supremacy clause of the U.S. Constitution.

3       280.    The elements of a breach of contract under California law are: (1) existence of a

4  valid contract between Plaintiffs and Defendants; (2) Plaintiffs' performance (or excuse for non-

5  performance) under the contract; (3) Defendants' breach of the contract; and (4) proof of harm or

6  financial injury as a result of the breach.

7       281.    Plaintiffs and Defendants have entered into agreement, including the TOS and

8  related agreement(s) that are enforceable contract(s) governed by and under California law;

9       282.    Plaintiffs have performed their obligations under the TOS and/or other contract(s),

10 including complying with YouTube's viewpoint neutral content based access rules and granting

11 Defendants a perpetual and irrevocable license to their video content and all personal data and

12 consumer information derived or used in connection with Plaintiffs' content on or use of YouTube.

13      283.    Defendants have breached their promises to provide Plaintiffs' equal access to

14 YouTube and all related services that Defendants offer to other users, and are subject only to

15 content based rules that are viewpoint neutral and apply equally to all.  Specifically, Defendants

16 have denied and interfered with Plaintiffs' right of equal access to YouTube and its related services

17 by profiling and using Plaintiffs' race, identity or viewpoints, not merely the material in the video

18 content, to review, filter and restrict Plaintiffs' access to YouTube in a manner that is not permitted

19 by federal and California law.

20      284.    As a direct and proximate result of Defendants' breach, Plaintiffs have suffered

21 monetary damages and other financial harms and losses in excess of $500.00 per year plus other

22 lost revenues, the total amount of which will be determined at trial.

23      285.    As a direct and proximate result of Defendants' breach, Plaintiffs have also suffered

24 irreparable harm to their contractual based rights of free speech and expression provided for under

25 the express and implied provisions of the TOS and other contract(s).

26

27

28

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

**THIRD CAUSE OF ACTION**
**FOR BREACH OF THE IMPLIED COVENANT**
**OF GOOD FAITH AND FAIR DEALING**
**(On Behalf Of Each Plaintiff Individually And The Class)**

286.   Plaintiffs re-allege and incorporate by reference in whole or in part the allegations alleged in paragraphs 1 through 285.

287.   Under California law, every contract "imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." *McClain v. Octagon Plaza, LLC,* 159 Cal.App.4th 784, 798 (2008) (quoting *Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc*., 2 Cal.4th 342, 371– 72 (1992)).

288.   The covenant "is based on general contract law and the long-standing rule that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." *Waller v. Truck Ins. Exchange, Inc*., 11 Cal.4th 1, 36 (1995).  The covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another.  When a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing" and such discretion "must be exercised in good faith."  *Carma*, 2 Cal.4th at 372; *see also Perdue v. Crocker Nat'l Bank*, 38 Cal.3d 913, 923 (1985) (""where a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing").)

289.   Breach of the implied covenant occurs "[w]here the terms of a contract are literally complied with but one party to the contract deliberately countervenes the intention and spirit of the contract." *Hilton Hotels Corp. v. Butch Lewis Prod., Inc*., 808 P.2d 919, 922–23 (Nev. 1991). "Establishing such a breach of the implied covenant depends upon the 'nature and purposes of the underlying contract and the legitimate expectations of the parties arising from the contract." *Integrated Storage Consulting Servs., Inc. v. NetApp, Inc.,* No. 5:12-CV-06209-EJD, 2013 WL 3974537, at *7 (N.D. Cal. July 31, 2013).

290.   Five factual elements are required to establish a breach of the covenant of good faith and fair dealing: (1) the parties entered into a contract; (2) the plaintiff fulfilled his obligations

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

under the contract; (3) any conditions precedent to the defendant's performance occurred; (4) the defendant unfairly interfered with the plaintiff's rights to receive the benefits of the contract; and (5) the plaintiff was harmed by the defendant's conduct.  Judicial Council of California Civil Jury Instruction 325.

291.     Plaintiffs and Defendants have entered into contracts, including the TOS, in connection with Plaintiffs' use and access to YouTube and the related services Defendants offer under those contracts.

292.     Plaintiffs have fulfilled their obligations under the TOS and other agreement(s) and fulfilled or performed the conditions precedent, if any, under those agreement(s), including complying with YouTube's viewpoint neutral content based access rules and granting Defendants an irrevocable and perpetual license to their video content and any personal information and data derived from Plaintiffs' use or content on YouTube, and paying Defendants other consideration for services and access.

293.     Defendants unfairly interfered with Plaintiffs' rights by profiling and using their race, personal identity or viewpoint to deny them equal access to YouTube and its related services based on conduct that that is prohibited by and not permitted under California or federal law.

294.     As a direct and proximate result of Defendants' breach, Plaintiffs have suffered monetary damages and other financial harms and losses in excess of $500.00 per year plus other lost revenues, including the monetary value of unlawfully acquired property and license rights to Plaintiffs' content and the personal data and information derived from Plaintiffs and their subscribers and viewers, the total amount of which will be determined at trial.

295.     As a direct and proximate result of Defendants' breach, Plaintiffs have also suffered irreparable harm to their contractual based speech rights and expression provided for subject to only to viewpoint neutral content based rules as set forth in the express and implied provisions of the TOS and other contract(s).

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

**FOURTH CAUSE OF ACTION**
**FOR PROMISSORY ESTOPPEL**
**(On Behalf Of Each Plaintiff Individually And The Class)**

296.    Plaintiffs re-allege and incorporate by reference in whole or in part the allegations alleged in paragraphs 1 through 295.

297.    "The elements of promissory estoppel are (1) a promise, (2) the promisor should reasonably expect the promise to induce action or forbearance on the part of the promisee or a third person, (3) the promise induces action or forbearance by the promise or a third person (which we refer to as detrimental reliance), and (4) injustice can be avoided only by enforcement of the promise. *West v. JPMorgan Chase Bank, N.A.,* 214 Cal.App.4th 780, 803 (2013).

298.    Defendants have made at least 5 promises to Plaintiffs and other similarly situated users:

a.    Defendants promise Plaintiffs equal access to YouTube subject only to viewpoint neutral content-based rules that apply equally to all users;

b.    Defendants promise not to discriminate against Plaintiffs based on their race, sexual identity, commercial status or identity, or the personal viewpoints except as permitted under California or controlling federal law;

c.    Defendants promise to provide viewer and audience reach, advertising, subscription, monetization, and content curation services to Plaintiffs and other users who comply with YouTube's viewpoint neutral content-based rules;

d.    Defendants promise only to use, appropriate, or derive revenue from Plaintiffs' content and data, and that of their viewers and subscribers subject to Defendants' honoring and fulfilling their express and implied terms and obligations under the TOS and other agreement(s); and

e.    Defendants promise to operate YouTube as a public forum for freedom of expression that is subject only to narrowly tailored, viewpoint neutral content based rules.

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

1    299.    Defendants made these promises with the reasonable expectation and intent of

2 inducing Plaintiffs to grant Defendants an irrevocable license rights and other valuable

3 consideration derived from Plaintiffs' use of YouTube.

4    300.    Defendants also made these promises with the intent of inducing Plaintiffs, as well

5 as their viewers, subscribers, and followers, to access and use YouTube so that Defendants can

6 monetize, advertise, and profit from user access and use of YouTube and the related services that

7 Defendants offer.

8    301.    Defendants, through these promises, induced Plaintiffs to grant Defendants an

9 irrevocable license, rights and other valuable consideration derived from Plaintiffs' use of

10 YouTube.

11    302.    Defendants, through these promises, induced Plaintiffs, as well as their viewers,

12 subscribers, and followers, to access and use YouTube so that Defendants can monetize, advertise,

13 and profit from user access and use of YouTube and the related services that Defendants offer.

14    303.    Enforcing Defendants' promises will avoid injustices, including stopping overt,

15 intentional, and race and sex discrimination against Plaintiffs, prohibiting from misappropriating

16 Plaintiffs' content and data, and prohibiting Defendants to become unjustly enriched and unfairly,

17 inequitably, and illegally obtain the benefits of promises that Defendants have failed to honor,

18 comply with, or enforce.

19    304.    As a proximate result of Defendants' failure to honor and fulfill each of their

20 promises, Plaintiffs have suffered financial and monetary losses, had their intellectual and other

21 property rights unjustly misappropriated by Defendants' own personal financial and unjust gain,

22 and have suffered irreparable harm to speech and expression promised by Defendants, in an amount

23 to be determined at trial.

### FIFTH CAUSE OF ACTION
### FOR DISCRIMINATION IN CONTRACT IN VIOLATION OF 42 U.S.C. § 1981
### (On Behalf Of Each Plaintiff Individually And The Class)

26    305.    Plaintiffs re-allege and incorporate by reference in whole or in part the allegations

27 alleged in paragraphs 1 through 304.

28

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

306.     Title 42, Section 1981 of the U.S. Code codifies the right of each individual member of a protected racial classification to "have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. § 1981(a).

307.     The statute defines "make and enforce contracts" as including "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id.* § 1981(b).  The statutory protections apply to both "nongovernmental discrimination" and "impairment under color of State law." *Id.* § 1981(c).

308.     The elements of a claim for relief under 42 U.S.C. § 1981 are: (1) Plaintiff is a member of a protected class; (2) impairment of a contractual relationship under which plaintiff has rights; (3) defendant impaired that relationship on account of racial discrimination (such that, but for race, plaintiff would not have suffered the loss of a legally protected right); and (4) plaintiff was deprived of such services while similarly situated persons outside the protected class were not.  *See Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020); *Astre v. McQuaid*, 804 Fed. App'x 665, 666-67 (Mar. 25, 2020); *Lindsey v. SLT Los Angeles, LLC*, 447 F.3d 1138, 1145 (9th Cir. 2006).

309.     Plaintiff are African Americans and are members of the protected class under section 1981.

310.     Plaintiffs entered into binding and legally enforceable contracts with Defendants including the TOS and related agreement(s) under California and controlling federal law.

311.     The contractual relationship between each Plaintiff and Defendants was impaired with respect to the TOS and each and every one of the related agreement(s) in at least five ways:

a.     Defendants' TOS and, any other agreements, under which they claim the right to exercise "unfettered" discretion to impose content, use or services access restrictions based, in any way, on Plaintiffs' racial identity or viewpoint, violates and impairs the TOS, license agreements, and other service agreement(s) on its face;

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

1        b.      Defendants continue to breach the TOS and other agreement(s), by

2   exercising their contractual discretion to profile, filter, restrict, and block Plaintiffs' content and

3   access to YouTube, based on Plaintiffs' racial identity and viewpoint, in a manner that is not

4   permitted, but is expressly prohibited under California and federal law;

5        c.      Defendants breached and continue to breach their express and implied

6   promises under the TOS and other related agreement(s) that, You Tube shall not profile, use, base,

7   or impose any restrictions on Plaintiffs' content or access to YouTube based, in any way, on a

8   user's racial identity or viewpoint, and only review, filter, and restrict Plaintiffs' videos based on

9   on line video material that runs afoul of YouTube's viewpoint neutral content based rules;

10       d.      Defendants' use of content filtering, review, restricting, and blocking tools

11  and procedures to profile and use Plaintiffs' racial identity and viewpoint with respect to any

12  provision in the TOS or related agreements, impairs each and every one of Plaintiffs' rights,

13  express or implied, that exist in the TOS or other related agreement(s) that Defendants entered into

14  with Plaintiffs; and

15       e.      Defendants impaired their contractual relationship with each Plaintiff

16  because of Defendants' intentional use of Plaintiffs' racial identity or viewpoint to review, filter,

17  regulate, restrict, and block Plaintiffs' videos and access to YouTube under the false pretext that the

18  material in the video was properly reviewed and found to violate one of YouTube's content based

19  rules governing user content and access to the platform.

20       312.    Defendants impaired their contractual relationship with each Plaintiff on account of

21  intentional racial discrimination.  Despite their promises of neutrality and a diversity of viewpoints,

22  Defendants engage in a pattern and practice of intentional willful and malicious discrimination in

23  the provision of their services, including discriminating against and censoring of Plaintiffs' speech,

24  based not upon the content of speech, but on their race. Through the acts complained of herein,

25  Defendants intentionally denied, and aided or incited in denying, Plaintiffs full and equal

26  accommodations, advantages, privileges, and services, by discriminating against them in

27  demonetizing Plaintiffs' content and by placing their videos in "Restricted Mode."  But for their

28

1  race, Plaintiffs would not have been subjected to Defendants' filtering or the denial of their

2  contractual benefits under the Agreements.

3      313.    While Defendants have impaired and denied, and continue to impair and deny,

4  Plaintiffs' contractual benefits under the TOS and related agreement(s), similarly situated persons

5  who are not protected under the section 1981 protected class were not similarly treated, including

6  persons affiliated with or working for Defendants and/or their preferred users.  Such persons are

7  not being racially profiled and are not subject to the same content or access filtering, restrictions, or

8  blocking despite material in their videos that violates YouTube's content based rules.

9      314.    As a direct and proximate result of Defendants' unlawful discriminatory actions,

10  Plaintiffs suffered, and continue to suffer, irreparable injury in fact, including, but not limited to:

11  lower viewership, lost advertising opportunities otherwise available to other nonprofits, decreased

12  ad revenue, and reputational damage, for which there exists no adequate remedy at law.

13

**SIXTH CAUSE OF ACTION**
**FOR UNLAWFUL DISCRIMINATION**
**IN VIOLATION OF THE UNRUH CIVIL RIGHTS ACT**
**(On Behalf Of Each Plaintiff Individually And The Class)**

14

15

16      315.    Plaintiffs re-allege and incorporate by reference in whole or in part the allegations

17  alleged in paragraphs 1 through 314.

18      316.    The elements of a claim for discrimination under the Unruh Civil Rights Act,

19  California Civil Code §§ 51, *et seq.* are: (1) Defendants denied, aided or incited a denial of full and

20  equal accommodations or services to Plaintiffs; (2) that a motivating reason for Defendants'

21  conduct was Plaintiffs' race or national origin; (3) that Plaintiffs were harmed and (4) that

22  Defendants' conduct was a substantial factor in causing that harm. *Nkwuo v. Metro PCS, Inc*., No.

23  5:14–cv–05027–PSG, 2015 WL 4999978, at *2 (N.D. Cal. Aug. 21, 2015).

24      317.    Defendants Google and YouTube host business establishment(s) that solicit, induce,

25  provide, and grant members of the public like Plaintiffs the right to access and use YouTube and its

26  services, subject only to viewpoint neutral content based rules that apply equally to all..

27      318.    Defendants grant members of the public like Plaintiffs the right to use and access

28  YouTube for commercial reasons and consideration, including obtaining a perpetual and

irrevocable license to Plaintiffs' and the other public users' content and data, including the right to appropriate that content and data for sale and other forms of monetization including advertising, data information sales and services, and other revenue and profit stream on YouTube through contract and business transactions including the TOs and related agreement(s).

319.   A substantial motivating reason for Defendants' conduct is Defendants' use of the racial identity, viewpoints, and other protected racial classifications under the law of Plaintiffs and other persons similarly situated to impose restrictions on their video content.

320.   Defendants' conduct is the result of arbitrary, capricious, invidious, and pretext-based discrimination against Plaintiffs' political and religious identity and race, color and/or national origin and viewpoints.

321.   Defendants' use of Plaintiffs' racial or other identities to restrict their right to equal access to YouTube is unlawful and fails to further any lawful, legitimate business interest, including ensuring compliance with YouTube's content based rules or protecting younger and "sensitive" audiences.

322.   Defendants have censored and treated, and continue to censor and treat, Plaintiffs and their videos differently from Defendants' own or preferred content, solely because of discriminatory animus towards Plaintiffs' identities and views.

323.   Specifically, Defendants use AI, Algorithm, and other filtering machines, procedures, and systems to knowingly and intentionally engage in and effectuate a pattern and practice of discrimination for profit by reviewing, filtering, restricting, and blocking Plaintiffs' content and access to YouTube based on Plaintiffs' racial or other identity or viewpoints and other traits or viewpoint that discriminate against Plaintiffs based on classifications that are protected under the Unruh Act, namely race, color and/or national origin.

324.   Defendants' wrongful actions were knowing and intentional, taken with oppression, fraud and/or malice, and effectuated through algorithms, machines, and human reviews that use Plaintiffs' racial identity and viewpoints, or other protected classifications to interfere with and block Plaintiffs' content and access on YouTube under the pretextual promise that everyone has

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

equal access to YouTube subject only to viewpoint t neutral content based rules that apply equally to all.

325.    As a direct and proximate result of Defendants' unlawful discriminatory actions, Plaintiffs suffered, and continue to suffer, irreparable injury in fact, for which there is no complete adequate remedy at law, including, but not limited harm and injury to contract based speech rights, and lost financial and business opportunities including viewership, advertising, monetization, and other opportunities and rights to gain popularity and revenues that are otherwise available to other users who are not profiled and regulated on YouTube based on their racial identity or viewpoints.

326.    As a direct and proximate result of Defendants' discriminatory acts and practices, Plaintiffs have also suffered monetary damages in an amount to be determined at trial.

327.    Defendants' violations of the Unruh Act further entitle Plaintiffs to recover statutory damages of up to three times the amount of actual damages in an amount to be proven at trial, or a minimum of $4,000 per violation.

**SEVENTH CAUSE OF ACTION**
**FOR FALSE ADVERTISING IN VIOLATION OF**
**THE LANHAM ACT, U.S.C. § 1125, *et seq*.**
**(On Behalf Of Each Plaintiff Individually And The Class)**

328.    Plaintiffs re-allege and incorporate by reference in whole or in part the allegations alleged in paragraphs 1 through 327.

329.    The elements of a false advertising claim under the Lanham Act, 47 U.S.C. § 1125, *et seq*., are: (1) false statement of fact by defendant in a commercial advertisement about its own or another's product; (2) the false statement actually deceived or has the tendency to deceive a substantial segment of the YouTube consumers or users; (3) the false statement is material, in that it is likely to influence the purchasing decision by a YouTube user; (4) the false statement entered interstate commerce; and (5) Plaintiffs have been, and are likely, to be injured as a result of the false statement. *Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*, 758 F.3d 1069, 1071 (9th Cir. 2014).

330.    Defendants' statements that Plaintiffs or their videos are "Restricted" is false because only videos that are reviewed and found to contain material that violates Plaintiffs' content

based rules, including nudity, vulgarity, violence, hate, shocking or sexually explicit material are can be "Restricted."  Plaintiffs' videos do not contain such "Restricted Material."

331.    Defendants' statements are further false because Defendants used Plaintiffs' race, identity or viewpoint to Restrict the video rather than any material that based on a review of the video violated YouTube's rules.

332.    Defendants' false statements are also "commercial advertising" because the statements were made to penetrate the market of YouTube users and have the effect of limiting or steering viewers away from Plaintiffs' channels and videos, to video content, channels, or creators who are sponsored by Defendants and for which or whom Defendants compete with Plaintiffs for viewers, advertising, monetization, and other revenue streams on YouTube.

333.    Defendants' false statements are likely to deceive users and advertisers on YouTube because the expressly and implicitly insinuate that there is something inappropriate, offensive, improper, or prohibited under YouTube's viewpoint neutral rules.

334.    Defendants' false statements are also material.  They likely influence and affect a user's and/or advertiser's viewing/purchasing decisions.  Users and/or advertisers are likely deceived that the video contains offensive material that violates YouTube's rules after Defendants reviewed the video for content violations under YouTube's Community Guidelines, Age Restrictions, and "Restricted Mode" prohibitions, when the basis for the restriction was Plaintiffs' race, identity or viewpoint and was not undertaken in compliance with YouTube's rules.

335.    Defendants' false statements not only influence but categorically control every user or advertiser's purchasing decisions because the statement results blocking of a user or advertisers access to the video on YouTube and precludes the user or advertiser from ever accessing, viewing and purchasing the video or purchasing and placing and ad for the video, or otherwise making any purchasing decision contrary to that of Defendants.

336.    Defendants' false statements entered internet commerce and reached millions of viewers who reside in all 50 States, U.S. Territories, and other users across the world.

337.    Plaintiffs are and are likely to continue to be financially harmed by the false statements, including losing substantial amounts revenues for viewer CPMs, advertising,

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

monetization, and other user or advertiser revenue streams on YouTube in an amount to be determined at trial.

**EIGHTH CAUSE OF ACTION**
**FOR UNLAWFUL, DECEPTIVE, AND UNFAIR BUSINESS PRACTICES**
**CAL. BUS. & PROFS. CODE §17200,** *et seq.*
**(On Behalf Of Each Plaintiff Individually And The Class)**

338.    Plaintiffs re-allege and incorporate by reference in whole or in part the allegations alleged in paragraphs 1 through 337.

339.    Defendants have committed acts of unfair competition, as defined by California Business and Professions Code § 17200, by engaging in the practices described above.

340.    Defendants' profiling, filtering, restricting, and blocking Plaintiffs' content and access on YouTube based on Plaintiffs' race, identity, or viewpoint is an unlawful business practice under section 17200 because those practices, acts, and conduct violates 42 U.S.C. § 1981 and the Unruh Civil Rights Act.

341.    Defendants' profiling, filtering, restricting, and blocking Plaintiffs' content and access on YouTube based on Plaintiffs' race, identity, or viewpoint are also deceptive business acts or practices as defined under section 17200 because they are based on intentionally false promises by Defendants to Plaintiffs, and other users, and advertisers that YouTube only restricts or blocks content or access based on violations of YouTube's content based rules that apply equally to all.  In fact, Defendants have knowingly and intentionally use Plaintiffs' racial or other identity or viewpoint to block content and access to YouTube under the false pretext that the video was reviewed like all videos on YouTube, including those sponsored by Defendants, and that the review found that Plaintiffs' videos actually contain material that violates YouTube's viewpoint neutral rules.

342.     Defendants' profiling, filtering, restricting, and blocking Plaintiffs' content and access on YouTube based on Plaintiffs' race, identity, or viewpoint are also unfair business acts or practices as defined under section 17200 because Defendants operate as both content review curators and content sponsors on YouTube.  This conflict is on full display when Defendants use their "unfettered" authority to restrict or block Plaintiffs' videos based on their race, identity, or

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

1   viewpoint but permit their own content or that of their preferred or sponsored content creators or

2   channels to go without review, restriction, or blocking even where the content violates YouTube's

3   content based rules.

4        343.    This includes inserting metadata and other signals into Plaintiffs' videos that permit

5   Defendants to profile and restrict or block content without reviewing the video and results in

6   restrictions and blocking of Plaintiffs' content based on Defendants' embedding and creating the

7   metadata, signals, or other racial profiling content that results in the restriction or blocking.

8        344.    There is no utility to the public for Defendants' actions, and the unlawful, deceptive

9   and unfair practices and conduct do not further a legitimate interest in protecting users from

10  offensive content.

11       345.    As a direct and proximate result of Defendants' unlawful, deceptive, and unfair

12  practices, conduct, and acts, Plaintiffs have suffered, and continue to suffer, immediate and

13  irreparable injury in fact, including lost income, reduced viewership, and damage to brand,

14  reputation, and goodwill, for which there exists no adequate remedy at law.

15       346.    Furthermore, as a result of such practices, conduct, and acts, Defendants

16  misappropriate and are unjustly enriched by taking consideration in the form of property rights to

17  content and data, and revenue that belongs to Plaintiffs in an amount that exceeds $5 million.

18       347.    Plaintiffs are therefore entitled to restitution of that and other amounts, as well as

19  other equitable relief to be determined at trial.

20       348.    At all times Defendants' wrongful actions were taken with oppression, fraud and/or

21  malice.  Indeed, at least dating back to 2017, Defendants have admitted and known that they were

22  targeting users like Plaintiffs, based on their race, identity, or viewpoint, in violation of their

23  promises and rules not to discriminate based on race, or any other identity or viewpoint.

24                      **NINTH CAUSE OF ACTION**
      **FOR VIOLATION OF CALIFORNIA CONSTITUTION ARTICLE I, SECTION 2**
25                **(On Behalf Of Each Plaintiff Individually And The Class)**

26       349.    Plaintiffs re-allege and incorporate herein by reference, as though set forth in full,

27  each of the allegations set forth in paragraphs 1 through 348 above.

28

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

350.     Article I, section 2 of the California Constitution enshrines the right to liberty of speech:  "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right." Cal. Const., art. I, § 2, subd. (a).

351.     The Liberty of Speech Clause is broader and more protective than the federal First Amendment. *Los Angeles Alliance for Survival v. City of Los Angeles,* 22 Cal.4th 352, 366-367 (2000).

352.     The Liberty of Speech provision "grants broader rights to free expression than does the First Amendment to the United States Constitution" because it enshrines the fundamental "idea that private property can constitute a public forum for free speech if it is open to the public in a manner similar to that of public streets and sidewalks." *Fashion Valley Mall, LLC v. Nat'l Labor Relations Bd.,* 42 Cal.4th 850, 857-58 (2007).

353.     Under the California Constitution, a person's Liberty of Speech enjoys full constitutional protection when it occurs on any private property that is used or designated by the owner or operator as a place similar to areas that have already been determined to be public forums. That includes privately owned internet sites.

354.     Consequently, the California Constitution protects the right to free speech on private property even in cases when the federal Constitution may not.

355.      The threshold element of a claim under the Liberty of Speech Clause is that the defendant property owner has so opened up his or her property for public use as to make it the functional equivalent of a traditional public forum based on three factors: (1) the nature, purpose, and primary use of the property; (2) the extent and nature of the public invitation to use the property; and (3) the relationship between the ideas sought to be presented and the purpose of the property's occupants." *Albertson's, Inc. v. Young*, 107 Cal. App. 4th 106, 119 (2003); 73 Op. Cal. Atty. Gen. 213, 222– 223 (1990).

356.     Defendants operate YouTube for the express purpose of inviting the public to use the platform as a for profit "public forum" where the public is invited to engage in "freedom of expression," where everyone's voice may be heard, subject only to viewpoint neutral rules that apply equally to all and Defendants' right to monetize and profit from the expression, speech, or

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

1  material that appears on YouTube through the property based license rights that the user must grant

2  Defendants as the price of admission to the forum.

3       357.    According to Defendants, the purpose, use, nature, invitation to use the forum, and

4  relationship between that purpose and invitation, on the one hand, and the ideas sought to be

5  presented the public, on the other, is that Defendants offer public internet service "that enables

6  more than a billion users around the world to upload" videos, where users are urged to "Broadcast

7  Yourself," "promote yourself" or "do the broadcasting yourself."

8       358.    Under the TOS, Defendants also represent that YouTube is open to everyone for

9  free expression and communication, regardless of race, identity, or viewpoint as long as the video

10  material complies with viewpoint neutral rules that apply equally to all.

11       359.    Based on these and other representations, Defendants have induced or attracted 2.3

12  billion people to use YouTube and Defendants currently use the YouTube "public forum" control

13  and regulate 95% of the global public video content that has currently or has ever existed in the

14  world.

15       360.    Under California law, Defendants' regulation of speech on the YouTube platform is

16  state action because Defendants perform an exclusively and traditionally public function: the

17  regulation of 95% of the world's public video based speech content by designating and operating

18  YouTube as a viewpoint neutral public forum for freedom of expression under California law.

19       361.    Accordingly, Defendants are prohibited from arbitrarily, unreasonably, or

20  discriminatorily excluding, regulating, or restricting videos or user access to services on YouTube

21  on the basis of viewpoint or identity of the speaker.  And any such exclusions, restrictions, or

22  regulations must comply with protections afforded Plaintiffs' free speech and expression under the

23  Liberty of Speech Clause, and the established jurisprudence that such protections apply to private

24  parties who use their property for purposes similar to the use of a government owned and operated

25  public forum.

26       362.    Plaintiffs' video content and access services constitute expressive speech and

27  activity that is protected by Article I, section 2 of the California Constitution.

28

363.    Defendants have filtered, restricted, blocked or interfered with Plaintiffs' rights to access, use, and express themselves on YouTube.

364.    Defendants' filtering, restricting, and blocking on Plaintiffs' speech and expressive conduct on YouTube violates Plaintiffs' Liberty of Speech because they are not based on the platform's viewpoint neutral rules governing what content is and is not permissible, but on the race, identity or viewpoint of Plaintiffs.

365.    Defendants' censorship and other speech regulation conduct harms and violates Plaintiffs' Liberty of Speech rights on YouTube in direct contravention of the procedural and substantive rules that Defendants created, published, and use to regulate that speech on YouTube.

366.    Furthermore Defendants' rules, both as applied and on their face, are subjective, vague, and overbroad criteria and proscription that Defendants use with unfettered and unbridled discretion to censor speech for any reason, or no reason at all, no matter how arbitrary or capricious in further violation of Plaintiffs' Liberty of Speech rights.

367.    Defendants also maliciously use and apply the rules as a pretext to censor and restrict Plaintiffs' speech for unlawful purposes including race and identity discrimination against protected classes of users and to gain a competitive advantage over Plaintiffs and other users who Defendants compete with in YouTube.

368.    Defendants' conduct, including the application of purportedly viewpoint neutral rules, are arbitrary and capricious, and unlawfully restrains and harms Plaintiffs based upon racial, political, religious, or other identity or viewpoint profiling the speaker, rather than the actual content of the speakers words or expression.  Defendants' actions, therefore, also violate Plaintiffs' right to free association and assembly under the Liberty of Speech Clause.

369.    Defendants' actions violate Plaintiffs' right to free association and assembly because , by blocking viewers' access to videos and comments based on the identity or viewpoint of the speakers or their opinions or other content featured in their videos that do not violate YouTube's viewpoint neutral content based rules

370.    No compelling, significant, or legitimate reason justifies any or all of Defendants' actions, including the purported interest claimed by Defendants for the need to protect minors or

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

sensitive audiences from offensive content because Plaintiffs' content is not "offensive" or otherwise violates Defendants' purported viewpoint neutral rules.

371.    And even if such interests did exist to justify Defendants' restriction and demonetization rules in theory, the conduct and restrictions imposed on Plaintiffs' speech are unconstitutional because they are not narrowly or reasonably tailored to further such interests, but sweep within their ambit speech and expression that complies with the rules that Defendants use to purportedly protect minors and sensitive audiences and are applied by Defendants with unfettered power to censor speech based in race, identity, or viewpoint or for any other discriminatory or unlawful reason or no reason at all.

372.    Given Defendants' monopolistic control over search results, on line advertising, public video content, and the myriad of other information services that Defendants unilaterally control, Plaintiffs have no alternative affording it a reasonable opportunity to reach their full intended audience.

373.    Defendants' discriminatory policies and application of those policies are not viewpoint-neutral, are unreasonable in time, place, and manner, and are unreasonable in relation to the nature, purpose, and use of the forum, but are unreasonable prior restraints on Plaintiffs' protected political speech, motivated by impermissible discrimination against Plaintiffs' racial identity and viewpoint.

374.    Defendants' intentional and wrongful actions were taken with oppression, fraud, malice and/or are arbitrary and capricious, and as part of Defendants' normal course of business, effectuated through both algorithms, as well as through human agents.  Additionally, Defendants' actions were done knowingly and intentionally to deprive Plaintiffs and their viewers of their rights under the California Constitution.

375.    As a direct and proximate result of Defendants' violations of clearly established law regarding public fora, Plaintiffs and all other persons similarly situated have suffered, and continue to suffer, immediate and irreparable injury in fact to their right to Liberty of Speech, including, but not limited to financial harms of lost income, reduced viewership, and damage to brand, reputation, and goodwill, for which there exists no adequately complete remedy at law.

**TENTH CAUSE OF ACTION**
**FOR FREEDOM OF SPEECH UNDER THE FIRST AMENDMENT,**
**UNITED STATES CONSTITUTION, AMENDMENT 1**
**(On Behalf Of Each Plaintiff Individually And The Class)**

376.    Plaintiffs re-allege and incorporate herein by reference, as though set forth in full, each of the allegations set forth in paragraphs 1 through 375 above.

**A.    Procedural Background**

377.    The First Amendment prohibits a party from engaging in "state action" that violates or harms a person's right to engage in speech, association, expression, or other activity protected by the Amendment.

378.    Since at least 1946, the U.S. Supreme Court has held that the First Amendment protects persons from private parties who engage in "state action" to restrict speech in ways that violate the First Amendment.

379.    Private parties can be state actors whose conduct is subject to judicial scrutiny and held to account under the U.S. Constitution in a number of different circumstances, including, but not limited to, a private party who (1) engages in a public function that has been traditionally reserved as the exclusive province of government, such as operating a company town or providing a service for the administration of a traditional government function like elections or law enforcement (the "Public Function Test"); and/or (2) is the beneficiary of a government law that endorses or permits the party to engage in conduct that interferes with a fundamental constitutional right in a manner that the government may not (the "Permissive Endorsement Test").

380.    The issue of when a private party is engaged in "state action" under either of these or other tests, is dependent on particular circumstances and has not been applied by the courts as a one size fits all.

381.    As a result, the extent to which circumstances may exist in which a private party engages in conduct that violates the First Amendment remains murky and unclear.

382.    In *Manhattan Cmty. Access Corp. v. Halleck,* --- U.S. --, --, 139 S. Ct. 1921 (2019), the Supreme Court held that and private owner-operator of a public access cable channel who regulates public speech on that channel does not become a state actor solely by the mere of making

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

1  a privately owned television channel available for as a forum for speech: "a private entity who

2  provides a forum for speech is not transformed by that fact alone into a state actor." *Manhattan*

3  *Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1930, 204 L. Ed. 2d 405 (2019).

4  383.   In so doing, however, the Court in *Halleck* limited its 5-4 decision to the

5  circumstances of that case and declined to overrule prior cases in which a private party who

6  regulates speech or engages in conduct that is otherwise prohibited under the Constitution was

7  found to be a "state actor" who was subject to constitutional scrutiny.

8  384.   Instead, the Court "stressed" that "very few" functions fall into that category of

9  "state action," including, "for example, running elections and operating a company town. *Id.* at

10  1929, 204 (citing *Terry v. Adams*, 345 U.S. 461, 468–470, 73 S. Ct. 809, 97 L. Ed. 1152 (1953)

11  (elections); *Marsh v. Alabama*, 326 U.S. 501, 505–509, 66 S. Ct. 276, 90 L. Ed. 265 (1946)

12  (company town); *Smith v. Allwright*, 321 U.S. 649, 662–666, 64 S. Ct. 757, 88 L. Ed. 987 (1944)

13  (elections); *Nixon v. Condon*, 286 U.S. 73, 84–89, 52 S. Ct. 484, 76 L. Ed. 984 (1932) (elections).

14  385.   The Court also stated that "a variety of functions do not fall into that category,

15  including, for example: running sports associations and leagues, administering insurance payments,

16  operating nursing homes, providing special education, representing indigent criminal defendants,

17  resolving private disputes, and supplying electricity." *Id.* (citing *American Mfrs. Mut. Ins. Co. v.*

18  *Sullivan*, 526 U.S. 40, 55–57, 119 S. Ct. 977, 143 L.Ed.2d 130 (1999) (insurance payments);

19  *National Collegiate Athletic Assn. v. Tarkanian*, 488 U.S. 179, 197, n. 18, 109 S. Ct. 454, 102 L.

20  Ed.2d 469 (1988) (college sports); *San Francisco Arts & Athletics, Inc. v. United States Olympic*

21  *Comm.*, 483 U.S. 522, 544–545, 107 S. Ct. 2971, 97 L.Ed.2d 427 (1987) (amateur sports); *Blum*,

22  457 U.S. at 1011–1012, 102 S. Ct. 2777 (nursing home); *Rendell-Baker*, 457 U.S. at 842, 102 S. Ct.

23  2764 (special education); *Polk County v. Dodson*, 454 U.S. 312, 318–319, 102 S. Ct. 445, 70 L.

24  Ed.2d 509 (1981) (public defender); *Flagg Bros.*, 436 U.S. at 157–163, 98 S. Ct. 1729 (private

25  dispute resolution); *Jackson*, 419 U.S. at 352–354, 95 S. Ct. 449 (electric service).

26  386.   Consequently, allegations that the relevant function in this case is only the operation

27  of public access channels on a cable system, is not a "function [that is] traditionally and exclusively

28  been performed by government to be establish "state action" under the Public Function Test. *Id.*

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

387.     Beyond those statements, however, the Court in *Halleck* did not specify what the pleading requirements are for establishing state action under one of the few "public functions" that would trigger constitutional scrutiny.  Nor was it presented with or had occasion to consider whether the private parties conduct was undertaken under a government enacted law that permitted unlawful conduct, including race discrimination, in contravention of fundamental constitutional rights, so as to trigger a limited state action under the Permissive Endorsement Test set forth in *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 109 S. Ct. 1402, 1407, 103 L. Ed. 2d 639 (1989).

388.     In *Prager University v. Google LLC*, the Ninth Circuit applied *Halleck* to hold that YouTube does not "lose its private character merely because the public is generally invited to use it for designated purposes" because "YouTube may be a paradigmatic public square on the Internet, but it is 'not transformed' into a state actor solely by "provid[ing] a forum for speech." *Prager Univ. v. Google LLC*, 951 F.3d 991, 997 (9th Cir. 2020) (citing *Halleck*, 139 S. Ct. at 1930, 1934).

389.     But like *Halleck*, *Prager* did not, nor could it, overrule or eliminate the Public Function Test doctrine of state action nor did it specify what the pleading requirement were for establishing one of "the few" functions that will trigger state action.  And it appears that the decision may be in conflict with *Halleck* and earlier cases when it held that public forum designations are "not a matter of election by a private entity" and "[we] decline to subscribe to Prager U's novel opt-in theory of the First Amendment. *Id.* at  999 (9th Cir. 2020) (citing *Cent. Hardware*, 407 U.S. at 547, 92 S. Ct. 2238 (holding only that "[b]efore an owner of private property can be subjected to the commands of the First and Fourteenth Amendments the privately owned property must assume to some significant degree the functional attributes of public property devoted to public use").

390.     Furthermore, the Ninth Circuit did not mention, or consider in any manner, the more limited theory of Permissive Endorsement "state action" based on Defendants' use of Section 230(c), a congressional speech regulation law, to unlawfully restrict speech 95% of the world's video speech based on race discrimination  and other protected identity classifications or

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

viewpoints that conflict with Plaintiffs' fundamental equal protection and speech rights under the Supreme Court's seminal case in *Skinner*.

391.    Consequently, no Court has ruled, nor could it, that Defendants can never engage, under any circumstances, in "state action" that is subject to judicial scrutiny under the First Amendment.  Nor has the pleading standards and requirement for such a claim been established, other than Defendants must be engaged in one of the few public functions identified in *Halleck* or use a congressional statute to do what they could not otherwise do under established law: discriminate against Plaintiffs' speech based on their race, identity or viewpoint.

**B.**    **Permissive Endorsement Allegations Of State Action**

392.    In *Skinner*, private railroad companies were preparing to implement suspicion-based breath and urine testing of their employees pursuant to recently enacted federal regulations referred to in the case as "Subpart D."  *Skinner*, 489 U.S. at 611.  Like Section 230(c)(2) of the CDA, Subpart D was "permissive"; it did not compel the testing, but rather left the decision to the railroads.  *Id.*  Crucially, however, again like Section 230(c)(2), Subpart D conferred state-law immunity: it protected railroads from being sued under state law if they chose to test.  *Skinner*, 489 U.S. at 611, 614-15 (Subpart D "pre-empt[ed] state laws, rules or regulations covering the same subject matter" and thus "removed all legal barriers to the testing").  In so doing, a unanimous Supreme Court held:

> "[t]he fact that the Government has not compelled a private party to perform a search does not, by itself, establish that the search is a private one.  Here, specific features of the regulations combine to convince us that the Government did more than adopt a passive position toward the underlying private conduct.

*Id.* at 615.

393.    Under *Skinner*, the elements of a state action claim under the Permissive Endorsement Test are: (1) reliance on a government law that removes all laws and legal barriers to private conduct that would otherwise unlawful and does so in a way that impacts a fundamental constitutional right; (2) a defendant uses the law to engage in that unlawful conduct; and (3) the government shares in the fruits or benefits in some way from the unlawful conduct.

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

394. Defendants rely on Section 230 to unlawfully discriminate against Plaintiffs and regulate their speech based on race, identity, viewpoint or in some other manner that violates federal or state law.

395. Defendants use Section 230(c) to pre-empt state law and obtain complete immunity in a manner that removes all legal barriers to the regulating, blocking, or restricting of content based on Plaintiffs' race, identity, or viewpoint.

396. Plaintiffs are forced to submit to race discrimination and other violations of their legal rights when they use YouTube.

397. The Communications Decency Act was, as the statute's name indicates, enacted by Congress to restrict access to "indecent" content on the Internet. 141 Cong. Rec. S8330 (daily ed. June 14, 1995) (statement of Sen. Exon).

398. The express purpose of Section 230(c)(2) is to encourage Internet platforms like Google and YouTube to "restrict" "obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable" material. 47 U.S.C. § 230(c)(2).

399. "The intent of Congress in enacting § 230(c)(2) was *to encourage efforts by Internet service providers to eliminate such material*." *Goddard v. Google*, No. C 08-2738 JF (PVT), 2008 WL 5245490, at *6 (N.D. Cal. Dec. 17, 2008) (emphasis added).

400. Section 230(c) makes clear Congress' "strong preference" for regulating on line speech based on race, identity or viewpoint and for allowing Defendants to discriminate against Plaintiffs in violation of established federal and state law.

401. The federal government has also made clear its "desire to share the fruits" of the unlawful and discriminatory conduct undertaken by Defendants with respect to regulating on line speech, law enforcement, information gathering, and other government services.

402. By way of one example only, in the six-month period from January to June 2017, when Defendants first admitted that they were knowingly and intentionally profiling and targeting users based on race, identity, and viewpoint, Google received almost 17,000 requests from U.S. law enforcement to turn over information regarding users' content and searches. *See Cooperation or*

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

1    *Resistance?: The Role of Tech Companies in Government Surveillance*, 131 Harv. L. Rev. 1722,

2    1722 (2018).  Google provided information to the government in some 80% of those cases.

3        403.    Under Section 230(c), Congress allows and affirmatively endorses the unlawful

4    discrimination and other conduct by Defendants.

5        404.    Defendants' use of Section 230(c) to engage in discrimination and other unlawful

6    conduct under state and federal law to regulate on line " material" on the internet is government

7    endorsed of the unlawful conduct and renders that conduct "state action" under *Skinner*  and the

8    Permissive Endorsement Test.

9        **C.      State Action Allegations Under The Public Function Test**

10        405.    Under *Halleck*  and *Prager*, the elements of state action under the Public Function

11   Test Appear to be: (1) Defendants are engaged in functions and conduct that fall into that

12   categories of "state action" that includes, but is not limited to, "running elections and operating a

13   company town."

14        406.    On or about December 2019, Defendants merged their different TOS into a single

15   contract whereby Defendants' discretion to find a violation YouTube's content based rules can be

16   used by Defendants to bar the user from using any or all services offered by Defendants in any way

17   including, the purchase and use of hand held smart phone, email, search engines, applications, and

18   information or other services that are essential for public health, safety, law enforcement, election

19   administration, taxation, and any other service performed by governments.

20        407.    Defendants also operate a "company town" in which they control essential

21   information and communication services without which local, state, or federal government agencies

22   cannot provide or otherwise administer essential services including elections.

23        408.    Until, if ever, the Supreme Court eliminates the Public Function Test for "state

24   action" in all cases as a matter of law, Defendants' use and regulation of speech and information

25   services on YouTube involves the "very few" functions that satisfy the Public Function Test for

26   "state action."

27

28

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

1

     **D.**    **Defendants' Conduct Violates The First Amendment**

2        409.    Defendants continue to filter, restrict, block and/or interfere with Plaintiffs' rights to

3  access, use, and express themselves on YouTube.

4        410.    Defendants' filtering, restricting, and blocking on Plaintiffs' speech and expressive

5  conduct on YouTube violates Plaintiffs' First Amendment rights because the conduct is not based

6  on the platform's viewpoint neutral rules governing what content is and is not permissible, but on

7  the race, identity or viewpoint of Plaintiffs.

8        411.    Defendants' censorship and other speech regulation conduct harms and violates

9  Plaintiffs' speech rights on YouTube in direct contravention of the procedural and substantive

10  viewpoint neutral content based rules that Defendants created, published, and use to regulate

11  speech on YouTube.

12        412.    Furthermore Defendants' rules, both as applied and on their face, are subjective,

13  vague, and overbroad criteria and proscription that Defendants use with unfettered and unbridled

14  discretion to censor speech for any reason, or no reason at all, no matter how arbitrary or capricious

15  in further violation of Plaintiffs' First Amendment Rights.

16        413.    Defendants also maliciously use and apply the Rules as a pretext to censor and

17  restrict Plaintiffs' speech for unlawful purposes including race and identity discrimination against

18  protected classes of users and to gain a competitive advantage over Plaintiffs and other users who

19  Defendants compete with in YouTube.

20        414.    Defendants' conduct, including the application of purportedly viewpoint neutral

21  rules, are arbitrary and capricious, and unlawfully restrains and harms Plaintiffs and all other

22  persons similarly situated, based upon racial, political, religious, or other identity or viewpoint

23  profiling of the speaker, rather than the actual content of the speaker's words or expression.

24  Defendants' actions, therefore, also violate Plaintiffs' right to free association and assembly under

25  the First Amendment.

26        415.    Defendants' actions violate Plaintiffs' right to free association and assembly because

27  , by blocking viewers' access to videos and comments based on the identity or viewpoint of the

28

speakers or their opinions or other content featured in their videos that do not violate YouTube's viewpoint neutral content based rules

416.    No compelling, significant, or legitimate reason justifies any or all of Defendants' actions, including the purported interest claimed by Defendants for the need to protect minors or sensitive audiences from offensive content because Plaintiffs' content is not "offensive" or otherwise violates Defendants' purported viewpoint neutral rules.

417.    And even if such interests did exist to justify Defendants' restriction and demonetization rules in theory, the conduct and restrictions imposed on Plaintiffs' speech are unconstitutional because they are not narrowly or reasonably tailored to further such interests, but sweep within their ambit speech and expression that complies with the rules that Defendants use to purportedly protect minors and sensitive audiences and are applied by Defendants with unfettered power to censor speech based in race, identity, or viewpoint or for any other discriminatory or unlawful reason or no reason at all.

418.    Given Defendants' monopolistic control over search results, online advertising, public video content, and the myriad of other information services that Defendants unilaterally control, Plaintiffs have no alternative affording them a reasonable opportunity to reach their full intended audience.

419.    Defendants' discriminatory policies and application of those policies are not viewpoint-neutral, are unreasonable in time, place, and manner, and are unreasonable in relation to the nature, purpose, and use of the forum, but are unreasonable prior restraints on Plaintiffs' protected political speech, motivated by impermissible discrimination against Plaintiffs' identity and viewpoint.

420.    Defendants' intentional and wrongful actions were taken with oppression, fraud, malice and/or are arbitrary and capricious, and as part of Defendants' normal course of business, effectuated through both algorithms, as well as through human agents.  Defendants' actions were done knowingly and intentionally to deprive Plaintiffs and their viewers of their rights under the California Constitution.

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

421.   As a direct and proximate result of Defendants' violations of clearly established law regarding constitutional speech regulation on YouTube, Plaintiffs have suffered, and continue to suffer, immediate and irreparable injury in fact to their right to Liberty of Speech, including, but not limited to financial harms of lost income, reduced viewership, and damage to brand, reputation, and goodwill, for which there exists no adequately complete remedy at law.

## VII.   PRAYER FOR RELIEF

Wherefore Plaintiffs and all other persons similarly situated request that the Court grant the following relief:

1.   A declaratory judgment remedy under 28 U.S.C. § 2201, et seq. for Plaintiffs' First Cause of Action challenging the construction, application, and constitutionality of Section 230(c) of the Communications Decency Act, 47 USC § 230(c), that Section 230(c) does not grant immunity to Defendants, or otherwise apply to claims and allegations that arise from, relate to, or are based on, Defendants Google/YouTube's unlawful racial profiling and use of the user's race, or other identity or viewpoint to filter, restrict, or block content, or otherwise deny Plaintiffs' access or use of any services offered by Google/YouTube in connection with Plaintiffs' use of YouTube on the grounds that:

a.   The plain language of sections 230(c)(1) and/or (2) only immunizes and ISP for filtering and blocking "offensive material," and does not immunize the regulating, restricting or blocking of material based on the racial, or other identity or viewpoint of the user posting or viewing the video;

b.   Sections 230(c)(1) or (c)(2) does not immunize an ISP who engages in race based identity or viewpoint discrimination under contracts and other business conduct that violates 42 U.S.C. § 1981 or the Unruh Civil Rights Act;

c.   The application of Section 230(c) in any way to permit and immunize race, sex, or other identity or viewpoint based profiling and regulation of content and access on YouTube is unconstitutional and violates the First Amendment under Denver Area 518 U.S. 727, 766-67; and/or

1          d.      The President's Executive Order date May 28, 2020, prohibits the

2   application of Section 230(c) immunity to the content and access filtering, restricting, and blocking

3   decisions and requires the Department of Justice to clarify and enforce the law in accordance with

4   identity and viewpoint neutrality.

5          2.      A declaratory judgment remedy under section 2201that Defendants have violated

6   and continue to violate Plaintiffs' rights to free speech and expression subject only to viewpoint

7   neutral content based rules that apply equally to all under Plaintiffs Second through Sixth, and

8   Eighth through Tenth Causes of Action;

9          3.      An injunction requiring Defendants to:

10         a.      Cease and desist from capriciously restricting, demonetizing, or otherwise

11  censoring any content of videos uploaded to the YouTube based on Plaintiffs' race, or other

12  identity or viewpoint in violation of federal and California law; and

13         b.      Cease and desist from censoring, restricting, restraining, or regulating speech

14  based on the discretionary use or application of discriminatory, animus-based, arbitrary, capricious,

15  vague, unspecified, or subjective criteria, rules, guidelines, and/or practices;

16         4.      Compensatory, special, and statutory damages in an amount to be proven at trial,

17  including statutory damages pursuant to, *inter alia*, Civil Code § 51, 51.5, 52, Civil Procedure Code

18  § 1021.5, 15 U.S.C. § 1117, 42 U.S.C. §§ 1981, 1983;

19         5.      A civil penalty of $2,500 for each violation pursuant to Business and Professions

20  Code §§ 17200, 17206, and 17536;

21         6.      Punitive damages and exemplary damages in an amount to be proven at trial;

22         7.      Restitution of financial losses or harm caused by Defendants' conduct and ill-gotten

23  gains, and disgorgement of profit obtained from all unlawful conduct in an amount to be proven at

24  trial;

25         8.      Attorneys' fees and costs of suit;

26         9.      Prejudgment and post-judgment interest; and

27         10.     Any and all other relief that the Court deems just and proper.

28

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

## VIII.   JURY TRIAL DEMAND

Plaintiffs demand trial by jury on all issues of law so triable.

DATED:  June 16, 2020                    Respectfully submitted,

BROWNE GEORGE ROSS LLP
Peter Obstler
Eric M. George
Debi A. Ramos
Keith R. Lorenze


By:  _____/s/ Peter Obstler_____
                    Peter Obstler
Attorneys for Plaintiffs Kimberly Carleste Newman,
Lisa Cabrera, Catherine Jones and Denotra Nicole Lewis

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION AND DAMAGES**

# Exhibit "A"

1  BROWNE GEORGE ROSS LLP
   Peter Obstler (State Bar No. 171623)
2    pobstler@bgrfirm.com
   44 Montgomery Street, Suite 1280
3  San Francisco, California 94104
   Telephone: (415) 391-7100; Facsimile: (415) 391-7198
4
   BROWNE GEORGE ROSS LLP
5  Eric M. George (State Bar No. 166403)
     egeorge@bgrfirm.com
6  Debi A. Ramos (State Bar No. 135373)
     dramos@bgrfirm.com
7  2121 Avenue of the Stars, Suite 2800
   Los Angeles, California  90067
8  Telephone: (310) 274-7100; Facsimile: (310) 275-5697

9  Attorneys for LGBTQ+ Plaintiffs Divino Group
   LLC, Chris Knight, Celso Dulay, Cameron Stiehl,
10 BriaAndChrissy LLC, Bria Kam, Chrissy
   Chambers, Chase Ross, Brett Somers, and
11 Lindsay Amer, Stephanie Frosch, Sal
   Cinquemani, Tamara Johnson and Greg Scarnici

12

13              UNITED STATES DISTRICT COURT

14     NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| 15 DIVINO GROUP LLC, a California limited liability company, CHRIS KNIGHT, an | Case No. 5:19-cv-004749-VKD |
| 16 individual, CELSO DULAY, an individual, CAMERON STIEHL, an individual, | **DECLARATION OF STEPHANIE FROSCH IN SUPPORT OF PLAINTIFFS' MOTION FOR LEAVE TO FILE SUR-REPLY BRIEF AND REQUEST FOR HEARING AND CASE MANAGEMENT CONFERENCE** |
| 17 BRIAANDCHRISSY LLC, a Georgia limited liability company, BRIA KAM, an individual, | |
| 18 CHRISSY CHAMBERS, an individual, CHASE ROSS, an individual, BRETT | |
| 19 SOMERS, an individual, and LINDSAY AMER, an individual, STEPHANIE | |
| 20 FROSCH, an individual, SAL CINEQUEMANI, an individual, TAMARA | *(Filed concurrently with Plaintiffs' Sur-Reply Brief; Declaration of Peter Obstler)* |
| 21 JOHNSON, an individual, and GREG SCARNICI, an individual, | |
| 22 | |
| Plaintiffs, | |
| 23 | |
| vs. | |
| 24 | Date: |
| GOOGLE LLC, a Delaware limited liability | Time:   10:00 a.m. |
| 25 company, YOUTUBE, LLC, a Delaware liability company, and DOES 1-25, | Place:   Courtroom 2 |
| 26 | Before: Magistrate Judge Virginia DeMarchi |
| Defendants. | |
| 27 | |
| 28 | |

I, Stephanie Frosch, declare:

1. I am a named Plaintiff in the above-captioned action. I have firsthand, personal knowledge of the facts set forth below and if called as a witness could competently testify thereto, unless other specified.

2. I am an LGBTQ internet content creator and YouTube user who is active in the YouTube Community.

3. In 2009, I became a YouTube content creator and now operate two YouTube channels: Youtube.com/ElloSteph and Youtube.com/StephFrosch.

4. From 2009 through 2016, my YouTube channels were successful. However, in 2017, I started having problems with YouTube:

    a. YouTube was classifying many of my videos as subject to Restricted Mode, making them unavailable to a large number of viewers, even though the videos contained no nudity, profanity, sexual conduct, or discussions of sexual activities. YouTube also allowed other YouTube channels to copy my videos without permission, and the content in those videos was re-posted by another user and was not subjected to Restricted Mode. .

    b. Many of my videos were demonetized or subject to reduced monetization despite the fact that they do not include graphic images of violence or sexuality, nudity, profanity, sexual conduct, or discussions of sexual activities.

    c. YouTube was running ads on channels which were posting copies of my videos without permission.

    d. At least one of the customized thumbnail images I crafted for each of my videos uploaded to my channels was removed.

    e. Longtime subscribers to my channels were being dropped from my channels, and YouTube was preventing them from re-subscribing. As a result, my subscribers were not receiving notices when I posted new content.

5. YouTube no longer allows me to see the revenue I generated before October 2009. My best recollection is that I earned approximately $23,000 from YouTube ad revenue in 2009. In addition to ad revenue, I earn money from the sale of merchandise, from separate brand

sponsorship agreements connected with videos posted on my channels, and from the sale of merchandise from the website www.districtlines.com/ellosteph. This is a separate website which sells merchandise relating to my original videos posted to YouTube.

6. In 2017, I joined with other LGBTQ+ YouTube creators to publicly raise awareness about issues and concerns regarding Defendants' discriminatory treatment of LGBTQ+ channels. Among other issues, I expressly raised the concern that changes to YouTube's algorithms and other content curation machine based procedures were disproportionately restricting and affecting access to and the reach of content, as well as affecting other YouTube services for LGBTQ+ YouTube creators and viewers who are members of what Defendants call the "YouTube Community."

7. On September 8, 2017, an LGBTQ+ YouTube content creator forwarded to me an email dated August 25, 2017, from Laura Chernikoff of the "Internet Creators Guild" inviting him to an event co-sponsored by YouTube regarding changes to YouTube's algorithm which were adversely affecting the LGBTQ+ community.

Ms. Chernikoff's invitation stated:

You're invited to an upcoming event put on by the Internet Creators Guild, in partnership with YouTube on Thursday, September 14th at 11:00 AM.

Following the advertising situation on YouTube this spring (dubbed the "Adpocalypse"), YouTube is interested in hearing about creators' experiences on the platform. In particular, it's important for creators to understand the advertising guidelines and tools that brands interact with, in order to be aware how it may affect your monetization.

We've been discussing this issue with YouTube, who have been working to address creator concerns on this topic. They would like to share this presentation, which will be under NDA, in order to hear from ICG Members and creators we're in touch with as part of a small focus group.

We thought you would be an engaged and thoughtful participant and hope you're able to attend.

Attached as Exhibit 1 is a true and correct copy of the email I received with the invitation to the September 14-event. Based on the email, I understood that *before* YouTube would even speak to me or any other members of the group of LGBTQ+ creators about the problems with the new YouTube algorithm implemented in May of 2017, *YouTube required each of us to sign a Non-*

*Disclosure Agreement* (the "NDA").

8. Ms. Chernikoff sent an email to me dated September 11, 2017 which confirms my participation in the September 14-event and states: "Please note that a non-disclosure agreement (NDA) will be sent via email by a member of the YouTube team and is required to be signed prior to the event, so keep an eye out!" Attached as Exhibit 2 is a true and correct copy of the email dated September 11, 2017 from Ms. Chernikoff.

9. On September 13, 2017, Defendants sent to me by email a request for my signature on an electronic Non-Disclosure Agreement in connection with the September 14-event. Upon signing the electronic document, I received a confirmation email which has a subject: "You have accepted Google's Non-Disclosure Agreement." The text of the email sets forth my personal information and a copy of the Non-Disclosure Agreement. Attached as Exhibit 3 is a true and correct copy of the email from Google confirming receipt of my signed Non-Disclosure Agreement.

10. The Non-Disclosure Agreement states:

"In order to evaluate and possibly enter into a business transaction (the "Purpose"), Google Inc., for itself and its subsidiaries and affiliates, and the other party identified below hereby agree:"

At the time that I signed the agreement, I had no idea what "business transaction" the document was referring to. As a YouTube user, I had previously entered into a YouTube Terms of Service Agreement and an AdSense Agreement. As of September 13, 2017, I was not thinking about entering into any new "business transaction" with YouTube or Google, or changing the existing agreements I had with YouTube and AdSense. Neither YouTube nor Google had mentioned any new business transaction, or changes to any existing agreements. I was merely trying to meet with YouTube representatives to discuss with them the many problems that I had been having with my YouTube channel and the falling views and revenue I was experiencing as a result of changes YouTube made to their algorithm in May of 2017. I did not expect for YouTube or Google to give me trade secrets, computer codes, or any other proprietary information at the meeting. And they did not. I simply talked to YouTube and/or Google about my problems and how to resolve them.

**Stephanie Frosch Declaration in Support of Motion to File Sur-Reply Brief**

-4-

Case No. 5:19-cv-004749-VKD

11.     The Non-Disclosure Agreement does not define what "Confidential Information" is, except to say that it is whatever "the Discloser considers" to be "confidential." I have no way of knowing what YouTube or Google consider to be confidential, or expect me to treat as confidential. "Confidential Information" is not limited to trade secrets such as YouTube or Google's customer lists, computer codes, or processes.

12.     On September 14, 2017, I went to the event at the YouTube Playa Vista Office in Los Angeles, California. Upon arrival at the September 14-event, I checked in at 11:00 a.m. YouTube provided lunch for the participants. Around 11:30, a YouTube representative announced that the YouTube analytics guy had limited time and was running late. The YouTube representative asked us to quickly sign a hard copy Non-Disclosure Agreement so that we could get started as fast as possible, and indicated that we had to move quickly so that there was time with the analytics representative. The representative then came up to me, handed me a hard copy Non-Disclosure Agreement, and asked me to sign it while he stood there waiting. I was not given time to read the document which had multiple pages and appeared to be longer and more detailed than the one I had signed online. The representative then took my signed document, and quickly approached another creator requesting their signature. YouTube did not offer me a copy of this Non-Disclosure Agreement. Immediately after signing the document, I was ushered into a large conference room.

13.     The September 14 event involved 12 to 20. YouTube creators, each representing a different class of video. While I was the only LGBTQ representative creator, there were other LGBTQ creators who were posting videos in other categories. I recall there were individual representatives for cooking, comedy, and gaming videos, some of which happened to identify as LGBTQ although they were not specifically creating videos for the LGBTQ community. We were seated at a large oval conference table, and offered notebooks and pens. The presenters all identified as YouTube employees.

14.     During the September 14 event, we watched a PowerPoint presentation. We heard from a man who identified himself as the YouTube employee responsible for analytics and a woman who addressed algorithm issues. Also present were Ben Cramer and someone who was

handing out YouTube swag. In all, I recall that there were five YouTube representatives present at the event, in addition to the man who got me to sign the second Non-Disclosure Agreement before I entered the conference room for the presentation. YouTube specifically prohibited us from taking photos or recording the event.

15. The YouTube presenters stated that they wanted to work with us creators, and explained that YouTube makes money off of the creators who make the video content from advertisers, and that creators win by sharing in the advertising money. They explained that advertisers buy ads based on viewer demographics for the videos. YouTube and creators monetize off of each other and YouTube does not want to hurt creators. The YouTube presenters discussed problems with filtering video content for purposes of restricted mode, monetization and the payments for cpm (clicks per minute).

16. When asked why videos which use gay couples are getting blocked as mature content or inappropriate for all audiences, or videos are getting blocked for mentioning the word "queer," the YouTube representative made the following statements:

a. Blocking LGBTQ videos was caused when YouTube started using an artificial intelligence algorithm to filter content based on what advertisers want; it is the algorithm that is "targeting" LGBTQ videos. YouTube was not discriminating, the algorithm was discriminating. The YouTube representative was talking about the algorithm as if it were some independent video censor that was entirely unrelated to YouTube and its employees, and beyond their control; rather than a tool which YouTube specifically designed and put in place to regulate videos on the platform, which YouTube could change or remove from the platform entirely.

b. There are too many videos on YouTube to review all content manually. YouTube must use artificial intelligence to conduct the content reviews on the YouTube platform.

c. The artificial intelligence algorithm identifies people, including the racial or sexual identities or viewpoints of the creator or viewers when filtering and curating content and restricting access to YouTube services; it does not review and make restrictions based only on the video content. This is due in part to the fact that advertisers want to be able to target audiences based on the demographics of the creators and their audiences. The result is that the algorithm

1  discriminates based on the identity of the creator or its intended audience when making what are

2  supposed to be neutral content based regulations and restrictions for videos that run on YouTube.

3      d.    Despite the problems with the algorithm, YouTube and the creators are on

4  the "same side." The rules should apply equally to all regardless of the identity or viewpoint of

5  the creator.

6      e.    When the creators told YouTube representatives that they understood why

7  an advertiser would not want a Pampers ad on video content featuring guns, they still did not

8  understand why content from homosexual creators was being demonetized when identical content

9  from heterosexual creators was not, the YouTube representatives said that they were "going to fix

10 it." No details of what they were doing, or planned on doing to fix the algorithm were provided

11 and no one (at the meeting or since) indicated when, if ever, the fix for this "problem" would be

12 completed.

13      f.    In response to further questions from creators, the YouTube representatives

14 specifically acknowledged that the algorithm was looking at and profiling the sexual identities,

15 races, disabilities, religious and political affiliations of creators, intended audiences and viewers

16 alike.

17 17.    The YouTube representatives discussed the example of a YouTube creator who had

18 a chef's channel and posted cooking videos:  if the creator identified as gay, or had a lot of

19 subscribers or viewers who accessed a lot of LGBTQ related videos, the cooking video would be

20 tagged as a "gay" video for monetization and restricted mode purposes, regardless of the actual

21 content of the video.

22 18.    Towards the end of the September 14-event, which lasted about 2 hours, I

23 specifically asked the YouTube representative, "What are you doing to fix the problems we have

24 identified?" and "When will you be done fixing the problems?"  The YouTube representative

25 responded to each question saying, "I cannot answer that question."  To this date, no one at the

26 September 14 event has ever provided me any substantive response to my questions regarding the

27 problems or the fix.

28 19.    As far as I can recall, no one at the September 14-event -- (a)  said that what they

Stephanie Frosch Declaration in Support of Motion to
File Sur-Reply Brief                           -7-                    Case No. 5:19-cv-004749-VKD

1   were saying was "confidential" in connection with either the online or hard copy Non-Disclosure

2   Agreements;  (b) said that what they were talking about was a "trade secret;"  (c) described actual

3   YouTube's computer code or proprietary processes used in connection with YouTube, the

4   analytics, the algorithm, or AdSense;  (d) asked me not to repeat anything that was said during the

5   event by other creators.

6       20.     Until the time that Defendants finally released me from my NDAs in March of this

7   year, I was prohibited by the NDAs from discussing, with anyone, including my attorneys in this

8   case, the substance, nature, and details of the September 14-event, including the statements made

9   by the YouTube representatives about identity and viewpoint discrimination in regulating

10  monetization, access to content and services.  Consequently, the information and statements

11  presented at the September 14-event  could not be included in the Second Amended Complaint.

12  Even though I have no idea what, if anything Defendants claim is "confidential," I was afraid and

13  at risk that if I ever talked about what was said at the meeting, YouTube could or would sue me

14  for violating the NDA(s).  I have also been afraid that Defendants would suspend or terminate my

15  channel, my gmail account, or even suspend my access to Google searches if I violated the

16  NDA(s).

17      21.     On March 26, 2020, after my lawyers had notified YouTube that I had decided to

18  file a motion to void or release me from the gag provisions of the NDAs, Defendants informed my

19  lawyers in writing that they had  "no intention of enforcing the NDA." Attached as Exhibit 4 is a

20  true and correct copy of the correspondence between my lawyers and Defendants' attorneys,

21  including the email releasing me from the NDAs.

22      22.     Following the receipt of that email, I was finally able to inform my lawyers of  the

23  substance of what was said by the YouTube representatives at the September 14-event.

24      23.     I have reviewed the Defendants' Motion to Dismiss the Second Amended

25  Complaint.  In the Motion to Dismiss, Defendants make a number of factual assertions which are

26  loosely based on allegations in the Complaint.  As stated below, I believe that Defendants' factual

27  assertions are either wrong or misleading, as indicated below:

28          a.       Defendants state in their Motion:

Content creators upload videos to the service free of charge, enabling YouTube's billions of users to view them, comment on them, and subscribe to their favorite creators' channels. ¶ 52. MTD at 3:2-4.

In truth, while there is no monetary charge for uploading videos, in exchange for the opportunity to use the YouTube website, Defendants required me to give them a license to use all of my original video content that is posted to the YouTube website, the right to collect data about me, and my use of the YouTube website, and also the right to collect data about people who view my videos on the YouTube website.

   b.  Defendants state in their Motion:

YouTube values the perspectives and experiences that LGBTQ+ content creators bring to the platform. MTD at 3:17-18.

My experience with YouTube since 2017 is directly contrary to this statement. After the September 14-event, no one at YouTube followed up with me – no one checked to see if my problems had been resolved; no one checked to see how much the algorithm had cost me in lost subscribers, advertising revenue, cpm, or reduced viewers. In fact, no one from YouTube ever helped me solve the problems identified at the September 14-event. Rather, following the event, my subscribers, advertising revenues, cpm, and viewers continued to decline. Though my viewership was stable, AdSense revenues dropped substantially.

   24.  Since filing the lawsuit, YouTube shut off the analytics for the cpm so that creators like me are no longer able to calculate the lost revenue from reduced cpm due to demonetization. My viewer numbers have been cut dramatically and subscribers complain that they cannot get new video notices. Recently, I co-created a video with my girlfriend, who does not identify as LGBTQ. We both posted the same identical video at the same time. While my girlfriend earned $3,000 from the video, I earned only $300.

   a.  Defendants state in their Motion:

In 2017, when LGBTQ+ creators raised issues about Restricted Mode, YouTube acknowledged that the feature was not fully working as intended and agreed to make improvements. ¶¶ 28, 87. MTD at 3:21-4:1.

Defendants' description of YouTube's "acknowledgment" is misleading. Contrary to the Motion's spin on the allegations in the Complaint, the concerns I and other LGBTQ+ creators

raised were not limited to Restricted Mode, but extended to demonetization and cpm.  In fact, at the September 14-event, YouTube's representatives acknowledged that the algorithm was discriminating against LGBTQ creators as well as other creators based on their identities and personal affiliations, as well as those of their subscribers and viewers.  YouTube's representatives also stated that the feature was working as YouTube intended:  it was profiling creators and viewers for YouTube's advertisers so that the advertisers could target audiences based on personal identity including whether viewers were gay, disabled, members of a racial group or affiliated with specific viewpoints or groups.  YouTube's representatives confirmed that decisions regarding a video's status vis a vis restricted mode, monetization and cpm were being made on grounds that were unrelated to the actual content of the video.  While the YouTube representatives agreed that they were working to fix the problems, they did not specify what they were doing to stop the discrimination in the  interim or to otherwise provide a timeframe for completing the fix.

> b. Defendants state in their Motion:

> As for the Plaintiffs here, YouTube has addressed their individual concerns in good faith, and often removed restrictions from their videos, when appropriate under YouTube's policies, in response to their appeals. ¶¶ 186, 223, 227, 230, 233, 236.a. MTD at 4:1-4.

Defendants' statement is grossly misleading to the extent that it suggests that YouTube actually resolved any of the complaints I (or any other LGBTQ+ creator) raised at the 2017 meeting with the  Defendants.  YouTube has not "addressed" my concerns, continues to profile my videos based on my identity as a member of the LGBTQ community and my affiliation with LGBTQ groups and has increased its discrimination against me by restricting the majority of my videos, and gutting my subscriber lists, viewers, ad revenue, and cpm.

> c. Defendants state in their Motion:

> The use of its service is governed by rules and an array of content policies. ¶¶ 10, 248, 288. Before creating channels and uploading their content to the service, Plaintiffs acknowledge they agreed to YouTube's Terms of Service and the incorporated Community Guidelines. ¶¶ 10, 14, 59, 248,

> The Terms of Service provide that "YouTube reserves the right to remove Content without prior notice," including videos uploaded by content creators. Ex. 2-3.  The Community Guidelines are twelve "common-sense rules" prohibiting certain kinds of content, including "[n]udity or sexual content" and "[v]ulgar language." Exs. 3-4. Google and YouTube reserve the right to remove any content that they believe to

be contrary to the Terms of Service and the incorporated Community Guidelines. Ex. 2. MTD at 4:6-15.

YouTube allows content creators whose channels meet certain minimum viewership requirements to earn revenue from (or "monetize") their videos by running advertisements with them as part of the YouTube Partner Program. To be eligible to monetize their videos, in addition to the Terms of Service and Community Guidelines discussed above, Plaintiffs agreed to certain additional "written contracts," including YouTube's Partner Program Terms and the AdSense Terms of Service. See ¶ 331; Exs. 5-6, 10. In addition, Plaintiffs agreed to comply with YouTube's monetization policies, including the Advertiser-friendly content guidelines, which are designed to ensure that ads do not appear alongside videos with content that certain audiences might find objectionable. See ¶¶ 152, 248, 331; Exs. 5-11. YouTube uses automated software to identify content as inappropriate for advertising, and creators may appeal demonetization decisions for manual review. ¶ 94; Ex. 9. MTD at 5:9-19.

Defendants' description of the website rules is misleading and deceptive: When I agreed to Defendants' Terms of Service, Community Guidelines, Partnership Program Terms, and AdSense Terms of Service, I understood that these terms were nonnegotiable and that each YouTube user was agreeing to these same terms. YouTube stated in its Terms of Service and Community Guidelines that the rules to which I agreed would be applied equally to all YouTube users, in a neutral manner. At the September 14-event, YouTube representatives reaffirmed their commitment to the universal set of rules which apply equally to all; however, they also confirmed that they were using an artificial intelligence algorithm which discriminates against users based on their identities. As long as YouTube's algorithm profiles users, then YouTube cannot be applying the same rules equally to all users in a neutral manner.

25.     YouTube did not inform me that my videos would be distributed, made available for viewing, or monetized for profit based on who I am (a lesbian educator) or on my stated views regardless of the actual content of the video posted. Nor did YouTube inform me that to the extent that it sponsored other creators, or their channels or individual videos, that those sponsored creators/channels/videos would not be subject to the same Terms of Service, Community Guidelines, Partnership Program Terms, or AdSense Terms of Service that I must follow. Nor did YouTube inform me that it would be creating Defendants' own original video content which would not be subjected to the same Terms of Service, Community Guidelines, Partnership Program Terms, or AdSense Terms of Service that I and other third-party users must follow.

26.    YouTube did not inform me that in giving Defendants a license to use the videos I posted, that it would allow other YouTube users to copy my original videos, post them on the channels of other YouTube users, or receive revenue related to my original videos.

27.    Tamara Johnson, one of the named Plaintiffs, is an LGBTQ+ creator who operates the YouTube channel, SVTV Network.  Ms. Johnson also owns and operates an internet online on-demand monthly subscription network https://www.svtvnetwork.com/ dedicated to original content specifically designed for LGBTQ+ audiences.  Ms. Johnson is an African American.  Her original web series videos feature African American members of the LGBTQ community.

28.    In their Reply Brief, Defendants assert that:

> . . . Plaintiffs' opposition brief also purports to represent the interests of "African American content creators and users" (see, e.g., Opp. 1), but the Complaint does not include any actual allegations in support of any claim for racial discrimination. Reply fn.2 at p.3.

This is not true.  Plaintiffs' Second Amended Complaint includes allegations that Defendants unlawfully use "data regarding the video **creators,' subscribers,' or viewers' . . . race**, ethnicity, commercial, or political identities or viewpoints" (paragraph 7 emphasis added); and Defendants "rely upon and invoke federal law under Section 230(c) to preempt and immunize unlawful filtering, regulations, and practices on the YouTube Platform, including **practices which discriminate based upon race** . . . or individual viewpoints, and in doing so, engage in unlawful discriminatory, arbitrary, and capricious repression of public speech under color of federal law." [Paragraph 289 emphasis added.]  The Second Amended Complaint also alleges that Defendants are "using identity based censorship to determine who can and cannot continue to use the YouTube Platform" (paragraph 8); and that their representative "promised LGBTQ+ YouTubers that Defendants would ensure that **'Restricted Mode' should not filter out content belonging to individuals or groups based on certain attributes like** gender, gender identity, political viewpoints, **race**, religion or sexual orientation," (paragraph 29, 121, emphasis added).

29.    The allegations of the Second Amended Complaint identified above are consistent with and supported by what I was told by the YouTube representatives at the September 14-event regarding racial profiling and discrimination embedded in the algorithm.  When called to testify as

a witness, I will testify specifically that the YouTube representatives at the September 14 event said that the algorithm was targeting African American creators, subscribers and viewers in the same way that it was targeting LGBTQ creators, subscribers and viewers.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and Executed this 20th day of April, 2020, at New York, New York.

_____ _____

STEPHANIE FROSCH

# Exhibit "1"

From: **Steph Frosch** <ellosteph@gmail.com>
Date: Tue, Aug 20, 2019 at 12:04 AM
Subject: Fwd: Focus Group event: YouTube's Advertising Guidelines
To: Stephanie Frosch <stephfrosch@gmail.com>


---------- Forwarded message ---------
From: **Laura Chernikoff** <laura@internetcreatorsguild.com>
Date: Thu, Sep 21, 2017 at 11:46 AM
Subject: Re: Focus Group event: YouTube's Advertising Guidelines
To: Steph Frosch <ellosteph@gmail.com>


Thanks for participating in this ICG event with YouTube. We know this session had some logistical challenges with the timing and apologize. We're still experimenting with this type of event, and thinking about ways to advocate for creators about the difficult monetization and advertising guidelines challenges. We'd love to hear about your experience – you can share your honest feedback by **filling out this brief survey**.

Laura

**Laura Chernikoff**
*Executive Director*
Internet Creators Guild
internetcreatorsguild.com

On Wed, Sep 13, 2017 at 2:57 PM, Steph Frosch <ellosteph@gmail.com> wrote:
Signed and sent! Looking forward to tomorrow.

All the best,
Stephanie Frosch
YouTube.com/ElloSteph

On Wed, Sep 13, 2017 at 11:21 AM, Laura Chernikoff <laura@internetcreatorsguild.com>
wrote:
Hey, I wanted to send a quick reminder to sign the NDA YouTube sent for tomorrow's event. They need everyone attending the event to sign in order to participate, so I wanted to make sure you hadn't missed it. Let me know if you have any questions or concerns!

Laura

**Laura Chernikoff**
*Executive Director*
Internet Creators Guild
internetcreatorsguild.com

On Mon, Sep 11, 2017 at 11:07 AM, Laura Chernikoff <laura@internetcreatorsguild.com>
wrote:
Thanks Davey! Moving you to bcc.

Steph, we're excited to have you at this event this week. Here's a confirmation with details about the location.

Please note that a non-disclosure agreement (NDA) will be sent via email by a member of the YouTube team and is <u>required to be signed prior to the event</u>, so keep an eye out!

**RSVP:** You are <u>confirmed</u>.
**Date:** Thursday, September 14th
**Check In Time:** 11am
**Presentation Starts:** 11:30am
*Lunch and an opportunity to mingle with your fellow creators will be included.
**Location:** YouTube Playa Vista Office –
<u>12400 W. Bluff Creek Drive. Los Angeles, CA 90094</u>
**Directions:** At the intersection of S Centinela Ave & Jefferson Blvd, turn onto S Campus Center Dr. Drive to the end of Campus Center Dr. Turn left on West Bluff Creek Drive and make a quick right into "Lot B". US-PLV-H10 will be the building just West of the parking lot.

If you have trouble finding the office, contact **Ben Kramer:** <u>benkramer@google.com</u> // <u>650-495-7545</u>

If your plans have changed and you are unable to attend, please let us know ASAP.

Laura

**Laura Chernikoff**
*Executive Director*
Internet Creators Guild
<u>internetcreatorsguild.com</u>

On Fri, Sep 8, 2017 at 5:36 PM, Davey Wavey <<u>davey@daveywavey.tv</u>> wrote:
Hey Laura,

CC'ing Steph Frosch on this. She'd love to attend!

On Thu, Aug 31, 2017 at 6:06 PM, Laura Chernikoff <<u>laura@internetcreatorsguild.com</u>> wrote:
Unfortunately this event is in-person only. Sorry to hear you can't make it, but we'll keep you in mind for similar events in the future.

Do any other LA-based creators come to mind who were effected by this issue? I know the LGBT community especially deals with this and I want to make sure their voices are well represented in that room.

Laura

**Laura Chernikoff**
*Executive Director*

Internet Creators Guild
internetcreatorsguild.com

On Tue, Aug 29, 2017 at 9:52 AM, Davey Wavey <davey@daveywavey.tv> wrote:
Hey Laura,

I'll be traveling - is there a remote option for attending?

Best,
Davey

On Fri, Aug 25, 2017 at 1:28 PM, Laura Chernikoff <laura@internetcreatorsguild.com> wrote:
Hey Davey,

You're invited to an upcoming event put on by the Internet Creators Guild, in partnership with YouTube on Thursday, September 14th at 11:00 AM.

Following the advertising situation on YouTube this spring (dubbed the "Adpocalypse"), YouTube is interested in hearing about creators' experiences on the platform. In particular, it's important for creators to understand the advertising guidelines and tools that brands interact with, in order to be aware how it may affect your monetization.

We've been discussing this issue with YouTube, who have been working to address creator concerns on this topic. They would like to share this presentation, which will be under NDA, in order to hear from ICG Members and creators we're in touch with as part of a small focus group.

We thought you would be an engaged and thoughtful participant and hope you're able to attend.

**Please RSVP with either yes, no, or maybe by <u>September 5th</u>.**

Thursday, September 14th
Check in 11:00 AM; presentation at 11:30 AM
YouTube Playa Vista Campus

***Understanding YouTube's Advertising-Friendly Content Guidelines***

*In this session, YouTube will cover the recent changes to the platform's Advertiser-Friendly Content Guidelines and what they mean to both advertisers and creators. They will review the updated guidelines, discuss how YouTube surfaces ads, and the targeting systems advertisers leverage to place their ads. This will be followed by a Q&A, where creators will be able to ask questions, as well as share their experiences and feedback on these changes.*

This event is invite-only and has limited space. If you know of other creators who would be interested in the topic and available to attend, please let me know their name, channel, and email address.

Thanks!


Laura

**Laura Chernikoff**
*Executive Director*
Internet Creators Guild
[internetcreatorsguild.com](internetcreatorsguild.com)

--

Davey Wavey
Digital Storyteller | 

--

Davey Wavey
Digital Storyteller | daveywavey.tv

**Stephanie Frosch**



[YouTube](YouTube) | [Instagram](Instagram) | [Twitter](Twitter)

--



**Stephanie Frosch**
she/her/hers
Storyteller || Activist || Educator ||

phone: +1 954.235.4604

    

# Exhibit "2"

From: **Laura Chernikoff** <laura@internetcreatorsguild.com>
Date: Mon, Sep 11, 2017 at 1:08 PM
Subject: Re: Focus Group event: YouTube's Advertising Guidelines
To:
Cc: Steph Frosch <ellosteph@gmail.com>

Thanks Davey! Moving you to bcc.

Steph, we're excited to have you at this event this week. Here's a confirmation with details about the location.

Please note that a non-disclosure agreement (NDA) will be sent via email by a member of the YouTube team and is required to be signed prior to the event, so keep an eye out!

**RSVP:** You are confirmed.
**Date:** Thursday, September 14th
**Check In Time:** 11am
**Presentation Starts:** 11:30am
*Lunch and an opportunity to mingle with your fellow creators will be included.
**Location:** YouTube Playa Vista Office –
12400 W. Bluff Creek Drive. Los Angeles, CA 90094
**Directions:** At the intersection of S Centinela Ave & Jefferson Blvd, turn onto S Campus Center Dr. Drive to the end of Campus Center Dr. Turn left on West Bluff Creek Drive and make a quick right into "Lot B". US-PLV-H10 will be the building just West of the parking lot.

If you have trouble finding the office, contact **Ben Kramer:** benkramer@google.com // 650-495-7545

If your plans have changed and you are unable to attend, please let us know ASAP.

Laura

**Laura Chernikoff**
*Executive Director*
Internet Creators Guild
internetcreatorsguild.com

On Fri, Sep 8, 2017 at 5:36 PM, Davey Wavey <davey@daveywavey.tv> wrote:
Hey Laura,

CC'ing Steph Frosch on this. She'd love to attend!

On Thu, Aug 31, 2017 at 6:06 PM, Laura Chernikoff <laura@internetcreatorsguild.com> wrote:
Unfortunately this event is in-person only. Sorry to hear you can't make it, but we'll keep you in mind for similar events in the future.

Do any other LA-based creators come to mind who were effected by this issue? I know the LGBT community especially deals with this and I want to make sure their voices are well represented in that room.

Laura

**Laura Chernikoff**
*Executive Director*
Internet Creators Guild
internetcreatorsguild.com

On Tue, Aug 29, 2017 at 9:52 AM, Davey Wavey <davey@daveywavey.tv> wrote:
Hey Laura,

I'll be traveling - is there a remote option for attending?

Best,
Davey

On Fri, Aug 25, 2017 at 1:28 PM, Laura Chernikoff <laura@internetcreatorsguild.com> wrote:
Hey Davey,

You're invited to an upcoming event put on by the Internet Creators Guild, in partnership with YouTube on Thursday, September 14th at 11:00 AM.

Following the advertising situation on YouTube this spring (dubbed the "Adpocalypse"), YouTube is interested in hearing about creators' experiences on the platform. In particular, it's important for creators to understand the advertising guidelines and tools that brands interact with, in order to be aware how it may affect your monetization.

We've been discussing this issue with YouTube, who have been working to address creator concerns on this topic. They would like to share this presentation, which will be under NDA, in order to hear from ICG Members and creators we're in touch with as part of a small focus group.

We thought you would be an engaged and thoughtful participant and hope you're able to attend.

**Please RSVP with either yes, no, or maybe by <u>September 5th</u>.**

Thursday, September 14th
Check in 11:00 AM; presentation at 11:30 AM
YouTube Playa Vista Campus

***Understanding YouTube's Advertising-Friendly Content Guidelines***

*In this session, YouTube will cover the recent changes to the platform's Advertiser-Friendly Content Guidelines and what they mean to both advertisers and creators. They will review the updated guidelines, discuss how YouTube surfaces ads, and the targeting systems advertisers leverage to place their ads. This will be followed by a Q&A, where creators will be able to ask questions, as well as share their experiences and feedback on these changes.*

This event is invite-only and has limited space. If you know of other creators who would be interested in the topic and available to attend, please let me know their name, channel, and email address.

Thanks!

Laura

**Laura Chernikoff**
*Executive Director*
Internet Creators Guild
[internetcreatorsguild.com](internetcreatorsguild.com)


Davey Wavey
Digital Storyteller | daveywavey.tv


Davey Wavey
Digital Storyteller | daveywavey.tv

**Stephanie Frosch**

[YouTube](YouTube) | [Instagram](Instagram) | [Twitter](Twitter)

# Exhibit "3"

From: **Google Legal** <nda-noreply@google.com>
Date: Wed, Sep 13, 2017 at 4:56 PM
Subject: You have accepted Google's Non-Disclosure Agreement
To: <StephFrosch@gmail.com>

You have accepted the terms and conditions presented in Google's
Non-Disclosure Agreement on 2017-09-13 20:56:35.

Company Name: ElloSteph
Name: Stephanie Frosch
Title: Content Creator
Email: StephFrosch@gmail.com
Address:
1300 N Curson Ave Apt 4
West Hollywood, California, 90046
United States

Below is a copy of the Agreement for your reference:

NON-DISCLOSURE AGREEMENT

 In order to evaluate and possibly enter into a business transaction (the
"Purpose"), Google Inc., for itself and its    subsidiaries and affiliates,
and the other party identified below hereby agree:

1.  The Effective Date of this agreement is the date this agreement is
accepted by the party identified below.

2.  A party (the "Discloser") may disclose to the other party (the
"Recipient") information pertaining to the Purpose that the Discloser
considers confidential ("Confidential Information").

3.  Recipient may use Confidential Information only for the Purpose.
Recipient must use a reasonable degree of care to protect Confidential
Information and to prevent any unauthorized use or disclosure of
Confidential Information. Recipient may share Confidential Information with
its employees, directors, agents or third party contractors who need to
know it and if they have agreed with either party in writing to keep
information confidential.

4.  Confidential Information does not include information that: (a) was
known to Recipient without restriction before receipt from Discloser; (b)
is publicly available through no fault of Recipient; (c) is rightfully
received by Recipient from a third party without a duty of confidentiality;
or (d) is independently developed by Recipient. A party may disclose
Confidential Information when compelled to do so by law if it provides

reasonable prior notice to the other party, unless a court orders that the other party not be given notice.

5.  Either party may terminate this agreement with thirty days prior written notice, but this agreement's provisions will survive as to Confidential Information that is disclosed before termination.

6.  Unless the parties otherwise agree in writing, Recipient's duty to protect Confidential Information expires five years from disclosure.

7.  This agreement imposes no obligation to proceed with any business transaction.

8.  No party acquires any intellectual property rights under this agreement except the limited rights necessary to use the Confidential Information for the Purpose.

9.  This agreement does not create any agency or partnership relationship. This agreement is not assignable or transferable by either party without the prior written consent of the other party.

10.  This agreement is the parties' entire agreement on this topic, superseding any prior or contemporaneous agreements. Any amendments must be in writing.  The parties may execute this agreement in counterparts, which taken together will constitute one instrument.  Failure to enforce any of provisions of this agreement will not constitute a waiver.

11.  This agreement is governed by the laws of the State of California, excluding its conflict-of-laws principles. The exclusive venue for any dispute relating to this agreement shall be Santa Clara County, California.

CommMutual Rev 112707



**Stephanie Frosch**
she/her/hers
Storyteller || Activist || Educator ||

phone: +1 954.235.4604

    

# Exhibit "4"

**From:** White, Lauren Gallo <lwhite@wsgr.com>
**Sent:** Thursday, March 26, 2020 6:21 PM
**To:** Debi Ramos <dramos@bgrfirm.com>
**Cc:** Kramer, David <DKramer@wsgr.com>; Willen, Brian <bwillen@wsgr.com>; Knoll, Kelly <kknoll@wsgr.com>; Peter Obstler <pobstler@bgrfirm.com>; Grubbs, Deborah <DGrubbs@wsgr.com>; Kathleen McCormick <kmccormick@bgrfirm.com>
**Subject:** Re: Divino Group, LLC v Google LLC, et al. [IWOV-DOCSLA.FID349140]

Debi:

As I said in my letter, further discussion would be productive to identify whether the information Ms. Frosch wishes to disclose might be protected by her NDA with YouTube. That is because we share your position that "any protective order [cannot] be used to keep non-confidential information from being presented to the Court and the public." Your continued argument and apparent insistence on running to court despite defendants' desire to meet and confer—and despite the parties' obligation to do so—are unwarranted and improper. Nevertheless, because defendants are not aware of any confidential information that Ms. Frosch might have learned at the September 14, 2017 event that might be protected by her NDA with YouTube, defendants have no intention of enforcing the NDA against her. While it would of course be premature to introduce testimony or other evidence at the current stage of the case, in the event this case gets past the pleadings, defendants will not enforce the NDA to prevent Ms. Frosch from testifying about her September 14, 2017 meeting. But YouTube's willingness to release Ms. Frosch from her obligations is not license to you to misstate the record, make misrepresentations, or improperly offer evidence to the Court.

Best regards,
Lauren

# PROOF OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 801 S. Figueroa Street, Suite 2000, Los Angeles, CA 90017.

On April 20, 2020, I served true copies of the following document(s) described as

**PLAINTIFFS' MOTION FOR LEAVE TO FILE SUR-REPLY BRIEF; DECLARATION OF PETER OBSTLER; DECLARATION OF STEPHANIE FROSCH; (Proposed) ORDER TO FILE SUR-REPLY**

on the interested parties in this action as follows:

**SEE ATTACHED SERVICE LIST**

**BY MAIL ON 4/21/20:** I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with the practice of Browne George Ross LLP for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid. I am a resident or employed in the county where the mailing occurred. The envelope was placed in the mail at Los Angeles, California.

**BY EMAIL ON 4/20/20:** I served the document via email transmission to the email address listed above and did not, within a reasonable period of time, receive notice of an unsuccessful submission.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on April 20, 2020, at Los Angeles, California.

_Kathleen McCormick_

Kathleen McCormick

Case No. 5:19-cv-004749-VKD

1

**SERVICE LIST**
**Divino Group LLC v. Google LLC and YouTube, LLC**
**United States District Court - Case No. 5:19-cv-004749-VKD**

2

3

4

INDRANEEL SUR
Trial Attorney

5

Civil Division, Federal Programs Branch

6

1100 L Street, NW
Washington, DC   20530

7

202-616-8488
EMAIL:  indraneel.sur@usdoj.gov

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit "B"

**Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 11/19/2019 3:51 PM
Reviewed By: R. Walker
Case #19CV340667
Envelope: 3671559**

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SANTA CLARA

PRAGER UNIVERSITY,

       Plaintiff,

    vs.

GOOGLE LLC, et al.,

       Defendants.

Case No.: 19CV340667

**ORDER AFTER HEARING ON
OCTOBER 25, 2019**

**(1) Demurrer by Defendants Google
LLC and YouTube, LLC to the
First Amended Complaint**
**(2) Motion by Plaintiff Prager
University for Preliminary
Injunction**

    The above-entitled matter came on for hearing on Friday, October 25, 2019 at 11:00 a.m. in Department 1 (Complex Civil Litigation), the Honorable Brian C. Walsh presiding. A tentative ruling was issued prior to the hearing. The appearances are as stated in the record. The Court has reviewed and considered the written submissions of all parties and has reflected on the oral argument of counsel, including by reviewing the transcript lodged by plaintiff on November 14, 2019. Being fully advised, the Court adopts the tentative ruling as follows:

    This action arises from Prager University's allegations that YouTube, LLC and its parent company Google LLC have unlawfully restricted content created by Prager on YouTube, defendants' social media and video sharing platform. Before the Court are defendants' demurrer

*Prager University v. Google LLC, et al., Superior Court of California, County of Santa Clara, Case No. 19CV340667*
*Order After Hearing on October 25, 2019 [Demurrer to the First Amended Complaint and Motion for Preliminary Injunction]*

EXHIBIT "B"

to the operative First Amended Complaint ("FAC") and Prager's motion for a preliminary injunction.  Both motions are opposed.

## I.  Factual and Procedural Background

As alleged in the FAC, Prager is a non-profit, 501(c)(3) tax exempt, educational organization that promotes discussion on historical, religious, and current events by disseminating educational videos intended for younger, student-based audiences between the ages of 13 and 35.  (FAC, ¶ 10.)  The videos depict scholars, sources, and other prominent speakers who often espouse viewpoints in the mainstream of conservative thought.  (*Ibid.*)

Defendants operate YouTube as the largest and most profitable mechanism for monetizing free speech and freedom of expression in the history of the world, generating $10 to 15 billion in annual revenue by monetizing the content of users like Prager who are invited to post videos to YouTube.  (FAC, ¶ 11.)  Since its inception, Prager has posted more than 250 of its videos to YouTube.  (*Id.* at ¶ 39.)

### A.  The Alleged Content Restriction Scheme

To induce users like Prager to upload video content, defendants represent that YouTube is a public place for free speech defined by "four essential freedoms" that govern the public's use of the platform:

1. **Freedom of Expression:**  We believe people should be able to speak freely, share opinions, foster open dialogue, and that creative freedom leads to new voices, formats and possibilities.

2. **Freedom of Information:**  We believe everyone should have easy, open access to information and that video is a powerful force for education, building understanding, and documenting world events, big and small.

3. **Freedom of Opportunity:**  We believe everyone should have a chance to be discovered, build a business and succeed on their own terms, and that people—not gatekeepers—decide what's popular.

4. **Freedom to Belong:**  We believe everyone should be able to find communities of support, break down barriers, transcend borders and come together around shared interests and passions.

(FAC, ¶ 12.)  Defendants further promise that YouTube is governed by content-based rules and filtering which "apply equally to all," regardless of the viewpoint, identity, or source of the speaker.  (*Id.* at ¶ 13.)

However, contrary to these representations, defendants censor, restrict, and restrain video content based on animus, discrimination, profit, and/or for any other reason "or no reason." (FAC, ¶ 14.)  According to Prager, an internal memo and presentation entitled "The Good Censor" shows that defendants have secretly decided to " 'migrate' away from [serving as] a hosting platform …where the public is invited to engage in freedom of expression" to become a media company that profits "by promoting Defendants' own, or their preferred content through the exercise of unfettered discretion to censor and curate otherwise public content." (*Id.* at ¶¶ 56-65.)  To effectuate their discriminatory practices, defendants use clandestine filtering tools, including algorithms and other machine-based and manual review tools, that are embedded with discriminatory and anti-competitive animus-based code, including code that is used to identify and restrict content based on the identity, viewpoint, or topic of the speaker.  (*Id.*, ¶ 19.)  They also "ensure that the YouTube employees charged with administering the content filtering and regulation scheme … operate in a dysfunctional and politically partisan workplace environment." (*Id.* at ¶ 20.)

Against this background, Prager's rights under California law have been violated by two unlawful content-based restrictions: (i) "Restricted Mode," a filtering protocol that defendants use to block what they deem, in their sole, unfettered discretion, to be "inappropriate" for "sensitive" audiences and (ii) "Advertising Restrictions," a content-based video advertising restriction policy that prohibits potential advertisers from accessing videos that defendants deem "inappropriate" for advertising.  (FAC, ¶ 17.)  Defendants use these mechanisms as a pretext to restrict and censor Prager's videos, even though the content of its videos complies with YouTube's Terms of Service, Community Guidelines, and criteria for "sensitive audiences" and advertisers, while they fail to restrict the content of other preferred users, content partners, and content produced by defendants themselves that is not compliant.  (*Id.* at ¶¶ 18, 23.)  Defendants

have provided no rational basis for restricting Prager's content while allowing similar or noncompliant content to go unrestricted. (*Id.* at ¶ 25.)

## B.  Restricted Mode

According to defendants, Restricted Mode is intended "to help institutions like schools as well as people who wanted to better control the content they see on YouTube with an option to choose an intentionally limited YouTube experience." (FAC, ¶ 68.) Viewers can choose to turn Restricted Mode on from their personal accounts, but it may also be turned on by system administrators for libraries, schools, and other institutions or workplaces. (*Ibid.*) Defendants estimate that about 1.5 percent of YouTube's daily views (or approximately 75 million views per day) come from individuals using Restricted Mode. (*Id.* at ¶ 69.) When Restricted Mode is activated, a video's name, creator or subject, and content, along with any other information related to the video, are blocked, as if the video did not exist on the YouTube platform. (*Id.* at ¶ 68.)

Defendants claim to restrict content in Restricted Mode based upon their "Restricted Mode Guidelines," which identify five criteria for determining whether content warrants restriction:

1. Talking about drug use or abuse, or drinking alcohol in videos;
2. Overly detailed conversations about or depictions of sex or sexual activity;
3. Graphic descriptions of violence, violent acts, natural disasters and tragedies, or even violence in the news;
4. Videos that cover specific details about events related to terrorism, war, crime, and political conflicts that resulted in death or serious injury, even if no graphic imagery is shown;
5. Inappropriate language, including profanity; and
6. Video content that is gratuitously incendiary, inflammatory, or demeaning towards an individual or group.

(FAC, ¶ 70.) Videos are initially restricted through an automated filtering algorithm that examines certain "signals" like the video's metadata, title, and language, or following manual review if a video is "flagged" as inappropriate by public viewers. (*Id.*, ¶ 71.)

YouTube also publishes "Community Guidelines" and "Age Based Restriction" guidelines similar to its "Restricted Mode Guidelines"; however, content that complies with

these guidelines may nevertheless be subject to Restricted Mode. (FAC, ¶¶ 72-73.) Prager's videos have never been age restricted or found to violate YouTube's Community Guidelines. (*Id.* at ¶ 75.)

Defendants have admitted that they make "mistakes in understanding context and nuances when [assessing] which videos to make available in Restricted Mode." (FAC, ¶ 91.) For example, on March 19, 2017, they publicly admitted that they improperly restricted videos posted or produced by members of the LGBTQ community and changed their policy, filtering algorithm, and manual review policies in response to complaints from this community. (*Id.* at ¶¶ 94-96.) However, Prager alleges that defendants have continued to improperly restrict videos by LGBTQ users, which is evidence of viewpoint animus. (*Id.* at ¶¶ 97-98.)

C. Advertising Restrictions

Defendants also restrict users like Prager "from monetizing or boosting the reach or viewer distribution of [their] videos." (FAC, ¶ 78.) Prager alleges that these restrictions are ostensibly governed by the "AdSense program policies," which it suggests are "similar[ly] vague, ambiguous, and arbitrary" to the Restricted Mode Guidelines. (*Id.* at ¶¶ 78, 80.) Prager claims that, similar to their "mistakes" in applying "Restricted Mode," defendants once "denied a reach boost or ad product" on the ground of "shocking content" based on a user's sexual or gender orientation and viewpoint. (*Id.* at ¶ 81.) It alleges that the application of such an "inappropriate" or "shocking content" designation falsely and unfairly stigmatizes Prager as well. (*Id.* at ¶ 82.) (However, while Prager alleges that certain of its videos have been demonetized, it does not allege whether defendants gave specific reasons for these actions or what those reasons were.) (See *id.* at ¶ 84.)

D. The Parties' Dispute

In July of 2016, Prager discovered that defendants were restricting user access to its videos through Restricted Mode. (FAC, ¶ 101.) It raised the issue with defendants, but they have failed to offer any reasonable or consistent explanation for why Prager's videos are being restricted. (*Id.* at ¶¶ 101-117.) In 2016, at least 16 Prager videos were restricted; by 2017, a total of 21 were. (*Ibid.*) By the time the FAC was filed in May of 2019, the total had risen to 80. (*Id.*

at ¶ 127.) Prager's videos were either "restricted as to content, demonetized, or both." (*Id.* at ¶ 116.) Defendants also discontinued Prager's "ad grants" account for more than six days in October of 2017. (*Id.* at ¶ 118.) On pages 9-17 of the FAC, Prager provides a chart listing its restricted videos by title, along with videos from defendants' "preferred content providers" with similar titles that are unrestricted. (*Id.* at ¶ 23.)

On October 23, 2017, Prager sued defendants in federal court, asserting claims for (1) violation of Article I, section 2 of the California Constitution; (2) violation of the First Amendment of the United States Constitution; (3) violation of the California Unruh Civil Rights Act ("Unruh Act"), Cal. Civ. Code. § 51 *et seq.*; (4) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*; (5) breach of the implied covenant of good faith and fair dealing; (6) violation of the Lanham Act, 15 U.S.C. § 1125 *et seq.*; and (7) declaratory relief. (*Prager University v. Google LLC* (N.D. Cal., Mar. 26, 2018, No. 17-CV-06064-LHK) 2018 WL 1471939, at *2.) It filed a motion for a preliminary injunction in the federal action on December 29, 2017. (*Id.* at *3.) On March 26, 2018, the federal court granted defendants' motion to dismiss Prager's federal claims and denied Prager's motion for a preliminary injunction, finding that Prager had failed to state a claim for violation of the First Amendment because it did not allege state action, and had also failed to state a claim under the Lanham Act. (*Id.* at *5-13.) Having dismissed all of Prager's federal claims, the court declined to exercise supplemental jurisdiction over its state law claims, explaining:

> Here, the factors of economy, convenience, fairness, and comity support dismissal of Plaintiff's remaining state law claims. This case is still at the pleading stage, and no discovery has taken place. Federal judicial resources are conserved by dismissing the state law theories of relief at this stage. Further, the Court finds that dismissal promotes comity as it enables California courts to interpret questions of state law. This is an especially important consideration in the instant case because Plaintiff asserts a claim that demands an analysis of the reach of Article I, section 2 of the California Constitution in the age of social media and the Internet.

(*Prager University v. Google LLC, supra,* 2018 WL 1471939, at *13.) Prager has appealed the federal court's ruling to the Court of Appeal for the Ninth Circuit, which heard argument in the matter on August 27, 2019.

*Prager University v. Google LLC, et al., Superior Court of California, County of Santa Clara, Case No. 19CV340667*
*Order After Hearing on October 25, 2019 [Demurrer to the First Amended Complaint and Motion for Preliminary Injunction]*

6

Prager filed this action on January 8, 2019, reasserting its state law claims for

(1) violation of Article I, section 2 of the California Constitution; (2) violation of the Unruh Act; (3) violation of the UCL; and (4) breach of the implied covenant of good faith and fair dealing. On May 13, the Court entered a stipulated order establishing a briefing schedule for Prager's anticipated motion for a preliminary injunction and defendants' anticipated demurrer and/or special motion to strike.  On May 20, pursuant to that order, Prager moved for a preliminary injunction and filed the FAC, which asserts the same four causes of action as its original complaint.  Defendants filed their demurrer on June 28.  Both matters are now fully briefed and came on for hearing by the Court on October 25, 2019.

## II.  Demurrer to the FAC

Defendants demur to each cause of action in the FAC for failure to state a claim.  (Code Civ. Proc., § 430.10, subd. (e).)  They contend that Prager's claims are barred by two provisions of section 230 of the Communications Decency Act (the "CDA") and by the First Amendment, and otherwise fail to state a cause of action.

Defendants' request for judicial notice, which is unopposed, is GRANTED as to public web pages displaying the terms of the various YouTube policies at issue in this action (Exhibits 1-9).  (Evid. Code § 452, subd. (h); see *Pacific Employers Ins. Co. v. State of Cal.* (1970) 3 Cal.3d 573, 575, fn.1 [where portions of agreement were attached to plaintiff's complaint, the balance of that agreement was properly a subject of judicial notice]; *Ingram v. Flippo* (1999) 74 Cal.App.4th 1280, 1285 [judicial notice of letter and media release was proper where, although they were not attached to the complaint, they formed a basis for the claims, and the complaint excerpted quotes and summarized parts in detail, thus "it is essential that we evaluate the complaint by reference to these documents"].)  Defendants' request is also GRANTED as to a transcript of a case management conference held in the federal action, although the Court is not bound by the court's comments or rulings in that case.  (Evid. Code § 452, subd. (d).)

/ / /

/ / /

A. Legal Standard

The function of a demurrer is to test the legal sufficiency of a pleading. (*Trs. Of Capital Wholesale Elec. Etc. Fund v. Shearson Lehman Bros.* (1990) 221 Cal.App.3d 617, 621.) Consequently, "[a] demurrer reaches only to the contents of the pleading and such matters as may be considered under the doctrine of judicial notice." (*South Shore Land Co. v. Petersen* (1964) 226 Cal.App.2d 725, 732, internal citations and quotations omitted; see also Code Civ. Proc., § 430.30, subd. (a).) "It is not the ordinary function of a demurrer to test the truth of the plaintiff's allegations or the accuracy with which he describes the defendant's conduct. ... Thus, ... the facts alleged in the pleading are deemed to be true, however improbable they may be." (*Align Technology, Inc. v. Tran* (2009) 179 Cal.App.4th 949, 958, internal citations and quotations omitted.)

In ruling on a demurrer, the allegations of the complaint must be liberally construed, with a view to substantial justice between the parties. (*Glennen v. Allergan, Inc.* (2016) 247 Cal.App.4th 1, 6.) Nevertheless, while "[a] demurrer admits all facts properly pleaded, [it does] not [admit] contentions, deductions or conclusions of law or fact." (*George v. Automobile Club of Southern California* (2011) 201 Cal.App.4th 1112, 1120.) A demurrer will lie where the allegations and matters subject to judicial notice clearly disclose some defense or bar to recovery, including a statutory immunity. (*Casterson v. Superior Court (Cardoso)* (2002) 101 Cal.App.4th 177, 183.)

B. Violation of the California Constitution

Because concepts related to the parties' speech rights under the First Amendment and California Constitution are important to other aspects of its analysis, the Court will first examine whether Prager states a claim for violation of Article I, section 2 of the California Constitution.

As urged by defendants, "California's free speech clause"—like the First Amendment—"contains a state action limitation." (*Golden Gateway Center v. Golden Gateway Tenants Assn.* (2001) 26 Cal.4th 1013, 1023.) However, the California Constitution's protection of speech has been interpreted more broadly in this regard. (See *Fashion Valley Mall, LLC v. National Labor Relations Bd.* (2007) 42 Cal.4th 850, 862-863.) Most notably, in the

"groundbreaking" decision of *Robins v. Pruneyard Shopping Center* (1979) 23 Cal.3d 899, the Supreme Court of California "departed from the First Amendment jurisprudence of the United States Supreme Court and extended the reach of the free speech clause of the California Constitution to privately owned shopping centers." (*Golden Gateway Center v. Golden Gateway Tenants Assn., supra,* 26 Cal.4th at p. 1016.)

More than 20 years after *Robins v. Pruneyard, Golden Gateway Center* confirmed and began to define the scope of the state action limitation under the California Constitution, finding the requirement was not satisfied where a tenants' association sought to distribute leaflets in a private apartment complex that was "not freely open to the public." (*Golden Gateway Center v. Golden Gateway Tenants Assn., supra,* 26 Cal.4th at p. 1031.) *Golden Gateway Center* looked to the reasoning of *Robins* for guidance, noting that "*Robins* relied heavily on the functional equivalence of the shopping center to a traditional public forum-the downtown or central business district," and relied on "the public character of the property," emphasizing "the public's unrestricted access." (*Id.* at pp. 1032-1033, internal citations and quotations omitted.) *Golden Gateway Center* held that this unrestricted access is a "threshold requirement for establishing state action": without it, private property "is not the functional equivalent of a traditional public forum." (*Id.* at p. 1033.) In announcing this requirement, the opinion confirmed that it "largely follow[ed] the Court of Appeal decisions construing *Robins*," including *Planned Parenthood v. Wilson* (1991) 234 Cal.App.3d 1662. (*Id.* at p. 1033.) Those decisions also emphasized *Robins*'s focus on "the unique character of the modern shopping center and ... the public role such centers have assumed in contemporary society" by effectively replacing "the traditional town center business block, where historically the public's First Amendment activity was exercised and its right to do so scrupulously guarded." (*Planned Parenthood v. Wilson, supra,* 234 Cal.App.3d at pp. 1669-1670.) This concept was again emphasized by the California Supreme Court in *Fashion Valley,* which repeatedly referenced "[t]he idea that private property can constitute a public forum for free speech if it is open to the public in a manner similar to that of public streets and sidewalks ...." (*Fashion Valley Mall, LLC v. National Labor Relations Bd., supra,* 42 Cal.4th at p. 858; see also *id.* at p. 859.)

With this fundamental principle in mind, it is apparent that Prager does not state a claim under the California Constitution. Prager contends that "YouTube is the cyber equivalent of a town square where citizens exchange ideas on matters of public interest" and that defendants have opened their platform to the public by advertising its use for this purpose. However, Prager does not allege that it has been denied access to the core YouTube service. Rather, it urges that its access to "Restricted Mode" and YouTube's advertising service has been restricted. Prager does not persuade the Court that these services are freely open to the public or are the functional equivalent of a traditional public forum like a town square or a central business district.[1] Considering "the nature, purpose, and primary use of the property; the extent and nature of the public invitation to use the property; and the relationship between the ideas sought to be presented and the purpose of the property's occupants" (*Albertson's, Inc. v. Young* (2003) 107 Cal.App.4th at p. 119), it is clear that these services are nothing like a traditional public forum. "Restricted Mode" is an optional service that enables users to limit the content that they (or their children, patrons, or employees) view in order to avoid mature content. Limiting content is the very purpose of this service, and defendants do not give content creators unrestricted access to it or suggest that they will do so. The service exists to permit users to avoid the more open experience of the core YouTube service. Similarly, the use of YouTube's advertising service is restricted to meet the preferences of advertisers. (See FAC, ¶ 80 [stated purpose of advertising restrictions "is to keep Google's content and search networks safe and clean for our advertisers …"]; Declaration of Brian M. Willen, Exs. 7-9.)

Defendants correctly urge that even to recognize the core YouTube platform as a public forum would be a dramatic expansion of *Robins*. As one federal court observed, "[t]he analogy between a shopping mall and the Internet is imperfect, and there are a host of potential 'slippery slope' problems that are likely to surface were [*Robins*] to apply to the Internet." (*hiQ Labs, Inc. v. LinkedIn Corporation* (N.D. Cal. 2017) 273 F.Supp.3d 1099, 1116 [observing that "[n]o court

---

[1] Prager cites no authority that supports its position that a court can never determine the applicability of *Robins* on demurrer, and this position is incorrect. (See *Savage v. Trammell Crow Co.* (1990) 223 Cal.App.3d 1562, 1577, fn. 4 [stating that scope of *Robins* can be addressed on demurrer in appropriate circumstances].) Here, the necessary facts are alleged in the FAC and/or subject to judicial notice.

has expressly extended [*Robins*] to the Internet generally"], *aff'd and remanded* (9th Cir. 2019) 938 F.3d 985.) However the courts of this state ultimately view that analogy with regard to a dominant, widely-used site like the core YouTube service, the analogy falls apart completely on the facts alleged here. "Restricted Mode" and YouTube's advertising service are new, inherently selective platforms that do not resemble a traditional public forum. As discussed below, even more than the core YouTube service, these platforms necessarily reflect the exercise of editorial discretion rather than serving as an open "town square."

Finally, Prager contends that cases that have deemed web sites to be "public forums" for purposes of California's "anti-SLAPP" statute require this Court to extend *Robins* to its claim. However, the anti-SLAPP statute encompasses speech "***in a place open to the public or*** a public forum in connection with an issue of public interest" (Code Civ. Proc., § 425.16, subd. (e)(3), emphasis added), and has been applied to locations that clearly do not meet the standard described in *Golden Gateway Center.* (See, e.g., *Seelig v. Infinity Broadcasting Corp.* (2002) 97 Cal.App.4th 798, 807 [anti-SLAPP statute applied to comments made during on-air discussion on talk radio].) "[T]he protections afforded by the anti-SLAPP statute are not coextensive with the categories of conduct or speech protected by the First Amendment or its California counterparts (Cal. Const., art. I, §§ 2–4)." (*Industrial Waste & Debris Box Service, Inc. v. Murphy* (2016) 4 Cal.App.5th 1135, 1152.) "As our high court recently reaffirmed, 'courts determining whether conduct is protected under the anti-SLAPP statute look not to First Amendment law, but to the statutory definitions in section 425.16, subdivision (e).' " (*Ibid.*, quoting *City of Montebello v. Vasquez* (2016) 1 Cal.5th 409, 422.)

Defendants' demurrer to the first cause of action will accordingly be sustained without leave to amend. In addition to failing to state a claim under *Robins v. Pruneyard*, this cause of action is barred by section 230 of the CDA for the reasons discussed below. (See *In re Garcia* (2014) 58 Cal.4th 440, 452 [supremacy clause of the federal Constitution requires that any conflicting state law give way to federal statute], citing U.S. Const., art. VI, cl. 2 ["This Constitution, and the laws of the United States which shall be made in pursuance thereof ... shall

1  be the supreme law of the land; and the judges in every state shall be bound thereby, any thing in

2  the Constitution or laws of any state to the contrary notwithstanding"].)

3      B.  CDA Immunity

4      Section 230(c)(1) of the CDA provides that "[n]o provider or user of an interactive

5  computer service shall be treated as the publisher or speaker of any information provided by

6  another information content provider." "§ 230 precludes courts from entertaining claims that

7  would place a computer service provider in a publisher's role.  Thus, lawsuits seeking to hold a

8  service provider liable for its exercise of a publisher's traditional editorial functions—such as

9  deciding whether to publish, withdraw, postpone or alter content—are barred." (*Hassell v.*

10 *Bird* (2018) 5 Cal.5th 522, 536, quoting *Zeran v. America Online, Inc.* (4th Cir. 1997) 129 F.3d

11 327, 330.)

12     "The CDA—of which section 230 is a part—was enacted in 1996." (*Delfino v. Agilent*

13 *Technologies, Inc.* (2006) 145 Cal.App.4th 790, 802.)  "Its 'primary goal ... was to control the

14 exposure of minors to indecent material' over the Internet." (*Ibid.*, quoting *Batzel v. Smith* (9th

15 Cir. 2003) 333 F.3d 1018, 1026, superseded by statute on another point as stated in *Breazeale v.*

16 *Victim Services, Inc.* (9th Cir. 2017) 878 F.3d 759, 766.)  "Thus, an 'important purpose of

17 [the CDA] was to encourage [Internet] service providers to self-regulate the dissemination of

18 offensive materials over their services.' " (*Ibid.*, quoting *Zeran v. America Online, Inc., supra,*

19 129 F.3d at p. 331.)  Section 230(c)(2) consequently immunizes service providers[2]  who

20 endeavor to restrict access to material deemed objectionable, providing that

21     [n]o provider or user of an interactive computer service shall be held liable on
22     account of--

23     **(A)** any action voluntarily taken in good faith to restrict access to or availability of
       material that the provider or user considers to be obscene, lewd, lascivious, filthy,
24     excessively violent, harassing, or otherwise objectionable, whether or not such
       material is constitutionally protected; or
25

26     **(B)** any action taken to enable or make available to information content providers
       or others the technical means to restrict access to material described in
27

28

---

[2] There is no dispute that defendants are providers of "an interactive computer service" under section 230.

paragraph (1).[3]

(47 U.S.C. § 230(c)(2).)

A second, but related, objective of the CDA "was to avoid the chilling effect upon Internet free speech that would be occasioned by the imposition of tort liability upon companies that do not create potentially harmful messages but are simply intermediaries for their delivery." (*Delfino v. Agilent Technologies, Inc., supra,* 145 Cal.App.4th at pp. 802-803.) The legislative history reflects that Congress was responding to a New York trial court case where "a service provider was held liable for defamatory comments posted on one of its bulletin boards, based on a finding that the provider had adopted the role of 'publisher' by actively screening and editing postings." (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 44.) " 'Fearing that the specter of liability would ... deter service providers from blocking and screening offensive material,' " Congress forbid " 'the imposition of publisher liability on a service provider for the exercise of its editorial and self-regulatory functions.' " (*Id.,* quoting *Zeran v. America Online, Inc., supra,* 129 F.3d at p. 331.)  Thus, section 230(c)(1) " 'confer[s] broad immunity on Internet intermediaries' " in " 'a strong demonstration of legislative commitment to the value of maintaining a free market for online expression.' " (*Hassell v. Bird, supra,* 5 Cal.5th at p. 539, quoting *Barrett v. Rosenthal, supra,* 40 Cal.4th at p. 56.)

Of the two provisions, section 230(c)(1) has been applied more frequently and broadly, including by courts in the Northern District of California to conduct indistinguishable from that alleged in this action. Notably, in *Sikhs for Justice "SFJ", Inc. v. Facebook, Inc.* (N.D. Cal. 2015) 144 F.Supp.3d 1088, 1090, *aff'd sub nom. Sikhs for Justice, Inc. v. Facebook, Inc.* (9th Cir. 2017) 697 Fed.App'x. 526, a human rights organization alleged that Facebook blocked access to its page in India "on its own or on the behest of the Government of India," because of discrimination on the grounds of race, religion, ancestry, and national origin.  Quoting *Barnes v. Yahoo!, Inc.* (9th Cir. 2009) 570 F.3d 1096 and *Fair Housing Council of San Fernando Valley v. Roommates.Com, LLC* (9th Cir. 2008) 521 F.3d 1157, the court reasoned that

---

[3] It is widely agreed that section 230(c)(2)(B)'s reference to "paragraph (1)" is an error, and the provision should be interpreted to refer to section 230(c)(2)(A) or "paragraph (A)." (See, e.g., *Enigma Software Group USA, LLC v. Malwarebytes, Inc.* (9th Cir. 2019) 938 F.3d 1026, 1031, fn. 1.)

[p]ublication involves reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content. Thus, a publisher decides whether to publish material submitted for publication. It is immaterial whether this decision comes in the form of deciding what to publish in the first place or what to remove among the published material. ***In other words, any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230.***

(*Sikhs for Justice "SFJ", Inc. v. Facebook, Inc., supra,* 144 F.Supp.3d at p. 1094, emphasis added, internal citations and quotations omitted.) This approach has been endorsed by the Ninth Circuit. (See *Riggs v. MySpace, Inc.* (9th Cir. 2011) 444 Fed.App'x. 986, 987 [district court properly dismissed claims "arising from MySpace's decisions to delete Riggs's user profiles on its social networking website yet not delete other profiles Riggs alleged were created by celebrity imposters," citing *Fair Housing Council of San Fernando Valley v. Roommates.Com, LLC, supra,* 521 F.3d at pp. 1170-1171 for the proposition that "any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230"].) California opinions have similarly reasoned that the "type of activity" at issue here—"to restrict or make available certain material"—"is expressly covered by section 230." (*Doe II v. MySpace Inc.* (2009) 175 Cal.App.4th 561, 572-573 [describing "the general consensus to interpret section 230 immunity broadly, extending from *Zeran* ..."]; see also *Hassell v. Bird, supra,* 5 Cal.5th at p. 537 [California "courts have followed *Zeran* in adopting a broad view of section 230's immunity provisions"].) This interpretation was recently applied again by the Northern District in *Federal Agency of News LLC v. Facebook, Inc.* (N.D. Cal., July 20, 2019, No. 18-CV-07041-LHK) --- F.Sup.3d ---, 2019 WL 3254208, where it was held that section 230(c)(1) immunized Facebook from claims arising from its removal of a Russian company's account and page due to its alleged control by an entity found to have interfered in the 2016 United States presidential election.[4]

---

[4] See also *Langdon v. Google, Inc.* (D. Del. 2007) 474 F.Supp.2d 622, 630-631 (applying immunity under section 230(c)(1) and/or (2) where plaintiff alleged defendants refused to display ads on his web pages criticizing the North Carolina and Chinese governments based on political viewpoint discrimination); *Levitt v. Yelp! Inc.* (N.D. Cal., Oct. 26, 2011, No. C-10-1321 EMC) 2011 WL 5079526, at \*7-9, *aff'd* (9th Cir. 2014) 765 F.3d 1123 (section 230(c)(1) immunity applied to allegations that Yelp manipulated plaintiffs' user reviews in order to induce them to pay for

Consistent with the language of section 230(c)(1), these cases do not question the service provider's motive in deciding to remove content from its service. While Prager contends that section 230(c)(1) immunity should not be applied where a plaintiff alleges a service provider acted in bad faith or to stifle competition, it cites no persuasive authority adopting this interpretation.[5]

Courts have expressed greater concern with the issue of motive when interpreting section 230(c)(2), perhaps because paragraph (A) of that provision expressly includes a "good faith" requirement. Here, defendants rely on paragraph (B) of that provision, which they urge—like section 230(c)(1)—does not require good faith. In *Zango, Inc. v. Kaspersky Lab, Inc.* (9th Cir. 2009) 568 F.3d 1169, 1176-1177, the Ninth Circuit applied section 230(c)(2)(B) to a provider of Internet security software that deemed the plaintiff's software to be "malware," noting that the plaintiff had waived the issue of "whether subparagraph (B), which has no good faith language,

---

advertising); *Lancaster v. Alphabet Inc.* (N.D. Cal., July 8, 2016, No. 15-CV-05299-HSG) 2016 WL 3648608, at *2-3 ("§ 230[(c)(1) of the CDA prohibits any claim arising from Defendants' removal of Plaintiffs' videos"); *Green v. YouTube, LLC* (D.N.H., Mar. 13, 2019, No. 18-CV-203-PB) 2019 WL 1428890, at *6, *report and recommendation adopted sub nom. Green v. YouTube, Inc.* (D.N.H., Mar. 29, 2019, No. 18-CV-203-PB) 2019 WL 1428311 (applying immunity under section 230(c)(1) where plaintiff alleged his accounts were improperly shut down); *Brittain v. Twitter, Inc.* (N.D. Cal., June 10, 2019, No. 19-CV-00114-YGR) 2019 WL 2423375, at *3 (section 230(c)(1) immunity applied where plaintiff alleged improper suspension of his Twitter accounts and that Twitter "limit[ed] users who reference new/competing networks and/or utilize Third Party API services"); *King v. Facebook, Inc.* (N.D. Cal., Sept. 5, 2019, No. 19-CV-01987-WHO) 2019 WL 4221768 (section 230(c)(1) immunity applied to theory that "Facebook has violated its (Terms of Service) in removing [plaintiff's] posts and suspending his account, and that Facebook treats black activists and their posts differently than it does other groups, particularly white supremacists and certain 'hate groups' ").

[5] To the extent *e-ventures Worldwide, LLC v. Google, Inc.* (M.D. Fla. 2016) 188 F.Supp.3d 1265 adopts Prager's view, it does so by conflating section 230(c)(1) and section 230(c)(2) with no analysis. The Court does not find this persuasive. While a subsequent, unpublished opinion in that action, *e-ventures Worldwide, LLC v. Google, Inc.* (M.D. Fla., Feb. 8, 2017, No. 214CV646FTMPAMCM) 2017 WL 2210029, *3-4 reasoned that applying section 230(c)(1) to service providers' editorial decisions regarding a plaintiff's own content would swallow "the more specific immunity in (c)(2)" with its good faith requirement, the opinion went on to grant summary judgment based on the First Amendment's protection of editorial judgments, "no matter the motive." This case does not persuade the Court to part ways with the courts that apply section 230(c)(1) to the same end based on the same reasoning.

Similarly, *Levitt v. Yelp! Inc.* (N.D. Cal., Mar. 22, 2011, No. C 10-1321 MHP) 2011 WL 13153230, at *9 deemed it "a[] close[] question … whether Yelp may be held liable for its removal of positive reviews for the alleged purpose of coercing businesses to purchase advertising," considering that this theory implicated bad faith. The court ultimately did not resolve the issue as it found the complaint otherwise failed to state a cause of action. A subsequent opinion in that case, *Levitt v. Yelp! Inc.* (N.D. Cal., Oct. 26, 2011, No. C-10-1321 EMC) 2011 WL 5079526, *9 held that section 230(c)(1) does not include a good faith requirement, and applied "even assuming Plaintiffs have adequately pled allegations stating a claim of an extortionate threat with respect to Yelp's alleged manipulation of user reviews." The Court finds the reasoning of the subsequent opinion more persuasive.

---

should be construed implicitly to have a good faith component like subparagraph (A)." The concurring opinion expressed concern with extending immunity beyond the facts present in that case:

> Congress plainly intended to give computer users the tools to filter the Internet's deluge of material *users* would find objectionable, in part by immunizing the providers of blocking software from liability. *See* § 230(b)(3). But under the generous coverage of § 230(c)(2)(B)'s immunity language, a blocking software provider might abuse that immunity to block content for anticompetitive purposes or merely at its malicious whim, under the cover of considering such material "otherwise objectionable."

(*Zango, Inc. v. Kaspersky Lab, Inc.*, *supra*, 568 F.3d at p. 1178 (conc. opn. of Fisher, J.).) Noting that "[d]istrict courts nationwide have grappled with the issues discussed in *Zango*'s majority and concurring opinions, and have reached differing results," the Ninth Circuit recently held that a service provider's intent may be relevant under section 230(c)(2)(B): specifically, where a plaintiff alleges blocking by a direct competitor for anticompetitive purposes, its claims survive dismissal. (*Enigma Software Group USA, LLC v. Malwarebytes, Inc.* (9th Cir. 2019) 938 F.3d 1026.)

Here, defendants' creation of a "Restricted Mode" to allow sensitive users to voluntarily choose a more limited experience of the YouTube service is exactly the type of self-regulation that Congress sought to encourage in enacting section 230, and fits within section 230(c)(2)(B)'s immunity for "any action taken to enable or make available to … others," namely, YouTube users, "the technical means to restrict access to" material "that the provider or user considers to be obscene, … excessively violent, … or otherwise objectionable." Rather than unilaterally restricting access to material on its core platform as contemplated by section 230(c)(2)(A)— which contains a "good faith" requirement—defendants allow users to voluntarily restrict access to material that defendants deem objectionable for the stated reason that, like the categories of material enumerated by the statute, it may be inappropriate for young or sensitive viewers.[6] The

---

[6] Consistent with these circumstances, a page discussing options for administrators employing "Restricted Mode," which was submitted by Prager in connection with its motion for preliminary injunction, indicates that "[a]dministrators and designated approvers can now whitelist entire channels," in addition to individual videos, to ensure a channel is "watchable by your users." (Declaration of Peter Obstler, Ex. L.) Thus, it appears that users can

Court views this as a critical difference between the two provisions and disagrees with the majority in *Enigma*,[7] who ignore the plain language of the statute by reading a good faith limitation into section 230(c)(2)(B). (See *Enigma Software Group USA, LLC v. Malwarebytes, Inc., supra,* 938 F.3d at p. 1040 (dis. opn. of Rawlinson, J.) ["The majority's policy arguments are in conflict with our recognition in *Zango* that the broad language of the Act is consistent with 'the Congressional goals for immunity' as expressed in the language of the statute. [Citation.] As the district court cogently noted, we 'must presume that a legislature says in a statute what it means and means in a statute what it says there.' "].)

Finding CDA immunity here is also consistent with cases that apply it in indistinguishable circumstances based on section 230(c)(1), and with their reasoning, which recognizes that challenges to a service provider's editorial discretion "treat[]" the provider "as a publisher." (See *Sikhs for Justice "SFJ", Inc. v. Facebook, Inc., supra,* 144 F.Supp.3d 1088 [applying section 230(c)(1) to claim under Title II of the Civil Rights Act of 1964]; *Federal Agency of News LLC v. Facebook, Inc., supra,* 2019 WL 3254208 [applying section 230(c)(1) to claims under Title II of the Civil Rights Act of 1964, the Unruh Act, and for breach of the implied covenant of good faith and fair dealing].) The Court finds that immunity under section 230(c)(1) also applies here, to the allegations involving both "Restricted Mode" and defendants' advertising service.

While the Court understands Prager's argument that all three provisions of section 230 should have a good faith requirement, this argument is contrary to the plain language of the statute. (See *Hassell v. Bird, supra,* 5 Cal.5th at p. 540 [noting that *Barrett v. Rosenthal, supra,* 40 Cal.4th 33 voiced "qualms" that *Zeran*'s interpretation of section 230 provides blanket immunity for those who intentionally redistribute defamatory statements, but held "these concerns were of no legal consequence" where principles of statutory interpretation compelled a

---

specifically override defendants' decisions to disable certain videos or channels in "Restricted Mode," confirming that "Restricted Mode" is a tool made available to users rather than a unilateral ban.

[7] See *People v. Williams* (1997) 16 Cal.4th 153, 190 ("Decisions of lower federal courts interpreting federal law are not binding on state courts."); *Elliott v. Albright* (1989) 209 Cal.App.3d 1028, 1034 (although at times entitled to great weight, the decisions of the lower federal courts on federal questions are merely persuasive).

broad construction].) And while it is not this Court's role to judge the wisdom of the policy embodied by section 230, there are good reasons to support it. As the court in *Levitt v. Yelp! Inc.* (N.D. Cal., Oct. 26, 2011, No. C-10-1321 EMC) 2011 WL 5079526 reasoned,

> traditional editorial functions often include subjective judgments informed by political and financial considerations. [Citation.] Determining what motives are permissible and what are not could prove problematic. Indeed, from a policy perspective, permitting litigation and scrutin[izing] motive could result in the "death by ten thousand duck-bites" against which the Ninth Circuit cautioned in interpreting § 230(c)(1). [(*Fair Housing Council of San Fernando Valley v. Roommates.Com, LLC, supra,* 521 F.3d at p. 1174.)]

> One of Congres[s]'s purposes in enacting § 230(c) was to avoid the chilling effect of imposing liability on providers by both safeguarding the "diversity of political discourse ... and myriad avenues for intellectual activity" on the one hand, and "remov[ing] disincentives for the development and utilization of blocking and filtering technologies" on the other hand. §§ 230(a), (b); *see also* S.Rep. No. 104–230, at 86 (1996) (Conf.Rep.), *available at* 1996 WL 54191, at *[194] (describing purpose of section 230 to protect providers from liability "for actions to restrict or to enable restrict[ion] of access to objectionable online material"). For that reason, "[C]lose cases ... must be resolved in favor of immunity, lest we cut the heart out of section 230 ...." [(*Fair Housing Council of San Fernando Valley v. Roommates.Com, LLC, supra,* 521 F.3d at p. 1174.)]

> As illustrated by the case at bar, finding a bad faith exception to immunity under § 230(c)(1) could force Yelp to defend its editorial decisions in the future on a case by case basis and reveal how it decides what to publish and what not to publish. Such exposure could lead Yelp to resist filtering out false/unreliable reviews (as someone could claim an improper motive for its decision), or to immediately remove all negative reviews about which businesses complained (as failure to do so could expose Yelp to a business's claim that Yelp was strong-arming the business for advertising money). The Ninth Circuit has made it clear that the need to defend against a proliferation of lawsuits, regardless of whether the provider ultimately prevails, undermines the purpose of section 230.

(*Levitt v. Yelp! Inc., supra,* 2011 WL 5079526, at *8-9.) In the Court's view, these concerns are particularly salient here, where the challenged services are by definition more curated than defendants' core service and could not exist without more robust screening by defendants.

In opposition to defendants' demurrer, Prager cites a number of cases that affirm the principle applied in *Fair Housing Council of San Fernando Valley v. Roommates.Com, LLC, supra,* 521 F.3d 1157, which held that a service provider is not entitled to CDA immunity with

regard to content it develops itself. However, this principle is inapposite here. Prager does not allege that defendants developed any of Prager's content or appended any commentary to it—to the contrary, they allege the content became completely invisible in "Restricted Mode" or was simply demonetized. Applying CDA immunity under these circumstances does not conflict with *Roommates.* (See *Fair Housing Council of San Fernando Valley v. Roommates.Com, LLC, supra,* 521 F.3d at p. 1163 [in enacting CDA immunity, "Congress sought to immunize the *removal* of user-generated content, not the *creation* of content"].)[8]

Finally, Prager contends that applying CDA immunity here would constitute an unlawful prior restraint on its speech in violation of the First Amendment. However, a federal court has already held that defendants' conduct does not violate the First Amendment, and this Court agrees with that analysis for the reasons discussed in connection with its analysis of Prager's claim under the California Constitution. Moreover, Prager does not allege that defendants prevented it from engaging in speech, even on their own platform—again, it contends that certain videos were excluded from "Restricted Mode" and/or were demonetized.

The Court consequently finds that section 230(c)(2)(B) bars Prager's claims related to "Restricted Mode" and section 230(c)(1) bars all of its claims, with the possible exception of those based on its own promises and representations, which are discussed below.[9]

### C. Breach of the Implied Covenant of Good Faith and Fair Dealing and Fraud Under the UCL

Finally, Prager correctly urges that some California authority holds section 230(c)(1) of the CDA does not apply to claims based on a defendant's own promises and representations to a plaintiff, rather than its role as a publisher. (See *Demetriades v. Yelp, Inc.* (2014) 228 Cal.App.4th 294, 313 [this immunity does not apply where "plaintiff seeks to hold Yelp liable for its own statements regarding the accuracy of its filter"]; but see *Hassell v. Bird, supra,* 5 Cal.5th at p. 542 [disapproving of "creative pleading" in an attempt to avoid section 230

---

[8] Although it does not bring a claim for defamation, Prager appears to suggest that defendants have defamed it by removing its content from "Restricted Mode" or demonetizing it. Such a claim would likely be foreclosed by the ruling in *Bartholomew v. YouTube, LLC.* (2017) 17 Cal.App.5th 1217, 1234.

[9] The Court thus does not address defendants' argument that Prager's claims are barred by the First Amendment.

---

immunity].)  This authority does not apply to the Court's finding of immunity under section 230(c)(2)(B).  In any event, Prager's claims asserting this type of theory—namely, its claim for breach of the implied covenant of good faith and fair dealing and its claim under the fraud prong of the UCL—do not state a cause of action.

Prager does not and cannot state a claim for breach of the implied covenant of good faith and fair dealing in light of the express provisions of YouTube's Terms of Service, which provide that "YouTube reserves the right to remove Content without prior notice" and which also allow YouTube to "discontinue any aspect of the Service at any time."  (See Declaration of Brian Willen, Ex. 1; *Song fi Inc. v. Google, Inc.* (N.D. Cal. 2015) 108 F.Supp.3d 876, 885 [plaintiff could not state a claim for violation of the covenant of good faith and fair dealing based on content removal in light of YouTube's Terms of Service].)  Similarly, YouTube's AdSense Terms of Service reserve the right "to refuse or limit your access to the Services."  (Declaration of Brian Willen, Ex. 8; see *Sweet v. Google Inc.* (N.D. Cal., Mar. 7, 2018, No. 17-CV-03953-EMC) 2018 WL 1184777, at *9-10 [plaintiff could not state a claim for violation of the covenant of good faith and fair dealing based on demonitization in light of similar reservation of rights in YouTube's Partner Program Terms].)  "[C]ourts are not at liberty to imply a covenant directly at odds with a contract's express grant of discretionary power except in those relatively rare instances when reading the provision literally would, contrary to the parties' clear intention, result in an unenforceable, illusory agreement."  (*Third Story Music, Inc. v. Waits* (1995) 41 Cal.App.4th 798, 808.)  That is not the case here, and Prager does not contend that it is.  (See *Sweet v. Google Inc., supra,* 2018 WL 1184777, at *9-10 [applying *Third Story*].)

As to the UCL fraud claim, to the extent it is based on the "four essential freedoms" set forth above and similar statements, these statements are non-actionable puffery.  (See *Demetriades v. Yelp, Inc., supra,* 228 Cal.App.4th at p. 311 [" 'a statement that is quantifiable, that makes a claim as to the "specific or absolute characteristics of a product," may be an actionable statement of fact while a general, subjective claim about a product is non-actionable puffery,' " quoting *Newcal Industries, Inc. v. Ikon Office Solution* (9th Cir.2008) 513 F.3d 1038, 1053]; *Prager University v. Google LLC, supra,* 2018 WL 1471939, at *11 ["None of the

statements about YouTube's viewpoint neutrality identified by Plaintiff resembles the kinds of 'quantifiable' statements about the 'specific or absolute characteristics of a product' that are actionable under the Lanham Act.'"].)

Prager also alleges that defendants represented that "the 'same standards apply equally to all' when it comes to the content regulation on YouTube." (FAC, ¶ 85; see also *id.* at ¶ 13.) While this statement is arguably more than mere puffing (see *Demetriades v. Yelp, Inc., supra,* 228 Cal.App.4th at p. 311-312), Prager does not allege that it suffered a loss of money or property as a result of its reliance on this statement. "There are innumerable ways in which economic injury from unfair competition may be shown," including where a plaintiff "ha[s] a present or future property interest diminished." (*Kwikset Corp. v. Superior Court (Benson)* (2011) 51 Cal.4th 310, 323; see also *Alborzian v. JPMorgan Chase Bank, N.A.* (2015) 235 Cal.App.4th 29, 38 [UCL "unlawful" plaintiffs established standing by alleging diminished credit score caused by defendant's false negative reporting to credit agencies, even where they never made payments on the loan at issue].) The "lost income, reduced viewership, and damage to brand, reputation, and goodwill" that Prager alleges (FAC, ¶ 157) would certainly satisfy this requirement if there were a causal connection between Prager's alleged reliance on defendants' statement in participating in the YouTube service and these harms. However, these injuries cannot have resulted from Prager's decision to use YouTube: they could only have been caused by YouTube's later decisions to restrict and/or demonetize Prager's content. (See *Prager University v. Google LLC, supra,* 2018 WL 1471939, at *11-12 ["Plaintiff has not sufficiently alleged that it 'has been or is likely to be injured as the result of the' statements about YouTube's viewpoint neutrality. [Citation.] As discussed above, any harm that Plaintiff suffered was caused by Defendants' decisions to limit access to some of Plaintiff's videos."].) These later decisions by YouTube could not have been relied on by Prager. (See *id.* at *11 ["Although Plaintiff asserts that it has suffered injury in the form of 'lower viewership, decreased ad revenue, a reduction in advertisers willing to purchase advertisements shown on Plaintiff's videos, diverted viewership, and damage to its brand, reputation and goodwill," … nothing in Plaintiff's complaint suggests that this harm flowed directly from Defendants' publication of

their policies and guidelines. Instead, any harm that Plaintiff suffered was caused by Defendants' decisions to limit access to some of Plaintiff's videos ...."].)  Moreover, recognizing this theory would appear to conflict with principles of defamation law as recently discussed in *Bartholomew v. YouTube, LLC.* (2017) 17 Cal.App.5th 1217.

Prager thus fails to state a cause of action based on the implied covenant of good faith and fair dealing or the fraud prong of the UCL.

D.  Conclusion and Order

For all these reasons, the demurrer to the first through fourth causes of action is SUSTAINED WITHOUT LEAVE TO AMEND.


III.  Motion for Preliminary Injunction

As discussed above, Prager has not shown a reasonable probability of success on the merits in this action.  Its motion for a preliminary injunction is consequently DENIED.  (See *San Francisco Newspaper Printing Co. v. Superior Court (Miller)* (1985) 170 Cal.App.3d 438, 442.)


IT IS SO ORDERED.

Dated: **Nov. 19, 2019**

Honorable Brian C. Walsh
Judge of the Superior Court

# Exhibit "C"

1   JOSEPH H. HUNT
        Assistant Attorney General
2   ERIC WOMACK
        Assistant Branch Director
3   INDRANEEL SUR
        indraneel.sur@usdoj.gov
4       D.C. Bar No. 978017
        Trial Attorney
5       Civil Division, Federal Programs Branch
        P.O. Box 883
6       Washington, D.C.  20044
        Telephone:  (202) 616-8488
7       Facsimile:  (202) 616-8470

8   Counsel for the United States of America

9

10                  UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF CALIFORNIA
11                        SAN JOSE DIVISION

12

13   DIVINO GROUP LLC, a California limited          Case No. 5:19-cv-004749-VKD
     liability company, CHRIS KNIGHT, an
     individual, CELSO DULAY, an individual,
14   CAMERON STIEHL, an individual,                  **UNITED STATES OF AMERICA'S**
     BRIAANDCHRISSY LLC, a Georgia limited           **NOTICE OF INTERVENTION**
15   liability company, BRIA KAM, an individual,     **TO DEFEND THE**
     CHRISSY CHAMBERS, an individual, CHASE          **CONSTITTUTIONALITY OF**
16   ROSS, an individual, BRETT SOMERS, an           **47 U.S.C. § 230(c)**
     individual, and LINDSAY AMER, an individual,
17   STEPHANIE FROSCH, an individual, SAL
     CINEQUEMANI, an individual, TAMARA
18   JOHNSON, an individual, and GREG
     SCARNICI, an individual,
19
                Plaintiffs,
20
           vs.                                        Action Filed: August 13, 2019
21                                                    Trial Date: None Set
     GOOGLE LLC, a Delaware limited liability         Rule 5.1 Notice Filed: December 20, 2019
22   company, YOUTUBE, LLC, a Delaware
     limited liability company, and DOES 1-25,
23
                Defendants.
24

25

26

27

28

EXHIBIT "C"

Under Federal Rules of Civil Procedure 5.1(c) and 24(a)(1), and in accordance with the authorization of the Solicitor General of the United States, the United States hereby intervenes in this action for the limited purpose of defending the constitutionality of Section 230(c) of the Communications Decency Act of 1996 ("CDA") (Pub. L. No. 104-104, § 509, codified at 47 U.S.C. § 230(c)).

On December 20, 2019, Plaintiffs filed a notice of constitutional challenge regarding 47 U.S.C. § 230(c) (Doc. 21). In that Notice, Plaintiffs stated that their pleadings allege that "Section 230(c) does not, and cannot, apply in this case, under the plain language of the statute or under the Constitution, to prevent the Plaintiffs from seeking legal redress for harms and injuries caused by Defendants' discrimination against them and other similarly situated Plaintiffs and users of YouTube." *Id.* at 3. Moreover, in opposition to the motion to dismiss the operative complaint filed by Defendants (Doc. 25), Plaintiffs in their brief filed February 24, 2020 made certain contentions regarding the constitutionality of 47 U.S.C. § 230(c) (Doc. 28). The Court has not yet certified a constitutional question under Rule 5.1(b) and 28 U.S.C. § 2403.

The United States is entitled to intervene in this action under the Federal Rules of Civil Procedure and by statute. Rule 5.1(c) permits the Attorney General to intervene in an action where, as here, the constitutionality of a federal statute is challenged. *See* Fed. R. Civ. P. 5.1(c). Rule 24 further permits a non-party to intervene when the non-party "is given an unconditional right to intervene by a federal statute." Fed. R. Civ. P. 24(a)(1). The United States has an unconditional statutory right to intervene "[i]n any action . . . wherein the constitutionality of any Act of Congress affecting the public interest is drawn in question . . . ." 28 U.S.C. § 2403(a). In such an action, "the court . . . shall permit the United States to intervene . . . for argument on the question of constitutionality." *Id.* Here, Plaintiffs have "drawn in question" the constitutionality of 47 U.S.C. § 230(c), and the United States has an unconditional right to intervene to defend the statute.

The United States will immediately hereafter file its memorandum in defense of the constitutionality of 47 U.S.C. § 230(c). The United States' intervention, including its filing

UNITED STATES' NOTICE OF INTERVENTION
Case No. 5:19-cv-004749-VKD

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**P.O. Box 883**
**Washington, D.C. 20044**
**Tel: (202) 616-8488**

of a memorandum in support of the constitutionality of 47 U.S.C. § 230(c), will not interfere with the timely adjudication of this action.  This notification is also timely.  By this Court's order of April 23, 2020, the United States' deadline for intervention is today.  Doc. 44.

Accordingly, the United States hereby provides notice of intervention in this action for the purpose of defending the constitutionality of 47 U.S.C. § 230(c).

DATED:  May 8, 2020

Respectfully submitted,
JOSEPH H. HUNT
Assistant Attorney General

ERIC WOMACK
Assistant Branch Director

INDRANEEL SUR
Trial Attorney

By:  */s/ Indraneel Sur*
INDRANEEL SUR

U.S. Department of Justice
Counsel for the United States of America

UNITED STATES' NOTICE OF INTERVENTION
Case No. 5:19-cv-004749-VKD

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, D.C. 20044
Tel: (202) 616-8488

JOSEPH H. HUNT
    Assistant Attorney General
ERIC WOMACK
    Assistant Branch Director
INDRANEEL SUR
    indraneel.sur@usdoj.gov
    D.C. Bar No. 978017
    Trial Attorney
    Civil Division, Federal Programs Branch
    1100 L Street, NW
    Washington, D.C.  20530
    Telephone:  (202) 616-8488
    Facsimile:  (202) 616-8470

Counsel for the United States of America

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

|  |  |
|---|---|
| DIVINO GROUP LLC, a California limited liability company, CHRIS KNIGHT, an individual, CELSO DULAY, an individual, CAMERON STIEHL, an individual, BRIAANDCHRISSY LLC, a Georgia limited liability company, BRIA KAM, an individual, CHRISSY CHAMBERS, an individual, CHASE ROSS, an individual, BRETT SOMERS, an individual, and LINDSAY AMER, an individual, STEPHANIE FROSCH, an individual, SAL CINEQUEMANI, an individual, TAMARA JOHNSON, an individual, and GREG SCARNICI, an individual, <br><br>         Plaintiffs, <br><br>     vs. <br><br> GOOGLE LLC, a Delaware limited liability company, YOUTUBE, LLC, a Delaware limited liability company, and DOES 1-25, <br><br>     Defendants. | Case No. 5:19-cv-004749-VKD <br><br> **MEMORANDUM OF LAW FOR INTERVENOR UNITED STATES IN SUPPORT OF THE CONSTITUTIONALITY OF 47 U.S.C. § 230(C)** <br><br><br><br><br><br> Action Filed: August 13, 2019 <br> Trial Date: None Set <br> Rule 5.1 Notice Filed: December 20, 2019 |

# TABLE OF CONTENTS

INTRODUCTION.............................................................................................................1

STATEMENT.................................................................................................................2

    I.  Statutory Background ..................................................................................2

    II. Proceedings In Plaintiffs' Case.................................................................4

ARGUMENT .................................................................................................................7

    I.  The Court Should First Decide The Potentially Dispositive Statutory
        Issues Because They May Obviate The Need To Address Plaintiffs'
        Constitutional Challenge ............................................................................7

    II. If The Court Reaches the Question, It Should Conclude That
        Section 230(c) Is Constitutional.................................................................8

CONCLUSION.............................................................................................................12

UNITED STATES'S MEMORANDUM OF LAW IN SUPPORT OF
CONSTITUTIONALITY OF 47 U.S.C. § 230(C) - i -
Case No. 5:19-cv-004749-VKD

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**1100 L Street, NW**
**Washington, DC 20530**
**Tel: (202) 616-8488**

# TABLE OF AUTHORITIES

**CASES**

*Ashcroft v. Free Speech Coalition,*
    535 U.S. 234 (2002) ..................................................................................................8

*Ashwander v. TVA,*
    297 U.S. 288 (1936) ..................................................................................................7

*Barnes v. Yahoo!, Inc.,*
    570 F.3d 1096 (9th Cir. 2009) ..................................................................................4

*Borough of Duryea v. Guarnieri,*
    564 U.S. 379 (2011) ........................................................................................ 10, 11

*Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.,*
    473 U.S. 788 (1985) ..................................................................................................9

*Delfino v. Agilent Techs., Inc.,*
    145 Cal. App. 4th 790, 52 Cal. Rptr. 3d 376 (Cal. Ct. App. 2006) .........................4

*Dep't of Commerce v. U.S. House of Representatives,*
    525 U.S. 316 (1999) ..................................................................................................7

*Doe v. Internet Brands, Inc.,*
    824 F.3d 846 (9th Cir. 2016) ....................................................................................4

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC,*
    521 F.3d 1157 (9th Cir. 2008) ..........................................................................2, 3, 4

*Fields v. Legacy Health Sys.,*
    413 F.3d 943 (9th Cir. 2005) ..................................................................................11

*Ileto v. Glock, Inc.,*
    565 F.3d 1126 (9th Cir. 2009) ................................................................................11

*Logan v. Zimmerman Brush Co.,*
    455 U.S. 422 (1982) ................................................................................................11

*Manhattan Cmty. Access Corp. v. Halleck,*
    139 S. Ct. 1921 (2019) ..............................................................................................9

UNITED STATES'S MEMORANDUM OF LAW IN SUPPORT OF
CONSTITUTIONALITY OF 47 U.S.C. § 230(C) - ii -
Case No. 5:19-cv-004749-VKD

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**1100 L Street, NW**
**Washington, DC 20530**
**Tel: (202) 616-8488**

*N.Y.C. Transit Auth. v. Beazer,*
    440 U.S. 568 (1979) ........................................................................................................ 8

*Orin v. Barclay,*
    272 F.3d 1207 (9th Cir. 2001) ..................................................................................... 12

*Prager University v. Google LLC,*
    951 F.3d 991 (9th Cir. 2020) ................................................................................. *passim*

*Sikhs for Justice, Inc. v. Facebook, Inc.,*
    697 F. App'x 526 (9th Cir. 2017) ................................................................................. 2

*Sikhs for Justice "SFJ", Inc. v. Facebook, Inc.,*
    144 F. Supp. 3d 1088 (N.D. Cal. 2015) ...................................................................... 2

*Spector Motor Serv. v. McLaughlin,*
    323 U.S. 101 (1944) ...................................................................................................... 7

*Stratton Oakmont, Inc. v. Prodigy Servs. Co.,*
    No. 31063/94, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995) ................................ 3

*Sure-Tan, Inc. v. NLRB,*
    467 U.S. 883 (1984) .................................................................................................... 10

*Zango, Inc. v. Kaspersky Lab, Inc.,*
    568 F.3d 1169 (9th Cir. 2009) ..................................................................................... 3

*Zeran v. Am. Online, Inc.,*
    129 F.3d 327 (4th Cir. 1997) ........................................................................................ 4

**STATUTES**

15 U.S.C. § 1125 *et seq.* ................................................................................................. 6, 7

28 U.S.C. § 2403 .............................................................................................................. 6

42 U.S.C. § 1983 .............................................................................................................. 6

47 U.S.C. § 230 ........................................................................................................ *passim*

Communications Decency Act of 1996 ("CDA"),
    Pub. L. No. 104-104, 110 Stat 56 (codified at 47 U.S.C. § 230) .............................. 1

UNITED STATES'S MEMORANDUM OF LAW IN SUPPORT OF
CONSTITUTIONALITY OF 47 U.S.C. § 230(C) - iii -
Case No. 5:19-cv-004749-VKD

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**1100 L Street, NW**
**Washington, DC 20530**
**Tel: (202) 616-8488**

**RULES**

Fed. R. Civ. P. 5.1 ................................................................................................ 6

Fed. R. Civ. P. 12 ........................................................................................ *passim*

**OTHER AUTHORITIES**

F. Mott, *American Journalism* 55 (3d ed. 1962) .................................................. 9

H.R. Rep. No. 104-458 (1996) (Conf. Rep.), *as reprinted in* 1996 U.S.C.C.A.N. 10 ................. 3

John E. Nowak, Ronald D. Rotunda & J. Nelson Young,
    *Handbook on Constitutional Law* (1978) ...................................................... 12

UNITED STATES'S MEMORANDUM OF LAW IN SUPPORT OF
CONSTITUTIONALITY OF 47 U.S.C. § 230(C) - iv -
Case No. 5:19-cv-004749-VKD

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**1100 L Street, NW**
**Washington, DC 20530**
**Tel: (202) 616-8488**

## **INTRODUCTION**

Plaintiffs, who are video creators seeking monetary and other recovery based on the alleged editorial decisions of a popular Internet platform, YouTube, have raised a constitutional challenge to Section 230(c) of the Communications Decency Act of 1996 ("CDA") (Pub. L. No. 104-104, § 509, codified at 47 U.S.C. § 230(c)).  When the World Wide Web was in its early days in 1996, Congress sought through Section 230(c) to promote and protect "Good Samaritan" blocking and screening of offensive material by limiting the liability of website owners and operators.  The statute immunizes for certain liability purposes an "interactive computer service" provider from being treated as the publisher or speaker of content created by third parties and hosted by the service (47 U.S.C. § 230(c)(1)), or for removing or restricting access to certain types of offensive material (§ 230(c)(2)).

In seeking Rule 12(b)(6) dismissal of the operative complaint, YouTube has invoked the statute as an affirmative defense to Plaintiffs' claims, and Plaintiffs have responded by arguing, among other things, that the statute violates the First Amendment and the equal protection guarantee of the Fifth Amendment to the extent it shields YouTube from liability for Plaintiffs' claims.  Plaintiffs also seek a declaratory judgement to that effect.

The United States intervenes today in response to Plaintiffs' constitutional challenge, and, in defense of the statute, respectfully limits this brief to two arguments.

*First*, under the doctrine of constitutional avoidance, this Court should start by deciding the statutory arguments presented by the parties regarding the pending Rule 12(b)(6) motion, because those non-constitutional grounds may obviate the need for decision on any constitutional question.  A court should decide a constitutional question only when necessary, which would not be the situation here if the Court were to conclude that statutory grounds suffice to dispose of the case.

*Second*, if the Court concludes that it must reach the constitutional question, Plaintiffs' challenge should be rejected on the merits.  Section 230(c) does not regulate Plaintiffs' primary conduct.  Instead, the statute establishes a rule prohibiting liability for certain conduct by online platforms, including YouTube.  Because the United States is intervening

UNITED STATES'S MEMORANDUM OF LAW IN SUPPORT OF
CONSTITUTIONALITY OF 47 U.S.C. § 230(C) - 1 -
Case No. 5:19-cv-004749-VKD

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**1100 L Street, NW**
**Washington, DC 20530**
**Tel: (202) 616-8488**

for the limited purpose of defending the constitutionality of Section 230(c), it does not take a position on whether the statute forecloses the particular claims Plaintiffs have alleged. But assuming it does, that would not violate the First Amendment's Speech Clause, because—as the Ninth Circuit squarely held in *Prager University v. Google LLC*, 951 F.3d 991 (9th Cir. 2020)—YouTube is not a state actor capable of denying the freedom of speech. In other words, Section 230(c) would not deny Plaintiffs any constitutional claim they otherwise would have. Nor do Plaintiffs' arguments find support in the First Amendment's Petition Clause or in the constitutional guarantee of equal protection. In short, however Plaintiffs' challenge to Section 230(c) is framed, it is meritless, and should be rejected.

## STATEMENT

### I. Statutory Background

Section 230(c) of the CDA is entitled "Protection for 'Good Samaritan' blocking and screening of offensive material." The Ninth Circuit has described the statute as "immuniz[ing] providers of interactive computer services against liability arising from content created by third parties." *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1163-64 (9th Cir. 2008) (*en banc*) (footnotes omitted).

In particular, Paragraph (1) states: "No provider . . . of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). The statute also provides that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." *Id.* § 230(e)(3). The result is to protect online platforms from such liabilities as those the common law imposed on publishers or speakers for libel or slander. Some courts have also construed the limitation to shield online platforms against certain liabilities under federal law. *See, e.g.*, *Sikhs for Justice "SFJ", Inc. v. Facebook, Inc.*, 144 F. Supp. 3d 1088, 1096 (N.D. Cal. 2015), *aff'd sub nom. Sikhs for Justice, Inc. v. Facebook, Inc.*, 697 F. App'x 526 (9th Cir. 2017). The immunity applies only when the interactive computer service provider is not also the "information content provider" of the material in question—

UNITED STATES'S MEMORANDUM OF LAW IN SUPPORT OF
CONSTITUTIONALITY OF 47 U.S.C. § 230(C) - 2 -
Case No. 5:19-cv-004749-VKD

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**1100 L Street, NW**
**Washington, DC 20530**
**Tel: (202) 616-8488**

*i.e.,* the person "responsible, in whole or in part, for the creation or development of" the "offending content." *See Roommates*, 521 F.3d at 1162-63 (quoting § 230(f)(3)).

For its part, Paragraph (2) describes a separate immunity. It states:

No provider or user of an interactive computer service shall be held liable on account of —

(A)   any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

(B)   any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph [A].

47 U.S.C. § 230(c)(2).*

The problem Congress sought to solve in Section 230(c) arose from a New York state trial court's ruling that an internet service provider that had voluntarily deleted some messages from an online message board was then "legally responsible for the content of defamatory messages that it failed to delete." *See Roommates*, 521 F.3d at 1163 (discussing *Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, No. 31063/94, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995)). The statute responded by "immuniz[ing] the *removal* of user-generated content, not the *creation* of content." *Id.* That is, Section 230 "provides 'Good Samaritan' protections from civil liability for providers . . . of an interactive computer service for actions to restrict . . . access to objectionable online material. One of the specific purposes of this section is to overrule *Stratton* . . . which . . . treated such providers . . . as publishers or speakers of content that is not their own because they have restricted access to objectionable material." H.R. Rep. No. 104-458 (1996) (Conf. Rep.), *as reprinted in* 1996 U.S.C.C.A.N. 10.

---

*   The text of Paragraph (2)(B) refers to "the material described in paragraph (1)," but the Ninth Circuit "take[s] it that the reference to the 'material described in paragraph (1)' is a typographical error, and that instead the reference should be to . . . § 230(c)(2)(A)," because "Paragraph (1) pertains to the treatment of a publisher or speaker and has nothing to do with 'material,' whereas subparagraph (A) pertains to and describes material." *Zango, Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1169, 1173 n.5 (9th Cir. 2009).

UNITED STATES'S MEMORANDUM OF LAW IN SUPPORT OF
CONSTITUTIONALITY OF 47 U.S.C. § 230(C) - 3 -
Case No. 5:19-cv-004749-VKD

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
Tel: (202) 616-8488

According to the Ninth Circuit, Section 230(c)(1) shields the defendant from a claim wherever "the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a 'publisher or speaker.'" *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009). In that context, the Ninth Circuit views "publication" as "involv[ing] reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content." *Id.*. The Ninth Circuit has remarked in an *en banc* opinion that "any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune" under Section 230(c)(1). *Roommates*, 521 F.3d at 1170-71.

The Ninth Circuit has described one of the policies behind the liability shield as promotion of speech—that is, to "avoid the chilling effect upon Internet free speech that would be occasioned by the imposition of tort liability upon companies that do not create potentially harmful messages but are simply intermediaries for their delivery." *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 852 (9th Cir. 2016) (quoting *Delfino v. Agilent Techs., Inc.*, 145 Cal. App. 4th 790, 52 Cal. Rptr. 3d 376, 387 (Cal. Ct. App. 2006)). In enacting Section 230(c), Congress made findings describing online platforms as offering "a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity." § 230(a)(3). Accordingly, "the policy of the United States" is "to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, *unfettered by Federal or State regulation.*" § 230(b)(2) (emphasis added). To be sure, Congress also determined that it was the policy of the United States "to ensure vigorous enforcement of *Federal criminal laws* to deter and punish trafficking in obscenity, stalking, and harassment by means of computer." § 230(b)(5) (emphasis added). But in balancing the various interests, Congress sought "not to deter harmful online speech through the separate route of imposing *tort liability* on companies that serve as intermediaries for other parties' potentially injurious messages." *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330-31 (4th Cir. 1997) (Wilkinson, C.J.) (emphasis added).

UNITED STATES'S MEMORANDUM OF LAW IN SUPPORT OF
CONSTITUTIONALITY OF 47 U.S.C. § 230(C) - 4 -
Case No. 5:19-cv-004749-VKD

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
Tel: (202) 616-8488

## II. Proceedings In Plaintiffs' Case

The instant Plaintiffs are "Lesbian, Gay, Bisexual, Transgender, Transsexual or Queer internet content creators" who make videos, including many that "discuss issues which affect members of the LGBTQ+ community." 2d Am. Compl. ¶¶ 1, 41 (Doc. 20) ("SAC"). YouTube, owned by Google, is allegedly the dominant Internet video platform, hosting "roughly 95%" of global "public video-based content," and "monetizing the free speech and expression of . . . the 2.3 billion people who now use" it. SAC ¶ 15. Plaintiffs allegedly contracted with YouTube, licensing it to distribute their videos while agreeing that YouTube retained various rights—including the right to enforce its community guidelines, and the right to determine "in its sole discretion" whether the videos contained "material . . . in violation of" the agreement. Rule 12(b)(6) Opp. 4 (Doc. 28); *see* SAC ¶¶ 10, 117(d), 288. According to Plaintiffs, YouTube "monetize[s]" the videos by selling advertisements for display along with them, and some Plaintiffs have paid YouTube to promote their videos (individually or grouped into channels) to potential viewers. SAC ¶¶ 55, 89, 131. YouTube allegedly retains "unfettered and absolute discretion to restrict the viewership, reach, and monetization of [the] videos." SAC ¶ 118.

One way that YouTube allegedly exercises that discretion is through its "Restricted Mode," which works "much like a curtain" to "block[] access" by "younger, sensitive audiences to video content that contains certain specifically enumerated 'mature' aspects." SAC ¶ 77. When a viewer turns on "Restricted Mode" for a personal account (or when it is activated by a parent or system administrator, such as one acting on behalf of a public library, school, or other work place) and lands on a video placed in "Restricted Mode," instead of showing the video, YouTube displays a warning, stating that the video is unavailable and that to view the video the viewer would "need to disable Restricted Mode." SAC ¶¶ 77-79, 83, 343. YouTube allegedly tells viewers who inquire that videos are placed in "Restricted Mode" when they include, among other things, "[o]verly detailed conversations about or depictions of sex or sexual activity," "inappropriate language, including profanity," or other sensitive

UNITED STATES'S MEMORANDUM OF LAW IN SUPPORT OF
CONSTITUTIONALITY OF 47 U.S.C. § 230(C) - 5 -
Case No. 5:19-cv-004749-VKD

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**1100 L Street, NW**
**Washington, DC 20530**
**Tel: (202) 616-8488**

content.  SAC ¶¶ 26, 85, 344, 345, 346.  "On average, 1.5–2% of users view YouTube through Restricted Mode."  *Prager Univ.*, 951 F.3d at 996.

YouTube has allegedly styled itself (including in testimony to Congress) as a "neutral public forum."  SAC ¶¶ 61, 287, 342.  But Plaintiffs allege that YouTube has used its "power over filtering" as a "censorship power to silence and crush Plaintiffs because they identify [as] LGBTQ+ and express LGBTQ+ viewpoints."  SAC ¶ 21.  In particular, Plaintiffs allege that YouTube placed some of their videos into "Restricted Mode," or rendered certain videos ineligible for generation of advertising revenue by "demonetizing" them, justified by YouTube's alleged false statements that the videos contained "inappropriate" or "otherwise objectionable" content.  SAC ¶¶ 3, 26, 151, 345-47.  According to Plaintiffs, the episodes of "Restricted Mode" and demonetization misuse they allege are not isolated; rather, YouTube purportedly has a "'company policy' of not selling ads to 'gay' content creators because the 'gay thing' render[s] [their] video[s] 'shocking' and sexually explicit regardless of the actual content of the video[s]."  SAC ¶ 20; *see* SAC ¶¶ 122, 134, 146; SAC Ex. A (transcript of communication with Google Support staff in Bangalore, India allegedly describing policy).

Plaintiffs seek a declaration that 47 U.S.C. § 230(c) violates the First and Fourteenth Amendments; they allege that applying the statute as a bar on their claims would be "both an unconstitutional restraint on Plaintiffs' First Amendment rights to freedom of petition and speech, and a violation of equal protection of law under the Fourteenth Amendment."  SAC ¶ 261; *see* SAC ¶¶ 280-82.  Plaintiffs also assert various claims against YouTube, including two federal statutory claims—one alleging that YouTube engaged in unconstitutional "[v]iewpoint-[b]ased [d]iscrimination" remediable under 42 U.S.C. § 1983 (SAC ¶¶ 283-303), and the other alleging that YouTube engaged in false advertising and false association in violation of the Lanham Act, 15 U.S.C. § 1125 *et seq.* (SAC ¶¶ 337-48).

This Court has not yet certified any constitutional question under 28 U.S.C. § 2403 and Rule 5.1.  On March 9, 2020, this Court endorsed a stipulation providing the United States until April 24, 2020 to determine whether to intervene and to file a brief, if any.  Doc.

UNITED STATES'S MEMORANDUM OF LAW IN SUPPORT OF
CONSTITUTIONALITY OF 47 U.S.C. § 230(C) - 6 -
Case No. 5:19-cv-004749-VKD

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
Tel: (202) 616-8488

32.  On the Government's motion, the Court later enlarged the time for the United States to intervene to May 8, 2020.  Doc. 44.

## **ARGUMENT**

### I.  The Court Should First Decide The Potentially Dispositive Statutory Issues Because They May Obviate The Need To Address Plaintiffs' Constitutional Challenge

As an initial matter, this Court should not address the constitutionality of Section 230(c) unless it first determines that the pending motion to dismiss cannot be resolved on non-constitutional grounds.  "If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable."  *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 343 (1999) (quoting *Spector Motor Serv. v. McLaughlin*, 323 U.S. 101, 105 (1944)); *see id.*, 525 U.S. at 344 ("[I]f a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter") (quoting *Ashwander v. TVA*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring)).

This Court should adhere to that doctrine of constitutional avoidance here and decline to rule on the constitutionality of Section 230(c) unless the motion to dismiss cannot be resolved on other grounds.  The United States has intervened solely for the purpose of defending the constitutionality of Section 230(c) and therefore takes no position on the merits of the non-constitutional issues.  It is apparent, however, that the Court's resolution of those issues might obviate the need to consider Section 230(c)'s constitutionality.

Here is one example:  Plaintiffs assert a Section 1983 claim (SAC ¶¶ 283-303), and Lanham Act claims for false advertising and false association (SAC ¶¶ 337-48).  This Court might decide that Plaintiffs have not alleged the elements of either of those federal statutory claims in light of the Ninth Circuit's twin conclusions in *Prager University* that (1) YouTube is not a state actor constrained by the First Amendment (951 F.3d at 999), and (2) "YouTube's statements concerning its content moderation policies do not constitute 'commercial advertising or promotion'" within the meaning of the Lanham Act  (*id.* at 999-1000 (quoting

UNITED STATES'S MEMORANDUM OF LAW IN SUPPORT OF
CONSTITUTIONALITY OF 47 U.S.C. § 230(C) - 7 -
Case No. 5:19-cv-004749-VKD

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
Tel: (202) 616-8488

15 U.S.C. § 1125(a)(1)(B))).  And this Court might similarly decide that Plaintiffs have not alleged the elements of their state law claims.

Here is another example:  Plaintiffs contend that Section 230(c) does not apply to the misconduct alleged.  Rule 12(b)(6) Opp. 13-21.  If the Court were to conclude that YouTube's acts as alleged by Plaintiffs do not fit within the terms of either paragraph 230(c)(1) or (2), then the statute would not apply, and there would be no occasion for passing on the constitutionality of the statute.

In short, where "dispositive" statutory grounds may be available, it is "incumbent on" this Court to examine and decide the case on those grounds first.  *Cf. N.Y.C. Transit Auth. v. Beazer*, 440 U.S. 568, 582 (1979) ("Before deciding the constitutional question, it was incumbent on [lower courts] to consider whether the statutory grounds might be dispositive.").

## II. If The Court Reaches the Question, It Should Conclude That Section 230(c) Is Constitutional

If the Court were to reach the constitutional question, it should conclude that Plaintiffs' challenge fails on the merits.  Section 230(c) does not regulate or limit Plaintiffs' primary conduct, such as their expressive activities.  For example, Plaintiffs do not allege that Section 230(c) prevents them from creating videos or posting them on the Internet.  *Cf. Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002) (restriction on virtual child pornography challenged by creators of erotic and nudist works).  Instead, Section 230(c) establishes a substantive limitation on the liability of certain Internet companies for claims arising from certain specified conduct.  But Plaintiffs cannot show that Congress violated Plaintiffs' constitutional rights by making that affirmative defense available here to YouTube, because none of the clauses of the Constitution on which Plaintiffs rely confers on Plaintiffs any right to bring an underlying claim.

*First*, Plaintiffs do not identify any valid underlying First Amendment speech claim they could have brought against YouTube had Section 230(c) not been in force.  To the contrary, the Ninth Circuit explicitly held in *Prager University* that "YouTube is a private

UNITED STATES'S MEMORANDUM OF LAW IN SUPPORT OF
CONSTITUTIONALITY OF 47 U.S.C. § 230(C) - 8 -
Case No. 5:19-cv-004749-VKD

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
Tel: (202) 616-8488

entity" that is not a state actor subject to the constraints of the First Amendment. *See* 951 F.3d at 996, 999. The Ninth Circuit observed that "courts have uniformly concluded that digital internet platforms that open their property to user-generated content do not become state actors," and held that "the state action doctrine precludes constitutional scrutiny of YouTube's content moderation pursuant to its Terms of Service and Community Guidelines." *See id.* at 997, 999. The Ninth Circuit thus concluded that "YouTube may be a paradigmatic public square on the Internet, but it is 'not transformed' into a state actor solely by 'provid[ing] a forum for speech.'" *Id.* at 997 (quoting *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1930, 1934 (2019)).

The Ninth Circuit relied on the "Supreme Court's state action precedent," including "its recent teaching in *Halleck*." *Id.* In that 2019 decision, the Supreme Court explained: "[W]hen a private entity provides a forum for speech, the private entity is not ordinarily constrained by the First Amendment because the private entity is not a state actor. The private entity may thus exercise editorial discretion over the speech and speakers in the forum." *Halleck*, 139 S. Ct. at 1930. As one illustration, the Court commented: "Benjamin Franklin did not have to operate his newspaper as 'a stagecoach, with seats for everyone.'" *Halleck*, 139 S. Ct. at 1931 (quoting F. Mott, *American Journalism* 55 (3d ed. 1962)). And the Supreme Court made clear that an "imprecise and overbroad phrase" in "passing dicta" in one of its prior decisions "should not be read to suggest that private property owners or private lessees are subject to First Amendment constraints whenever they dedicate their private property to public use or otherwise open their property for speech." *See id.* at 1931 n.3 (discussing *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 801 (1985)). No exception to that principle about private property owners applies to YouTube, as the Ninth Circuit reasoned. *See Prager Univ.*, 951 F.3d at 997-99.

Because YouTube is not a state actor, its alleged misconduct toward Plaintiffs does not implicate Plaintiffs' freedom of speech. And because YouTube's actions do not implicate the First Amendment, the liability protection Section 230(c) affords to YouTube likewise

UNITED STATES'S MEMORANDUM OF LAW IN SUPPORT OF
CONSTITUTIONALITY OF 47 U.S.C. § 230(C) - 9 -
Case No. 5:19-cv-004749-VKD

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**1100 L Street, NW**
**Washington, DC 20530**
**Tel: (202) 616-8488**

does not implicate the First Amendment. Or, put another way, Section 230(c) has not deprived Plaintiffs of any valid underlying Speech Clause claim.

*Second*, although Plaintiffs' Petition Clause argument lacks detailed explanation, they appear to contend that the Petition Clause requires Congress to allow them to proceed with their federal and state law claims even though the challenged statute provides an affirmative defense potentially foreclosing those claims. *See* SAC ¶ 281 (alleging that unconstitutionality stems from "Google/YouTube's use of Section 230(c) as a shield to prevent Plaintiffs from *petitioning the courts for relief* to redress violations of their civil, consumer, and contractual rights, including rights which expressly protect Plaintiffs as a class from identity or viewpoint based discrimination and speech restrictions") (emphasis added); *see also* Rule 12(b)(6) Opp. 20-21 (contending that "the [Communications Decency Act] cannot be construed to preclude Plaintiffs from *petitioning the Courts* to redress discriminatory and unlawful restrictions their rights to free speech and equal benefits and protection of the law") (emphasis added). That assertion mistakenly posits that the Petition Clause requires the Government to guarantee Plaintiffs the ability to continue to litigate the particular claims for relief they have alleged and to reach a particular outcome (here, denial of the Rule 12(b)(6) motion). Tellingly, Plaintiffs have cited no precedents construing the Petition Clause as guaranteeing such an outcome in litigation.

To be sure, the Supreme Court has observed that its "precedents confirm that the Petition Clause protects the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes. '[T]he right of access to courts for redress of wrongs is an aspect of the First Amendment right to petition the government.'" *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011) (quoting *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 896-97 (1984)). "A petition," the Supreme Court has further explained, "conveys the special concerns of its author to the government and, in its usual form, requests action by the government to address those concerns." *Guarnieri*, 564 U.S. at 388-89 (citing *Sure-Tan*, 467 at 896-97).

UNITED STATES'S MEMORANDUM OF LAW IN SUPPORT OF
CONSTITUTIONALITY OF 47 U.S.C. § 230(C) - 10 -
Case No. 5:19-cv-004749-VKD

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
Tel: (202) 616-8488

But the requirements of the Petition Clause have already been fully satisfied in this case, given that, by commencing this action, Plaintiffs "convey[ed] [their] special concerns . . . to the government and . . . request[ed] action by the government to address those concerns." *See Guarnieri*, 564 U.S. at 388-89. And Plaintiffs remain free to urge Congress to amend the statute. The Petition Clause, however, does not mandate the substantive response to their petition that Plaintiffs desire—*i.e.*, a decision disregarding the affirmative defense set forth in Section 230(c).

Were it otherwise, every statute or precedent limiting or preempting previously-available legal remedies would violate the Petition Clause. To the contrary: As the Supreme Court explained in interpreting the Due Process Clause of the Fourteenth Amendment, a State (and, accordingly, the Federal Government) "remains free to create substantive defenses or immunities for use in adjudication—or to eliminate its statutorily created causes of action altogether . . . ." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 432-33 (1982).

Plaintiffs' Petition Clause argument resembles the Due Process Clause argument the Ninth Circuit rejected in *Ileto v. Glock, Inc.*, 565 F.3d 1126 (9th Cir. 2009). The plaintiffs there challenged a federal statute limiting the liability of firearms manufacturers in certain circumstances. In upholding the law, the Ninth Circuit concluded that Congress's "legislative determination" creating the liability protection "provides all the process that is due." *Id.* at 1141-42 (internal quotation marks omitted). The court also rejected the contention that the statutory liability limitation deprived the plaintiffs of a property right, reasoning that "a party's property right in any cause of action does not vest until a final unreviewable judgment is obtained." *See id.* at 1140-41 (quoting *Fields v. Legacy Health Sys.*, 413 F.3d 943, 956 (9th Cir. 2005)).

Although Plaintiffs have not explicitly invoked the Due Process Clause as a basis for their challenge here, they advance an interpretation of the Petition Clause that would effectively circumvent *Logan* and *Ileto*. At least where, as here, Plaintiffs did not obtain a "final unreviewable judgment" in their favor before Section 230(c) came into force, they have no entitlement to the particular legal theories they have alleged. *See Ileto*, 565 F.3d at 1140-

UNITED STATES'S MEMORANDUM OF LAW IN SUPPORT OF
CONSTITUTIONALITY OF 47 U.S.C. § 230(C) - 11 -
Case No. 5:19-cv-004749-VKD

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
Tel: (202) 616-8488

41.  Congress therefore retained authority to impose limitations on those theories by enacting Section 230(c).  *Logan* and *Ileto* thus provide additional confirmation that Plaintiffs' Petition Clause theory lacks merit.

*Third*, Plaintiffs' equal protection challenge fails for the same reasons as their First Amendment Speech and Petition claims, and does not require separate analysis under Ninth Circuit precedent.  "It is generally unnecessary to analyze laws which burden the exercise of First Amendment rights by a class of persons under the equal protection guarantee, because the substantive guarantees of the Amendment serve as the strongest protection against the limitation of these rights."  *Orin v. Barclay*, 272 F.3d 1207, 1213 n.3 (9th Cir. 2001) (quoting John E. Nowak, Ronald D. Rotunda & J. Nelson Young, *Handbook on Constitutional Law* (1978)).  On that basis, the Ninth Circuit treated an "equal protection claim as subsumed by, and co-extensive with, [the Section 1983 plaintiff's] First Amendment claim."  *Id.*  This Court need go no further in rejecting Plaintiffs' equal protection theory.

## CONCLUSION

For the foregoing reasons, the Court should decide Defendants' Rule 12(b)(6) motion without reaching any constitutional question if possible.  If the Court reaches Plaintiffs' challenge to the constitutionality of 47 U.S.C. § 230(c), it should reject it.

DATED:  May 8, 2020

Respectfully submitted,
JOSEPH H. HUNT
Assistant Attorney General

ERIC WOMACK
Assistant Branch Director

INDRANEEL SUR
Trial Attorney

By:  */s/ Indraneel Sur*
        INDRANEEL SUR

U.S. Department of Justice
Counsel for the United States of America

UNITED STATES'S MEMORANDUM OF LAW IN SUPPORT OF
CONSTITUTIONALITY OF 47 U.S.C. § 230(C) - 12 -
Case No. 5:19-cv-004749-VKD

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
Tel: (202) 616-8488

# Exhibit "D"

EXECUTIVE ORDER

- - - - - - -

PREVENTING ONLINE CENSORSHIP

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

Section 1. Policy. Free speech is the bedrock of American democracy. Our Founding Fathers protected this sacred right with the First Amendment to the Constitution. The freedom to express and debate ideas is the foundation for all of our rights as a free people. In a country that has long cherished the freedom of expression, we cannot allow a limited number of online platforms to hand pick the speech that Americans may access and convey on the internet. This practice is fundamentally un-American and anti-democratic. When large, powerful social media companies censor opinions with which they disagree, they exercise a dangerous power. They cease functioning as passive bulletin boards, and ought to be viewed and treated as content creators.

The growth of online platforms in recent years raises important questions about applying the ideals of the First Amendment to modern communications technology. Today, many Americans follow the news, stay in touch with friends and family, and share their views on current events through social media and other online platforms. As a result, these platforms function in many ways as a 21st century equivalent of the public square.

Twitter, Facebook, Instagram, and YouTube wield immense, if not unprecedented, power to shape the interpretation of public events; to censor, delete, or disappear information; and to control what people see or do not see.

As President, I have made clear my commitment to free and open debate on the internet. Such debate is just as important online as it is in our universities, our town halls, and our homes. It is essential to sustaining our democracy.

Online platforms are engaging in selective censorship that is harming our national discourse. Tens of thousands of Americans have reported, among other troubling behaviors, online platforms "flagging" content as inappropriate, even though it does not violate any stated terms of service; making unannounced and unexplained changes to company policies that have the effect of disfavoring certain viewpoints; and deleting content and entire accounts with no warning, no rationale, and no recourse.

Twitter now selectively decides to place a warning label on certain tweets in a manner that clearly reflects political bias. As has been reported, Twitter seems never to have placed such a label on another politician's tweet. As recently as last week, Representative Adam Schiff was continuing to mislead his followers by peddling the long-disproved Russian Collusion Hoax, and Twitter did not flag those tweets. Unsurprisingly, its officer in charge of so-called "Site Integrity" has flaunted his political bias in his own tweets.

At the same time online platforms are invoking inconsistent, irrational, and groundless justifications to censor or otherwise restrict Americans' speech here at home, several online platforms are profiting from and promoting the aggression and disinformation spread by foreign governments like China. One United States company, for example, created a search engine for the Chinese Communist Party that would have blacklisted searches for "human rights," hid data unfavorable to the Chinese Communist Party, and tracked users determined appropriate for surveillance. It also established research partnerships in China that provide direct benefits to the Chinese military. Other companies have accepted advertisements paid for by the Chinese government that spread false information about China's mass imprisonment of religious minorities, thereby enabling these abuses of human rights. They have also amplified China's propaganda abroad, including by allowing Chinese

EXHIBIT "D"

government officials to use their platforms to spread misinformation regarding the origins of the COVID-19 pandemic, and to undermine pro-democracy protests in Hong Kong.

As a Nation, we must foster and protect diverse viewpoints in today's digital communications environment where all Americans can and should have a voice. We must seek transparency and accountability from online platforms, and encourage standards and tools to protect and preserve the integrity and openness of American discourse and freedom of expression.

Sec. 2. Protections Against Online Censorship. (a) It is the policy of the United States to foster clear ground rules promoting free and open debate on the internet. Prominent among the ground rules governing that debate is the immunity from liability created by section 230(c) of the Communications Decency Act (section 230(c)). 47 U.S.C. 230(c). It is the policy of the United States that the scope of that immunity should be clarified: the immunity should not extend beyond its text and purpose to provide protection for those who purport to provide users a forum for free and open speech, but in reality use their power over a vital means of communication to engage in deceptive or pretextual actions stifling free and open debate by censoring certain viewpoints.

Section 230(c) was designed to address early court decisions holding that, if an online platform restricted access to some content posted by others, it would thereby become a "publisher" of all the content posted on its site for purposes of torts such as defamation. As the title of section 230(c) makes clear, the provision provides limited liability "protection" to a provider of an interactive computer service (such as an online platform) that engages in "'Good Samaritan' blocking" of harmful content. In particular, the Congress sought to provide protections for online platforms that attempted to protect minors from harmful content and intended to ensure that such providers would not be discouraged from taking down harmful material. The provision was also intended to further the express vision of the Congress that the internet is a "forum for a true diversity of political discourse." 47 U.S.C. 230(a)(3). The limited protections provided by the statute should be construed with these purposes in mind.

In particular, subparagraph (c)(2) expressly addresses protections from "civil liability" and specifies that an interactive computer service provider may not be made liable "on account of" its decision in "good faith" to restrict access to content that it considers to be "obscene, lewd, lascivious, filthy, excessively violent, harassing or otherwise objectionable." It is the policy of the United States to ensure that, to the maximum extent permissible under the law, this provision is not distorted to provide liability protection for online platforms that -- far from acting in "good faith" to remove objectionable content -- instead engage in deceptive or pretextual actions (often contrary to their stated terms of service) to stifle viewpoints with which they disagree. Section 230 was not intended to allow a handful of companies to grow into titans controlling vital avenues for our national discourse under the guise of promoting open forums for debate, and then to provide those behemoths blanket immunity when they use their power to censor content and silence viewpoints that they dislike. When an interactive computer service provider removes or restricts access to content and its actions do not meet the criteria of subparagraph (c)(2)(A), it is engaged in editorial conduct. It is the policy of the United States that such a provider should properly lose the limited liability shield of subparagraph (c)(2)(A) and be exposed to liability like any traditional editor and publisher that is not an online provider.

(b) To advance the policy described in subsection (a) of this section, all executive departments and agencies should ensure that their application of section 230(c) properly reflects the narrow purpose of the section and take all appropriate actions in this regard. In addition, within 60 days of the date of this order, the Secretary of Commerce (Secretary), in

consultation with the Attorney General, and acting through the National Telecommunications and Information Administration (NTIA), shall file a petition for rulemaking with the Federal Communications Commission (FCC) requesting that the FCC expeditiously propose regulations to clarify:

(i) the interaction between subparagraphs (c)(1) and (c)(2) of section 230, in particular to clarify and determine the circumstances under which a provider of an interactive computer service that restricts access to content in a manner not specifically protected by subparagraph (c)(2)(A) may also not be able to claim protection under subparagraph (c)(1), which merely states that a provider shall not be treated as a publisher or speaker for making third-party content available and does not address the provider's responsibility for its own editorial decisions;

(ii) the conditions under which an action restricting access to or availability of material is not "taken in good faith" within the meaning of subparagraph (c)(2)(A) of section 230, particularly whether actions can be "taken in good faith" if they are:

(A) deceptive, pretextual, or inconsistent with a provider's terms of service; or

(B) taken after failing to provide adequate notice, reasoned explanation, or a meaningful opportunity to be heard; and

(iii) any other proposed regulations that the NTIA concludes may be appropriate to advance the policy described in subsection (a) of this section.

Sec. 3. Protecting Federal Taxpayer Dollars from Financing Online Platforms That Restrict Free Speech. (a) The head of each executive department and agency (agency) shall review its agency's Federal spending on advertising and marketing paid to online platforms. Such review shall include the amount of money spent, the online platforms that receive Federal dollars, and the statutory authorities available to restrict their receipt of advertising dollars.

(b) Within 30 days of the date of this order, the head of each agency shall report its findings to the Director of the Office of Management and Budget.

(c) The Department of Justice shall review the viewpoint-based speech restrictions imposed by each online platform identified in the report described in subsection (b) of this section and assess whether any online platforms are problematic vehicles for government speech due to viewpoint discrimination, deception to consumers, or other bad practices.

Sec. 4. Federal Review of Unfair or Deceptive Acts or Practices. (a) It is the policy of the United States that large online platforms, such as Twitter and Facebook, as the critical means of promoting the free flow of speech and ideas today, should not restrict protected speech. The Supreme Court has noted that social media sites, as the modern public square, "can provide perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard." Packingham v. North Carolina, 137 S. Ct. 1730, 1737 (2017). Communication through these channels has become important for meaningful participation in American democracy, including to petition elected leaders. These sites are providing an important forum to the public for others to engage in free expression and debate. Cf. PruneYard Shopping Center v. Robins, 447 U.S. 74, 85-89 (1980).

(b) In May of 2019, the White House launched a Tech Bias Reporting tool to allow Americans to report incidents of online censorship. In just weeks, the White House received over 16,000 complaints of online platforms censoring or otherwise taking action against users based on their political viewpoints. The White House will submit such complaints received to the Department of Justice and the Federal Trade Commission (FTC).

(c) The FTC shall consider taking action, as appropriate and consistent with applicable law, to prohibit unfair or deceptive acts or practices in or affecting commerce, pursuant to section 45 of title 15, United States Code. Such unfair or deceptive acts or practice may include

practices by entities covered by section 230 that restrict speech in ways that do not align with those entities' public representations about those practices.

(d) For large online platforms that are vast arenas for public debate, including the social media platform Twitter, the FTC shall also, consistent with its legal authority, consider whether complaints allege violations of law that implicate the policies set forth in section 4(a) of this order. The FTC shall consider developing a report describing such complaints and making the report publicly available, consistent with applicable law.

Sec. 5. State Review of Unfair or Deceptive Acts or Practices and Anti-Discrimination Laws.

(a) The Attorney General shall establish a working group regarding the potential enforcement of State statutes that prohibit online platforms from engaging in unfair or deceptive acts or practices. The working group shall also develop model legislation for consideration by legislatures in States where existing statutes do not protect Americans from such unfair and deceptive acts and practices. The working group shall invite State Attorneys General for discussion and consultation, as appropriate and consistent with applicable law.

(b) Complaints described in section 4(b) of this order will be shared with the working group, consistent with applicable law. The working group shall also collect publicly available information regarding the following:

(i) increased scrutiny of users based on the other users they choose to follow, or their interactions with other users;

(ii) algorithms to suppress content or users based on indications of political alignment or viewpoint;

(iii) differential policies allowing for otherwise impermissible behavior, when committed by accounts associated with the Chinese Communist Party or other anti-democratic associations or governments;

(iv) reliance on third-party entities, including contractors, media organizations, and individuals, with indicia of bias to review content; and

(v) acts that limit the ability of users with particular viewpoints to earn money on the platform compared with other users similarly situated.

Sec. 6. Legislation. The Attorney General shall develop a proposal for Federal legislation that would be useful to promote the policy objectives of this order.

Sec. 7. Definition. For purposes of this order, the term "online platform" means any website or application that allows users to create and share content or engage in social networking, or any general search engine.

Sec. 8. General Provisions. (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

DONALD J. TRUMP

THE WHITE HOUSE,

May 28, 2020.

# EXHIBIT "E"

```
 1                    UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF CALIFORNIA
 2                         SAN JOSE DIVISION

 3        DIVINO GROUP LLC, ET AL.,

 4              PLAINTIFFS,            CASE NO. CV-19-4749-VKD

 5         VS.                         SAN JOSE, CALIFORNIA

 6     GOOGLE LLC, ET AL.,             JUNE 2, 2020

 7              DEFENDANT.             PAGES 1 - 51

 8
                    TRANSCRIPT OF ZOOM PROCEEDINGS
 9           BEFORE THE HONORABLE VIRGINIA K. DEMARCHI
                    UNITED STATES DISTRICT JUDGE
10
              A-P-P-E-A-R-A-N-C-E-S BY ZOOM
11
       FOR THE PLAINTIFFS:   BROWNE GEORGE ROSS LLP
12                           BY:  PETER OBSTLER
                             44 MONTGOMERY STREET
13                           SUITE 1280
                             SAN FRANCISCO, CALIFORNIA 94104
14
                             BY:  DEBI ANN RAMOS
15                           801 S. FIGUEROA ST., SUITE 2000
                             LOS ANGELES, CALIFORNIA 90067
16

17     FOR THE DEFENDANTS:   WILSON SONSINI GOODRICH & ROSATI
                             BY:  BRIAN M. WILLEN
18                           1301 AVENUE OF THE AMERICA, 40TH
                             FLOOR
19                           NEW YORK, NEW YORK 10019-6022

20                           BY:  LAUREN G. WHITE
                             650 PAGE MILL ROAD
21                           PALO ALTO, CALIFORNIA 94304-1050

22           (APPEARANCES CONTINUED ON THE NEXT PAGE.)

23     OFFICIAL COURT REPORTER:    IRENE L. RODRIGUEZ, CSR, RMR, CRR
                                   CERTIFICATE NUMBER 8074
24
            PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY,
25      TRANSCRIPT PRODUCED WITH COMPUTER.
```

EXHIBIT "E"

1        A P P E A R A N C E S BY ZOOM: (CONT'D)

2        FOR INTERESTED PARTY:
                                US DEPARTMENT OF JUSTICE
3                               CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
                                BY:  INDRANEEL SUR
4                               1100 L ST.
                                RM. 12010
5                               WASHINGTON, DC 20530

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
          1     SAN JOSE, CALIFORNIA                    JUNE 2, 2020

          2                 P R O C E E D I N G S

10:24AM   3        (COURT CONVENED AT 10:24 A.M.)

10:24AM   4            THE CLERK:  THE NEXT MATTER IS DIVINO GROUP VERSUS

10:24AM   5     GOOGLE, CASE NUMBER 19-CV-4749.

10:24AM   6            THE COURT:  GOOD MORNING.  I'M WAITING FOR THE PRIOR

10:24AM   7     MATTER AND ALSO WITH OUR TECHNOLOGY.

10:24AM   8        WHO WILL BE SPEAKING ON BEHALF OF DIVINO GROUP TODAY?

10:24AM   9        MR. OBSTLER, YOU'RE ON MUTE.

10:24AM  10            MR. OBSTLER:  SORRY ABOUT THAT, YOUR HONOR.  THIS IS

10:24AM  11     THE MOST NERVE-RACKING PART OF THE WHOLE HEARING IS TRYING TO

10:24AM  12     GET THIS THING TO WORK.

10:24AM  13        (LAUGHTER.)

10:24AM  14            MR. OBSTLER:  PETER OBSTLER, MYSELF, WILL BE

10:24AM  15     SPEAKING ON BEHALF OF THE DIVINO PLAINTIFFS, YOUR HONOR.

10:24AM  16            THE COURT:  OKAY.  WHO WILL BE SPEAKING ON BEHALF OF

10:24AM  17     GOOGLE TODAY?

10:24AM  18            MR. WILLEN:  GOOD MORNING, YOUR HONOR.  THIS IS

10:24AM  19     BRIAN WILLEN.  ME AND MY COLLEAGUE, MS. WHITE, WILL BOTH BE

10:24AM  20     SPEAKING FOR GOOGLE.

10:24AM  21        I WILL BE ADDRESSING ANY ISSUES RELATED TO SECTION 230,

10:24AM  22     AND MS. WHITE WILL BE ADDRESSING ANY ISSUES RELATED TO THE

10:24AM  23     UNDERLYING CAUSES OF ACTION.

10:24AM  24            THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.

10:24AM  25        AND I DO HAVE MR. SUR ON BEHALF OF THE UNITED STATES.
```

10:25AM  1        ALL RIGHT.  SO WE ARE HERE ON THE DEFENDANTS' MOTION TO

10:25AM  2   DISMISS THE SECOND AMENDED COMPLAINT.

10:25AM  3        I WILL HEAR FROM ALL PARTIES, BUT I WOULD LIKE TO START

10:25AM  4   JUST BY IDENTIFYING THE ISSUES THAT I AM MOST INTERESTED IN

10:25AM  5   HEARING ABOUT, AND THEN I'LL LET YOU MAKE YOUR ARGUMENTS, AND I

10:25AM  6   HAVE SOME VERY SPECIFIC QUESTIONS.

10:25AM  7        SO PLAINTIFFS HAVE EIGHT CLAIMS FOR RELIEF, REALLY SEVEN

10:25AM  8   CLAIMS FOR RELIEF SINCE THE EIGHTH ONE IS A REQUEST FOR

10:25AM  9   DECLARATORY RELIEF AND MORE OF A REQUEST FOR A REMEDY.

10:25AM  10       MY PRINCIPAL CONCERN IS THE PRAGER DECISION.  IT DOES SEEM

10:25AM  11  THAT THE NINTH CIRCUIT'S DECISION IN PRAGER IS DISPOSITIVE WITH

10:25AM  12  RESPECT TO THE FEDERAL CLAIMS AND PERHAPS THE CALIFORNIA

10:25AM  13  CONSTITUTION CLAIM BECAUSE OF THE FINDING THAT THE

10:25AM  14  NINTH CIRCUIT MADE THAT GOOGLE AND YOUTUBE ARE NOT STATE

10:25AM  15  ACTORS.  THAT CONCLUSION SEEMS TO ELIMINATE THOSE CLAIMS.

10:25AM  16       THE CALIFORNIA CONSTITUTION CLAIMS ARE ALSO PREMISED ON

10:26AM  17  THE IDEA THAT GOOGLE AND YOUTUBE ARE STATE ACTORS, SO THAT ONE

10:26AM  18  ALSO SEEMS TO BE ELIMINATED BY THIS DECISION.

10:26AM  19       AND THEN WITH RESPECT TO THE LANHAM ACT CLAIM, THE FINDING

10:26AM  20  THAT THE TERMS OF SERVICE AND COMMUNITY GUIDELINES ARE NOT

10:26AM  21  COMMERCIAL ADVERTISING OR PROMOTION AND THAT THE OTHER

10:26AM  22  STATEMENTS THAT ARE CONTAINED -- THAT ARE HIGHLIGHTED IN THE

10:26AM  23  SECOND AMENDED COMPLAINT ARE OPERATIONAL OR PUFFERY MEANS THAT

10:26AM  24  THE PLAINTIFFS COULD NOT PREVAIL ON THE LANHAM ACT CLAIM.

10:26AM  25       SO I WOULD LIKE TO UNDERSTAND THE PARTIES' VIEWS ON THE

10:26AM 1    SIGNIFICANCE OF <u>PRAGER</u>.  THAT'S THE FIRST THING.

10:26AM 2        AND THE SECOND ITEM THAT CAUGHT MY ATTENTION WAS THE

10:26AM 3    UNRAH ACT CLAIM WHICH DOESN'T HAVE -- DOESN'T GIVE MUCH

10:26AM 4    DISCUSSION IN THE PARTIES' PAPERS, BUT HERE'S MY QUESTION ABOUT

10:26AM 5    THE UNRAH ACT CLAIM, OR QUESTIONS.

10:26AM 6        DOES IT ACTUALLY APPLY TO THE GOOGLE YOUTUBE PLATFORM?

10:26AM 7    AND IF SO, UNDER WHAT SPECIFIC THEORY?

10:26AM 8        IF I CONSTRUE THE SECOND AMENDED COMPLAINT AS ALLEGING AN

10:27AM 9    UNWRITTEN POLICY TO DISCRIMINATE AGAINST THE LGBTQ CONTENT

10:27AM 10   CREATORS, IS THAT REALLY WITHIN THE SCOPE OF PUBLISHING

10:27AM 11   ACTIVITY UNDER SECTION 230(C)(1) OR (C)(2), WHICH HAS A GOOD

10:27AM 12   FAITH REQUIREMENT?

10:27AM 13       IS THAT KIND OF AN UNWRITTEN POLICY SUFFICIENT TO STATE A

10:27AM 14   CLAIM EVEN IF GOOGLE AND YOUTUBE'S OFFICIAL WRITTEN POLICY IS

10:27AM 15   VIEWPOINT NEUTRAL?

10:27AM 16       SO I HAVE SOME QUESTIONS AROUND THE UNRAH ACT CLAIM THAT I

10:27AM 17   WOULD LIKE THE PARTIES TO FOCUS ON.

10:27AM 18       AND THEN FINALLY I DID SEE THAT THE PLAINTIFFS DID FILE

10:27AM 19   YESTERDAY A REQUEST FOR JUDICIAL NOTICE ABOUT THE RECENT

10:27AM 20   EXECUTIVE ORDER, AND I'LL PERMIT THE PARTIES TO ADDRESS THAT,

10:27AM 21   ALTHOUGH I DO NOT SEE HOW THAT HAS ANY BEARING ON THE MOTION TO

10:27AM 22   DISMISS.

10:27AM 23       BUT THOSE ARE MY HIGH-LEVEL OBSERVATIONS AND FLAGGING

10:27AM 24   THOSE ISSUES FOR YOUR CONSIDERATION, BUT I WILL LET YOU ARGUE

10:28AM 25   HOWEVER YOU WOULD LIKE TO ARGUE.

10:28AM 1      AND SINCE IT'S THE DEFENDANTS' MOTION, I WILL GO AHEAD AND

10:28AM 2  LET GOOGLE START.

10:28AM 3      SO MR. WILLEN.

10:28AM 4          MR. WILLEN:  YES.  THANK YOU, YOUR HONOR.

10:28AM 5      I THINK I SHOULD PROBABLY TAKE YOUR FIRST SET OF QUESTIONS

10:28AM 6  FIRST WHICH HAS TO DO WITH THE IMPACT OF THE NINTH CIRCUIT'S

10:28AM 7  DECISION IN PRAGER, AND SINCE I THINK THAT RELATES TO THE

10:28AM 8  MERITS OF THE CAUSES OF ACTION RATHER THAN SECTION 230, I WILL

10:28AM 9  LET MY COLLEAGUE, MS. WHITE, ADDRESS THAT IN THE FIRST

10:28AM 10 INSTANCE.

10:28AM 11         THE COURT:  ALL RIGHT.  VERY WELL.

10:28AM 12         MS. WHITE:  THANK YOU, YOUR HONOR.

10:28AM 13     TAKING YOUR QUESTIONS IN ORDER, I'LL BEGIN WITH THE FIRST

10:28AM 14 AMENDMENT.  WE ABSOLUTELY AGREE WITH YOUR SUGGESTION THAT THE

10:28AM 15 NINTH CIRCUIT'S DECISION FORECLOSES PLAINTIFFS' FIRST AMENDMENT

10:28AM 16 CLAIM.

10:28AM 17     THEIR CLAIM IS PREDICATED ON AN INFRINGEMENT OF THEIR OWN

10:28AM 18 FIRST AMENDMENT RIGHTS, AND OF COURSE THE CASE LAW IS EXTREMELY

10:29AM 19 CLEAR FOLLOWING THE SUPREME COURT'S DECISION IN HALLECK AND NOW

10:29AM 20 THE NINTH CIRCUIT'S DECISION IN PRAGER, WHICH WAS BROUGHT BY

10:29AM 21 COUNSEL FOR PLAINTIFFS HERE AND ASSERTED CLAIMS BASED ON THE

10:29AM 22 SAME PRODUCTS AND SERVICES ON YOUTUBE'S PLATFORM THAT ARE AT

10:29AM 23 ISSUE IN THIS CASE.

10:29AM 24     THERE'S SIMPLY NO PATH FORWARD IN LIGHT OF THE COURT'S

10:29AM 25 HOLDING TO -- FOR THE COURT TO CONCLUDE THAT YOUTUBE IS A STATE

```
10:29AM   1    ACTOR.

10:29AM   2         AND PLAINTIFFS HAVE FILED A SURREPLY ADDRESSING THAT

10:29AM   3    DECISION, ALTHOUGH THEY DID NOT ADDRESS JUDGE KOH'S UNDERLYING

10:29AM   4    DECISION THAT THE NINTH CIRCUIT AFFIRMED IN THEIR OPPOSITION

10:29AM   5    BRIEF.

10:29AM   6         AND IN THEIR SURREPLY THEY CLAIM THAT THIS CASE IS

10:30AM   7    DIFFERENT BECAUSE THEY HAVE ARTICULATED A DIFFERENT STATE

10:30AM   8    ACTION THEORY UNDER THE SO-CALLED ENDORSEMENT TEST UNDER THE

10:30AM   9    SUPREME COURT SKINNER DECISION.

10:30AM  10         BUT WHETHER THE COURT CONSIDERS THE ENDORSEMENT TEST OR

10:30AM  11    THE PUBLIC FUNCTION TEST THAT WAS ARGUED IN PRAGER, THE

10:30AM  12    PARTY -- THE PLAINTIFFS MUST SHOW THAT IN ORDER TO SHOW STATE

10:30AM  13    ACTION, THAT THE CONDUCT THAT ALLEGEDLY DEPRIVED THEM OF THEIR

10:30AM  14    RIGHTS CAN FAIRLY BE ATTRIBUTED TO THE STATE OR THE GOVERNMENT.

10:30AM  15         AND THERE IS NO BASIS TO ARGUE THAT YOUTUBE, IN MONITORING

10:30AM  16    ITS SERVICE AND MODERATING CONTENT ON ITS SERVICE WAS SOMEHOW

10:30AM  17    ACTING WITH THE GOVERNMENT'S ENDORSEMENT.  AND SECTION 230 BY

10:30AM  18    ITS EXPRESS TERMS, AND THE LEGISLATIVE HISTORY CONFIRMS, THAT

10:31AM  19    THE GOVERNMENT WAS, IN FACT, SEEKING TO TAKE ITSELF OUT OF THE

10:31AM  20    PROCESS OF CONTENT MODERATION ONLINE.  SO THERE IS NO BASIS FOR

10:31AM  21    THE COURT TO CONCLUDE THAT SECTION 230 SOMEHOW PUTS A THUMB ON

10:31AM  22    THE SCALE IN FAVOR OF THE CONTENT MODERATION DECISIONS THAT

10:31AM  23    YOUTUBE MADE WITH RESPECT TO THE PLAINTIFFS' CONTENT HERE.

10:31AM  24         THE COURT:  IT SEEMS ALMOST LIKE AN ABSENCE OF

10:31AM  25    ENDORSEMENT, SORT OF AN EXPLICIT NON-ENDORSEMENT OF ANY
```

10:31AM 1    PARTICULAR MONITORING OR POLICING OR CENSORSHIP OR RESTRICTION.

10:31AM 2    IT'S LEAVING IT UP TO THE PLATFORM OR THE SERVICE PROVIDER IN

10:31AM 3    THIS CASE.

10:31AM 4        SO I TAKE YOUR POINT ABOUT THE ENDORSEMENT THEORY.  IT

10:31AM 5    DOESN'T SEEM TO FIT, BUT I WILL HEAR FROM THE PLAINTIFFS ON

10:31AM 6    THAT.

10:31AM 7        OKAY.  SO IN YOUR VIEW -- IN DEFENDANTS' VIEW DOES THE

10:32AM 8    PRAGER DECISION TAKE CARE OF THE FIRST AMENDMENT CLAIM AS WELL

10:32AM 9    AS THE CALIFORNIA CONSTITUTION CLAIM?

10:32AM 10        I MEAN, IT DOESN'T SPECIFICALLY ADDRESS THE CALIFORNIA

10:32AM 11    CONSTITUTION, THE NINTH CIRCUIT DOES NOT.  THAT WAS THE

10:32AM 12    PRAGER II DECISION.

10:32AM 13            MR. WILLEN:  THAT'S RIGHT, YOUR HONOR.  WE THINK IT

10:32AM 14    DOES.  CALIFORNIA STATE COURTS HAVE MADE CLEAR THAT THE

10:32AM 15    CALIFORNIA CONSTITUTION HAS A STATE ACTION REQUIREMENT JUST

10:32AM 16    LIKE THE FIRST AMENDMENT.

10:32AM 17        AND AS THE NINTH CIRCUIT IN PRAGER HELD, THAT TO FIND A

10:32AM 18    PRIVATE PLATFORM INVOLVED IN HOSTING EXPRESSIVE CONDUCT A STATE

10:32AM 19    ACTOR WOULD ESSENTIALLY BE A PARADIGM SHIFT AND THAT HOLDING

10:32AM 20    BEARS ON THE CALIFORNIA CONSTITUTION CLAIM AS WELL.

10:32AM 21        NOW, PLAINTIFFS HAVE INVOKED THIS NARROW AND 40-YEAR-OLD

10:33AM 22    EXCEPTION ARTICULATED BY THE CALIFORNIA SUPREME COURT IN

10:33AM 23    ROBINS VERSUS PRUNEYARD, BUT THAT DECISION WAS APPLIED TO REAL

10:33AM 24    PROPERTY GIVEN THE NATURE OF REAL PROPERTY AND HAS NEVER BEEN

10:33AM 25    EXTENDED BEYOND THE SCOPE OF REAL PROPERTY.

10:33AM  1      AND, IN FACT, EVERY CASE THAT HAS CONSIDERED SIMILAR

10:33AM  2  EFFORTS TO EXPAND ITS SCOPE TO ONLINE SERVICES HAS REJECTED

10:33AM  3  THOSE EFFORTS.  IN ADDITION TO PRAGER II THERE WAS THE DOMEN

10:33AM  4  CASE IN THE SOUTHERN DISTRICT OF NEW YORK AND JUDGE CHEN IN THE

10:33AM  5  HIQ DECISION.

10:33AM  6      THE COURT:  ALL RIGHT.  THANK YOU.

10:33AM  7    AND THE LANHAM ACT ISSUE?

10:33AM  8      MS. WHITE:  YES.  ON THAT, YOUR HONOR, I DON'T

10:33AM  9  ENTIRELY UNDERSTAND PLAINTIFFS' ARGUMENTS IN THEIR SURREPLY FOR

10:33AM 10  ATTEMPTING TO DISTINGUISH THE LANHAM ACT, BUT THERE'S

10:33AM 11  ESSENTIALLY FOUR CATEGORIES OF STATEMENTS AT ISSUE IN THEIR

10:34AM 12  CLAIM, AND THEY ALL RELATE TO STATEMENTS THAT THE NINTH CIRCUIT

10:34AM 13  CONSIDERED IN PRAGER, THOSE DEALING WITH THE TERMS OF SERVICE

10:34AM 14  DESCRIPTIONS OF RESTRICTED MODE AND SOME IMPLICIT STATEMENT BUT

10:34AM 15  NO ACTUAL STATEMENT REGARDING THE DECISION TO MAKE CERTAIN OF

10:34AM 16  PLAINTIFFS' VIDEOS UNAVAILABLE IN RESTRICTED MODE.

10:34AM 17    THE NINTH CIRCUIT ADDRESSED EACH OF THOSE CATEGORIES OF

10:34AM 18  STATEMENTS AND CLEARLY HELD THAT NO LANHAM ACT CLAIM COULD

10:34AM 19  PROCEED ON THE BASIS OF ANY OF THEM.  THEY ARE NOT MADE IN

10:34AM 20  COMMERCIAL OR PROMOTIONAL CONTEXTS AND THEY, WITH RESPECT TO

10:34AM 21  YOUTUBE'S PROMOTIONAL STATEMENTS AND MISSION STATEMENTS, ARE

10:34AM 22  NOT -- ARE ESSENTIALLY NONACTIONABLE PUFFERY.

10:34AM 23      THE COURT:  AND IF GOOGLE WERE TO ACT OR HAVE AN

10:34AM 24  INTERNAL UNWRITTEN POLICY THAT WAS INCONSISTENT WITH THOSE

10:34AM 25  PUBLIC STATEMENTS, WOULD THE ANSWER STILL BE THE SAME UNDER THE

10:35AM 1    LANHAM ACT?  DOES IT MATTER?  THOSE ARE -- THE STATEMENTS THAT

10:35AM 2    ARE PUBLIC FACING AND DESCRIBE THE PLATFORM AS BEING VIEWPOINT

10:35AM 3    NEUTRAL, THAT'S NOT ADVERTISING, THAT'S NOT PROMOTION, SO IT

10:35AM 4    DOESN'T MATTER IF, IN FACT, THAT'S NOT THE WAY IT WORKS AND

10:35AM 5    THERE'S SOME UNWRITTEN POLICY THAT DISCRIMINATES AGAINST THE

10:35AM 6    LGBT CONTENT CREATORS AND STILL NOT ACTIONABLE UNDER THE

10:35AM 7    LANHAM ACT WOULD BE YOUR VIEW?

10:35AM 8         MS. WHITE:  THAT'S RIGHT, YOUR HONOR.  TO STATE A

10:35AM 9    CLAIM UNDER THE LANHAM ACT FOR FALSE ADVERTISING, WHICH IS WHAT

10:35AM 10   I UNDERSTAND THE PLAINTIFFS CLAIM TO BE HERE, THEY HAVE TO TIE

10:35AM 11   THE CLAIM TO SOME ACTUAL STATEMENT.

10:35AM 12        SO IMPLICIT OR ABSTRACT MOTIVE IS NOT SUFFICIENT TO STATE

10:35AM 13   A CLAIM UNDER THE LANHAM ACT.

10:35AM 14        THE COURT:  ALL RIGHT.  SO I DID HAVE A QUESTION

10:35AM 15   ABOUT TRYING TO FOCUS IN ON THIS ISSUE OF PLAINTIFFS ALLEGE

10:36AM 16   DISCRIMINATION BASED ON THEIR IDENTITY AS OPPOSED TO CONTENT.

10:36AM 17        AND I DON'T KNOW IF THIS IS A QUESTION FOR YOU OR

10:36AM 18   MR. WILLEN BECAUSE IT REALLY DOES GET INTO THE QUESTION OF WHAT

10:36AM 19   IS IMMUNIZED AND WHAT IS NOT.

10:36AM 20        PLAINTIFFS SAY IN THEIR COMPLAINT THAT THEIR CONTENT IS

10:36AM 21   BLOCKED OR RESTRICTED IN SOME WAY NOT BECAUSE OF THE CONTENT

10:36AM 22   ITSELF BUT BECAUSE THE CREATORS OF THE CONTENT ARE GAY OR ARE

10:36AM 23   SEEKING TO HAVE THEIR CONTENT VIEWED BY THE LGBT COMMUNITY, SO

10:36AM 24   THEY'RE TARGETING CONTENT TO THE LGBT COMMUNITY.

10:36AM 25        SO THAT MAKES ME WONDER WHETHER THAT KIND OF CONDUCT IS,

10:36AM 1    AS I ASKED FROM THE BEGINNING, SO IF I CREDIT THAT AS AN

10:36AM 2    ALLEGATION THAT I MUST ACCEPT AS TRUE THAT IT'S A

10:36AM 3    DISCRIMINATION BASED ON IDENTITY, IS THAT WITHIN THE SCOPE OF

10:36AM 4    THE PUBLISHING ACTIVITIES UNDER SECTION (C)(1)?

10:37AM 5        AND THE SECOND PART IS IF YOU HAVE TO SHOW GOOD FAITH

10:37AM 6    UNDER (C)(2), IS THAT KIND OF DISCRIMINATION, IS THERE A

10:37AM 7    QUESTION WHETHER THAT KIND OF DISCRIMINATION IS NOT GOOD FAITH

10:37AM 8    UNDER (C)(2)?

10:37AM 9        SO THOSE ARE QUESTIONS FOR MR. WILLEN.

10:37AM 10           MR. WILLEN:  SURE.  I'D BE HAPPY TO ADDRESS THOSE,

10:37AM 11   YOUR HONOR.

10:37AM 12       SO WITH RESPECT TO (C)(1), THE COURT IS NOT WRITING ON A

10:37AM 13   BLANK SLATE HERE.  WE'VE HAD A SERIES OF DECISIONS, AT LEAST

10:37AM 14   SIX CASES IN THE LAST TWO OR THREE YEARS ALL OF WHICH HAVE

10:37AM 15   APPLIED SECTION 230(C)(1) TO CLAIMS UNDER VARIOUS

10:37AM 16   DISCRIMINATION LAWS, INCLUDING THE UNRAH ACT.

10:37AM 17       SO, FOR EXAMPLE, THE DOMEN CASE THAT MS. WHITE MENTIONED

10:37AM 18   IN THE SOUTHERN DISTRICT OF NEW YORK WAS A CLAIM OF THE

10:37AM 19   UNRAH ACT SPECIFICALLY HELD THAT THE STATE, YOU KNOW,

10:37AM 20   DISCRIMINATION LAWS AND CLAIMS ARISING UNDER THEM ARE WITHIN

10:37AM 21   THE SCOPE OF PUBLISHING ACTIVITY AT LEAST IN CERTAIN CONTEXTS

10:38AM 22   UNDER (C)(1).

10:38AM 23       WE HAVE THE SIKHS FOR JUSTICE CASE, JUDGE KOH'S DECISION,

10:38AM 24   WHICH HELD THE SAME THING AS DID TITLE II OF THE FEDERAL CIVIL

10:38AM 25   RIGHTS ACT, AND THAT DECISION WAS AFFIRMED IN AN UNPUBLISHED

10:38AM 1    DECISION BY THE NINTH CIRCUIT, WHICH SPECIFICALLY SAID THERE'S

10:38AM 2    NO, THERE'S NO REASON TO EXEMPT THIS CLAIM FROM SECTION 230.

10:38AM 3         PRAGER HELD THE SAME THING.  SIKHS VERSUS FACEBOOK, THE

10:38AM 4    FEDERAL NEWS AGENCY CASE, ALSO A JUDGE KOH DECISION.  SO

10:38AM 5    THERE'S A LONG SERIES OF CASES THAT HAVE HELD THIS.

10:38AM 6         AND WHAT THAT REFLECTS IS THAT I THINK YOU HAVE TO LOOK IN

10:38AM 7    A CASE LIKE THIS, AS THOSE COURTS DID, AT THE NATURE OF THE

10:38AM 8    ACTIVITY THAT IS GIVING RISE TO THE CLAIM.

10:38AM 9         HERE PRIMARILY WHAT THE PLAINTIFFS ARE ALLEGING IS A

10:38AM 10   CHALLENGE TO TWO THINGS:

10:38AM 11        ONE IS THE DECISIONS THAT YOUTUBE MADE WITH RESPECT TO

10:38AM 12   RESTRICTED MODE, AND THAT'S THE EXCLUSION OF CERTAIN VIDEOS

10:38AM 13   FROM BEING ELIGIBLE TO BEING SHOWN IN YOUTUBE'S RESTRICTED

10:38AM 14   MODE;

10:39AM 15        AND THE SECOND IS THE DECISION TO DEMONETIZE SOME VIDEOS,

10:39AM 16   ALTHOUGH NOT ALL OF THE VIDEOS.

10:39AM 17        SO MS. WHITE CAN CERTAINLY ADDRESS WHETHER THOSE

10:39AM 18   ALLEGATIONS EVEN STATE A CLAIM UNDER THE UNRAH ACT, BUT

10:39AM 19   ASSUMING THAT THEY DID, THAT CHALLENGE, THE SPECIFIC ISSUES AT

10:39AM 20   ISSUE HERE, PLAINLY QUALIFY AS PUBLISHING ACTIVITY AS IT'S BEEN

10:39AM 21   DEFINED BY THE NINTH CIRCUIT AND THE SERIES OF NORTHERN

10:39AM 22   DISTRICT OF CALIFORNIA AND OTHER CASES THAT I MENTIONED.

10:39AM 23        SO WITH RESPECT TO RESTRICTED MODE, THAT WAS THE EXPRESS

10:39AM 24   HOLDING OF THE PRAGER II STATE COURT DECISION CHALLENGED THE

10:39AM 25   RESTRICTED MODE CLEARLY COMES UNDER SECTION 230(C)(2) AS

| | |
|---|---|
| 10:39AM | 1 |
| 10:39AM | 2 |
| 10:39AM | 3 |
| 10:39AM | 4 |
| 10:40AM | 5 |

10:39AM 1    PUBLISHING CONDUCT, EXCUSE ME, AND LIKEWISE THE SAME THING WITH

10:39AM 2    RESPECT TO DEMONETIZATION, AND THAT WAS CONFIRMED EVEN MORE

10:39AM 3    RECENTLY BY JUDGE KIM'S DECISION IN THE LEWIS CASE WHICH WE

10:39AM 4    SUBMITTED AS SUPPLEMENTAL AUTHORITY.  AND THAT WAS A CASE

10:40AM 5    INVOLVING DEMONETIZATION, AND THE COURT THERE EXPLAINED VERY

10:40AM 6    CLEARLY I THINK THAT DEMONETIZATION IS A FORM OF PUBLISHER

10:40AM 7    ACTIVITY.

10:40AM 8         THE COURT:  LET ME PAUSE YOU RIGHT THERE,

10:40AM 9    MR. WILLEN, BECAUSE I GET THE POINT THAT OTHER CASES HAVE HELD

10:40AM 10   THAT PUBLISHING ACTIVITY ENCOMPASSES QUITE A BROAD SWATH OF

10:40AM 11   ACTIVITY, I UNDERSTAND THAT POINT.

10:40AM 12        BUT TO PUT A REALLY FINE POINT ON IT HERE, WHAT I'M

10:40AM 13   CONCERNED ABOUT IS IF, IF THE ALLEGATION IS, AND I KNOW THAT

10:40AM 14   GOOGLE DISPUTES THAT THIS IS REALLY WHAT IS ALLEGED, BUT IF THE

10:40AM 15   ALLEGATION IS THAT, A, SOMEONE WHO DOES ALL OF THOSE PUBLISHING

10:40AM 16   ACTIVITIES IS NEVERTHELESS DISCRIMINATING ON THE BASIS OF THE

10:40AM 17   AUTHOR'S IDENTITY, THE CONTENT CREATOR'S IDENTITY, REGARDLESS

10:40AM 18   OF WHAT IT IS THAT THE CONTENT HAS IN IT, IF THAT'S THE

10:40AM 19   ALLEGATION, ARE YOU SAYING THAT THAT IS PUBLISHING ACTIVITY,

10:40AM 20   DISCRIMINATION ON THE BASIS OF, LET'S JUST SAY SEXUAL

10:41AM 21   ORIENTATION OF THE CONTENT CREATOR, THAT'S WITHIN PUBLISHING

10:41AM 22   ACTIVITY UNDER (C)(1)?

10:41AM 23        MR. WILLEN:  WELL, I WOULD SAY TWO THINGS.  SO,

10:41AM 24   FIRST OF ALL, I THINK IT'S ACTUALLY CLEAR FROM THE FACTS

10:41AM 25   ALLEGED IN THE COMPLAINT AS OPPOSED TO KIND OF RHETORIC IN THE

| | | |
|---|---|---|
| 10:41AM | 1 | COMPLAINT THAT THAT'S NOT WHAT IS PLAUSIBLY ALLEGED HERE. |
| 10:41AM | 2 | YOU KNOW, WE KNOW, FOR EXAMPLE, THAT ALL OF THE -- NONE OF |
| 10:41AM | 3 | THE PLAINTIFFS HERE HAVE HAD ALL OF THEIR VIDEOS EXCLUDED FROM |
| 10:41AM | 4 | RESTRICTED MODE, NONE OF THEM HAVE ALL OF THEIR VIDEOS NOT |
| 10:41AM | 5 | ELIGIBLE FOR MONETIZATION. |
| 10:41AM | 6 | SO CLEARLY IF YOU ACTUALLY LOOK AT WHAT IS GOING ON IN |
| 10:41AM | 7 | THIS CASE, IT'S VERY HARD TO SAY THAT THERE IS ANY SORT OF |
| 10:41AM | 8 | IDENTITY OR USER BASE DISCRIMINATION.  SO I THINK THAT'S AN |
| 10:41AM | 9 | IMPORTANT POINT. |
| 10:41AM | 10 | BUT AGAIN, WITH RESPECT TO SORT OF THE LEGAL QUESTION |
| 10:41AM | 11 | UNDER SECTION 230, I MEAN I THINK IT DOES FOLLOW, AND THERE MAY |
| 10:41AM | 12 | BE SOME CASES WHERE THIS COULD NOT BE THE CASE DEPENDING ON THE |
| 10:41AM | 13 | PARTICULAR CIRCUMSTANCES. |
| 10:41AM | 14 | BUT THE NINTH CIRCUIT HAS BEEN VERY CLEAR THAT SECTION |
| 10:42AM | 15 | 230(C)(1) APPLIES WITHOUT REGARD TO THE NATURE OF THE CAUSE OF |
| 10:42AM | 16 | ACTION. |
| 10:42AM | 17 | THE THING THAT YOU'RE LOOKING AT IS WHAT IS THE DUTY THAT |
| 10:42AM | 18 | THE CAUSE OF ACTION IMPOSES AND WHERE THAT DUTY TAKES THE FORM |
| 10:42AM | 19 | OF A COMMAND EITHER TO PUBLISH OR NOT TO PUBLISH.  THAT IS |
| 10:42AM | 20 | PRECISELY WHAT SECTION 230(C)(1) PROTECTS AGAINST.  SO |
| 10:42AM | 21 | WITHDRAWING CONTENT FROM PUBLICATION, CLEAR PUBLIC ACTIVITY. |
| 10:42AM | 22 | SO WHERE A DISCRIMINATION CLAIM TAKES THE FORM OF SEEKING |
| 10:42AM | 23 | TO IMPOSE A DUTY ON THE PLATFORM TO EITHER PUBLISH OR NOT TO |
| 10:42AM | 24 | WITHDRAW FROM PUBLICATION A PARTICULAR PIECE OF CONTENT OR A |
| 10:42AM | 25 | PARTICULAR USER'S CONTENT, THAT I THINK JUST UNDER THE |

10:42AM 1    ESTABLISHED LAW APPLIES AND KICKS THE IMMUNITY IN.

10:42AM 2            THE COURT:  THAT'S WHY I WAS ASKING THIS QUESTION IN

10:42AM 3    THE CONTEXT OF THE UNRAH ACT BECAUSE THAT TO ME SEEMED LIKE THE

10:42AM 4    ONLY -- IT'S NOT -- IT CAN'T BE A FIRST AMENDMENT ISSUE.  WE

10:43AM 5    KNOW THAT FROM PRAGER.

10:43AM 6            MR. WILLEN:  YEAH.

10:43AM 7            THE COURT:  I DIDN'T REALLY SEE HOW . THERE'S A 14TH

10:43AM 8    AMENDMENT ISSUE.  IT'S NOT REALLY PLED THAT WAY.

10:43AM 9        IT'S MORE OF AS A RESPONSE TO THE AFFIRMATIVE RESPONSE

10:43AM 10   UNDER 230(C).  SO THAT'S WHY I WAS FOCUSSING ON THE UNRAH ACT

10:43AM 11   BECAUSE IMAGINE THAT A PUBLISHER WAS DISCRIMINATING AGAINST A

10:43AM 12   CONTENT CREATOR BASED ON RACE, AND JUST MAKE IT REAL

10:43AM 13   STRAIGHTFORWARD, AND THAT WAS THE ALLEGATION.

10:43AM 14       SO LET'S JUST REMOVE IT FROM THE ACTUAL CASE HERE, BECAUSE

10:43AM 15   I KNOW THAT GOOGLE HAS A DIFFERENT VIEW OF WHAT ACTUALLY IS

10:43AM 16   PLED AND WHAT WAS PLAUSIBLY PLED, AND I JUST WANTED TO AVOID

10:43AM 17   THAT ISSUE.

10:43AM 18       I'M ASKING YOU A HYPOTHETICAL QUESTION.  A PUBLISHER IS

10:43AM 19   DISCRIMINATING AGAINST A CONTENT CREATOR ON THE BASIS OF RACE,

10:43AM 20   NOT ON CONTENT, IS THAT PUBLISHING ACTIVITY UNDER (C)(1) AND IS

10:43AM 21   IT IMMUNIZED -- WOULD IT ALSO BE IMMUNIZED UNDER (C)(2)?

10:43AM 22           MR. WILLEN:  YEAH.  SO I THINK THE (C)(2) QUESTION

10:43AM 23   IS A DIFFICULT ONE BECAUSE OF THE GOOD FAITH LANGUAGE.

10:44AM 24       OBVIOUSLY WE HAVE NOT SPECIFICALLY RAISED (C)(2) IN

10:44AM 25   CONNECTION WITH THIS MOTION.  I THINK THIS ISSUE HAS NOT

10:44AM 1    SPECIFICALLY COME UP IN THE (C)(2) CONTEXT.  I CAN IMAGINE SOME

10:44AM 2    COURTS TAKING THE POSITION THAT A PROPERLY PLEADED CLAIM OF THE

10:44AM 3    SORT THAT YOU DESCRIBE AS SORT OF FACIAL RACE DISCRIMINATION

10:44AM 4    CLAIM MAY NOT BE GOOD FAITH UNDER (C)(2), I CAN IMAGINE A COURT

10:44AM 5    TAKING THAT POSITION.

10:44AM 6         I THINK AGAIN, THOUGH, (C)(1) DOES NOT HAVE A GOOD FAITH

10:44AM 7    PROVISION, AND IT APPLIES WITH CIRCUMSTANCES AND APPLIES

10:44AM 8    DIFFERENTLY.

10:44AM 9         I THINK WE HAVE TO LOOK AT THE CARVE-OUTS THAT DO EXIST

10:44AM 10   UNDER (C)(1).  WE HAVE PARTICULAR STATUTES THAT CONGRESS CHOSE

10:44AM 11   TO EXEMPT, INTELLECTUAL PROPERTY, FEDERAL INTELLECTUAL PROPERTY

10:44AM 12   CLAIMS, CRIMINAL PROSECUTIONS, CLAIMS UNDER THE STORED

10:44AM 13   COMMUNICATIONS AND ELECTRONIC COMMUNICATIONS PRIVACY ACT.

10:45AM 14   DISCRIMINATION CLAIMS OBVIOUSLY ARE NOT, NOT THERE.

10:45AM 15        I THINK THERE COULD BE SOME STARK CASES WHERE A COURT

10:45AM 16   MIGHT FIND UNDER A PARTICULAR SET OF CIRCUMSTANCES THAT SOME

10:45AM 17   ALLEGED DISCRIMINATION DIDN'T TAKE THE FORM OF A PUBLISHER OF

10:45AM 18   ACTUALLY TARGETING PUBLISHER CONDUCT, AND, THEREFORE, DIDN'T

10:45AM 19   COME WITHIN (C)(1).

10:45AM 20        I THINK THIS CASE, WHICH IS THE CASE THAT WE HAVE TO LOOK

10:45AM 21   AT, IS I THINK CLEARLY ON THE OTHER SIDE OF THE LAW GIVEN THE

10:45AM 22   NATURE OF THE ALLEGATIONS FOCUSSED SPECIFICALLY ON RESTRICTED

10:45AM 23   MODE, FOCUSSED ON DEMONETIZATION.

10:45AM 24        WE KNOW FROM THE CASES THAT THOSE ARE CORE PUBLISHER

10:45AM 25   ACTIVITIES, AND WE KNOW FROM THE CASES THAT THE DISCRIMINATION

10:45AM  1    CLAIMS THAT ARE TARGETING THOSE KINDS OF ACTIVITIES HAVE BEEN

10:45AM  2    REPEATEDLY PRECLUDED BY SECTION 230(C)(1).

10:45AM  3         SO I DON'T THINK THERE'S ANY BASIS IN THIS CASE, GIVEN

10:45AM  4    THESE ALLEGATIONS, TO DEPART FROM THAT CONSENSUS.

10:45AM  5              THE COURT:  ALL RIGHT.  LET ME JUST ASK, DOES ANYONE

10:46AM  6    ON BEHALF OF GOOGLE WISH TO ADDRESS THE REQUEST FOR UNUSUAL

10:46AM  7    NOTICE?

10:46AM  8              MR. WILLEN:  SURE.  I'D BE HAPPY TO TALK ABOUT THAT

10:46AM  9    AS WELL.  YEAH, I THINK WE SHARE YOUR SENSE, YOUR HONOR, THAT

10:46AM  10   THE EXECUTIVE ORDER REALLY HAS NOTHING TO DO WITH THE ISSUES ON

10:46AM  11   THIS MOTION.

10:46AM  12        THE EXECUTIVE ORDER SEEMS TO US, AT LEAST THE ONLY

10:46AM  13   PROVISION OF IT THAT PURPORTS TO HAVE ANY ACTUAL PRESENT

10:46AM  14   EFFECT, WHICH IS PARAGRAPH 2, IS ADDRESSED TO AN INTERPRETATION

10:46AM  15   OF SECTION 230(C)(2)(A), WHICH SEEMS TO REDUCE TO IF YOU DON'T

10:46AM  16   QUALIFY FOR PROTECTION UNDER 230(C)(2)(A), YOU'RE NOT PROTECTED

10:46AM  17   BY SECTION 230(C)(2)(A).

10:46AM  18        SO I DON'T THINK THAT HAS ANY BEARING ON THIS MOTION WHICH

10:46AM  19   DOESN'T RELY ON SECTION 230(C)(2) AT ALL.

10:46AM  20        EVERYTHING ELSE IN THE ORDER IS SORT OF DIRECTED TO THINGS

10:46AM  21   THAT MIGHT HAPPEN IN THE FUTURE AND DIRECTIVES FOR RULE MAKING,

10:47AM  22   ET CETERA.

10:47AM  23        SO I DON'T THINK THERE'S ANYTHING TO DO WITH IT.  I DON'T

10:47AM  24   THINK IT HAS ANY BEARING ON THESE ISSUES, AND CERTAINLY IT

10:47AM  25   DOESN'T DISPLACE AND IT'S REALLY NOT CAPABLE OF DISPLACING

10:47AM 1    EITHER THE TEXT OF THE STATUTE OR THE LAW THAT HAS BEEN

10:47AM 2    ESTABLISHED WITH RESPECT TO (C)(1).

10:47AM 3           THE COURT:  ALL RIGHT.  THANK YOU FOR THAT.

10:47AM 4       IS THERE ANYTHING ELSE THAT YOU WOULD LIKE TO ARGUE IN

10:47AM 5    SUPPORT OF YOUR MOTION THAT I HAVEN'T FOCUSSED ON IN PARTICULAR

10:47AM 6    OR THAT YOU THINK NEEDS FURTHER ELABORATION AT THIS TIME?

10:47AM 7           MR. WILLEN:  I THINK THE ONLY THING, AND OBVIOUSLY I

10:47AM 8    WANT TO HEAR FROM THE PLAINTIFFS AND RESPOND TO WHAT THEY MIGHT

10:47AM 9    SAY, BUT I DO THINK THAT THE QUESTION OF THE CONSTITUTION, THE

10:47AM 10   CONSTITUTIONAL CHALLENGE TO SECTION 230 THAT THEY HAVE RAISED I

10:47AM 11   THINK, AS THE COURT RECOGNIZED, THE FINDING OF NO STATE ACTION

10:47AM 12   IN THE PRAGER CASE MAKING CLEAR THAT YOUTUBE IS A PRIVATE FORUM

10:48AM 13   AND NOT A GOVERNMENT ACTOR, I THINK THAT FINDING EQUALLY BARS

10:48AM 14   NOT JUST THE FIRST AMENDMENT CLAIM BUT ALSO ANY CHALLENGE TO

10:48AM 15   CONSTITUTIONALITY OF SECTION 230.

10:48AM 16      I THINK THE DECISION THAT IS PROBABLY MOST DIRECTLY ON

10:48AM 17   POINT IN EXPLAINING WHY THAT CHALLENGE FAILS IS THE

10:48AM 18   NINTH CIRCUIT'S DECISION IN ROBERTS VERSUS AT&T MOBILITY WHICH

10:48AM 19   WAS NOT A CASE THAT WE WERE ABLE TO CITE IN OUR PAPERS BECAUSE

10:48AM 20   IT RELATES TO AN ARGUMENT THAT THE PLAINTIFFS MADE IN THEIR

10:48AM 21   SURREPLY AND IN THEIR RESPONSE TO THE GOVERNMENT, BUT I THINK

10:48AM 22   THAT CASE WAS VERY HELPFUL.

10:48AM 23           THE COURT:  ALL RIGHT.  THANK YOU.  THANK YOU VERY

10:48AM 24   MUCH.

10:48AM 25      MR. OBSTLER, I WOULD LIKE FOR YOU TO HAVE IN MIND THE

10:48AM 1   QUESTIONS THAT THE COURT ASKED AT THE BEGINNING, SO JUST TO

10:48AM 2   REVIEW THE SIGNIFICANCE OF THE PRAGER DECISION ON YOUR FEDERAL

10:48AM 3   CLAIMS AND POSSIBLY THE CALIFORNIA CONSTITUTION CLAIM AS WELL;

10:48AM 4       THE QUESTIONS THAT THE COURT HAD ABOUT THE APPLICATION OF

10:49AM 5   230(C)(1) AND (2) AND THE CONTEXT OF THE INTENTIONAL

10:49AM 6   DISCRIMINATION, AND I FRAMED IT AS A QUESTION UNDER THE

10:49AM 7   UNRAH ACT, BUT YOU MAY THINK OF IT DIFFERENTLY, AND THEN I'LL

10:49AM 8   ALSO GIVE YOU AN OPPORTUNITY TO -- I WOULD LIKE YOU TO ADDRESS

10:49AM 9   YOUR REQUEST FOR JUDICIAL NOTICE AND LET ME KNOW WHY YOU THINK

10:49AM 10  IT MATTERS TO THE MOTION TO DISMISS.  AND MAYBE IT'S JUST

10:49AM 11  SPECIFICALLY TO THE GOVERNMENT'S POSITION ON THE MOTION TO

10:49AM 12  INTERVENE, BUT I'D LIKE TO JUST UNDERSTAND THAT, AND ANYTHING

10:49AM 13  ELSE THAT YOU WOULD LIKE TO ARGUE.  ALL RIGHT.

10:49AM 14          MR. OBSTLER:  THANK YOU SO MUCH, YOUR HONOR.

10:49AM 15      I REALLY APPRECIATE AN OPPORTUNITY TO GET A HEARING ON

10:49AM 16  THIS CASE BECAUSE I THINK THERE ARE A LOT OF MISCONCEPTIONS

10:49AM 17  ABOUT WHAT WE HAVE ALLEGED IN 126 PAGES AND 354 PARAGRAPHS.

10:49AM 18      I'M GOING TO ANSWER ALL OF YOUR QUESTIONS, BUT I'M GOING

10:49AM 19  TO REFER VERY CLOSELY TO THE COMPLAINT IN DOING THAT BECAUSE I

10:49AM 20  THINK A LOT OF WHAT THEY'RE REALLY ARGUING WHEN YOU PEEL BACK

10:50AM 21  THE ONION IS FACT BASED.  IF THEY'RE DISCRIMINATING, THESE

10:50AM 22  ARGUMENTS FALL APART.

10:50AM 23      I'LL START WITH THE PRAGER CASE.  I THINK WAY TOO MUCH

10:50AM 24  TIME -- AND I BEAR A LOT OF RESPONSIBILITY FOR THIS BECAUSE I

10:50AM 25  LITIGATED THE PRAGER CASE -- IS BEING SPENT ON STATE ACTION.

10:50AM   1    I'M GOING TO SUBMIT HERE ON STATE ACTION.  I DON'T WANT TO

10:50AM   2    WASTE ANY MORE TIME ON IT.  I THINK YOUR HONOR HAS HER VIEWS.

10:50AM   3         MY ONLY ISSUE WITH THE STATE ACTION DECISIONS THAT HAVE

10:50AM   4    COME DOWN SO FAR IS THAT THERE IS NOT A CLEAR PLEADING STANDARD

10:50AM   5    ON WHAT YOU WOULD HAVE TO PLEAD TO PLEAD PUBLIC FUNCTION OR TO

10:50AM   6    PLEAD ENDORSEMENT.

10:50AM   7         SO IF I COULD KNOW THAT, I COULD THEN MAKE A GOOD FAITH

10:50AM   8    DECISION AS TO WHETHER OR NOT I CAN ALLEGE THOSE TYPES OF

10:50AM   9    FACTS.  I WOULD LIKE TO HOLD, THOUGH, UNLESS THE COURT REALLY

10:50AM   10   WANTS TO HEAR FROM ME NOW ON THAT ISSUE, I WOULD REALLY LIKE TO

10:50AM   11   HOLD THAT TO THE END BECAUSE, FRANKLY, I'M PRETTY MUCH PREPARED

10:50AM   12   TO SUBMIT ON THAT.  WE'RE GOING TO HAVE TO GO UP ON THIS, AND

10:50AM   13   IT MAY BE THAT PRAGER AND HALLECK ENDS EVERYTHING.  I

10:50AM   14   UNDERSTAND THAT.  OKAY.  I DON'T THINK THAT'S THE KEY ISSUE IN

10:50AM   15   MY CASE AT THIS POINT.

10:50AM   16        THE COURT:  THE STATE ACTION ISSUE MAKES YOUR FIRST

10:51AM   17   AMENDMENT CLAIM YOUR WEAKEST CLAIM.

10:51AM   18        MR. OBSTLER:  I WOULD ABSOLUTELY AGREE WITH THAT,

10:51AM   19   YOUR HONOR.  I THINK SKINNER AND THE CONSTITUTIONALITY -- AND

10:51AM   20   SO SKINNER IS SORT OF UPSIDE-DOWN ON THE CONSTITUTIONALITY

10:51AM   21   ARGUMENT, BUT I WOULD AGREE THAT THAT, OF ALL OF THE CLAIMS IN

10:51AM   22   THIS CASE AT THIS POINT, DEPENDING ON WHAT THE STANDARD IS, IF

10:51AM   23   THAT'S THE WEAKEST CLAIM IN THIS CASE.

10:51AM   24        NOW, I WILL SAY THEY HAVE MERGED THEIR TERMS OF SERVICE

10:51AM   25   RECENTLY SO A VIOLATION ON YOUTUBE CAN ALSO LEAD TO THEM TAKING

10:51AM  1    ANDROID DEVICES AWAY, CAN LEAD TO THEM SHUTTING DOWN ALL SORTS

10:51AM  2    OF GOOGLE SERVICES.  THEY'RE VERY INVOLVED IN ELECTIONS.  WE

10:51AM  3    KNOW THAT FOR WHAT WENT ON IN THE DISASTER THAT HAPPENED IN THE

10:51AM  4    CAUCUSES.

10:51AM  5              THE COURT:  I WOULD RATHER NOT GET INTO THINGS THAT

10:51AM  6    ARE NOT ALLEGED IN YOUR COMPLAINT.

10:51AM  7              MR. OBSTLER:  YOUR HONOR, WE HAVE ALLEGED THAT THEY

10:51AM  8    ARE INVOLVED IN THESE FUNCTIONS.  WE HAVE ALLEGED THAT.  IF I

10:51AM  9    NEED TO ALLEGE MORE SPECIFICITY BECAUSE I'VE GOT SOME VERY

10:51AM 10    STRINGENT PLEADING REQUIREMENTS HERE, WE CAN TAKE A LOOK AT

10:52AM 11    THAT.

10:52AM 12        SO MY ONLY REQUEST ON THAT IS THAT THE COURT ARTICULATE

10:52AM 13    THE STANDARD WHY WE FAIL AND GIVE US LEAVE TO CONSIDER WHETHER

10:52AM 14    WE CAN AMEND, BUT OTHERWISE WE'RE PREPARED TO GO UP ON THAT

10:52AM 15    ISSUE, YOUR HONOR.

10:52AM 16              THE COURT:  ALL RIGHT.  LET'S HEAR ABOUT YOUR

10:52AM 17    ARGUMENTS THAT DON'T RELY ON STATE ACTION.

10:52AM 18              MR. OBSTLER:  OKAY.  LET'S START WITH LANHAM.  THEY

10:52AM 19    SEEM TO BE FOCUSSED VERY MUCH ON THE STATEMENTS ABOUT FREEDOM

10:52AM 20    OF EXPRESSION AND ALL THIS TYPE OF STUFF.  THAT'S NOT THE BASIS

10:52AM 21    FOR A LANHAM CLAIM.

10:52AM 22        THE BASIS FOR A LANHAM CLAIM IS THEY WEAR TWO HATS.

10:52AM 23    THEY'RE ONE OF THE LARGEST CONTENT CREATORS ON THE YOUTUBE

10:52AM 24    PLATFORM.  THEY HAVE PREFERRED CONTENT DEALS WITH MAJOR, MAJOR

10:52AM 25    MAINSTREAM PUBLISHERS.  SO THEY'RE WEARING TWO HATS.

10:52AM 1     AND WHAT THEY'RE DOING, YOUR HONOR, AND I HOPE YOU CAN SEE

10:52AM 2  THIS, THIS IS WHAT APPEARS --

10:52AM 3          THE COURT:  THAT'S OKAY.  I HAVE THE COMPLAINT.  YOU

10:52AM 4  DON'T NEED TO PUT IT ON THE VIDEO.

10:52AM 5          MR. OBSTLER:  YEAH.  THEY ARE SAYING TO ALL SORTS OF

10:52AM 6  VIEWERS AND AUDIENCES AROUND THE COUNTRY THAT MY CLIENT'S

10:52AM 7  VIDEOS ARE INAPPROPRIATE BECAUSE THEY CONTAIN SHOCKING CONTENT,

10:53AM 8  SEXUAL OR NUDITY, DRUGS, VIOLENCE, ET CETERA.  THAT'S WHAT THEY

10:53AM 9  ARE TELLING THE AUDIENCES WHEN THEY RESTRICT THOSE VIDEOS.

10:53AM 10     THIS CASE, BY THE WAY, IS NOT JUST ABOUT RESTRICTED MODE.

10:53AM 11  IT'S ABOUT EVERY SINGLE SERVICE THAT GOOGLE AND YOUTUBE OFFER

10:53AM 12  WHERE THE TRIGGER TO OBTAIN THE SERVICE IS BASED ON A CONTENT

10:53AM 13  BASED REVIEW OR CONTENT BASED PROCEDURE.

10:53AM 14     SO MY ARGUMENT IN LANHAM IS THAT THEY'RE USING THEIR ROLE

10:53AM 15  AS CONTENT REGULATORS TO BRAND OUR CONTENT AS INAPPROPRIATE, SO

10:53AM 16  WHEN THE READER LOOKS TO SEE WHAT IS ON RESTRICTED MODE, THEY

10:53AM 17  HAVE A LIST AND THAT IS AN AFFIRMATIVE STATEMENT THAT THEY HAVE

10:53AM 18  REVIEWED THE CONTENT AND THAT THEY HAVE FOUND THE CONTENT TO

10:53AM 19  VIOLATE THAT RULE.

10:53AM 20          THE COURT:  SO LET ME PAUSE YOU THERE FOR A MOMENT

10:53AM 21  AND LET ME MAKE SURE THAT I UNDERSTAND WHAT YOU'RE SAYING THE

10:53AM 22  LANHAM ACT CLAIM IS.

10:53AM 23     IS IT A FALSE ADVERTISING CLAIM UNDER 1125(A)(1)(B)?

10:54AM 24          MR. OBSTLER:  YES, YES.

10:54AM 25          THE COURT:  OKAY.  SO THEN YOU HAVE TO GO THROUGH

10:54AM 1    THE ELEMENTS.

10:54AM 2         SO IF YOU HAD TO TELL ME AN ANSWER TO THIS QUESTION, WHAT

10:54AM 3    IS THE FALSE OR MISLEADING STATEMENT?

10:54AM 4         MR. OBSTLER:  THE FALSE OR MISLEADING STATEMENT THAT

10:54AM 5    THEY'RE MAKING IS THAT MY CLIENT'S VIDEOS ARE INAPPROPRIATE

10:54AM 6    SEXUALLY, CONTAIN SEXUAL NUDITY OR MATERIAL, CONTAIN VIOLENCE,

10:54AM 7    WHEN, IN FACT, THAT IS NOT TRUE BECAUSE THEY'RE NOT EVEN

10:54AM 8    LOOKING AT THE CONTENT.

10:54AM 9         THE COURT:  AND YOU'RE SAYING THAT THE STATEMENT IS

10:54AM 10   IMPLICIT BECAUSE A SCREEN DISPLAY THAT INDICATES TO THE VIEWER

10:54AM 11   THAT THAT IS BLOCKED, OR NOT AVAILABLE IN RESTRICTED MODE,

10:54AM 12   IMPLIES THAT IT MUST MEET ONE OF THOSE CATEGORIES OF CONTENT

10:54AM 13   THAT GOOGLE WILL NOT PERMIT TO BE SHOWN IN THAT MODE.

10:54AM 14        IS THAT THE THEORY?

10:54AM 15        MR. OBSTLER:  THAT IS CORRECT, YOUR HONOR.

10:54AM 16   BUT IT GOES A LITTLE DEEPER THAN THAT, OKAY?  BECAUSE IT

10:54AM 17   ALSO -- AND THIS OVERLAPS WITH THE (C)(1)(A) ISSUE, AND WE'VE

10:55AM 18   ALLEGED THIS AND THE FROSCH DECLARATION CONTAINS IT, TOO.

10:55AM 19        THEY'RE NOT ONLY USING DISCRIMINATORY ALGORITHMS TO DO

10:55AM 20   THIS.  THEY'RE ACTUALLY EMBEDDING METADATA INTO MY CLIENT'S

10:55AM 21   VIDEOS THAT ALLOW THE ALGORITHM TO DO THE PROFILE.

10:55AM 22        AGAIN, UNTIL WE DO DISCOVERY, THIS IS GOING TO BE A VERY

10:55AM 23   COMPLICATED CASE, AND WE'RE SAYING SHOW US THE CODE AND SHOW US

10:55AM 24   HOW THIS WORKS.

10:55AM 25        BUT WE DID A TEA VIDEO, AS YOUR HONOR KNOWS, WHERE WE

10:55AM  1    ALLEGED AND WHERE WE PUT IN BOTH TAG LINES AND THEN WE PUT IT

10:55AM  2    IN WITHOUT THE TAG LINES AND ALL IT SAYS IS WE LIKE TEA.  IT

10:55AM  3    GOT RESTRICTED.

10:55AM  4         AND AS MS. FROSCH WAS TOLD AT THE MEETINGS, HOW COULD THAT

10:55AM  5    HAVE HAPPENED UNLESS SOMEBODY PUT SOME METADATA IN THERE THAT

10:55AM  6    ALLOWED THAT ALGORITHM TO FIND YOU.

10:55AM  7         AND SO WHAT WE'RE SAYING IS THAT BECAUSE THEY'RE SUCH

10:56AM  8    LARGE CONTENT CREATORS, AND THEY'RE USING THEIR ROLE AS CONTENT

10:56AM  9    REGULATORS TO ALSO FALSELY BRAND CONTENT THAT IS ABSOLUTELY

10:56AM  10   APPROPRIATE AS INAPPROPRIATE, AND THAT BLOCKS OUR REACH, AND

10:56AM  11   THAT'S HOW THEY'RE COMPETING WITH US.

10:56AM  12         THE COURT:  RIGHT.  SO THAT DOESN'T SOUND SO MUCH

10:56AM  13   LIKE FALSE ADVERTISING, AND SO THAT'S WHY I WAS ASKING YOU, IS

10:56AM  14   IT A FALSE ADVERTISING CLAIM OR IS IT SOMETHING ELSE?

10:56AM  15         MR. OBSTLER:  WHEN YOU SAY THAT THAT DOESN'T SOUND

10:56AM  16   LIKE FALSE ADVERTISING --

10:56AM  17         THE COURT:  YOU'RE SAYING -- SO YOU'RE FALSELY

10:56AM  18   BRANDING -- YOUR THEORY IS THAT GOOGLE AND YOUTUBE ARE FALSELY

10:56AM  19   BRANDING YOUR CLIENT'S CONTENT?

10:56AM  20         MR. OBSTLER:  THAT'S CORRECT, BUT THEY'RE DOING IT

10:56AM  21   BY SHOWING EVERY VIEWER WHO GOES THERE (INDICATING).

10:56AM  22         MY WIFE THE OTHER DAY ACTUALLY GOT A RESTRICTED MODE

10:56AM  23   NOTICE ON HER FACEBOOK PAGE.  SO THE RESTRICTED MODE IS NOW

10:56AM  24   GOING ACROSS PLATFORM.  AND SHE LOOKED IT UP AND SHE SAID WHAT

10:56AM  25   IS GOING ON HERE?

10:56AM 1          THE POINT IS -- I'M SORRY, THE POINT IS --

10:57AM 2              THE COURT:  AGAIN, I'M JUST TRYING TO FIGURE OUT HOW

10:57AM 3      YOUR CLAIM FITS THE CLAIM THAT YOU'VE ALLEGED UNDER THE

10:57AM 4      LANHAM ACT, HOW YOUR FACTS FIT THAT CLAIM.  I'M STILL

10:57AM 5      STRUGGLING A LITTLE BIT WITH ALL OF THE ELEMENTS THAT YOU HAVE

10:57AM 6      TO SHOW FOR THE LANHAM ACT.

10:57AM 7          THE QUESTION THAT THE NINTH CIRCUIT FOCUSSED ON WAS THAT

10:57AM 8      THE STATEMENTS, AND THE SAME ARGUMENTS WERE MADE IN THAT CASE

10:57AM 9      AS FAR AS I CAN TELL, THE STATEMENTS WERE NOT MADE IN

10:57AM 10     COMMERCIAL ADVERTISING OR PROMOTION.

10:57AM 11             MR. OBSTLER:  YEP.

10:57AM 12             THE COURT:  THE FALSE STATEMENTS.

10:57AM 13         RATHER, THE STATEMENTS THAT WERE MADE WERE DESCRIBING

10:57AM 14     TRUTHFULLY WHAT HAD HAPPENED AS IN THIS GOT FLAGGED AS

10:57AM 15     SOMETHING THAT WOULD BE EXCLUDED FROM RESTRICTED MODE.

10:57AM 16         SO -- AND THE IMPLEMENTATION OF THAT, THE GUIDELINES THAT

10:57AM 17     RESULTED IN THAT DISPLAY BEING AS YOU DESCRIBE WERE NOT

10:58AM 18     ADVERTISING OR PROMOTION.

10:58AM 19         SO IN LIGHT OF PRAGER, HOW DO YOU AVOID THE CONCLUSIONS

10:58AM 20     THAT THAT COURT REACHED?  HOW DO YOU AVOID THOSE AND

10:58AM 21     EFFECTIVELY HAVE A CLAIM IN THIS CASE THAT DOESN'T HIT THOSE

10:58AM 22     SAME BARRIERS?

10:58AM 23             MR. OBSTLER:  BECAUSE THE COURT IN PRAGER MADE AN

10:58AM 24     INAPPROPRIATE FACTUAL FINDING.

10:58AM 25             THE COURT:  OKAY.  SO WHAT IS THE INAPPROPRIATE

10:58AM 1    FACTUAL FINDING?

10:58AM 2              MR. OBSTLER:  YEAH.  IT SAID THERE WAS NO

10:58AM 3    RELATIONSHIP BETWEEN THE STATEMENT THAT IS RESTRICTED IN ANY

10:58AM 4    ADVERTISING OR STATEMENT ABOUT THE QUALITY OF THE VIDEO.  THAT

10:58AM 5    WAS PLED IN THE COMPLAINT.

10:58AM 6         I ADMIT IT SHOULD HAVE BEEN MORE CLEARER.  WE EXPRESSLY

10:58AM 7    PLED THAT HERE, AND IT IS BY IMPLICATION AS YOU POINTED OUT

10:58AM 8    UNDER THE GRUBBS DECISION OR WHATEVER.

10:58AM 9         I MEAN, THIS IS THE INTERNET AND THEY'RE USING -- THEY'RE

10:58AM 10   RESTRICTING THE VIDEO.  THE PERSON LOOKED AT THAT RESTRICTION

10:58AM 11   AND WHAT IS IT -- WHY WOULD THEY RESTRICT THE VIDEO?  THERE HAS

10:58AM 12   TO BE SOMETHING WRONG WITH THAT VIDEO AND PEOPLE SEE THAT.

10:59AM 13        AND I THINK THAT IT IS A FACTUAL ISSUE AS TO WHETHER OR

10:59AM 14   NOT THERE IS A CONNECTION BETWEEN THIS STATEMENT OF FACT "MY

10:59AM 15   VIDEO IS RESTRICTED" AND A STATEMENT OF FACT ABOUT WHETHER OR

10:59AM 16   NOT THAT VIDEO CONTAINS INAPPROPRIATE MATERIAL, SHOCKING AND

10:59AM 17   SEXUALLY EXPLICIT, OR AS THE FLOOR MANAGER FOR GOOGLE SAID

10:59AM 18   "BECAUSE YOU'RE GAY" AND PUTTING THAT OUT ON THE NETWORK TO

10:59AM 19   EVERYBODY.

10:59AM 20        SECOND OF ALL, IF I WOULD GET LEAVE TO AMEND BECAUSE WE

10:59AM 21   JUST LEARNED THIS, RESTRICTED MODE SWEEPS BROADER THAN WHAT

10:59AM 22   THEY'VE TOLD US AND WHAT THEY'VE REPRESENTED TO THE COURT.  WE

10:59AM 23   NOW HAVE EVIDENCE THAT RESTRICTED MODE IS GOING TO PEOPLE WHO

10:59AM 24   DON'T EVEN HAVE IT ON, AND IT'S GOING ACROSS THE PLATFORM.

10:59AM 25        I'M SORRY, I LEARNED THAT RECENTLY.  THIS CASE HAS BEEN

10:59AM 1    EVOLVING.  WE HAVEN'T GOTTEN A SINGLE LICK OF DISCOVERY ON THIS

10:59AM 2    TO DATE, YOUR HONOR.

10:59AM 3            THE COURT:  RIGHT.  IT'S NOT UNUSUAL THAT AT THE

10:59AM 4    PLEADING STAGE YOU WOULDN'T HAVE HAD DISCOVERY.

10:59AM 5            MR. OBSTLER:  FAIR ENOUGH.

11:00AM 6            THE COURT:  THAT'S WHY WE'RE AT THE PLEADING STAGE.

11:00AM 7            MR. OBSTLER:  YEAH.

11:00AM 8            THE COURT:  SO THE ISSUE I STILL THINK IS

11:00AM 9    CHALLENGING FOR YOU IS CHARACTERIZING THESE STATEMENTS AS

11:00AM 10   ADVERTISING OR PROMOTION.  I THINK THAT'S STILL A CHALLENGING

11:00AM 11   POINT.

11:00AM 12       AND EVEN IF YOU HAD DISCOVERY ABOUT HOW RESTRICTED MODE IS

11:00AM 13   BEING APPLIED OR MISAPPLIED IN YOUR VIEW, OR OVERINCLUSIVE OR

11:00AM 14   UNDERINCLUSIVE, HOW IS THAT ADVERTISING OR PROMOTION IF WHAT

11:00AM 15   APPLE -- I'M SORRY, APPLE -- IF WHAT GOOGLE AND YOUTUBE ARE

11:00AM 16   DOING ARE SIMPLY SAYING THIS IS THE RESULT OF WHATEVER IT IS

11:00AM 17   BEHIND THE SCENES THAT RESULTED IN AN EXCLUSION FROM RESTRICTED

11:00AM 18   MODE, WHETHER IT'S A HUMAN DOING IT OR AN ALGORITHM DOING IT OR

11:00AM 19   A COMMUNITY FLAG, OR WHATEVER THE MECHANISM IS, THEY'RE

11:00AM 20   REPORTING ON THAT BLACK SCREEN THAT THAT PARTICULAR CONTENT IS

11:00AM 21   SUBJECT TO RESTRICTED MODE.

11:00AM 22       THAT'S A FACTUAL STATEMENT.

11:01AM 23           MR. OBSTLER:  CORRECT, YOUR HONOR.

11:01AM 24           THE COURT:  AND SO -- YOU KNOW, IT'S A LITTLE BIT --

11:01AM 25   WE CAN GET TO THE QUESTION OF WHETHER, YOU KNOW, WHAT THE

11:01AM  1    INTERSECT IS WITH SECTION 230, BUT JUST FOCUSSING ON JUST THE

11:01AM  2    LANHAM ACT CLAIM ITSELF AND WHETHER YOU MEET THE ELEMENTS, I'M

11:01AM  3    STILL HAVING TROUBLE WITH THE ALLEGATION THAT THAT IS REALLY

11:01AM  4    COMMERCIAL ADVERTISING OR PROMOTION.

11:01AM  5            MR. OBSTLER:  BUT THAT IS EXACTLY WHAT THE COURT

11:01AM  6    STRUGGLED WITH IN GRUBBS.  THAT IS EXACTLY WHAT THE COURT

11:01AM  7    STRUGGLED WITH IN THE DECISIONS THAT ARE CITED IN PRAGER AND

11:01AM  8    EVERY SINGLE ONE OF THEM WAS DONE ON A FACTUAL RECORD.  THERE

11:01AM  9    ISN'T A MOTION TO DISMISS IN ANY OF THOSE CASES.

11:01AM  10   NOW, I HAD TO MAKE A STRATEGIC DECISION OBVIOUSLY, AS TO

11:01AM  11   WHETHER WE WERE GOING TO MOVE FOR RECONSIDERATION WITH THE

11:01AM  12   NINTH CIRCUIT IN PRAGER.  WE CHOSE NOT TO DO SO.  THAT'S NOT

11:01AM  13   THIS CASE.  IT SHOULDN'T BE HERE, BUT YOU WERE ASKING ABOUT THE

11:01AM  14   CONSEQUENCES OF PRAGER.

11:01AM  15   FOR PRAGER PURPOSES WE CAN HAVE A LEGITIMATE DISPUTE, BUT

11:01AM  16   I THINK HERE WE ARE EXPRESSING ALLEGING THAT THESE ARE

11:02AM  17   STATEMENTS OF FACT THAT ARE BRANDING OUR VIDEOS AS

11:02AM  18   INAPPROPRIATE AT THE SAME TIME THAT THEY ARE NOT RESTRICTING

11:02AM  19   THEIR VIDEOS AND PUTTING THAT STUFF ON THEIR STUFF AND THAT TO

11:02AM  20   ME IS IMPLICIT FALSE ADVERTISING UNDER GRUBBS AND UNDER THE

11:02AM  21   OTHER CASES.

11:02AM  22   AND IF WE DEVELOP A RECORD, AND IT'S PRETTY CLEAR THAT

11:02AM  23   THIS IS NOT EVEN IN THE BALLPARK, YOUR HONOR, I'LL DISMISS THE

11:02AM  24   CLAIM.  BUT I THINK WE SHOULD GET AN OPPORTUNITY TO DO SOME

11:02AM  25   DISCOVERY ON THAT CLAIM.  I THINK THIS IS COMMERCIAL

11:02AM  1   ADVERTISING AS ALLEGED, AND I BELIEVE THAT BASED ON DISCOVERY

11:02AM  2   AND IF YOU LOOK AT THE CASES AND IF YOU LOOK AT WHAT THEY

11:02AM  3   CONSIDERED IN THOSE CASES, THIS IS NOT A ONE SIZE FITS ALL.

11:02AM  4   THIS CASE IS EXTREMELY DIFFERENT AND ESPECIALLY GIVEN THE

11:02AM  5   NATURE OF MY CLIENTS AND WHAT THAT STATEMENT MEANS ON THEIR

11:02AM  6   VIDEOS.

11:02AM  7        THE COURT:  ALL RIGHT.  LET ME JUST ASK BECAUSE

11:02AM  8   THERE SEEMS TO BE SOME AMBIGUITY ABOUT THIS IN THE BRIEFING.

11:02AM  9        DO THE PLAINTIFFS ALSO ALLEGE AN 1125(A)(1)(A) FALSE

11:02AM  10  ASSOCIATION CLAIM OR ARE YOU LIMITING YOUR CLAIM UNDER THE

11:02AM  11  LANHAM ACT TO FALSE ADVERTISING?

11:03AM  12        MR. OBSTLER:  AT THIS POINT WE'RE LIMITING UNDER

11:03AM  13  FALSE ADVERTISING.

11:03AM  14        THE COURT:  OKAY.

11:03AM  15        MR. OBSTLER:  I HAVEN'T THOUGHT ABOUT THE FALSE

11:03AM  16  ASSOCIATION CLAIM TO BE HONEST, YOUR HONOR.

11:03AM  17        THE COURT:  OKAY.

11:03AM  18        MR. OBSTLER:  THE CONCERN IS, AND IT GOES TO THE

11:03AM  19  THEORY IN THE WHOLE CASE, IS THAT WE THINK THAT THE WEARING OF

11:03AM  20  THE TWO HATS AND THE USE OF THE COMPUTERS, BECAUSE THEY CAN'T

11:03AM  21  HAVE HUMANS DO THIS STUFF, HAS GOTTEN TO THE POINT WHERE IT HAS

11:03AM  22  GOTTEN ANTICOMPETITIVE.

11:03AM  23        I UNDERSTAND THE LIMITS OF A LANHAM ACT CLAIM AS OPPOSED

11:03AM  24  TO AN ANTITRUST OR A UCL CLAIM, AND I RESPECT THAT.  I

11:03AM  25  UNDERSTAND THE ISSUE HERE IS COMMERCIAL ADVERTISING.  I

11:03AM 1    UNDERSTAND THAT IT IS VERY LEGITIMATE FOR YOUR HONOR TO SAY,

11:03AM 2    BOY, IT'S A FACT -- IT'S SAYING YOU'RE RESTRICTED.

11:03AM 3        BUT THE QUESTION IS, YOUR HONOR, DON'T YOU ASK YOURSELF

11:03AM 4    WHY WHEN YOU SEE THAT?  ISN'T IT REASONABLE TO SUGGEST THAT

11:03AM 5    PEOPLE ARE SAYING WHY?

11:03AM 6        AND FURTHERMORE, IF THE VIDEO ISN'T CONTAINING THAT

11:03AM 7    MATERIAL, WHY IS IT BEING RESTRICTED?  THAT IN AND OF ITSELF IS

11:04AM 8    A FALSE STATEMENT.  IT MAY NOT BE FALSE ADVERTISING.

11:04AM 9        THE COURT:  I UNDERSTAND YOUR THESIS FOR THE LANHAM

11:04AM 10   ACT CLAIM.

11:04AM 11       SO LET ME ASK YOU TO ADDRESS THE QUESTION THAT I HAD

11:04AM 12   RAISED AND THAT MR. WILLEN AND I SPENT SOME TIME DISCUSSING,

11:04AM 13   WHICH IS THAT WHETHER THERE IS IMMUNITY UNDER 230(C)(1) AND (2)

11:04AM 14   IN THE CONTEXT OF A CLAIM FOR INTENTIONAL DISCRIMINATION BASED

11:04AM 15   ON IDENTITY.

11:04AM 16       MR. OBSTLER:  YES, YOUR HONOR.  THIS IS PROBABLY THE

11:04AM 17   MOST IMPORTANT ISSUE IN THIS CASE, ABSOLUTELY THE MOST

11:04AM 18   IMPORTANT ISSUE IN THIS CASE AND ONE OF THE MOST IMPORTANT

11:04AM 19   ISSUES FOR THE INTERNET.

11:04AM 20       IT'S DIFFICULT FOR ME TO BELIEVE, AND I START WITH THIS

11:04AM 21   PREMISE THAT CONGRESS ENACTED THE LAW IN WHICH IT ALLOWED

11:04AM 22   INTERNET COMPANIES, EVEN IF THEY WANTED, TO SELF-REGULATE TO DO

11:04AM 23   SO BY FILTERING PEOPLE AND NOT CONTENT.

11:04AM 24       THERE IS NOTHING IN THE LANGUAGE OF (C)(1) OR (C)(2) THAT

11:04AM 25   PERMITS THIS TYPE OF BEHAVIOR.  NOTHING.  IT SAYS MATERIAL, IT

11:05AM 1   DOESN'T SAY PEOPLE.

11:05AM 2       OUR ALLEGATION IN THIS CASE IS THEY'RE FILTERING PEOPLE.

11:05AM 3   THEY'RE NOT FILTERING -- SO GOING TO (C)(1), LET ME MAKE ONE

11:05AM 4   POINT BEFORE WE GET INTO THE STATUTORY CONSTRUCTION OF THE

11:05AM 5   WHOLE THING.

11:05AM 6       ON (C)(1), THE REASON THAT, THAT PRAGER II, JUDGE WALSH

11:05AM 7   DISMISSED THE CLAIM WAS THAT HE SAID THAT THERE WAS NO

11:05AM 8   ALLEGATION THAT GOOGLE ADDED ANYTHING TO THE CONTENT.

11:05AM 9       WE HAVE THAT ALLEGATION IN THIS CASE.

11:05AM 10      THE COURT:  I'M SORRY, NO ALLEGATION THAT GOOGLE

11:05AM 11  ADDED ANYTHING --

11:05AM 12      MR. OBSTLER:  ANYTHING TO MY CLIENT'S CONTENT.  HE'S

11:05AM 13  SAYING UNDER (C)(1), UNDER ROOMMATES, IF YOU'RE INVOLVED IN ANY

11:05AM 14  ASPECT OF WHAT THE CONTENT IS THAT IS BEING CENSORED, RIGHT,

11:05AM 15  THEN YOU DON'T GET IMMUNITY.  EVERYBODY AGREES IN ROOMMATES.

11:05AM 16  IN FACT, GOOGLE --

11:05AM 17      THE COURT:  ARE YOU REFERRING TO YOUR ALLEGATION

11:05AM 18  THAT GOOGLE OR YOUTUBE IS ADDING METADATA TO YOUR CLIENT'S

11:06AM 19  CONTENT.

11:06AM 20      MR. OBSTLER:  YES.  YES.

11:06AM 21      THE COURT:  AND THAT IS WHAT YOU'RE SAYING IS THE

11:06AM 22  ADDITION OF CONTENT AS WITH PUBLISHING OR MAKING DECISIONS

11:06AM 23  ABOUT PUBLISHING?

11:06AM 24      MR. OBSTLER:  YES, BECAUSE THE METADATA IS WHAT THE

11:06AM 25  ALGORITHM IS USING TO MAKE THE DECISION.

11:06AM  1          THE COURT:  DOES A PUBLISHER NOT GET TO EDIT?

11:06AM  2          MR. OBSTLER:  YES, BUT A PUBLISHER WHO HAS A

11:06AM  3  CONTRACT WITH ITS AUTHOR THAT IT'S GOING TO BE VIEWPOINT

11:06AM  4  NEUTRAL DOESN'T GET TO DISCRIMINATE.

11:06AM  5      IN OTHER WORDS, IN OTHER WORDS, CAN THE -- CAN

11:06AM  6  SIMON & SCHUSTER GET YOUR LICENSING RIGHTS BY YOU AGREEING TO A

11:06AM  7  TERM OF SERVICE AND SAYING WE'RE GOING TO GIVE YOU VIEWPOINT

11:06AM  8  NEUTRAL EDITING OF YOUR STUFF AND THEN TURN AROUND AND BREACH

11:06AM  9  THAT?

11:06AM  10          THE COURT:  SO THAT'S A DIFFERENT QUESTION.  IF

11:06AM  11  YOU'RE SAYING THAT THERE'S A BREACH OF CONTRACT HERE BETWEEN A

11:06AM  12  PUBLISHER AND AN AUTHOR, THAT WOULD BE ONE THING, BUT THAT'S

11:06AM  13  NOT WHAT WE'RE FOCUSSING ON RIGHT NOW.

11:06AM  14      WE'RE TALKING ABOUT WHAT IS ENCOMPASSED WITHIN (C)(1) IN

11:07AM  15  TERMS PUBLISHING, AND I RAISED THIS QUESTION VERY DIRECTLY WITH

11:07AM  16  GOOGLE'S LAWYERS, DOES PUBLISHING INCLUDE DISCRIMINATING BASED

11:07AM  17  ON THE AUTHOR'S IDENTITY?  WHAT DOES THAT LOOK LIKE?

11:07AM  18      AND IS THAT AMONG THE FUNCTIONS A PUBLISHER IS ALLOWED TO

11:07AM  19  CONDUCT IN ITS ROLE AS A PUBLISHER AND THAT IS IMMUNIZED UNDER

11:07AM  20  (C)(1)?

11:07AM  21      (C)(2) HAS A GOOD FAITH REQUIREMENT.  (C)(1) DOES NOT.

11:07AM  22  YOUR ARGUMENT MAY BE SUBSTANTIALLY STRONGER UNDER (C)(2), BUT

11:07AM  23  UNDER (C)(1), IF THE PUBLISHER CAN CHOOSE WHAT TO PUBLISH AND

11:07AM  24  HOW, IT'S A VERY DIFFICULT ARGUMENT TO MAKE, AND THAT'S WHY I

11:07AM  25  WAS VERY INTERESTED IN THE QUESTION OF -- AND MR. WILLEN MADE

11:07AM  1    THE POINT THAT THERE ARE CERTAIN KINDS OF CAUSES OF ACTION THAT

11:07AM  2    TAKE CONDUCT OUTSIDE OF THE SCOPE OF 230(C)(1), IS THAT -- IF I

11:08AM  3    WERE TO CONSTRUE YOUR CLAIM THIS WAY, AND THERE'S A DEBATE

11:08AM  4    ABOUT WHETHER IT'S APPROPRIATE TO CONSTRUE IT THIS WAY GIVEN

11:08AM  5    THE FACTS THAT ARE ALLEGED IN YOUR COMPLAINT, THAT THERE WAS

11:08AM  6    INTENTIONAL DISCRIMINATION BASED ON IDENTITY AS OPPOSED TO

11:08AM  7    CONTENT, WHAT IS YOUR BEST CASE FOR SAYING THAT 230(C)(1) DOES

11:08AM  8    NOT ENCOMPASS THAT?

11:08AM  9        MR. OBSTLER:  THE QUESTION IS DOES 230(C)(1)

11:08AM  10   IMMUNIZE THEM AS TO THE SPECIFIC CAUSES OF ACTION IN THE CASE;

11:08AM  11   RIGHT?

11:08AM  12        THE COURT:  YES.  YES.  SO THE UNRAH ACT IS THE ONLY

11:08AM  13   ONE THAT I THINK GIVES YOU A LEG TO STAND ON.

11:08AM  14        MR. OBSTLER:  WHAT ABOUT BREACH OF CONTRACT,

11:08AM  15   YOUR HONOR?

11:08AM  16        THE COURT:  I'M SORRY?

11:08AM  17        MR. OBSTLER:  WHAT ABOUT BREACH OF CONTRACT?

11:08AM  18        THE COURT:  SO YOU DON'T HAVE BREACH OF CONTRACT.

11:08AM  19   YOU HAVE BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR

11:08AM  20   DEALING, WHICH THAT'S A HARD ONE IN ANY CIRCUMSTANCE,

11:08AM  21   ESPECIALLY GIVEN THE ALLEGED CONTRACT TERMS THAT YOU CITE

11:08AM  22   SAYING THAT THERE WAS A BREACH OF THE IMPLIED COVENANT IS

11:09AM  23   REALLY DIFFICULT JUST ON A 12(B)(6) BASIS.

11:09AM  24      SO YOU DON'T HAVE A BREACH OF CONTRACT CLAIM.

11:09AM  25        MR. OBSTLER:  WELL, YOUR HONOR, WOULD YOU GIVE ME

11:09AM 1    LEAVE TO AMEND AND ADD IT?

11:09AM 2            THE COURT:  WELL, BEFORE WE GET TO THAT, I'M JUST

11:09AM 3    REALLY VERY INTERESTED IN THIS QUESTION.

11:09AM 4            MR. OBSTLER:  I AM, TOO, YOUR HONOR.  LET ME TAKE

11:09AM 5    ANOTHER SHOT AT IT, PLEASE, IF I COULD.

11:09AM 6            THE COURT:  SO WHAT IS THE BEST CASE THAT YOU HAVE?

11:09AM 7            MR. OBSTLER:  OKAY.  NUMBER ONE, THERE IS NO (C)(1)

11:09AM 8    COVERAGE HERE BECAUSE THEY'RE ADDING OUR CONTENT, SO JUST ON

11:09AM 9    THE FACE OF THE STATUTE.

11:09AM 10        NUMBER TWO, CAN CONGRESS ENACT A LAW THAT IMMUNIZES

11:09AM 11   PUBLISHERS FROM RACE DISCRIMINATION IN THE ACT OF PUBLISHING?

11:09AM 12   IS THAT LAW CONSTITUTIONAL?

11:09AM 13        I WOULD SAY THAT UNDER DENVER AREA IT IS NOT.  THAT'S MY

11:09AM 14   ARGUMENT.

11:09AM 15           THE COURT:  YOUR RESPONSE TO THE COURT'S QUESTION

11:09AM 16   WOULD BE IF (C)(1) DOES ALLOW IT, IT HAS TO BE

11:09AM 17   UNCONSTITUTIONAL?

11:09AM 18           MR. OBSTLER:  THAT'S CORRECT.

11:09AM 19           THE COURT:  IT DOES IMMUNIZE THAT KIND OF -- LET'S

11:09AM 20   CALL IT INTENTIONAL DISCRIMINATION BASED ON SOME PROTECTED

11:10AM 21   CHARACTERISTIC, THAT KIND OF STATUTE HAS TO BE

11:10AM 22   UNCONSTITUTIONAL?

11:10AM 23           MR. OBSTLER:  YES, YOUR HONOR.

11:10AM 24           THE COURT:  WHY?

11:10AM 25           MR. OBSTLER:  BECAUSE UNDER DENVER AREA THE COURT

11:10AM 1    SAID THAT A CONGRESSIONAL ACT THAT DOES PERMISSIVE SPEECH

11:10AM 2    REGULATION AND THE GRANTING OF IMMUNITY THAT THEY -- I MEAN, I

11:10AM 3    WOULD BE ABLE TO SUE THEM, RIGHT, BUT FOR THE CDA.

11:10AM 4        SO THEY ARE -- WHAT THE COURT SAID IN DENVER AREA, WHICH

11:10AM 5    HAS OFTEN BEEN CITED, AND IT'S WHY WE CAME TO THE GAME LATE IN

11:10AM 6    DENVER, AND I WANT TO APOLOGIZE ON THAT.  I HAVE TO ADMIT I

11:10AM 7    WITHDREW EARLY ON THAT ONE.

11:10AM 8        DENVER AREA WAS A FIGHT INITIALLY OVER WHETHER OR NOT,

11:10AM 9    EXACTLY WHAT THE GOVERNMENT AND MR. WILLEN ARE MAKING, WHETHER

11:10AM 10   OR NOT THEY'RE STATE ACTORS AND WHETHER STATE ACTORS -- AND THE

11:10AM 11   CABLE COMPANY SAID THEY'RE NOT STATE ACTORS.  HOW CAN THEIR

11:10AM 12   PERMISSION TO BLOCK THINGS THAT ARE INDECENT BE IN ANY WAY BE

11:10AM 13   SUBJECT TO THE FIRST AMENDMENT?

11:11AM 14       AND WHAT JUSTICE BREYER AND SIX JUDGES ON THE SUPREME

11:11AM 15   COURT SAID IS, YES, IT'S BEING DONE FOR A CONGRESSIONAL ACT,

11:11AM 16   BUT FOR THAT ACT YOU AND I ARE NOT HAVING THAT DISCUSSION.  WE

11:11AM 17   MAY BE HAVING A DISCUSSION ABOUT WHETHER I STATED A CLAIM, BUT

11:11AM 18   FOR CONGRESSIONAL LAW THAT ALLOWS THEM IMMUNITY ON THESE

11:11AM 19   CLAIMS, WE'RE NOT HAVING THIS DISCUSSION.

11:11AM 20       SO IF THEY'RE GETTING IMMUNITY UNDER THIS STATUTE, IT'S

11:11AM 21   NOT A STATE ACTION ISSUE, IT'S WHETHER THE STATUTE PASSES

11:11AM 22   MUSTER JUST LIKE SECTION 10(C) OF THE CABLE ACT UNDER

11:11AM 23   DENVER AREA.

11:11AM 24       WHAT DID THE COURT SAY?  THREE THINGS.

11:11AM 25       GOT TO BE VIEWPOINT NEUTRAL.  NOT VIEWPOINT NEUTRAL IN

11:11AM  1    THIS CASE.

11:11AM  2        GOT TO BE NARROWLY TAILORED SO THERE'S NO RISK OF AN

11:11AM  3    IMPROPER VETO.

11:11AM  4        AND MOST IMPORTANTLY, IT CANNOT INTERFERE WITH PREEXISTING

11:11AM  5    LEGAL RELATIONSHIPS.

11:11AM  6        THIS IS SPOT ON WITH DENVER, AND THIS STATUTE CANNOT

11:11AM  7    WITHSTAND SCRUTINY UNDER DENVER.  IT IS A PERMISSIVE SPEECH

11:12AM  8    STATUTE JUST LIKE SECTION 10(C) OF THE CABLE ACT.

11:12AM  9        THE COURT:  OKAY.  THAT SEEMS LIKE A STRETCH

11:12AM  10   HONESTLY, THAT THAT -- THAT THIS CASE FITS THE MOLD OF

11:12AM  11   PERMISSIVE REGULATION IN DENVER AREA.

11:12AM  12       I'LL LET THE GOOGLE FOLKS RESPOND ON THAT POINT, BUT LET

11:12AM  13   ME JUST MAKE SURE YOU DON'T HAVE ANYTHING FURTHER THAT YOU

11:12AM  14   WOULD LIKE TO MAKE SURE THAT THE COURT HEARS IN TERMS OF YOUR

11:12AM  15   ARGUMENT, ANYTHING YOU WOULD LIKE TO ADDRESS FURTHER IN SUPPORT

11:12AM  16   OF YOUR OPPOSITION.

11:12AM  17       MR. OBSTLER:  WELL, I WANTED TO TALK ABOUT THE

11:12AM  18   EXECUTIVE ORDER.

11:12AM  19       THE COURT:  OH, YES.

11:12AM  20       MR. OBSTLER:  BUT I WANT TO COME BACK TO THIS POINT,

11:12AM  21   YOUR HONOR, BECAUSE YOU SAY IT SOUNDS LIKE A STRETCH.  AND I'D

11:12AM  22   BE CURIOUS IN KNOWING WHY YOUR HONOR BELIEVES THAT BECAUSE I

11:12AM  23   DON'T UNDERSTAND THE DIFFERENCE BETWEEN A STATUTE THAT WAS

11:12AM  24   ENACTED TO REGULATE IN INDECENT MATERIAL ON CABLE TELEVISION

11:12AM  25   CHANNELS AND A STATUTE THAT WAS ENACTED OSTENSIBLY TO ALLOW

11:12AM 1     PRIVATE PARTIES TO REGULATE OFFENSIVE MATERIAL ON THE INTERNET.

11:13AM 2          THE COURT:  I THINK AT LEAST ONE OF THE KEY

11:13AM 3     DISTINCTIONS HERE IS THAT SECTION 230(C) PERMITS PRIVATE

11:13AM 4     PARTIES TO DO THEIR OWN SELF-REGULATION.  THERE'S NO MANDATE.

11:13AM 5     THERE'S NOTHING -- THERE'S NOTHING THAT IS REQUIRED.  THEY MAY

11:13AM 6     OR MAY NOT.  AND IF THEY DO, THEY'RE IMMUNIZED.

11:13AM 7          IT PROVIDES PROTECTION FROM LIABILITY.  THAT'S WHAT IT IS.

11:13AM 8     IT'S NOT A MANDATE TO REGULATE IN ANY WAY, SHAPE OR FORM.

11:13AM 9          MR. OBSTLER:  I AGREE WITH YOU.

11:13AM 10          THE COURT:  I THINK IT'S AN IMPORTANT DISTINCTION.

11:13AM 11          MR. OBSTLER:  THAT'S EXACTLY THE POINT THAT

11:13AM 12     JUSTICE BREYER MADE.  HE SAID THIS IS A PERMISSIVE PORTION.

11:13AM 13     THERE WAS A MANDATORY PORTION AND A PERMISSIVE PORTION.  10(C)

11:13AM 14     WAS THE PERMISSIVE PORTION.  IT DOESN'T REQUIRE THEM TO DO IT

11:13AM 15     BUT THEY'RE PERMITTED TO DO IT, AND THE COURT SAID THAT IS

11:13AM 16     UNCONSTITUTIONAL.

11:13AM 17          I COMPLETELY AGREE WITH THE DISTINCTION THAT YOUR HONOR IS

11:13AM 18     MAKING, AND I THINK THAT'S SQUARE WITH DENVER ON THE SECTION

11:14AM 19     10(C) CLAIM.

11:14AM 20          THE COURT:  WELL, I'LL HEAR FROM GOOGLE ON THAT

11:14AM 21     POINT, BUT LET ME GIVE YOU AN OPPORTUNITY TO ADDRESS THE OTHER

11:14AM 22     MATTERS THAT YOU SAID YOU WANTED TO ADDRESS, THE EXECUTIVE

11:14AM 23     ORDER.

11:14AM 24          MR. OBSTLER:  THE REASON WE CAME IN WITH THE

11:14AM 25     EXECUTIVE ORDER IS THAT WE JUST WEREN'T CLEAR REALLY ON WHAT

11:14AM  1      THE GOVERNMENT'S POSITION REALLY IS.

11:14AM  2              THE COURT:  ALL RIGHT.

11:14AM  3              MR. OBSTLER:  THEY FILED THIS BRIEF, RIGHT, AND THEY

11:14AM  4      SAY IT CAN APPLY TO THE VIEWPOINT, IT'S CONSTITUTIONAL, IT CAN

11:14AM  5      APPLY TO A VIEWPOINT, IT CAN APPLY TO DISCRIMINATION.

11:14AM  6          AND THEN I READ SECTION 2 OF THE EXECUTIVE ORDER SAYING

11:14AM  7      IT'S THE POLICY OF THE UNITED STATES AND THE DEPARTMENT OF

11:14AM  8      JUSTICE IS DIRECTED TO DO EVERYTHING THAT THEY ARE ALLEGING IN

11:14AM  9      THEIR BRIEF.

11:14AM  10         SO I ONLY BRING IT UP TO SAY IF THE ORDER IS ENFORCEABLE

11:14AM  11     AT SOME POINT THEN I DON'T KNOW IF WE HAVE A NEW ISSUE HERE OR

11:14AM  12     WHAT.  AND IF THE ORDER IS NOT ENFORCEABLE, THEN THEY'RE

11:14AM  13     ARGUING THAT THE EXECUTIVE ORDER IS JUST SIMPLY NOT

11:14AM  14     ENFORCEABLE.  I'M NOT GOING TO TAKE A VIEW ON THAT, AND I DON'T

11:14AM  15     REALLY CARE.  AND I AGREE WITH YOUR HONOR, I DON'T THINK IT

11:15AM  16     REALLY MATTERS BECAUSE I THINK AT THE END OF THE DAY I THINK

11:15AM  17     THE STATUTE ON ITS FACE DOESN'T APPLY, AND I THINK THE STATUTE

11:15AM  18     IS UNCONSTITUTIONAL.

11:15AM  19         BUT THE ONLY REASON I BROUGHT IT UP WAS JUST I COULD NOT

11:15AM  20     SQUARE THAT EXECUTIVE ORDER AND HIM DIRECTING THE DEPARTMENT OF

11:15AM  21     JUSTICE AND SITTING THERE WITH BILL BARR WHEN THEY ANNOUNCED

11:15AM  22     THE ORDER WITH WHAT WAS IN THEIR BRIEF.  THAT WAS THE ONLY

11:15AM  23     REASON WE WANTED TO.

11:15AM  24             THE COURT:  WELL, LET ME GIVE MR. SUR AN OPPORTUNITY

11:15AM  25     TO ADDRESS THE EXECUTIVE ORDER BUT ALSO ANY OTHER MATTERS

11:15AM 1    RAISED IN THE GOVERNMENT'S MEMORANDUM ON THE CONSTITUTIONALITY

11:15AM 2    QUESTION.

11:15AM 3          MR. SUR.

11:15AM 4             MR. SUR:  THANK YOU VERY MUCH.

11:15AM 5          SINCE THE EXECUTIVE ORDER HAS COME UP, I GUESS I WILL

11:15AM 6    START THERE BUT MAYBE JUST TRY TO REITERATE IN OUR BRIEF IN

11:15AM 7    POINT ONE WE SIMPLY ARE RELYING ON ONE OF SEVERAL DOCTRINES OF

11:15AM 8    CONSTITUTIONAL AVOIDANCE, THE DOCTRINE THAT SAYS DECIDE THE

11:15AM 9    STATUTORY QUESTIONS FIRST.

11:15AM 10         MUCH OF THE DISCUSSION TODAY WAS ABOUT THE POTENTIAL

11:16AM 11   NUANCES OF THE STATUTE AND, RECENTLY OR NOT, TAKING A POSITION

11:16AM 12   ON THAT.

11:16AM 13         BUT OF COURSE THE PARTIES ARE WELL VERSED ON THAT AND SO

11:16AM 14   YOUR HONOR HAS BEEN WELL FURNISHED, I THINK, BY THE OPPOSING

11:16AM 15   VIEWS ON THE STATUTORY QUESTION, SIMILARLY WITH THE STATE LAW

11:16AM 16   CLAIMS AS WELL.

11:16AM 17         POINT TWO SIMPLY ARGUES THAT IF THE COURT DOES REACH THE

11:16AM 18   CONSTITUTIONAL QUESTION, THAT THERE REALLY IS NO PRECEDENT THAT

11:16AM 19   WOULD SUPPORT HOLDING THE STATUTE TO BE UNCONSTITUTIONAL,

11:16AM 20   PRINCIPALLY FOR THE REASONS THAT HAVE ALREADY BEEN DISCUSSED ON

11:16AM 21   THAT.

11:16AM 22         BUT JUST THE ONE NOTE I WOULD ADD IS DENVER AREA DID NOT

11:16AM 23   TRANSFORM THE NOTION OF STATE ACTION.  JUDGE KOH IN THE OPINION

11:16AM 24   THAT THE COURT OF APPEALS AFFIRMED IN PRAGER UNIVERSITY,

11:16AM 25   ALTHOUGH THE COURT OF APPEALS OPINION DIDN'T ADDRESS

11:16AM 1   DENVER AREA, JUDGE KOH DID REJECT RELIANCE ON IT IN THE

11:16AM 2   UNPUBLISHED OPINION THAT THEN WENT UP TO THE NINTH CIRCUIT AND

11:17AM 3   SO I DO NOTE THAT.

11:17AM 4        AND AS HAS ALREADY BEEN MENTIONED, BUT I WILL REITERATE,

11:17AM 5   THE NINTH CIRCUIT'S OPINION IN ROBERTS VERSUS AT&T MOBILITY,

11:17AM 6   WHICH IS AT 877 F.3D 833, WAS REALLY A DETAILED ANALYSIS OF

11:17AM 7   THE, QUOTE, "SPLINTERED DECISION" IN DENVER AREA, AND REALLY

11:17AM 8   INFORMS ANY ATTEMPT TO APPLY IT CERTAINLY FOR THE COURTS WITHIN

11:17AM 9   THE NINTH CIRCUIT.

11:17AM 10       SO WE THINK THAT VERY HELPFULLY CLARIFIES THAT THE

11:17AM 11  DENVER AREA DOESN'T TRANSFORM THE NOTION OF THE STATE ACTION IN

11:17AM 12  A WAY THAT WOULD REALLY, REALLY CHANGE ANYTHING THAT WE HAVE

11:17AM 13  SAID IN THE BRIEF.

11:17AM 14       HAVING MADE THOSE POINTS, LET ME THEN TURN VERY BRIEFLY TO

11:17AM 15  THE EXECUTIVE ORDER.

11:17AM 16       I THINK IT IS HELPFUL TO CONSIDER THE TEXT OF THE ORDER AS

11:17AM 17  A WHOLE AND IN THAT RESPECT I DO THINK THAT IT IS NOT

11:17AM 18  INSIGNIFICANT THAT THE ORDER HAS A SET OF GENERAL PROVISIONS AT

11:18AM 19  THE END THAT APPLY TO ANY ATTEMPT TO READ THE ORDER ANYWHERE.

11:18AM 20       SO ONE OF THOSE GENERAL PROVISIONS, AND I REALIZE IT

11:18AM 21  BECAUSE THEY APPEAR OFTEN IN GENERAL PROVISIONS, MAYBE THEY

11:18AM 22  DON'T GET THAT MUCH ATTENTION, BUT IT DOES WARRANT SPECIAL

11:18AM 23  ATTENTION IN THE ATTEMPT TO RELY ON HERE.

11:18AM 24       SECTION 8, LETTER C SAYS THAT THE ORDER IS NOT INTENDED TO

11:18AM 25  AND DOES NOT CREATE ANY RIGHT OR BENEFIT, SUBSTANTIVE OR

11:18AM   1   PROCEDURAL, ENFORCEABLE AT LAW OR IN EQUITY BY ANY PARTY

11:18AM   2   AGAINST THE UNITED STATES, ITS DEPARTMENTS, AGENCIES OR

11:18AM   3   ENTITIES, ITS OFFICERS, EMPLOYEES OR AGENTS OR ANY OTHER

11:18AM   4   PERSON.  SO I THINK WE HAVE TO START THERE.

11:18AM   5       THEN EVEN IF ONE WERE TO ASSUME IN THE ALTERNATIVE THAT

11:18AM   6   SECTION 8(C) SOMEHOW DIDN'T APPLY, I DO THINK TAKING EACH

11:19AM   7   SECTION IN TURN, THE COURT WILL SEE THAT THESE ARE ABOUT POLICY

11:19AM   8   AND THEY MAY BE EXPRESSED AT LENGTH, BUT THEY ARE ALL POINTS

11:19AM   9   ABOUT POLICY AND ESSENTIALLY DIRECTING VARIOUS EXECUTIVE BRANCH

11:19AM  10   ACTORS TO DO VARIOUS THINGS BUT DON'T GO INTO ANY QUESTION OF

11:19AM  11   CONSTITUTIONALITY.

11:19AM  12       REALLY THE ONLY POINT I WOULD MAKE ABOUT POLICY IS THAT

11:19AM  13   REALLY WHAT IT BRINGS OUR ATTENTION BACK TO IS PAGE 999 OF THE

11:19AM  14   OPINION OF THE COURT OF APPEALS IN PRAGER WHERE BEFORE THEY

11:19AM  15   CONCLUDED THEIR DISCUSSION OF A FIRST AMENDMENT THEY SAID THAT

11:19AM  16   THE PARTIES IN PRAGER UNIVERSITY HAD PROVIDED EXTENSIVE

11:19AM  17   ARGUMENTS ABOUT WHAT MIGHT HAPPEN IF THE COURT RULED ONE WAY OR

11:19AM  18   ANOTHER AND WHILE THOSE POLICY CONCEPTS WERE, QUOTE,

11:19AM  19   "IMPORTANT," THE COURT OF APPEALS IN THE NINTH CIRCUIT FOCUSSED

11:19AM  20   ON THE FIRST AMENDMENT DOCTRINE.

11:19AM  21       I THINK A SIMILAR CONCLUSION IS APPROPRIATE HERE THAT AT

11:19AM  22   MOST THE EXECUTIVE ORDER INDICATES THAT THERE MAY BE IMPORTANT

11:19AM  23   POLICY ISSUES SOMEWHERE IN THE GENERAL REALM OF SECTION 230,

11:20AM  24   BUT THAT THOSE ARE NOT BEFORE THE COURT IN ASSESSING THE

11:20AM  25   CONSTITUTIONALITY OF THE STATUTE.

11:20AM  1          REALLY WITH THAT I WILL CONCLUDE, UNLESS THE COURT HAS ANY

11:20AM  2     FURTHER QUESTION.

11:20AM  3          THE COURT:  THANK YOU VERY MUCH, MR. SUR.  THAT WAS

11:20AM  4     VERY HELPFUL.  I APPRECIATE IT.

11:20AM  5          MR. SUR:  THANK YOU.

11:20AM  6          THE COURT:  ALL RIGHT.  SO I WOULD LIKE TO HEAR FROM

11:20AM  7     GOOGLE, YOUTUBE BUT -- WELL, ANYTHING THAT YOU WOULD LIKE TO

11:20AM  8     RESPOND TO FROM MY CONVERSATION WITH MR. OBSTLER, BUT I AM

11:20AM  9     INTERESTED IN THE -- IF YOU HAVE ANYTHING FURTHER TO ADD ON THE

11:20AM 10     DENVER AREA POINT AND ITS SIGNIFICANCE.

11:20AM 11          MR. WILLEN:  SURE.  SO WHY DON'T I START WITH THAT

11:20AM 12     AND TALK ABOUT A COUPLE OF THINGS RELATED TO SECTION 230, AND I

11:20AM 13     CAN LET MS. WHITE TALK ABOUT THINGS RELATED TO THE UNRAH ACT

11:20AM 14     AND THE LANHAM ACT.

11:20AM 15          WITH RESPECT TO DENVER AREA, I THINK MR. OBSTLER HAS

11:20AM 16     RIGHTLY POINTED TO THE NINTH CIRCUIT'S DECISION IN ROBERTS

11:20AM 17     WHICH AT LENGTH EXPLAINS THE VERY, VERY LIMITED, IF ANY, IMPORT

11:21AM 18     OF DENVER AREA ON THE QUESTION OF STATE ACTION.

11:21AM 19          SO ROBERTS POINTS OUT, FIRST OF ALL, THAT THERE'S NO

11:21AM 20     MAJORITY OPINION IN THE DENVER AREA CASE.  THE OPINION THAT

11:21AM 21     MR. OBSTLER IS RELYING ON IS JUSTICE BREYER'S OPINION FOR FOUR

11:21AM 22     JUSTICES THAT DOES NOT SPEAK FOR THE COURT.  JUSTICE KENNEDY

11:21AM 23     AND JUSTICE GINSBERG SUPPLIED TWO ADDITIONAL VOTES BUT ON A

11:21AM 24     VERY, VERY DIFFERENT THEORY.

11:21AM 25          SO JUSTICE BREYER'S OPINION DOESN'T BY ITS OWN TERMS SAY

11:21AM  1    THAT PERMISSIVE SPEECH REGULATION IS SUBJECT TO SOME BRAND NEW

11:21AM  2    FIRST AMENDMENT SCRUTINY.  IT CONSTRUES A VERY, VERY SPECIFIC

11:21AM  3    PROVISION OF THE CABLE ACT, AND I THINK THE MOST IMPORTANT

11:21AM  4    POINT ABOUT THAT IS THAT IN ALLOWING THE CABLE COMPANIES TO

11:21AM  5    CENSOR, IT ALLOWED THEM TO CENSOR ONLY A PARTICULAR CONTENT

11:21AM  6    BASED SET OF MATERIALS, WHICH WAS SEXUALLY EXPLICIT CONTENT, SO

11:22AM  7    IT WAS VERY LIMITED IN THAT RESPECT, AND THE STATUTE WAS

11:22AM  8    ENACTED AGAINST A BACKDROP THAT THE CASE INVOLVED PUBLIC ACCESS

11:22AM  9    CHANNELS AND ACCESS CHANNELS ON CABLE NETWORK AND THE VERY

11:22AM  10   SPECIFIC CONTEXT.

11:22AM  11       ONE, THESE CHANNELS WERE HEAVILY REGULATED AND THE COURT

11:22AM  12   AND JUSTICE BREYER'S OPINION NOTED AND RELIED ON.

11:22AM  13       SECONDLY, AND I THINK EVEN MORE IMPORTANTLY, PRIOR TO THE

11:22AM  14   ENACTMENT OF THE STATUTE IN QUESTION, THE LAW FORBAD THE CABLE

11:22AM  15   COMPANIES FROM ENGAGING IN ANY CONTENT BASED OR ANY REAL

11:22AM  16   EDITORIAL DISCRETION WITH RESPECT TO THESE CHANNELS.

11:22AM  17       SO IT COMPLETELY CHANGED THE BACKGROUND LEGAL PRINCIPLES

11:22AM  18   WITH RESPECT TO THE RIGHT OF THE CABLE COMPANIES TO ENGAGE IN

11:22AM  19   CONTENT RESTRICTION.

11:22AM  20       THAT'S COMPLETELY DIFFERENT FROM WHAT WE HAVE HERE.  WE

11:22AM  21   HAVE A STATUTE THAT IS NOT CONTENT BASED.  SECTION 230(C)(1),

11:22AM  22   AS I THINK THE COURT POINTED OUT, SIMPLY SAYS THAT YOU CANNOT

11:22AM  23   BE TREATED AS A PUBLISHER FOR ANY SPEECH, SO WHETHER YOU ARE

11:23AM  24   RESTRICTING ACCESS TO CONTENT, WHETHER YOU ARE NOT RESTRICTING

11:23AM  25   ACCESS TO CONTENT, AND CERTAINLY NOT WITH RESPECT TO ANY GIVEN

11:23AM  1    CATEGORY OF CONTENT, SECTION 230(C) WILL PROTECT YOU.  SO IT'S

11:23AM  2    NOT EVEN CLOSE TO CONTENT BASED AND VIEWPOINT BASED.

11:23AM  3        AND THEN SECONDLY, AND JUST AS IMPORTANTLY, THE BACKGROUND

11:23AM  4    PRIOR TO SECTION 230 WAS THAT ONLINE PLATFORMS, PARTICULARLY

11:23AM  5    PLATFORMS, THE PROGENITORS OF WHAT WE HAVE NOW, GOOGLES AND

11:23AM  6    TWITTERS, HAD FULL DISCRETION, COMPLETE EDITORIAL DISCRETION

11:23AM  7    AND INDEED A FIRST AMENDMENT RIGHT TO MAKE EDITORIAL

11:23AM  8    DETERMINATIONS ABOUT WHAT SPEECH APPEARS ON THEIR PLATFORM.

11:23AM  9        SO SECTION 230 WASN'T CREATING SOME NEW EDITORIAL RIGHT

11:23AM 10    THAT DIDN'T EXIST BEFORE WHEREAS DENVER AREA VERY MUCH WAS.  SO

11:23AM 11    THAT'S THE FIRST GENERAL POINT.

11:23AM 12        THE SECOND POINT IS WITH RESPECT TO JUSTICE KENNEDY'S

11:23AM 13    OPINION WHICH SUPPLIED THE SORT OF DECISIVE VOTES FOR THE

11:23AM 14    PROPOSITION THAT AT LEAST THE ONE PROVISION WAS

11:24AM 15    UNCONSTITUTIONAL, THAT WHOLE DECISION WAS BASED ON THE

11:24AM 16    PROPOSITION THAT AT LEAST IN PUBLIC ACCESS CHANNELS WERE A

11:24AM 17    PUBLIC FORUM UNDER THE CONSTITUTION BECAUSE IT WAS SO HEAVILY

11:24AM 18    REGULATED AND WHAT I JUST MENTIONED.

11:24AM 19        JUSTICE BREYER'S OPINION DIDN'T GET INTO THAT, BUT THAT'S

11:24AM 20    REALLY IMPORTANT HERE BECAUSE WE KNOW -- THE THING WE KNOW FROM

11:24AM 21    PRAGER IS THAT YOUTUBE IS NOT A CONSTITUTIONAL PUBLIC FORUM.

11:24AM 22    SO GIVEN THAT, IT'S A COMPLETELY DIFFERENT CASE.

11:24AM 23        AND I THINK IT'S QUITE TELLING THAT IN THE HALLECK CASE,

11:24AM 24    OF COURSE THE SUPREME COURT'S MOST RECENT DISCUSSION OF STATE

11:24AM 25    ACTION, THE ONE REFERENCE TO DENVER AREA THAT IS MOST --

| | | |
|---|---|---|
| 11:24AM | 1 | THE OPERATOR:  THE RECORDING HAS STOPPED. |
| 11:24AM | 2 | MR. WILLEN:  EXCUSE ME.  CITING <u>DENVER AREA</u>, AND |
| 11:24AM | 3 | THIS IS A QUOTE FOR THE PROPOSITION THAT THE FREE SPEECH DOES |
| 11:24AM | 4 | NOT PROHIBIT PRIOR ABRIDGEMENT OF SPEECH. |
| 11:24AM | 5 | SO THE SUPREME COURT HAS SPOKEN TO THIS.  TO THE EXTENT |
| 11:25AM | 6 | THAT <u>DENVER AREA</u> HAS ANY SIGNIFICANCE, IT'S SIMPLY LIMITED TO |
| 11:25AM | 7 | ITS UNIQUE FACTS AND DOESN'T APPLY HERE.  SO THAT IS |
| 11:25AM | 8 | <u>DENVER AREA</u>. |
| 11:25AM | 9 | THE OTHER COUPLE THINGS I WOULD WANT TO SAY IN RESPONSE TO |
| 11:25AM | 10 | MR. OBSTLER, WE DIDN'T GET A CHANCE TO TALK ABOUT SECTION |
| 11:25AM | 11 | 230(C)(2)(D).  WE SPENT MOST OF OUR TIME TALKING ABOUT SECTION |
| 11:25AM | 12 | 230(C)(1). |
| 11:25AM | 13 | AS WE ARGUED, SECTION 230(C)(2)(B) IS SORT OF A SEPARATE |
| 11:25AM | 14 | IMMUNITY THAT CLEARLY APPLIES, AS WE KNOW FROM THE |
| 11:25AM | 15 | <u>PRAGER</u> DECISION, WITH RESPECT TO ANY CLAIM ARISING FROM |
| 11:25AM | 16 | RESTRICTED MODE.  AND I THINK FOR THE REASONS SET OUT IN |
| 11:25AM | 17 | JUDGE DAVILA'S RECENT OPINION IN <u>ASURVIO VERSUS MALWAREBYTES</u> |
| 11:25AM | 18 | CASE, THE ALLEGATIONS HERE THAT THERE IS SOME SORT OF |
| 11:25AM | 19 | COMPETITIVE RELATIONSHIP JUST AREN'T ENOUGH TO GET PLAINTIFFS |
| 11:25AM | 20 | OUTSIDE OF SECTION 230(C)(2)(B), SO THE COURT HAS ANOTHER PATH |
| 11:25AM | 21 | AT LEAST WITH RESPECT TO A LOT OF THE CLAIMS HERE. |
| 11:26AM | 22 | AND THEN I GUESS THE ONLY OTHER POINT I WOULD MAKE IS THAT |
| 11:26AM | 23 | MR. OBSTLER WAS, TELLINGLY, NOT ABLE TO CITE ANY CASE THAT |
| 11:26AM | 24 | HELPED HIM ON THE PROPOSITION THAT SECTION 230(C)(1) WOULDN'T |
| 11:26AM | 25 | APPLY TO A CLAIM UNDER THE UNRAH ACTS UNDER THE CIRCUMSTANCES |

11:26AM  1    THAT WE HAVE HERE, AND THAT'S WHY HE RESORTED TO THE ARGUMENT

11:26AM  2    THAT THE STATUTE WOULD BE UNCONSTITUTIONAL IF APPLIED THAT WAY,

11:26AM  3    AND I DON'T THINK IT WOULD.  AND I DON'T THINK THERE'S ANY

11:26AM  4    SERIOUS ARGUMENT THAT IT WOULD, BUT HIS INABILITY TO POINT TO

11:26AM  5    ANY CASE LAW THAT HELPS HIM ON THE APPLICATION OF THE --

11:26AM  6             THE OPERATOR:  THIS MEETING IS BEING RECORDED.

11:26AM  7             MR. WILLEN:  -- I THINK IS VERY TELLING.

11:26AM  8        SO WITH THAT I WILL TURN IT OVER TO MS. WHITE AND LET HER

11:26AM  9    TALK ABOUT THE LANHAM ACT AND ANYTHING ELSE THAT SHE WANTS TO

11:26AM  10   SAY IN RESPONSE TO WHAT WE HAVE HEARD.

11:26AM  11            THE COURT:  THANK YOU, MR. WILLEN.

11:26AM  12       MS. WHITE.

11:26AM  13            MS. WHITE:  THANK YOU.

11:26AM  14       I'LL BEGIN JUST BRIEFLY ON THE LANHAM ACT QUESTION.  AS

11:27AM  15   YOUR HONOR CORRECTLY RECOGNIZED, TO STATE A CLAIM UNDER THAT

11:27AM  16   STATUTE PLAINTIFFS HAVE TO ALLEGE THAT YOUTUBE MADE A FALSE OR

11:27AM  17   MISLEADING STATEMENT IN COMMERCIAL ADVERTISING, AND THEY

11:27AM  18   HAVEN'T DONE THAT.  THEY REFER TO STATEMENTS ABOUT WHAT

11:27AM  19   RESTRICTED MODE DOES AND WHAT RESTRICTED GUIDELINES ARE, BUT

11:27AM  20   THOSE STATEMENTS ARE WHAT THE NINTH CIRCUIT HELD WERE NOT

11:27AM  21   COMMERCIAL ADVERTISING IN PRAGER.

11:27AM  22       THEY ALSO SUGGEST THAT THE DESIGNATION OF SOME OF

11:27AM  23   PLAINTIFFS' VIDEOS, AND I'LL NOTE THAT I THINK ONLY FOUR OF THE

11:27AM  24   NAMED PLAINTIFFS SPECIFICALLY ALLEGE THAT ANY OF THEIR VIDEOS

11:27AM  25   HAVE BEEN MADE UNAVAILABLE IN UNRESTRICTED MODE, BUT WITH

11:27AM 1   RESPECT TO THOSE, THEY ARGUE THAT THAT DESIGNATION SOMEHOW

11:27AM 2   BRANDS THEM IN A NEGATIVE LIGHT, BUT THE NINTH CIRCUIT

11:27AM 3   ADDRESSED THAT ARGUMENT DIRECTLY AS WELL AND HELD THAT THAT

11:27AM 4   DESIGNATION IS NOT MADE IN COMMERCIAL ADVERTISING PROMOTION AND

11:28AM 5   THAT'S ON PAGE 1,000 OF THE COURT'S OPINION.

11:28AM 6       FINALLY, ANY IMPLICIT STATEMENT ABOUT THE REASON FOR WHY

11:28AM 7   PLAINTIFFS' VIDEOS WERE MADE UNAVAILABLE IN RESTRICTED MODE,

11:28AM 8   ONE, THOSE REASONS WERE NOT MADE PUBLIC, AND, TWO, THOSE

11:28AM 9   REASONS WOULD BE A MATTER OF OPINION WHICH WOULD NOT BE

11:28AM 10  ACTIONABLE AS A FALSE STATEMENT, AND, AGAIN, NOT A STATEMENT

11:28AM 11  MADE IN FURTHERANCE OF COMMERCIAL ADVERTISING OR PROMOTION.

11:28AM 12      SO UNLESS YOUR HONOR HAS ANY FURTHER QUESTIONS ABOUT THE

11:28AM 13  LANHAM ACT, I'LL JUST CONCLUDE BY ADDRESSING THE QUESTIONS

11:28AM 14  ABOUT THE UNRAH ACT CLAIM.

11:28AM 15      AS MY COLLEAGUE EXPLAINED, WE DO THINK THERE'S NO REASON

11:28AM 16  WHY SECTION 230(C)(1) AND (C)(2)(B) SHOULD NOT APPLY WITH

11:28AM 17  RESPECT TO PLAINTIFFS' CLAIM UNDER THE UNRAH ACT BUT IN

11:29AM 18  ADDITION TO THAT THE PLAINTIFFS HAVE NOT COME CLOSE TO STATING

11:29AM 19  A CLAIM.

11:29AM 20      THE UNRAH ACT, WHEN PLED HERE AS SEPARATE FROM AN ADA

11:29AM 21  VIOLATION, IS AN INTENTIONAL DISCRIMINATION STATUTE.

11:29AM 22  CALIFORNIA COURTS HAVE CLEARLY HELD THAT FACIALLY NEUTRAL

11:29AM 23  POLICIES ARE NOT ACTIONABLE AND THAT ALLEGATIONS OF DISPARATE

11:29AM 24  IMPACT ARE NOT ENOUGH.

11:29AM 25      THE COURT:  OKAY.  SO LET'S PAUSE THERE.  THAT WAS

11:29AM 1    THE ARGUMENT YOU MADE IN YOUR BRIEF.  THEIR ARGUMENT IS NOT

11:29AM 2    THERE'S A DISPARATE IMPACT, BUT THAT THERE'S AN ACTUAL POLICY

11:29AM 3    OF DISCRIMINATION AGAINST LGBT CONTENT CREATORS.

11:29AM 4        SO I KNOW YOU DON'T THINK THAT THAT'S ACTUALLY WHAT THEY

11:29AM 5    HAVE ALLEGED.  BUT IF THAT'S THE ALLEGATION, DO YOU ALSO HAVE A

11:29AM 6    12(B)(6) ARGUMENT AGAINST -- FOR THE FAILURE TO STATE A CLAIM

11:29AM 7    UNDER THE UNRAH ACT ISSUE?

11:29AM 8            MS. WHITE:  IF THERE WERE AN ALLEGATION THAT THERE

11:29AM 9    WERE AN ACTUAL AFFIRMATIVE POLICY TO DISCRIMINATE THAT MAY

11:29AM 10   STATE A CLAIM FOR THE UNRAH ACT, BUT THERE'S NOTHING CLOSE TO

11:30AM 11   THAT HERE.  AND THERE'S A LOT OF RHETORIC.  THE COMPLAINT IS --

11:30AM 12           THE COURT:  RIGHT.  WELL, HERE'S THE QUESTION THAT

11:30AM 13   NOBODY WAS TALKING ABOUT IN THEIR PAPERS, BUT I JUST WONDERED,

11:30AM 14   THE UNRAH ACT, YOU KNOW, IN THE ADA CONTEXT YOU HAVE TO HAVE A

11:30AM 15   PUBLIC ACCOMMODATION AND YOU WOULD HAVE TO HAVE A BUSINESS.

11:30AM 16       DOES THIS PLATFORM QUALIFY FOR -- IN THAT CONTEXT UNDER

11:30AM 17   THE LANGUAGE OF THE STATUTE?

11:30AM 18           MS. WHITE:  SO THE UNRAH ACT APPLIES TO ALL BUSINESS

11:30AM 19   SERVICES AND THE CALIFORNIA COURTS HAVE HELD THAT THEY DIDN'T

11:30AM 20   APPLY TO WEBSITES.

11:30AM 21       I THINK THERE IS SOME AMBIGUITY IN PLAINTIFFS' CLAIMS

11:30AM 22   ABOUT EXACTLY WHAT -- WHO IS BEING DISCRIMINATED AGAINST AND ON

11:30AM 23   WHAT BASIS THAT THEY REFER TO MAINLY LGBTQ IDENTITIES.  THEY

11:30AM 24   ALSO REFER TO VIEWPOINTS.

11:30AM 25       I THINK WHILE THE UNRAH ACT IS INTENDED TO BE CONSTRUED

11:31AM 1    BROADLY, THERE MAY BE SOME CATEGORIES OF PERSONS TO WHOM IT

11:31AM 2    WOULDN'T APPLY, BUT GIVEN THEIR FAILURE TO ALLEGE THAT THERE IS

11:31AM 3    IN FACT A POLICY OF DISCRIMINATION OR THAT THESE PLAINTIFFS

11:31AM 4    DISCRIMINATED AGAINST BASED ON THEIR SEXUAL IDENTITIES, THE

11:31AM 5    COURT DOESN'T NEED TO REACH THOSE QUESTIONS IN THIS CASE.

11:31AM 6            THE COURT:  ALL RIGHT.  THANK YOU.

11:31AM 7        MR. OBSTLER, I'LL GIVE YOU A VERY BRIEF RESPONSE.  I DON'T

11:31AM 8    WANT TO HEAR ANYTHING YOU HAVE TOLD ME BEFORE, BUT IF THERE'S A

11:31AM 9    VERY BRIEF RESPONSE YOU WOULD LIKE TO MAKE, I'LL LET YOU HAVE

11:31AM 10   THE LAST WORD.

11:31AM 11           MR. OBSTLER:  THANK YOU SO MUCH, YOUR HONOR.  AGAIN,

11:31AM 12   I REALLY APPRECIATE IT.  AND YOUR QUESTIONS ARE DEAD ON ON

11:31AM 13   THIS.

11:31AM 14       FIRST OF ALL, ON DENVER AREA, IT WAS A SIX TO THREE

11:31AM 15   DECISION ON THE 10(C) PART OF THE OPINION AND PLEASE READ THE

11:31AM 16   OPINION.

11:31AM 17           THE COURT:  I WILL MAKE SURE THAT I AM WELL VERSED

11:31AM 18   ON THE EXACT HOLDINGS OF --

11:31AM 19           THE OPERATOR:  THE RECORDING HAS STOPPED.

11:32AM 20           MR. OBSTLER:  ON THE UNRAH ACT ISSUE --

11:32AM 21           THE OPERATOR:  THIS MEETING IS BEING RECORDED.

11:32AM 22           MR. OBSTLER:  ON THE UNRAH ACT ISSUE, THE THING THAT

11:32AM 23   REALLY BOTHERS ME HERE IS THAT I FEEL LIKE I'M ARGUING A

11:32AM 24   FACTUAL ISSUE ON A 12(B)(6) MOTION.

11:32AM 25       WE HAVE ALLEGED THAT WE HAD A CLIENT WHO, OR WE WILL

11:32AM  1    ALLEGE IF YOU TAKE THE DECLARATION, WHO WENT TO A MEETING ON

11:32AM  2    2017 AND WAS TOLD TO HER FACE FOUR TIMES THAT THE ALGORITHM

11:32AM  3    IS --

11:32AM  4              THE COURT:  YOU KNOW, I WILL READ -- I WILL MAKE

11:32AM  5    SURE THAT I LOOK AT ALL OF THE MANY, MANY ALLEGATIONS IN YOUR

11:32AM  6    COMPLAINT.  SO I DON'T NEED YOU TO ARGUE AGAIN ABOUT WHETHER

11:32AM  7    THERE IS A POLICY OF DISCRIMINATION ALLEGED OR NOT.

11:32AM  8         I THINK I AM -- I HAVE THE COMPLAINT, AND I'M GOING TO

11:32AM  9    RELY ON THE COMPLAINT.  THE PARTIES BRIEFED THAT ISSUE

11:32AM 10    EXTENSIVELY.

11:32AM 11         I'M REALLY TRYING TO SORT OUT THE LEGAL ISSUES HERE.

11:32AM 12         SO IS THERE SOMETHING FURTHER ON WHAT THE UNRAH ACT

11:33AM 13    REQUIRES OR NOT, THAT IS WHAT I'M LOOKING FOR.  IF THERE'S

11:33AM 14    NOTHING ELSE, YOU DON'T HAVE TO HAVE ANYTHING.

11:33AM 15              MR. OBSTLER:  THERE IS ONE OTHER THING.

11:33AM 16              THE COURT:  OKAY.

11:33AM 17              MR. OBSTLER:  YOU DON'T HAVE TO PLEAD THERE'S A

11:33AM 18    POLICY UNDER THE UNRAH ACT.  ALL I HAVE TO SHOW UNDER THE

11:33AM 19    UNRAH ACT IS THAT THERE WAS AN ACT OF DISCRIMINATION, AND I

11:33AM 20    THINK WE HAVE DONE THAT.  THAT WOULD BE MY LAST POINT.

11:33AM 21         THERE DOESN'T HAVE TO BE A WRITTEN POLICY UNDER THE

11:33AM 22    UNRAH ACT.  I DON'T THINK ANYBODY WOULD HAVE SUCH A POLICY.

11:33AM 23    OKAY.

11:33AM 24              THE COURT:  ALL RIGHT.  THANK YOU ALL VERY MUCH.  I

11:33AM 25    APPRECIATE ALL OF THE PRESENTATIONS AND THE EXTENSIVE BRIEFING.

11:33AM 1          AND I APPRECIATE YOU BEARING WITH OUR VERY FIRST ZOOM

11:33AM 2    WEBINAR.   I WILL TAKE THIS MATTER UNDER SUBMISSION, AND I'LL

11:33AM 3    ISSUE A WRITTEN ORDER.  ALL RIGHT.  THANK YOU VERY MUCH.

11:33AM 4               MR. WILLEN:  THANK YOU, YOUR HONOR.

11:33AM 5               MR. OBSTLER:  THANK YOU, YOUR HONOR.  WE APPRECIATE

11:33AM 6    YOUR TIME.

11:33AM 7          (ZOOM COURT CONCLUDED AT 11:33 A.M.

        8

        9

        10

        11

        12

        13

        14

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25

1

2

3                    CERTIFICATE OF REPORTER

4

5

6

7        I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8    STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9    280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10   CERTIFY:

11       THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16       IRENE RODRIGUEZ, CSR, RMR, CRR
         CERTIFICATE NUMBER 8074
17

18
         DATED:  JUNE 4, 2020
19

20

21

22

23

24

25