BROWNE GEORGE ROSS LLP
Peter Obstler (State Bar No. 171623)
  pobstler@bgrfirm.com
44 Montgomery Street, Suite 1280
San Francisco, California   94104
Telephone:  (415) 391-7100
Facsimile:  (310 275-5697

Eric M. George (State Bar No. 166403)
  egeorge@bgrfirm.com
Dennis S. Ellis (State Bar No. 178196)
  dellis@bgrfirm.com
Debi A. Ramos (State Bar No. 135373)
  dramos@bgrfirm.com
Keith R. Lorenze (State Bar No. 326894)
  klorenze@bgrfirm.com
2121 Avenue of the Stars, Suite 2800
Los Angeles, California 90067
Telephone: (310) 274-7100
Facsimile: (310) 275-5697

Attorneys for Plaintiffs Kimberly Carleste Newman, Lisa
Cabrera, Catherine Jones, Denotra Nicole Lewis, Andrew
Hepkins, Harvey Stubbs and Khalif Muhammad

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| Kimberly Carleste Newman, Lisa Cabrera, Catherine Jones, Denotra Nicole Lewis, Andrew Hepkins, Harvey Stubbs and Khalif Muhammad,<br><br>            Plaintiffs,<br><br>       vs.<br><br>Google LLC, YouTube LLC, Alphabet Inc, and DOES 1 through 100, inclusive,<br><br>            Defendants. | Case No. 5:20-cv-04011 LHK<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**<br><br><br>Trial Date:  None Set |

1643635.1

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION AND PREFATORY STATEMENT OF THE CASE ............................ 1

II.   PARTIES ........................................................................................................................ 6

III.  JURISDICTION AND VENUE ................................................................................... 10

IV.   FACTS COMMON TO ALL CLAIMS ....................................................................... 10

    A.   Defendants' Operation Of YouTube ................................................................ 12

    B.   The Governing Agreements .............................................................................. 22

        1.   The General Terms Of Use And Contract-Based Promises ......................... 23

        2.   The License Provisions .................................................................... 27

    C.   Defendants' Anti-Competitive, Unlawful, Deceptive And Unfair Business
        Practices ............................................................................................................ 29

    D.   Defendants' Tool Kit For Unlawful Practices ................................................ 32

        1.   Artificial Intelligence Algorithm Restrictions ................................ 32

        2.   Excluding Channels And Videos From Full Revenue Generation ............... 35

        3.   Misapplying "Restricted Mode" ....................................................... 36

        4.   Shadow Banning Channels And Videos ........................................... 41

        5.   Delegating Content Review And Regulation To Racists And White
        Supremacists ...................................................................................... 42

        6.   Interfering With Individual Video Viewing ..................................... 43

        7.   Ad Bombing ....................................................................................... 45

        8.   Excluding Videos From "Trending" And "Up Next" Video
        Recommendations ............................................................................... 46

        9.   "Up Next" Flooding .......................................................................... 47

        10.  Promoting And Profiting From Hate Speech .................................... 48

        11.  Interfering With, Obstructing, Ignoring And Delaying Appeals ................. 50

    E.   Defendants Have Violated And Continue To Violate The Rights Of Plaintiffs
        And The Class ................................................................................................... 51

        1.   Kimberly Carleste Newman .............................................................. 51

        2.   Lisa Cabrera ....................................................................................... 57

1643635.1

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

**TABLE OF CONTENTS**
(Continued)

Page

3. Catherine Jones ........................................................................... 75

4. Denotra Nicole Lewis ................................................................. 76

5. Andrew Hepkins .......................................................................... 84

6. Harvey Stubbs ............................................................................. 96

7. Khalif Muhammad ..................................................................... 103

V. CLASS ALLEGATIONS ........................................................................... 110

VI. INDIVIDUAL CAUSES OF ACTION ...................................................... 114

FIRST CAUSE OF ACTION Request For A Declaratory Relief Judgment that Section 230(c) Immunity Is Inapplicable to Discrimination Claims (On Behalf Of Individual Plaintiffs And The §1981 Class) ............................................................ 114

A. Procedural Background Facts ........................................................ 115

B. Justiciable Legal Controversies Currently Exist Regarding The Construction And Constitutionality Of 47 U.S.C. § 230(c). ...................................... 122

1. An Actual Controversy Exist As To Whether The Provisions Of Section 230(c) Immunize Defendants From Race, Personal Identity, or Viewpoint Discrimination In Filtering And Blocking On line Content And Access ..................................................... 122

2. An Actual Controversy Exists As To Whether Section 230(c) Immunizes Defendants For Conduct That Violates ................... 122

3. The Provisions And/or Application Of Any Part Of Section 230(c) To Claims Arising Out Of Race, Identity, Or Viewpoint Discrimination Is Unconstitutional .............................................. 123

4. The Executive Order Precludes The Government From Arguing Or Enforcing Section 230(c) To Claims Based On Intentional Identity Or Viewpoint Discrimination. ........................................ 123

C. Plaintiffs Served Rule 5.1 Notice On The U.S. Attorney General ......................... 124

SECOND CAUSE OF ACTION Equitable Claim For An Accounting Of Debts Owed Under Contract (On Behalf Of Individual Plaintiffs And The §1981 Class) ..................... 126

THIRD CAUSE OF ACTION For Conversion Of Plaintiffs Property (On Behalf Of Individual Plaintiffs And The §1981 Class) ........................................................... 128

FOURTH CAUSE OF ACTION For Replevin (On Behalf Of Individual Plaintiffs And The §1981 Class) ......................................................................................................... 130

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

# TABLE OF CONTENTS
### (Continued)

**Page**

FIFTH CAUSE OF ACTION  For Breach of Contract (On Behalf Of Individual Plaintiffs And The §1981 Class).........................................................................................132

SIXTH CAUSE OF ACTION  For Breach Of The Implied Covenant Of Good Faith And Fair Dealing (On Behalf Of Individual Plaintiffs And The §1981 Class) .........................133

SEVENTH CAUSE OF ACTION  For Promissory Estoppel (On Behalf Of Individual Plaintiffs And The §1981 Class) ...........................................................................135

EIGHTH CAUSE OF ACTION For Discrimination In Contract In Violation Of 42 U.S.C. § 1981  (On Behalf Of Individual Plaintiffs And The §1981 Class)......................................137

NINTH CAUSE OF ACTION  For Unlawful Discrimination In Violation Of The Unruh Civil Rights Act (On Behalf Of Individual Plaintiffs And The §1981 Class) ...................139

TENTH CAUSE OF ACTION  For False Advertising In Violation Of The Lanham Act, U.S.C. §1125, *et seq.* (On Behalf Of Individual Plaintiffs And The §1981 Class)............141

ELEVENTH CAUSE OF ACTION For Unlawful, Deceptive, And Unfair Business Practices Cal. Bus. & Profs. Code, §17200, *et seq.*  (On Behalf Of Individual Plaintiffs And The §1981 Class) .........................................................................143

TWELFTH CAUSE OF ACTION  For Violation Of California Constitution Article I, Section 2 (On Behalf Of Individual Plaintiffs And The §1981 Class)...............................145

THIRTEENTH CAUSE OF ACTION For Freedom Of Speech Under The First Amendment United States Constitution, Amendment 1 (On Behalf Of Individual Plaintiffs And The §1981 Class) .......................................................................149

      A.     Procedural Background .........................................................................149

      B.     Permissive Endorsement Allegations Of State Action............................................152

      C.     State Action Allegations Under The Public Function Test .....................................154

      D.     Defendants' Conduct Violates The First Amendment ...........................................155

VII.     PRAYER FOR RELIEF...............................................................................157

VIII.    JURY TRIAL DEMAND...............................................................................160

Plaintiffs, Kimberly Carleste Newman, Lisa Cabrera, Catherine Jones, Denotra Nicole Lewis, Andrew Hepkins, Harvey Stubbs and Khalif Muhammad bring this lawsuit (the "Lawsuit"), individually and on behalf of a putative class of similarly situated persons, against Defendant YouTube LLC ("YouTube"), and its parent companies, Google LLC ("Google") and Alphabet Inc. (collectively referred to as "Google/YouTube" or "Defendants," unless otherwise specified).[1]

# I.   INTRODUCTION AND PREFATORY STATEMENT OF THE CASE

1.      Plaintiffs are African American content creators, viewers, and consumers who use the global public social media platform "YouTube."

2.      Each Plaintiff brings this Lawsuit, on behalf of themselves individually, and as representatives of putative class of similarly situated persons (the "§1981 Class") to redress Google/YouTube's overt, intentional, and systematic use of their race, identity, viewpoint, and/or other personal characteristics, to deny them access and services on YouTube, in violation of their equitable and legal rights under contract, statutory, and common law.

3.      Defendants have been caught red handed using the race, gender, sexual orientation, identity, political viewpoints, an/or other personal characteristics of consumers, to restrict or deny access and/or services under the pretext of content based rules and terms of service that are supposed to apply equally to all consumers.  Instead of imposing access and service restrictions and/or denials based on a review of a consumer's videos, and a subsequent finding that the content

---

[1] Substantial overlap exists between the claims, allegations, putative classes and issues in this Lawsuit, with a case pending before this Court, *Divino Group, LLC et al., v. Google, LLC, et al,* Case No. 5:19-cv-004749 – VKD (N.D. Cal.) ("*Divino*").  After reviewing Civil L.R. 3-12 governing related cases, it is unclear whether this Lawsuit technically meets the specific criteria and elements required for formal relation of the two cases under Local Rule 3-12.  Specifically, this Lawsuit does not involve *all* of "the same parties," or the identical "property" owned by the same parties in *Divino*.  It is also unclear whether the "transactions" are the same within the meaning of Local Rule 3-12, or whether the "events" consist of the identical unlawful conduct of restricting of access to the YouTube platform based on the profiling and discriminatory use of a consumer's personal identity or viewpoint in *Divino,* in contrast with the racial identity profiling and discrimination against Plaintiffs and the members of the Class alleged in this Lawsuit.  Consequently, while Plaintiffs do not believe that all of the requirements for designating this Lawsuit and *Divino* "related" are satisfied under Local Rule 3-12, Plaintiffs are not opposed to having this Lawsuit related to, or coordinated with, the pending proceedings in *Divino*.

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

violates YouTube's neutral content based rules and terms of service, Defendants use a consumer's race, identity, viewpoints, and/or other personal characteristics to impose access and service restrictions and denials on Plaintiffs and the §1981 Class, all of whom are persons who qualify as a "protected" group of Americans under the law.

4.     Defendants admit that they knowingly, intentionally, and systematically employ artificial intelligence ("A.I."), algorithms, and other computer and/or machine based filtering tools to "target" Plaintiffs and the §1981 Class, by using information about their race, identity and viewpoint to restrict or deny them access and services on YouTube.

5.     Defendants also admit that they systematically profile consumers' personal characteristics, including Plaintiffs' race, to carry out a "policy" and to justify practices of restricting, denying, and/or interfering with access and services, based on whether the consumer is "black," "gay," or identifies with some other protected persons under the law -- not because Plaintiffs' content (or accessing of YouTube) violates Defendants' content based rules and terms of service.

6.     Defendants' conduct constitutes intentional, knowing, and systematic race discrimination.  It violates Plaintiffs' contractual, commercial, and civil rights.  It is also inequitable, unfair, and repugnant to any sense of justice under our legal system.

7.     Defendants have unlawfully seized and continue to possess, use, and profit from the property of Plaintiffs and the §1981 Class, without properly accounting for royalties and/or other revenues that are owed to Plaintiffs and the §1981 Class under the licensing agreement and other provisions of YouTube's terms of service,[2] including the provisions and agreements between Plaintiffs and Defendants for Google Adworks and/or Google Adsense..

---

[2] Here, "terms of service" refer to all of the terms of service set forth in the YouTube license agreements executed by Plaintiffs and the members of the §1981 Class or upon creating a YouTube account or a YouTube channel, which terms refer to and/or incorporate by reference the terms of service set forth in other agreements with Defendants, such as the terms of service for YouTube partnership, Google Search, Google gmail, Google Adworks, and Google Adsense.

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

8.      Regardless of whether Defendants' are motivated by commercial gain, ideological animus, a practical inability to apply content based rules and access provisions, or merely because of incompetence, ignorance, negligence, arrogance, or a combination thereof, Defendants' conduct is not lawful.  Restricting or denying consumer access and services to YouTube based on racial or identity based profiling violates Plaintiffs' legal rights under: (i) contract; (ii) federal and state laws that prohibit race or other types of discrimination with respect to contract; (iii) unfair business practices, consumer protection, and false advertising laws; (iv) state and/or federal free speech protections; (iv) possession, misuse, and conversion of private property; and (v) equitable accounting principles and requirements.

9.      Defendants do not deny that they are engaged in and have committed these unlawful practices, including racial discrimination under contract; nor can they deny it.  Indeed, Defendants admit that they have known that YouTube's content filtering and review tools and practices have been unlawfully "targeting" protected persons based on race, sexual or gender identity, and other personal characteristics since at least the spring of 2017.

10.     Instead, Defendants contend only that Google/YouTube cannot be held liable for these and other legal transgressions because Congress granted Defendants absolute immunity under 47 U.S.C. § 230(c) ("Section 230(c)" or the "Communications Decency Act"), including any and all of the unlawful conduct in this case.  Thus, Defendants do not deny that they discriminate, breach their license agreements and contracts with Plaintiffs and the §1981 Class, or engage in unfair business practices, stealing and conversion of consumer property and licensing rights, or have failed to accurately account for or pay revenues earned and owed to Plaintiffs and to the §1981 Class under YouTube's terms of service.

11.     Section 230(c) does not place Defendants absolutely and categorically above the law.  It does not apply, and cannot be applied, to immunize Defendants from liability, where, as here, Plaintiffs have alleged with specificity, that Defendants are engaged in knowing and intentional race discrimination, breach of contract, unfair business practices, false advertising, the theft of Plaintiffs' property, and failure to account for revenue owed under contract.

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

12.     On its face, Section 230(c) operates as a "permissive" speech regulation law enacted by Congress, solely and expressly to allow private Internet Service Providers ("ISPs") to take steps to protect minors from being exposed to "offensive material" on the internet.  Therefore, at a minimum, Defendants' claim of immunity requires that Defendants must at least review the content in the video, and base any access and service restrictions and/or denials on the content for which services and access are sought.  The race, identity, viewpoint, or personal characteristics of the Plaintiffs or members of the §1981 Class may never be considered.  Furthermore, identity based discrimination is never a lawful substitute or shortcut for actually reviewing content to determine if that content violates the rules and terms of service.

13.     Furthermore, Section 230(c) does not and cannot immunize an ISP provider from liability that arises from express or implied breaches of duties or obligation agreed to under a contract with its users and consumers.  This is especially true here, where Google/YouTube have contracted with Plaintiffs and the §1981 Class to provide access and services to consumers that are subject only to restriction or denial of service under specific viewpoint neutral content based rules that apply equally to all.

14.     Nor does Section 230(c) immunize from liability an ISP who has unlawfully taken, possessed, used, and or converted for unlawful gain it users' property, and/or has otherwise failed to abide by, account for, or pay debts or monies owed to users under the applicable license agreement and other terms of service provisions.

15.     Similarly, Section 230(c) does not immunize Defendants for directly engaging in unfair business practices, anti-competitive conduct, false advertising, or intentional and knowing race, gender, sexual orientation, political and other types of personal identity based discrimination against members of a protected class such as Plaintiffs or the members of the §1981 Class.

16.     To the extent that any court of competent jurisdiction were to construe Section 230(c) as immunizing the specific conduct and violations perpetrated by Google/YouTube against the Plaintiffs and members of the §1981 Class alleged in this Lawsuit, Section 230(c) could not survive constitutional scrutiny under the Supreme Court's 6-3 majority decision in *Denver Area Educational Telecommuns. Consortium, Inc. v. Federal Communications Comm'n*, 518 U.S. 727,

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

766-67 (1996).  In other words, if Section 230(c) were to be construed to immunize Defendants from the events, circumstances, and conduct alleged here, Section 230(c) would be unconstitutional because it (a) would not be viewpoint neutral, (b) was not narrowly tailored and reasonably related to a legitimate public purpose, including protecting minors from "offensive material" on the Internet, and (c) would interfere with established legal relationships, contract, rights, and obligations of the parties.  *Id*.

17.     Accordingly, Plaintiffs file this Lawsuit to hold Google/YouTube accountable for their unlawful and inequitable conduct under ten separate causes of action or claims for legal and equitable relief:

(i)  Declaratory judgment under 28 U.S.C. § 2001 *et seq.*, that Section 230(c) does not apply to the allegations and claims for relief in this Lawsuit because (a) Section 230(c) statutory language does not apply, and cannot be applied, to the prosecution of the allegations and claims in this Lawsuit; and/or (b) Section 230(c) is an unconstitutional "permissive" speech restriction law under *Denver Area* and progeny;

(ii)  Equitable accounting of revenue under California Common Law for amounts owed by Defendants as a result of inconsistent, inaccurate, incorrect and false reported view numbers, subscriber numbers, watch times and CPM which form the basis for calculating revenue earned by videos and channels;

(iii)  Equitable Conversion and Replevin under California Common Law for a Court Order that Defendants return the videos taken down, removed and/or deleted from the YouTube platform to the extent that Defendants still possess the electronic digital videos; and/or for damages a Court award of damages for the value of the videos where Defendants no longer possess the electronic digital videos;

(iv)  Breach of contract, implied breach of contract covenant, and promissory estoppel;

(v.)  Racial discrimination in contract in violation of federal law under 42 U.S.C. § 1981;

(vi.)  Racial discrimination in violation of the Unruh Civil Rights Act, Cal. Civ. Code § 51, *et seq.*;

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

(vii.)  Unlawful, deceptive, and unfair discriminatory business practices in violation of the Unfair Competition Laws under California Business and Professions Code § 17200, *et seq.*;

(viii.)  False advertising and commercial disparagement in violation of the Lanham Act, 15 U.S.C. § 1125, *et seq.*;

(ix.)  Discrimination in violation of the Liberty of Speech Clause under Article I, Section 2 of the California Constitution; and

(x.)  Discrimination in speech in violation of First Amendment of the U.S. Constitution arising from Defendants' use of Section 230(c) to immunize them from liability for discrimination.

## II.    PARTIES

18.    Plaintiff Kimberly Carleste Newman, also known as Kimberly Santana ("Plaintiff Newman"), is an African American woman residing in the State of California who is the creator and owner of "The True Royal Family," and "True Royal," two YouTube channels dedicated to developing and posting videos that discuss and present information regarding issues and current events which are important to the African American community.  Plaintiff Newman created "The True Royal Family" channel in 2015, followed by "True Royal," in 2016.  Since its creation, Plaintiff Newman's "The True Royal Family" channel has posted more than 1654 separate videos, only 954 of which are still posted because Defendants removed 700 or more individual videos and have refused to restore them; the "True Royal" channel has posted 209 videos.  "The True Royal Family" channel has generated a total of 4.4 million views since creation, and the "True Royal" channel has generated 583,000 views since creation.  Plaintiff Newman is a YouTube "partner," and has generated total revenue of $2,672.68 for videos posted on "The True Royal Family," and $123.96 for videos posted on "True Royal."

19.    Plaintiff Lisa Cabrera ("Plaintiff Cabrera") is an African American woman residing in the State of New Jersey who is the creator and owner of "Lisa Cabrera" and "Lisa C," two YouTube channels dedicated to developing and posting videos that discuss and present information regarding issues and current events which are important to the African American community. Plaintiff Cabrera created the "Lisa Cabrera" channel in 2015.  Since creation, Plaintiff Cabrera's

"Lisa Cabrera" channel has posted 4,423 videos (68 of which Defendants archived for unknown reasons and can no longer be viewed by anyone), which have garnered 20 million views.  Plaintiff Cabrera is a YouTube partner who has generated a total of $25,500 for videos posted on the "Lisa Cabrera" channel.

20.     Plaintiff Catherine Jones ("Plaintiff Jones") is an African American woman residing in the State of Vermont who is the creator and owner of "Cooking with Carmen Caboom," a YouTube cooking channel for African Americans, and "Carmen Caboom," and "Carmen Caboom Reloaded," two YouTube channels dedicated to developing and posting both parodies and serious videos that discuss and present information about issues and current events which are important to the African American community.  Plaintiff Jones created the "Carmen Caboom" channel in 2010, a backup "Carmen Caboom" channel in 2014, the "Cooking with Carmen Caboom" channel in 2015 and the "Carmen Caboom Reloaded," channel in 2018.  Defendants improperly removed the original "Carmen Caboom" channel for purported nudity when no video posted to the channel included any nudity.  Plaintiff Jones is a YouTube partner.  Since creation, Plaintiff Jones' 2014 "Carmen Caboom" channel has posted numerous videos, several of which Defendants improperly removed as hate speech, the remaining videos have garnered approximately 500 -1,200 views per video overall which have generated approximately $500 per year.

21.     Plaintiff Denotra Nicole Lewis ("Plaintiff Lewis") is an African American woman residing in the State of Texas who is the creator and owner of "Nicole's View," a YouTube channel dedicated to developing and posting videos that discuss and present information regarding issues and current events which are important to the African American community.  Plaintiff Lewis created the "Nicole's View" channel in 2006.  She became a YouTube partner sometime between 2016 and 2017.  "Nicole's View" has generated 11.3 million views and approximately $6,000-7,000 in revenue per year, approximately $25,000 over the life of the channel.

22.     Plaintiff Andrew Hepkins ("Plaintiff Hepkins") is an African American freelance journalist, voice actor, and musician residing in the State of New York who is the creator and owner of "DruStory News," and "DruHepkins," YouTube channels.  "DruStory News" is dedicated to creating and posting videos that discuss and present information based on independent research

regarding news items, issues and current events which are important to everyone, including members of the African American community.  Plaintiff Hepkins created the "DruStory News" channel in 2014.  "DruStory News" has generated 3.6 million views and 17,600 subscribers.

23.     Plaintiff Harvey Stubbs ("Plaintiff Stubbs") is an African American commentator residing in the State of Illinois who is the creator and owner of the YouTube channels "Your World Your View," "Harvey Superboy," "Harvey Superboy 1," "HARVEY SUPERBOY," and "J Jackson."  These channels all have uploaded videos consisting of commentary regarding events, social issues, politics, news, and people who are of interest to or affect the African American Community in general, and the Chicago Area African American Community in particular.  Plaintiff Stubbs is a veteran and life-long resident of the Chicago Area, who is active in his community and offers a unique perspective on current and historical events and people in the public eye.  Plaintiff Stubbs started his first YouTube channel in 2007 and has created a number of additional channels due to Defendants' repeated unwarranted flags and Community Guidelines strikes against his channels.  "Your World Your View," which was created in September of 2013 has generated 6.6 million views.

24.     Plaintiff Khalif Muhammad ("Plaintiff Muhammad") is an African American social commentator residing in the State of California who is the creator and owner of "Dr.Syn-Q," a YouTube channel dedicated to developing and posting videos that discuss and present information regarding historic and current issues and events regarding racial inequality and redressing barriers to equality for the African American community generally and African Americans living in the Bay Area specifically.  Plaintiff Muhammad originally launched "Dr.Syn-Q" under the name "Counter Racism Now," in 2006.  Over the years, Plaintiff Muhammad has uploaded 273 videos to the "Dr.Syn-Q" channel.  As of August 11, 2020, only 159 videos are listed for the "Dr.Syn-Q" channel, Defendants having removed or archived approximately 114 videos.  Of these 159 videos, only 19 videos are listed with Restricted Mode enabled, however only 11 of those listed can actually be viewed with Restricted Mode enabled.  8 videos listed for the channel when Restricted Mode is enabled show a black screen with the legend, "This video is unavailable with Restricted Mode enabled.  To view this video, you will need to disable Restricted Mode."  In excess of 2,150

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

people have subscribed to the "Dr.Syn-Q" channel.  It is currently unknown how many views this channel has actually generated in the past 14 years:  Prior to 2020, the channel reflected in excess of 980,000 views.  On June 26, 2020, the channel reflected 899,717 views.  On August 9, 2020, the channel reflected only 388,997 views.  On August 11, 2020, the channel reflected 643,790 views. [SS 1013]

25.     Defendant YouTube, LLC is a for-profit limited liability corporation, wholly owned by Google LLC, and organized under the laws of the State of Delaware.  YouTube's principal place of business is Mountain View, California and it regularly conducts business throughout California, including Santa Clara County, California.  Defendant YouTube, LLC operates the largest and most popular internet video viewer site, platform, and service in California, the United States, and the world, and holds itself out as one of the most important and largest public forums for the expression of ideas and exchange of speech available to the public.  Plaintiffs are informed and believe that at all relevant times Defendant YouTube, LLC acts as an agent of Defendant Google LLC and uses, relies on, and participates with Defendant Google LLC in restricting speech on the YouTube site, platform, or service.

26.     Defendant Google LLC is a for-profit, limited liability company organized under the laws of the State of Delaware, with its principal place of business in Mountain View, California; it regularly conducts business throughout California, including Santa Clara County.  Plaintiffs are informed and believe, and thereon allege that, at all relevant times, Defendant Google LLC has acted as an agent of Defendant YouTube, LLC, and controls or participates in censoring and restricting speech on the YouTube service or platform.

27.     Defendant Alphabet Inc. is a for-profit American multinational corporation conglomerate incorporated under the laws of the State of Delaware, with its principal place of business in Mountain View, California.  According to Defendants, Alphabet Inc. was created as part of a corporate restructuring of Defendants Google, YouTube, and other subsidiary or affiliate entities on October 2, 2015. At that time, Alphabet Inc. became the parent company of Google and other former Google subsidiary or affiliated entities, including Defendant YouTube.  Defendants also claim that the creation and establishment of Alphabet Inc. was prompted by the desire to make

Defendants' core businesses "cleaner and more accountable" while allowing greater autonomy to group companies that operate in businesses other than internet services.

28.     The true names and capacities, whether individual, corporate, associate, or otherwise, of Defendants Does 1 through 100, inclusive, are presently unknown to Plaintiffs, and for that reason these Defendants are sued by such fictitious names.  Plaintiffs are informed and believe and thereon allege that each of the Doe Defendants is in some way legally responsible for the violations of law, injuries, and harm caused, as alleged herein.  If, and when appropriate, Plaintiffs will seek leave of the Court to amend this Complaint when the true names and capacities of said defendants are known.

## III.     JURISDICTION AND VENUE

29.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337(a), and 2201.  The Complaint includes Federal questions, and the amount in controversy arising from the claims asserted on behalf of Plaintiffs and all other persons similarly situated exceeds $5 million, exclusive of interest and costs.  Plaintiffs and all other persons similarly situated also challenge the construction and constitutionality of 47 U.S.C. § 230(c)(1) and (2), and seek a declaratory judgment that this statute does not immunize Defendants for overt intentional and systematic racial discrimination on the YouTube platform.

30.     Venue is proper in the Northern District of California (San Jose Division) under 28 U.S.C. § 1391.  Defendants reside and/or transact business in the County of Santa Clara, and are within the jurisdiction of this Court for purposes of service of process.  Defendants' TOS require that Plaintiffs and all other persons similarly situated file this Lawsuit in a court of competent jurisdiction located within Santa Clara County.

## IV.     FACTS COMMON TO ALL CLAIMS

31.     On June 2, 2020, this Court held a hearing on Defendants' Motion to Dismiss in *Divino*.  At the hearing, the Court asked Defendants if they were claiming immunity from liability for denying access to YouTube based on the user's race.  In response, Defendants' counsel conceded that a case involving intentional race discrimination by an ISP may not be covered by Section 230(c):

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

1      I THINK THERE COULD BE SOME STARK CASES WHERE A COURT MIGHT FIND

2      UNDER A PARTICULAR SET OF CIRCUMSTANCES THAT SOME ALLEGED

3      DISCRIMINATION DIDN'T TAKE THE FORM OF A PUBLISHER OF ACTUALLY

4      TARGETING PUBLISHER CONDUCT, AND, THEREFORE, DIDN'T COME WITHIN

5      (C)(1).

6      *  *  *  *

7      I CAN IMAGINE SOME COURTS TAKING THE POSITION THAT A PROPERLY

8      PLEADED CLAIM OF THE SORT THAT YOU DESCRIBE AS SORT OF FACIAL

9      RACE DISCRIMINATION CLAIM MAY NOT BE GOOD FAITH UNDER (C)(2), I

10      CAN IMAGINE A COURT TAKING THAT POSITION.

11 Attached as Exhibit E is a true and correct copy of the June 2, 2020-Transcript of Oral Argument

12 before the Hon. Virginia DeMarchi; Exhibit E, at  10:45 15-22.

13      32.     This Lawsuit is that "stark case."  Defendants are engaged in intentional race

14 discrimination against Plaintiffs and other persons similarly situated, that violates Defendants'

15 contractual promises not to discriminate, and also violates long established laws that prohibit

16 racism for profit.

17      33.     The central allegation in this Lawsuit is that Defendants engage in identity and

18 viewpoint based filtering, and the imposition service access restrictions or denials, that utilize and

19 are based, in part or in whole, on Plaintiffs' race, identity, viewpoints, or other personal

20 characteristics; rather than solely based on a review of whether the video complies with the content

21 based and other viewpoint neutral rules that apply equally to all YouTube users.

22      34.     Defendants profile, use, and consider Plaintiffs' race, personal identity, or

23 viewpoints, in order to interfere with, restrict, or block video uploading, viewing, promotion,

24 advertising, engagement, and/or monetization services because Plaintiffs are African American

25 and/or possess personal characteristics or viewpoints that Defendants dislike.  This is race and

26 identity based discrimination.  That is unlawful and cannot be immunized by Congress.

27      35.     Defendants' profiling, review, use, and consideration of  Plaintiffs' race, ethnicity,

28 religion, political affiliations or personal identity or viewpoints is prohibited not only under

Defendants' TOS and other related agreements with Plaintiffs, but it also violates laws dating back to the Civil War which prohibit racial discrimination in contract and business relationships.

**A.      Defendants' Operation Of YouTube**

36.      Defendants Google/YouTube are members of the largest public or private business enterprise, in the world.

37.      Through this enterprise, Defendants exercise complete, absolute, and "unfettered" control over access to approximately 95% of all video content that is available to the public world-wide.  This includes absolute control over any and all posting, viewing, engagement, advertising, personal data, and revenue monetization for the rights of the 2.3 billion consumers who access and use YouTube.

38.      Defendants are also the largest creators, promoters, and sponsors of video content on YouTube.  Thus, in addition to hosting and regulating video content and services on YouTube, Defendants compete directly with Plaintiffs and their video content for the same access, audiences, viewership, advertising, marketing, and revenue based services on the YouTube platform.

39.      In exercising these unprecedented powers, Defendants contract with Plaintiffs and all persons similarly situated to provide them equal access to YouTube and all of its related services, subject only to viewpoint neutral content based rules and criteria that apply equally to all.

40.      In reality, Defendants' access restrictions and denials are not the result of an identity and viewpoint blind review or the application of the rules to actual video content.  Instead, Defendants have an irreconcilable commercial conflict of interest: on the one hand, Defendants act as content creators or sponsors of video content, competing directly with Plaintiffs and all persons similarly situated for the same services, audiences, advertisers, and revenue streams on the YouTube platform; on the other hand, Defendants act as absolute regulators and monetizers of all YouTube content and services, and exercise unfettered authority to determine viewer and service access by enforcing their Community Guidelines and Terms of Service (the "TOS") against their competitors, based on the identities and/or viewpoints of Plaintiffs and all other persons similarly situated.

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

41.     Under the pretext of honest content and service regulation, Defendants rig the game for profit, by using their power to restrict and block Plaintiffs and other similarly situated competitors, based on racial identity or viewpoint discrimination.  Defendants also abuse their power by not subjecting videos they creator or which their preferred partners make, to the same Community Guidelines and TOS which they apply to all other YouTube users.  As a result, Defendants are not subject to filtering or blocking restrictions, even where Defendants' videos contain content that violates their own rules.

42.     Among the many abuses that Defendants have perpetrated against Plaintiffs and all other persons similarly situated, Defendants allow racist hate speech to go unregulated on Plaintiffs' YouTube channels, resulting in lost subscribers and viewership, and the surreptitious "bugging" of Plaintiffs' videos by the insertion, attachment, appending, or embedding of metadata and other signals that allow Defendants' filtering tools to target Plaintiffs and all other persons similarly situated, based on the video creator's race, identity and/or the viewpoint, as well as those of her channel subscribers, and viewers.

43.     This intentional and systematic racial discrimination violates Defendants' legal obligations under the contract(s), and is unlawful under federal and state antidiscrimination laws, false advertising, unlawful business practices, and free speech laws.  It is unlawful regardless of whether it is done for profit, or out of ideological animus.

44.     Interfering with the contractual and legal rights of Plaintiffs and all persons similarly situated with respect to YouTube access and use that is based in whole or in part on race, identity or viewpoint, violates YouTube's TOS and is unlawful under the strict prohibitions against racial discrimination in contract and business practices enshrined in federal and California law.  It is racism, overt intentional and systematic.

45.     Under the pretext of finding that videos violate some vague, ambiguous, and non-specific rule, Defendants use computer driven racial, identity and viewpoint profiling and filtering tools to restrict, censor, and denigrate Plaintiffs and all persons similarly situated on YouTube, wholly or in part, because they are African American, black, members of a protected racial classification under the law, or identify as such, or with a related viewpoint.

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

46.     Since 2017 at least, Defendants' filtering and review tools and procedures have been embedded with computer code or other machine based "triggers" that profile the personal racial identity or viewpoint of the YouTube users.  Defendants admit that their filtering tools use information about the identity of YouTube creators, subscribers and viewers to "target" members of protected racial classifications under the law and impose access restrictions on them that are not neutral with respect to race, identity or viewpoint; nor are they based on, or supported by actual material in the videos.  Defendants treat such videos as if they in fact violate Defendants' Community Guidelines and TOS, by denying full YouTube platform access and related services.

47.     On March 19, 2017, Defendants publicly admitted that they improperly censored videos using their "Restricted Mode" filtering that were posted or produced by members of the LGBTQ+ Community, based upon the identity and orientation of the speaker, rather than upon the content of the video.  Defendants also promised to remove all restricted filtering on videos posted or produced by LGBTQ+ members and groups, and change their filtering algorithm, and manual review policies and practices to address the risk that videos posted by LGBTQ+ vloggers were being censored because of the identity or viewpoint of the speaker.

48.     On April 27, 2017, Johanna Wright, Vice President of Product Management for Google/YouTube, took to the airwaves and news media to promise the global "YouTube Community," that Defendants would ensure that "Restricted Mode" would not "filter out content belonging to individuals or groups based on certain attributes like gender, gender identity, political viewpoints, race, religion or sexual orientation."  While Ms. Wright conceded that "Restricted Mode will never be perfect, [Google/YouTube] hope to build on [their] progress so far to continue making [their] systems more accurate and the overall "Restricted Mode" experience better over time."

49.     On September 14, 2017, Defendants invited independent YouTubers and content creators to address concerns that the YouTube platform's video review algorithm and practices discriminated against certain groups, including LGBTQ+, African American, and other users of color or vulnerable minorities.  At the meeting, Defendants admitted that their content filtering and review tools were "targeting" African American, LGBTQ+, and other "minority" users.

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

Defendants further admitted that this resulted in the application of erroneous or unwarranted blocking restrictions and access denials for users that were based, at least in part, on the user's racial or sexual identity or viewpoints, rather than based on a content violation of Defendants' Community Guidelines or TOS.

50.     At that time, Defendants also stated that they were working on a "fix," and that neither user identity nor viewpoint has any role in the application of YouTube's content based access rules and restrictions, or should otherwise interfere with a user's right to access the myriad of services that Defendants offer to users.[3]

51.     Despite Defendants attempts to reassure YouTube users, Defendants have increased the racial profiling and "targeting" of African American and members of other protected racial classifications under the law who use YouTube.

52.     In January 2018, Defendants got caught:  During a recorded call between a YouTube user and a Google supervisor (someone who Defendants now identify as the "Floor Manager" for their customer service advertising services center in Bangalore, India) Defendants represented to the user that its "holiday special" video was not eligible for advertising services because the filtering tools had identified the user as being involved with the "gay thing."  Under what the manager expressly stated was "company policy," the filtering algorithm determined that the video contained "shocking" or "sexually explicit" content, not because of any actual material in the video, but because the "company" considered video content created by a "gay" user or content that discussed the "gay thing" as ineligible for advertising or promotion.  Defendants considered content created or viewed by "gay" persons to be "shocking" or "sexually explicit."

---

[3] One of the persons who attended the meeting is Stephanie Frosch, a prominent and popular LGBTQ+ content creator on YouTube. Ms. Frosch is a named plaintiff in *Divino*.  In that case, Ms. Frosch declared under oath the she and the other attendees were required to execute multiple non-disclosure agreements (the "NDAs") before and at the event.  The NDAs prevented her, and any anyone else who attended the meeting, from disclosing any information about the meeting.  On March 23, 2020, after Plaintiffs threatened to move to set aside the NDAs as void and unenforceable.  Defendants agreed to release Ms. Frosch from her obligations under the NDAs. *See* Declaration of Stephanie Frosch Submitted in Support of Plaintiffs' Application to File a Sur Reply to Address New Authority.  A true and correct copy of the Declaration of Stephanie Frosch (Dkt. #40) is attached as Exhibit A.

53.     This pattern, practice or "policy" of denying users equal access to YouTube based on their race, sexual orientation, or other individual identities or viewpoints occurred on at least five other occasions to the same user after the January 2018-call with Defendants.  The pattern and practice has become so pervasive that many prominent and quality content creators have lost more than 90% of their viewers, advertisers, revenue, and other access rights in the last 24 months, solely because they are identified as African American, LGBTQ+ or members of other protected racial classifications under the law.

54.     The Plaintiffs in this Lawsuit face the same overt, intentional, and systemic identity and viewpoint discrimination, but, with one important difference:  Defendants do not discriminate against Plaintiffs only because of sex based identity or viewpoint profiling, but primarily because they identify as African American, or with other protected racial classifications under the law.

55.     Susan Wojcicki, YouTube's CEO, has taken to the airwaves over the past three years to repeatedly and unequivocally deny that Defendants discriminate against anyone when it comes to content or access restrictions to YouTube, all the while  insisting that all decisions, wrong or right, are the product of good faith, viewpoint neutral, and identity blind content reviews and decisions.

56.     Defendants do not disagree. Ms. Wojcicki has taken to the airwaves over the last three years to repeatedly and unequivocally deny that Defendants discriminate against anyone when it comes to content or access restrictions to YouTube, while insisting that all decisions, wrong or right, are the product of good faith, viewpoint neutral, and identity blind content reviews and decisions.

57.     On or about June 14, 2020, Ms. Wojcicki publicly announced that in conjunction with Defendant Alphabet, YouTube was starting a $100 million fund "dedicated to amplifying and developing the voices of Black creators and artists and their stories." In a blog post Wojcicki said, "At YouTube, we believe Black lives matter and we all need to do more to dismantle systemic racism."  *See* https://www.marketwatch.com/story/youtube-is-starting-a-100-million-fund-for-black-creators-artists-2020-06-11.

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

1      58.     Ms. Wojcicki's self-serving assurances notwithstanding, Defendants' conduct constitutes unlawful race discrimination.  Unlike any other form of prohibited discrimination, race discrimination has been outlawed in the United States since 1865, when Congress enacted §1981 and other civil rights statutes intended to wipe out, prohibit, and render unlawful any and all racial discrimination in contracts and business.

59.     Defendants know and admit that they discriminate.  They have admitted that since at least 2017, they use content based filtering and access review tools, systems, and practices that "target" African Americans and other members of protected racial classifications under the law.

60.     Nonetheless, Defendants repeatedly have failed to "fix" the discriminatory defects in their A.I., algorithm and other filtering tool systems or to stop the "targeting" as promised. Defendants continue to knowingly, intentionally, and systematically block, demonetize, and deny Plaintiffs and other persons similarly situated, their contractual and other legal rights to access the YouTube platform based on the color of their skin or other protected racial traits, rather than based on the material in videos.

61.     Defendants also abuse their dual roles as content reviewers and content creators on YouTube.  Specifically, under the pretext of unfettered "discretion" to serve as sole "censors" of content, Defendants use racial profiling to restrict the reach and access of Plaintiffs and of other third party users who compete directly with Defendants and their sponsored video content for click per minute ("CPM"), advertising, and other revenue stream and services on the YouTube platform.

62.     Instead of "fixing" the digital racism that pervades on the YouTube platform, Defendants have decided to double down and continue their racist and identity based practices because they are profitable.  By utilizing unilateral control over 95% of the world's public video content, Defendants unlawfully misappropriate viewers, CPM, advertising, and other revenues that rightfully belong to, or would otherwise be available to, Plaintiffs and all other persons similarly situated, by using discriminatory restrictions that unlawfully restrict and block Plaintiffs' content and access on the YouTube platform.

63.     Defendants have some serious explaining to do when it comes to the Plaintiffs and all other persons similarly situated using YouTube.  Plaintiffs would prefer that Defendants spend their money to stop the racist practices that now pervade the YouTube platform, including:

a.     **Abusing Artificial Intelligence Programs, Algorithms and Other Filtering Tools** to digitally profile, redline, and target Plaintiffs and all persons similarly situated on the YouTube platform, for access restrictions, blocking, demonetization, suspensions and removals from the platform based on the racial identity or viewpoint of the video creator, her subscribers, and/or the viewers of her videos by inserting or appending to individual videos race, identity or viewpoint based metadata, thereby forcing Plaintiffs to self-censor and refrain from posting videos regarding issues and current events which are important to the African American community, such as requiring Plaintiffs to avoid or hide references to abbreviations like "BLM," "KKK;" terms such as "Black," "White," "Racism," "Boogaloo," "White Supremacy," "Racial Profiling," "Police Shootings," "Police Brutality," "Black Lives Matter;" names of individuals such as those killed by law enforcement, "Bill Cosby," "Louis Farrakhan;" names of organizations such as "Ku Klux Klan," "Nazi," "Neo-Nazi," "Aryan Brotherhood," and/or other euphemisms that are known and particular to the African American community, despite the fact that the videos involved do not contain any hate speech, profanity, or nudity, and at most, contain very short references or quotations from recognized news sources, which are properly attributed.

b.     **Preventing Full Revenue Generation** for videos of Plaintiffs and all persons similarly situated who are not afforded full monetization, Channel Membership and Livestream donations for videos that are otherwise eligible under Defendants' rules, but have been demonetized or limited in monetization because of Defendants' addition of metadata and use of algorithms and filtering tools that profile creators, subscribers and viewers based on their race or viewpoint, rather than on the actual content of the video.

c.     **Misapplying "Restricted Mode"** to the videos of Plaintiffs and all persons similarly situated, which address or discuss issues of importance to their communities, merely because the videos have titles or tags which include "abbreviations like "BLM," "KKK;" terms such as "Black," "White," "Racism," "Boogaloo," "White Supremacy," "Racial Profiling," "Police

Shootings," "Police Brutality," "Black Lives Matter;" names of individuals such as those killed by law enforcement, "Bill Cosby," "Louis Farrakhan;" names of organizations such as "Ku Klux Klan," "Nazi," "Neo-Nazi," "Aryan Brotherhood," and/or other euphemisms that are known and particular to the African American community, despite the fact that the videos do not contain materials which discuss drug use or the abuse or drinking of alcohol; overly detailed conversations about or depictions of sexual activity; graphic depictions of violence, violent acts; natural disasters or tragedies or violence in the news; specific details about events related to terrorism, war, crime and political conflicts that resulted in death or serious injury, even if no graphic imagery is shown; inappropriate language, including profanity, or content that is gratuitously incendiary, inflammatory, or demeaning toward an individual or group.

       d.    **Shadow Banning Entire Channels And Individual Videos** of Plaintiffs and all persons similarly situated on the YouTube platform based on the race, identity or viewpoint of the video creator, her subscribers, and/or the viewers of her videos, so that the channel and/or individual videos do not appear in searches using the YouTube search application, and viewers cannot locate new videos which discuss issues and current events that are important to the communities of African Americans and members of other protected racial classifications under the law.

       e.    **Deputizing Other YouTube Users To Flag Channels And Videos** on the YouTube platform in order to restrict, block, and/or censor the videos of Plaintiffs and all persons similarly situated, and then, in acting on false or unconfirmed complaints of purported rule violations, Defendants remove, restrict, and/or demonetize, individual videos and/or suspend the channels without first verifying that the flagged video contains material that violates a specific Community Guideline or Term of Service.

       f.    **Interfering With Livestream Broadcasts And Viewer Video Watching** for Plaintiffs and all persons similarly situated by inserting new voice content and/or visual images into the video, unrelated to the topic; throttling, pixelating, interrupting or cutting off the Livestream video broadcast while in progress, or disrupting audio and/or pixelating, blacking out, or rendering blurry visual displays while viewers watch individual videos; deleting positive viewer

comments; and promoting, sponsoring, allowing and/or inserting offensive, misogynistic, racist, or obscene comments or engagement in direct violation of YouTube's Community Guidelines based on the race of the creators, channel subscribers and/or viewers, or their viewpoints.

g.   **Ad Bombing** the videos of Plaintiffs and all persons similarly situated by interrupting new videos as viewers watch them with multiple and repeated streaming and banner ads played at intervals of every 2, 3, or 4 minutes, without authorization of the YouTube creator, so that the viewer is annoyed, irritated or discouraged from watching the entire video or leaves the channel entirely.

h.   **Excluding From "Trending" And "Up Next" YouTube Video Recommendations** the videos of Plaintiffs and all persons similarly situated which, even though they comply with Defendants' Community Guidelines and TOS.  These videos are excluded from Defendants' promotional applications based on the race, identities, and viewpoints of the creators, channel subscribers and/or viewers.  Defendants' practices muffle the voices of Plaintiffs and all persons similarly situated on the YouTube platform and reduce the racial diversity of the opinions and information posted on the platform.

i.   **"Up Next" Flooding With Hostile, Irrelevant Or Extraneous YouTube Video Recommendations** that Defendants publish.  Defendants post video recommendations which appear on the screens of viewers watching the videos of Plaintiffs and all persons similarly situated for videos that contain content bears no relation to the video being watched, the channels to which the viewer has subscribed, or the viewer's video watching history, which contains content that criticizes, disparages, bullies, threatens, or offends individual members of the African American Community or the Community as a whole.

j.   **Promoting And Profiting From Hate Speech** by allowing racist and misogynist hate speech videos that target Plaintiffs and all persons similarly situated on the YouTube platform in direct violation of Defendants' Community Guidelines and TOS, and affording such videos monetization, despite the fact that such videos have been flagged by Plaintiffs and/or their subscribers as violating Defendants' standards, and despite having received repeated complaints regarding those videos.

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

1              k.      **Interfering With, Obstructing, Delaying And Ignoring Appeals** to

2 prevent Plaintiffs and all persons similarly situated from obtaining a timely manual review of video

3 content and reversal of Defendants' erroneous decisions to suspend their channels and to remove,

4 restrict monetization, or restrict access to videos deprives them of their rights to communicate with

5 their intended audience and/or to earn revenue, unless and until, Defendants lift the adverse action

6 and/or restriction, if ever.

7          64.      Regardless of Defendants' subjective motivations, Defendants are not above the

8 law.  Neither the scale, size, or "ubiquity" of Defendants' operations or their influence entitle

9 Defendants to "self-regulate" by ignoring or refusing to comply with the law, including the long

10 established prohibition on race discrimination in contract.

11         65.      Until such time as Defendants make good on their promises, representations, and

12 obligations to "fix" this racism and compensate Plaintiffs and all other persons similarly situated

13 who are victims of Defendants' unlawful and repugnant discriminatory conduct, Defendants will

14 continue to engage in intentional race discrimination that violates their agreements with Plaintiffs,

15 as well as established federal and state laws that govern the relationship between the parties.

16         66.      Plaintiffs can wait no longer for Defendants to "fix" the problems as they promised

17 years ago.  Nor should they have to.  The Defendants' knowing use of a consumer's, race, skin

18 color or some other immutable personal trait or viewpoint to filter and deny access to YouTube, is

19 illegal digital racial profiling, redlining, and discrimination.

20         67.      The time has come for Ms. Wojcicki, and Defendants' other senior officers, to put

21 up or shut up.  If Defendants truly believe that they are engaged in good faith, viewpoint neutral

22 content regulation on YouTube, then Defendants should produce the computer code and permit an

23 expert review of that code to examine the "triggers" for review and restriction of content.

24 Defendants can then, under oath in deposition and other sworn testimony, and through other

25 discovery, explain to Plaintiffs, the Court, and the public why their prior admissions and other

26 evidence of "targeting" African Americans and members of other protected racial classifications

27 under the law, are not true.

28

68.     Defendants' unsupported denials, or assertions that demonstrably discriminatory conduct is "mistakes" or the result of a "he said, she said" misunderstanding between its employees and officers, are not lawful rationales to deny Plaintiffs their day in court.

69.     Despite a whole lot of "telling," Defendants have made no attempt to "show" that they do not discriminate based on the race, identity or viewpoint of Plaintiffs or the hundreds of millions of all other persons similarly situated who fall victim to discrimination by Defendants.

70.     Defendants' refusal to show they do not discriminate is mystifying, if not damning. The computer code and information about how Defendants' A.I., algorithms, and other machine-based filtering tools operate, developed and have changed substantially since Defendants purchased YouTube in 2007.  Evidence regarding those changes will determine the extent to which Defendants use A.I, algorithms, or other filtering tools to profile and discriminate against YouTube users based on their race, identity or viewpoints.

71.     Each time that Plaintiffs (or any other member of the public) access the YouTube user interface, Plaintiffs and Defendants execute binding contract(s) that govern the parties' respective rights and obligations on YouTube, including the TOS.

**B.      The Governing Agreements**

72.     Each time that Plaintiffs (or any other member of the public) access the YouTube user interface, Plaintiffs and Defendants execute binding contract(s) that govern the each party's respective rights and obligations on YouTube, including the TOS.

73.     The provisions in the TOS and other agreements are part of a uniform consumer contract that every one of YouTube's 2.3 billion users must execute and agree to upon accessing the website.

74.     The TOS and other agreement(s) are governed by California law.

75.     Under the agreement(s), Defendants designate YouTube as a "passive website," that is open to the public, provided that any person who "uses or visits" the YouTube website or "any YouTube products software, data feeds, and services provided" consents and legally agrees to YouTube's "TOS," "Google's Privacy Policy," and "Community Guidelines," as "incorporated by

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION,
ACCOUNTING AND DAMAGES**

reference" and are further clarified or modified by Defendants "without notice" (collectively the "Agreement").

76.     The contract(s) allow Defendants not only collect, store, analyze, and organize the personal, financial, political, and other data for each of the YouTube Platform users, but Defendants also use and sell that data to third parties on the open market.

77.     In 2018, Defendants' authorized representatives testified under oath to Congress and confirmed that YouTube is "a neutral public forum" in which Defendants "enforce [their] policies in a politically neutral way."

78.     Among other statements, Defendants affirmatively represent to the public and YouTube users that all access rules and restrictions apply equally to all without consideration of the race, personal identity, or viewpoint of the user and that YouTube is a "forum" where the public can engage in "freedom of expression," to communicate and interact with other users subject to viewpoint neutral content based filtering and regulations that apply equally to all.

79.     As of the filing date of this lawsuit, YouTube's CEO and other senior officers of Defendants continue to represent and insist to the public that YouTube's regulation and restriction of access to its services is undertaken solely by "viewpoint neutral" application of specific content based rules limited to actual video content and does not use, consider, or take into account the user's race, sexual identity, political or religious association, or any other personal identity trait or viewpoint of the user.

80.     Based on Plaintiffs' experience, and the experience of other YouTube users who are members of other protected racial classifications under the law, that is a lie.  And Defendants have admitted as much on multiple occasions dating back to at least 2017.

### 1.     The General Terms Of Use And Contract-Based Promises

81.     As with many large public consumer businesses, Defendants contract with users through the use of an online, consumer form service contract(s).

82.     Like many other consumer service contracts, the TOS and other related agreement(s) that govern the consumer's respective obligations and rights is not a beacon of clarity. Specifically, Defendants utilize a myriad of confusing, ambiguous, vague, overbroad, overlapping,

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

1   interconnected, and inconsistent provisions to govern the parties' respective rights and obligations,

2   including integrating or incorporating service and access provisions that are not specific to the

3   YouTube platform, but apply to any service or product that Defendant Google provides or markets

4   to the public.

5        83.     In or about December 2019, Defendant Google merged its general terms of service

6   for its products and services with that of YouTube's TOS for all purposes.  Consequently, access

7   actions, restrictions, or blocking that occur on YouTube may also be used by Defendants to review,

8   restrict, block, or deny any service that either entity provides, including Android devices and use,

9   personal email, publisher advertising, confidential health record data storage and access, all

10  applications sold in Google's Android App store, election monitoring services, public health and

11  law enforcement services search, and any and all other communication or information services that

12  Google, YouTube, or their affiliates provide to consumers or the public.

13       84.     The result is a complex and indecipherable web of service provisions that are not

14  readily available to users and require each user to locate and navigate as part of a convoluted,

15  confusing and complicated disclosure process, which may not be functionally accessible to the

16  user.

17       85.     The user is also required to figure out what agreements and provisions govern what

18  conduct and restrictions, and which agreements are in place at the time to govern the specific

19  conduct.

20       86.     This is virtually impossible, because as is the case here, Defendants routinely

21  change or amend the provisions of these agreements and do so unilaterally, without adequate notice

22  to users.

23       87.     Because each Plaintiff executed a new TOS agreement every time they access

24  YouTube on their internet browsers, only Defendants know what versions of the agreements and

25  policies apply to the conduct at issue during the period of time governing the claims in this

26  Lawsuit.

27       88.     The TOS and other agreement(s) exist as electronic, on line documents.  The

28  agreements are executed electronically from drop down menus.  Consequently, users often do not

1  have access to or understand the TOS or agreement(s), let alone which version of the TOS and

2  other agreement(s) may govern a particular action or conduct that occurs on a particular date.

3      89.    One fundamental provision of the TOS and agreement(s), however, has not changed.

4  In every TOS or agreement during the relative period of this Lawsuit, Defendants promise users

5  equal and full access to all YouTube services, subject only to viewpoint neutral content-based rules

6  that apply equally to all.

7      90.    On January 17, 2018, Defendants testified to Congress under oath that access to all

8  services offered by Defendants in connection with YouTube are available to Plaintiffs, and all

9  users, subject only to viewpoint neutral content-based rules that apply equally to all users:

10  **Senator Cruz**: Thank you Mr. Chairman.  Welcome to each of the witnesses.  I'd like to

11  start by asking each of the company representatives a simple question, which is: do you

12  consider your companies to be neutral public fora?

13  * * * *

14  **Senator Cruz**: I'm just looking for a yes or no whether you consider yourself to be a

15  neutral public forum.

16  **Senator Cruz**: Ms. Downs?

17  **Ms. Downs**: Yes, our goal is to design products for everyone, subject to our policies and the

18  limitations they impose on the types of content that people may share on our products.

19  **Senator Cruz**: So, you're saying you do consider YouTube to be a neutral public forum?

20  **Ms. Downs**: *Correct.* We enforce our policies in a politically neutral way.  Certain things

21  are prohibited by our Community Guidelines, which are spelled out and provided publicly

22  to all of our users.

23  * * * *

24  **Ms. Downs**: *As I mentioned, we enforce our policies in a politically neutral way.*  In terms

25  of the specifics of Prager University, it's a subject of ongoing litigation so I'm not free to

26  comment on the specifics of that case.

27  See  https://www.c-span.org/video/?439849-1/facebook-twitter-youtube-officials-testify-combating-

28  extremism and  https://www.c-span.org/video/?448566-1/house-judiciary-committee-examines-

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION,
ACCOUNTING AND DAMAGES**

social-media-filtering-practices at 02:34:28 – 02:35:29 of the full hearing recording (emphasis added).

91.     Before and after that date, up to the time of the filing of this lawsuit, YouTube's CEO Susan Wojcicki and other senior officers of Defendants have repeatedly reaffirmed and maintained that all of access decisions are based on viewpoint neutral application of the content based rules governing the service that apply equally to all.

92.     Thus, whatever ambiguity exists in their agreements with Plaintiffs, Defendants admit that all of the agreements and the application of the provisions in those agreements are governed by a core and fundamental promise: access to the YouTube platform and all services is open and available to any member of the public who uses YouTube, subject only to viewpoint neutral content based rules that apply equally to all.

93.     That promise governs all of a user's content based rights and obligations associated with YouTube and all services.  It applies not only to Plaintiffs and to all public users, but also to Defendants, who sponsor video content that competes directly with Plaintiffs and other public users for CPMs, viewer reach and expansion, promotion and advertising, and monetization of revenue generated by each video that is posted on the YouTube platform and/or is available through viewer subscription services.

94.     Defendants' core, fundamental promise of ensuring equal access to YouTube, under neutral content-based rules is illusory, false, and unenforceable.

95.     Defendants exercise "unfettered discretion" when applying YouTube's content-based service rules and provisions and determining what access to give each user.  Defendants admit that at least since 2016, the exercise of this "unfettered discretion" by Defendants is not viewpoint or identity neutral.

96.     Since at least 2017, Defendants have grudgingly admitted that they "target" and deny access or services to Plaintiffs based, not on the video content posted by a Plaintiff, but "for any reason, or no reason," including the race, personal identity, or personal viewpoint, of YouTube content creators, viewers, and users.

97.     The practice of using its "discretion" to deny access to any Plaintiffs, or any user, based on race, identity, or viewpoint, rather than video content, violates and breaches the express and implied promises set forth in YouTube's TOS and other service or access agreements, because those agreements are governed in their entirety by California law, and expressly limit the exercise of Defendants' "discretion" to that "permitted" by law.

98.     Thus, Defendants' admissions that they are engaged in identity and viewpoint based access denials and targeting, breach the express and implied promises that discretionary access decision must be viewpoint neutral in application and comply with all federal and state laws prohibiting discrimination in contract, including 42 U.S.C. § 1981, the Unruh Act, and §§17200, *et seq.* of the California Business & Professions Code.

### 2.     The License Provisions

99.     The current (and/or prior versions) of YouTube's TOS at issue in this discrimination case require Plaintiffs to "grant" Defendants a renewable, "irrevocable" and "perpetual" license to any and all video content or communication that occurs on YouTube.  This includes, but is not limited to, the property rights for all personal data and other revenue streams that Plaintiffs hold an interest in or otherwise derive from the posting, viewing, advertising, or monetization of their videos on YouTube.

100.     Under the TOS, Plaintiffs "grant" Defendants a "worldwide, non-exclusive, royalty-free, sub licensable and transferable license to use that Content . . . in connection with the Service and YouTube's . . . . business . . . ."

101.     The TOS also grant other YouTube "users" a "non-exclusive, royalty-free license to access" content, "reproduce, distribute, prepare derivative works, display, and perform it . . . as enabled by a feature of the Service."

102.     This license includes the right of Defendants and other users to post and monetize Plaintiffs' "[c]ontent or other material" that makes Plaintiffs (i) "solely responsible for" the content and its "consequences," including (ii) all intellectual property rights and restrictions on the video content, and (iii) not posting content or seeking access to services in a manner that is "contrary to the YouTube Community Guidelines."

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

103.    In applying these provisions, Defendants reserve "the right to decide whether Content violates these Terms," including, "but not limited to, pornography, obscenity, or excessive length," and, "in so doing, remove such Content and/or terminate a user's account" if, "in its sole discretion . . . submitting such material is determined to be "in violation of these Terms."

104.    Defendants' acquisition of the licensing rights to 95% of the world's public video content along with the personal and financial information data that belongs to the 2.3 billion users who post or view the content is not free or a gift to the largest and most powerful tech enterprise in the history of the world.  Rather, the license rights are obtained through for tangible and valuable consideration: the right of the licensor or user to equal access to the YouTube platform and all of its services, subject to and limited only by the viewpoint neutral application of YouTube's content-based rules.

105.    Thus, under the TOS, Defendants' license agreement binds and requires them to apply and impose access restrictions for viewpoint neutral content based violations of a third party's intellectual property rights, Defendants' Community Guidelines, and other content based terms of YouTube's service, and to do so in a manner "permitted" by the law.

106.    Defendants' past, present, and continuing violations of the TOS is a fundamental and material breach of the trillion dollar licensing provisions by which Defendants obtained perpetual" and "irrevocable" right to use, display, and monetize 95% of the public's video content that exists or has ever existed in the world, as well as the personal and proprietary data of the 2.3 billion people who use or access the site.

107.    In addition, Plaintiffs also seek a declaratory judgment either that: (a) the plain language of Section 230(c) does not apply to racial profiling and discriminatory access restrictions which are based on a person's race, identity, or viewpoints, rather than based on the "on line material" that actually appears on YouTube; or (b) if Section 230(c) is construed to permit on line racial, identity or viewpoint based discrimination restrictions against YouTube users, Section 230(c) is unconstitutional because it violates the First Amendment's limits on permissive private party speech regulation.

108.     Under the First Amendment, the United States Supreme Court in *Denver Area Educational Telecommuns. Consortium, Inc. v. Federal Communications Comm'n*, 518 U.S. 727, 766-67 (1996), confirmed the obvious: a congressional law that permits a private party to regulate speech is unlawful and unconstitutional unless the law (a) is applied in a viewpoint neutral manner, (b) is narrowly tailored so as not to create a risk of an erroneous private veto over speech, **and** (c) does not interfere with or otherwise alter or obstruct the parties' existing legal relationship, obligations, and rights or the enforcement of those rights and obligations in a court of law.

109.     Defendants' assertion that Section 230(c) permits them to use a person's race, identity or viewpoint to block access to YouTube is unconstitutional because, at least as applied to this Lawsuit, Section 230(c) is neither (a) viewpoint neutral, (b) narrowly tailored to prevent against an erroneous veto of speech by Defendants under its rules, and/or (c) interferes with and eviscerates Defendants' preexisting legal obligations to Plaintiffs under state and federal law, including antidiscrimination, false advertising, consumer protection, and the express and implied promises set forth in Defendants' operative contract(s) with Plaintiffs

**C.      Defendants' Anti-Competitive, Unlawful, Deceptive And Unfair Business Practices**

110.     Defendants shuffle between three conflicting and irreconcilable roles in connection with YouTube:

a.      When Defendants put on their "ISP" hat, Defendants host, review, curate, and monetize the video content of third party users who license their content, and the personal data property rights of these users, in return for providing equal access to YouTube content and services, subject only to viewpoint neutral rules that apply equally to all.

b.      When Defendants put on their "creator" hat, Defendants create videos and partner with hand-picked creators to sponsor their content, and both operate and act as the largest and most powerful of YouTube users to compete directly and aggressively with Plaintiffs and other third party users for views, reach, engagements, CPM revenue, advertisers, and a host of other user based revenue streams on YouTube.

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

c.      When Defendants put on their "advertiser" hat, Defendants review, categorize, and classify the video content of third party users for purposes of selling advertisements on the YouTube platform in connection with individual videos and/or YouTube channels, based on demographic information in the form of Defendants' metadata that they generate for individual videos which is gleaned from video titles and tags (posted by Plaintiffs when the individual videos are posted to the platform), Plaintiffs' channel profiles (which were input when the channels were first created), the profiles of Plaintiffs' subscribers (which individual subscribers input when they first registered with Defendants) and the subscribers' video viewing histories (which Defendants gather, analyze and summarize in the form of metadata), as well as the profiles of other users who view Plaintiffs' videos (which were input when they first registered with Defendants) and the viewers' video viewing histories (which Defendants also gather, analyze and summarize in the form of metadata).  Using the enormous wealth of information Defendants have about the Plaintiffs, their subscribers and the viewers of their videos, Defendants can identify, price and sell advertising space on the YouTube platform in connection with individual videos posted, based on the demographics of the channel subscribers and video viewers.  In this way, Defendants can identify, market and sell advertising based on the race, identity and viewpoints of the YouTube users and generate revenue for Defendants, their affiliated creators, and affluent white YouTube creators, without ever reviewing any of the millions of individual videos posted on the YouTube platform.  In short, Defendants divvy up the video content on the platform by race, identity and viewpoint in order to sell advertisements to third parties without regard to the actual content of videos; moreover, Defendants fully monetize those creators whose subscribers and viewers fit the "right demographic," paying them collectively millions of dollars each month regardless of whether their individual videos comply with Defendants' own Community Guidelines and TOS.

111.    Defendants' multiple roles create platform wide conflicts of interest, in which Defendants utilize their unfettered authority to curate third party content on YouTube as a pretext to impose access and content restrictions on Plaintiffs and all other persons similarly situated, that are not imposed on content posted or sponsored directly or derivatively by Defendants or other parties with whom they contract with for sponsorship.

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

112.     In the last four years, Defendants have invested in and expanded their business to become the largest a production and media company in the world.  *See* https://www.feedough.com/youtube-business-model-how-does-youtube-make-money/.

113.     Among other things, Defendants announced that "[t]he company has partnered with its top content creators who wanted to charge a subscription rental or purchase fees for their content and made their uploaded content as paid content which requires users to pay for a subscription or purchase fees to access the content of the channel." Furthermore, Defendants decided to partner with "affiliates" whose "related product" advertisements are placed with some videos on YouTube. These products link to the affiliate partners, which pay a commission to Defendants if their products are purchased.

114.     Defendants understand that the YouTube Platform has effectively surpassed its user saturation point, and that monetizing and profiting from YouTube by merely hosting content on the platform is no longer financially feasible to satisfy Defendants' insatiable lust for revenue and profits.

115.     Thus, in addition to hosting their own video channels on YouTube, Defendants have entered into lucrative preferred provider production deals with other global media companies, including PBS, MSNBC, HBO, Fox News, Breitbart, and other media and entertainment conglomerates.

116.     Defendants have also entered the digital TV market with the advent of YouTube TV.  Defendants use their control over third party user content, on and access to the YouTube platform to induce consumers to purchase their TV and entertainment services by using the YouTube hosting platform, user interface to that platform, and content curation powers to induce consumers to use YouTube for all digital based TV or video content, including movies, music, sports, and entertainment.

117.     Defendants compete for that public audience or viewership unfairly and unlawfully, in a manner which gives their "preferred content" a competitive advantage, by among other things, using their filtering tools and criteria to restrict the access and reach of the smaller third-party users it hosts on YouTube. Thus, under the pretext of making the site safe for their users, Defendants

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

arbitrarily, capriciously, and deceptively restrict access and audience reach to the videos of their competitors on the platform, like Plaintiffs, while at the same time allowing their own content to avoid those same restrictions and restraints -- even when that content violates their own guidelines. In so doing, Defendants effectively clear space on the platform for content which they, or their preferred users supply, to better reach the sites' 2.3 billion users, by censoring the content of their competitors.

### D.      Defendants' Tool Kit For Unlawful Practices

118.     Defendants utilize a series of discriminatory, anticompetitive and unlawful suppression practices and conduct to grow their profits, financial, interests, and unprecedented consolidation and control over information, speech, advertising, expression, and internet viewership.

### 1.      Artificial Intelligence Algorithm Restrictions

119.     The central mechanism used by Defendants to achieve these objectives are A.I. based algorithms ("A.I."), and computer driven filtering tools that profile, regulate, restrict, flag, and block creator content and access on YouTube.  Defendants surreptitiously collect information regarding Plaintiffs and all other persons similarly situated, their subscribers, and the viewers of their videos, and generate metadata that is embedded, appended or associated with individual videos to facilitate Defendants' unlawful discriminatory and anticompetitive filtering and review tools to restrict or block the video content and access to the YouTube platform by Plaintiffs and all other persons similarly situated, both as YouTube creators and as viewers.

120.     Defendants **claim** that these algorithms are viewpoint and identity neutral, and that they ensure that the "same standards apply equally to all" when it comes to the content regulation of speech on YouTube. Defendants claim that their employees conduct "manual reviews" to supplement the electronic filtering and regulation of video content.

121.     But the evidence, including statements by Defendants' employees familiar with both electronic and manual filtering and regulation of speech that takes place on the YouTube Platform, suggests that Defendants' representations of neutral viewpoint and identity-based content regulation are **also** false. The A.I. and algorithmic filtering tools are embedded with code that

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

regulates content based on purely subjective, viewpoint, topic, and identity animus, and other unlawful criteria. Even before October 2016, Defendants' engineers began making changes to the code and operations of the algorithms and filtering tools in order to ensure that Defendants could filter videos and regulate access to video content based upon overt discrimination based on race, sexual or gender orientation, ethnic, political or religious animus, as well as for financial and/or anticompetitive purposes.

122.    Similarly, Defendants' viewpoint bias, animus, and discrimination towards the user's identity or viewpoint is institutionally and culturally rampant in Defendants' work place and employment practices. Among other things, Defendants operate and administer "Restricted Mode" through employees, including engineers and content reviewers, and independent contractors.  These people work in what has been widely reported and acknowledged as a dysfunctional work environment and often work outside of the United States in countries and cultural settings where discrimination against Plaintiffs and all other persons similarly situated is not only condoned but is deeply embedded in social mores.

123.    Internal emails by and between Defendants' employees show that many employees are routinely subjected to harassment, threats, blacklisting, discipline, and hazing based on their race, or political or religious viewpoints.  The dysfunction and viewpoint bias emanate from, and are enforced at, the highest ranks of Defendants' upper management, and drive the actions of employee supervisors, co-workers, third-party affiliates, and advertisers.

124.    Consequently, even when manual employee reviews of video content are used to check and audit restrictions on videos generated from the digital algorithms or from flagging by other YouTube users, Defendants apply "Restricted Mode" and other discretionary and vague content based criteria, to restrict access to Plaintiffs' videos using vague and undefined terms such as "mature" or "sensitive" for certain audiences, solely because the video discusses a topic involving abbreviations like "BLM," "KKK;" terms such as "Black," "White," "Racism," "Boogaloo," "White Supremacy," "Racial Profiling," "Police Shootings," "Police Brutality," "Black Lives Matter;" names of individuals such as those killed by law enforcement, "Bill Cosby," "Louis Farrakhan;" names of organizations such as "Ku Klux Klan," "Nazi," "Neo-Nazi," "Aryan

Brotherhood," and/or other euphemisms that are known and particular to the African American Community, or the video's title or tag words includes these trigger words.

125.    Defendants' conduct creates censorship, restraint of speech, and discrimination based on the race, identity, and/or viewpoint of Plaintiffs and all other persons similarly situated, not based upon video content which might violate a narrow, neutral, objective, and specifically verifiable criteria that furthers a compelling and legitimate public interest.

126.    Defendants' conduct also forces Plaintiffs and all other persons similarly situated to self-censor and to avoid not only using abbreviations like "BLM," "KKK;" terms such as "Black," "White," "Racism," "Boogaloo," "White Supremacy," "Racial Profiling," "Police Shootings," "Police Brutality," "Black Lives Matter;" names of individuals such as those killed by law enforcement, "Bill Cosby," "Louis Farrakhan;" names of organizations such as "Ku Klux Klan," "Nazi," "Neo-Nazi," "Aryan Brotherhood," and/or other euphemisms that are known and particular to the African American Community in video titles and tag words, but to avoid mentioning these in the video content, in order to avoid having Defendants remove videos or issue a "strike" against the channel, purportedly for posting "hate speech" or violating one or more of Defendants' unidentified Community Guidelines and TOS.

127.    Defendants' A.I. tools and practices effectively silence the voices of Plaintiffs and all other persons similarly situated concerning some of the most important issues and current events affecting their communities.

128.    Because Defendants' A.I. tools and practices single out the videos of Plaintiffs and all other persons similarly situated for adverse treatment (e.g., removal, restricted access if any, and/or limited or no monetization), the Plaintiffs and class members cannot generate sufficient viewers or subscribers to grow their channels so as to qualify for all of the Defendants' special programs and perks, such as YouTube partnership, Channel Membership, mobile Livestreaming, or SuperChat applications, resulting in the creation of a ghetto tier of YouTube creators based on their race, identity and/or viewpoints, who are doomed to create videos for very limited audiences for little to no money.

**2.     Excluding Channels And Videos From Full Revenue Generation**

129.     In addition to creating and using metadata to racially profile Plaintiffs and all other persons similarly situated, as well as their subscribers and viewers, for purposes of restricting access to the YouTube platform, Defendants use the same or similar metadata to limit the revenue which can be generated from individual videos.  Defendants use A.I., algorithms, and filtering tools and practices in conjunction with the metadata they create, to prevent Plaintiffs and other persons similarly situated from earning money from videos merely because the metadata reflects the video title and/or tags include abbreviations like "BLM," "KKK;" terms such as "Black," "White," "Racism," "Boogaloo," "White Supremacy," "Racial Profiling," "Police Shootings," "Police Brutality," "Black Lives Matter;" names of individuals such as those killed by law enforcement, "Bill Cosby," "Louis Farrakhan;" names of organizations such as "Ku Klux Klan," "Nazi," "Neo-Nazi," "Aryan Brotherhood," and/or other euphemisms that are known and particular to the African American Community.  Defendants also use the same or similar metadata to limit or prevent revenue generation from videos posted by Plaintiffs or other persons similarly situated, simply because the videos were created by Plaintiffs or members of other races, by other similar communities, or by those sharing the same viewpoints, or because the videos were posted on channels that are popular with members of Plaintiffs' communities, or are widely viewed by viewers who share Plaintiffs' race, identity, and/or viewpoints.

130.     Because Defendants use metadata based on video titles and tags to flag videos for limited monetization or demonetization, Plaintiffs and other persons similarly situated self-censor and either avoid posting videos regarding issues and current events that are important to their community (e.g., videos regarding the deaths of unarmed African Americans at the hands of law enforcement, healthcare providers' refusals to test or treat African Americans for the Covid-19 virus, the disparate infection, death and unemployment rates experienced by African Americans as a result of the Covid-19 pandemic), or they misspell key words like "Black," "White," "Race," "Racist," and "Racism," or they rely on euphemisms known only to the African American community.

131.     Defendants' conduct and practices cause Plaintiffs and other persons similarly situated to lose revenue which their fully compliant videos would otherwise have generated, as well to lose subscribers and viewers, and the opportunity to grow their channels and to qualify for full access to all of the perks that Defendants offer others.

### 3.     Misapplying "Restricted Mode"

132.     Defendants also use the same or similar metadata to restrict access to the full YouTube platform and related benefits by misapplying "Restricted Mode" to the videos of Plaintiffs and all persons similarly situated.  "Restricted Mode" is one of Defendants' primary tools for platform control and curation.  "Restricted Mode" affects tens of millions of YouTube users every single day.

133.     According to Alice Wu, a Senior Manager of Trust & Safety at YouTube, LLC, about 1.5 percent of YouTube's daily views (or approximately 75 million of the nearly 5 billion views every single day) come from people who have activated Defendants' "Restricted Mode."

134.     According to Defendants, "Restricted Mode" is supposed to function much like a curtain that blocks access to the hardcore pornography section at the corner video rental shop, limiting viewer access by younger, sensitive audiences to video content that contains certain specifically enumerated "mature" aspects.

135.     Defendants assert that "Restricted Mode" is a tool "to help institutions like schools as well as people who wanted to better control the content they see on YouTube with an option to choose an intentionally limited YouTube experience."  "Restricted Mode" also can be activated by system administrators to restrict all access on computer networks to all users and electronic devices connected to the network, including viewers who seek to access video content in public libraries, schools, and other public institutions or private workplaces.

136.     While Defendants claim that viewers control the use of "Restricted Mode," and can choose to turn on "Restricted Mode" for their personal accounts, there is growing evidence that it sweeps more broadly.  In certain instances, for viewers who do not have YouTube accounts and seek to view videos posted on YouTube by Plaintiffs and other persons similarly situated, Defendants have applied "Restricted Mode" to prevent those viewers from accessing videos

through links posted on other social media platforms that are not owned or controlled by Defendants, as well as to prevent YouTube users who have not activated "Restricted Mode" from accessing those videos.

137.    According to Defendants, "Restricted Mode" can be applied to videos in three ways.

a.    First, Defendants examine certain "signals" like the video's metadata, title, and tag words associated with the video.  When creators post videos, Defendants invite them to include certain information in the title or to input "tag" words which are purportedly designed to help viewers find videos in which they are interested, such as a title reflecting the subject of the video, and tag words indicating the video's themes or content.  Plaintiffs and other persons similarly situated unwittingly provide Defendants with such titles and tag words along with their posted videos.  Defendants then generate metadata which is additional content that they insert into, append to, or associate with the videos that are posted, which allows Defendants apply A.I., algorithms and other filtering tools to profile Plaintiffs, their subscribers and viewers, as well as other persons similarly situated, and to sort them by race, identity and viewpoints.  Defendants ultimately apply "Restricted Mode" to the otherwise compliant videos posted by Plaintiffs and other persons similarly situated, because the videos have titles or tag words that reflect issues of importance to African American or other racial communities, and those who simply watch videos popular in such communities – essentially relegating these videos to a limited audience which excludes white, conservative and/or "more sensitive viewers," simply because the videos were made by or for members of protected racial classifications under the law.

b.    Second, Defendants claim that such metadata "signals" identify videos which violate Defendants' Community Guidelines or TOS.  However, these "signals" are used by Defendants as a pretext to segregate disfavored content using "Restricted Mode," regardless of whether the video contains material which is unsuitable for children, younger audiences or more sensitive viewers.  Defendants themselves create all such metadata and insert, embed or associate that metadata which reflects demographic information regarding the video creators, channel subscribers and viewers, along with individual videos to create more "signals" for A.I., algorithms, and filtering tools to utilize.  Thus, in certain cases, videos that would otherwise pass through the

filtering process without incident, are flagged for restrictions by Defendants; not because of anything in the video content, but because of metadata or other "signal" information that Defendants themselves have inserted, embedded or associated with the video.  These signals include information about the race, identity and/or individual viewpoint of the video creator, her subscribers, and her viewers.

    c.  Third, Defendants also purportedly use "Restricted Mode" to passively restrict a video if it is "flagged" as "inappropriate" by anyone in the "community" of YouTube users.  According to Defendants, the so-called "flagged" videos are subsequently reviewed by a "team" of human reviewers for "violations" of Community Guidelines and/or TOS.  But flagged videos are subject to Defendants' own internal review procedures that are race, identity and viewpoint based, so that many flagged videos posted by Plaintiffs and other persons similarly situated may never receive an independent content review by a human being, much less a YouTube employee.

  138. As shown below, when a network administrator or an individual viewer activates "Restricted Mode," each video subject to "Restricted Mode" appears with Defendant's  custom stamp of disapproval, including a red face including a red square bearing a foreboding facial expression, together with text showing "This video is unavailable with Restricted Mode enabled. To view this video, you will need to disable Restricted Mode."

  139. Defendants' stamp of disapproval thus makes a specific and falsifiable misrepresentation to viewers of videos posted by Plaintiffs and other persons similarly situated, that the specific video that they have attempted to access contains content that is so inappropriate, shocking and outrageous, that the viewer must be protected from that content and that the YouTuber creator who has posted that content is responsible for having created and uploaded such inappropriate, shocking, and outrageous content.

  140. These specific and falsifiable factual representations are by no means limited to Defendants' "Restricted Mode" stamp of disapproval.  Viewers who attempt to ascertain why a particular video has been subjected to "Restricted Mode" are told by Defendants that videos are eliminated from "Restricted Mode" when they include specific pieces of content, including content

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

(1) talking about drug use or abuse, or drinking alcohol in videos; (2) overly detailed conversations about or depictions of sex or sexual activity; (3) graphic descriptions of violence, violent acts, natural disasters and tragedies, or even violence in the news; (4) videos that cover specific details about events related to terrorism, war, crime, and political conflicts that resulted in death or serious injury, even if no graphic imagery is shown; (5) inappropriate language, including profanity; and (6) video content that is gratuitously incendiary, inflammatory, or demeaning towards an individual or group.

141.    In reality Defendants' definition of "Restricted Mode" is applied in a significantly over inclusive and under inclusive manner, which has caused significant damage to Plaintiffs and other persons similarly situated.  Even the most simple examination of Plaintiffs' videos subject to "Restricted Mode" shows that Defendants are not only dead wrong in their representations to the public concerning African American videos that Defendants subject to the "Restricted Mode" stamp of disapproval, but Defendants are hiding from the public valuable content and are doing so in bad faith.

142.    To the extent that videos which have titles or tags which include "abbreviations like "BLM," "KKK;" terms such as "Black," "White," "Racism," "Boogaloo," "White Supremacy," "Racial Profiling," "Police Shootings," "Police Brutality," "Black Lives Matter;" names of individuals such as those killed by law enforcement, "Bill Cosby," "Louis Farrakhan;" names of organizations such as "Ku Klux Klan," "Nazi," "Neo-Nazi," "Aryan Brotherhood," and/or other euphemisms that are known and particular to the African American Community," Defendants apply the "Restricted Mode" filter to these videos and limit viewer access to many compliant videos posted by Plaintiffs and other persons similarly situated, which contain content of interest to the African American community.  Defendants do so, despite the fact that the videos do not contain materials which discuss drug use or abuse or drinking alcohol; overly detailed conversations about or depictions of sexual activity; graphic depictions of violence, violent acts; natural disasters or tragedies or violence in the news; specific details about events related to terrorism, war, crime and political conflicts that resulted in death or serious injury even if no graphic imagery is shown;

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

inappropriate language, including profanity, or content that is gratuitously incendiary, inflammatory, or demeaning toward an individual or group.

143.    Defendants effectively use "Restricted Mode" as a damper to quiet the voices of Plaintiffs and other persons similarly situated, from being heard by all YouTube users and to limit Plaintiffs' reach, thereby preventing them from growing their channels, increasing subscribers and viewers, generating revenue, and meeting minimum participation standards to qualify for Defendants' other benefits such as YouTube partnership, Channel Membership, Mobile Streaming and SuperChat.

144.    Once Defendants apply "Restricted Mode" to a video, Plaintiffs and other persons similarly situated are then forced to spend time and effort to appeal Defendants' decision and persuade a human being to actually look at the content of the video.  Even when the appeal is won, Plaintiffs and other persons similarly situated lose the opportunity to generate interest in and revenue from the new video for a period of weeks to months, and to thereby grow their channel during the period that the video is restricted.  Defendants never compensate for the erroneous application of "Restricted Mode," regardless of the length of time it takes for Defendants to actually review the restricted video content.

145.    Defendants impose these restrictions to justify anticompetitive and unlawful actions intended to gain a competitive advantage for their own video content and/or to ensure that their sponsored creators, content partners, and advertisers have an unfair competitive advantage in the YouTube video market.  By placing no restrictions on the monetization of their own videos or those of Defendants' sponsored creators, content partners and preferred advertisers, Defendants gain a competitive advantage by restricting the financial reach of Plaintiffs and other disfavored users, while simultaneously ensuring that their own video content (and those of their sponsored creators, content partners and preferred advertisers) are not subjected to the same (or any) Advertising Restrictions.

146.    Defendants also impose these restrictions to facilitate their advertising practices, whereby they profile videos by the race, identity and viewpoint of creators, subscribers and viewers so as to identify the videos with the most valuable demographics which command the highest

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

prices from most advertisers, without regard to whether there are any advertisers which are willing

to purchase spots associated with videos posted by Plaintiffs and other persons similarly situated.

147.   Defendants' actual practices unlawfully provide Defendants with monopoly power

over the video posting and viewership market, the video advertising market, and the ability to

manipulate, bully, and falsely denigrate legitimate YouTube users, like Plaintiffs and other persons

similarly situated, by subjectively designating their speech as "inappropriate," because Defendants

do not like or agree with the speakers' race, identity or point of view; or because Defendants are

too cheap to actually review the videos posted to the platform, and desire to rely on inexpensive

A.I., algorithms, and other filtering tools for purposes of selling advertisements and curating videos

on YouTube.

### 4.   Shadow Banning Channels And Videos

148.   Defendants treat videos that present or discuss serious issues and current events that

are important to the communities of the Plaintiffs and all other persons similarly situated as "not

family friendly," and as if they are inappropriate for all audiences simply because they were

uploaded by creators whose races, identities, and/or viewpoints are disfavored by Defendants.

Defendants are not merely removing, restricting access to or limiting monetization for videos

posted by Plaintiffs and all other persons similarly situated, Defendants are making those videos,

and some channels invisible on the YouTube Platform, despite the fact that the videos comply with

all of Defendants' Community Guidelines and TOS.

149.   In shadow banning videos, Defendants effectively prevent Plaintiffs' subscribers

and potential viewers from locating new videos which discuss issues and current events that are

followed by the African American community; by excluding such videos from the YouTube search

function on the platform, Defendants are preventing creators like Plaintiffs and all other persons

similarly situated from growing their channels by securing the necessary subscriber and viewer

numbers required to qualify for Defendants' special programs and perks, such as YouTube

partnership, channel membership, mobile Livestreaming, or SuperChat applications, and are

preventing them from generating revenue from their videos.

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION,
ACCOUNTING AND DAMAGES**

150.   Defendants also shadow ban entire channels belonging to Plaintiffs and other similarly situated persons, by making the channels unsearchable on the platform.  Without a link to Plaintiffs' channels, subscribers and viewers cannot access Plaintiffs' videos.  As a result of shadow banning of channels, many Plaintiffs and other persons similarly situated can only attract new subscribers or viewers by "word of mouth," and referrals from other members of their community, or from other social media platforms where links to Plaintiffs' YouTube channels are posted.

151.   Defendants' shadow bans not only impair the growth of channels belonging to, and revenue generated from videos posted by Plaintiffs and other persons similarly situated, Defendants' conduct both effectively reduces the audience for videos posted by Plaintiffs and muffles their voices across the platform, making it impossible for new YouTube viewers to locate video content that is important to their specific communities.  As a result, Plaintiffs, as African American creators, and other persons similarly situated, cannot expand subscriber and viewer numbers sufficient to grow their channels and fully enjoy full access to the YouTube platform and all of the benefits Defendants offer others.

**5.    Delegating Content Review And Regulation To Racists And White Supremacists**

152.   Defendants have configured the YouTube platform to allow any user to "report" or "flag" videos which they believe violate the Google/YouTube Community Guidelines or TOS, e.g., video content which contains hate speech, nudity, profanity, graphic depictions of sexuality or violence, disparaging remarks, content which violates existing copyrights or trademarks held by persons other than the creator posting the video, or descriptions of violent events and scenes which may disturb younger or more sensitive viewers.  Defendants not only allow users to "report" or "flag" videos posted by Plaintiffs and other persons similarly situated, Defendants take action based on those third-party reports and flags and proceed to remove, restrict, and/or demonetize individual videos; issue community "strikes;" and to suspend, and/or remove whole channels of Plaintiffs and other persons similarly situated.  Defendants do so without first verifying that the flagged video violates a specific Community Guideline or Term of Service.  In effect, Defendants

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

1  deputize YouTube users, including racists, sexists, white supremacists, Neo-Nazis, and other hate

2  speech trolls.  These delegated and affiliated users, exercise censorship powers on YouTube,

3  including reporting, flagging, bullying and threatening creators whenever Plaintiffs and other

4  persons similarly situated post content with which Defendants' racist agents disagree.

5       153.  In allowing third parties to wield the power to report or flag a video as violating the

6  applicable Community Guidelines and TOS, Defendants have deprived Plaintiffs and other persons

7  similarly situated, of equal access to the YouTube platform and all of the services Defendants make

8  available to others by creating the presumption that any flagged video does in fact contain content

9  which violates the Community Guidelines and/or TOS.  After being flagged by a third party,

10  Plaintiffs and other persons similarly situated are forced to spend substantial time and effort to

11  appeal the flag in order to restore the channel/video, remove the restriction, or obtain full

12  monetization for channel/video, which, but for the flag, would have reached a wide audience and

13  would have generated substantial revenue.

14       154.  Because of Defendants' conduct and practices, trolls regularly appear on the

15  channels of Plaintiffs and other persons similarly situated, threaten to shut down the channels – and

16  within a few days, the trolls succeed in getting Defendants to suspend the channels.  As a result,

17  Plaintiffs and other persons similarly situated engage in self-censorship and avoid posting videos

18  that address issues of historical, political, cultural, and educational significance to their

19  communities.  Recently, Plaintiffs and other persons similarly situated have avoided timely topics

20  such as the denial of Covid-19 testing and treatment to African American healthcare workers, the

21  inability of African American businesses to apply for CARE loans, and the disparate enforcement

22  of stay at home orders against African American communities.  Defendants' conduct therefore

23  encourages and enables the agendas of racists, white supremacists, and Neo-Nazis on YouTube, by

24  silencing the voices of Plaintiffs and other persons similarly situated.

25         **6.**    **Interfering With Individual Video Viewing**

26       155.  Livestream broadcasts are videos that are posted in a streaming live format which

27  are controlled exclusively by creators or by the moderators designated and authorized by individual

28  creators to review, edit, and remove viewer comments which appear as the video progresses over

1   time.  Livestream broadcasts allow real time viewer participation in discussions on YouTube

2   channels and often involve hundreds of people all making comments regarding important issues,

3   current events, or topics.  YouTube's Livestream broadcast application allows the video creator and

4   her designated moderators to control the content of the broadcast.  They control the viewer

5   participation in the comments section of the screen while the Livestream is played.

6       156.    Defendants routinely restrict viewer access to and revenue generation from videos

7   posted by Plaintiffs and other persons similarly situated, depressing subscriber and viewer

8   numbers.  Many African American channels do not generate significant income from advertising or

9   Channel Membership.  They must rely on other applications to generate revenue, such as

10  Defendants' SuperChat, and Livestream or Patreon Donations.  As a result, Livestream broadcasts

11  are a primary revenue generator for Plaintiffs.

12      157.    Defendants regularly interfere with the Livestream broadcasts by Plaintiffs and all

13  persons similarly situated, using either YouTube employees or independent contractors which

14  Defendants hire.  Defendants' Livestream interference includes such tactics as:  (a) stopping

15  Livestream broadcasts, and forcing the creator to restart the broadcast, resulting in lost viewers, low

16  watch times and irritated subscribers; (b) throttling (intentionally slowing ) broadcasting speeds

17  during Livestream which distorts or interrupts the audio feed, and disrupts or interrupts viewer

18  comments being input to the video on Plaintiffs' channel; (c) inserting new voice content and/or

19  visual images into the video which are entirely unrelated to the decisions and choices of the

20  channel creator and her chosen moderators, and are offensive, threatening, bullying, misogynistic,

21  racist, and/or obscene; (d) removing positive comments from viewers; and (e) disconnecting

22  individual viewers who are in the process of leaving positive comments, thereby silencing viewers

23  who would otherwise support the video or make monetary donations on the Livestream broadcast.

24      158.    For the past two years, until stay at home orders for nonessential businesses were

25  imposed in the Bay Area in March of this year, Defendants' Livestream broadcast interference was

26  relentless, causing Plaintiffs either to suspend Livestream broadcasts, to self-censor and refrain

27  from discussing issues or current events of interest to the African American community, or to

28  conduct them at odd hours without prior announcements.  Defendants' conduct in interfering with

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION,
ACCOUNTING AND DAMAGES**

1   Livestream broadcasts has reduced subscriber and viewer numbers for the channels of Plaintiffs

2   and other persons similarly situated, has reduced revenue generated from Livestream broadcasts

3   and from the channels overall, and has prevented the African American community from receiving

4   information about and discussing issues and current events which are important to members of that

5   community.

6        159.    Notably, for the weeks while stay at home orders were in place for the Bay Area,

7   Plaintiffs were able to conduct Livestream broadcasts unmolested.  However, Defendants'

8   interference has recommenced with the lifting of stay at home orders.  Defendants' interference is

9   now ongoing.

10       160.    Similarly, for the videos uploaded to Plaintiffs' channels that can be watched at any

11  time, through YouTube employees or independent contractors which Defendants hire, Defendants

12  (a) interrupt the video, and forcing the viewer to restart the video, resulting in lost viewers, low

13  watch times and irritated subscribers; (b) throttle the video as the viewer watches which distorts or

14  interrupts the audio feed, and disrupts or interrupts the visual images that the viewer sees; (c) insert

15  new audio content (e.g., noises, static, sounds such as honks, beeps, bumps, and barks) and/or

16  visual images into the video which are entirely unrelated to the decisions and choices of the

17  channel creator, give the impression that the video has low production values, and are annoying,

18  irritating or confusing to the viewers; and/or (d) prevent viewers from "liking" the video.

19  Defendants' interference causes viewers to shorten their watch times, refrain from subscribing to

20  Plaintiffs' channels, and watch fewer of Plaintiffs videos; which in turn prevents Plaintiffs from

21  qualifying for all of the benefits which Defendants offer on the YouTube platform, and reduces

22  revenue generated by Plaintiffs' videos and channels.

23              **7.    Ad Bombing**

24       161.    Because Defendants demonetize or limit monetization for many, if not most of the

25  videos which are uploaded by Plaintiffs and all persons similarly situated, videos which Defendants

26  fully monetize constitute a rare opportunity for generating revenue.  When Plaintiffs upload new

27  videos of substantial interest to the African American Community and/or other English or Spanish

28  speakers throughout the world, there is a limited window of opportunity for the video to generate a

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION,
ACCOUNTING AND DAMAGES**

large number of views and go "viral."  Defendants have a new tool to dampen and reduce views for new fully monetized videos:  Defendants repeatedly play multiple streaming and banner ads which at intervals of every 2, 3, 4 or 5 minutes, without authorization from the YouTube creator.  For a video that is between 5 and 20 minutes, the constant interruption of the video flow makes it difficult to watch.  Defendants are inserting anywhere from 3 to 10 streaming ads, and corresponding banner ads which pop up on viewers' screens for videos under 20 minutes long. Sometimes the ads are playing for a significant portion of the video's total watching time.  Ad bombing annoys, irritates and alienates viewers watching videos and gives a false impression that Plaintiffs are greedy and using their videos and channels to make money at the expense of their subscribers and viewers.  Ad bombing results in viewers exiting from videos without watching them to the end, viewers who are dissatisfied with the video and do not "like" the video or subscribe to Plaintiffs' channels; which in turn prevents new videos from going viral and causes lower reported view numbers for the videos and Plaintiffs' channels, lower reported watch times, lower reported subscribers, lower revenue and fewer YouTube creators who qualify for all of the benefits that Defendants offer on the platform.

### 8.   Excluding Videos From "Trending" And "Up Next" Video Recommendations

162.   Defendants routinely exclude videos posted by Plaintiffs and all persons similarly situated from YouTube's "Trending" and "Up Next" Recommendations which appear on users' screens when they watch videos on YouTube.  While Defendants exclude the videos of Plaintiffs and other persons similarly situated, they include in the "Trending" and "Up Next" applications both reaction videos which copy, pirate, or parody the videos of Plaintiffs, and videos which violate Defendants' Community Guidelines and/or TOS in so far as the videos contain hate speech, obscene, misogynistic, violent, threatening, or disparaging content which is directed specifically at Plaintiffs and other persons similarly situated.  Defendants have continued to include these videos posted by third parties over the repeated flags, written objections, and complaints by Plaintiffs and their subscribers, and they have fully monetized many such videos despite having received flags, objections and complaints that the videos violate Defendants' Community Guidelines and TOS.

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

1

### 9. "Up Next" Flooding

2  163. Defendants publish on the YouTube channels of Plaintiffs and all persons similarly

3 situated "Up Next" video recommendations that appear on viewers' screens as they watch videos

4 on YouTube.  The recommendations appear in the form of a list of video thumbnails with the video

5 titles and names of the channels where they are uploaded.  A viewer can watch the videos that

6 Defendants recommend simply by clicking on the thumbnail or by setting YouTube to

7 automatically play the recommended videos.

8  164. Defendants claim that the "Up Next" video recommendations are (a) similar or

9 related to the video which is being watched; (b) from channels to which the viewer has subscribed;

10 (c) are from channels which post videos that are similar to videos posted by other channels to

11 which the viewer has subscribed, or (d) are similar to other videos which the viewer has historically

12 watched on YouTube.

13  165. For Plaintiffs and all persons similarly situated, Defendants regularly publish long

14 "Up Next" lists featuring numerous individual videos that are entirely unrelated to the video being

15 watched, are not from subscribed channels or similar ones, are dissimilar to anything watched

16 previously by the viewer, and/or are annoying, irritating or offensive to the viewer.  Defendants

17 regularly publish "Up Next" lists recommending videos that are (a) uploaded to channels which the

18 viewer has previously indicated that she does not want to see; (b) associated with channels of

19 creators who make racist, derogatory and/or abusive content directed at the African American

20 Community; and/or (c) racist, derogatory, bullying, threatening and/or abusive to the African

21 American Community.

22  166. Defendants often publish "Up Next" video recommendations for the channels of

23 Defendants' preferred partners such as Fox News and its affiliates, or Defendants' own channels

24 such as YouTube Movies, in essence transforming "Up Next" into free advertising for Defendants

25 and their preferred partners at the expense of irritating, offending, and alienating the subscribers

26 and viewers of Plaintiffs and all persons similarly situated..

27  167. Plaintiffs' subscribers and viewers have left numerous comments complaining about

28 Defendants' "Up Next" practices.

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION,
ACCOUNTING AND DAMAGES**

168.     Defendants' "Up Next" flooding causes Plaintiffs' subscribers to stop watching videos, refrain from watching videos uploaded to Plaintiffs' channels, to refrain from subscribing to Plaintiffs' channels, and even to "unsubscribe" from Plaintiffs' channels. "Up Next" flooding causes lower reported views for videos and channels, lower watch times, lower reported subscriber numbers and ultimately, lower revenue paid to Plaintiffs.

**10.     Promoting And Profiting From Hate Speech**

169.     Defendants regularly promote and monetize hate speech targeting Plaintiffs and all persons similarly situated on the YouTube platform in direct violation of Defendants' Community Guidelines and TOS, and ignore repeated flags, reports and complaints regarding those videos.

170.     Many hate speech videos targeting the African American community on YouTube include identifying information regarding Plaintiffs and other persons similarly situated, including without limitation their telephone numbers, residential addresses, registered trademarks, original copyrighted material, or personal likenesses, in direct violation of Defendants' Community Guidelines and TOS. Plaintiffs and other persons similarly targeted on the YouTube platform have followed Defendants' published procedures to remove the hate speech, including flagging the videos, reporting the violations of Defendants' Community Guidelines and Terms of Use by email, and sending follow up emails complaining of both the videos and the channels on which the videos are posted. The subscribers of Plaintiffs have reported that they too have flagged, reported and written follow up emails to Defendants complaining of the hate speech videos and their related channels.

171.     Despite having received repeated, multiple flags, reports and written complaints over a period of months concerning specific hate speech videos posted by Defendants' favored partners, Defendants have refused to do anything to enforce their own published Community Guidelines and TOS and have not removed the videos or suspended the channels posting such videos. To this day, many hate speech videos remain posted without restriction, and fully monetized to generate revenue for their creators, despite having content that is patently false, racist, and/or sexist, violent, abusive or obscene. Some of the hate speech videos include threats of bodily

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

1   harm or death specifically directed at the Plaintiffs and other persons similarly situated.  Some hate

2   speech videos are posted in a way that falsely indicates that it was posted by Plaintiffs.

3          172.    Among the many YouTube channels which Defendants insulate for enforcement of

4   Community Guidelines and TOS, the channels of Tommy Sotomayor and Candace Owens

5   particularly stand out for their hateful, racist, and misogynist video content. Tommy Sotomayor

6   regularly posts videos which promote violence against members of the African American

7   community.  Candace Owens regularly posts videos disparaging male members of the African

8   American community.  Though Plaintiffs, their subscribers and other persons similarly situated

9   repeated flagged, reported and complained about these two channels and their posted videos, as

10  wells as their trolls who engage in abusive, bullying conduct directed to YouTube users who

11  mention Sotomayor or Owens, Defendants nonetheless regularly include videos posted by

12  Sotomayor and by Owens in the "Trending," and "Up Next" recommendation applications on the

13  screens of African American viewers.  Defendants have rendered "flag proof" the channels of

14  Sotomayor and Owens, and videos posted there.

15         173.    Defendants' refusal to enforce their own Community Guidelines and TOS equally to

16  all YouTube users to eliminate hate speech videos; Defendants' continued promotion of hate

17  speech videos by including them in the "Trending," and "Up Next" applications; and Defendants'

18  continued monetization of hate speech videos and profiting from the sale of advertisements in

19  connection with such videos have substantially reduced racial diversity on the YouTube platform

20  and have endangered YouTube users like Plaintiffs and other persons similarly situated.

21  Defendants' conduct has stifled the voices of Plaintiffs and other persons similarly situated, who

22  are unable to reach their intended audiences or to post videos which address or discuss issues and

23  current events of concern to the African American community because while Plaintiffs' compliant

24  videos are wrongly removed, restricted and demonetized as "hate speech," Defendants protect,

25  promote and profit from vile, vicious, hate speech, and personal attacks on Plaintiffs and other

26  persons similarly situated.  Plaintiffs have received harassing telephone calls and written

27  communications, forcing them to change their telephone numbers and to move from their homes.

28

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION,
ACCOUNTING AND DAMAGES**

1  They have also lost subscribers, viewers and revenue as a result of Defendants' failure and refusal

2  to enforce their own Community Guidelines and TOS equally on all YouTube users.

3            **11.**     **Interfering With, Obstructing, Ignoring And Delaying Appeals**

4       174.    Following Defendants' actions to limit monetization or demonetize a video, or to

5  remove or restrict a video, or to issue a strike against or to suspend a channel, Plaintiffs and other

6  persons similarly situated are forced to spend time and effort to appeal Defendants' decision and to

7  persuade a human being to actually look at the otherwise compliant video(s) in question.  Often,

8  appeals by Plaintiffs and other persons similarly situated drag on for months before Defendants

9  respond to the appeal, but Defendants often do not even respond to Plaintiffs' appeals and either

10  ignore them entirely or confirm the action out of hand, without having a human being review the

11  video content that was the basis for Defendants' actions.  In reality, Plaintiffs and other persons

12  similarly situated often have no real appeal at all.

13       175.    On those rare events when an appeal filed by Plaintiffs or other persons similarly

14  situated are successful, after a human being actually review the video content in question and

15  concludes that Defendants' action was wrongly imposed, Defendants do not reimburse the creator

16  for lost revenue from the video(s) or the channel during the appeal process.  Defendants therefore

17  have a perverse incentive built in their platform regulation, filtering and curation process:  by

18  automating the application of "Restricted Mode," the monetization limitation process, and

19  authorizing members of the YouTube community to flag videos and channels following, which

20  Defendants automatically rely and act on those flags without first verifying videos/channels are in

21  violation of Community Guidelines or TOS, Defendants don't have to pay the affected creators for

22  the use of their video content, and can withhold payment unless and until a success appeal occurs.

23  At each step of the appeal process, Defendants continue to withhold payment of revenue generated

24  by the affected videos, profiting from their own improper decisions.  Defendants absolutely control

25  the process:  they can ignore an appeal, delay the process by weeks, months or even years, or

26  simply confirm the adverse action without ever examining the offending video content – there is no

27  oversight, no higher authority, no way to force Defendants to follow their own Community

28  Guidelines or TOS.

176.   Defendants routinely exclude videos posted by Plaintiffs and all persons similarly situated from YouTube's "Trending" and "Up Next" Recommendations which appear on users' screens when they watch videos on YouTube.  While Defendants exclude the videos of Plaintiffs and other persons similarly situated, they include in the "Trending" and "Up Next" applications both reaction videos which copy, pirate, or parody the videos of Plaintiffs, and videos which violate Defendants' Community Guidelines and/or TOS in so far as the videos contain hate speech, obscene, misogynistic, violent, threatening, or disparaging content which is directed specifically at Plaintiffs and other persons similarly situated.  Defendants have continued to include these videos posted by third parties over the repeated flags, written objections, and complaints by Plaintiffs and their subscribers, and they have fully monetized many such videos despite having received flags, objections and complaints that the videos violate Defendants' Community Guidelines and TOS.

**E.     Defendants Have Violated And Continue To Violate The Rights Of Plaintiffs And The Class**

**1.     Kimberly Carleste Newman**

177.   Plaintiff Newman has been a registered YouTube user since 2015, creating and posting approximately 1,654 videos on her "The True Royal Family" YouTube channel; and since 2016, creating and posting 209 videos on her "True Royal" YouTube channel.  Plaintiff Newman is an African American woman who identifies as such.

178.   Plaintiff Newman makes and posts videos that discuss and present information regarding issues and current events which are important to the African American community, from a Black perspective.  While her videos are pro-Black, they are not intended solely to inform and entertain the African American Community; they are suitable for members of other communities who are sympathetic to or curious about issues and current events as perceived from a Black perspective.  "The True Royal Family" channel has generated approximately 1 million views annually.  The "True Royal" channel has generated approximately 200,000 views annually.  Notwithstanding the substantial annual viewer numbers generated by her channels, Plaintiff Newman has only generated total revenues of $2,672.68 for videos posted on "The True Royal Family," and $123.96 for videos posted on the "True Royal" channel.

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

179.    Plaintiff Newman is informed and believes that Defendants have gathered extensive information in order to generate metadata and then insert, embed, append, or associate such metadata with the videos posted to "The True Royal Family," and "True Royal."  Defendants gathered information regarding her race (Defendants know that Plaintiff Newman is an African American woman); that she makes and posts videos which have as a subject, relate to or discuss issues and current events that are important to members of the African American community; her subscribers either self-identify as members of the African American community or watch many videos posted by other creators who have self-identified as members of the African American community; and many of those who view her videos either self-identify as members of the African American community or watch videos posted by other creators who have self-identified as members of the African American community.

180.    Plaintiff Newman is informed and believes that Defendants have applied "Restricted Mode" and have limited monetization for videos she posted to "The True Royal Family" and "True Royal" because Defendants have a policy and practice of using A.I., algorithms, and other filtering tools to classify, curate, censor, and sell advertisements for YouTube videos based on metadata Defendants create from information regarding the race, identity and viewpoint of creators, subscribers and viewers, rather than the content of the videos posted to the YouTube platform.

181.    Defendants have applied "Restricted Mode" and have limited monetization to nearly all of the videos which remain visible to viewers on "The True Royal Family," and nearly all of the videos posted to "True Royal," despite the fact that each of the videos fully complies with all of Defendants' Community Guidelines and TOS, and contain no nudity, sexualized scenes or language, graphic depictions of sex or violence, drug abuse, or alcohol consumption.  Defendants have applied "Restricted Mode" to most of the videos posted, and have allowed only very limited monetization for some videos, without any explanation or rationale for doing so.  Plaintiff Newman is informed and believes that the sole reason that Defendants have acted in this fashion is that Defendants discriminate against Plaintiffs and other persons similarly situated based on race, e.g., the videos were created by an African American; the videos relate to issues and events of concern

1  to the African American community, and the videos are viewed by large numbers of members of

2  the African American community.

3       182.  For various periods, off and on, throughout the past five years, Defendants have

4  shadow banned both individual videos posted by Plaintiff Newman, and her channels, "The True

5  Royal Family," and "True Royal."  Viewers have informed Plaintiff Newman that they were unable

6  to locate individual videos using YouTube search applications and terms such as "Kimberly

7  Santana," "The True Royal Family," "True Royal," or using as search terms the names of

8  individual videos posted by Plaintiff Newman.  Viewers have further informed Plaintiff Newman

9  that when they searched for "African American" video content, YouTube search applications

10  produced videos posted by Tommy Sotomayor consisting of hate speech and content which

11  disparages members of the African American Community.

12       183.  Defendants do not provide any receipt or record of any kind when YouTubers

13  "flag," report, or complain about videos posted by other YouTube creators.  Because of

14  Defendants' practices regarding such YouTube users' efforts to obtain redress for violations of

15  their rights, individual creators like Plaintiffs and other persons similarly situated are not able to

16  prove that they, in fact, flagged any individual video or channel.  For those users whom Defendants

17  disfavor, the videos and channels are not automatically removed, restricted or demonetized, and the

18  injured YouTube user cannot prove that she flagged the noncompliant or infringing video or

19  channel.  Rather, disfavored users like Plaintiffs and other persons similarly situated are left to

20  make repeated written reports and complaints regarding the noncompliant or infringing video or

21  channel, often, to no effect whatsoever.  Defendants merely ignore those written reports and

22  complaints too.

23       184.  Defendants flagged a video posted by Plaintiff Newman in which she personally

24  sings acapella a song written by Stevie Wonder on grounds that she was infringing the copyright

25  for the song.  Plaintiff's channel was suspended for two weeks for the purported infringement.

26       185.  In September 2019, a third party hacked "The True Royal Family" channel and

27  removed over 600 of Plaintiff Newman's videos so that neither the public nor Plaintiff Newman

28  could view, access, or download any of the videos or portions thereof.  Plaintiff Newman promptly

1 applied to Defendants, asking that they restore the videos to "The True Royal Family" channel.

2 Defendants agreed to return the videos, but has not done so.

3      186.    Months later, in 2020, rather than restoring the original 600+ videos, Defendants

4 removed another group of videos from the channel totaling more than 100 individual videos.

5 Plaintiff Newman again appealed to Defendants to restore or return all of the 700+ missing videos

6 removed from "The True Royal Family," but Defendants have failed and refused to do so without

7 any explanation as to why the original 600+ videos have not been restored, why the additional

8 100+ videos were removed, or why they have not been restored or returned.

9      187.    Plaintiff Newman has been deprived of subscribers, viewers and revenue from the

10 700+ missing videos for more than nine months.  Plaintiff Newman has followed Defendants'

11 online appeals process seeking the return of the missing videos as a whole, and appealing the

12 removal of numerous individual videos.  Plaintiff Newman has also filed repeat appeals for the

13 same videos.  However Defendants have not responded to her requests that they return the missing

14 videos to her channel and have done nothing to address her ongoing injury or lost revenue.

15      188.    Defendants have used A.I., algorithms, and filtering tools to restrict the reach of her

16 videos and to prevent her from increasing subscriber and viewer numbers to grow her channels and

17 generate revenue.  For the past several years, the analytics page reflecting subscriber and viewer

18 numbers for "The True Royal Family" channel have remained steady, varying little from month to

19 month regardless of the number of new videos posted or the Livestream broadcasts.  To avoid the

20 impact of Defendant' A.I., algorithms and filtering tools on Defendants' metadata generated from

21 video titles and tags, Plaintiff Newman intentionally self-censors:  (a) she avoids using

22 controversial video titles; (b) she avoids using abbreviations like "BLM," "KKK;" terms such as

23 "Black," "White," "Racism," "Boogaloo," "White Supremacy," "Racial Profiling," "Police

24 Shootings," "Police Brutality," "Black Lives Matter;" names, such as those of individuals such as

25 those killed by law enforcement, "Bill Cosby," "Louis Farrakhan;" names of organizations such as

26 "Ku Klux Klan," "Nazi," "Neo-Nazi," "Aryan Brotherhood," and euphemisms that are known and

27 particular to the African American Community; she intentionally misspells terms such as "Black,"

28 "White," "Race," "Racism," and "Racial Profiling," because Defendants routinely flags such terms.

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

189.   Despite her efforts to self-censor and avoid the reach of Defendants' A.I., algorithms, and filtering tools, most of the videos posted on "The True Royal Family" and "True Royal" have only limited monetization, if any, and produce next to no revenue

190.   Despite her efforts to self-censor and avoid the reach of Defendants' A.I., algorithms, and filtering tools, most of the videos posted on "The True Royal Family" and "True Royal" have only limited monetization, if any, and produce next to no revenue.

191.   Plaintiff Newman has increasingly turned to Livestream broadcasts to generate revenue from her video content.  Viewers can make monetary donations to YouTube creators like Plaintiffs using SuperChat during Livestream broadcasts.  However, for the past two years, Defendants have been interfering with Livestream broadcasts on "The True Royal Family." Subscribers to "The True Royal Family" have informed Plaintiff Newman that their favorable comments have been interrupted or removed, they have been booted off of the Livestream or prevented from posting comments, and they have been prevented from making donations during Livestream broadcasts.  The subscribers' experiences, as related to Plaintiff Newman, involve conduct which is the exclusive province of the channel owner or their designated moderator(s). Plaintiff Newman had not designated any moderator for the Livestream broadcasts which were the subjects of subscriber complaints.  Defendants also have been throttling, interrupting and even cutting off Livestream video broadcasts in the middle of the event.  Additionally, Defendants have been inserting voice and visual content which blocks out that which Plaintiff Newman is posting live.

192.   Defendants' conduct during "The True Royal Family" Livestream broadcasts have reduced subscriber participation and interest in such events, have reduced new viewer participation, and have reduced the number and size of viewer donations to "The True Royal Family" channel depriving Plaintiff Newman of new subscribers and revenue.

193.   Plaintiff Newman has also experienced significant and extended bullying, harassment, disparaging remarks and threats of physical violence on YouTube, both in the form of trolls leaving comments on "The True Royal Family" channel, and in the form of abusive and threating videos posted by other YouTube creators.  Videos bearing Plaintiff Newman's name, and

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

containing profanity and obscene content have been posted on the YouTube platform.  A video threating to kill her was also posted on the platform.  Such videos violate Defendants' Community Guidelines and TOS, and should be removed as such.  However, Defendants' A.I., algorithm, and other filtering tools not only failed to identify these violations of the applicable rules, Defendants failed and refused to respond to efforts by Plaintiff and her subscribers to flag the videos, or to written reports and complaints regarding the disparaging and threatening videos, much less to enforce Defendants' own public standards and remove the videos or suspend the channels responsible for posting the videos.

194.    As a direct and proximate result of Defendants' racial discrimination and wrongful conduct, "The True Royal Family" and "True Royal" have not substantially increased their respective subscriber and viewer numbers in recent years.  Plaintiff Newman has suffered, and continues to suffer from the loss of 700+ individual videos, improper application of Defendants' A.I., algorithms, and other filtering tools resulting in the shadow banning of her videos and her channels, the misapplication of "Restricted Mode," the improper limitations on monetization for most of her videos, violations of her intellectual property rights and personal disparagement and threats to her person.  Defendants' conduct is willful, intentional and unlawful in discriminating against Plaintiff based on her race, identity and viewpoints, and those of her subscribers and viewers in limiting access to the YouTube platform, related benefits, and opportunities to generate revenue.

195.    For the past three years, Plaintiff Newman has observed that the view numbers for individual videos and the channels, "The True Royal Family" and "True Royal," have varied by 100-200 per month.  The subscribers rise and fall by 100-200 per month.  Given the variations in the numbers of videos Plaintiff Newman posts from month to month, and the large number of events and issues which have arisen in certain months that generate enormous interest in the African American YouTube Community, Plaintiff Newman is informed and believes that the information which Defendants have reported on numbers of views and subscribers are inaccurate and undercount the actual number of times viewers watch videos, and subscribe to "The True Royal Family," and "True Royal."

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

196.    As a result of the Defendants' inaccurate reports of views and subscribers, Plaintiff Newman is informed and believes that Defendants owe additional revenue to her under the TOS. Plaintiff Newman cannot determine the amount that Defendants in fact owe to her based on the extremely limited data reported by Defendants.

## 2.    Lisa Cabrera

197.    Plaintiff Cabrera has been a registered YouTube creator since 2015 when she created the "Lisa Cabrera" channel.  Plaintiff Cabrera registered "Lisa Cabrera" as a trademark in connection with her YouTube channel.  4,423 individual videos have been posted to the "Lisa Cabrera" channel, 68 of those videos were archived by Defendants.  In the past two years alone, Plaintiff Cabrera has uploaded for public viewing in excess of 3,000 videos.  The "Lisa Cabrera" videos have generated more than 20 million views, with 830,000 views in just the past 28 days.

198.    Plaintiff Cabrera is a YouTube partner.  She creates and posts videos about current events and news on her channels, displaying pictures and news clips in her videos with original voice over commentary and narration accompanying the visual images.  Despite the substantial number of total and monthly views generated by the "Lisa Cabrera" channel, Plaintiff Cabrera has received only $25,500 total revenue from YouTube.

199.    Plaintiff Cabrera has long suspected that Defendants' reported views for the "Lisa Cabrera" channel, individual videos published on the channel, and revenue generated by the channel are inaccurate and underreported.  For the past three years, Plaintiff Cabrera has observed that the view numbers for individual videos and the channels, "Lisa Cabrera" and "Lisa C," have varied by 100-200 per month.  The subscribers rise and fall by 100-200 per month.  Given the variations in the numbers of videos Plaintiff Cabrera posts from month to month, and the number of significant events and issues regarding civil rights violations, law enforcement abuses, and disputes affecting the African American Community, Plaintiff Cabrera is informed and believes that the information which Defendants have reported on numbers of views and subscribers are inaccurate and undercount the actual number of times viewers watch videos, and subscribe to "Lisa Cabrera," and "Lisa C."

200.   Recently, Plaintiff Cabrera observed additional inaccuracies in Defendants' reported views for a specific video.  On August 9, 2020, Plaintiff Cabrera uploaded and marked as "unpublished"[4] a video entitled "White Americans Are More Comfortable with Getting A Covid . . ." She did not view the video after uploading or provide a link to the video for someone else.  Shortly after uploading the video, Defendants reported that the video had been viewed 4 times.

a.   As of 6:09 a.m. on August 10, 2020, Defendants had reported 9 views for this "unpublished" video.

b.   The next day, Defendants reported 10 views.

---

[4] "Unpublished" videos are uploaded but do not appear in the list of videos available to the public on the YouTube channel.  They will not appear in YouTube search results based on the title or tags of the video.  The channel creator can leave "unpublished" videos uploaded or can change the video status to "public."  When the creator changes the video status to "public," Defendants add the title of the video to the channel's list of videos and to the platform's videos which can be watched by anyone searching for the video on the YouTube platform.

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**



      c.      Later that day, Defendants reported 9 views.

The video remains uploaded but "unlisted," and not available to the public.  To the extent that the video is "unlisted," Defendants' report of more than "0 views" is inaccurate.  Furthermore, if the Defendants' reported 10 views were accurate, and somehow people were watching the "unpublished" video, later reporting 9 views suggests that the earlier reported 10 views was wrong. Based on these reports, Plaintiff Cabrera is informed and believes that Defendants' reports regarding numbers of views, subscribers and hours of viewing time are wrong.

      201.     Recently, Plaintiff Cabrera has noticed that Defendants' reported subscriber and viewer number for "Lisa Cabrera" have markedly fallen.

      a.     In June, Defendants reported that "Lisa Cabrera" added more than 5,000 subscribers and 1.7 million views.

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**



b.     In July, Defendants reported that "Lisa Cabrera" added more than 8,000 subscribers and 1.7 million views.

c.     However, in August, for the first two weeks of the month, Defendants are reporting that "Lisa Cabrera" added only 392 subscribers and 513,000 views.

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**



Based on the number of new videos added to "Lisa Cabrera" in August and the numbers of new subscribers and viewers which "Lisa Cabrera" has generated historically, Plaintiff Cabrera is informed and believes that Defendants' reporter subscriber and viewer numbers for August are inaccurate at best and intentionally reduced or falsified at worst. Given the channel's historical performance and recent trends, by mid-August, the channel should have no fewer than 4,000 new subscribers and 800,000 new views.

202.    Plaintiff Cabrera is informed and believes that the revenue for the channel which Defendants have reported in August is inaccurate because it is based on inaccurate subscriber and view numbers. Defendants solely control access to the data upon which they calculate subscriber numbers, view numbers and "watch time" for "Lisa Cabrera." Without access to this data, Plaintiff Cabrera cannot calculate how much additional revenue Defendants owe to her.

203.    Defendants have deemed that most of the videos posted to "Lisa Cabrera" and "Lisa C" are inappropriate for most of the YouTube advertisers. As a result, the vast majority of Plaintiff Cabrera's videos have no monetization or limited monetization; the videos produce little to no revenue, no matter how many views or CPM the individual videos generate. Defendants further reduce Plaintiff Cabrera's revenue from her channels by discouraging viewers from watching even those few monetized videos using a tool called "ad bombing," (loading multiple ads that repeatedly interrupt the flow of the video). By way of example only, Defendants have "ad bombed" the following "Lisa Cabrera" videos in the past month:

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

a.     https://www.youtube.com/watch?v=MNFjH67mW78, a video entitled "Ex-Minneapolis Officer Tou Thao Released," which is under 6 minutes long:  Defendants played a streaming ad and banner ad at the beginning of the video, and **interrupted the video 3 times to play 4 different streaming and banner ads**, and played 2 more streaming ads at the conclusion of the video – In all, Defendants played 7 streaming ads in connection with this very short video;

b.     https://www.youtube.com/watch?v=Y1l9U6PKuOk, a video entitled "Congress Plans to Move HR 40 with No Direct Payments," which is 10 minutes long:  Defendants interrupted the video at 2 minutes, 4 minutes, 6 minutes and 8 minutes by playing streaming and banner ads, as well as playing another 2 streaming and banner ads at the conclusion of the video – In all, Defendants played 6 ads in connection with this 10 minute video; and

c.     https://www.youtube.com/watch?v=UlU0O66RWvw, a video entitled "50K+ New Covid-19 Cases 3 Days in a Row Trump Says," which is 16 minutes long:  Defendants interrupted the video at 3 minutes, 7 minutes, 10 minutes and 13 minutes by playing streaming and banner ads every 3 minutes, as well as playing another two streaming and banner ads at the end of the video – In all, Defendants played 6 separate streaming ads in connection with this 16 minute video.

Such repeated interruptions of new videos with streaming ads played at 2, 3 or 4 minute intervals throughout a relatively short video discourages viewers from watching videos to the end and reduces Plaintiffs' reach and ability to generate buzz for their new videos, resulting in shorter viewing hours, lower view numbers, reduced subscriptions for their channels, and prevents new videos from going viral or earning full potential revenue from both ads and CPM.

204.     Another way that Defendants put a damper on Plaintiffs' new videos is to delay access to new videos for hours after Subscribers receive notification that the new video has posted. Subscribers to "Lisa Cabrera" often have difficulty viewing new videos published by Plaintiff Cabrera and must wait upwards of 12 hours for new videos to become available for viewing. Plaintiff Cabrera's subscribers have posted comments like:  "Why are your videos saying you uploaded 5+ hours ago or sometimes 11 and 12 hours ago. . .   But I get em as if you just uploaded like two hours ago or way later.  This happens often lately . . . ."

205.    Defendants also use the "Up Next" recommendations which appear to the right of Plaintiffs' videos when viewed to reduce interest in Plaintiffs' videos.  For African American Plaintiffs, often the Defendants recommend in the "Up Next" column content that is entirely unrelated to either the specific video being viewed on Plaintiffs' channels, unrelated or antithetical to the Plaintiffs' African American YouTube community, or is Defendants' own product or produced by one of Defendants' preferred content partners.  Plaintiff Cabrera's subscribers have posted comments on "Lisa Cabrera," such as:

> I am one of your Youtube subscribers and recently I was watching the story about bubba
> Wallace finding a noose in his stall on Mainstream Media, anyways, then youtube started to
> line my feed with unknown content creators that I am NOT subscribed to [sic] these
> creators were basically making derogatory remarks about bubba and the noose incident . . . .
> . So I was surprised that youtube did this type of practice in what appears to be intentional.
> I get many suggestions when I am looking for new videos to watch on yoga, etc [sic]
> Youtube often does not suggest any African Americans. . . .  I am an avid watcher of
> youtube [sic]  I can attest that they put out feed suggestions often that are not African
> Americans and even put out recommendations of creators that I requested not to watch,
> oftentimes these creators either have derogatory comments about African Americans or the
> creator is NOT African American. . . .

Defendants' practice of flooding "Up Next" with recommendations that undermine Plaintiff Cabrera's content, belittle the African American Community, or irritate African American subscribers to "Lisa Cabrera" irritates and even alienates channel subscribers, reduces viewing time, prevents viewers from leaving favorable comments and/or subscribing and prevents new videos from becoming viral and maximizing viewership and revenue.

206.    Defendants' video playing services are also substandard for African American channels like "Lisa Cabrera."  Often subscribers to "Lisa Cabrera" play videos that appear defective with flickering images, pixelated photos, and/or slashes through text.



**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

1

2

3



4

5

6

7

8

9

10

11   Often subscribers to "Lisa Cabrera" live stream videos see videos that appear in slow motion, are

12   interrupted with pauses not programmed by Plaintiff Cabrera or are cut off entirely.  Sometimes

13   subscribers' comments disappear as they are being typed on the viewer's screen; other times, entire

14   strings of comments disappear from live stream videos without Plaintiff Cabrera removing them.

15   Such substandard video services give viewers the impression that Plaintiff Cabrera's videos are

16   substandard and/or recorded with defective equipment; alternatively, viewers may believe that

17   Plaintiff Cabrera is deleting their comments because of some personal animosity resulting in lower

18   viewing times, less audience participation, fewer new subscriptions and even cancellation of

19   existing subscriptions to the channel.

20          207.    Plaintiff Cabrera is informed and believes that Defendants have gathered extensive

21   information in order to generate metadata and then insert, embed, append, or associate such

22   metadata with the videos posted to "Lisa Cabrera," and "Lisa C."  Defendants gathered information

23   regarding her race (Defendants know that Plaintiff Cabrera is an African American woman); that

24   she makes and posts videos which have as a subject, relate to or discuss news and current events

25   that are important to members of the African American community; her subscribers either self-

26   identify as members of the African American community or watch many videos posted by other

27   creators who have self-identified as members of the African American community; and many of

28   those who view her videos either self-identify as members of the African American community or

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION,
ACCOUNTING AND DAMAGES**

1  watch videos posted by other creators who have self-identified as members of the African

2  American community.

3        208.    Plaintiff Cabrera is informed and believes that Defendants have applied "Restricted

4  Mode" and have limited monetization for videos she posted to "Lisa Cabrera" and "Lisa C"

5  because Defendants have a policy and practice of using A.I., algorithms, and other filtering tools to

6  classify, curate, censor, and sell advertisements for YouTube videos based on metadata Defendants

7  create from information regarding the race, identity and viewpoint of creators, subscribers and

8  viewers, rather than the content of the videos posted to the YouTube platform.

9        209.    Defendants have applied "Restricted Mode" and have limited monetization to most

10  of the videos on "Lisa Cabrera," despite the fact that each of the videos fully complies with all of

11  Defendants' Community Guidelines and TOS, and contains no nudity, sexualized scenes or

12  language, graphic depictions of sex or violence, drug abuse, or alcohol consumption.  Defendants

13  have applied "Restricted Mode" to most of the videos posted, and have allowed only very limited

14  monetization for some videos, without any explanation or rationale for doing so.  By way of

15  example, as of August 12, 2020, the following videos uploaded to "Lisa Cabrera" are no longer

16  available for viewing with "Restricted Mode" enabled:

17          a.    https://www.youtube.com/watch?v=OG4rq7QYWBg, a video entitled

18  "Record Breaking Background Checks in the US," with 11,997 views;

19          b.    https://www.youtube.com/watch?v=nANzWSJxEn8, a video entitled

20  "Melinda Gates Vaccines for the Black Community Comment," with 1,059 views;

21          c.    https://www.youtube.com/watch?v=m0yEkU73wDk, a video entitled "Black

22  Voices are Growing on Social Media," with 1,597 views; and

23          d.    https://www.youtube.com/watch?v=RXOLwL41kNM, a video entitled

24  "Blacks and Hispanics now make up majority of people under age 16," with 705 views.

25  None of these videos violate any Community Guideline or TOS.  Each includes properly cited

26  news sources and original commentary regarding events and information of significant interest to

27  the African American Community.  Until very recently, "Blacks and Hispanics now make up

28  majority of people under age 16," was both unrestricted and at least partially monetized.

210.    Defendants have applied "Restricted Mode" to all of the comments to each of Plaintiff Cabrera's videos.  They did so without notice or explanation to Plaintiff Cabrera.  As a result of this practice, viewers who rely on internet access supplied by public libraries, schools, employers or commercial establishments which enable "Restricted Mode" for their networks, will see Defendants' automatically generated message: "Restricted Mode has hidden comments for this video."  Viewers accessing Plaintiff Cabrera's videos on a network which has enabled "Restricted Mode," will not be able to comment on these videos or to view the comments of anyone else.  This practice deprives viewers of the YouTube interactive community experience and discourages viewers from actively participating in Plaintiff Cabrera's YouTube community, from subscribing to Plaintiff Cabrera's videos, and from watching videos through to the end, resulting in reduced viewing times, number of views and revenue for channels..

211.    Defendants have not applied the same Community Guidelines, TOS and standards for "Restricted Mode" to white creators during the past two years.  For example, Defendants recently came under fire for its failure to apply its Community Guidelines, TOS and standards to YouTube channels "PewDiePie" or "Shane."

a.    PewDiePie is a YouTube channel created in 2010, with 106 million subscribers, and nearly 26 billion views.  Much, but not all of PewDiePie's videos relate to gaming.  https://www.youtube.com/watch?v=KGO99JWnZBs, a video entitled "Streamers Who Have Said the N Word," featuring a series of video clips of different video gamers saying "nigger" and using profanity.  This YouTube video has generated 1.6 million views.  The video clips also include ads for products.  The creation and posting of such a video, which highlights the word "nigger" and profanity coming out of the mouths of PewDiePie and other gamers, is gratuitous and serves no purpose other than to be provocative.  While the video is not viewable with "Restricted Mode" enabled, it remains uploaded to the channel, generating views for PewDiePie and fueling the channel's growth.

b.    Shane Dawson, who owns the YouTube channel "Shane."  "Shane" was created in 2005 and has in excess of 21 million subscribers, having generated in excess of 4.4 billion views by uploading vulgar, racist, sexually explicit and exploitative videos.   Had

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

1  Defendants monitored the content of "Shane" videos, they would have known as of 2015 that

2  "Shane" had offensive racist videos featuring black face on the channel because Shane Dawson

3  published to the channel his https://www.youtube.com/watch?v=3jZDt5zQWsE video, entitled

4  "My Apology (Blackface & Offensive Videos) which generated 1.8 million views.

5          i.      Unsurprisingly, "Shane" was not removed from the platform or

6  demonetized as a channel.  Rather, it was not until more than four years later, in the past two

7  months, that Defendants took any action regarding the videos uploaded on "Shane," and

8  demonetized the channel, after Shane Dawson posted a second apology, his

9  https://www.youtube.com/watch?v=ardRp2x0D_E video, entitled "Taking Accountability," during

10  which he apologizes for posting videos that are offensive, racist, inappropriate featuring children.

11  This second so-called apology posted on June 26, 2020, generated 16.7 million views.

12  Interestingly, the video is not available with Restricted Mode enabled, so many of those offended

13  by "Shane" videos will not be able to view the detailed apology.

14          ii.     While many, but not all such offensive, racist, inappropriate videos

15  were removed by Shane Dawson, most of the videos, or snippets from the videos, were reposted by

16  other YouTube creators and can be easily viewed.  By way of example only (Plaintiffs have not

17  undertaken to identify all or even most of such reposted videos), the following Shane Dawson

18  videos or snippets remain for viewing on Defendants' platform:

19          (1)     https://youtu.be/gbU1uJnw0Oc, a video entitled "Shane

20  Dawson Black Face, N Word," which generated 618,328 views and can be viewed with Restricted

21  Mode enabled;

22          (2)     https://youtu.be/_cPt-Hp2uyU, a video entitled "Shane

23  Dawson Jacking off to Willow Smith," featuring a video clip of Shane Dawson feigning

24  masturbation while looking at a poster of 11 year old Willow Smith which can be viewed with

25  Restricted Mode enabled.

26          (3)     https://youtu.be/0wd-_ZdQyQI, a video entitled "Shane

27  Dawson N word compilation," which can be viewed but not with Restricted Mode enabled; and

28

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

1       (4)    https:///youtube.com/watc?v+qGS8BTUGeYI#action=share,

2   a video entitled YouTube CEO Susan Wojcicki's Favorite Youtuber RACIST Shane Dawson

3   sexually harassing young girls," featuring video clips of Shane Dawson discussing "dick rings,"

4   with underage girls, and asking them to eat cocktail wieners more slowly for the "pedophiles"

5   watching the video, which cannot be viewed with Restricted Mode enabled.

6   These videos not only remain on the platform, but like "Shane," Defendants have not removed the

7   videos or shut down the channels upon which they are uploaded.

8       iii.    "Shane's" other videos which remained viewable as of August 12,

9   2020 so long as restricted Mode was not enabled include:

10       (1)    https://www.youtube.com/watch?v=-A1HXBj7myU, a video

11   entitled "Blowjob Prank," which generated 1.3 million views and features Shane Dawson feigning

12   fellatio on a number of friends at a dark filling station;

13       (2)    https://www.youtube.com/watch?v=eDZrGk2F6c0, a video

14   entitled "Sex Position Challenge," which generated 3.1 million views and includes explicit

15   profanity laced descriptions of a sexual position;

16       (3)    https://www.youtube.com/watch?v=0QQ4Y19wJyE, a video

17   entitled "Biggest WTF Moments of 2015," which generated 1.7 million views and features

18   profanity and images of a nude Justin Bieber with very small black out boxes, a product called a

19   "vajankle" which appears to be an anatomically correct model of female genitalia appended onto a

20   severed ankle, and a Caucasian wearing a sombrero doing an impression of a Hispanic man;

21       (4)    https://www.youtube.com/watch?v=uk5s3DXL2EY, a video

22   entitled "Man with a Robot Penis," which generated 1.3 million views and includes a Caucasian

23   doing a profanity laced impression of an Indian man;

24       (5)    https://www.youtube.com/watch?v=6FLUNQB41wM, a

25   video entitled "Reacting to Lemon Party," which generated 1.3 million views and features profanity

26   laced voice over commentary accompanying video clips of young girls who appear to be pre-teens

27   or early teens watching pornographic clips of elderly people.

28

1   It remains to be seen as to whether Shane Dawson earned advertising revenue from these videos, or

2   whether he earned CPM revenue.  Regardless, Shane Dawson grew his channel, by generating

3   millions of views over the years, by creating and posting these videos.  Something which African

4   American creators are unable to do.

5       212.    Plaintiff Cabrera is informed and believes that the sole reason that Defendants have

6   chosen to specially enforce the Community Guidelines and TOS against African American creators

7   is because Defendants discriminate against Plaintiffs and other persons similarly situated based on

8   race, e.g., Defendants do not restrict videos because of their content; they restrict the videos

9   because of the identity of the creators:  Defendants remove videos, apply "Restricted Mode" to

10  videos, and demonetize videos because they are created by an African American that relate to

11  issues and events of concern to the African American community, or are viewed by large numbers

12  of members of the African American community.

13      213.    In addition to the Defendants' efforts to reduce Plaintiff Cabrera's reach by

14  misapplication of "Restricted Mode," for various periods, off and on, throughout the past five

15  years, Defendants have shadow banned both individual videos posted by Plaintiff Cabrera, and her

16  channels, "Lisa Cabrera," and "Lisa C" in their entirety.  Viewers have informed Plaintiff that they

17  were unable to locate individual videos using YouTube search applications and terms such as "Lisa

18  Cabrera," "Lisa C," or using as search terms the names of individual videos posted by Plaintiff

19  Cabrera.

20      214.    Because Defendants single out Plaintiffs and other persons similarly situated for

21  rigorous enforcement of Defendants' Community Guidelines and TOS, to avoid receiving a

22  "strike" for copyright infringement and related channel suspension, Plaintiff Cabrera is careful

23  about complying with 'fair use' rules when using clips from someone else's videos:  she keeps

24  news clips short, averaging 1-4 minutes in length; she does not alter the original material in any

25  way; she always gives full credit in the video to the source of the original material of others.

26      215.    Sometimes, Plaintiff Cabrera posts identical videos both on the "Lisa Cabrera"

27  channel and the "Lisa C" back up channel to see if they generate similar viewer numbers and are

28  treated the same by Defendants' A.I., algorithms and other filtering tools.  Sometimes, the identical

videos posted on the "Lisa C" channel generate more viewers and revenue than those posted on the "Lisa Cabrera" channel.  On six different occasions, Defendants flagged the "Lisa C" channel for posting "100% of the video of another YouTube creator, despite the fact that the video was created by Plaintiff Cabrera, registered owner of both channels, and despite Plaintiff Cabrera's written communications to Plaintiffs notifying them that she had given permission to "Lisa C" to repost each of the videos.  Ultimately, Plaintiff was forced to archive each of the six videos that Defendants had flagged on the "Lisa C" channel simply because Defendants claimed that she was violating her own copyright on her own channel.

216.    Plaintiff Cabrera registered her "Lisa Cabrera" name and an associated image as trademarks.  As part of the channel creation process, Defendants ask YouTube creators if they are using marks which have been registered as a trademark.  When she created the "Lisa Cabrera" channel, Plaintiff Cabrera informed Defendants that she had registered her channel name and a specific image used with thumbnail tiles as trademarks.  Nonetheless, Defendants refused to remove videos using Plaintiff Cabrera's registered trademark image from the channels of other YouTube creators in response to Plaintiff's repeatedly flagging such videos, reporting the trademark infringement for the mark by the channel, and repeated unauthorized uses of the "Lisa Cabrera" name.  For a period of years, Defendants have ignored Plaintiff Cabrera's complaints and allowed other YouTube users to infringe on her trademarks with impunity, in violation of Defendants' own Community Guidelines and TOS.

217.    While Defendants refuse to protect the intellectual property of Plaintiffs and other persons similarly situated, Defendants routinely flag or remove videos, and suspend channels for violating the intellectual property of others.

218.    Defendants removed 68 of Plaintiff Cabrera's videos without notice, explanation or justification other than the videos involved copyright infringements.  Though she promptly appealed each removal, she was unable to have Defendants resolve the removal of the videos.  Defendants permanently archived those 68 videos.  Now they cannot be viewed, accessed or copied by anyone.  They are simply "lost" to Plaintiff Cabrera.  Defendants never informed Plaintiff whether someone had flagged any of these videos; who, if anyone, asserted a copyright interest in

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

1   any content of any individual video; what, if anything, in the video triggered the Defendants'

2   conduct.  Without such information, Plaintiff Cabrera could neither understand the Defendants'

3   strike against any one video nor attempt to resolve the strike for any video.

4        219.    Defendants wrongly suspended the "Lisa Cabrera" channel for "hate speech in

5   connection with a video Plaintiff posted commenting on a report by NBC regarding the purchase of

6   illicit narcotics on the dark web.  Plaintiff Cabrera promptly appealed the suspension.  Defendants

7   rejected the appeal and refused to actually watch the video.  It was only after Plaintiff Cabrera filed

8   a case against Defendants in small claims court that Defendants finally contacted Plaintiff Cabrera

9   and informed her that the suspension was erroneous.  In all, "Lisa Cabrera" was suspended and

10  fully demonetized for six weeks due to Defendants' error.

11       220.    Following the lifting of the suspension for the "Lisa Cabrera" channel, the channel

12  remained demonetized, without the SuperChat application, and with 0 subscribers listed for the

13  channel.  Defendants waited two additional weeks to restore monetization for individual videos,

14  SuperChat and the prior existing subscribers for the channel.  In all, Plaintiff Cabrera lost 8 weeks

15  of revenue due to Defendants' wrongful conduct and refusal to even look at the video content that

16  they had improperly flagged as "hate speech."  Defendants never offered to compensate her for the

17  lost revenue they caused.

18       221.    Defendants demonetized many videos on the "Lisa Cabrera" channel without notice

19  or explanation, even when the videos fully comply with Community Guidelines and TOS.  For

20  example, Defendants demonetized the following "Lisa Cabrera" fully compliant videos:

21            a.       https://youtu.be/LbT3ZAPj_AA, a video entitled "A Heatwave Hits Western

22  Europe;"

23            b.       https://youtu.be/TE_Z1Y0P7Rg, a video entitled "US Birth Rates Are At A

24  32 Year Low;"

25            c.       https://youtu.be/9i41xbByk2g; a video entitled "Documentary:  China's One

26  Child Policy and Propaganda;"

27            d.       https://youtu.be/GFPbYHEgTqA, a video entitled "The Spanish Flu 1918

28  See The Similarities in Pictures;" and

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION,
ACCOUNTING AND DAMAGES**

1    e.  https://youtu.be/pcHDdad4CIw, a video entitled "Trump's Tariffs Are

2 Contributing to More Farmer Tragedies."

3   222.  Defendants also deputize YouTube users (those who are not members of disfavored

4 groups like those to which Plaintiffs and other persons similarly situated belong) to flag videos and

5 channels that purportedly violate Defendants' Community Guidelines and TOS, and then

6 automatically remove, restrict, or demonetize flagged videos, and suspend or remove flagged

7 channels, without verifying that the videos or channels in question actually violate any published

8 standard.  As a result of Defendants' abdication to anonymous YouTubers of responsibility for

9 enforcing applicable standards, Plaintiffs and other persons similarly situated are subjected to

10 racist, misogynist, abusive trolls who target Plaintiffs' videos and channels for adverse action by

11 Defendants.

12   223.  In January of this year, Defendants again suspended  all monetization for videos

13 posted to "Lisa Cabrera" following a threat made by YouTube user, Oxyman, during a Livestream

14 broadcast on his channel where he vowed, "I'm gonna make sure [Lisa Cabrera's] channel gets

15 demonetized."  Plaintiff Cabrera is informed and believes that Oxyman flagged her channel

16 purportedly for violating Defendants' Community Guidelines or TOS.  Without taking any steps to

17 verify the flag or reported violation, Defendants then demonetized the "Lisa Cabrera" channel in

18 January of this year without any prior notification or explanation given to Plaintiff.

19   224.  Thereafter, Plaintiff Cabrera promptly appealed the Defendants' action.  Defendants

20 informed her that she could reapply for access to monetization only after waiting 30 days.

21   225.  After 60 days, Defendants restored monetization for the "Lisa Cabrera" channel

22 videos without any explanation as to why they had demonetized the channel to begin with.

23 Defendants never offered to compensate her for the lost revenue they caused by blindly assuming

24 the validity of Oxyman's flag on the "Lisa Cabrera" channel.

25   226.  To compound the financial injury to Plaintiff Cabrera, during this same period,

26 Defendants were running advertisements for the World Health Organization regarding Covid-19

27 prevention, and receiving advertising revenue at the same time that "Lisa Cabrera" was completely

28 demonetized.

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION,
ACCOUNTING AND DAMAGES**

227.   Plaintiff Cabrera has also been the subject of improper posts by YouTube creator, Michael Anderson, a known white supremacist.  Michael Anderson posted a false video which had as a subject Plaintiff Cabrera and disparaged her personally.  Mr. Anderson also posted Plaintiff's name and residential address in the comments section of his video.  After recording an image of the video displaying Lisa Cabrera's name and address in the comments section; Mr. Anderson then removed the video and reposted it without Lisa Cabrera's address.

228.   Following Mr. Anderson's posting of the video and Plaintiff Cabrera's residential address, numerous additional copies of the video with the address in the comments section appeared on multiple additional YouTube channels.

229.   Plaintiff Cabrera used Defendants' reporting tool, which sent links to the video to Defendants.  Defendants never responded to Plaintiff.  Approximately fifty of the subscribers to the "Lisa Cabrera" channel informed Plaintiff that they too had reported links to the video to Defendants using the reporting tool.  Defendants took no apparent steps to remove the disparaging video featuring Plaintiff Cabrera's name and false information regarding her, despite the fact that the video clearly violated Defendants' Community Guidelines and TOS, while ignoring dozens of reports with links flagging the Michael Anderson video.

230.   On another occasion, Michael Anderson made and posted another video which had Plaintiff Cabrera as the subject, and "Lisa Cabrera" in the video's title.  This video featured an image of Mr. Anderson in a car brandishing a revolver and talking about Plaintiff Cabrera.  Again, Plaintiff Cabrera used Defendants' reporting tool and sent to Defendants a link to the video which communicated a clear threat of violence by Mr. Anderson against Plaintiff Cabrera.  Again multiple subscribers to "Lisa Cabrera" communicated to Plaintiff that they too had flagged the video using Defendants' reporting tool.  And again, Defendants did absolutely nothing to remove the video, or to suspend or remove Michael Anderson's channel for violating Defendants' Community Guidelines or TOS.

231.   As a direct and proximate result of Defendants' blatant and overt racial discrimination and wrongful conduct, "Lisa Cabrera" has not grown in subscriber numbers, viewer numbers or view times as the channel would have otherwise grown absent Defendants' conduct.

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

Plaintiff Cabrera has been subjected to public disparagement, racist and misogynist abuse, public posting of her private contact information and overt threats of physical violence – all of which has occurred with the tacit, if not overt, approval of Defendants who have repeatedly refused to enforce their own Community Guidelines and TOS.  Plaintiff Cabrera has suffered lost revenue directly due to Defendants' racist profiling, A.I., algorithms and other filtering tools, while her channel was demonetized, while her channel was suspended, while Defendants have held her 68 videos in "archive," and Defendants continue to misapply "Restricted Mode" and limited monetization to individual videos she has posted.

232.    As a result of the Defendants' inaccurate reports of views and subscribers, Plaintiff Cabrera is further informed and believes that Defendants owe additional revenue to her under the TOS.  Plaintiff Cabrera cannot determine the amount that Defendants in fact owe to her based on the extremely limited data reported by Defendants.

### 3.    Catherine Jones

233.    Plaintiff Catherine Jones ("Plaintiff Jones") is an African American woman residing in the State of Vermont who is the creator and owner of "Cooking with Carmen Caboom," a YouTube cooking channel for African Americans, and "Carmen Caboom," and "Carmen Caboom Reloaded," two YouTube channels dedicated to developing and posting both parodies and serious videos which discuss and present information regarding issues and current events which are important to the African American community.

234.    Plaintiff Jones created the "Carmen Caboom" channel in 2010, a backup "Carmen Caboom" channel in 2014, the "Cooking with Carmen Caboom" channel in 2015 and the "Carmen Caboom Reloaded," channel in 2018.  Defendants improperly removed the original "Carmen Caboom" channel for purported nudity when no video posted to the channel included any nudity.

235.    Plaintiff Jones has followed the online appeals process YouTube provides when it gives notice of channel suspensions and terminations in an attempt to recover the improperly removed channels and videos that were uploaded to the channels.  Plaintiff Jones has also written emails and attempted to leave messages for Defendants, requesting that the removed channels and videos be restored.  Defendants have not responded or returned the videos.

236.     Plaintiff Jones is also a YouTube partner.  Since creation, Plaintiff Jones" 2014 "Carmen Caboom" channel has posted many videos, several of which Defendants improperly removed as hate speech, the remaining videos have garnered approximately 500 -1,200 views per video overall which have generated approximately $500 per year.

### 4.     Denotra Nicole Lewis

237.     Plaintiff Lewis has been a registered YouTube user since 2006 and has posted her own videos on her YouTube channel, "Nicole's View" since 2016.  Plaintiff Lewis presently has 178 videos which are viewable on "Nicole's View," 169 of which are listed when "Restricted Mode" is enabled.

238.     When Plaintiff Lewis registered "Nicole's View," Plaintiff Lewis answered Defendants' online questionnaire and self-identified as African American or Black.  Had Defendants not requested that she provide personal information about herself for her profile, Plaintiff Lewis would not have done so.  When she provided this information, she had no idea that Defendants would use information about her race to generate metadata about her, the videos she watches, and the videos she posts, or that Defendants would insert, embed or associate such metadata with videos she post; or that Defendants would insert, embed or associate the metadata of her subscribers or her viewers based on race, identity or viewpoint; or that Defendants would filter, censor or restrict her videos based on information regarding her race, identity or viewpoint.

239.     Plaintiff Lewis creates and posts videos to inform and entertain the African American Community with respect to current events and issues of import to Black Americans.  To date, she has posted 748 videos to her channel, some of which Defendants have removed from the platform, leaving 731 which can be watched by the public.  While "Nicole's View" has generated in excess of 10.6 million views since 2016, she has only generated approximately $25,000 from those views.

240.     Plaintiff Lewis is informed and believes that Defendants have gathered extensive information in order to generate metadata based on that information, and then insert, embed, append, or associate such metadata with videos posted on "Nicole's View."  Defendants gathered information regarding her race (Defendants know that Plaintiff Lewis is an African American

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

1    woman); that she makes and posts videos which have as a subject, relate to or discuss issues and

2    current events that are important to members of the African American community; her subscribers

3    either self-identify as members of the African American community or watch many videos posted

4    by other creators who have self-identified as members of the African American community; and

5    many of those who view her videos either self-identify as members of the African American

6    community or watch videos posted by other creators who have self-identified as members of the

7    African American community.

8        241.    Plaintiff Lewis is informed and believes that Defendants have applied "Restricted

9    Mode" and have limited monetization for the videos she posted to "Nicole's View" because

10   Defendants have a policy and practice of using A.I., algorithms, and other filtering tools to classify,

11   curate, censor, and sell advertisements for YouTube videos based metadata Defendants create from

12   information regarding the race, identity and viewpoint of creators, subscribers and viewers, rather

13   than the content of the videos.

14       242.    Defendants routinely limit viewer access by wrongly applying "Restricted Mode"

15   and by limiting monetization to most of the videos posted on the "Nicole's View" channel, despite

16   the fact that the videos fully comply with all of Defendants' Community Guidelines and TOS, and

17   contain no nudity, sexualized scenes or language, graphic depictions of sex or violence, drug abuse,

18   or alcohol consumption.

19       243.    Plaintiff Lewis has uploaded 748 videos to the "Nicole's View" channel, 17 of

20   which Defendants wrongly removed or archived for unknown reasons.

21       244.    Of the remaining uploaded videos only 178 are listed under "Nicole's View."  167

22   of those are listed with "Restricted Mode" enabled.  Only 84 of those videos listed can in fact be

23   viewed with "Restricted Mode" enabled.  For example, Defendants have misapplied "Restricted

24   Mode" to the following compliant videos:

25           a.       https://www.youtube.com/watch?v=qZIrfp1VDRw, "Bill Cosby Granted

26   Appeal Hearing;"

27           b.       https://www.youtube.com/watch?v=l-75B5Z7Uek, "Nicole's View Live:

28   Special Guest Jenny Winings from the Hit Documentary Film 'Square One;'"

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

1          c.      https://www.youtube.com/watch?v=Z6l6esoTOqM, "Joe Jackson's

2    Granddaughter Yasmine Jackson & What People are NOT Talking About;"

3          d.      https://www.youtube.com/watch?v=iYECpBVdz9w, "They Never Cared

4    About Us;"

5          e.      https://www.youtube.com/watch?v=M1l9hdXXs2w, "Special Guests Dennae

6    Wright & Marvelous;"

7          f.      https://www.youtube.com/watch?v=oUXnC6CL20I, "5 Stars:  Why Dave

8    Chappelle's New Netflix . . . ."

9          g.      https://www.youtube.com/watch?v=x7qNjfBN5AQ, "Disgustingly Racist:

10   Leaving Neverland;"

11         h.      https://www.youtube.com/watch?v=f6Mfpy2HYMQ, "Controlling the

12   Narrative:  Michael Jackson Fans Sue;"

13         i.      https://www.youtube.com/watch?v=iTsgfpOC7JM, "Halle Bailey & The

14   New Little Mermaid;"

15         j.      https://www.youtube.com/watch?v=bxL98GrCnRI, "The Truth Shall Set

16   You Free:  Robert W. Lee IV;"

17         k.      https://www.youtube.com/watch?v=_dBWUTyTyPk, "News Story Update:

18   The Latest with Bill Cosby;"

19         l.      https://www.youtube.com/watch?v=FlySprQjLCA, "Livestream:  Chatting

20   with Author Cavis Adams;"

21         m.      https://www.youtube.com/watch?v=7HcM8fWr4gU, "Typical Move:  why

22   Jussie Somollett's Court documents;" and

23         n.      https://www.youtube.com/watch?v=xIvOvLNaGFI&feature=youtu.be,

24   "SHOCKING:  Here's Why You Got One Side of The Allegations against Bill Cosby."  Plaintiff

25   Lewis paid an advertising company to promote this documentary style video.  The advertising

26   expenses were wasted after Defendants applied "Restricted Mode," to this video.  Consequently,

27   the video has generated only 8,139 views to date.

28

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION,
ACCOUNTING AND DAMAGES**

245.     When viewers attempt to watch these videos with "Restricted Mode" enabled, they usually see this notice from Defendants:



However, occasionally they see a different notice from Defendants a black screen with a legend: "This video is not available," with no explanation as to why the video cannot be viewed. Defendants have neither explained why they post two different notices for the same videos, or why they would notify viewers that a video was not available when it could in fact be watched simply by disabling "Restricted Mode," or viewing it on a computer network which has not enabled "Restricted Mode."

246.     With respect to the balance of 84 videos which can be viewed with "Restricted Mode," enabled, neither subscribers nor viewers can comment on any of these videos or review the comments of others.  When the videos are watched in "Restricted Mode," each video is accompanied by a notice posted by Defendants where the comments usually appear stating: "Restricted Mode enabled.  To view this video, you will need to disable Restricted Mode." Defendants' application of "Restricted Mode" to compliant videos, and prohibition on leaving or reading viewer comments effectively discourage new viewers from participating in the "Nicole's View" channel, and prevents them from actively participating in the African American YouTube Community generally.  New viewers cannot actively engage with other members of the African American YouTube Community by exchanging comments.  As a result, they spend less time

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

1  watching videos and are less likely to subscribe, resulting in lower numbers of views for the video

2  and the channel, and less revenue for Plaintiff Lewis.

3      247.    Defendants have allowed only limited monetization to a fraction of "Nicole's View"

4  videos, without any explanation or rationale other than to indicate that the "content identified is

5  unsuitable for most advertisers."  Plaintiff Lewis is informed and believes that the sole reason that

6  Defendants find the content is "unsuitable for most advertisers," is because Defendants

7  discriminate against Plaintiffs and other persons similarly situated based on race, e.g., the content

8  was created by an African American, relates to issues and events of concern to the African

9  American community, and/or is viewed by many members of the African American community.

10     248.    For certain periods over the past four years, Defendants have shadow banned certain

11  individual compliant videos posted by Plaintiff Lewis on "Nicole's View."  During various periods

12  of time, those videos did not appear in YouTube searches using the terms "Nicole Lewis," or

13  "Nicole's View" or in searches using individual video titles as search terms.

14     249.    "Nicole's View" video content consists roughly of 75% pre-recorded videos and

15  25% Livestream broadcasts.  For Livestream broadcasts, Plaintiff Lewis sometimes has as many as

16  1000 viewers participating.  Plaintiff Lewis employs designated moderators to monitor, control and

17  censor viewer comments to ensure compliance with Defendants' Community Guidelines and TOS,

18  promptly removing any non-compliant comments and blocking offending participants.

19     250.    For the past two years, Defendants have used A.I., algorithms, and filtering tools to

20  restrict the reach of videos posted on "Nicole's View," resulting in stagnant subscriber and viewer

21  numbers.  "Nicole's View" is no longer growing.  The channel's analytics page from month to

22  month reflects only minor changes to the numbers of subscribers, viewers, and view times.  To

23  avoid the impact of Defendant' A.I., algorithms and filtering tools on Defendants' metadata

24  generated from video titles and tags, Plaintiff Lewis intentionally self-censors:  (a) she avoids using

25  controversial video titles; (b) she avoids using abbreviations like "BLM," "KKK;" terms such as

26  "Black," "White," "Racism," "Boogaloo," "White Supremacy," "Racial Profiling," "Police

27  Shootings," "Police Brutality," "Black Lives Matter;" names, such as those of individuals such as

28  those killed by law enforcement, "Bill Cosby," "Louis Farrakhan;" names of organizations such as

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

"Ku Klux Klan," "Nazi," "Neo-Nazi," "Aryan Brotherhood," and euphemisms that are known and particular to the African American Community; she intentionally misspells terms such as "Black," "White," "Race," "Racism," and "Racial Profiling," because Defendants routinely flag videos which have such terms as tags or which have titles that include such terms.

251.    Despite Plaintiff Lewis' efforts to self-censor and avoid the reach of Defendants' A.I., algorithms, and filtering tools, most of the videos posted on "Nicole's View" have only limited monetization, if any.

252.    On February 11, 2020, Plaintiff Lewis received an email from Defendants indicating that "SuperChat was disabled," purportedly because "Nicole's View" was using the original content of other YouTubers.  However, after a week, it became apparent that Defendants had not merely disabled SuperChat, but had completely demonetized the entire "Nicole's View" channel. Defendants did so without notice or explanation.  Plaintiff Lewis promptly filed an appeal of the decision to disable SuperChat and to demonetize the entire channel.

253.    Mindful of the stringent standards which Defendants have always applied to the channels of Plaintiffs and other persons similarly situated, Plaintiff Lewis has always followed Defendants' Community Guidelines, and TOS.  Whenever she uses a news clip, she limits the clip to several minutes and generates her own original commentary as video content to accompany the clip.  The originators of all news clips incorporated into videos posted by Plaintiff Lewis are always accorded full proper and credit in the video so that there is no possibility of viewers confusing the news clip with her original commentary or content.

254.    Defendants did not respond to Plaintiff Lewis' appeal.  On or about June 7, 2020, she suddenly noticed that Defendants had resumed placing advertisements on "Nicole's View" videos.  When she checked the channel's analytics pages, it reflected that her monetized videos were again generating revenue and her Livestream broadcasts were generating donations. Defendants have neither explained why the channel was fully demonetized for nearly two months, nor, why it was remonetized; nor have they offered compensation for the revenue which the channel lost during that period.

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

255.     Recently Defendants have begun to interfere with Livestream broadcasts on "Nicole's View."  On the evening of August 14, 2020, Plaintiff Lewis conducted a Livestream broadcast of https://www.youtube.com/watch?v=vtPeu6SCq0g, "The Destructive Agenda of Feminism with Elizabeth Mell."  Roughly half way through the one hour thirty-five minute broadcast, the broadcast was interrupted by repeated audio interruptions which Plaintiff Lewis could hear rendering her unable to hear Elizabeth Mell.  The noises and audio interruptions continued intermittently.  Plaintiff Lewis confirmed that the noises and disruptions were not caused by her equipment or by background noise at her location.  Elizabeth Mell informed Plaintiff Lewis that the noises and disruptions were not being generated from her microphone or from ambient noise at her location.  Following the substantially ruined Livestream broadcast, Defendants applied "Restricted Mode" to the video.



256.     Defendants also post inappropriate videos in the "Up Next" recommendations that appear to the right of videos which viewers watch on "Nicole's View."  For example, regardless of those channels to which the viewer has subscribed, Defendants regularly populate the "Up Next" recommendations with video recommendations from other creators, often recommending videos which are entirely unrelated to the video playing on "Nicole's View," with content that is critical of or derogatory to individual African Americans or the African American Community as a whole; or with content from white creators and/or commentators with racist views.

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

257.    Often, Defendants flood the "Up Next" recommendations on "Nicole's View" with videos of Defendants' commercial partners such as Fox News and its affiliates.  Set forth below are just a few of the "Nicole's View" videos for which Defendants have repeatedly recommended Fox News videos in "Up Next:"

        a.      https://www.youtube.com/watch?v=G9un5z6sPoE (a video thanking subscribers for their support of the channel) – 4 unrelated Fox News video recommendation;

        b.      https://www.youtube.com/watch?v=cjQ13mwjuIw (a video featuring Andrew Wyatt) – 3 unrelated Fox News video recommendations;

        c.      https://www.youtube.com/watch?v=TzCjFLD-ddo (a video about Billy Dee Williams) – 2 unrelated Fox News video recommendations;

        d.      https://www.youtube.com/watch?v=Xs-cmV44Rco (another video about Billy Dee Williams) – 2 unrelated Fox News video recommendations;

        e.      https://www.youtube.com/watch?v=4mLbAYhCv6Y (a video discussing White culture blaming the Black Community for social ills) – 2 unrelated Fox News video recommendations;

        f.      https://www.youtube.com/watch?v=W6MjdZvlqXM (a video asking viewers to sign a petition to investigate the Prosecutor pursuing criminal charges against Bill Cosby) – 5 unrelated Fox Business video recommendation;

        g.      https://www.youtube.com/watch?v=jikt7ZrdEDY (a video discussing a promotion on the channel) – 3 unrelated Fox News video recommendations;

        h.      https://www.youtube.com/watch?v=W6MjdZvlqXM (a video thanking subscribers for their support) – 4 unrelated Fox News video recommendations;

        i.      https://www.youtube.com/watch?v=yO2ZEaaKRvQ (a video promoting another Black YouTube creator) – 2 unrelated Fox News video recommendations; and

        j.      https://www.youtube.com/watch?v=G9un5z6sPoE (a video thanking viewers for support) – 4 unrelated Fox News video recommendations.

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

In all, Defendants have recommended 78 individual videos from Fox News or Fox Business in "Up Next" which have no relation to the video subject matter or the African American Community, in connection with roughly half of "Nicole's View" videos watched with "Restricted Mode" enabled.

258.    Defendants have also shadow banned "Nicole's View."  When viewers go to YouTube and input "Nicole's View" as a search term, the channel does not appear as a search result; rather, a small list of individual videos uploaded to "Nicole's View" more than a year ago appear as search results.  This means that when viewers actively search for Plaintiff Lewis' channel, they cannot find it.  They find only old videos.  Seeing a small number of old videos, viewers might well conclude that "Nicole's View" is no longer uploading new videos.  When viewers are unable to find Plaintiff Lewis' channel, and new videos by searching on YouTube, Plaintiff Lewis loses views, ad revenue and CPM revenue.

259.    As a direct and proximate result of Defendants' racial discrimination and wrongful conduct, "Nicole's View" has not grown in subscriber numbers, viewer numbers or view times and it would have grown otherwise and Plaintiff Lewis has been deprived of significant revenue from Defendants' sale of advertising, SuperChat and Livestream donations over the life of her channel. Plaintiff Lewis' videos were all fully demonetized between February 11, 2020 and June 7, 2020, during which period "Nicole's View" generated no income whatsoever.

### 5.    Andrew Hepkins

260.    Plaintiff Hepkins has been uploading videos to "DruStory News," and "DruHepkins," since 2014.  Plaintiff Hepkins is a serious journalist and conducts independent research in connection with most of his videos.  As a serious journalist, Plaintiff Hepkins closely follows Defendants' Community Guidelines and TOS by not using adult language, profanity, vulgarity, presenting explicit sexual or violent content, or making disparaging remarks.  The "DruStory News" videos present fact based content and encourage viewers to conduct their own research and to engage in critical thinking in connection with both current events reported by mainstream media and historical events.  Plaintiff Hepkins also enjoys the sport of boxing.  From time to time, he uploads videos with critiques of specific boxers or boxing matches.  In all, 58 videos have been uploaded to "DruStory News," which have generated a total of 3,565,753 views.

261.     Defendants informed Plaintiff Hepkins that they removed one of these videos for "violating YouTube's policy on harassment and bullying."  However, since 2019, "DruStory News" has not generated any revenue at all.

262.     For the past two years, Plaintiff Hepkins has observed numerous inaccuracies in Defendants' reported view numbers for the "DruStory News" channel and individual videos.  One example of inaccurate reported views concerns https://www.youtube.com/watch?v=dmmWoO2nd2Y, "The Michael Jackson Agenda EXPOSED" that discusses the movie "Leaving Never Land," and facts which purportedly support civil plaintiffs' allegations against Michael Jackson.  The video was posted March 22, 2019.  It was popular with viewers.

a.     Shortly after the video was uploaded to "DruStory News," viewers started posting comments, complaining that they could not "like"[5] the video when they watched it.  One viewer wrote:  "I tried to like this video but couldn't."

b.     Plaintiff Hepkins noticed that the number of views had slowed to under 35,000 despite the passing days.  Over time, he watched as Defendants' reported views for the video approached 32,000, and then fell to 31,000.  Days later, Defendants' reported views fell even lower to 29,000.  Over the days that followed, Defendants' reported number of views climbed beyond 32,000.  Again, several days thereafter, Plaintiff Hepkins saw that Defendants' reported view numbers were again under 30,000.

c.     Defendants did not notify Plaintiff Hepkins that they were reducing view numbers.  Nor have they given any explanation or rationale which would justify reducing view numbers under the TOS or the Adsense agreement.

---

[5] By clicking on an icon which appears with individual videos, viewers can "like" a video.  The number of "likes" generated by a video increases the likelihood that the video will be recommended as "trending," and that Defendants will recommend it in the "Up Next," feature that appears on viewers' screens.  By generating a large number of "likes," the Michael Jackson video uploaded on "DruStory News" can go viral and generate millions of views.  Those views translate into revenue for the channel.

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

263.     Frustrated by the Defendants' repeated downward adjustment of view numbers for

the Michael Jackson video, Plaintiff Hepkins posted this comment on the video:

> Yes they are shaving the views. I've been watching all week. Every time it goes to 32K the
>
> views get shaved back down to 29-30. This has happened to me before.

On another occasion, Plaintiff Hepkins left another comment on the video:

> Here we go AGAIN with this. Every time the video hits past 31K, views disappear and it
>
> mysteriously goes back down to 29-30K. Smh. Still at it.

Ultimately, "The Michael Jackson Agenda EXPOSED" never went viral and generated only 70,000

views.

a.     On June 26, 2020, Plaintiff Hepkins uploaded

https://www.youtube.com/watch?v=KdVXcpBQOvs, "BIG NEWS Cosby Appeal is Granted," to

"DruStory News."  The video was popular and started generating views.  For June, Defendants

reported that the video had generated 6,943 views.



264.     In July, Defendants reported that the video had only generated 4,913 views – 1,500

fewer views than were reported for the prior month, despite the 4 additional weeks during which

time viewers watched the video.

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

265.    Plaintiff Hepkins is informed and believes that the Defendants' practice of reducing or shaving view numbers over time has reduced the revenue which Defendants report for the "DruStory News" channel.  The number of views and number of subscribers are part of the calculation which Defendants make each month in determining how much they owe to Plaintiff Hepkins for the "DruStory News" videos.  Given Defendants' reduced view numbers over a period of months, Plaintiff Hepkins is informed and believes that the Defendants' revenue calculations based on those reported view numbers also are inaccurate and undercount revenues owed by Defendants to Plaintiff Hepkins.

266.    Defendants alone control access to the data upon which the subscriber numbers, viewer numbers and hours spent watching numbers are based.  Plaintiff Hepkins has no way to calculate the correct additional amounts which Defendants owe to him without access to the underlying data which reflects the number of subscribers, the number of viewers, and the hours spent viewing videos per day for each of the "DruStory News" videos.

267.    Defendants have deemed nearly all of the "DruStory News" videos to be unsuitable for most of the YouTube advertisers, resulting in limited monetization for the majority of Plaintiff Hepkins' videos.  Defendants have fully monetized only 2 of the 54 videos uploaded to "DruStory News."  Defendants have either limited the monetization for, or have completely demonetized the other 52 "DruStory News" videos.

268.     Defendants have never given Plaintiff Hepkins any explanation as to why "DruStory News" videos concerning water quality, veganism, internet scams or Jewish support for Palestinians are unsuitable for most advertisers, much less advertisers who have posted ads channels belonging to Defendants' preferred YouTube partners such as PBS, CNN, or MSNBC. Nor have Defendants explained why Plaintiff Hepkins' boxing videos are unsuitable for advertisers who post ads on sports channels with boxing related videos.

269.     "DruStory News" uploaded "Fake News is REAL:  More Undeniable Proof!" on December 29, 2016.  The video discusses inaccurate reports which have appeared in mainstream media news outlets.  The video features a series of researched factual rebuttals to specific news reports, demonstrating that some things that have been published as news are false or fabricated.

a.     Defendants initially determined that the video was ineligible for monetization and demonetized the video.

b.     Defendants then notified Plaintiff Hepkins that the video violated unspecified "Community Guidelines," and issued a "Community Guidelines strike or temporary penalty" to the channel.  Defendants stated that the video constitutes a "personal attack," "predatory behavior, stalking, threats, harassment, bullying, or intimidation."  Defendants added, "We remove comments, videos, or posts where the main aim is to maliciously harass or attack another user."



**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

c.  Now, viewers who click on the thumbnail for the video see:



d.  This video has been removed from the platform.



e.  The video cannot be viewed by anyone.

270.  "Fake News is REAL:  More Undeniable Proof!" does not attack, threaten, harass, intimidate, bully, insult, disparage or even discuss any individual in connection with "Fake News." Rather, the video discusses specific news reports which were in fact false or erroneous, and

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

1   presents facts disputing the original reports.  Defendants were wrong to find that the video violated

2   Community Guidelines, and were entirely off base in assessing a Community Guidelines strike or

3   penalty against "DruStory News" for the video; and in removing the video from the platform.

4        271.   Plaintiff Hepkins appealed the Defendants' actions.  Defendants ignored the appeal.

5        272.   Defendants also issued copyright violation flags for 7 different "DruStory News"

6   videos, for nothing more than using short video or textual excerpts which included proper citations

7   to the source materials.  In the face of legitimate fair use claims by "DruStory News," Defendants

8   issued copyright flags for short video clips which appeared in "Anthony Joshua," "Why People

9   Hate the Truth (Part 1)," "Eric Garner Death and Funeral – Full Unseen Coverage," "Chemtrails: Is

10  This Real or Conspiracy?" "The Revival of Overt Racism (Part 1)," "The Truth About Wade

11  Robson Exposed," and "BOMBSHELL Cosby News! (Finale) – What the Media Didn't Want You

12  To See Part 3."  Defendants even issued a copyright flag for the short video clips of Neo from the

13  movie "The Matrix."

14       273.   While Defendants quickly pursue copyright claims advanced against African

15  American creators on YouTube, like Plaintiff Hepkins; they are slow and often refuse to enforce

16  copyright claims when made by African American creators.  On at least two occasions, Plaintiff

17  Hepkins flagged videos that reposted all or most of his original videos that are uploaded to

18  "DruStory News."  Defendants ignored those complaints.  As a result of Defendants' inaction, the

19  infringers continue to use Plaintiff Hepkins' original video content without consequence.

20       274.   Defendants have shadow banned "Dru Story News."  When "Restricted Mode" is

21  enabled, searches for "DruStory News" on YouTube will produce a smattering of search results

22  including several individual videos uploaded to the channel, but "DruStory News" does not appear

23  as a search result.  Defendants' "Restricted Mode" renders the entire "DruStory News" channel

24  invisible on the YouTube platform.

25       275.   When "Restricted Mode" is enabled, Google searches for the YouTube channel,

26  "DruStory News," generate results which include:

27        a.   Plaintiff Hepkins' websites https://www.drustorynews.com and

28  https://www.druhepkins.com;

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION,
ACCOUNTING AND DAMAGES**

1          b.      Plaintiff Hepkins' Twitter page https://twitter.com/drustorynews?lang=en;

2          c.      Plaintiff Hepkins' Facebook page

3    https://www.facebook.com/DruStoryNews,

4          d.      Plaintiff Hepkins' Instagram page

5    https://www.instagram.com/drustorynews/?hl=en; and

6          e.      Plaintiff Hepkins' Patreon page https://www.patreon.com/Drustorynews.

7    The channel, https://www.youtube.com/user/DruhepkinsBlogs, does not appear on Google searches

8    with "Restricted Mode" enabled on YouTube.

9          276.    Plaintiff Hepkins is informed and believes that Defendants have used their artificial

10   intelligence programs, algorithms and other filtering tools in misapplying "Restricted Mode' to

11   nearly all of the "DruStory News" videos in accordance with their policy and practice of

12   discriminating against African Americans on the YouTube platform.

13         a.      Defendants routinely misapply "Restricted Mode" to "DruStory News"

14   compliant videos.  During the months of June and July, the Defendants applied "Restricted Mode"

15   to more than 90% of the videos uploaded to "DruStory News."

16         b.      As of July 30, 2020, of the 53 videos which Defendants have listed for

17   "DruStory News," only 5 were listed when "Restricted Mode" was enabled.

18



**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

1    Only 3 of those videos could actually be watched.

2           c.     By August 13, 2020, 54 videos were listed on "DruStory News" when

3    "Restricted Mode" was enabled.



**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

1



d.      When "Restricted Mode" is enabled, for 51 of those 54 videos listed, viewers

on "DruStory News" see a black screen generated by Defendants with the notice:

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

277.    Among the videos which Defendants prevent viewers from watching with "Restricted Mode" enabled are all of boxing videos uploaded to "DruStory News" and a number of general interest videos such as:

         a.      https://www.youtube.com/watch?v=wPOV8OZybyI, "What's in the Water?"

         b.      https://www.youtube.com/watch?v=85z9CJXpyo0, "The Reason for Vegan: Real Food for Thought;"

         c.      https://www.youtube.com/watch?v=xcTuhXdjjD8, "The Revival of Overt American Racism (Part 1);"

         d.      https://www.youtube.com/watch?v=8ULbXEKs0hg, "TRUTH:  Should Fluoride Be in Our Water?"

         e.      https://www.youtube.com/watch?v=FtBUOc2rt_4, "Sellers:  Beware of Paypal Charge Back Scammers!!!!!"

         f.      https://www.youtube.com/watch?v=ht67K-eqQok, "March for the Death of Eric Garner in Staten Island;"

         g.      https://www.youtube.com/watch?v=P3mv65ZzLvY, "Are More Jews Showing Support for Palestine (Part 1);"

         h.      https://www.youtube.com/watch?v=PEHXa_5MYAc, "Eric Garner Death and Funeral – Full Unseen . . ."

None of these videos violate any of Defendants' Community Guidelines or TOS.

278.    The very same 3 videos that could be viewed when "Restricted Mode" was enabled on July 30, 2020, are still the only 3 videos that could actually be watched on August 13, 2020: (i) https://www.youtube.com/watch?v=MiAXR7JdbNU, a video entitled "The Real TRUTH About the Cosby Deposition;" (ii)  https://www.youtube.com/watch?v=orzkRhnVJp4, a video entitled "The Truth About Cereal:  Cereal is Bad . . . ;" and https://www.youtube.com/watch?v=M4EWDVHZNIc, a video entitled "Are More Jews Showing Support for Palestine (Part 2).

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

1        a.      However, even for these 3 videos, viewers cannot actively engage on the "DruStory News" channel because they cannot leave comments or view comments while "Restricted Mode" is enabled.

        b.      Where viewer comments and Plaintiff Hepkins' responses would be, for these 3 videos, viewers see Defendants' legend:  "Restricted Mode has hidden comments for this video."

279.    Plaintiff Hepkins is informed and believes that the "Up Next" feature should display on the viewer's screen a list of quality videos that are by "DruStory News," relate to content similar to the video being watched, be videos uploaded to channels to which the viewer subscribes and/or be similar to other videos historically viewed previously by that viewer, so that the viewer sees recommendations for more videos they want to watch.  However, Defendants rarely display "Up Next" recommendations for "DruStory News" videos or for videos of other African American YouTube creators.  Instead, Defendants have transformed "Up Next" into a billboard for the videos of Defendants' preferred YouTube partners, forcing "DruStory Viewers" who are looking African American creators' videos, or those regarding specific subjects to watch a stream of video thumbnails with titles featuring Fox News videos and YouTube Movies.  Of course, "DruStory News" does not receive any revenue for the "Up Next" advertising Defendants is supplying to Fox News or YouTube Movies on the channel.

280.    Defendants have flooded "Up Next" video recommendations for the following "DruStory News" videos:

        a.      For https://www.youtube.com/watch?v=KdVXcpBQOvs, "BIG NEWS Cosby Appeal is Granted," Defendants posted video recommendations for 9 Fox News videos and 10 YouTube Movie videos;

        b.      For https://www.youtube.com/watch?v=BjgQVdsPTrU, "The Fear Agenda," Defendants posted video recommendations for 4 Fox News videos and 14 YouTube Movie videos;

        c.      For https://www.youtube.com/watch?v=1H5ujVGqT6I, "New Year's Message to the Light Workers," Defendants posted video recommendations for 6 Fox News videos and 9 YouTube Movie videos;

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

d.    For https://www.youtube.com/watch?v=68lsRzaRb4Y, "Anthony Joshua's Redemption," Defendants posted 5 YouTube Movie recommendations;

e.    https://www.youtube.com/watch?v=Z9pFztQ_WUY, "DRAMA Behind the Scenes of Cosby Appeal Hearing," Defendants posted video recommendations for 5 Fox News videos and 10 YouTube Movie videos; and

f.    https://www.youtube.com/watch?v=R1i08ILkzQk, "Democratic Dilemma: Are People of Color Ready . . ." Defendants posted video recommendations for 12 Fox News videos and 3 YouTube Movie videos.

281.    Plaintiff Hepkins is also the creator and owner of the DruStory News Blog, www.drustorynews.com.  Plaintiff Hepkins published an article entitled "Was Michael Jackson Innocent or Guilty, the Final Verdict" on the Drustorynews.com blog.  The article was for a short time highly sought after and widely read on the internet.  However, after several weeks, the article was shadow banned and no longer appeared in Google searches for "Michael Jackson," or "Michael Jackson Innocent."  The article could only be found on Google by inputting a link to the article or by accessing the blog and searching for it there.

282.    Plaintiff Hepkins is informed and believes that Defendant Google's removal of the "Was Michael Jackson Innocent or Guilty, the Final Verdict" article has caused Plaintiff Hepkins to lose views on www.drustorynews.com, and to lose revenue for that website.

### 6.    Harvey Stubbs

283.    Plaintiff Stubbs is an African American YouTube commentator residing in the State of Illinois who is the creator and owner of the YouTube channels "Your World Your View," "Harvey Superboy," "Harvey Superboy 1," "HARVEY SUPERBOY," and "J Jackson."  Since 2007, Plaintiff Stubbs has been uploading videos principally consisting of commentary regarding events, social issues, politics, news, celebrities and people who are of interest to or affect the African American Community in general, and the Chicago Area African American Community in particular.  Plaintiff Stubbs is a military veteran and life-long resident of the Chicago Area, who is active in his community and offers a unique perspective.

284.    Plaintiff Stubbs was forced to create a number of additional YouTube channels as a result of Defendants' repeated unwarranted flags and Community Guidelines strikes against his channels.

285.    "Your World Your View," which was created in September of 2013 has generated 6.6 million views.

286.    Plaintiff Stubbs long has observed issues with Defendants' reporting of the number of views for individual new videos and for his YouTube channels over the years.  For popular new videos, where many viewers were leaving comments, the numbers of views did not appear to grow along with the number of new comments, the Defendants' reported view numbers grew only very slowly over time -- regardless of the popularity of the video or the number of other YouTube creators that recommended and posted links to the video.  Plaintiff Stubbs is informed and believes that the Defendants' reported number of views for the videos, and corresponding views for the channel on which those videos were posted were inaccurate, under reported, and caused Defendants to calculate incorrect revenue amounts generated by the videos, resulting in an underpayment of revenue based on views and CPM  for the videos and the channels.

287.    Plaintiff Stubbs does not have access to the data upon which Defendants calculate revenue for his "Limited" monetization videos or channels, such as daily subscriber numbers, view numbers or watch times.  Defendants alone control access to the underlying data.  Without this information, Plaintiff Stubbs cannot calculate the additional revenue which Defendants owe to him under the circumstances.

288.    Plaintiff Stubbs also is informed and believes that Defendants have not paid him for additional advertising revenue associated with demonetized videos and/or channels.  Though Defendants have restricted many, if not the vast majority of all of the videos posted on the YouTube platform by Plaintiff Stubbs.  Some of these videos have "Limited" monetization and produce an income stream.  Under the TOS and Adsense agreement, Defendants should be reporting and paying Plaintiff Stubbs advertising based on the advertisements which Defendants actually play or post on his videos and channels.

289. Plaintiff Stubbs is further informed and believes that for some of those videos which Defendants demonetized because they are "unsuitable" for its advertisers, for which Plaintiff Stubbs receives no reported revenue, Defendants nonetheless have played or posted ads before, during and/or after videos, and have been posting single ads in the "Up Next" column which appears on the screens of viewers who access Plaintiff Stubbs' channels.

290. Defendants have not paid to Plaintiff Stubbs any of the revenue generated when Defendants stream or post ads on demonetized videos or on the channel. Plaintiff Stubbs does not have access to the underlying data used to calculate either the total number of ads played/posted on or with his demonetized videos, the CPM, the watch times, or the money that Defendants owe to him. Defendants alone control the access to the data required to calculate how much additional ad revenue Defendants owe to Plaintiff Stubbs.

291. Since 2007, Defendants wrongly, repeatedly, and consistently flagged Plaintiff Stubbs' videos for purported violations of Community Guidelines and TOS. Plaintiff Stubbs's videos contain no nudity, sexualized scenes or language, graphic depictions of sex or violence, drug abuse, or alcohol consumption. Additionally, when he uploads videos with adult themes, Plaintiff Stubbs tags the video as suitable for age 18 or older, and often adds a specific verbal and written warning at the beginning of the video stating that adult themes will be discussed and the viewer should take steps to watch the video privately.

292. Defendants have flagged and issued Community Guideline Strikes against Plaintiff Stubbs' compliant videos countless times over the past 13 years. Defendants have even taken down Plaintiff Stubbs' channels "Harvey Superboy1," HARVEY SUPERBOY," "Harvey SuperBoy," "Mr Superboy 223," and "J Jackson;" these channels cannot be located on the YouTube platform using searches for those names. Defendants also removed all of the videos that were uploaded to these channels.

293. Though Plaintiff Stubbs appealed many of the wrongful flags and Community Guideline Strikes, Defendants ignored his appeals. Plaintiff Stubbs has been forced, time and time again to start new YouTube channels and renew efforts to obtain sufficient subscribers, viewers and viewing hours to requalify for Defendants' benefits on the platform.

294.     Defendants routinely apply "Restricted Mode," to Plaintiff Stubbs' videos that fully comply with Defendants' Community Guidelines and TOS, regardless of the content of those videos.  As of July 29, 2020, "Your World Your View," had 1,121 videos uploaded and listed on the channel.  When "Restricted Mode" was enabled, viewers could see 51 of those videos listed but could watch only 16 of those 1,121 videos.  As of August 13, 2020, when "Restricted Mode" was enabled, only 40 of the 1,121 videos were listed.  4 videos could be watched.  In other words, Defendants have now restricted access to all but 4 of 1,121 "Your World Your View" videos.  Viewers cannot watch videos such as:

a.     https://www.youtube.com/watch?v=1YW0Pb0o374, "Walmart Getting Rid of Greeters," discussing the significant positive effect of employing "greeters" for the aged, the disabled, and veterans; as well as, the costs which communities pay when Walmart opens its doors, in terms of tax breaks given, lost and failed local businesses and low wage jobs,

b.     https://www.youtube.com/watch?v=Ulc5GmcH6qg, "Cosby Show Residuals," discussing the disparity between television companies' pulling episodes of the Cosby Show from circulation after Bill Cosby's conviction versus their handling of other shows where serious issues arose concerning actors;

c.     https://www.youtube.com/watch?v=2sQfK2XVIR, "Carol Channing Gone at 97," discussing Carol Channing as a Black artist who spent most of her career passing as a White woman;

d.     https://www.youtube.com/watch?v=sg-wt_M-F9I, "The Go Fund Me Liars," discussing a scam involving a White couple and a White homeless veteran who fabricated a story to raise funds on social media to raise money for the veteran;

e.     https://www.youtube.com/watch?v=egRC6uBwNd4, "New Vid Up," announcing a new video posted to a YouTube channel;

f.     https://www.youtube.com/watch?v=zw7p4VHjBKY, "New Video at Blackjunction 6," announcing a new video posted to a website; and

g.     https://www.youtube.com/watch?v=sGAYU00Z0QE, "Aretha Franklin Gone at 76," discussing the career and legacy of Black artist Aretha Franklin.

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

295.     Plaintiff Stubbs also experienced repeated, consistent and regular interruptions and service quality issues regarding audio and visual aspects of videos posted to his channel.  Over the years, he has received numerous comments from viewers reporting problems listening to videos such as audio interruptions, substandard audio quality.  In https://www.youtube.com/watch?v=_DxcNH0BZ_E, "My Voice," Plaintiff Stubbs notes that he has "[r]eceived complaints about audio issues going on for years; this is games they play It happens every year; this crap is not me, every year around this time of year, get comments to change subjects, problems; range noises; as well as, reporting visual problems such as poor quality or distorted images."

296.     Plaintiff Stubbs documented the video quality issue in comments to videos, such as Plaintiff Stubbs uploaded two videos discussing the specific problems his viewers were experiencing:  https://www.youtube.com/watch?v=GLWe4FJC--Y, "Sound of My Voice," and https://www.youtube.com/watch?v=VJDuaSA-vtA, "Issues with Viewing."

297.     As of July 29, 2020, "Your World Your View" viewers experienced observable issues with each of the following videos:

a.       https://www.youtube.com/watch?v=gOXHuz1w2b0, "Zoe is Just Like Her Mother," the audio cut out 5 minutes into the 11 minute video;

b.       https://www.youtube.com/watch?v=jnZtybgx9-I, "Look at the Support They Get," several deep beeps played at 16 and 17 minutes into the video and were repeated later in the audio;

c.       https://www.youtube.com/watch?v=Eq59sUu68Cc, "Racism at Buffalo Wild Wings," the audio was garbled at 2 minutes into the video;

d.       https://www.youtube.com/watch?v=2b2pyNLuCps, "DL Talk Show Cancelled," the audio was garbled and disrupted at 3, 9 and 11 minutes into the 12 minute video; and

e.       https://www.youtube.com/watch?v=_DxcNH0BZ_E, "My Voice," the audio was distorted intermittently throughout the video.

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

298.     For years, "Your World Your View," viewers have had audio issues with videos regardless of how Plaintiff Stubbs recorded and uploaded the video, and despite his using different or new recording technologies.  Plaintiff Stubs cannot replicate the problems when he plays the videos.  Plaintiff Stubbs is informed and believes that the problems viewers have watching videos his videos discourages new viewers from watching videos on his YouTube channels, annoys viewers so that they do not watch full videos and damages his channel by giving a false impression that the video have poor production values and/or that he does not value his viewers enough to upload good quality videos.  Plaintiff Stubbs is also informed and believes that the substandard audio and video experience about which his viewers complain originates with Defendants, their employees and/or their independent contractors.

299.     Defendants also ad bomb those few "Your World Your View" videos which have full or "Limited" monetization.  For example, on July 29, 2020, on https://www.youtube.com/watch?v=jUdMKEP9E2c, "It was Just a Matter of Time," Defendants played 2 streaming ads and 2 banner ads at beginning of the video, as well as, 1 streaming ad and a banner ad at 2 minutes, 6 minutes and 10 minutes into the video, plus 2 streaming ads and 2 banner ads at the conclusion of the video, as well as showing an ad at the top of "Up Next."

300.     Defendants also flood the "Up Next" column for "Your World Your View" with extraneous video recommendations that bear no relation to the individual videos being viewed.  On July 29, 2020, Defendants flooded the "Up Next" recommendations for the following videos:

    a.     https://www.youtube.com/watch?v=jUdMKEP9E2c, "It was Just a Matter of Time," 14 Fox News videos, 2 YouTube Movies videos appeared in "Up Next;"

    b.     https://www.youtube.com/watch?v=9WfH9WTk138, "Open Your Eyes," 12 Fox News videos appeared in "Up Next;"

    c.     https://www.youtube.com/watch?v=FWahxaWfftE, "Don't Ridicule People with Mental Health Issues," 15 Fox news videos and 4 YouTube Movies videos appeared in "Up Next;"

    d.     https://www.youtube.com/watch?v=oHAxDyW8uIg, "Jada Can't Pass Judgement," 8 Fox News videos, 9 YouTube Movies videos appeared in "Up Next;" and

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

1          e.      https://www.youtube.com/watch?v=obDvE2pOU6w, "Nothing to Connect,"

2  9 Fox News videos and 2 YouTube Movies videos appeared in "Up Next."

3        301.    Over the years, Plaintiff Stubbs has uploaded many videos addressing political

4  subjects.  Since 2016, Plaintiff Stubbs also has posted a number of videos critically appraising

5  President Trump, his public statements, and his actions taken prior to becoming president and as

6  president.  Recently, Defendants have been streaming ads and posting banner ads on "Your World

7  Your View" soliciting support for President Trump's reelection:

8          a.      https://www.youtube.com/watch?v=2b2pyNLuCps, "DL Talk Show

9  Cancelled," Defendants posted a banner ad on the video "Are you a Trump voter in 2020?" and an

10  ad in "Up Next," for "action.donaldjtrump.com;"

11          b.      https://www.youtube.com/watch?v=obDvE2pOU6w, "Nothing to Connect,"

12  Defendants streamed an ad soliciting support for Republican candidates paid for by

13  "action.donaldjtrump.com," and posted a banner ad entitled "'Text  to Join' to 88022 and stand

14  with President Trump;"

15          c.      https://www.youtube.com/watch?v=jnZtybgx9-I, "Look at the Support They

16  Get," Defendants streamed an ad soliciting contributions and posted a banner ad for

17  "action.donaldjtrump.com;" and

18          d.      https://www.youtube.com/watch?v=P5gUc1HLce4, "Your World Your

19  View," Defendants streamed an ad entitled ""Official Survey" and posted a banner ad for

20  "action.donaldjtrump.com;" as well as an ad in "Up Next" entitled ""Text 'JOIN' to 88022 and

21  Stand with President Trump!"

22        302.    Plaintiff Stubbs is informed and believes that Defendants have intentionally placed

23  these ads soliciting support for President Trump, a person who has made numerous statements

24  about African Americans that are racist, disparaging, untrue, and/or grossly distorted, and about

25  African Americans living in the Chicago Area, in order to irritate, annoy, and/or discourage African

26  American subscribers and viewers of "Your World Your View," and to reduce view numbers and

27  viewing hours for the individual videos affected, and the channel as a whole.

28

303.    Defendants' actions have damaged Plaintiff Stubbs and will continue to cause him damage in the form of reduced revenue and reduced reach for his videos.  Defendants have also injured the African American subscribers and viewers of "Your World Your View," by providing substandard video services to them, and to the extent that they rely on public internet services from libraries, public retailers, schools or places of employment, by applying "Restricted Mode" to the videos.  Poor African American YouTube viewers who rely on free publicly available internet services can only view less than 1% of the "Your World Your View" videos.

### 7.    Khalif Muhammad

304.    In 2006, Plaintiff Muhammad created his YouTube channel to publish his personal video commentaries as a vehicle to combat historical pervasive racism in the United States and to promote the United Independent Compensatory Code developed by Neely Fuller Jr.  Over the years, the channel has been renamed several times.  Plaintiff Muhammad's YouTube channel is now called "Dr.Syn-Q."  In all, Plaintiff Muhammad has uploaded 273 videos to his YouTube channel.

305.    At this point, Plaintiff Muhammad does not know how many views this channel in fact has generated over the past 14 years:  For several years, Defendants reported that "Dr.Syn-Q" had in excess of 900,000 views.  The channel view numbers invariably stayed just under 1 million views, regardless of the number of videos uploaded to the channel.  "Dr.Syn-Q" could never reach the 1 million view milestone.  In 2020 Defendants' reported views inexplicably started to decline.

a.    On June 26, 2020, Defendants reported 899,717 views for the channel. Plaintiff Muhammad received no notice from Defendants regarding the decreased reported view numbers.  Plaintiff Muhammad could not understand how the aggregate number of views for the lifetime of the channel had decreased, particularly after Defendants reported view numbers in excess of 900,000 for several years.

b.    On August 9, 2020, Defendants reported only 388,997 views for the channel. "Dr.Syn-Q" had lost in excess of 500,000 views.

c.    On August 11, 2020, Defendants reported 643,790 views for the channel.



Defendants' current reported view number is approximately 300,000 fewer than the number Defendants reported in 2019.

306.     Plaintiff Muhammad is informed and believes that Defendants' 2020 reports of the number of views for "Dry.Syn-Q" are inaccurate and unreliable, that the Defendants' reported subscriber numbers an watch time are also likely inaccurate given the Defendants' fluctuating reported view numbers.  Plaintiff Muhammad also is informed and believes that Defendants' TOS which he signed does not mention, much less authorize Defendants to unilaterally reduce the reported numbers of views (or numbers of subscribers or watch times) without notice or an opportunity to object.  Plaintiff Muhammad is further informed and believes that Defendants' reported lower view numbers for "Dr.Syn-Q" violate the TOS and the Adsense agreement.

307.     Despite "Dr.Syn-Q" having generated nearly 1 million views by 2019, Defendants now report a total watch time of 2,083 hours.  Plaintiff Muhammad is informed and believes that the Defendants' reported watch time for the channel is inaccurate and undercounts actual historical and current hours of "Dr.Syn-Q" videos viewed.  Plaintiff Muhammad is also informed and believes that Defendants' inaccurate reports of view numbers, subscriber numbers and watch times has prevented him from demonstrating that "Dr.Syn-Q" has qualified previously for Defendants' benefits such as monetization of the channel.

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

308.   Plaintiff Muhammad does not have access to the underlying data regarding how many viewers subscribed to "Dr.Syn-Q," how many watched videos uploaded to "Dr.Syn-Q" or the total hours viewers watched those videos at any time between 2006 and 2020.  Accordingly, Plaintiff Muhammad cannot accurately determine whether "Dr.Syn-Q" has qualified for the benefits such as monetization, and if so, how much Defendants owe to him under the TOS and Adsense.

309.   Recently, Defendants removed https://youtu.be/D0&mM_OUEkg, "Neely Fuller Jr: MAXIMUM SOPHISTICATED CONFUSION," a 9 minute video posted in 2007 because of what Defendants assert is "inappropriate content."



a.   As of August 10, 2020, the video could not be viewed.  The video frankly discusses social practices which exist and describes them as part of an intentional program to preserve regional power in the hands of a white minority.  The video is academic, even tempered in tone, and contains no nudity, sexualized scenes or language, graphic depictions of sex or violence,

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

drug abuse, or alcohol consumption.  While the video discusses "white supremacists," it does not identify any individual, entity, or specific group, much less disparage, harass, threaten, or bully any individual or group.  The video does not constitute hate speech or incite wrongful conduct.

b.      Plaintiff Muhammad, filed an appeal with Defendants.  Defendants did not respond to Plaintiff Muhammad.

c.      Days after removing the video from "Dr.Syn-Q," Defendants restored "MAXIMUM SOPHISTICATED CONFUSION" to the channel, and removed the prior "Restricted Mode" designation.



d.      As of August 14, 2020, the video was listed, available and watchable on "Dr.Syn-Q."

It is outrageous that Defendants removed this video after 13 years on the channel, particularly given the resurgence of White Supremacist organizations, increasing hate crimes against people of color, and the recent subversive activities of White Supremacists under the cover of Black Lives Matter protests.

310.    Defendants have also demonetized "Dr.Syn-Q" without giving any specific explanation or rationale.  For 13 years, Defendants have refused to accord even "Limited"

monetization for a single compliant "Dr.Syn-Q" video.  Plaintiff Muhammad cannot understand why Defendants demonetized videos such as:

        a.     https://www.youtube.com/watch?v=4tiG9dtpnmg, "My Response to Racist Propaganda . . ;"

        b.     https://www.youtube.com/watch?v=P7wdO4GJojk, "My Existence:  Paying My Respects to Muhammad Ali!;"

        c.     https://www.youtube.com/watch?v=QIRowdf6x2k, "The Education of white Supremacy . . . ;" and

        d.     https://www.youtube.com/watch?v=clldd6sGpCI, "When We Were Slaves."

311.    For many years Defendants have employed their artificial intelligence, algorithm and other filtering tools to wrongfully apply "Restricted Mode," to many of Plaintiff Muhammad's videos.  Defendants' capricious application of artificial intelligence, algorithm and other filtering tools is arbitrary and entirely unrelated to the content of Plaintiff Muhammad's videos.  From week to week, Defendants change the designations for individual videos so that the number of videos which can be watched with "Restricted Mode" is enabled changes from week to week.  For example, of the 159 videos listed on "Dr.Syn-Q," as of August 8, 2020 only 19 videos were listed when "Restricted Mode" was enabled, and only 11 of those listed could watched.

312.    Viewers who access "Dr.Syn-Q" from many public internet networks such as libraries, schools, commercial establishments offering free internet access or places of employment where "Restricted Mode" is enabled,  cannot view most of the videos uploaded to the channel. Defendants prevent these viewers from commenting on the videos that can be viewed, and prevent viewers from reading comments left by others.  For videos which can be viewed with "Restricted Enabled," viewers of "Dr.Syn-Q" see "Restricted Mode has hidden comments for this video" in the "comments" section of their screen.

313.    Defendants prevent poor African American YouTube subscribers and viewers without internet connectivity at home from accessing "Dr.Syn-Q" videos.  Plaintiff Muhammad is informed and believes that man poor African Americans obtain YouTube access through publicly available free networks such as schools, libraries and retail businesses; and that such networks

1  often enable "Restricted Mode" to prevent students and patrons from accessing pornography or

2  otherwise inappropriate content.  Defendants' application of "Restricted Mode" to "Dr. Syn-Q"

3  videos limits both Plaintiff Muhammad's reach on the YouTube platform because most of his

4  videos cannot be watched by poor African Americans who rely on public free internet networks.

5  Plaintiff Muhammad also is informed and believes that Defendants' application of "Restricted

6  Mode" also and silences African American YouTube subscribers and viewers because Defendants

7  disable the comments on "Dr.Syn-Q," and no one can read, leave or respond to comments posted

8  on "Dr.Syn-Q" videos when "Restricted Mode" is enabled.

9       314.    As of August 14, 2020, when "Restricted Mode" was enabled, all 159 "Dr.Syn-Q"

10  videos were listed.  129 of those listed videos, when watched, displayed only a black screen with

11  the legend, "This video is unavailable with Restricted Mode enabled.  To view this video, you will

12  need to disable Restricted Mode," and could not be viewed.  30 of the remaining videos listed could

13  be watched – 11 videos more than could be viewed on August 8, 2020.  The comments for these 30

14  videos were disabled and could not be read.

15       315.    Defendants' continued application of "Restricted Mode," to the following compliant

16  videos defies any rational content based explanation:

17       a.    https://www.youtube.com/watch?v=4tiG9dtpnmg, "My Response to Racist

18  Propaganda . . ." a discussion of a news article describing Black Friday protest in Chicago where

19  protesters successfully blocked shoppers from stores ,

20       b.    https://www.youtube.com/watch?v=Rytybtnwv30, "YouTube Flagged My

21  Video! Black Folks Guide . . . ." a composite, including Plaintiff Muhammad's statement of

22  purpose and commitment to the United Independent Compensatory Code and ads for African

23  American businesses, a discussion of his appeal of Defendants' "hate speech" flag and age

24  restriction for "What Should You Do When You're Called The 'N-Word,''" and a lengthy

25  discussion of the electoral college;

26       c.    https://www.youtube.com/watch?v=P7wdO4GJojk, "My Existence:  Paying

27  My Respects to Muhammad Ali!," a series of video clips of historical public interviews of

28

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION,
ACCOUNTING AND DAMAGES**

1  Muhammad Ali by David Frost and William F. Buckley with Plaintiff Muhammad's personal

2  tribute to Muhammad Ali;

3           d.       https://www.youtube.com/watch?v=9rryenTnblg, "Black Consciousness

4  Movement: 'Black' People. . . " a statement in support of the United Independent Compensatory

5  Code, taking personal responsibility in the African American Community, and a rejection of the

6  cult of personality;

7           e.       https://www.youtube.com/watch?v=QIRowdf6x2k, "The Education of white

8  Supremacy . . . ." a personal statement describing Plaintiff Muhammad's life journey, rejection of a

9  gang lifestyle, and commitment to fight White Supremacy, illustrated with a collection of

10  photographs of him as a child and a young man;

11          f.       https://www.youtube.com/watch?v=P-OKdhEYeHs, "Is [King Noble] Black

12  Supremacy The Answer," a short reading from the United Independent Compensatory Code

13  notebook and commentary;

14          g.       https://www.youtube.com/watch?v=gqPkW-npyRc, "My Weapon of

15  Choice," a short video which starts with a view of a gun barrel that turns into a camera;

16          h.       https://www.youtube.com/watch?v=gB02GL_Ts5s, "The Religion of White

17  Supremacy," a short reading from "The United Independent Compensatory Code," by Neely Fuller

18  Jr., and a brief discussion of the text;"

19          i.       https://www.youtube.com/watch?v=NSk5uPR562Y, "The Establishment of

20  Racism White Supremacy," a short reading from "The United Independent Compensatory Code,"

21  by Neely Fuller Jr., and brief commentary; and

22          j.       https://www.youtube.com/watch?v=CBuTbCzB-M0, "These People Are

23  Victims of Racism," Plaintiff Muhammad's personal commentary regarding photographs of "non-

24  White" people throughout the world, the four principles of "The United Independent Compensatory

25  Code" along with his explanation of the terms and the politics of race; and

26          k.       https://www.youtube.com/watch?v=clldd6sGpCI, "When We Were Slaves,"

27  a presentation of historic slave photographs with a short message exhorting people not to forget 400

28  years of slavery in the United States.

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

The content of these videos does not violate Defendants' Community Guidelines or TOS.  Rather, the content includes accurate historical images, properly referenced readings of "The United Independent Compensatory Code" with commentary, or Plaintiff Muhammad's personal commentary regarding celebrities, historical figures or events and/or issues of the day.

316.    Plaintiff Muhammad is informed and believes that Defendants have a policy of identifying YouTube creators, subscribers and viewers by race; that Defendants are using artificial intelligence, algorithm and other filtering tools to demonetize and restrict videos that are created by or popular with people of color; and that Defendants have restricted most of the "Dr.Syn-Q" videos because he is an African American.  Plaintiff Muhammad is further informed and believes that Defendants' race based discriminatory conduct has hurt him personally by reducing his reach on YouTube, has damaged "Dr.Syn-Q" by preventing revenue generation on the channel, and has injured the "Dr.Syn-Q" subscribers and the viewers who have been unable to access "Dr.Syn-Q" videos to which Defendants have applied "Restricted Mode."

## V.    CLASS ALLEGATIONS

317.    Plaintiffs bring this action on behalf of themselves and a putative class of similarly situated persons who use or have used YouTube or any of the services that Defendants offer in connection with YouTube and who come within the definition or classification of a protected class of persons under 42 U.S.C. 1981 (the "Class").

318.    Each and every claim alleged in this case is also alleged on behalf of every member of the Class.

319.    The Class seeks both monetary damages, restitution, and/or other injunctive relief on behalf of any persons who fall within the Class Definition:

All persons or entities in the United States who are or were:

(i) a person or entity defined or classified as a protected class or

person under 42 U.S.C. §1981; and

(ii) are members, users and or consumers of YouTube who uploaded,

posted, or viewed video content on YouTube subject to

Google/YouTube's TOS, Mission Statement, Community Guidelines,

and/or any other content-based filtering, monetization, distribution,

personal data use policies, advertising or regulation and practices any

other regulations or practices that are related to the YouTube

Platform on or after January 1, 2015 and continuing through to June

16, 2020 (the "Class Period").

Excluded from the Class are Defendants and their employees,

affiliates, parents, subsidiaries, and co-conspirators, whether or not

named in this Complaint, and the United States government.

320.    Class certification for the Class is authorized under Federal Rule of Civil Procedure 23 and applies to both claims for injunctive and equitable relief, including restitution, under Rule 23(b) (2) and for monetary damages under Rule 23(b)(3).

321.    There are at least 42 million members of the Class.

322.    The number of persons who fall within the definitions of the Class are so numerous and geographically dispersed so as to make joinder of all members of the Class or Subclass in their individual capacities impracticable, inefficient, and unmanageable, and without class wide relief, each member of the Class would effectively be denied his, her, its, or their rights to prosecute and obtain legal and equitable relief based on the claims and allegations averred in this Complaint.

323.    There are questions of law and fact common to the Class that relate to and/or are dispositive of the nature and allegations of unlawful conduct alleged in the Complaint, and the nature, type and common pattern of injury and harm caused by that unlawful conduct and sustained by the putative members of the Class and Subclass including, but not limited to:

a.      Whether Defendants must provide its users and consumers with an accounting for debts owed under contract(s), including their TOS.

b.      Whether Defendants concealed, misrepresented or omitted to disclose material policies and practices regarding the unlawful regulation of video content, advertising, distribution, monetization, contractual obligations, and characteristics of the YouTube Platform to the members of the Class;

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

1          c.     Whether Defendants use or have used unlawful, discriminatory,

2    anticompetitive and fraudulent, deceptive, unfair, and/or bad faith filtering tools and practices, in

3    the code and operation of their machine based, algorithmic, or A.I. filtering tools, and/or other

4    practices and procedures to review, regulate, and restrict content, and/or regulate and restrict the

5    advertising, monetization, distribution, and property rights of the Class;

6          d.     Whether Defendants are or have engaged in discriminatory practices against

7    the members of the Class based on protected characteristics under 42 U.S.C § 1981 or the Unruh

8    Civil Rights Act;

9          e.     Whether Defendants breached or are in breach of their form consumer

10   contracts and obligations to the Class;

11         f.     Whether Defendants have or are engaged in unlawful, deceptive, unfair, or

12   anticompetitive practices that violate federal or California law, and harmed and injured the Class;

13         g.     Whether the conduct of Defendants, as alleged in this Complaint, caused

14   injury to the business and property of Plaintiffs and the members of the Class;

15         h.     Whether Defendants' alleged regulations, practices, and conduct have caused

16   or threaten to cause irreparable harm to the speech of the Class so as to warrant the issuing of

17   temporary, preliminary and/or final injunctive relief and corresponding declaratory relief with

18   respect to the legal rights of the Class;

19         i.     The scope, nature, substance, and enforcement of injunctive and equitable

20   relief sought by the Class;

21         j.     Whether Defendants were unjustly enriched or obtained profits or ill-gotten

22   financial gains as a result of the unlawful, discriminatory, deceptive, unfair, or anticompetitive

23   practices perpetrated against the Class;

24         k.     Whether Defendants breached or are in breach of their contractual

25   obligations, implied duty of good faith and fair dealing, and or other promises under the consumer

26   form contracts entered into with members of the Class during the Class Period;

27

28

l.      Whether Defendants' content-based regulations and filtering practices, on their face and/or as applied, violate the free speech rights of Plaintiffs and the Class under California or federal law;

m.      Whether Defendants' content based regulations and filtering practices, on their face and/or as applied, violate the free speech rights of Plaintiffs and the Class under California or federal law;

n.      Whether Plaintiffs and the members of the §1981 Class are entitled to an equitable accounting of debts owed under contracts entered into with Defendants;

o.      Whether Defendants have converted stolen, unlawfully possessed, and/or unlawfully used and profited from the property of Plaintiffs and the members of the §1981 Class so as to entitle them to royalties, damages, replevin, and other legal or equitable relief; and

p.      Whether the Class is entitled to declaratory and other relief based on Defendants' assertion of immunity from liability under the Communications Decency Act, 15 U.S.C. § 230 (c) (the "CDA"), with respect to any of the claims or allegations asserted by Plaintiffs and the Class in this Lawsuit.

324.    Each of individual named Plaintiffs is a person protected under 42 U.S.C. § 1981, and a member of the Class.

325.    The claims of Plaintiffs are typical of and identical to those of the Class.

326.    Plaintiffs will fairly and adequately protect the interests of the members of the Class.

327.    Plaintiffs are represented by counsel who are competent and experienced in the prosecution and defense of similar claims and litigation, including class actions filed, prosecuted, defended, or litigated in under California and federal law, in California and federal courts, in connection with claims and certification of consumer and civil rights classes composed of members who reside in California and/or the United States.

328.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications.

329.    The questions of law and fact common to the members of the Class predominate over any questions of law or fact affecting only individual members of the Class or Subclass,

1  including legal and factual issues relating to liability and the nature of the harm caused by

2  Defendants' unlawful actions.

3      330.    The questions of law and fact common to the members of the Class also

4  predominate over any questions of law or fact affecting only individual members of the Class

5  because all claims in this Lawsuit are governed under California or controlling federal law,

6  including legal and factual issues relating to liability and the nature of the harm caused by

7  Defendants' unlawful actions.

8      331.    A class action is superior to other available methods for the fair and efficient

9  adjudication of this controversy.  Treatment as a class action will permit a large number of

10 similarly situated persons to adjudicate their common claims in a single forum simultaneously,

11 efficiently and without the duplication of effort and expense that numerous individual actions

12 would engender.

13     332.    Certification of the Class is also superior to other available methods for the fair and

14 efficient adjudication of this controversy because and all claims in this Lawsuit must be brought

15 and venued in a court of competent jurisdiction located Santa Clara County.

16     333.    The Class are readily definable and are categories for which records should and do

17 exist in the files of Defendants.

18     334.    The prosecution as a class action will also eliminate the possibility of repetitious

19 litigation.

20     335.    Class treatment will also permit the adjudication of smaller claims by members of

21 the Class who otherwise could not afford to litigate or assert the claims asserted by Plaintiffs in this

22 Lawsuit.

23 **VI.    INDIVIDUAL CAUSES OF ACTION**

24                     **FIRST CAUSE OF ACTION**
                **Request For A Declaratory Relief Judgment that Section 230(c)**
25          **Immunity Is Inapplicable to Discrimination Claims**
                **(On Behalf Of Individual Plaintiffs And The §1981 Class)**
26

27     336.    Plaintiffs re-allege and incorporate herein by reference, as though set forth in full,

28 each of the allegations set forth in paragraphs 1 through 335 above.

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION,
ACCOUNTING AND DAMAGES**

**A.      Procedural Background Facts**

337.     The CDA provides "**Protection for 'Good Samaritan' blocking and screening of offensive material:**"

(1) **Treatment of publisher or speaker**

No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

(2) **Civil liability**

No provider or user of an interactive computer service shall be held liable on account of — (A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or (B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1). 47 U.S.C. § 230(c).

338.     On November 19, 2019, the Honorable Brian C. Walsh, Judge of the Superior Court of the County of Santa Clara (the "State Court"), ruled in *Prager University v. Google LLC*, Santa Clara County Superior Court Case No. 19CV340667,that 47 U.S.C. § 230(c) "immunizes service providers [such as Defendants] who endeavor to restrict access to material deemed objectionable," by employing filters to remove users' content from their platforms based on the political, religious, or other personal identity or viewpoint of the user rather than the actual online content posted by the user on the platform.  2019 WL 8640569, at *7 (Cal. Super. Ct. Nov. 19, 2019).

339.     Furthermore, the State Court ruled that, notwithstanding the express good faith language in Section 230(c)(2)(A), the content filtering and restrictions that internet service providers like Defendants engage in are not subject to any good faith, objective judicial review of the underlying content, or the internet providers filtering or restriction practices, but reside within and are left to the sole, unfettered discretion of the internet provider who acts to filter and restrict content at its whim.  2019 WL 8640569, at *10-11.

340.   In *Prager*, therefore, at least one state trial court has construed Section 230(c) as granting Defendants absolute immunity for all content curation decisions, including decisions based not on the actual on line material, but on the race, sex, or other identity and dismissing plaintiffs' claims without leave to amend despite detailed factual allegations, evidence, and party admissions of identity and viewpoint based discrimination and animus in regulating and filtering speech on YouTube.  2019 WL 8640569, at *10-12.

341.   A true and correct copy of the November 19, 2019 Order issued by the Hon. Brian Walsh, granting Defendants' immunity and dismissing all of plaintiffs' claims for relief without leave to amend is attached as Exhibit B hereto.

342.   On December 19, 2019, plaintiff timely filed a notice of appeal.  The notice of appeal rendered state court decision uncitable and of no precedential or legal value unless and until the California appellate courts affirm the application of Section 230(c) to intentional discrimination and the federal courts, which are the final authority on federal questions of law, concur in that decision.

343.   On May 18, 2020, the United States Department of Justice intervened in the *Divino* case and filed a brief defending the application of Section 230(c) to ISP's who filter, review, restrict, bock, or censor on line speech based on a user's racial, sexual, or other identity or viewpoint without regard to whether the online speech of the user violated the content based rules of the internet site or the provisions of Section 230(c).  A true and correct copy of the United States Department of Justice's Notice of Intervention (Dkt.# 46) and Memorandum of Law in Support (Dkt.#47) are attached as Exhibit C.

344.   On May 28, 2020 the President of The United States issued an Executive Order repudiating both the State Court decisions in *Prager* and contradicting the United States' position that Section 230(c) applies or can be applied to an ISP who engages in intentional race, sex or other identity or viewpoint based discrimination alleged in this Lawsuit and *Divino*.

345.   In the May 28 Order, the President directed the U.S. Department of Justice ("DOJ") and other Article 2 agencies or departments to enforce the "policy of the United States" that immunity law may not be applied or enforced with respect to any on line, publishing, filtering,

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

1    blocking, or censorship conduct undertaken by an Internet Service Provider (ISP) that was based in

2    any part on the user's race, sex, or other personal identity or viewpoint.

3       346.    The May 28 Executive Order states in pertinent part:

4    **Section 2 Protections Against Online Censorship.**

5    **(a)** It is the policy of the United States to foster clear ground rules promoting free and open

6    debate on the internet. Prominent among the ground rules governing that debate is the

7    immunity from liability created by section 230(c) of the Communications Decency Act

8    (section 230(c)). 47 U.S.C. 230(c).  It is the policy of the United States that the scope of that

9    immunity should be clarified: the immunity should not extend beyond its text and purpose

10   to provide protection for those who purport to provide users a forum for free and open

11   speech, but in reality use their power over a vital means of communication to engage in

12   deceptive or pretextual actions stifling free and open debate by censoring certain

13   viewpoints.  * * * *

14      347.    In particular, subparagraph (c)(2) expressly addresses protections from "civil

15   liability" and specifies that an interactive computer service provider may not be made liable "on

16   account of" its decision in "good faith" to restrict access to content that it considers to be "obscene,

17   lewd, lascivious, filthy, excessively violent, harassing or otherwise objectionable."  It is the policy

18   of the United States to ensure that, to the maximum extent permissible under the law, this provision

19   is not distorted to provide liability protection for online platforms that -- far from acting in "good

20   faith" to remove objectionable content -- instead engage in deceptive or pretextual actions (often

21   contrary to their stated TOS) to stifle viewpoints with which they disagree. Section 230 was not

22   intended to allow a handful of companies to grow into titans controlling vital avenues for our

23   national discourse under the guise of promoting open forums for debate, and then to provide those

24   behemoths blanket immunity when they use their power to censor content and silence viewpoints

25   that they dislike.  When an interactive computer service provider removes or restricts access to

26   content and its actions do not meet the criteria of subparagraph (c)(2)(A), it is engaged in editorial

27   conduct.  It is the policy of the United States that such a provider should properly lose the limited

28

1   liability shield of subparagraph (c)(2)(A) and be exposed to liability like any traditional editor and

2   publisher that is not an online provider.

3   **(b)** To advance the policy described in subsection (a) of this section, all executive

4   departments and agencies should ensure that their application of section 230(c)

5   properly reflects the narrow purpose of the section and take all appropriate actions in

6   this regard.  In addition, within 60 days of the date of this order, the Secretary of

7   Commerce (Secretary), in Case 5:19-cv-04749-VKD Document 57 Filed 06/01/20

8   Page 6 of 8 consultation with the Attorney General, and acting through the National

9   Telecommunications and Information Administration (NTIA), shall file a petition

10   for rulemaking with the Federal Communications Commission (FCC) requesting

11   that the FCC expeditiously propose regulations to clarify:

12   (i) the interaction between subparagraphs (c)(1) and (c)(2) of section 230, in

13   particular to clarify and determine the circumstances under which a provider of an

14   interactive computer service that restricts access to content in a manner not

15   specifically protected by subparagraph (c)(2)(A) may also not be able to claim

16   protection under subparagraph (c)(1), which merely states that a provider shall not

17   be treated as a publisher or speaker for making third-party content available and

18   does not address the provider's responsibility for its own editorial decisions; (ii) the

19   conditions under which an action restricting access to or availability of material is

20   not "taken in good faith" within the meaning of subparagraph (c)(2)(A) of section

21   230, particularly whether actions can be "taken in good faith" if they are:

22   **(A)** deceptive, pretextual, or inconsistent with a provider's terms of service; or **(B)** taken

23   after failing to provide adequate notice, reasoned explanation, or a meaningful opportunity

24   to be heard; and **(iii)** any other proposed regulations that the NTIA concludes may be

25   appropriate to advance the policy described in subsection (a) of this section. **(c)** The

26   Department of Justice shall review the viewpoint-based speech restrictions imposed by each

27   online platform identified in the report described in subsection (b) of this section and assess

28

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION,
ACCOUNTING AND DAMAGES**

1   whether any online platforms are problematic vehicles for government speech due to

2   viewpoint discrimination, deception to consumers, or other bad practices. * * * *

3   **Sec. 4. Federal Review of Unfair or Deceptive Acts or Practices.** (a) It is the

4   policy of the United States that large online platforms, such as Twitter and

5   Facebook, as the critical means of promoting the free flow of speech and ideas

6   today, should not restrict protected speech. The Supreme Court has noted that social

7   media sites, as the modern public square, "can provide perhaps the most powerful

8   mechanisms available to a private citizen to make his or her voice heard."

9   *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017).  Communication

10  through these channels has become important for meaningful participation in

11  American democracy, including to petition elected leaders.  These sites are

12  providing an important forum to the public for others to engage in free expression

13  and debate. *Cf. PruneYard Shopping Center v. Robins*, 447 U.S. 74, 85-89 (1980).  *

14  * *Sec. 5. State Review of Unfair or Deceptive Acts or Practices and Anti-

15  Discrimination Laws.

16  **(a)** The Attorney General shall establish a working group regarding the potential

17  enforcement of State statutes that prohibit online platforms from engaging in unfair or

18  deceptive acts or practices.  The working group shall also develop model legislation for

19  consideration by legislatures in States where existing statutes do not protect Americans

20  from such unfair and deceptive acts and practices.  The working group shall invite State

21  Attorneys General for discussion and consultation, as appropriate and consistent with

22  applicable law.

23  **(b)** Complaints described in section 4(b) of this order will be shared with the working

24  group, consistent with applicable law.  The working group shall also collect publicly

25  available information regarding the following:

26  (i) increased scrutiny of users based on the other users they choose to follow, or their

27  interactions with other users;

28

-119-

(ii) algorithms to suppress content or users based on indications of political alignment or viewpoint;

(iii) differential policies allowing for otherwise impermissible behavior, when committed by accounts associated with the Chinese Communist Party or other anti-democratic associations or governments;

(iv) reliance on third-party entities, including contractors, media organizations, and individuals, with indicia of bias to review content; and

(v) acts that limit the ability of users with particular viewpoints to earn money on the platform compared with other users similarly situated.

A true and correct copy of the President's Executive Order is attached as Exhibit D to this Complaint.

348.    In *Divino*, the "related" case to this Lawsuit, the LGBTQ+ plaintiffs asserted a claim for a declaratory judgment under 28 U.S.C. § 2201, *et seq*. asking this Court to declare that the immunity provision of Section 230(c) does not extend to intentional identity or viewpoint discrimination conduct by an ISP and, if not so construed, the law is unconstitutional, both as applied and on its face, under *Denver Area* and progeny.

349.    On June 2, 2020, this Court held a hearing in the *Divino* case on, among other things, the extent to which Section 230(c) applies, if at all, to intentional identity or viewpoint based discrimination by Defendants.

350.    Defendants argued that Section 230(c)(1) immunizes them from identity and viewpoint based discrimination because such discrimination is "publishing conduct" that Congress enacted Section 230(c)(1) to protect.

351.    Defendants contended that Section 230(c)(1) grants absolute immunity to an ISP for "publishing conduct" that includes discriminating against user based on the person's racial or sexual identity to filter, review, or block the access of the online user or its content on a website that is otherwise open to the general public.

352.    Although Defendants conceded at the oral argument that immunity might not be available in limited but unspecified "circumstances" involving race discrimination, Defendants

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

1   maintained that intentional and systematic discrimination used to profile, review, and block the

2   access and content of LGBTQ+ users was a traditional publishing function that comes within the

3   conduct that Congress intended to protect under Section 230(c)(1).

4        353.   The LGBTQ+ plaintiffs in *Divino* argued that Section 230(c)(1) does not prevent the

5   enforcement of contractual promises and other preexisting legal relationships between an ISP and

6   user, including contractual based promises that Defendants may only filter, review and impose

7   access restrictions on users based on the content of the video under specific rules that apply equally

8   to all without reference or consideration of the user's identity or viewpoint.

9        354.   The breaching of these legally enforceable promises and obligations, express or

10   implied, in a contract and license agreements between a user and an the ISP, and the other

11   obligations and rights codified in the state or federal laws that regulate businesses that prohibit

12   discrimination based on identity are neither specific or unique to publishers or traditional editorial

13   function, and do not implicate liability for third party defamation or wrongs, but are legal

14   obligations that apply to all business under contract and other legal obligations imposed on any

15   business and its customer or consumer.

16        355.   The *Divino* plaintiffs also argued, as the Plaintiffs and all persons similarly situated

17   argue in this Lawsuit, that Section 230(c) applies only to the filtering, reviewing, restricting, or

18   blocking of on line "material" not to or based upon a person's identity or viewpoint, because racial

19   profiling and identity or viewpoint censorship has nothing to do with and does not further the

20   express statutory purpose of protecting minors from "offensive material" on the internet.

21        356.   The extension of Section 230(c)(1) beyond a limited immunity for defamation and

22   other liabilities that arise from the failure to block unlawful third party content also renders Section

23   230(c)(2) statutory limits prohibiting bad faith or discriminatory filtering and blocking of on line

24   appropriate content unenforceable, meaningless, and pure statutory surplussage.

25        357.   Finally, as in *Divino*, the application of either Section 230(c)(1) or (2) to immunize

26   an ISP that uses identity or viewpoint discrimination to regulate on line speech is an

27   unconstitutional permissive speech regulation law violates the First Amendment under *Denver*

28   *Area* and progeny.

358.    The use of Section 230(c) to censor users based on their race, identity, or viewpoint is not viewpoint neutral, narrowly tailored to protect children from "offensive" material without creating a risk of erroneous private veto over otherwise appropriate speech, and eviscerates the pre-existing legal relationships, including the contractual and statutory obligations, and rights of the parties that would otherwise be enforceable in a court of law.

359.    The Court has taken the arguments under submission.

360.    A true and correct copy of the transcript of the Section 230(c) arguments recorded at the hearing in *Divino* is attached as Exhibit E to this complaint.

**B.      Justiciable Legal Controversies Currently Exist Regarding The Construction And Constitutionality Of 47 U.S.C. § 230(c).**

361.    At least four actual controversies now exist between the parties regarding the proper construction, scope, application, and constitutionality of the CDA statutory immunity granted to internet service providers given the unique allegations and claims asserted against Defendants in this case.

362.    Each of the controversies arise from a dispute about the extent to which Section 230(c) immunizes an internet service provider that discriminates against users because of the user's race, personal identity or viewpoints, including any profiling or consideration of Plaintiffs' race in making access decisions on YouTube

**1.      An Actual Controversy Exist As To Whether The Provisions Of Section 230(c) Immunize Defendants From Race, Personal Identity, or Viewpoint Discrimination In Filtering And Blocking On line Content And Access**

363.    A justiciable controversy exist as to whether Section 230(c)(1) or (2) grants immunity to an ISP that breaches and express or implied contractual promises not to discriminate against users based on a person's identity, or viewpoint when reviewing, restricting, or denying access to YouTube under license and use agreements between the user and the ISP.

**2.      An Actual Controversy Exists As To Whether Section 230(c) Immunizes Defendants For Conduct That Violates**

364.    A second justiciable controversy exists as to whether the provisions of Section 230(c)(1) or (2) permit Defendants to engage unlawful conduct that uses person's race, identity, or

viewpoint to restrict on line material and access in contravention of established federal and state laws prohibiting such discrimination in contract, 42 U.S.C. § 1981 and Unruh Civil Rights Act, Cal. Civ. Code §§51, *et seq.*, unlawful, deceptive or anticompetitive business practices, including conduct prohibited under section 1124 of the Lanham Act and section 17200 of the California Business and Professions Code, and discriminatory censorship in violation of the Liberty of Speech Clause enshrined in Article 1, Section 2 of the California Constitution.

**3. The Provisions And/or Application Of Any Part Of Section 230(c) To Claims Arising Out Of Race, Identity, Or Viewpoint Discrimination Is Unconstitutional**

365. As a third justiciable controversy exists as to whether Section 230(c) is unconstitutional because it violates the First Amendment and/or Equal Protection clause of the U.S. Constitution on its face and/or as applied to this Lawsuit.

366. Construing any provision of the "Good Samaritan Immunity For Blocking On line Material" under Section 230(c) as permitting an ISP to use a person's race, identity, or viewpoint to filter, review, or block on line access or content is unconstitutional under the test governing the constitutionality of permissive private party speech laws.

367. Section 230(c) (1) and (2) is congressional law that was enacted to permit a private party to regulate on line speech. Consequently, under *Denver Area* and progeny, the law cannot be applied in a manner that is NOT identity or viewpoint neutral, must be narrowly tailored and applied to avoid the risk of erroneous private censorship, and may not be used to interfere or alter the pre-existing legal relationships between the parties.

**4. The Executive Order Precludes The Government From Arguing Or Enforcing Section 230(c) To Claims Based On Intentional Identity Or Viewpoint Discrimination.**

368. A fourth justiciable controversy exists as to legal effect of the President's Executive Order on the application of Section 230(c) to on line content and access regulation based on a user's identity and viewpoint, as is set forth in this Lawsuit.

369. In the Order, the President declares that is the policy of the United States to ensure that Section 230(c) must be applied in a manner that is viewpoint neutral and does not permit ISPs to censor on line content or block on line user access based on the identity or viewpoint of the user.

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

If given full legal affect, the Executive Order mandates the obvious: Section 230(c) applies only to filtering and blocking "offensive material," not the persons who use the internet.

370.     The Executive Order provides that its application does not create a substantive legal right that did not exist before, or otherwise alter the parties' relationships.  But that language begs the question as to what rights and relationships already exist under Section 230(c) in this Lawsuit. The Executive Order directs the United States to enforce the law and promulgate regulations that preclude what Defendants want to use its provisions for in this Lawsuit:  to discriminate against Plaintiffs based on their race, identity and viewpoints.

371.     Consequently, the Executive Order also creates a conflict of interest for the Department of Justice under Rule 5.1.  The Order specifically instructs DOJ to take all steps, including, but not limited to, promulgating regulations to ensure that Section 230(c) is not and will never be used to permit identity or viewpoint discrimination in the regulation of on line content.

372.     At the same time, DOJ has intervened and formally taken the opposite position before this Court regarding the application of Section 230(c) to the very identity and viewpoint discrimination that the President has instructed DOJ to prohibit.  That position effectively precludes DOJ or any agency of the United States from promulgating and enforcing the very regulations and other steps in the Order that preclude identity and viewpoint discrimination.

373.     Furthermore, because of the conflicting positions taken by DOJ in *Divino*, the United States may be judicially estopped from enforcing or giving any affect to the President's Executive Order.

**C.       Plaintiffs Served Rule 5.1 Notice On The U.S. Attorney General**

374.     In challenging the Constitutionality of the CDA, Plaintiffs must comply with Federal Rule of Civil Procedure 5.1 which requires that "[A] party . . . promptly [] file a notice of constitutional question stating the question and identifying the paper that raises," where "a federal statute is questioned and the parties do not include the United States, one of its agencies, or one of its officers or employees in an official capacity." Fed. R. Civ. P. 5.1. Under Rule 5.1 "statute" means any congressional enactment that would qualify as an "Act of Congress."

375.     Rule 5.1 requires more than the court certification provided by 28 U.S.C. § 2403; Rule 5.1 requires notice and certification to the United States Attorney General of any constitutional challenge to a federal statute, not merely to challenges of laws "affecting the public interest." 28 U.S.C. § 2403.

376.     The CDA constitutes a federal statute under Rule 5.1.

377.     Plaintiffs have served the Rule 5.1 Notice on the United States Attorney General stating that Plaintiffs are challenging the constitutionality of 47 U.S.C. § 230(c), identifying the CDA, and attaching a copy of this Complaint, and a copy of Judge Walsh's November 19, 2019 Order.

378.     Plaintiffs have served the Rule 5.1 Notice and attachments by certified mail and have sent a copy of the Notice and attachments to the United States Attorney General by overnight delivery service.

379.     28 U.S.C. § 2403 also requires that the Court notify the United States Attorney General of Plaintiffs' First Cause of Action set forth in this Complaint: "In any action, suit or proceeding in a court of the United States to which the United States or any agency, officer or employee thereof is not a party, wherein **the constitutionality of any Act of Congress affecting the public interest is drawn in question, the court shall certify such fact to the Attorney General**, and shall permit the United States to intervene for presentation of evidence, if evidence is otherwise admissible in the case, and for argument on the question of constitutionality.  The United States shall, subject to the applicable provisions of law, have all the rights of a party and be subject to all liabilities of a party as to court costs to the extent necessary for a proper presentation of the facts and law relating to the question of constitutionality."  28 U.S.C. § 2403(a) (emphasis added).

380.     Accordingly, Plaintiffs respectfully request that the Court certify to the United States Attorney General of the United States that 48 U.S.C. § 230(c), a federal statute, has been challenged by Plaintiffs on the grounds averred below.

381.     At this time, United States has a potentially unwaivable conflict of interest under the applicable law and ethics rules governing conflicts of interest and divided duty of loyalty.

1    In complying with the notice requirements under Rule 5.1, Plaintiffs are not waiving but are

2  expressly reserving their rights to assert that the United States has a conflict of interest that may

3  preclude intervention under Rule 5.1, and/or to seek other appropriate relief, including

4  disqualification, and oppose intervention, in this Lawsuit or any other proceeding that conflicts

5  with the policy of the United States that Section 230(c) does not permit or immunize identity or

6  viewpoint discrimination.

**SECOND CAUSE OF ACTION**
7  **Equitable Claim For An Accounting Of Debts Owed Under Contract**
8  **(On Behalf Of Individual Plaintiffs And The §1981 Class)**

9    382.   Plaintiffs re-allege and incorporate herein by reference, as though set forth in full,

10  each of the allegations set forth in paragraphs 1 through 381 above.

11    383.   A claim for accounting can be either a legal remedy or an equitable claim.  *Hafiz v.*

12  *Greenpoint Mortgage Funding, Inc.*, 652 F. Supp. 2d 1039, 1043 (N.D. Cal. 2009).

13    384.   An equitable claim for an accounting "requires a showing that a relationship exists

14  between the plaintiff and defendant that requires an accounting, and that some balance is due the

15  plaintiff that can only be ascertained by an accounting."  *Teselle v. McLoughlin,* 173 Cal.App.4th

16  156, 179 (2009).  All that is required is "some relationship" between the parties. *Id*.

17    385.   To state an equitable claim for an accounting, therefore, a plaintiff need only allege

18  that: (1) a contractual relationship exists between the Plaintiffs and Defendants under which

19  monetary consideration is owed to the plaintiff; (2) the amount due and owing cannot be

20  determined or ascertained without an examination of the debts and credits recorded and kept on the

21  "books" of the defendant to determine what the precise amount that is due and owing; (3) the

22  defendant has engaged in misconduct; and (4) no adequate remedy at law exists. *Green Valley*

23  *Landowners Assn. v. City of Vallejo*, 241 Cal.App.4th 425, 443 (2015)**;** *Prakashpalan v. Engstrom,*

24  *Lipscomb & Lack*, 223 Cal.App.4th 1105, 1136–1137 (2014).

25    386.   A contractual relationship exists between Defendants and the putative §1981 Class.

26  Each §1981 Class member has entered into license agreements with YouTube and contracts with

27  Adworks or Adsense with Google for services on YouTube and Google, under which Defendants

28  have obtained specified rights to Plaintiffs' videos, personal data, and other property in exchange

1  for monetary compensation to Plaintiffs based on viewership, advertising, CPM, and other metrics

2  related to their video content, channels, and personal information and data.

3      387.    Under those licensing agreements and advertising contracts, Defendants have both

4  promised give to Plaintiffs and the members of the putative §1981 Class specified benefits such as

5  the ability to generate revenue from a YouTube channel and videos uploaded to the channel (i.e.,

6  monetization), mobile Livestreaming, Channel Membership, and SuperChat; and once qualified for

7  monetization, monthly revenue based on the number of subscribers to the channel, the number of

8  viewers for the channel and for individual videos, the total monthly watch time spent by viewers

9  watching videos uploaded to the channel, CPM, and the number of advertisements appearing on or

10  with individual videos and the channel.

11      388.    Over the past three year, at different periods, Defendants have frozen, altered,

12  unilaterally reduced and/or shaved total numbers from (a) the monthly reported view numbers for

13  individual videos, (b) the total reported historical aggregate view numbers for channels, (c) the total

14  reported subscriber numbers for channels, (d) the monthly reported watch times for individual

15  videos, (e) the monthly and total reported watch times for channels, and (f) monthly reported

16  revenue payable to Plaintiffs and the members of the putative §1981 Class.  Defendants have

17  changed reported numbers from week to week, month to month, and year to year without affording

18  notice, any explanation, or an opportunity to object or appeal to the Plaintiffs and the members of

19  the putative §1981 Class.  Defendants have engaged in misconduct in reporting inconsistent,

20  inaccurate, varying, and incorrect information regarding numbers of subscribers and views, and

21  watch times that has resulted in and proximately caused discrepancies and uncertainty about the

22  precise amounts of compensation owed to Plaintiffs and the members of the §1981 class.

23  Defendants' inaccurate and false reports have deprived Plaintiffs and members of the putative

24  §1981 Class of the opportunity to qualify to receive revenue from YouTube channels, and have

25  deprived them of revenue for individual monetized videos and monetized channels which

26  Defendants are obligated to pay under the license agreements, the TOS and the Adworks and

27  Adsense contracts.

28

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

389.     Defendants control the data from which they have calculated and reported numbers of subscribers, numbers of views, watch times and revenue to Plaintiffs and members of the putative §1981 Class, who cannot review the Defendants' data or ascertain the correct numbers which should have been reported.  Nor do Plaintiffs and members of the putative §1981 Class  have access to other data which would allow them to calculate the true amounts which Defendants owe and should have paid under the license agreement, the TOS and the Adworks and/or Adsense contracts.

390.     There is no adequate remedy at law by which Plaintiffs and the members of the putative §1981 Class can ascertain the precise amounts of compensation that Defendants owe to the Plaintiffs and the members of the class under the terms of the license agreement, the TOS, and the Adworks and/or Adsense contracts.  Without an equitable accounting, Plaintiffs and the members of the will be deprived of revenue and compensation that Defendants owe each of them and the putative §1981 Class cannot determine or ascertain the precise amounts which Defendants owe.

### THIRD CAUSE OF ACTION
**For Conversion Of Plaintiffs Property**
**(On Behalf Of Individual Plaintiffs And The §1981 Class)**

391.     Plaintiffs re-allege and incorporate herein by reference, as though set forth in full, each of the allegations set forth in paragraphs 1 through 390 above.

392.     Conversion is a strict liability tort. The foundation of the action rests neither in the knowledge nor the intent of the defendant. Instead, the tort consists in the breach of an absolute duty; the act of conversion itself is tortious. Questions of the Defendants' good faith, lack of knowledge, and/or motive are immaterial.

393.     A claim for conversion therefore rests solely upon the Defendants' unwarranted interference with the Plaintiffs' "'dominion over the property" that causes an injury or harm to Plaintiffs.  Neither good nor bad faith, care nor negligence, knowledge, nor ignorance, are material to the action.  *Los Angeles Fed. Credit Union v. Madatyan*, 209 Cal.App.4th 1383, 1387 (2012).

394.     The elements of a claim for conversion are: (1) Plaintiffs' ownership or right to possession of specified property; (2) the Defendants' conversion by a wrongful act that results in harm or disposition of the property and/or Plaintiffs' rights to that property; and (3) harm or

1   disposition that results in financial harm or damages to Plaintiffs. *Hester v. Public Storage*, 49

2   Cal.App.5th 668, at *7 (May 28, 2020); *Hodges v. County of Placer*, 41 Cal.App.5th 537, 551

3   (2019).

4   　　　　395.　Since 2006, Plaintiffs and members of the putative §1981 Class have created and

5   uploaded thousands of original videos to channels established on the YouTube platform. These

6   videos were created and uploaded at the sole expense and by the efforts of Plaintiffs and members

7   of the putative §1981 Class. Defendants contributed nothing to the creation of these original

8   videos. For many Plaintiffs and members of the putative §1981 Class, the uploaded video

9   constitutes the only existing copy of the video.

10   　　　　396.　Under the license agreement and the TOS, (among other things) Plaintiffs grant a

11   nonexclusive license to Defendants to display, use, copy, repost, and promote those original videos

12   which are uploaded to the YouTube platform. Plaintiffs and members of the putative §1981 Class

13   have not granted Defendants an exclusive right to use uploaded videos, and they retain all of the

14   intellectual property rights to the videos after the videos are uploaded.

15   　　　　397.　Though Defendants only have a nonexclusive license to the uploaded videos, over

16   the past 14 years, Defendants have, without advanced notice, wrongfully unilaterally removed

17   thousands of Plaintiffs' original individual videos from the YouTube platform, terminated access to

18   the YouTube platform, and/or removed channels and all of the videos uploaded to the channels

19   without affording an opportunity to create a copy of the videos which were uploaded by Plaintiffs

20   and members of the putative §1981 Class. Defendants have done so without affording Plaintiffs

21   and members of the putative §1981 Class an effective opportunity to appeal the decision to remove

22   videos, terminate access to the platform, or remove channels; or to make a copy of the video and

23   electronic data associated with the video.

24   　　　　398.　Defendants often removed the videos, terminated access, or removed channels

25   without any explanation or rationale for having done so. On occasion, when Defendants did give

26   written notice, the notice indicated the adverse action had been taken because the video violated

27   one of Defendants' numerous vague Community Guidelines or TOS, and did not actually specify

28   what about the video content was problematic or prohibited. Appeals sent to Defendants from

1  Plaintiffs and members of the putative §1981 Class often are ignored by Defendants or summarily

2  affirmed without explanation or specifying the video content that violated Defendants rules.

3      399.    For many Plaintiffs and members of the putative §1981 Class, Defendants still retain

4  videos in the form of electronic data, and could return to Plaintiffs and members of the putative

5  §1981 Class copies of the videos uploaded but now removed from the YouTube platform.

6  However, Defendants ignore the calls, messages, letters, emails and even judgments issued by

7  small claims courts from Plaintiffs and members of the putative §1981 Class.  Defendants have not

8  returned the videos of Plaintiffs and members of the putative §1981 Class which have been

9  wrongfully removed, or for which platform access has been terminated denied.

10      400.    In removing videos, terminating access to the platform and/or removing channels

11  wholesale, Defendants have interfered with the dominion by Plaintiffs and members of the putative

12  §1981 Class over their videos; Defendants have deprived them entirely of the use of the videos, as

13  well as the money spent to create the videos.  Defendants have deprived Plaintiffs and members of

14  the putative §1981 Class of future revenue that could be earned from the videos, because Plaintiffs

15  and members of the putative §1981 Class cannot post their videos on the platform of one of

16  Defendants' social media competitors where the videos could generate revenue, or upload the

17  videos to a pay-per-view internet website where the videos could generate revenue.

18  **FOURTH CAUSE OF ACTION**<br>**For Replevin**

19  **(On Behalf Of Individual Plaintiffs And The §1981 Class)**

20      401.    Plaintiffs re-allege and incorporate herein by reference, as though set forth in full,

21  each of the allegations set forth in paragraphs 1 through 400 above.

22      402.    Plaintiffs and members of the putative §1981 Class acknowledge that Court often

23  treat Conversion and Replevin interchangeably, or treat Replevin as a remedy for Conversion.

24  Plaintiff plead Conversion and Replevin separately out of an abundance of caution, so as to ensure

25  that they preserve the right to recover money in the event that copies of the videos Defendants have

26  removed cannot be obtained.

27      403.    Replevin is a common law remedy that permits the prevailing party to recover both

28  personal property and incidental damages from a defendant who unlawfully possesses the property.

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION,**<br>**ACCOUNTING AND DAMAGES**

404.     When the claim is asserted in a federal court proceeding, Replevin is a remedy specifically approved by rule, as governed by the appropriate state law.

405.     In California, a claim for Replevin is the functional equivalent of the common law writ for recovery of specific personal property.  California courts, therefore, refer to Replevin as a cause of action for "claim and delivery" that permits the plaintiff to recover both personal property and incidental damages from an unlawful possessor.  *Adler v. Taylor*, 2005 WL 4658511, at \*3 (C.D. Cal. Feb. 2, 2005), aff'd sub nom., *Orkin v. Taylor,* 487 F.3d 734 (9th Cir. 2007).

406.     The gist of common law Replevin is simple: Defendants' unlawful possession of Plaintiffs' property.  With respect to an equitable claim or remedy for Replevin in connection with a claim for conversion, the additional elements are:  (a) Defendants' actual possession of Plaintiffs' property; (b) Plaintiffs; demand for possession of the property; and (c) Defendants' refusal to deliver the property.  See *Stockton Morris Plan Co. v. Mariposa Cnty.*, 99 Cal.App.2d 210, 213 (1950);  *Penske Truck Leasing Co. v. I-10 Towing and Recovery, Inc.*,  No. EDCV 18-2547 JGB (SPx), 2019 WL 6736905, at \*3 (C.D. Cal. Mar. 11, 2019).

407.     Plaintiffs and members of the putative §1981 Class uploaded their videos to the YouTube platform.  Defendants maintain servers which electronically record the videos which are uploaded to the YouTube platform.

408.     Following Defendants removal of individual videos, termination of access to the platform or removal of whole channels preventing Plaintiffs and members of the putative §1981 Class from accessing the videos which they uploaded to the YouTube platform, Plaintiffs and members of the putative §1981 Class undertook multiple and varied efforts to obtain the return of the videos.  When Defendants gave written notice after the fact of removal or termination of access, Plaintiffs and members of the putative §1981 Class pursued appeals seeking to recover the videos by accessing Defendants' appeal sites on the YouTube platform.  Usually, Defendants did not give written notice of the removal or termination of access, and Plaintiffs and members of the putative §1981 Class telephoned published help numbers for YouTube help and left voicemail messages demanding that the videos be returned; they wrote emails and letters to YouTube seeking the return of the videos and inquiring how and when the videos would be returned; some even filed law suits

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

in small claims courts and obtained judgments for the videos.  However, Defendants either ignored the demands for videos made by Plaintiffs and members of the putative §1981 Class or affirmed the removal or termination of access without further communication.

### FIFTH CAUSE OF ACTION
### For Breach of Contract
### (On Behalf Of Individual Plaintiffs And The §1981 Class)

409.    Plaintiffs re-allege and incorporate by reference in whole or in part the allegations alleged in paragraphs 1 through 408.

410.    The TOS and agreement(s) between Defendants and Plaintiffs governing filtering, review and access to content and services on YouTube provide that the right and obligations under those agreements are governed and subject to California law, including federal law that California is obligated to enforce under the supremacy clause of the U.S. Constitution.

411.    The elements of a breach of contract under California law are: (1) existence of a valid contract between Plaintiffs and Defendants; (2) Plaintiffs' performance (or excuse for non-performance) under the contract; (3) Defendants' breach of the contract; and (4) proof of harm or financial injury as a result of the breach.

412.    Plaintiffs and Defendants have entered into agreement, including the TOS and related agreement(s) that are enforceable contract(s) governed by and under California law;

413.    Plaintiffs have performed their obligations under the TOS and/or other contract(s), including complying with YouTube's viewpoint neutral content based access rules and granting Defendants a perpetual and irrevocable license to their video content and all personal data and consumer information derived or used in connection with Plaintiffs' content on or use of YouTube.

414.    Defendants have breached their promises to provide Plaintiffs' equal access to YouTube and all related services that Defendants offer to other users, and are subject only to content based rules that are viewpoint neutral and apply equally to all.  Specifically, Defendants have denied and interfered with Plaintiffs' right of equal access to YouTube and its related services by profiling and using Plaintiffs' race, identity or viewpoints, not merely the material in the video

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

1    content, to review, filter and restrict Plaintiffs' access to YouTube in a manner that is not permitted

2    by federal and California law.

3        415.    As a direct and proximate result of Defendants' breach, Plaintiffs have suffered

4    monetary damages and other financial harms and losses in excess of $500.00 per year plus other

5    lost revenues, the total amount of which will be determined at trial.

6        416.    As a direct and proximate result of Defendants' breach, Plaintiffs have also suffered

7    irreparable harm to their contractual based rights of free speech and expression provided for under

8    the express and implied provisions of the TOS and other contract(s).

### SIXTH CAUSE OF ACTION
### For Breach Of The Implied Covenant
### Of Good Faith And Fair Dealing
### (On Behalf Of Individual Plaintiffs And The §1981 Class)

12   417.    Plaintiffs re-allege and incorporate by reference in whole or in part the allegations

13   alleged in paragraphs 1 through 416.

14   418.    Under California law, every contract "imposes upon each party a duty of good faith

15   and fair dealing in its performance and its enforcement." *McClain v. Octagon Plaza, LLC,* 159

16   Cal.App.4th 784, 798 (2008) (quoting *Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 2

17   Cal.4th 342, 371– 72 (1992)).

18   419.    The covenant "is based on general contract law and the long-standing rule that

19   neither party will do anything which will injure the right of the other to receive the benefits of the

20   agreement." *Waller v. Truck Ins. Exchange, Inc.*, 11 Cal.4th 1, 36 (1995). The covenant of good

21   faith finds particular application in situations where one party is invested with a discretionary

22   power affecting the rights of another. When a contract confers on one party a discretionary power

23   affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in

24   accordance with fair dealing" and such discretion "must be exercised in good faith." *Carma*, 2

25   Cal.4th at 372; *see also Perdue v. Crocker Nat'l Bank*, 38 Cal.3d 913, 923 (1985) (""where a

26   contract confers on one party a discretionary power affecting the rights of the other, a duty is

27   imposed to exercise that discretion in good faith and in accordance with fair dealing").)

28

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION,
ACCOUNTING AND DAMAGES**

420.     Breach of the implied covenant occurs "[w]here the terms of a contract are literally complied with but one party to the contract deliberately countervenes the intention and spirit of the contract."  *Hilton Hotels Corp. v. Butch Lewis Prod., Inc.*, 808 P.2d 919, 922–23 (Nev. 1991). "Establishing such a breach of the implied covenant depends upon the 'nature and purposes of the underlying contract and the legitimate expectations of the parties arising from the contract." *Integrated Storage Consulting Servs., Inc. v. NetApp, Inc.,* No. 5:12-CV-06209-EJD, 2013 WL 3974537, at *7 (N.D. Cal. July 31, 2013).

421.     Five factual elements are required to establish a breach of the covenant of good faith and fair dealing: (1) the parties entered into a contract; (2) the plaintiff fulfilled his obligations under the contract; (3) any conditions precedent to the defendant's performance occurred; (4) the defendant unfairly interfered with the plaintiff's rights to receive the benefits of the contract; and (5) the plaintiff was harmed by the defendant's conduct.  Judicial Council of California Civil Jury Instruction 325.

422.     Plaintiffs and Defendants have entered into contracts, including the TOS, in connection with Plaintiffs' use and access to YouTube and the related services Defendants offer under those contracts.

423.     Plaintiffs have fulfilled their obligations under the TOS and other agreement(s) and fulfilled or performed the conditions precedent, if any, under those agreement(s), including complying with YouTube's viewpoint neutral content based access rules and granting Defendants an irrevocable and perpetual license to their video content and any personal information and data derived from Plaintiffs' use or content on YouTube, and paying Defendants other consideration for services and access.

424.     Defendants unfairly interfered with Plaintiffs' rights by profiling and using their race, personal identity or viewpoint to deny them equal access to YouTube and its related services based on conduct that that is prohibited by and not permitted under California or federal law.

425.     As a direct and proximate result of Defendants' breach, Plaintiffs have suffered monetary damages and other financial harms and losses in excess of $500.00 per year plus other lost revenues, including the monetary value of unlawfully acquired property and license rights to

1  Plaintiffs' content and the personal data and information derived from Plaintiffs and their

2  subscribers and viewers, the total amount of which will be determined at trial.

3      426.   As a direct and proximate result of Defendants' breach, Plaintiffs have also suffered

4  irreparable harm to their contractual based speech rights and expression provided for subject to

5  only to viewpoint neutral content based rules as set forth in the express and implied provisions of

6  the TOS and other contract(s).

7  **SEVENTH CAUSE OF ACTION**<br>**For Promissory Estoppel**

8  **(On Behalf Of Individual Plaintiffs And The §1981 Class)**

9      427.   Plaintiffs re-allege and incorporate by reference in whole or in part the allegations

10  alleged in paragraphs 1 through 426.

11      428.   "The elements of promissory estoppel are (1) a promise, (2) the promisor should

12  reasonably expect the promise to induce action or forbearance on the part of the promisee or a third

13  person, (3) the promise induces action or forbearance by the promise or a third person (which we

14  refer to as detrimental reliance), and (4) injustice can be avoided only by enforcement of the

15  promise. *West v. JPMorgan Chase Bank, N.A.,* 214 Cal.App.4th 780, 803 (2013).

16      429.   Defendants have made at least 5 promises to Plaintiffs and other similarly situated

17  users:

18          a.   Defendants promise Plaintiffs equal access to YouTube subject only to

19  viewpoint neutral content-based rules that apply equally to all users;

20          b.   Defendants promise not to discriminate against Plaintiffs based on their race,

21  sexual identity, commercial status or identity, or the personal viewpoints except as permitted under

22  California or controlling federal law;

23          c.   Defendants promise to provide viewer and audience reach, advertising,

24  subscription, monetization, and content curation services to Plaintiffs and other users who comply

25  with YouTube's viewpoint neutral content-based rules;

26          d.   Defendants promise only to use, appropriate, or derive revenue from

27  Plaintiffs' content and data, and that of their viewers and subscribers subject to Defendants'

28

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION,**<br>**ACCOUNTING AND DAMAGES**

honoring and fulfilling their express and implied terms and obligations under the TOS and other agreement(s); and

      e.    Defendants promise to operate YouTube as a public forum for freedom of expression that is subject only to narrowly tailored, viewpoint neutral content based rules.

430.    Defendants made these promises with the reasonable expectation and intent of inducing Plaintiffs to grant Defendants an irrevocable license rights and other valuable consideration derived from Plaintiffs' use of YouTube.

431.    Defendants also made these promises with the intent of inducing Plaintiffs, as well as their viewers, subscribers, and followers, to access and use YouTube so that Defendants can monetize, advertise, and profit from user access and use of YouTube and the related services that Defendants offer.

432.    Defendants, through these promises, induced Plaintiffs to grant Defendants an irrevocable license, rights and other valuable consideration derived from Plaintiffs' use of YouTube.

433.    Defendants, through these promises, induced Plaintiffs, as well as their viewers, subscribers, and followers, to access and use YouTube so that Defendants can monetize, advertise, and profit from user access and use of YouTube and the related services that Defendants offer.

434.    Enforcing Defendants' promises will avoid injustices, including stopping overt, intentional, and race and sex discrimination against Plaintiffs, prohibiting from misappropriating Plaintiffs' content and data, and prohibiting Defendants to become unjustly enriched and unfairly, inequitably, and illegally obtain the benefits of promises that Defendants have failed to honor, comply with, or enforce.

435.    As a proximate result of Defendants' failure to honor and fulfill each of their promises, Plaintiffs have suffered financial and monetary losses, had their intellectual and other property rights unjustly misappropriated by Defendants' own personal financial and unjust gain, and have suffered irreparable harm to speech and expression promised by Defendants, in an amount to be determined at trial.

**EIGHTH CAUSE OF ACTION**
**For Discrimination In Contract In Violation Of 42 U.S.C. § 1981**
**(On Behalf Of Individual Plaintiffs And The §1981 Class)**

436.    Plaintiffs re-allege and incorporate by reference in whole or in part the allegations alleged in paragraphs 1 through 435.

437.    Title 42, Section 1981 of the U.S. Code codifies the right of each individual member of a protected racial classification to "have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens."  42 U.S.C. § 1981(a).

438.    The statute defines "make and enforce contracts" as including "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  *Id.* § 1981(b).  The statutory protections apply to both "nongovernmental discrimination" and "impairment under color of State law."  *Id.* § 1981(c).

439.    The elements of a claim for relief under 42 U.S.C. § 1981 are: (1) Plaintiff is a member of a protected class; (2) impairment of a contractual relationship under which plaintiff has rights; (3) defendant impaired that relationship on account of racial discrimination (such that, but for race, plaintiff would not have suffered the loss of a legally protected right); and (4) plaintiff was deprived of such services while similarly situated persons outside the protected class were not.  *See Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020); *Astre v. McQuaid*, 804 Fed. App'x 665, 666-67 (Mar. 25, 2020); *Lindsey v. SLT Los Angeles, LLC*, 447 F.3d 1138, 1145 (9th Cir. 2006).

440.    Plaintiff are African Americans and are members of the protected class under section 1981.

441.    Plaintiffs entered into binding and legally enforceable contracts with Defendants including the TOS and related agreement(s) under California and controlling federal law.

442.    The contractual relationship between each Plaintiff and Defendants was impaired with respect to the TOS and each and every one of the related agreement(s) in at least five ways:

a.      Defendants' TOS and, any other agreements, under which they claim the right to exercise "unfettered" discretion to impose content, use or services access restrictions based, in any way, on Plaintiffs' racial identity or viewpoint, violates and impairs the TOS, license agreements, and other service agreement(s) on its face;

b.      Defendants continue to breach the TOS and other agreement(s), by exercising their contractual discretion to profile, filter, restrict, and block Plaintiffs' content and access to YouTube, based on Plaintiffs' racial identity and viewpoint, in a manner that is not permitted, but is expressly prohibited under California and federal law;

c.      Defendants breached and continue to breach their express and implied promises under the TOS and other related agreement(s) that, You Tube shall not profile, use, base, or impose any restrictions on Plaintiffs' content or access to YouTube based, in any way, on a user's racial identity or viewpoint, and only review, filter, and restrict Plaintiffs' videos based on online video material that runs afoul of YouTube's viewpoint neutral content based rules;

d.      Defendants' use of content filtering, review, restricting, and blocking tools and procedures to profile and use Plaintiffs' racial identity and viewpoint with respect to any provision in the TOS or related agreements, impairs each and every one of Plaintiffs' rights, express or implied, that exist in the TOS or other related agreement(s) that Defendants entered into with Plaintiffs; and

e.      Defendants impaired their contractual relationship with each Plaintiff because of Defendants' intentional use of Plaintiffs' racial identity or viewpoint to review, filter, regulate, restrict, and block Plaintiffs' videos and access to YouTube under the false pretext that the material in the video was properly reviewed and found to violate one of YouTube's content based rules governing user content and access to the platform.

443.    Defendants impaired their contractual relationship with each Plaintiff on account of intentional racial discrimination.  Despite their promises of neutrality and a diversity of viewpoints, Defendants engage in a pattern and practice of intentional willful and malicious discrimination in

the provision of their services, including discriminating against and censoring of Plaintiffs' speech, based not upon the content of speech, but on their race. Through the acts complained of herein, Defendants intentionally denied, and aided or incited in denying, Plaintiffs full and equal accommodations, advantages, privileges, and services, by discriminating against them in demonetizing Plaintiffs' content and by placing their videos in "Restricted Mode." But for their race, Plaintiffs would not have been subjected to Defendants' filtering or the denial of their contractual benefits under the Agreements.

444.    While Defendants have impaired and denied, and continue to impair and deny, Plaintiffs' contractual benefits under the TOS and related agreement(s), similarly situated persons who are not protected under the section 1981 protected class were not similarly treated, including persons affiliated with or working for Defendants and/or their preferred users. Such persons are not being racially profiled and are not subject to the same content or access filtering, restrictions, or blocking despite material in their videos that violates YouTube's content based rules.

445.    As a direct and proximate result of Defendants' unlawful discriminatory actions, Plaintiffs suffered, and continue to suffer, irreparable injury in fact, including, but not limited to: lower viewership, lost advertising opportunities otherwise available to other nonprofits, decreased ad revenue, and reputational damage, for which there exists no adequate remedy at law.

**NINTH CAUSE OF ACTION**
**For Unlawful Discrimination**
**In Violation Of The Unruh Civil Rights Act**
**(On Behalf Of Individual Plaintiffs And The §1981 Class)**

446.    Plaintiffs re-allege and incorporate by reference in whole or in part the allegations alleged in paragraphs 1 through 445.

447.    The elements of a claim for discrimination under the Unruh Civil Rights Act, California Civil Code §§ 51, *et seq.* are: (1) Defendants denied, aided or incited a denial of full and equal accommodations or services to Plaintiffs; (2) that a motivating reason for Defendants' conduct was Plaintiffs' race or national origin; (3) that Plaintiffs were harmed and (4) that Defendants' conduct was a substantial factor in causing that harm. *Nkwuo v. Metro PCS, Inc*., No. 5:14–cv–05027–PSG, 2015 WL 4999978, at *2 (N.D. Cal. Aug. 21, 2015).

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION,**
**ACCOUNTING AND DAMAGES**

448.     Defendants Google and YouTube host business establishment(s) that solicit, induce, provide, and grant members of the public like Plaintiffs the right to access and use YouTube and its services, subject only to viewpoint neutral content based rules that apply equally to all..

449.     Defendants grant members of the public like Plaintiffs the right to use and access YouTube for commercial reasons and consideration, including obtaining a perpetual and irrevocable license to Plaintiffs' and the other public users' content and data, including the right to appropriate that content and data for sale and other forms of monetization including advertising, data information sales and services, and other revenue and profit stream on YouTube through contract and business transactions including the TOs and related agreement(s).

450.     A substantial motivating reason for Defendants' conduct is Defendants' use of the racial identity, viewpoints, and other protected racial classifications under the law of Plaintiffs and other persons similarly situated to impose restrictions on their video content.

451.     Defendants' conduct is the result of arbitrary, capricious, invidious, and pretext-based discrimination against Plaintiffs' political and religious identity and race, color and/or national origin and viewpoints.

452.     Defendants' use of Plaintiffs' racial or other identities to restrict their right to equal access to YouTube is unlawful and fails to further any lawful, legitimate business interest, including ensuring compliance with YouTube's content based rules or protecting younger and "sensitive" audiences.

453.     Defendants have censored and treated, and continue to censor and treat, Plaintiffs and their videos differently from Defendants' own or preferred content, solely because of discriminatory animus towards Plaintiffs' identities and views.

454.     Specifically, Defendants use AI, Algorithm, and other filtering machines, procedures, and systems to knowingly and intentionally engage in and effectuate a pattern and practice of discrimination for profit by reviewing, filtering, restricting, and blocking Plaintiffs' content and access to YouTube based on Plaintiffs' racial or other identity or viewpoints and other traits or viewpoint that discriminate against Plaintiffs based on classifications that are protected under the Unruh Act, namely race, color and/or national origin.

455.    Defendants' wrongful actions were knowing and intentional, taken with oppression, fraud and/or malice, and effectuated through algorithms, machines, and human reviews that use Plaintiffs' racial identity and viewpoints, or other protected classifications to interfere with and block Plaintiffs' content and access on YouTube under the pretextual promise that everyone has equal access to YouTube subject only to viewpoint t neutral content based rules that apply equally to all.

456.    As a direct and proximate result of Defendants' unlawful discriminatory actions, Plaintiffs suffered, and continue to suffer, irreparable injury in fact, for which there is no complete adequate remedy at law, including, but not limited harm and injury to contract based speech rights, and lost financial and business opportunities including viewership, advertising, monetization, and other opportunities and rights to gain popularity and revenues that are otherwise available to other users who are not profiled and regulated on YouTube based on their racial identity or viewpoints.

457.    As a direct and proximate result of Defendants' discriminatory acts and practices, Plaintiffs have also suffered monetary damages in an amount to be determined at trial.

458.    Defendants' violations of the Unruh Act further entitle Plaintiffs to recover statutory damages of up to three times the amount of actual damages in an amount to be proven at trial, or a minimum of $4,000 per violation.

**TENTH CAUSE OF ACTION**
**For False Advertising In Violation Of**
**The Lanham Act, U.S.C. §1125, *et seq.***
**(On Behalf Of Individual Plaintiffs And The §1981 Class)**

459.    Plaintiffs re-allege and incorporate by reference in whole or in part the allegations alleged in paragraphs 1 through 458.

460.    The elements of a false advertising claim under the Lanham Act, 47 U.S.C. § 1125, *et seq.*, are: (1) false statement of fact by defendant in a commercial advertisement about its own or another's product; (2) the false statement actually deceived or has the tendency to deceive a substantial segment of the YouTube consumers or users; (3) the false statement is material, in that it is likely to influence the purchasing decision by a YouTube user; (4) the false statement entered interstate commerce; and (5) Plaintiffs have been, and are likely, to be injured as a result of the

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

false statement.  *Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*, 758 F.3d 1069, 1071 (9th Cir. 2014).

461.    Defendants' statements that Plaintiffs or their videos are "Restricted" is false because only videos that are reviewed and found to contain material that violates Plaintiffs' content based rules, including nudity, vulgarity, violence, hate, shocking or sexually explicit material are can be "Restricted."  Plaintiffs' videos do not contain such "Restricted Material."

462.    Defendants' statements are further false because Defendants used Plaintiffs' race, identity or viewpoint to restrict the video rather than any material that based on a review of the video violated YouTube's rules.

463.    Defendants' false statements are also "commercial advertising" because the statements were made to penetrate the market of YouTube users and have the effect of limiting or steering viewers away from Plaintiffs' channels and videos, to video content, channels, or creators who are sponsored by Defendants and for which or whom Defendants compete with Plaintiffs for viewers, advertising, monetization, and other revenue streams on YouTube.

464.    Defendants' false statements are likely to deceive users and advertisers on YouTube because the expressly and implicitly insinuate that there is something inappropriate, offensive, improper, or prohibited under YouTube's viewpoint neutral rules.

465.    Defendants' false statements are also material.  They likely influence and affect a user's and/or advertiser's viewing/purchasing decisions.  Users and/or advertisers are likely deceived that the video contains offensive material that violates YouTube's rules after Defendants reviewed the video for content violations under YouTube's Community Guidelines, Age Restrictions, and "Restricted Mode" prohibitions, when the basis for the restriction was Plaintiffs' race, identity or viewpoint and was not undertaken in compliance with YouTube's rules.

466.    Defendants' false statements not only influence but categorically control every user or advertiser's purchasing decisions because the statement results blocking of a user or advertisers access to the video on YouTube and precludes the user or advertiser from ever accessing, viewing and purchasing the video or purchasing and placing and ad for the video, or otherwise making any purchasing decision contrary to that of Defendants.

467.     Defendants' false statements entered internet commerce and reached millions of viewers who reside in all 50 States, U.S. Territories, and other users across the world.

468.     Plaintiffs are and are likely to continue to be financially harmed by the false statements, including losing substantial amounts revenues for viewer CPMs, advertising, monetization, and other user or advertiser revenue streams on YouTube in an amount to be determined at trial.

**ELEVENTH CAUSE OF ACTION**
**For Unlawful, Deceptive, And Unfair Business Practices**
**Cal. Bus. & Profs. Code, §17200, *et seq.***
**(On Behalf Of Individual Plaintiffs And The §1981 Class)**

469.     Plaintiffs re-allege and incorporate by reference in whole or in part the allegations alleged in paragraphs 1 through 468.

470.     Defendants have committed acts of unfair competition, as defined by California Business and Professions Code § 17200, by engaging in the practices described above.

471.     Defendants' profiling, filtering, restricting, and blocking Plaintiffs' content and access on YouTube based on Plaintiffs' race, identity, or viewpoint is an unlawful business practice under section 17200 because those practices, acts, and conduct violates 42 U.S.C. § 1981 and the Unruh Civil Rights Act.

472.     Defendants' profiling, filtering, restricting, and blocking Plaintiffs' content and access on YouTube based on Plaintiffs' race, identity, or viewpoint are also deceptive business acts or practices as defined under section 17200 because they are based on intentionally false promises by Defendants to Plaintiffs, and other users, and advertisers that YouTube only restricts or blocks content or access based on violations of YouTube's content based rules that apply equally to all.  In fact, Defendants have knowingly and intentionally use Plaintiffs' racial or other identity or viewpoint to block content and access to YouTube under the false pretext that the video was reviewed like all videos on YouTube, including those sponsored by Defendants, and that the review found that Plaintiffs' videos actually contain material that violates YouTube's viewpoint neutral rules.

473.     Defendants' profiling, filtering, restricting, and blocking Plaintiffs' content and access on YouTube based on Plaintiffs' race, identity, or viewpoint are also unfair business acts or practices as defined under section 17200 because Defendants operate as both content review curators and content sponsors on YouTube.  This conflict is on full display when Defendants use their "unfettered" authority to restrict or block Plaintiffs' videos based on their race, identity, or viewpoint but permit their own content or that of their preferred or sponsored content creators or channels to go without review, restriction, or blocking even where the content violates YouTube's content based rules.

474.     This includes inserting metadata and other signals into Plaintiffs' videos that permit Defendants to profile and restrict or block content without reviewing the video and results in restrictions and blocking of Plaintiffs' content based on Defendants' embedding and creating the metadata, signals, or other racial profiling content that results in the restriction or blocking.

475.     There is no utility to the public for Defendants' actions, and the unlawful, deceptive and unfair practices and conduct do not further a legitimate interest in protecting users from offensive content.

476.     As a direct and proximate result of Defendants' unlawful, deceptive, and unfair practices, conduct, and acts, Plaintiffs have suffered, and continue to suffer, immediate and irreparable injury in fact, including lost income, reduced viewership, and damage to brand, reputation, and goodwill, for which there exists no adequate remedy at law.

477.     Furthermore, as a result of such practices, conduct, and acts, Defendants misappropriate and are unjustly enriched by taking consideration in the form of property rights to content and data, and revenue that belongs to Plaintiffs in an amount that exceeds $5 million.

478.     Plaintiffs are therefore entitled to restitution of that and other amounts, as well as other equitable relief to be determined at trial.

479.     At all times Defendants' wrongful actions were taken with oppression, fraud and/or malice.  Indeed, at least dating back to 2017, Defendants have admitted and known that they were targeting users like Plaintiffs, based on their race, identity, or viewpoint, in violation of their promises and rules not to discriminate based on race, or any other identity or viewpoint.

**TWELFTH CAUSE OF ACTION**
**For Violation Of California Constitution Article I, Section 2**
**(On Behalf Of Individual Plaintiffs And The §1981 Class)**

480.     Plaintiffs re-allege and incorporate herein by reference, as though set forth in full, each of the allegations set forth in paragraphs 1 through 479 above.

481.     Article I, section 2 of the California Constitution enshrines the right to liberty of speech:  "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right." Cal. Const., art. I, § 2, subd. (a).

482.     The Liberty of Speech Clause is broader and more protective than the federal First Amendment. *Los Angeles Alliance for Survival v. City of Los Angeles,* 22 Cal.4th 352, 366-367 (2000).

483.     The Liberty of Speech provision "grants broader rights to free expression than does the First Amendment to the United States Constitution" because it enshrines the fundamental "idea that private property can constitute a public forum for free speech if it is open to the public in a manner similar to that of public streets and sidewalks." *Fashion Valley Mall, LLC v. Nat'l Labor Relations Bd.,* 42 Cal.4th 850, 857-58 (2007).

484.     Under the California Constitution, a person's Liberty of Speech enjoys full constitutional protection when it occurs on any private property that is used or designated by the owner or operator as a place similar to areas that have already been determined to be public forums. That includes privately owned internet sites.

485.     Consequently, the California Constitution protects the right to free speech on private property even in cases when the federal Constitution may not.

486.      The threshold element of a claim under the Liberty of Speech Clause is that the defendant property owner has so opened up his or her property for public use as to make it the functional equivalent of a traditional public forum based on three factors: (1) the nature, purpose, and primary use of the property; (2) the extent and nature of the public invitation to use the property; and (3) the relationship between the ideas sought to be presented and the purpose of the

-145-                                          Case No. 5:20-cv-04011 LHK .

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

property's occupants." *Albertson's, Inc. v. Young*, 107 Cal. App. 4th 106, 119 (2003); 73 Op. Cal. Atty. Gen. 213, 222– 223 (1990).

487.    Defendants operate YouTube for the express purpose of inviting the public to use the platform as a for profit "public forum" where the public is invited to engage in "freedom of expression," where everyone's voice may be heard, subject only to viewpoint neutral rules that apply equally to all and Defendants' right to monetize and profit from the expression, speech, or material that appears on YouTube through the property based license rights that the user must grant Defendants as the price of admission to the forum.

488.    According to Defendants, the purpose, use, nature, invitation to use the forum, and relationship between that purpose and invitation, on the one hand, and the ideas sought to be presented the public, on the other, is that Defendants offer public internet service "that enables more than a billion users around the world to upload" videos, where users are urged to "Broadcast Yourself," "promote yourself" or "do the broadcasting yourself."

489.    Under the TOS, Defendants also represent that YouTube is open to everyone for free expression and communication, regardless of race, identity, or viewpoint as long as the video material complies with viewpoint neutral rules that apply equally to all.

490.    Based on these and other representations, Defendants have induced or attracted 2.3 billion people to use YouTube and Defendants currently use the YouTube "public forum" control and regulate 95% of the global public video content that has currently or has ever existed in the world.

491.    Under California law, Defendants' regulation of speech on the YouTube platform is state action because Defendants perform an exclusively and traditionally public function: the regulation of 95% of the world's public video based speech content by designating and operating YouTube as a viewpoint neutral public forum for freedom of expression under California law.

492.    Accordingly, Defendants are prohibited from arbitrarily, unreasonably, or discriminatorily excluding, regulating, or restricting videos or user access to services on YouTube on the basis of viewpoint or identity of the speaker.  And any such exclusions, restrictions, or regulations must comply with protections afforded Plaintiffs' free speech and expression under the

1  Liberty of Speech Clause, and the established jurisprudence that such protections apply to private

2  parties who use their property for purposes similar to the use of a government owned and operated

3  public forum.

4      493.   Plaintiffs' video content and access services constitute expressive speech and

5  activity that is protected by Article I, section 2 of the California Constitution.

6      494.   Defendants have filtered, restricted, blocked or interfered with Plaintiffs' rights to

7  access, use, and express themselves on YouTube.

8      495.   Defendants' filtering, restricting, and blocking on Plaintiffs' speech and expressive

9  conduct on YouTube violates Plaintiffs' Liberty of Speech because they are not based on the

10  platform's viewpoint neutral rules governing what content is and is not permissible, but on the race,

11  identity or viewpoint of Plaintiffs.

12      496.   Defendants' censorship and other speech regulation conduct harms and violates

13  Plaintiffs' Liberty of Speech rights on YouTube in direct contravention of the procedural and

14  substantive rules that Defendants created, published, and use to regulate that speech on YouTube.

15      497.   Furthermore Defendants' rules, both as applied and on their face, are subjective,

16  vague, and overbroad criteria and proscription that Defendants use with unfettered and unbridled

17  discretion to censor speech for any reason, or no reason at all, no matter how arbitrary or capricious

18  in further violation of Plaintiffs' Liberty of Speech rights.

19      498.   Defendants also maliciously use and apply the rules as a pretext to censor and

20  restrict Plaintiffs' speech for unlawful purposes including race and identity discrimination against

21  protected classes of users and to gain a competitive advantage over Plaintiffs and other users who

22  Defendants compete with in YouTube.

23      499.   Defendants' conduct, including the application of purportedly viewpoint neutral

24  rules, are arbitrary and capricious, and unlawfully restrains and harms Plaintiffs based upon racial,

25  political, religious, or other identity or viewpoint profiling the speaker, rather than the actual

26  content of the speakers words or expression.  Defendants' actions, therefore, also violate Plaintiffs'

27  right to free association and assembly under the Liberty of Speech Clause.

28

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION,
ACCOUNTING AND DAMAGES**

500.     Defendants' actions violate Plaintiffs' right to free association and assembly because, by blocking viewers' access to videos and comments based on the identity or viewpoint of the speakers or their opinions or other content featured in their videos that do not violate YouTube's viewpoint neutral content based rules

501.     No compelling, significant, or legitimate reason justifies any or all of Defendants' actions, including the purported interest claimed by Defendants for the need to protect minors or sensitive audiences from offensive content because Plaintiffs' content is not "offensive" or otherwise violates Defendants' purported viewpoint neutral rules.

502.     And even if such interests did exist to justify Defendants' restriction and demonetization rules in theory, the conduct and restrictions imposed on Plaintiffs' speech are unconstitutional because they are not narrowly or reasonably tailored to further such interests, but sweep within their ambit speech and expression that complies with the rules that Defendants use to purportedly protect minors and sensitive audiences and are applied by Defendants with unfettered power to censor speech based in race, identity, or viewpoint or for any other discriminatory or unlawful reason or no reason at all.

503.     Given Defendants' monopolistic control over search results, on line advertising, public video content, and the myriad of other information services that Defendants unilaterally control, Plaintiffs have no alternative affording it a reasonable opportunity to reach their full intended audience.

504.     Defendants' discriminatory policies and application of those policies are not viewpoint-neutral, are unreasonable in time, place, and manner, and are unreasonable in relation to the nature, purpose, and use of the forum, but are unreasonable prior restraints on Plaintiffs' protected political speech, motivated by impermissible discrimination against Plaintiffs' racial identity and viewpoint.

505.     Defendants' intentional and wrongful actions were taken with oppression, fraud, malice and/or are arbitrary and capricious, and as part of Defendants' normal course of business, effectuated through both algorithms, as well as through human agents.  Additionally, Defendants'

actions were done knowingly and intentionally to deprive Plaintiffs and their viewers of their rights under the California Constitution.

506.    As a direct and proximate result of Defendants' violations of clearly established law regarding public fora, Plaintiffs and all other persons similarly situated have suffered, and continue to suffer, immediate and irreparable injury in fact to their right to Liberty of Speech, including, but not limited to financial harms of lost income, reduced viewership, and damage to brand, reputation, and goodwill, for which there exists no adequately complete remedy at law.

**THIRTEENTH CAUSE OF ACTION**
**For Freedom Of Speech Under The First Amendment**
**United States Constitution, Amendment 1**
**(On Behalf Of Individual Plaintiffs And The §1981 Class)**

507.    Plaintiffs re-allege and incorporate herein by reference, as though set forth in full, each of the allegations set forth in paragraphs 1 through 506 above.

**A.      Procedural Background**

508.    The First Amendment prohibits a party from engaging in "state action" that violates or harms a person's right to engage in speech, association, expression, or other activity protected by the Amendment.

509.    Since at least 1946, the U.S. Supreme Court has held that the First Amendment protects persons from private parties who engage in "state action" to restrict speech in ways that violate the First Amendment.

510.    Private parties can be state actors whose conduct is subject to judicial scrutiny and held to account under the U.S. Constitution in a number of different circumstances, including, but not limited to, a private party who (1) engages in a public function that has been traditionally reserved as the exclusive province of government, such as operating a company town or providing a service for the administration of a traditional government function like elections or law enforcement (the "Public Function Test"); and/or (2) is the beneficiary of a government law that endorses or permits the party to engage in conduct that interferes with a fundamental constitutional right in a manner that the government may not (the "Permissive Endorsement Test").

511.     The issue of when a private party is engaged in "state action" under either of these or other tests, is dependent on particular circumstances and has not been applied by the courts as a one size fits all.

512.     As a result, the extent to which circumstances may exist in which a private party engages in conduct that violates the First Amendment remains murky and unclear.

513.     In *Manhattan Cmty. Access Corp. v. Halleck,* --- U.S. --, --, 139 S. Ct. 1921 (2019), the Supreme Court held that and private owner-operator of a public access cable channel who regulates public speech on that channel does not become a state actor solely by the mere of making a privately owned television channel available for as a forum for speech: "a private entity who provides a forum for speech is not transformed by that fact alone into a state actor." *Manhattan Cmty. Access Corp. v. Halleck,* 139 S. Ct. 1921, 1930, 204 L. Ed. 2d 405 (2019).

514.     In so doing, however, the Court in *Halleck* limited its 5-4 decision to the circumstances of that case and declined to overrule prior cases in which a private party who regulates speech or engages in conduct that is otherwise prohibited under the Constitution was found to be a "state actor" who was subject to constitutional scrutiny.

515.     Instead, the Court "stressed" that "very few" functions fall into that category of "state action," including, "for example, running elections and operating a company town. *Id.* at 1929, 204 (citing *Terry v. Adams*, 345 U.S. 461, 468–470, 73 S. Ct. 809, 97 L. Ed. 1152 (1953) (elections); *Marsh v. Alabama*, 326 U.S. 501, 505–509, 66 S. Ct. 276, 90 L. Ed. 265 (1946) (company town); *Smith v. Allwright*, 321 U.S. 649, 662–666, 64 S. Ct. 757, 88 L. Ed. 987 (1944) (elections); *Nixon v. Condon*, 286 U.S. 73, 84–89, 52 S. Ct. 484, 76 L. Ed. 984 (1932) (elections).

516.     The Court also stated that "a variety of functions do not fall into that category, including, for example: running sports associations and leagues, administering insurance payments, operating nursing homes, providing special education, representing indigent criminal defendants, resolving private disputes, and supplying electricity." *Id.* (citing *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 55–57, 119 S. Ct. 977, 143 L.Ed.2d 130 (1999) (insurance payments); *National Collegiate Athletic Assn. v. Tarkanian*, 488 U.S. 179, 197, n. 18, 109 S. Ct. 454, 102 L. Ed.2d 469 (1988) (college sports); *San Francisco Arts & Athletics, Inc. v. United States Olympic*

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

1   *Comm.*, 483 U.S. 522, 544–545, 107 S. Ct. 2971, 97 L.Ed.2d 427 (1987) (amateur sports); *Blum*,

2   457 U.S. at 1011–1012, 102 S. Ct. 2777 (nursing home); *Rendell-Baker*, 457 U.S. at 842, 102 S. Ct.

3   2764 (special education); *Polk County v. Dodson*, 454 U.S. 312, 318–319, 102 S. Ct. 445, 70 L.

4   Ed.2d 509 (1981) (public defender); *Flagg Bros.*, 436 U.S. at 157–163, 98 S. Ct. 1729 (private

5   dispute resolution); *Jackson*, 419 U.S. at 352–354, 95 S. Ct. 449 (electric service).

6   517.   Consequently, allegations that the relevant function in this case is only the operation

7   of public access channels on a cable system, is not a "function [that is] traditionally and exclusively

8   been performed by government to be establish "state action" under the Public Function Test. *Id.*

9   518.   Beyond those statements, however, the Court in *Halleck* did not specify what the

10   pleading requirements are for establishing state action under one of the few "public functions" that

11   would trigger constitutional scrutiny.  Nor was it presented with or had occasion to consider

12   whether the private parties conduct was undertaken under a government enacted law that permitted

13   unlawful conduct, including race discrimination, in contravention of fundamental constitutional

14   rights, so as to trigger a limited state action under the Permissive Endorsement Test set forth in

15   *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 109 S. Ct. 1402, 1407, 103 L. Ed. 2d 639

16   (1989).

17   519.   In *Prager University v. Google LLC*, the Ninth Circuit applied *Halleck* to hold that

18   YouTube does not "lose its private character merely because the public is generally invited to use it

19   for designated purposes" because "YouTube may be a paradigmatic public square on the Internet,

20   but it is 'not transformed' into a state actor solely by "provid[ing] a forum for speech." *Prager*

21   *Univ. v. Google LLC*, 951 F.3d 991, 997 (9th Cir. 2020) (citing *Halleck*, 139 S. Ct. at 1930, 1934).

22   520.   But like *Halleck*, *Prager* did not, nor could it, overrule or eliminate the Public

23   Function Test doctrine of state action nor did it specify what the pleading requirement were for

24   establishing one of "the few" functions that will trigger state action.  And it appears that the

25   decision may be in conflict with *Halleck* and earlier cases when it held that public forum

26   designations are "not a matter of election by a private entity" and "[we] decline to subscribe to

27   Prager U's novel opt-in theory of the First Amendment. *Id.* at 999 (9th Cir. 2020) (citing *Cent.*

28   *Hardware*, 407 U.S. at 547, 92 S. Ct. 2238 (holding only that "[b]efore an owner of private

property can be subjected to the commands of the First and Fourteenth Amendments the privately owned property must assume to some significant degree the functional attributes of public property devoted to public use").

521.    Furthermore, the Ninth Circuit did not mention, or consider in any manner, the more limited theory of Permissive Endorsement "state action" based on Defendants' use of Section 230(c), a congressional speech regulation law, to unlawfully restrict speech 95% of the world's video speech based on race discrimination  and other protected identity classifications or viewpoints that conflict with Plaintiffs' fundamental equal protection and speech rights under the Supreme Court's seminal case in *Skinner*.

522.    Consequently, no Court has ruled, nor could it, that Defendants can never engage, under any circumstances, in "state action" that is subject to judicial scrutiny under the First Amendment.  Nor has the pleading standards and requirement for such a claim been established, other than Defendants must be engaged in one of the few public functions identified in *Halleck* or use a congressional statute to do what they could not otherwise do under established law: discriminate against Plaintiffs' speech based on their race, identity or viewpoint.

### B.    Permissive Endorsement Allegations Of State Action

523.    In *Skinner*, private railroad companies were preparing to implement suspicion-based breath and urine testing of their employees pursuant to recently enacted federal regulations referred to in the case as "Subpart D."  *Skinner*, 489 U.S. at 611.  Like Section 230(c)(2) of the CDA, Subpart D was "permissive"; it did not compel the testing, but rather left the decision to the railroads.  *Id.*  Crucially, however, again like Section 230(c)(2), Subpart D conferred state-law immunity: it protected railroads from being sued under state law if they chose to test.  *Skinner*, 489 U.S. at 611, 614-15 (Subpart D "pre-empt[ed] state laws, rules or regulations covering the same subject matter" and thus "removed all legal barriers to the testing").  In so doing, a unanimous Supreme Court held:

> "[t]he fact that the Government has not compelled a private party to perform a
> search does not, by itself, establish that the search is a private one.  Here, specific

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

1        features of the regulations combine to convince us that the Government did more

2        than adopt a passive position toward the underlying private conduct.

3  *Id*. at 615.

4       524.    Under *Skinner*, the elements of a state action claim under the Permissive

5  Endorsement Test are: (1) reliance on a government law that removes all laws and legal barriers to

6  private conduct that would otherwise unlawful and does so in a way that impacts a fundamental

7  constitutional right; (2) a defendant uses the law to engage in that unlawful conduct; and (3) the

8  government shares in the fruits or benefits in some way from the unlawful conduct.

9       525.    Defendants rely on Section 230 to unlawfully discriminate against Plaintiffs and

10  regulate their speech based on race, identity, viewpoints or in some other manner that violates

11  federal or state law.

12      526.    Defendants use Section 230(c) to pre-empt state law and obtain complete immunity

13  in a manner that  removes all legal barriers to the regulating, blocking, or restricting of content

14  based on Plaintiffs' race, identity, or viewpoint.

15      527.    Plaintiffs are forced to submit to race discrimination and other violations of their

16  legal rights when they use YouTube.

17      528.    The Communications Decency Act was, as the statute's name indicates, enacted by

18  Congress to restrict access to "indecent" content on the Internet.  141 Cong. Rec. S8330 (daily ed.

19  June 14, 1995) (statement of Sen. Exon).

20      529.    The express purpose of Section 230(c)(2) is to encourage Internet platforms like

21  Google and YouTube to "restrict" "obscene, lewd, lascivious, filthy, excessively violent, harassing,

22  or otherwise objectionable" material.  47 U.S.C. § 230(c)(2).

23      530.    "The intent of Congress in enacting § 230(c)(2) was *to encourage efforts by Internet*

24  *service providers to eliminate such material*."  *Goddard v. Google*, No. C 08-2738 JF (PVT), 2008

25  WL 5245490, at *6 (N.D. Cal. Dec. 17, 2008) (emphasis added).

26      531.    Section 230(c) makes clear Congress' "strong preference" for regulating on line

27  speech based on race, identity or viewpoint and for allowing Defendants to discriminate against

28  Plaintiffs in violation of established federal and state law.

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

532.     The federal government has also made clear its "desire to share the fruits" of the unlawful and discriminatory conduct undertaken by Defendants with respect to regulating on line speech, law enforcement, information gathering, and other government services.

533.     By way of one example only, in the six-month period from January to June 2017, when Defendants first admitted that they were knowingly and intentionally profiling and targeting users based on race, identity, and viewpoint, Google received almost 17,000 requests from U.S. law enforcement to turn over information regarding users' content and searches.  *See Cooperation or Resistance?: The Role of Tech Companies in Government Surveillance*, 131 Harv. L. Rev. 1722, 1722 (2018).  Google provided information to the government in some 80% of those cases.

534.     Under Section 230(c), Congress allows and affirmatively endorses the unlawful discrimination and other conduct by Defendants.

535.     Defendants' use of Section 230(c) to engage in discrimination and other unlawful conduct under state and federal law to regulate online " material" on the internet is government endorsed of the unlawful conduct and renders that conduct "state action" under *Skinner* and the Permissive Endorsement Test.

**C.     State Action Allegations Under The Public Function Test**

536.     Under *Halleck*  and *Prager*, the elements of state action under the Public Function Test Appear to be: (1) Defendants are engaged in functions and conduct that fall into that categories of "state action" that includes, but is not limited to, "running elections and operating a company town."

537.     On or about December 2019, Defendants merged their different TOS into a single contract whereby Defendants' discretion to find a violation YouTube's content based rules can be used by Defendants to bar the user from using any or all services offered by Defendants in any way including, the purchase and use of hand held smart phone, email, search engines, applications, and information or other services that are essential for public health, safety, law enforcement, election administration, taxation, and any other service performed by governments.

538.    Defendants also operate a "company town" in which they control essential information and communication services without which local, state, or federal government agencies cannot provide or otherwise administer essential services including elections.

539.    Until, if ever, the Supreme Court eliminates the Public Function Test for "state action" in all cases as a matter of law, Defendants' use and regulation of speech and information services on YouTube involves the "very few" functions that satisfy the Public Function Test for "state action."

**D.    Defendants' Conduct Violates The First Amendment**

540.    Defendants continue to filter, restrict, block and/or interfere with Plaintiffs' rights to access, use, and express themselves on YouTube.

541.    Defendants' filtering, restricting, and blocking on Plaintiffs' speech and expressive conduct on YouTube violates Plaintiffs' First Amendment rights because the conduct is not based on the platform's viewpoint neutral rules governing what content is and is not permissible, but on the race, identity or viewpoint of Plaintiffs.

542.    Defendants' censorship and other speech regulation conduct harms and violates Plaintiffs' speech rights on YouTube in direct contravention of the procedural and substantive viewpoint neutral content based rules that Defendants created, published, and use to regulate speech on YouTube.

543.    Furthermore Defendants' rules, both as applied and on their face, are subjective, vague, and overbroad criteria and proscription that Defendants use with unfettered and unbridled discretion to censor speech for any reason, or no reason at all, no matter how arbitrary or capricious in further violation of Plaintiffs' First Amendment Rights.

544.    Defendants also maliciously use and apply the Rules as a pretext to censor and restrict Plaintiffs' speech for unlawful purposes including race and identity discrimination against protected classes of users and to gain a competitive advantage over Plaintiffs and other users who Defendants compete with in YouTube.

545.    Defendants' conduct, including the application of purportedly viewpoint neutral rules, are arbitrary and capricious, and unlawfully restrains and harms Plaintiffs and all other

persons similarly situated, based upon racial, political, religious, or other identity or viewpoint profiling of the speaker, rather than the actual content of the speaker's words or expression. Defendants' actions, therefore, also violate Plaintiffs' right to free association and assembly under the First Amendment.

546.    Defendants' actions violate Plaintiffs' right to free association and assembly because, by blocking viewers' access to videos and comments based on the identity or viewpoint of the speakers or their opinions or other content featured in their videos that do not violate YouTube's viewpoint neutral content based rules

547.    No compelling, significant, or legitimate reason justifies any or all of Defendants' actions, including the purported interest claimed by Defendants for the need to protect minors or sensitive audiences from offensive content because Plaintiffs' content is not "offensive" or otherwise violates Defendants' purported viewpoint neutral rules.

548.    And even if such interests did exist to justify Defendants' restriction and demonetization rules in theory, the conduct and restrictions imposed on Plaintiffs' speech are unconstitutional because they are not narrowly or reasonably tailored to further such interests, but sweep within their ambit speech and expression that complies with the rules that Defendants use to purportedly protect minors and sensitive audiences and are applied by Defendants with unfettered power to censor speech based in race, identity, or viewpoint or for any other discriminatory or unlawful reason or no reason at all.

549.    Given Defendants' monopolistic control over search results, online advertising, public video content, and the myriad of other information services that Defendants unilaterally control, Plaintiffs have no alternative affording them a reasonable opportunity to reach their full intended audience.

550.    Defendants' discriminatory policies and application of those policies are not viewpoint-neutral, are unreasonable in time, place, and manner, and are unreasonable in relation to the nature, purpose, and use of the forum, but are unreasonable prior restraints on Plaintiffs' protected political speech, motivated by impermissible discrimination against Plaintiffs' identity and viewpoint.

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

551.   Defendants' intentional and wrongful actions were taken with oppression, fraud, malice and/or are arbitrary and capricious, and as part of Defendants' normal course of business, effectuated through both algorithms, as well as through human agents.  Defendants' actions were done knowingly and intentionally to deprive Plaintiffs and their viewers of their rights under the California Constitution.

552.   As a direct and proximate result of Defendants' violations of clearly established law regarding constitutional speech regulation on YouTube, Plaintiffs have suffered, and continue to suffer, immediate and irreparable injury in fact to their right to Liberty of Speech, including, but not limited to financial harms of lost income, reduced viewership, and damage to brand, reputation, and goodwill, for which there exists no adequately complete remedy at law.

## VII.   PRAYER FOR RELIEF

Wherefore Plaintiffs and all other persons similarly situated request that the Court grant the following relief:

1.   A declaratory judgment remedy under 28 U.S.C. § 2201, et seq. for Plaintiffs' First Cause of Action challenging the construction, application, and constitutionality of Section 230(c) of the Communications Decency Act, 47 USC § 230(c), that Section 230(c) does not grant immunity to Defendants, or otherwise apply to claims and allegations that arise from, relate to, or are based on, Defendants Google/YouTube's unlawful racial profiling and use of the user's race, or other identity or viewpoint to filter, restrict, or block content, or otherwise deny Plaintiffs' access or use of any services offered by Google/YouTube in connection with Plaintiffs' use of YouTube on the grounds that::

a.   The plain language of sections 230(c)(1) and/or (2) only immunizes and ISP for filtering and blocking "offensive material," and does not immunize the regulating, restricting or blocking of material based on the racial, or other identity or viewpoint of the user posting or viewing the video;;

b.   Sections 230(c)(1) or (c)(2) does not immunize an ISP who engages in race based identity or viewpoint discrimination under contracts and other business conduct that violates 42 U.S.C. § 1981 or the Unruh Civil Rights Act;

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

c.      The application of Section 230(c) in any way to permit and immunize race, sex, or other identity or viewpoint based profiling and regulation of content and access on YouTube is unconstitutional and violates the First Amendment under Denver Area 518 U.S. 727, 766-67; and/or

d.      The President's Executive Order date May 28, 2020, prohibits the application of Section 230(c) immunity to the content and access filtering, restricting, and blocking decisions and requires the Department of Justice to clarify and enforce the law in accordance with identity and viewpoint neutrality.

2.      A declaratory judgment remedy under section 2201that Defendants have violated and continue to violate Plaintiffs' rights to free speech and expression subject only to viewpoint neutral content based rules that apply equally to all under Plaintiffs Second through Sixth, and Eighth through Tenth Causes of Action;

3.      A Court Order requiring Defendants to provide an equitable accounting of all revenue owed to Plaintiffs and the members of the putative §1981 Class under California Common Law for each of their uploaded monetized video, total subscribers, CPM, views and advertisements played or posted on each of their channels on a monthly basis,  including the following underlying data regarding::

a.      The day-to-day number of views for each monetized video uploaded to each channel;

b.      The day-to-day number of subscribers for each monetized channel;

c.      The day-to-day watch time for each video uploaded to each channel;

d.      The day-to-day number of ads played or posted on each video, along with the rates charged by Defendants for the ads, and the revenue actually collected for the ads; and

e.      The names of the creators of the videos which Defendants list in the "Up Next" column for each video on a day-to-day basis, a statement of all revenues which Defendants have obtained in connection with the "Up Next" video recommendations, along with the titles of the videos and an indication as to whether the creator is one of Defendants' preferred partners.

4.      A Court Order requiring Defendants:

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

       a.      To the extent that Defendants still have the electronic digital version of the video, to deliver to Plaintiffs and members of the putative §1981 Class an electronic digital copy of (i) each video that was uploaded and subsequently removed by Defendants from the YouTube platform, and (ii) each video which Plaintiffs and members of the putative §1981 Class were unable to obtain a copy of because Defendants either terminated access to the YouTube platform or removed the channel where the video was uploaded.

       b.      To the extent that Defendants do not have the electronic digital version of the video, to pay to Plaintiffs and members of the putative §1981 Class the reasonable value of copy of (i) each video that was uploaded and subsequently removed by Defendants from the YouTube platform, and (ii) each video which Plaintiffs and members of the putative §1981 Class were unable to obtain a copy of because Defendants either terminated access to the YouTube platform or removed the channel where the video was uploaded

    5.      A Court Order requiring Defendants:

       a.      Cease and desist from capriciously restricting, demonetizing, or otherwise censoring any content of videos uploaded to the YouTube based on Plaintiffs' race, or other identity or viewpoint in violation of federal and California law; and.

       b.      Cease and desist from censoring, restricting, restraining, or regulating speech based on the discretionary use or application of discriminatory, animus-based, arbitrary, capricious, vague, unspecified, or subjective criteria, rules, guidelines, and/or practices;

    6.      Compensatory, special, and statutory damages in an amount to be proven at trial, including statutory damages pursuant to, *inter alia*, Civil Code § 51, 51.5, 52, Civil Procedure Code § 1021.5, 15 U.S.C. § 1117, 42 U.S.C. §§ 1981, 1983;

    7.      A civil penalty of $2,500 for each violation pursuant to Business and Professions Code §§ 17200, 17206, and 17536;

    8.      Punitive damages and exemplary damages in an amount to be proven at trial;

    9.      Restitution of financial losses or harm caused by Defendants' conduct and ill-gotten gains, and disgorgement of profit obtained from all unlawful conduct in an amount to be proven at trial;

1        10.      Attorneys' fees and costs of suit;

2        11.      Prejudgment and post-judgment interest; and

3        12.      Any and all other relief that the Court deems just and proper.

4    **VIII.   JURY TRIAL DEMAND**

5        Plaintiffs Kimberly Carleste Newman, Lisa Cabrera, Catherine Jones, Denotra Nicole

6    Lewis, Andrew Hepkins, Harvey Stubbs and Khalif Muhammad demand trial by jury on all issues

7    of law so triable.

8    DATED:  August 17, 2020                    Respectfully submitted,

9                                              BROWNE GEORGE ROSS LLP

10                                                  Peter Obstler
                                                    Eric M. George
11                                                  Dennis S. Ellis
                                                    Debi A. Ramos
12                                                  Keith R. Lorenze

13

14                                         By:  ____/s/ Peter Obstler_____

15                                                  Peter Obstler
                                          Attorneys for Plaintiffs Kimberly Carleste Newman,
16                                        Lisa Cabrera, Catherine Jones, Denotra Nicole Lewis,
                                          Andrew Hepkins, Harvey Stubbs and Khalif Muhammad

17

18

19

20

21

22

23

24

25

26

27

28

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION,
ACCOUNTING AND DAMAGES**

# **Exhibit "A"**

1  BROWNE GEORGE ROSS LLP
   Peter Obstler (State Bar No. 171623)
2    pobstler@bgrfirm.com
   44 Montgomery Street, Suite 1280
3  San Francisco, California 94104
   Telephone: (415) 391-7100; Facsimile: (415) 391-7198
4
   BROWNE GEORGE ROSS LLP
5  Eric M. George (State Bar No. 166403)
     egeorge@bgrfirm.com
6  Debi A. Ramos (State Bar No. 135373)
     dramos@bgrfirm.com
7  2121 Avenue of the Stars, Suite 2800
   Los Angeles, California  90067
8  Telephone: (310) 274-7100; Facsimile: (310) 275-5697

9  Attorneys for LGBTQ+ Plaintiffs Divino Group
   LLC, Chris Knight, Celso Dulay, Cameron Stiehl,
10 BriaAndChrissy LLC, Bria Kam, Chrissy
   Chambers, Chase Ross, Brett Somers, and
11 Lindsay Amer, Stephanie Frosch, Sal
   Cinequemani, Tamara Johnson and Greg Scarnici

12

13                  UNITED STATES DISTRICT COURT

14        NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

15 | DIVINO GROUP LLC, a California limited | Case No. 5:19-cv-004749-VKD
   | liability company, CHRIS KNIGHT, an |
16 | individual, CELSO DULAY, an individual, | **DECLARATION OF STEPHANIE**
   | CAMERON STIEHL, an individual, | **FROSCH IN SUPPORT OF MOTION TO**
17 | BRIAANDCHRISSY LLC, a Georgia limited | **BE RELIEVED OF NON-DISCLOSURE**
   | liability company, BRIA KAM, an individual, | **AGREEMENT**
18 | CHRISSY CHAMBERS, an individual, |
   | CHASE ROSS, an individual, BRETT |
19 | SOMERS, an individual, and LINDSAY |
   | AMER, an individual, STEPHANIE |
20 | FROSCH, an individual, SAL |
   | CINEQUEMANI, an individual, TAMARA |
21 | JOHNSON, an individual, and GREG | Date:
   | SCARNICI, an individual, | Time:   10:00 a.m.
22 | | Place:   Courtroom 2
   |             Plaintiffs, | Before: Magistrate Judge Virginia DeMarchi
23 | |
   |     vs. |
24 | |
   | GOOGLE LLC, a Delaware limited liability |
25 | company, YOUTUBE, LLC, a Delaware |
   | limited liability company, and DOES 1-25, |
26 | |
   |             Defendants. |
27

28

DECLARATION OF STEPHANIE FROSCH IN SUPPORT
OF MOTION TO BE RELIEVED OF NDA                    Case No. 5:19-cv-004749-VKD

I, Stephanie Frosch, declare:

1.      I am one of the Plaintiffs in the above-captioned action.   I have firsthand, personal knowledge of the facts set forth below and if called as a witness could competently testify thereto

2.      I am an LGBTQ internet activist; have spoken at conventions, and have been interviewed on MTV and the main stream media regarding my YouTube experience and what YouTube has done to me.

3.      I became a YouTube user in 2009 and operate two YouTube channels: Youtube.com/ElloSteph and Youtube.com/StephFrosch.

4.      In 2009 I earned approximately $23,000 from YouTube ad revenue.  In addition to ad revenue, I earn money from the sale of merchandise, from separate brand sponsorship agreements connected with videos posted on my channels, and from the sale of merchandise from the website www.districtlines.com/ellosteph.  This is a separate website which sells merchandise relating to my original videos posted to YouTube.

5.      From 2009 through 2016, my YouTube channels were successful.  However, in 2017, I started having problems with YouTube.

    a)  YouTube was classifying many of my videos as subject to Restricted Mode, making them unavailable to a large number of viewers, regardless of whether the video itself contains no nudity, profanity, sexual conduct, or discussions of sexual activities; while allowing other YouTube channels to copy my videos without my permission, where they were not subjected to Restricted Mode.

    b)  Many of my videos were demonetized or subject to reduced monetization despite the fact that they do not include graphic images of violence or sexuality, include no nudity, profanity, sexual conduct, or discussions of sexual activities.

    c)  YouTube was paying ad revenue to channels which were posting copies of my videos without permission.

    d)  Many of the customized thumbnail images I crafted for each of my videos uploaded to my channels were removed.

    e)  Longtime subscribers to my channels were being dropped from my channels, and

1  YouTube was preventing them from re-subscribing.  As a result, my subscribers

2  were not receiving notices when I posted new content.

3  6.       In 2017, I joined other LGBTQ+ YouTube creators and publicly complained about

4  what Google/YouTube was doing to LGBTQ+ channels and how Google/YouTube's changes to

5  the algorithm had disproportionately affected the LGBTQ+ YouTube creators and viewers.

6  7.       On September 8, 2017, an LGBTQ+ YouTube content creator forwarded to me an

7  email dated August 25, 2017, from Laura Chernikoff of the "Internet Creators Guild" inviting him

8  to an event co-sponsored by YouTube regarding changes to YouTube's algorithm which were

9  adversely affecting the LGBTQ+ community.

10  a)  I was not a member of the "Internet Creators Guild."  I know people who were

11  members, and understand that it was an independent group founded by internet creators

12  to serve in much the same way as the Writer's Guild or the Screen Actors' Guild.  It

13  and was not owned, operated or controlled by Google/YouTube.  Funds for its

14  operation were generated from its members.

15  b)  The "Internet Creators Guild" is no longer operating.  When I attempted to reach

16  the group, its webpage had posted:  "ICG is now closed. Thank you to all of our

17  members. We are currently working on processing refunds on a pro-rata basis.

18  Questions? Email us at info@internetcreatorsguild.com."

19  8.       Ms. Chernikoff's invitation stated:

20  You're invited to an upcoming event put on by the Internet Creators Guild, in
partnership with YouTube on Thursday, September 14th at 11:00 AM.

21
22  Following the advertising situation on YouTube this spring (dubbed the
"Adpocalypse"), YouTube is interested in hearing about creators' experiences on
the platform. In particular, it's important for creators to understand the advertising
23  guidelines and tools that brands interact with, in order to be aware how it may
affect your monetization.

24
25  We've been discussing this issue with YouTube, who have been working to
address creator concerns on this topic. They would like to share this presentation,
which will be under NDA, in order to hear from ICG Members and creators we're
26  in touch with as part of a small focus group.

27  We thought you would be an engaged and thoughtful participant and hope
you're able to attend.

28

DECLARATION OF STEPHANIE FROSCH IN SUPPORT
OF MOTION TO BE RELIEVED OF NDA                    -2-                    Case No. 5:19-cv-004749-VKD

Attached as Exhibit 1 is a true and correct copy of the email I received with the invitation to the September 14-event.  Based on the email, I understood that *before* Google/YouTube would even speak to me or any other members of the group of LGBTQ+ creators about the problems with the new YouTube algorithm implemented in May of 2017, ***Google/YouTube required each of us to sign a Non-Disclosure Agreement*** (the "NDA").

9.     Ms. Chernikoff sent an email to me dated September 11, 2017 which confirms my participation in the September 14-event and states:  "Please note that a non-disclosure agreement (NDA) will be sent via email by a member of the YouTube team and is required to be signed prior to the event, so keep an eye out!"  Attached as Exhibit 2 is a true and correct copy of the email dated September 11, 2017 from Ms. Chernikoff.

10.     On September 13, 2017, Google/YouTube sent to me by email a request for my signature on an electronic Non-Disclosure Agreement in connection with the September 14-event.  Upon signing the electronic document, I received a confirmation email which has a subject:  "You have accepted Google's Non-Disclosure Agreement."  The text of the email sets forth my personal information and a copy of the Non-Disclosure Agreement.  Attached as Exhibit 3 is a true and correct copy of the email from Google confirming receipt of my signed Non-Disclosure Agreement.

a.   The Non-Disclosure Agreement states:

"In order to evaluate and possibly enter into a business transaction (the "Purpose"), Google Inc., for itself and its subsidiaries and affiliates, and the other party identified below hereby agree:"

11.     At the time that I signed the agreement, I had no idea what "business transaction" the document was referring to.  As a YouTube user, I had previously entered into a YouTube Terms of Service Agreement and an AdSense Agreement.  As of September 13, 2017, I was not thinking about entering into any new "business transaction" with YouTube or Google, or changing the existing agreements I had with YouTube and AdSense.  Neither YouTube nor Google had mentioned any new business transaction, or changes to any existing agreements.  I was merely trying to meet with YouTube representatives to discuss with them the many problems that I had been having with my YouTube channel and the falling views and revenue I was experiencing as a

result of changes YouTube made to their algorithm in May of 2017.  I did not expect for YouTube

or Google to give me trade secrets, computer codes, or any other proprietary information.  I simply

expected to talk to YouTube and/or Google about my problems and how to resolve them.

b.   The Non-Disclosure Agreement states:

2.  A party (the "Discloser") may disclose to the other party (the "Recipient")
information pertaining to the Purpose that the Discloser considers confidential
("Confidential Information").

3.  Recipient may use Confidential Information only for the Purpose.  Recipient
must use a reasonable degree of care to protect Confidential Information and to
prevent any unauthorized use or disclosure of Confidential Information. Recipient
may share Confidential Information with its employees, directors, agents or third
party contractors who need to know it and if they have agreed with either party in
writing to keep information confidential.

4.  Confidential Information does not include information that: (a) was known to
Recipient without restriction before receipt from Discloser; (b) is publicly available
through no fault of Recipient; (c) is rightfully received by Recipient from a third
party without a duty of confidentiality;  or (d) is independently developed by
Recipient. A party may disclose Confidential Information when compelled to do so
by law if it provides reasonable prior notice to the other party, unless a court orders
that the other party not be given notice.

12.      The Non-Disclosure Agreement does not actually define what "Confidential

Information" is, except to say that it is whatever "the Discloser considers" to be "confidential."  I

have no way of knowing what YouTube or Google consider to be confidential, or expect me to

treat as confidential.  "Confidential Information" is not limited to trade secrets such as YouTube or

Google's customer lists, computer codes, or processes.

c.   The Non-Disclosure Agreement states that either party "may terminate this agreement

with thirty days prior written notice, but this agreement's provisions will survive as to

Confidential Information that is disclosed before termination."  I would like to

terminate the agreement, because it seems like it is totally inapplicable to the

circumstances surrounding the September 14-event, but even if I do so, I am afraid that

if I repeat anything at all that was said during the event, I might be revealing something

which YouTube or Google believes is confidential, and will be violating the agreement

I signed.

13.      On September 14, 2017, I went to the event at the YouTube Playa Vista Office in

Los Angeles, California.  I checked in at 11:00 a.m.  Around 11:30, a YouTube representative announced that the YouTube analytics representative had limited time and was running late.  The YouTube representative asked us to quickly sign hard copy Non-Disclosure Agreements so that we could get started as fast as possible, and indicated that we had to move quickly so that there was time with the analytics representative.  At the representative's request I signed a hard copy Non-Disclosure Agreement.  I was not given time to read the document which had multiple pages and appeared to be longer and more detailed than the one I signed online.  The YouTube representative took the signed document, and approached another creator requesting their signature.  No one offered me a copy the document.  Immediately after signing the document, I was ushered me into a large conference room.

14.     The September 14-event consisted of 16-20 YouTube creators, each representing a different class of video.  While I was the only LGBTQ representative creator, there were other LGBTQ creators who were posting videos in other categories.  I recall there were individual representatives for cooking, comedy, and gaming videos, some of which happened to identify LGBTQ, but were not specifically creating videos for the LGBTQ community.

    d.  We were seated at a large oval conference table, and offered notebooks and pens.  The presenters all identified as YouTube employees.

    e.  We watched  PowerPoint presentation.  We heard from a man who identified himself as responsible for analytics and a woman who addressed algorithm issues.  Also present were Ben Cramer and someone who was handing out Google/YouTube swag.  In all, I recall that there were 5 YouTube representatives present, in addition to the man who got me to sign the Non-Disclosure Agreement.

    f.  After the PowerPoint presentation, the YouTube creators asked questions.  Towards the end of the session, which lasted about 2 hours, I specifically asked, "What are you doing to fix the problems we have identified?" and "When will you be done fixing the problems?"  No one present provided any substantive response to my questions.

    g.  As far as I can recall, no one at the September 14-event -- (a)  said that what they were saying was "confidential" in connection with either the online or hard copy Non-

1      Disclosure Agreements;  (b) said that what they were talking about was a "trade

2      secret;"  (c) described actual YouTube's computer code or proprietary processes used

3      in connection with YouTube, the analytics, the algorithm, or AdSense;  (d) asked me

4      not to repeat anything that was said during the event by other creators.

5          15.      Prior to today, I have not spoken to anyone about what the YouTube

6   representatives said during the September 14-event; I did not even speak to my attorneys about it.

7   Even though I do not believe that anything said during the September 14-event is a secret or

8   should be treated as "confidential," and I have no idea what, if anything YouTube or Google claim

9   is "confidential," I have been afraid that if I ever talked about what was said at the September 14-

10   event, YouTube would sue me and I would be forced to spend money on defending myself.  I have

11   also been afraid that YouTube and Google would suspend or terminate my channel, my gmail

12   account, or even suspend my access to Google searches.

13          16.      I have reviewed the Defendants' Motion to Dismiss the Second Amended

14   Complaint (the "Motion").  In the Motion, Defendants make a number of factual assertions.  As

15   stated below, I believe that Defendants' factual assertions are either plain wrong or misleading;

16   and/or they contradict information I obtained at the September 14-event, as indicated below:

17          h.      Defendants state in their Motion:

18              Content creators upload videos to the service free of charge,
               enabling YouTube's billions of users to view them, comment on
19              them, and subscribe to their favorite creators' channels. ¶ 52.  MTD
               at 3:2-4.
20

21          17.      In truth, while there is no monetary charge for uploading videos, in exchange for

22   the opportunity to use the YouTube website, Google/YouTube required me to give them a license

23   to use all of my original video content that is posted to the YouTube website, the right to collect

24   data about me, and my use of the YouTube website, and also the right to collect data about people

25   who view my videos on the YouTube website.

26          i.      Defendants state in their Motion:

27              YouTube values the perspectives and experiences that LGBTQ+
               content creators bring to the platform.  MTD at 3:17-18.
28

DECLARATION OF STEPHANIE FROSCH IN SUPPORT
OF MOTION TO BE RELIEVED OF NDA                      -6-            Case No. 5:19-cv-004749-VKD

18.     My experience with YouTube since 2017 is directly contrary to this statement.  I believe that Google/YouTube representatives have made statements which suggest otherwise, if not directly contradict this statement, but the NDA prevents me from providing the Court with the basis for my belief.

j.   Defendants state in their Motion:

> In 2017, when LGBTQ+ creators raised issues about Restricted Mode, YouTube acknowledged that the feature was not fully working as intended and agreed to make improvements. ¶¶ 28, 87. MTD at 3:21-4:1.

19.     As stated, Defendants' description of YouTube's "acknowledgment" is misleading. Contrary to the Motion's spin on the allegations in the Complaint, the concerns I and other LGBTQ+ creators raised were not limited to Restricted Mode.  The NDA prevents me from informing the Court as to the scope of the issues raised during the 2017 discussions, or what Google/YouTube actually told me and other LGBTQ+ creators.  But for the NDA, I would provide the Court with a full description of the full scope of the issues raised and the full scope of what YouTube acknowledged in response to LGBTQ+ complaints.

k.   Defendants state in their Motion:

> As for the Plaintiffs here, YouTube has addressed their individual concerns in good faith, and often removed restrictions from their videos, when appropriate under YouTube's policies, in response to their appeals. ¶¶ 186, 223, 227, 230, 233, 236.a.  MTD at 4:1-4.

20.     Defendants' statement is grossly misleading to the extent that it suggests that YouTube actually resolved any of the complaints I (or any other LGBTQ+ creator) raised in 2017 to Google/YouTube.  To the contrary:  not only do my problems persist unresolved to this day, the statement is not consistent with admissions made by YouTube representatives on September 14, 2017.  In fact, the problems I had with YouTube continued to worsen while my subscriber numbers and ad revenue dwindled.  Given what I have observed with respect to other LGBTQ+ channels, the complaints raised in 2017 by other LGBTQ+ creators were not resolved either.  To the extent that "YouTube has addressed" my complaints, the NDA prevents me from relating to the Court what YouTube said in response to my complaints.  But for the NDA, I would provide additional information which supports Plaintiffs' allegation that Defendants have a policy of

1   discriminating against LGBTQ+ YouTube users based on the identities of the creators and their

2   viewers.

3           l.   Defendants state in their Motion:

4                   The use of its service is governed by rules and an array of content

5                   policies. ¶¶ 10, 248, 288. Before creating channels and uploading
    their content to the service, Plaintiffs acknowledge they agreed to

6                   YouTube's Terms of Service and the incorporated Community
    Guidelines. ¶¶ 10, 14, 59, 248,

7                   The Terms of Service provide that "YouTube reserves the right to

8                   remove Content without prior notice," including videos uploaded by
    content creators. Ex. 2-3.  The Community Guidelines are twelve

9                   "common-sense rules" prohibiting certain kinds of content,
    including "[n]udity or sexual content" and "[v]ulgar language." Exs.

10                  3-4. Google and YouTube reserve the right to remove any content
    that they believe to be contrary to the Terms of Service and the

11                  incorporated Community Guidelines. Ex. 2.  MTD at 4:6-15.

12

13                  YouTube allows content creators whose channels meet certain
    minimum viewership requirements to earn revenue from (or

14                  "monetize") their videos by running advertisements with them as
    part of the YouTube Partner Program. To be eligible to monetize

15                  their videos, in addition to the Terms of Service and Community
    Guidelines discussed above, Plaintiffs agreed to certain additional

16                  "written contracts," including YouTube's Partner Program Terms
    and the AdSense Terms of Service. See ¶ 331; Exs. 5-6, 10. In

17                  addition, Plaintiffs agreed to comply with YouTube's monetization
    policies, including the Advertiser-friendly content guidelines, which

18                  are designed to ensure that ads do not appear alongside videos with
    content that certain audiences might find objectionable. See ¶¶ 152,

19                  248, 331; Exs. 5-11. YouTube uses automated software to identify
    content as inappropriate for advertising, and creators may appeal

20                  demonetization decisions for manual review. ¶ 94; Ex. 9.  MTD at
    5:9-19.

21         21.    Defendants' description of the website rules is misleading, and wrongly one sided:

22  When I agreed to Defendants' Terms of Service, Community Guidelines, Partnership Program

23  Terms, and AdSense Terms of Service, I understood that these terms were nonnegotiable and that

24  each YouTube user was agreeing to these same terms.  YouTube stated in its Terms of Service and

25  Community Guidelines that the rules to which I agreed would be applied equally to all YouTube

26  users, in a neutral manner.

27         22.    YouTube did not inform me that my videos would be distributed, made available

28  for viewing, or monetized for profit based on who I am (a lesbian educator) or on my stated views

regardless of the actual content of the video posted.  Nor did YouTube inform me that to the extent that it sponsored other creators, or their channels or individual videos, that those sponsored creators/channels/videos would not be subject to the same Terms of Service, Community Guidelines, Partnership Program Terms, or AdSense Terms of Service that I must follow.  Nor did YouTube inform me that it would be creating original video content which would not be subjected to the same Terms of Service, Community Guidelines, Partnership Program Terms, or AdSense Terms of Service that I must follow.

23.     YouTube did not inform me that in giving Defendants a license to use the videos I posted, that it would allow other YouTube users to copy my original videos, post them on the channels of other YouTube users, or receive revenue related to my original videos.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and Executed this __ day of March, 2020, at New York, New York.

_____

STEPHANIE FROSCH

# Exhibit "1"

From: **Steph Frosch** <ellosteph@gmail.com>
Date: Tue, Aug 20, 2019 at 12:04 AM
Subject: Fwd: Focus Group event: YouTube's Advertising Guidelines
To: Stephanie Frosch <stephfrosch@gmail.com>


---------- Forwarded message ---------
From: **Laura Chernikoff** <laura@internetcreatorsguild.com>
Date: Thu, Sep 21, 2017 at 11:46 AM
Subject: Re: Focus Group event: YouTube's Advertising Guidelines
To: Steph Frosch <ellosteph@gmail.com>


Thanks for participating in this ICG event with YouTube. We know this session had some logistical challenges with the timing and apologize. We're still experimenting with this type of event, and thinking about ways to advocate for creators about the difficult monetization and advertising guidelines challenges. We'd love to hear about your experience – you can share your honest feedback by **filling out this brief survey**.

Laura

**Laura Chernikoff**
*Executive Director*
Internet Creators Guild
internetcreatorsguild.com

On Wed, Sep 13, 2017 at 2:57 PM, Steph Frosch <ellosteph@gmail.com> wrote:
Signed and sent! Looking forward to tomorrow.

All the best,
Stephanie Frosch
YouTube.com/ElloSteph

On Wed, Sep 13, 2017 at 11:21 AM, Laura Chernikoff <laura@internetcreatorsguild.com> wrote:
Hey, I wanted to send a quick reminder to sign the NDA YouTube sent for tomorrow's event. They need everyone attending the event to sign in order to participate, so I wanted to make sure you hadn't missed it. Let me know if you have any questions or concerns!

Laura

**Laura Chernikoff**
*Executive Director*
Internet Creators Guild
internetcreatorsguild.com

On Mon, Sep 11, 2017 at 11:07 AM, Laura Chernikoff <laura@internetcreatorsguild.com> wrote:
Thanks Davey! Moving you to bcc.

Steph, we're excited to have you at this event this week. Here's a confirmation with details about the location.

Please note that a non-disclosure agreement (NDA) will be sent via email by a member of the YouTube team and is required to be signed prior to the event, so keep an eye out!

**RSVP:** You are confirmed.
**Date:** Thursday, September 14th
**Check In Time:** 11am
**Presentation Starts:** 11:30am
*Lunch and an opportunity to mingle with your fellow creators will be included.
**Location:** YouTube Playa Vista Office –
12400 W. Bluff Creek Drive. Los Angeles, CA 90094
**Directions:** At the intersection of S Centinela Ave & Jefferson Blvd, turn onto S Campus Center Dr. Drive to the end of Campus Center Dr. Turn left on West Bluff Creek Drive and make a quick right into "Lot B". US-PLV-H10 will be the building just West of the parking lot.

If you have trouble finding the office, contact **Ben Kramer:** benkramer@google.com // 650-495-7545

If your plans have changed and you are unable to attend, please let us know ASAP.

Laura

**Laura Chernikoff**
*Executive Director*
Internet Creators Guild
internetcreatorsguild.com

On Fri, Sep 8, 2017 at 5:36 PM, Davey Wavey <davey@daveywavey.tv> wrote:
Hey Laura,

CC'ing Steph Frosch on this. She'd love to attend!

On Thu, Aug 31, 2017 at 6:06 PM, Laura Chernikoff <laura@internetcreatorsguild.com> wrote:
Unfortunately this event is in-person only. Sorry to hear you can't make it, but we'll keep you in mind for similar events in the future.

Do any other LA-based creators come to mind who were effected by this issue? I know the LGBT community especially deals with this and I want to make sure their voices are well represented in that room.

Laura

**Laura Chernikoff**
*Executive Director*

Internet Creators Guild
internetcreatorsguild.com

On Tue, Aug 29, 2017 at 9:52 AM, Davey Wavey <davey@daveywavey.tv> wrote:
Hey Laura,

I'll be traveling - is there a remote option for attending?

Best,
Davey

On Fri, Aug 25, 2017 at 1:28 PM, Laura Chernikoff <laura@internetcreatorsguild.com> wrote:
Hey Davey,

You're invited to an upcoming event put on by the Internet Creators Guild, in partnership with YouTube on Thursday, September 14th at 11:00 AM.

Following the advertising situation on YouTube this spring (dubbed the "Adpocalypse"), YouTube is interested in hearing about creators' experiences on the platform. In particular, it's important for creators to understand the advertising guidelines and tools that brands interact with, in order to be aware how it may affect your monetization.

We've been discussing this issue with YouTube, who have been working to address creator concerns on this topic. They would like to share this presentation, which will be under NDA, in order to hear from ICG Members and creators we're in touch with as part of a small focus group.

We thought you would be an engaged and thoughtful participant and hope you're able to attend.

**Please RSVP with either yes, no, or maybe by <u>September 5th</u>.**

Thursday, September 14th
Check in 11:00 AM; presentation at 11:30 AM
YouTube Playa Vista Campus

***Understanding YouTube's Advertising-Friendly Content Guidelines***

*In this session, YouTube will cover the recent changes to the platform's Advertiser-Friendly Content Guidelines and what they mean to both advertisers and creators. They will review the updated guidelines, discuss how YouTube surfaces ads, and the targeting systems advertisers leverage to place their ads. This will be followed by a Q&A, where creators will be able to ask questions, as well as share their experiences and feedback on these changes.*

This event is invite-only and has limited space. If you know of other creators who would be interested in the topic and available to attend, please let me know their name, channel, and email address.

Thanks!


Laura

**Laura Chernikoff**
*Executive Director*
Internet Creators Guild
[internetcreatorsguild.com](internetcreatorsguild.com)


--
Davey Wavey
Digital Storyteller | 

--
Davey Wavey
Digital Storyteller | 

**Stephanie Frosch**

[YouTube](YouTube) | [Instagram](Instagram) | [Twitter](Twitter)

--



**Stephanie Frosch**
she/her/hers
Storyteller || Activist || Educator ||

phone: +1 954.235.4604

    

EXHIBIT 1

# Exhibit "2"

From: **Laura Chernikoff** <laura@internetcreatorsguild.com>
Date: Mon, Sep 11, 2017 at 1:08 PM
Subject: Re: Focus Group event: YouTube's Advertising Guidelines
To:
Cc: Steph Frosch <ellosteph@gmail.com>

Thanks Davey! Moving you to bcc.

Steph, we're excited to have you at this event this week. Here's a confirmation with details about the location.

Please note that a non-disclosure agreement (NDA) will be sent via email by a member of the YouTube team and is required to be signed prior to the event, so keep an eye out!

**RSVP:** You are confirmed.
**Date:** Thursday, September 14th
**Check In Time:** 11am
**Presentation Starts:** 11:30am
*Lunch and an opportunity to mingle with your fellow creators will be included.
**Location:** YouTube Playa Vista Office –
12400 W. Bluff Creek Drive. Los Angeles, CA 90094
**Directions:** At the intersection of S Centinela Ave & Jefferson Blvd, turn onto S Campus Center Dr. Drive to the end of Campus Center Dr. Turn left on West Bluff Creek Drive and make a quick right into "Lot B". US-PLV-H10 will be the building just West of the parking lot.

If you have trouble finding the office, contact **Ben Kramer:** benkramer@google.com // 650-495-7545

If your plans have changed and you are unable to attend, please let us know ASAP.

Laura

**Laura Chernikoff**
*Executive Director*
Internet Creators Guild
internetcreatorsguild.com

On Fri, Sep 8, 2017 at 5:36 PM, Davey Wavey <davey@daveywavey.tv> wrote:
Hey Laura,

CC'ing Steph Frosch on this. She'd love to attend!

On Thu, Aug 31, 2017 at 6:06 PM, Laura Chernikoff <laura@internetcreatorsguild.com> wrote:
Unfortunately this event is in-person only. Sorry to hear you can't make it, but we'll keep you in mind for similar events in the future.

Do any other LA-based creators come to mind who were effected by this issue? I know the LGBT community especially deals with this and I want to make sure their voices are well represented in that room.

Laura

**Laura Chernikoff**
*Executive Director*
Internet Creators Guild
internetcreatorsguild.com

On Tue, Aug 29, 2017 at 9:52 AM, Davey Wavey <davey@daveywavey.tv> wrote:
Hey Laura,

I'll be traveling - is there a remote option for attending?

Best,
Davey

On Fri, Aug 25, 2017 at 1:28 PM, Laura Chernikoff <laura@internetcreatorsguild.com> wrote:
Hey Davey,

You're invited to an upcoming event put on by the Internet Creators Guild, in partnership with YouTube on Thursday, September 14th at 11:00 AM.

Following the advertising situation on YouTube this spring (dubbed the "Adpocalypse"), YouTube is interested in hearing about creators' experiences on the platform. In particular, it's important for creators to understand the advertising guidelines and tools that brands interact with, in order to be aware how it may affect your monetization.

We've been discussing this issue with YouTube, who have been working to address creator concerns on this topic. They would like to share this presentation, which will be under NDA, in order to hear from ICG Members and creators we're in touch with as part of a small focus group.

We thought you would be an engaged and thoughtful participant and hope you're able to attend.

**Please RSVP with either yes, no, or maybe by <u>September 5th</u>.**

Thursday, September 14th
Check in 11:00 AM; presentation at 11:30 AM
YouTube Playa Vista Campus

***Understanding YouTube's Advertising-Friendly Content Guidelines***

*In this session, YouTube will cover the recent changes to the platform's Advertiser-Friendly Content Guidelines and what they mean to both advertisers and creators. They will review the updated guidelines, discuss how YouTube surfaces ads, and the targeting systems advertisers leverage to place their ads. This will be followed by a Q&A, where creators will be able to ask questions, as well as share their experiences and feedback on these changes.*

This event is invite-only and has limited space. If you know of other creators who would be interested in the topic and available to attend, please let me know their name, channel, and email address.

Thanks!

Laura

**Laura Chernikoff**
*Executive Director*
Internet Creators Guild
internetcreatorsguild.com


Davey Wavey
Digital Storyteller | daveywavey.tv


Davey Wavey
Digital Storyteller | daveywavey.tv

**Stephanie Frosch**

*EllaSteph*

YouTube | Instagram | Twitter

EXHIBIT 2

# Exhibit "3"

From: **Google Legal** <nda-noreply@google.com>
Date: Wed, Sep 13, 2017 at 4:56 PM
Subject: You have accepted Google's Non-Disclosure Agreement
To: <StephFrosch@gmail.com>

You have accepted the terms and conditions presented in Google's
Non-Disclosure Agreement on 2017-09-13 20:56:35.

Company Name: ElloSteph
Name: Stephanie Frosch
Title: Content Creator
Email: StephFrosch@gmail.com
Address:
1300 N Curson Ave Apt 4
West Hollywood, California, 90046
United States

Below is a copy of the Agreement for your reference:

NON-DISCLOSURE AGREEMENT

 In order to evaluate and possibly enter into a business transaction (the
"Purpose"), Google Inc., for itself and its    subsidiaries and affiliates,
and the other party identified below hereby agree:

1.  The Effective Date of this agreement is the date this agreement is
accepted by the party identified below.

2.  A party (the "Discloser") may disclose to the other party (the
"Recipient") information pertaining to the Purpose that the Discloser
considers confidential ("Confidential Information").

3.  Recipient may use Confidential Information only for the Purpose.
Recipient must use a reasonable degree of care to protect Confidential
Information and to prevent any unauthorized use or disclosure of
Confidential Information. Recipient may share Confidential Information with
its employees, directors, agents or third party contractors who need to
know it and if they have agreed with either party in writing to keep
information confidential.

4.  Confidential Information does not include information that: (a) was
known to Recipient without restriction before receipt from Discloser; (b)
is publicly available through no fault of Recipient; (c) is rightfully
received by Recipient from a third party without a duty of confidentiality;
or (d) is independently developed by Recipient. A party may disclose
Confidential Information when compelled to do so by law if it provides

reasonable prior notice to the other party, unless a court orders that the other party not be given notice.

5.  Either party may terminate this agreement with thirty days prior written notice, but this agreement's provisions will survive as to Confidential Information that is disclosed before termination.

6.  Unless the parties otherwise agree in writing, Recipient's duty to protect Confidential Information expires five years from disclosure.

7.  This agreement imposes no obligation to proceed with any business transaction.

8.  No party acquires any intellectual property rights under this agreement except the limited rights necessary to use the Confidential Information for the Purpose.

9.  This agreement does not create any agency or partnership relationship. This agreement is not assignable or transferable by either party without the prior written consent of the other party.

10.  This agreement is the parties' entire agreement on this topic, superseding any prior or contemporaneous agreements. Any amendments must be in writing.  The parties may execute this agreement in counterparts, which taken together will constitute one instrument.  Failure to enforce any of provisions of this agreement will not constitute a waiver.

11.  This agreement is governed by the laws of the State of California, excluding its conflict-of-laws principles. The exclusive venue for any dispute relating to this agreement shall be Santa Clara County, California.

CommMutual Rev 112707



**Stephanie Frosch**
she/her/hers
Storyteller || Activist || Educator ||

phone: +1 954.235.4604

    

EXHIBIT 3

# Exhibit "B"

1

2

3

4

5

6

7

**Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 11/19/2019 3:51 PM
Reviewed By: R. Walker
Case #19CV340667
Envelope: 3671559**

8

SUPERIOR COURT OF CALIFORNIA

9

COUNTY OF SANTA CLARA

10

11

PRAGER UNIVERSITY,

12

Plaintiff,

13

vs.

14

15

GOOGLE LLC, et al.,

16

Defendants.

17

18

Case No.: 19CV340667

**ORDER AFTER HEARING ON
OCTOBER 25, 2019**

**(1) Demurrer by Defendants Google
LLC and YouTube, LLC to the
First Amended Complaint
(2) Motion by Plaintiff Prager
University for Preliminary
Injunction**

19

The above-entitled matter came on for hearing on Friday, October 25, 2019 at 11:00

20

a.m. in Department 1 (Complex Civil Litigation), the Honorable Brian C. Walsh presiding. A

21

tentative ruling was issued prior to the hearing. The appearances are as stated in the record.

22

The Court has reviewed and considered the written submissions of all parties and has reflected

23

on the oral argument of counsel, including by reviewing the transcript lodged by plaintiff on

24

November 14, 2019. Being fully advised, the Court adopts the tentative ruling as follows:

25

26

This action arises from Prager University's allegations that YouTube, LLC and its parent

27

company Google LLC have unlawfully restricted content created by Prager on YouTube,

28

defendants' social media and video sharing platform. Before the Court are defendants' demurrer

*Prager University v. Google LLC, et al., Superior Court of California, County of Santa Clara, Case No. 19CV340667*
*Order After Hearing on October 25, 2019 [Demurrer to the First Amended Complaint and Motion for Preliminary Injunction]*

1

EXHIBIT "B"

to the operative First Amended Complaint ("FAC") and Prager's motion for a preliminary injunction.  Both motions are opposed.

## I.  Factual and Procedural Background

As alleged in the FAC, Prager is a non-profit, 501(c)(3) tax exempt, educational organization that promotes discussion on historical, religious, and current events by disseminating educational videos intended for younger, student-based audiences between the ages of 13 and 35.  (FAC, ¶ 10.)  The videos depict scholars, sources, and other prominent speakers who often espouse viewpoints in the mainstream of conservative thought.  (*Ibid.*)

Defendants operate YouTube as the largest and most profitable mechanism for monetizing free speech and freedom of expression in the history of the world, generating $10 to 15 billion in annual revenue by monetizing the content of users like Prager who are invited to post videos to YouTube.  (FAC, ¶ 11.)  Since its inception, Prager has posted more than 250 of its videos to YouTube.  (*Id.* at ¶ 39.)

### A.  The Alleged Content Restriction Scheme

To induce users like Prager to upload video content, defendants represent that YouTube is a public place for free speech defined by "four essential freedoms" that govern the public's use of the platform:

1. **Freedom of Expression:**  We believe people should be able to speak freely, share opinions, foster open dialogue, and that creative freedom leads to new voices, formats and possibilities.

2. **Freedom of Information:**  We believe everyone should have easy, open access to information and that video is a powerful force for education, building understanding, and documenting world events, big and small.

3. **Freedom of Opportunity:**  We believe everyone should have a chance to be discovered, build a business and succeed on their own terms, and that people—not gatekeepers—decide what's popular.

4. **Freedom to Belong:**  We believe everyone should be able to find communities of support, break down barriers, transcend borders and come together around shared interests and passions.

(FAC, ¶ 12.) Defendants further promise that YouTube is governed by content-based rules and filtering which "apply equally to all," regardless of the viewpoint, identity, or source of the speaker. (*Id.* at ¶ 13.)

However, contrary to these representations, defendants censor, restrict, and restrain video content based on animus, discrimination, profit, and/or for any other reason "or no reason." (FAC, ¶ 14.) According to Prager, an internal memo and presentation entitled "The Good Censor" shows that defendants have secretly decided to " 'migrate' away from [serving as] a hosting platform ...where the public is invited to engage in freedom of expression" to become a media company that profits "by promoting Defendants' own, or their preferred content through the exercise of unfettered discretion to censor and curate otherwise public content." (*Id.* at ¶¶ 56-65.) To effectuate their discriminatory practices, defendants use clandestine filtering tools, including algorithms and other machine-based and manual review tools, that are embedded with discriminatory and anti-competitive animus-based code, including code that is used to identify and restrict content based on the identity, viewpoint, or topic of the speaker. (*Id.*, ¶ 19.) They also "ensure that the YouTube employees charged with administering the content filtering and regulation scheme ... operate in a dysfunctional and politically partisan workplace environment." (*Id.* at ¶ 20.)

Against this background, Prager's rights under California law have been violated by two unlawful content-based restrictions: (i) "Restricted Mode," a filtering protocol that defendants use to block what they deem, in their sole, unfettered discretion, to be "inappropriate" for "sensitive" audiences and (ii) "Advertising Restrictions," a content-based video advertising restriction policy that prohibits potential advertisers from accessing videos that defendants deem "inappropriate" for advertising. (FAC, ¶ 17.) Defendants use these mechanisms as a pretext to restrict and censor Prager's videos, even though the content of its videos complies with YouTube's Terms of Service, Community Guidelines, and criteria for "sensitive audiences" and advertisers, while they fail to restrict the content of other preferred users, content partners, and content produced by defendants themselves that is not compliant. (*Id.* at ¶¶ 18, 23.) Defendants

*Prager University v. Google LLC, et al., Superior Court of California, County of Santa Clara, Case No. 19CV340667*
*Order After Hearing on October 25, 2019 [Demurrer to the First Amended Complaint and Motion for Preliminary Injunction]*

3

have provided no rational basis for restricting Prager's content while allowing similar or noncompliant content to go unrestricted. (*Id.* at ¶ 25.)

### B. Restricted Mode

According to defendants, Restricted Mode is intended "to help institutions like schools as well as people who wanted to better control the content they see on YouTube with an option to choose an intentionally limited YouTube experience." (FAC, ¶ 68.) Viewers can choose to turn Restricted Mode on from their personal accounts, but it may also be turned on by system administrators for libraries, schools, and other institutions or workplaces. (*Ibid.*) Defendants estimate that about 1.5 percent of YouTube's daily views (or approximately 75 million views per day) come from individuals using Restricted Mode. (*Id.* at ¶ 69.) When Restricted Mode is activated, a video's name, creator or subject, and content, along with any other information related to the video, are blocked, as if the video did not exist on the YouTube platform. (*Id.* at ¶ 68.)

Defendants claim to restrict content in Restricted Mode based upon their "Restricted Mode Guidelines," which identify five criteria for determining whether content warrants restriction:

1. Talking about drug use or abuse, or drinking alcohol in videos;
2. Overly detailed conversations about or depictions of sex or sexual activity;
3. Graphic descriptions of violence, violent acts, natural disasters and tragedies, or even violence in the news;
4. Videos that cover specific details about events related to terrorism, war, crime, and political conflicts that resulted in death or serious injury, even if no graphic imagery is shown;
5. Inappropriate language, including profanity; and
6. Video content that is gratuitously incendiary, inflammatory, or demeaning towards an individual or group.

(FAC, ¶ 70.) Videos are initially restricted through an automated filtering algorithm that examines certain "signals" like the video's metadata, title, and language, or following manual review if a video is "flagged" as inappropriate by public viewers. (*Id.*, ¶ 71.)

YouTube also publishes "Community Guidelines" and "Age Based Restriction" guidelines similar to its "Restricted Mode Guidelines"; however, content that complies with

*Prager University v. Google LLC, et al., Superior Court of California, County of Santa Clara, Case No. 19CV340667*
*Order After Hearing on October 25, 2019 [Demurrer to the First Amended Complaint and Motion for Preliminary Injunction]*

4

these guidelines may nevertheless be subject to Restricted Mode. (FAC, ¶¶ 72-73.) Prager's videos have never been age restricted or found to violate YouTube's Community Guidelines. (*Id.* at ¶ 75.)

Defendants have admitted that they make "mistakes in understanding context and nuances when [assessing] which videos to make available in Restricted Mode." (FAC, ¶ 91.) For example, on March 19, 2017, they publicly admitted that they improperly restricted videos posted or produced by members of the LGBTQ community and changed their policy, filtering algorithm, and manual review policies in response to complaints from this community. (*Id.* at ¶¶ 94-96.) However, Prager alleges that defendants have continued to improperly restrict videos by LGBTQ users, which is evidence of viewpoint animus. (*Id.* at ¶¶ 97-98.)

C. Advertising Restrictions

Defendants also restrict users like Prager "from monetizing or boosting the reach or viewer distribution of [their] videos." (FAC, ¶ 78.) Prager alleges that these restrictions are ostensibly governed by the "AdSense program policies," which it suggests are "similar[ly] vague, ambiguous, and arbitrary" to the Restricted Mode Guidelines. (*Id.* at ¶¶ 78, 80.) Prager claims that, similar to their "mistakes" in applying "Restricted Mode," defendants once "denied a reach boost or ad product" on the ground of "shocking content" based on a user's sexual or gender orientation and viewpoint. (*Id.* at ¶ 81.) It alleges that the application of such an "inappropriate" or "shocking content" designation falsely and unfairly stigmatizes Prager as well. (*Id.* at ¶ 82.) (However, while Prager alleges that certain of its videos have been demonetized, it does not allege whether defendants gave specific reasons for these actions or what those reasons were.) (See *id.* at ¶ 84.)

D. The Parties' Dispute

In July of 2016, Prager discovered that defendants were restricting user access to its videos through Restricted Mode. (FAC, ¶ 101.) It raised the issue with defendants, but they have failed to offer any reasonable or consistent explanation for why Prager's videos are being restricted. (*Id.* at ¶¶ 101-117.) In 2016, at least 16 Prager videos were restricted; by 2017, a total of 21 were. (*Ibid.*) By the time the FAC was filed in May of 2019, the total had risen to 80. (*Id.*

*Prager University v. Google LLC, et al., Superior Court of California, County of Santa Clara, Case No. 19CV340667
Order After Hearing on October 25, 2019 [Demurrer to the First Amended Complaint and Motion for Preliminary Injunction]*

5

at ¶ 127.) Prager's videos were either "restricted as to content, demonetized, or both." (*Id.* at ¶ 116.) Defendants also discontinued Prager's "ad grants" account for more than six days in October of 2017. (*Id.* at ¶ 118.) On pages 9-17 of the FAC, Prager provides a chart listing its restricted videos by title, along with videos from defendants' "preferred content providers" with similar titles that are unrestricted. (*Id.* at ¶ 23.)

On October 23, 2017, Prager sued defendants in federal court, asserting claims for (1) violation of Article I, section 2 of the California Constitution; (2) violation of the First Amendment of the United States Constitution; (3) violation of the California Unruh Civil Rights Act ("Unruh Act"), Cal. Civ. Code. § 51 *et seq.*; (4) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*; (5) breach of the implied covenant of good faith and fair dealing; (6) violation of the Lanham Act, 15 U.S.C. § 1125 *et seq.*; and (7) declaratory relief. (*Prager University v. Google LLC* (N.D. Cal., Mar. 26, 2018, No. 17-CV-06064-LHK) 2018 WL 1471939, at *2.) It filed a motion for a preliminary injunction in the federal action on December 29, 2017. (*Id.* at *3.) On March 26, 2018, the federal court granted defendants' motion to dismiss Prager's federal claims and denied Prager's motion for a preliminary injunction, finding that Prager had failed to state a claim for violation of the First Amendment because it did not allege state action, and had also failed to state a claim under the Lanham Act. (*Id.* at *5-13.) Having dismissed all of Prager's federal claims, the court declined to exercise supplemental jurisdiction over its state law claims, explaining:

> Here, the factors of economy, convenience, fairness, and comity support dismissal of Plaintiff's remaining state law claims. This case is still at the pleading stage, and no discovery has taken place. Federal judicial resources are conserved by dismissing the state law theories of relief at this stage. Further, the Court finds that dismissal promotes comity as it enables California courts to interpret questions of state law. This is an especially important consideration in the instant case because Plaintiff asserts a claim that demands an analysis of the reach of Article I, section 2 of the California Constitution in the age of social media and the Internet.

(*Prager University v. Google LLC*, *supra*, 2018 WL 1471939, at *13.) Prager has appealed the federal court's ruling to the Court of Appeal for the Ninth Circuit, which heard argument in the matter on August 27, 2019.

*Prager University v. Google LLC, et al.*, *Superior Court of California, County of Santa Clara, Case No. 19CV340667*
*Order After Hearing on October 25, 2019 [Demurrer to the First Amended Complaint and Motion for Preliminary Injunction]*

6

Prager filed this action on January 8, 2019, reasserting its state law claims for (1) violation of Article I, section 2 of the California Constitution; (2) violation of the Unruh Act; (3) violation of the UCL; and (4) breach of the implied covenant of good faith and fair dealing. On May 13, the Court entered a stipulated order establishing a briefing schedule for Prager's anticipated motion for a preliminary injunction and defendants' anticipated demurrer and/or special motion to strike.  On May 20, pursuant to that order, Prager moved for a preliminary injunction and filed the FAC, which asserts the same four causes of action as its original complaint.  Defendants filed their demurrer on June 28.  Both matters are now fully briefed and came on for hearing by the Court on October 25, 2019.

## II.  Demurrer to the FAC

Defendants demur to each cause of action in the FAC for failure to state a claim.  (Code Civ. Proc., § 430.10, subd. (e).)  They contend that Prager's claims are barred by two provisions of section 230 of the Communications Decency Act (the "CDA") and by the First Amendment, and otherwise fail to state a cause of action.

Defendants' request for judicial notice, which is unopposed, is GRANTED as to public web pages displaying the terms of the various YouTube policies at issue in this action (Exhibits 1-9).  (Evid. Code § 452, subd. (h); see *Pacific Employers Ins. Co. v. State of Cal.* (1970) 3 Cal.3d 573, 575, fn.1 [where portions of agreement were attached to plaintiff's complaint, the balance of that agreement was properly a subject of judicial notice]; *Ingram v. Flippo* (1999) 74 Cal.App.4th 1280, 1285 [judicial notice of letter and media release was proper where, although they were not attached to the complaint, they formed a basis for the claims, and the complaint excerpted quotes and summarized parts in detail, thus "it is essential that we evaluate the complaint by reference to these documents"].)  Defendants' request is also GRANTED as to a transcript of a case management conference held in the federal action, although the Court is not bound by the court's comments or rulings in that case.  (Evid. Code § 452, subd. (d).)

/ / /

/ / /

1

### A.  Legal Standard

The function of a demurrer is to test the legal sufficiency of a pleading.  (*Trs. Of Capital Wholesale Elec. Etc. Fund v. Shearson Lehman Bros.* (1990) 221 Cal.App.3d 617, 621.)  Consequently, "[a] demurrer reaches only to the contents of the pleading and such matters as may be considered under the doctrine of judicial notice." (*South Shore Land Co. v. Petersen* (1964) 226 Cal.App.2d 725, 732, internal citations and quotations omitted; see also Code Civ. Proc., § 430.30, subd. (a).)  "It is not the ordinary function of a demurrer to test the truth of the plaintiff's allegations or the accuracy with which he describes the defendant's conduct. ... Thus, ... the facts alleged in the pleading are deemed to be true, however improbable they may be." (*Align Technology, Inc. v. Tran* (2009) 179 Cal.App.4th 949, 958, internal citations and quotations omitted.)

In ruling on a demurrer, the allegations of the complaint must be liberally construed, with a view to substantial justice between the parties.  (*Glennen v. Allergan, Inc.* (2016) 247 Cal.App.4th 1, 6.)  Nevertheless, while "[a] demurrer admits all facts properly pleaded, [it does] not [admit] contentions, deductions or conclusions of law or fact." (*George v. Automobile Club of Southern California* (2011) 201 Cal.App.4th 1112, 1120.)  A demurrer will lie where the allegations and matters subject to judicial notice clearly disclose some defense or bar to recovery, including a statutory immunity. (*Casterson v. Superior Court (Cardoso)* (2002) 101 Cal.App.4th 177, 183.)

### B.  Violation of the California Constitution

Because concepts related to the parties' speech rights under the First Amendment and California Constitution are important to other aspects of its analysis, the Court will first examine whether Prager states a claim for violation of Article I, section 2 of the California Constitution.

As urged by defendants, "California's free speech clause"—like the First Amendment— "contains a state action limitation." (*Golden Gateway Center v. Golden Gateway Tenants Assn.* (2001) 26 Cal.4th 1013, 1023.)  However, the California Constitution's protection of speech has been interpreted more broadly in this regard. (See *Fashion Valley Mall, LLC v. National Labor Relations Bd.* (2007) 42 Cal.4th 850, 862-863.)  Most notably, in the

"groundbreaking" decision of *Robins v. Pruneyard Shopping Center* (1979) 23 Cal.3d 899, the Supreme Court of California "departed from the First Amendment jurisprudence of the United States Supreme Court and extended the reach of the free speech clause of the California Constitution to privately owned shopping centers." (*Golden Gateway Center v. Golden Gateway Tenants Assn., supra,* 26 Cal.4th at p. 1016.)

More than 20 years after *Robins v. Pruneyard*, *Golden Gateway Center* confirmed and began to define the scope of the state action limitation under the California Constitution, finding the requirement was not satisfied where a tenants' association sought to distribute leaflets in a private apartment complex that was "not freely open to the public." (*Golden Gateway Center v. Golden Gateway Tenants Assn., supra,* 26 Cal.4th at p. 1031.) *Golden Gateway Center* looked to the reasoning of *Robins* for guidance, noting that "*Robins* relied heavily on the functional equivalence of the shopping center to a traditional public forum-the downtown or central business district," and relied on "the public character of the property," emphasizing "the public's unrestricted access." (*Id.* at pp. 1032-1033, internal citations and quotations omitted.) *Golden Gateway Center* held that this unrestricted access is a "threshold requirement for establishing state action": without it, private property "is not the functional equivalent of a traditional public forum." (*Id.* at p. 1033.) In announcing this requirement, the opinion confirmed that it "largely follow[ed] the Court of Appeal decisions construing *Robins*," including *Planned Parenthood v. Wilson* (1991) 234 Cal.App.3d 1662. (*Id.* at p. 1033.) Those decisions also emphasized *Robins*'s focus on "the unique character of the modern shopping center and … the public role such centers have assumed in contemporary society" by effectively replacing "the traditional town center business block, where historically the public's First Amendment activity was exercised and its right to do so scrupulously guarded." (*Planned Parenthood v. Wilson, supra,* 234 Cal.App.3d at pp. 1669-1670.) This concept was again emphasized by the California Supreme Court in *Fashion Valley*, which repeatedly referenced "[t]he idea that private property can constitute a public forum for free speech if it is open to the public in a manner similar to that of public streets and sidewalks …." (*Fashion Valley Mall, LLC v. National Labor Relations Bd., supra,* 42 Cal.4th at p. 858; see also *id.* at p. 859.)

With this fundamental principle in mind, it is apparent that Prager does not state a claim under the California Constitution. Prager contends that "YouTube is the cyber equivalent of a town square where citizens exchange ideas on matters of public interest" and that defendants have opened their platform to the public by advertising its use for this purpose. However, Prager does not allege that it has been denied access to the core YouTube service. Rather, it urges that its access to "Restricted Mode" and YouTube's advertising service has been restricted. Prager does not persuade the Court that these services are freely open to the public or are the functional equivalent of a traditional public forum like a town square or a central business district.[1] Considering "the nature, purpose, and primary use of the property; the extent and nature of the public invitation to use the property; and the relationship between the ideas sought to be presented and the purpose of the property's occupants" (*Albertson's, Inc. v. Young* (2003) 107 Cal.App.4th at p. 119), it is clear that these services are nothing like a traditional public forum. "Restricted Mode" is an optional service that enables users to limit the content that they (or their children, patrons, or employees) view in order to avoid mature content. Limiting content is the very purpose of this service, and defendants do not give content creators unrestricted access to it or suggest that they will do so. The service exists to permit users to avoid the more open experience of the core YouTube service. Similarly, the use of YouTube's advertising service is restricted to meet the preferences of advertisers. (See FAC, ¶ 80 [stated purpose of advertising restrictions "is to keep Google's content and search networks safe and clean for our advertisers ..."]; Declaration of Brian M. Willen, Exs. 7-9.)

Defendants correctly urge that even to recognize the core YouTube platform as a public forum would be a dramatic expansion of *Robins*. As one federal court observed, "[t]he analogy between a shopping mall and the Internet is imperfect, and there are a host of potential 'slippery slope' problems that are likely to surface were [*Robins*] to apply to the Internet." (*hiQ Labs, Inc. v. LinkedIn Corporation* (N.D. Cal. 2017) 273 F.Supp.3d 1099, 1116 [observing that "[n]o court

---

[1] Prager cites no authority that supports its position that a court can never determine the applicability of *Robins* on demurrer, and this position is incorrect. (See *Savage v. Trammell Crow Co.* (1990) 223 Cal.App.3d 1562, 1577, fn. 4 [stating that scope of *Robins* can be addressed on demurrer in appropriate circumstances].) Here, the necessary facts are alleged in the FAC and/or subject to judicial notice.

1  has expressly extended [*Robins*] to the Internet generally"], *aff'd and remanded* (9th Cir. 2019)

2  938 F.3d 985.)  However the courts of this state ultimately view that analogy with regard to a

3  dominant, widely-used site like the core YouTube service, the analogy falls apart completely on

4  the facts alleged here.  "Restricted Mode" and YouTube's advertising service are new, inherently

5  selective platforms that do not resemble a traditional public forum.  As discussed below, even

6  more than the core YouTube service, these platforms necessarily reflect the exercise of editorial

7  discretion rather than serving as an open "town square."

8      Finally, Prager contends that cases that have deemed web sites to be "public forums" for

9  purposes of California's "anti-SLAPP" statute require this Court to extend *Robins* to its claim.

10  However, the anti-SLAPP statute encompasses speech "***in a place open to the public or*** a public

11  forum in connection with an issue of public interest" (Code Civ. Proc., § 425.16, subd. (e)(3),

12  emphasis added), and has been applied to locations that clearly do not meet the standard

13  described in *Golden Gateway Center*.  (See, e.g., *Seelig v. Infinity Broadcasting Corp.* (2002) 97

14  Cal.App.4th 798, 807 [anti-SLAPP statute applied to comments made during on-air discussion

15  on talk radio].)  "[T]he protections afforded by the anti-SLAPP statute are not coextensive with

16  the categories of conduct or speech protected by the First Amendment or its California

17  counterparts (Cal. Const., art. I, §§ 2–4)." (*Industrial Waste & Debris Box Service, Inc. v.*

18  *Murphy* (2016) 4 Cal.App.5th 1135, 1152.)  "As our high court recently reaffirmed, 'courts

19  determining whether conduct is protected under the anti-SLAPP statute look not to First

20  Amendment law, but to the statutory definitions in section 425.16, subdivision (e).' " (*Ibid.*,

21  quoting *City of Montebello v. Vasquez* (2016) 1 Cal.5th 409, 422.)

22      Defendants' demurrer to the first cause of action will accordingly be sustained without

23  leave to amend.  In addition to failing to state a claim under *Robins v. Pruneyard*, this cause of

24  action is barred by section 230 of the CDA for the reasons discussed below.  (See *In re*

25  *Garcia* (2014) 58 Cal.4th 440, 452 [supremacy clause of the federal Constitution requires that

26  any conflicting state law give way to federal statute], citing U.S. Const., art. VI, cl. 2 ["This

27  Constitution, and the laws of the United States which shall be made in pursuance thereof ... shall

28

be the supreme law of the land; and the judges in every state shall be bound thereby, any thing in the Constitution or laws of any state to the contrary notwithstanding"].)

B. CDA Immunity

Section 230(c)(1) of the CDA provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." "§ 230 precludes courts from entertaining claims that would place a computer service provider in a publisher's role.  Thus, lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content—are barred." (*Hassell v. Bird* (2018) 5 Cal.5th 522, 536, quoting *Zeran v. America Online, Inc.* (4th Cir. 1997) 129 F.3d 327, 330.)

"The CDA—of which section 230 is a part—was enacted in 1996." (*Delfino v. Agilent Technologies, Inc.* (2006) 145 Cal.App.4th 790, 802.)  "Its 'primary goal ... was to control the exposure of minors to indecent material' over the Internet." (*Ibid.*, quoting *Batzel v. Smith* (9th Cir. 2003) 333 F.3d 1018, 1026, superseded by statute on another point as stated in *Breazeale v. Victim Services, Inc.* (9th Cir. 2017) 878 F.3d 759, 766.)  "Thus, an 'important purpose of [the CDA] was to encourage [Internet] service providers to self-regulate the dissemination of offensive materials over their services.' " (*Ibid.*, quoting *Zeran v. America Online, Inc., supra*, 129 F.3d at p. 331.)  Section 230(c)(2) consequently immunizes service providers[2]  who endeavor to restrict access to material deemed objectionable, providing that

> [n]o provider or user of an interactive computer service shall be held liable on account of--
>
> **(A)** any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or
>
> **(B)** any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in

---

[2] There is no dispute that defendants are providers of "an interactive computer service" under section 230.

paragraph (1).[3]

(47 U.S.C. § 230(c)(2).)

A second, but related, objective of the CDA "was to avoid the chilling effect upon Internet free speech that would be occasioned by the imposition of tort liability upon companies that do not create potentially harmful messages but are simply intermediaries for their delivery." (*Delfino v. Agilent Technologies, Inc., supra,* 145 Cal.App.4th at pp. 802-803.) The legislative history reflects that Congress was responding to a New York trial court case where "a service provider was held liable for defamatory comments posted on one of its bulletin boards, based on a finding that the provider had adopted the role of 'publisher' by actively screening and editing postings." (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 44.) " 'Fearing that the specter of liability would ... deter service providers from blocking and screening offensive material,' " Congress forbid " 'the imposition of publisher liability on a service provider for the exercise of its editorial and self-regulatory functions.' " (*Id.,* quoting *Zeran v. America Online, Inc., supra,* 129 F.3d at p. 331.) Thus, section 230(c)(1) " 'confer[s] broad immunity on Internet intermediaries' " in " 'a strong demonstration of legislative commitment to the value of maintaining a free market for online expression.' " (*Hassell v. Bird, supra,* 5 Cal.5th at p. 539, quoting *Barrett v. Rosenthal, supra,* 40 Cal.4th at p. 56.)

Of the two provisions, section 230(c)(1) has been applied more frequently and broadly, including by courts in the Northern District of California to conduct indistinguishable from that alleged in this action. Notably, in *Sikhs for Justice "SFJ", Inc. v. Facebook, Inc.* (N.D. Cal. 2015) 144 F.Supp.3d 1088, 1090, *aff'd sub nom. Sikhs for Justice, Inc. v. Facebook, Inc.* (9th Cir. 2017) 697 Fed.App'x. 526, a human rights organization alleged that Facebook blocked access to its page in India "on its own or on the behest of the Government of India," because of discrimination on the grounds of race, religion, ancestry, and national origin. Quoting *Barnes v. Yahoo!, Inc.* (9th Cir. 2009) 570 F.3d 1096 and *Fair Housing Council of San Fernando Valley v. Roommates.Com, LLC* (9th Cir. 2008) 521 F.3d 1157, the court reasoned that

---

[3] It is widely agreed that section 230(c)(2)(B)'s reference to "paragraph (1)" is an error, and the provision should be interpreted to refer to section 230(c)(2)(A) or "paragraph (A)." (See, e.g., *Enigma Software Group USA, LLC v. Malwarebytes, Inc.* (9th Cir. 2019) 938 F.3d 1026, 1031, fn. 1.)

[p]ublication involves reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content. Thus, a publisher decides whether to publish material submitted for publication. It is immaterial whether this decision comes in the form of deciding what to publish in the first place or what to remove among the published material. ***In other words, any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230.***

(*Sikhs for Justice "SFJ", Inc. v. Facebook, Inc., supra,* 144 F.Supp.3d at p. 1094, emphasis added, internal citations and quotations omitted.) This approach has been endorsed by the Ninth Circuit. (See *Riggs v. MySpace, Inc.* (9th Cir. 2011) 444 Fed.App'x. 986, 987 [district court properly dismissed claims "arising from MySpace's decisions to delete Riggs's user profiles on its social networking website yet not delete other profiles Riggs alleged were created by celebrity imposters," citing *Fair Housing Council of San Fernando Valley v. Roommates.Com, LLC, supra,* 521 F.3d at pp. 1170-1171 for the proposition that "any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230"].) California opinions have similarly reasoned that the "type of activity" at issue here—"to restrict or make available certain material"—"is expressly covered by section 230." (*Doe II v. MySpace Inc.* (2009) 175 Cal.App.4th 561, 572-573 [describing "the general consensus to interpret section 230 immunity broadly, extending from *Zeran* …"]; see also *Hassell v. Bird, supra,* 5 Cal.5th at p. 537 [California "courts have followed *Zeran* in adopting a broad view of section 230's immunity provisions"].) This interpretation was recently applied again by the Northern District in *Federal Agency of News LLC v. Facebook, Inc.* (N.D. Cal., July 20, 2019, No. 18-CV-07041-LHK) --- F.Sup.3d ---, 2019 WL 3254208, where it was held that section 230(c)(1) immunized Facebook from claims arising from its removal of a Russian company's account and page due to its alleged control by an entity found to have interfered in the 2016 United States presidential election.[4]

---

[4] See also *Langdon v. Google, Inc.* (D. Del. 2007) 474 F.Supp.2d 622, 630-631 (applying immunity under section 230(c)(1) and/or (2) where plaintiff alleged defendants refused to display ads on his web pages criticizing the North Carolina and Chinese governments based on political viewpoint discrimination); *Levitt v. Yelp! Inc.* (N.D. Cal., Oct. 26, 2011, No. C-10-1321 EMC) 2011 WL 5079526, at *7-9, *aff'd* (9th Cir. 2014) 765 F.3d 1123 (section 230(c)(1) immunity applied to allegations that Yelp manipulated plaintiffs' user reviews in order to induce them to pay for

Consistent with the language of section 230(c)(1), these cases do not question the service provider's motive in deciding to remove content from its service. While Prager contends that section 230(c)(1) immunity should not be applied where a plaintiff alleges a service provider acted in bad faith or to stifle competition, it cites no persuasive authority adopting this interpretation.[5]

Courts have expressed greater concern with the issue of motive when interpreting section 230(c)(2), perhaps because paragraph (A) of that provision expressly includes a "good faith" requirement. Here, defendants rely on paragraph (B) of that provision, which they urge—like section 230(c)(1)—does not require good faith. In *Zango, Inc. v. Kaspersky Lab, Inc.* (9th Cir. 2009) 568 F.3d 1169, 1176-1177, the Ninth Circuit applied section 230(c)(2)(B) to a provider of Internet security software that deemed the plaintiff's software to be "malware," noting that the plaintiff had waived the issue of "whether subparagraph (B), which has no good faith language,

---

advertising); *Lancaster v. Alphabet Inc.* (N.D. Cal., July 8, 2016, No. 15-CV-05299-HSG) 2016 WL 3648608, at *2-3 ("§ 230[(c)(1) of the CDA prohibits any claim arising from Defendants' removal of Plaintiffs' videos"); *Green v. YouTube, LLC* (D.N.H., Mar. 13, 2019, No. 18-CV-203-PB) 2019 WL 1428890, at *6, *report and recommendation adopted sub nom. Green v. YouTube, Inc.* (D.N.H., Mar. 29, 2019, No. 18-CV-203-PB) 2019 WL 1428311 (applying immunity under section 230(c)(1) where plaintiff alleged his accounts were improperly shut down); *Brittain v. Twitter, Inc.* (N.D. Cal., June 10, 2019, No. 19-CV-00114-YGR) 2019 WL 2423375, at *3 (section 230(c)(1) immunity applied where plaintiff alleged improper suspension of his Twitter accounts and that Twitter "limit[ed] users who reference new/competing networks and/or utilize Third Party API services"); *King v. Facebook, Inc.* (N.D. Cal., Sept. 5, 2019, No. 19-CV-01987-WHO) 2019 WL 4221768 (section 230(c)(1) immunity applied to theory that "Facebook has violated its (Terms of Service) in removing [plaintiff's] posts and suspending his account, and that Facebook treats black activists and their posts differently than it does other groups, particularly white supremacists and certain 'hate groups' ").

[5] To the extent *e-ventures Worldwide, LLC v. Google, Inc.* (M.D. Fla. 2016) 188 F.Supp.3d 1265 adopts Prager's view, it does so by conflating section 230(c)(1) and section 230(c)(2) with no analysis. The Court does not find this persuasive. While a subsequent, unpublished opinion in that action, *e-ventures Worldwide, LLC v. Google, Inc.* (M.D. Fla., Feb. 8, 2017, No. 214CV646FTMPAMCM) 2017 WL 2210029, *3-4 reasoned that applying section 230(c)(1) to service providers' editorial decisions regarding a plaintiff's own content would swallow "the more specific immunity in (c)(2)" with its good faith requirement, the opinion went on to grant summary judgment based on the First Amendment's protection of editorial judgments, "no matter the motive." This case does not persuade the Court to part ways with the courts that apply section 230(c)(1) to the same end based on the same reasoning.

Similarly, *Levitt v. Yelp! Inc.* (N.D. Cal., Mar. 22, 2011, No. C 10-1321 MHP) 2011 WL 13153230, at *9 deemed it "a[] close[] question … whether Yelp may be held liable for its removal of positive reviews for the alleged purpose of coercing businesses to purchase advertising," considering that this theory implicated bad faith. The court ultimately did not resolve the issue as it found the complaint otherwise failed to state a cause of action. A subsequent opinion in that case, *Levitt v. Yelp! Inc.* (N.D. Cal., Oct. 26, 2011, No. C-10-1321 EMC) 2011 WL 5079526, *9 held that section 230(c)(1) does not include a good faith requirement, and applied "even assuming Plaintiffs have adequately pled allegations stating a claim of an extortionate threat with respect to Yelp's alleged manipulation of user reviews." The Court finds the reasoning of the subsequent opinion more persuasive.

---

should be construed implicitly to have a good faith component like subparagraph (A)." The concurring opinion expressed concern with extending immunity beyond the facts present in that case:

> Congress plainly intended to give computer users the tools to filter the Internet's deluge of material *users* would find objectionable, in part by immunizing the providers of blocking software from liability. *See* § 230(b)(3). But under the generous coverage of § 230(c)(2)(B)'s immunity language, a blocking software provider might abuse that immunity to block content for anticompetitive purposes or merely at its malicious whim, under the cover of considering such material "otherwise objectionable."

(*Zango, Inc. v. Kaspersky Lab, Inc.*, *supra,* 568 F.3d at p. 1178 (conc. opn. of Fisher, J.).) Noting that "[d]istrict courts nationwide have grappled with the issues discussed in *Zango*'s majority and concurring opinions, and have reached differing results," the Ninth Circuit recently held that a service provider's intent may be relevant under section 230(c)(2)(B): specifically, where a plaintiff alleges blocking by a direct competitor for anticompetitive purposes, its claims survive dismissal. (*Enigma Software Group USA, LLC v. Malwarebytes, Inc.* (9th Cir. 2019) 938 F.3d 1026.)

 Here, defendants' creation of a "Restricted Mode" to allow sensitive users to voluntarily choose a more limited experience of the YouTube service is exactly the type of self-regulation that Congress sought to encourage in enacting section 230, and fits within section 230(c)(2)(B)'s immunity for "any action taken to enable or make available to … others," namely, YouTube users, "the technical means to restrict access to" material "that the provider or user considers to be obscene, … excessively violent, … or otherwise objectionable." Rather than unilaterally restricting access to material on its core platform as contemplated by section 230(c)(2)(A)— which contains a "good faith" requirement—defendants allow users to voluntarily restrict access to material that defendants deem objectionable for the stated reason that, like the categories of material enumerated by the statute, it may be inappropriate for young or sensitive viewers.[6] The

---

[6] Consistent with these circumstances, a page discussing options for administrators employing "Restricted Mode," which was submitted by Prager in connection with its motion for preliminary injunction, indicates that "[a]dministrators and designated approvers can now whitelist entire channels," in addition to individual videos, to ensure a channel is "watchable by your users." (Declaration of Peter Obstler, Ex. L.) Thus, it appears that users can

1  Court views this as a critical difference between the two provisions and disagrees with the

2  majority in *Enigma*,[7] who ignore the plain language of the statute by reading a good faith

3  limitation into section 230(c)(2)(B). (See *Enigma Software Group USA, LLC v. Malwarebytes,*

4  *Inc., supra,* 938 F.3d at p. 1040 (dis. opn. of Rawlinson, J.) ["The majority's policy arguments

5  are in conflict with our recognition in *Zango* that the broad language of the Act is consistent with

6  'the Congressional goals for immunity' as expressed in the language of the statute. [Citation.]

7  As the district court cogently noted, we 'must presume that a legislature says in a statute what it

8  means and means in a statute what it says there.' "].)

9      Finding CDA immunity here is also consistent with cases that apply it in

10  indistinguishable circumstances based on section 230(c)(1), and with their reasoning, which

11  recognizes that challenges to a service provider's editorial discretion "treat[]" the provider "as a

12  publisher." (See *Sikhs for Justice "SFJ", Inc. v. Facebook, Inc., supra,* 144 F.Supp.3d 1088

13  [applying section 230(c)(1) to claim under Title II of the Civil Rights Act of 1964]; *Federal*

14  *Agency of News LLC v. Facebook, Inc., supra,* 2019 WL 3254208 [applying section 230(c)(1) to

15  claims under Title II of the Civil Rights Act of 1964, the Unruh Act, and for breach of the

16  implied covenant of good faith and fair dealing].) The Court finds that immunity under section

17  230(c)(1) also applies here, to the allegations involving both "Restricted Mode" and defendants'

18  advertising service.

19      While the Court understands Prager's argument that all three provisions of section 230

20  should have a good faith requirement, this argument is contrary to the plain language of the

21  statute. (See *Hassell v. Bird, supra,* 5 Cal.5th at p. 540 [noting that *Barrett v. Rosenthal, supra,*

22  40 Cal.4th 33 voiced "qualms" that *Zeran*'s interpretation of section 230 provides blanket

23  immunity for those who intentionally redistribute defamatory statements, but held "these

24  concerns were of no legal consequence" where principles of statutory interpretation compelled a

25

26  specifically override defendants' decisions to disable certain videos or channels in "Restricted Mode," confirming

27  that "Restricted Mode" is a tool made available to users rather than a unilateral ban.

28  [7] See *People v. Williams* (1997) 16 Cal.4th 153, 190 ("Decisions of lower federal courts interpreting federal law are not binding on state courts."); *Elliott v. Albright* (1989) 209 Cal.App.3d 1028, 1034 (although at times entitled to great weight, the decisions of the lower federal courts on federal questions are merely persuasive).

broad construction].)  And while it is not this Court's role to judge the wisdom of the policy embodied by section 230, there are good reasons to support it.  As the court in *Levitt v. Yelp! Inc.* (N.D. Cal., Oct. 26, 2011, No. C-10-1321 EMC) 2011 WL 5079526 reasoned,

> traditional editorial functions often include subjective judgments informed by political and financial considerations. [Citation.]  Determining what motives are permissible and what are not could prove problematic. Indeed, from a policy perspective, permitting litigation and scrutin[izing] motive could result in the "death by ten thousand duck-bites" against which the Ninth Circuit cautioned in interpreting § 230(c)(1). [(*Fair Housing Council of San Fernando Valley v. Roommates.Com, LLC, supra,* 521 F.3d at p. 1174.)]

> One of Congres[s]'s purposes in enacting § 230(c) was to avoid the chilling effect of imposing liability on providers by both safeguarding the "diversity of political discourse ... and myriad avenues for intellectual activity" on the one hand, and "remov[ing] disincentives for the development and utilization of blocking and filtering technologies" on the other hand. §§ 230(a), (b); *see also* S.Rep. No. 104–230, at 86 (1996) (Conf.Rep.), *available at* 1996 WL 54191, at *[194] (describing purpose of section 230 to protect providers from liability "for actions to restrict or to enable restrict[ion] of access to objectionable online material"). For that reason, "[C]lose cases ... must be resolved in favor of immunity, lest we cut the heart out of section 230 ...." [(*Fair Housing Council of San Fernando Valley v. Roommates.Com, LLC, supra,* 521 F.3d at p. 1174.)]

> As illustrated by the case at bar, finding a bad faith exception to immunity under § 230(c)(1) could force Yelp to defend its editorial decisions in the future on a case by case basis and reveal how it decides what to publish and what not to publish. Such exposure could lead Yelp to resist filtering out false/unreliable reviews (as someone could claim an improper motive for its decision), or to immediately remove all negative reviews about which businesses complained (as failure to do so could expose Yelp to a business's claim that Yelp was strong-arming the business for advertising money). The Ninth Circuit has made it clear that the need to defend against a proliferation of lawsuits, regardless of whether the provider ultimately prevails, undermines the purpose of section 230.

(*Levitt v. Yelp! Inc., supra,* 2011 WL 5079526, at *8-9.)  In the Court's view, these concerns are particularly salient here, where the challenged services are by definition more curated than defendants' core service and could not exist without more robust screening by defendants.

In opposition to defendants' demurrer, Prager cites a number of cases that affirm the principle applied in *Fair Housing Council of San Fernando Valley v. Roommates.Com, LLC, supra,* 521 F.3d 1157, which held that a service provider is not entitled to CDA immunity with

regard to content it develops itself. However, this principle is inapposite here. Prager does not allege that defendants developed any of Prager's content or appended any commentary to it—to the contrary, they allege the content became completely invisible in "Restricted Mode" or was simply demonetized. Applying CDA immunity under these circumstances does not conflict with *Roommates.* (See *Fair Housing Council of San Fernando Valley v. Roommates.Com, LLC, supra,* 521 F.3d at p. 1163 [in enacting CDA immunity, "Congress sought to immunize the *removal* of user-generated content, not the *creation* of content"].)[8]

Finally, Prager contends that applying CDA immunity here would constitute an unlawful prior restraint on its speech in violation of the First Amendment. However, a federal court has already held that defendants' conduct does not violate the First Amendment, and this Court agrees with that analysis for the reasons discussed in connection with its analysis of Prager's claim under the California Constitution. Moreover, Prager does not allege that defendants prevented it from engaging in speech, even on their own platform—again, it contends that certain videos were excluded from "Restricted Mode" and/or were demonetized.

The Court consequently finds that section 230(c)(2)(B) bars Prager's claims related to "Restricted Mode" and section 230(c)(1) bars all of its claims, with the possible exception of those based on its own promises and representations, which are discussed below.[9]

### C.  Breach of the Implied Covenant of Good Faith and Fair Dealing and Fraud Under the UCL

Finally, Prager correctly urges that some California authority holds section 230(c)(1) of the CDA does not apply to claims based on a defendant's own promises and representations to a plaintiff, rather than its role as a publisher. (See *Demetriades v. Yelp, Inc.* (2014) 228 Cal.App.4th 294, 313 [this immunity does not apply where "plaintiff seeks to hold Yelp liable for its own statements regarding the accuracy of its filter"]; but see *Hassell v. Bird, supra,* 5 Cal.5th at p. 542 [disapproving of "creative pleading" in an attempt to avoid section 230

---

[8] Although it does not bring a claim for defamation, Prager appears to suggest that defendants have defamed it by removing its content from "Restricted Mode" or demonetizing it. Such a claim would likely be foreclosed by the ruling in *Bartholomew v. YouTube, LLC.* (2017) 17 Cal.App.5th 1217, 1234.

[9] The Court thus does not address defendants' argument that Prager's claims are barred by the First Amendment.

---

immunity].)  This authority does not apply to the Court's finding of immunity under section 230(c)(2)(B).  In any event, Prager's claims asserting this type of theory—namely, its claim for breach of the implied covenant of good faith and fair dealing and its claim under the fraud prong of the UCL—do not state a cause of action.

Prager does not and cannot state a claim for breach of the implied covenant of good faith and fair dealing in light of the express provisions of YouTube's Terms of Service, which provide that "YouTube reserves the right to remove Content without prior notice" and which also allow YouTube to "discontinue any aspect of the Service at any time." (See Declaration of Brian Willen, Ex. 1; *Song fi Inc. v. Google, Inc.* (N.D. Cal. 2015) 108 F.Supp.3d 876, 885 [plaintiff could not state a claim for violation of the covenant of good faith and fair dealing based on content removal in light of YouTube's Terms of Service].)  Similarly, YouTube's AdSense Terms of Service reserve the right "to refuse or limit your access to the Services." (Declaration of Brian Willen, Ex. 8; see *Sweet v. Google Inc.* (N.D. Cal., Mar. 7, 2018, No. 17-CV-03953-EMC) 2018 WL 1184777, at *9-10 [plaintiff could not state a claim for violation of the covenant of good faith and fair dealing based on demonitization in light of similar reservation of rights in YouTube's Partner Program Terms].)  "[C]ourts are not at liberty to imply a covenant directly at odds with a contract's express grant of discretionary power except in those relatively rare instances when reading the provision literally would, contrary to the parties' clear intention, result in an unenforceable, illusory agreement." (*Third Story Music, Inc. v. Waits* (1995) 41 Cal.App.4th 798, 808.)  That is not the case here, and Prager does not contend that it is. (See *Sweet v. Google Inc., supra,* 2018 WL 1184777, at *9-10 [applying *Third Story*].)

As to the UCL fraud claim, to the extent it is based on the "four essential freedoms" set forth above and similar statements, these statements are non-actionable puffery. (See *Demetriades v. Yelp, Inc., supra,* 228 Cal.App.4th at p. 311 [" 'a statement that is quantifiable, that makes a claim as to the "specific or absolute characteristics of a product," may be an actionable statement of fact while a general, subjective claim about a product is non-actionable puffery,' " quoting *Newcal Industries, Inc. v. Ikon Office Solution* (9th Cir.2008) 513 F.3d 1038, 1053]; *Prager University v. Google LLC, supra,* 2018 WL 1471939, at *11 ["None of the

statements about YouTube's viewpoint neutrality identified by Plaintiff resembles the kinds of 'quantifiable' statements about the 'specific or absolute characteristics of a product' that are actionable under the Lanham Act."].)

Prager also alleges that defendants represented that "the 'same standards apply equally to all' when it comes to the content regulation on YouTube." (FAC, ¶ 85; see also *id.* at ¶ 13.) While this statement is arguably more than mere puffing (see *Demetriades v. Yelp, Inc., supra,* 228 Cal.App.4th at p. 311-312), Prager does not allege that it suffered a loss of money or property as a result of its reliance on this statement. "There are innumerable ways in which economic injury from unfair competition may be shown," including where a plaintiff "ha[s] a present or future property interest diminished." (*Kwikset Corp. v. Superior Court (Benson)* (2011) 51 Cal.4th 310, 323; see also *Alborzian v. JPMorgan Chase Bank, N.A.* (2015) 235 Cal.App.4th 29, 38 [UCL "unlawful" plaintiffs established standing by alleging diminished credit score caused by defendant's false negative reporting to credit agencies, even where they never made payments on the loan at issue].) The "lost income, reduced viewership, and damage to brand, reputation, and goodwill" that Prager alleges (FAC, ¶ 157) would certainly satisfy this requirement if there were a causal connection between Prager's alleged reliance on defendants' statement in participating in the YouTube service and these harms. However, these injuries cannot have resulted from Prager's decision to use YouTube: they could only have been caused by YouTube's later decisions to restrict and/or demonetize Prager's content. (See *Prager University v. Google LLC, supra,* 2018 WL 1471939, at *11-12 ["Plaintiff has not sufficiently alleged that it 'has been or is likely to be injured as the result of the' statements about YouTube's viewpoint neutrality. [Citation.] As discussed above, any harm that Plaintiff suffered was caused by Defendants' decisions to limit access to some of Plaintiff's videos."].) These later decisions by YouTube could not have been relied on by Prager. (See *id.* at *11 ["Although Plaintiff asserts that it has suffered injury in the form of 'lower viewership, decreased ad revenue, a reduction in advertisers willing to purchase advertisements shown on Plaintiff's videos, diverted viewership, and damage to its brand, reputation and goodwill,' ... nothing in Plaintiff's complaint suggests that this harm flowed directly from Defendants' publication of

their policies and guidelines. Instead, any harm that Plaintiff suffered was caused by Defendants' decisions to limit access to some of Plaintiff's videos ...."].) Moreover, recognizing this theory would appear to conflict with principles of defamation law as recently discussed in *Bartholomew v. YouTube, LLC.* (2017) 17 Cal.App.5th 1217.

Prager thus fails to state a cause of action based on the implied covenant of good faith and fair dealing or the fraud prong of the UCL.

D. Conclusion and Order

For all these reasons, the demurrer to the first through fourth causes of action is SUSTAINED WITHOUT LEAVE TO AMEND.

III. Motion for Preliminary Injunction

As discussed above, Prager has not shown a reasonable probability of success on the merits in this action. Its motion for a preliminary injunction is consequently DENIED. (See *San Francisco Newspaper Printing Co. v. Superior Court (Miller)* (1985) 170 Cal.App.3d 438, 442.)

IT IS SO ORDERED.

Dated: **Nov. 19, 2019**

_____
Honorable Brian C. Walsh
Judge of the Superior Court

# <u>Exhibit "C"</u>

1  JOSEPH H. HUNT
       Assistant Attorney General
2  ERIC WOMACK
       Assistant Branch Director
3  INDRANEEL SUR
       indraneel.sur@usdoj.gov
4      D.C. Bar No. 978017
       Trial Attorney
5      Civil Division, Federal Programs Branch
       P.O. Box 883
6      Washington, D.C.  20044
       Telephone:  (202) 616-8488
7      Facsimile:  (202) 616-8470

8  Counsel for the United States of America

9

10              **UNITED STATES DISTRICT COURT**
           **NORTHERN DISTRICT OF CALIFORNIA**
11                   **SAN JOSE DIVISION**

12

13  DIVINO GROUP LLC, a California limited
    liability company, CHRIS KNIGHT, an          Case No. 5:19-cv-004749-VKD
    individual, CELSO DULAY, an individual,
14  CAMERON STIEHL, an individual,               **UNITED STATES OF AMERICA'S**
    BRIAANDCHRISSY LLC, a Georgia limited        **NOTICE OF INTERVENTION**
15  liability company, BRIA KAM, an individual,  **TO DEFEND THE**
    CHRISSY CHAMBERS, an individual, CHASE       **CONSTITTUTIONALITY OF**
16  ROSS, an individual, BRETT SOMERS, an        **47 U.S.C. § 230(c)**
    individual, and LINDSAY AMER, an individual,
17  STEPHANIE FROSCH, an individual, SAL
    CINEQUEMANI, an individual, TAMARA
18  JOHNSON, an individual, and GREG
    SCARNICI, an individual,
19
20              Plaintiffs,                       Action Filed: August 13, 2019
                                                  Trial Date: None Set
21         vs.                                    Rule 5.1 Notice Filed: December 20, 2019

22  GOOGLE LLC, a Delaware limited liability
    company, YOUTUBE, LLC, a Delaware
23  limited liability company, and DOES 1-25,

24              Defendants.

25

26

27

28

Under Federal Rules of Civil Procedure 5.1(c) and 24(a)(1), and in accordance with the authorization of the Solicitor General of the United States, the United States hereby intervenes in this action for the limited purpose of defending the constitutionality of Section 230(c) of the Communications Decency Act of 1996 ("CDA") (Pub. L. No. 104-104, § 509, codified at 47 U.S.C. § 230(c)).

On December 20, 2019, Plaintiffs filed a notice of constitutional challenge regarding 47 U.S.C. § 230(c) (Doc. 21).  In that Notice, Plaintiffs stated that their pleadings allege that "Section 230(c) does not, and cannot, apply in this case, under the plain language of the statute or under the Constitution, to prevent the Plaintiffs from seeking legal redress for harms and injuries caused by Defendants' discrimination against them and other similarly situated Plaintiffs and users of YouTube." *Id.* at 3.  Moreover, in opposition to the motion to dismiss the operative complaint filed by Defendants (Doc. 25), Plaintiffs in their brief filed February 24, 2020 made certain contentions regarding the constitutionality of 47 U.S.C. § 230(c) (Doc. 28).  The Court has not yet certified a constitutional question under Rule 5.1(b) and 28 U.S.C. § 2403.

The United States is entitled to intervene in this action under the Federal Rules of Civil Procedure and by statute.  Rule 5.1(c) permits the Attorney General to intervene in an action where, as here, the constitutionality of a federal statute is challenged.  *See* Fed. R. Civ. P. 5.1(c).  Rule 24 further permits a non-party to intervene when the non-party "is given an unconditional right to intervene by a federal statute." Fed. R. Civ. P. 24(a)(1).  The United States has an unconditional statutory right to intervene "[i]n any action . . . wherein the constitutionality of any Act of Congress affecting the public interest is drawn in question . . . ." 28 U.S.C. § 2403(a).  In such an action, "the court . . . shall permit the United States to intervene . . . for argument on the question of constitutionality." *Id.*  Here, Plaintiffs have "drawn in question" the constitutionality of 47 U.S.C. § 230(c), and the United States has an unconditional right to intervene to defend the statute.

The United States will immediately hereafter file its memorandum in defense of the constitutionality of 47 U.S.C. § 230(c).  The United States' intervention, including its filing

UNITED STATES' NOTICE OF INTERVENTION
Case No. 5:19-cv-004749-VKD

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**P.O. Box 883**
**Washington, D.C. 20044**
**Tel: (202) 616-8488**

of a memorandum in support of the constitutionality of 47 U.S.C. § 230(c), will not interfere with the timely adjudication of this action.  This notification is also timely.  By this Court's order of April 23, 2020, the United States' deadline for intervention is today.  Doc. 44.

Accordingly, the United States hereby provides notice of intervention in this action for the purpose of defending the constitutionality of 47 U.S.C. § 230(c).

DATED:  May 8, 2020

Respectfully submitted,
JOSEPH H. HUNT
Assistant Attorney General

ERIC WOMACK
Assistant Branch Director

INDRANEEL SUR
Trial Attorney

By:  */s/ Indraneel Sur*
    INDRANEEL SUR

U.S. Department of Justice
Counsel for the United States of America

UNITED STATES' NOTICE OF INTERVENTION
Case No. 5:19-cv-004749-VKD

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, D.C. 20044
Tel: (202) 616-8488

1    JOSEPH H. HUNT
          Assistant Attorney General
2    ERIC WOMACK
          Assistant Branch Director
3    INDRANEEL SUR
          indraneel.sur@usdoj.gov
4         D.C. Bar No. 978017
          Trial Attorney
5         Civil Division, Federal Programs Branch
          1100 L Street, NW
6         Washington, D.C.  20530
          Telephone:  (202) 616-8488
7         Facsimile:  (202) 616-8470

8    Counsel for the United States of America

9

10                  UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF CALIFORNIA
11                        SAN JOSE DIVISION

12

13   DIVINO GROUP LLC, a California limited        Case No. 5:19-cv-004749-VKD
     liability company, CHRIS KNIGHT, an
14   individual, CELSO DULAY, an individual,       **MEMORANDUM OF LAW FOR**
     CAMERON STIEHL, an individual,                **INTERVENOR UNITED STATES**
15   BRIAANDCHRISSY LLC, a Georgia limited         **IN SUPPORT OF THE**
     liability company, BRIA KAM, an individual,   **CONSTITUTIONALITY OF**
16   CHRISSY CHAMBERS, an individual, CHASE        **47 U.S.C. § 230(C)**
     ROSS, an individual, BRETT SOMERS, an
17   individual, and LINDSAY AMER, an individual,
     STEPHANIE FROSCH, an individual, SAL
18   CINEQUEMANI, an individual, TAMARA
     JOHNSON, an individual, and GREG
19   SCARNICI, an individual,

20              Plaintiffs,                         Action Filed: August 13, 2019
                                                    Trial Date: None Set
21        vs.                                       Rule 5.1 Notice Filed: December 20, 2019

22   GOOGLE LLC, a Delaware limited liability
     company, YOUTUBE, LLC, a Delaware
23   limited liability company, and DOES 1-25,

24              Defendants.

25

26

27

28

UNITED STATES'S MEMORANDUM OF LAW IN SUPPORT OF
CONSTITUTIONALITY OF 47 U.S.C. § 230(C)
Case No. 5:19-cv-004749-VKD

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**1100 L Street, NW**
**Washington, DC 20530**
**Tel: (202) 616-8488**

1

## TABLE OF CONTENTS

2      INTRODUCTION.................................................................................................1

3      STATEMENT .....................................................................................................2

4
       I.    Statutory Background ...........................................................................2
5
       II.   Proceedings In Plaintiffs' Case............................................................4
6

7      ARGUMENT ......................................................................................................7

8
       I.    The Court Should First Decide The Potentially Dispositive Statutory
9            Issues Because They May Obviate The Need To Address Plaintiffs'
10           Constitutional Challenge ......................................................................7

11     II.   If The Court Reaches the Question, It Should Conclude That
             Section 230(c) Is Constitutional...........................................................8
12

13     CONCLUSION....................................................................................................12

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>TABLE OF AUTHORITIES</u>

2

**CASES**

3
4

*Ashcroft v. Free Speech Coalition,*
   535 U.S. 234 (2002) ....................................................................................................8

5
6

*Ashwander v. TVA,*
   297 U.S. 288 (1936) ....................................................................................................7

7
8

*Barnes v. Yahoo!, Inc.,*
   570 F.3d 1096 (9th Cir. 2009)......................................................................................4

9
10

*Borough of Duryea v. Guarnieri,*
   564 U.S. 379 (2011) ............................................................................................. 10, 11

11
12

*Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.,*
   473 U.S. 788 (1985) ....................................................................................................9

13

*Delfino v. Agilent Techs., Inc.,*
   145 Cal. App. 4th 790, 52 Cal. Rptr. 3d 376 (Cal. Ct. App. 2006) ..........................4

14
15

*Dep't of Commerce v. U.S. House of Representatives,*
   525 U.S. 316 (1999) ....................................................................................................7

16
17

*Doe v. Internet Brands, Inc.,*
   824 F.3d 846 (9th Cir. 2016)........................................................................................4

18
19

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC,*
   521 F.3d 1157 (9th Cir. 2008)..............................................................................2, 3, 4

20
21

*Fields v. Legacy Health Sys.,*
   413 F.3d 943 (9th Cir. 2005)......................................................................................11

22
23

*Ileto v. Glock, Inc.,*
   565 F.3d 1126 (9th Cir. 2009)....................................................................................11

24
25

*Logan v. Zimmerman Brush Co.,*
   455 U.S. 422 (1982) ..................................................................................................11

26
27

*Manhattan Cmty. Access Corp. v. Halleck,*
   139 S. Ct. 1921 (2019)................................................................................................9

28

UNITED STATES'S MEMORANDUM OF LAW IN SUPPORT OF
CONSTITUTIONALITY OF 47 U.S.C. § 230(C) - ii -
Case No. 5:19-cv-004749-VKD

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**1100 L Street, NW**
**Washington, DC 20530**
**Tel: (202) 616-8488**

*N.Y.C. Transit Auth. v. Beazer,*
  440 U.S. 568 (1979) ...................................................................................................... 8

*Orin v. Barclay,*
  272 F.3d 1207 (9th Cir. 2001) .................................................................................... 12

*Prager University v. Google LLC,*
  951 F.3d 991 (9th Cir. 2020) .............................................................................*passim*

*Sikhs for Justice, Inc. v. Facebook, Inc.,*
  697 F. App'x 526 (9th Cir. 2017) ................................................................................ 2

*Sikhs for Justice "SFJ", Inc. v. Facebook, Inc.,*
  144 F. Supp. 3d 1088 (N.D. Cal. 2015) ...................................................................... 2

*Spector Motor Serv. v. McLaughlin,*
  323 U.S. 101 (1944) ...................................................................................................... 7

*Stratton Oakmont, Inc. v. Prodigy Servs. Co.,*
  No. 31063/94, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995) ............................... 3

*Sure-Tan, Inc. v. NLRB,*
  467 U.S. 883 (1984) .................................................................................................... 10

*Zango, Inc. v. Kaspersky Lab, Inc.,*
  568 F.3d 1169 (9th Cir. 2009) ..................................................................................... 3

*Zeran v. Am. Online, Inc.,*
  129 F.3d 327 (4th Cir. 1997) ....................................................................................... 4

**STATUTES**

15 U.S.C. § 1125 *et seq.* ...................................................................................................6, 7

28 U.S.C. § 2403 ...................................................................................................................... 6

42 U.S.C. § 1983 ...................................................................................................................... 6

47 U.S.C. § 230 ..............................................................................................................*passim*

Communications Decency Act of 1996 ("CDA"),
  Pub. L. No. 104-104, 110 Stat 56 (codified at 47 U.S.C. § 230) ............................. 1

UNITED STATES'S MEMORANDUM OF LAW IN SUPPORT OF
CONSTITUTIONALITY OF 47 U.S.C. § 230(C) - iii -
Case No. 5:19-cv-004749-VKD

**U.S. DEPARTMENT OF JUSTICE**
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
Tel: (202) 616-8488

## RULES

Fed. R. Civ. P. 5.1 ........................................................................................................ 6

Fed. R. Civ. P. 12 ................................................................................................. *passim*

## OTHER AUTHORITIES

F. Mott, *American Journalism* 55 (3d ed. 1962) ............................................................ 9

H.R. Rep. No. 104-458 (1996) (Conf. Rep.), *as reprinted in* 1996 U.S.C.C.A.N. 10 ................. 3

John E. Nowak, Ronald D. Rotunda & J. Nelson Young,
    *Handbook on Constitutional Law* (1978) ........................................................... 12

UNITED STATES'S MEMORANDUM OF LAW IN SUPPORT OF
CONSTITUTIONALITY OF 47 U.S.C. § 230(C) - iv -
Case No. 5:19-cv-004749-VKD

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**1100 L Street, NW**
**Washington, DC 20530**
**Tel: (202) 616-8488**

## **INTRODUCTION**

Plaintiffs, who are video creators seeking monetary and other recovery based on the alleged editorial decisions of a popular Internet platform, YouTube, have raised a constitutional challenge to Section 230(c) of the Communications Decency Act of 1996 ("CDA") (Pub. L. No. 104-104, § 509, codified at 47 U.S.C. § 230(c)).  When the World Wide Web was in its early days in 1996, Congress sought through Section 230(c) to promote and protect "Good Samaritan" blocking and screening of offensive material by limiting the liability of website owners and operators.  The statute immunizes for certain liability purposes an "interactive computer service" provider from being treated as the publisher or speaker of content created by third parties and hosted by the service (47 U.S.C. § 230(c)(1)), or for removing or restricting access to certain types of offensive material (§ 230(c)(2)).

In seeking Rule 12(b)(6) dismissal of the operative complaint, YouTube has invoked the statute as an affirmative defense to Plaintiffs' claims, and Plaintiffs have responded by arguing, among other things, that the statute violates the First Amendment and the equal protection guarantee of the Fifth Amendment to the extent it shields YouTube from liability for Plaintiffs' claims.  Plaintiffs also seek a declaratory judgement to that effect.

The United States intervenes today in response to Plaintiffs' constitutional challenge, and, in defense of the statute, respectfully limits this brief to two arguments.

*First*, under the doctrine of constitutional avoidance, this Court should start by deciding the statutory arguments presented by the parties regarding the pending Rule 12(b)(6) motion, because those non-constitutional grounds may obviate the need for decision on any constitutional question.  A court should decide a constitutional question only when necessary, which would not be the situation here if the Court were to conclude that statutory grounds suffice to dispose of the case.

*Second*, if the Court concludes that it must reach the constitutional question, Plaintiffs' challenge should be rejected on the merits.  Section 230(c) does not regulate Plaintiffs' primary conduct.  Instead, the statute establishes a rule prohibiting liability for certain conduct by online platforms, including YouTube.  Because the United States is intervening

UNITED STATES'S MEMORANDUM OF LAW IN SUPPORT OF
CONSTITUTIONALITY OF 47 U.S.C. § 230(C) - 1 -
Case No. 5:19-cv-004749-VKD

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**1100 L Street, NW**
**Washington, DC 20530**
**Tel: (202) 616-8488**

for the limited purpose of defending the constitutionality of Section 230(c), it does not take a position on whether the statute forecloses the particular claims Plaintiffs have alleged.  But assuming it does, that would not violate the First Amendment's Speech Clause, because—as the Ninth Circuit squarely held in *Prager University v. Google LLC*, 951 F.3d 991 (9th Cir. 2020)—YouTube is not a state actor capable of denying the freedom of speech.  In other words, Section 230(c) would not deny Plaintiffs any constitutional claim they otherwise would have.  Nor do Plaintiffs' arguments find support in the First Amendment's Petition Clause or in the constitutional guarantee of equal protection.  In short, however Plaintiffs' challenge to Section 230(c) is framed, it is meritless, and should be rejected.

## STATEMENT

### I.  Statutory Background

Section 230(c) of the CDA is entitled "Protection for 'Good Samaritan' blocking and screening of offensive material."   The Ninth Circuit has described the statute as "immuniz[ing] providers of interactive computer services against liability arising from content created by third parties."  *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1163-64 (9th Cir. 2008) (*en banc*) (footnotes omitted).

In particular, Paragraph (1) states:  "No provider . . . of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1).  The statute also provides that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."  *Id.* § 230(e)(3).  The result is to protect online platforms from such liabilities as those the common law imposed on publishers or speakers for libel or slander.  Some courts have also construed the limitation to shield online platforms against certain liabilities under federal law.  *See, e.g.*, *Sikhs for Justice "SFJ", Inc. v. Facebook, Inc.*, 144 F. Supp. 3d 1088, 1096 (N.D. Cal. 2015), *aff'd sub nom. Sikhs for Justice, Inc. v. Facebook, Inc.*, 697 F. App'x 526 (9th Cir. 2017).  The immunity applies only when the interactive computer service provider is not also the "information content provider" of the material in question—

UNITED STATES'S MEMORANDUM OF LAW IN SUPPORT OF
CONSTITUTIONALITY OF 47 U.S.C. § 230(C) - 2 -
Case No. 5:19-cv-004749-VKD

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**1100 L Street, NW**
**Washington, DC 20530**
**Tel: (202) 616-8488**

*i.e.,* the person "responsible, in whole or in part, for the creation or development of" the "offending content." *See Roommates*, 521 F.3d at 1162-63 (quoting § 230(f)(3)).

For its part, Paragraph (2) describes a separate immunity.  It states:

No provider or user of an interactive computer service shall be held liable on account of —

(A)     any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

(B)     any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph [A].

47 U.S.C. § 230(c)(2).*

The problem Congress sought to solve in Section 230(c) arose from a New York state trial court's ruling that an internet service provider that had voluntarily deleted some messages from an online message board was then "legally responsible for the content of defamatory messages that it failed to delete."  *See Roommates*, 521 F.3d at 1163 (discussing *Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, No. 31063/94, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995)).  The statute responded by "immuniz[ing] the *removal* of user-generated content, not the *creation* of content."  *Id.*  That is, Section 230 "provides 'Good Samaritan' protections from civil liability for providers . . . of an interactive computer service for actions to restrict . . . access to objectionable online material.  One of the specific purposes of this section is to overrule *Stratton* . . . which . . . treated such providers . . . as publishers or speakers of content that is not their own because they have restricted access to objectionable material." H.R. Rep. No. 104-458 (1996) (Conf. Rep.), *as reprinted in* 1996 U.S.C.C.A.N. 10.

---

*     The text of Paragraph (2)(B) refers to "the material described in paragraph (1)," but the Ninth Circuit "take[s] it that the reference to the 'material described in paragraph (1)' is a typographical error, and that instead the reference should be to . . . § 230(c)(2)(A)," because "Paragraph (1) pertains to the treatment of a publisher or speaker and has nothing to do with 'material,' whereas subparagraph (A) pertains to and describes material." *Zango, Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1169, 1173 n.5 (9th Cir. 2009).

UNITED STATES'S MEMORANDUM OF LAW IN SUPPORT OF
CONSTITUTIONALITY OF 47 U.S.C. § 230(C) - 3 -
Case No. 5:19-cv-004749-VKD

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
Tel: (202) 616-8488

According to the Ninth Circuit, Section 230(c)(1) shields the defendant from a claim wherever "the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a 'publisher or speaker.'"  *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009).  In that context, the Ninth Circuit views "publication" as "involv[ing] reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content." *Id.*.  The Ninth Circuit has remarked in an *en banc* opinion that "any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune" under Section 230(c)(1).  *Roommates*, 521 F.3d at 1170-71.

The Ninth Circuit has described one of the policies behind the liability shield as promotion of speech—that is, to "avoid the chilling effect upon Internet free speech that would be occasioned by the imposition of tort liability upon companies that do not create potentially harmful messages but are simply intermediaries for their delivery." *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 852 (9th Cir. 2016) (quoting *Delfino v. Agilent Techs., Inc.*, 145 Cal. App. 4th 790, 52 Cal. Rptr. 3d 376, 387 (Cal. Ct. App. 2006)).  In enacting Section 230(c), Congress made findings describing online platforms as offering "a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity."  § 230(a)(3).  Accordingly, "the policy of the United States" is "to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, *unfettered by Federal or State regulation*."  § 230(b)(2) (emphasis added).  To be sure, Congress also determined that it was the policy of the United States "to ensure vigorous enforcement of *Federal criminal laws* to deter and punish trafficking in obscenity, stalking, and harassment by means of computer." § 230(b)(5) (emphasis added). But in balancing the various interests, Congress sought "not to deter harmful online speech through the separate route of imposing *tort liability* on companies that serve as intermediaries for other parties' potentially injurious messages." *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330-31 (4th Cir. 1997) (Wilkinson, C.J.) (emphasis added).

UNITED STATES'S MEMORANDUM OF LAW IN SUPPORT OF
CONSTITUTIONALITY OF 47 U.S.C. § 230(C) - 4 -
Case No. 5:19-cv-004749-VKD

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**1100 L Street, NW**
**Washington, DC 20530**
**Tel: (202) 616-8488**

## II. Proceedings In Plaintiffs' Case

The instant Plaintiffs are "Lesbian, Gay, Bisexual, Transgender, Transsexual or Queer internet content creators" who make videos, including many that "discuss issues which affect members of the LGBTQ+ community."   2d Am. Compl. ¶¶ 1, 41 (Doc. 20) ("SAC"). YouTube, owned by Google, is allegedly the dominant Internet video platform, hosting "roughly 95%" of global "public video-based content," and "monetizing the free speech and expression of . . . the 2.3 billion people who now use" it.   SAC ¶ 15.   Plaintiffs allegedly contracted with YouTube, licensing it to distribute their videos while agreeing that YouTube retained various rights—including the right to enforce its community guidelines, and the right to determine "in its sole discretion" whether the videos contained "material . . . in violation of" the agreement.   Rule 12(b)(6) Opp. 4 (Doc. 28); *see* SAC ¶¶ 10, 117(d), 288. According to Plaintiffs, YouTube "monetize[s]" the videos by selling advertisements for display along with them, and some Plaintiffs have paid YouTube to promote their videos (individually or grouped into channels) to potential viewers.   SAC ¶¶ 55, 89, 131.   YouTube allegedly retains "unfettered and absolute discretion to restrict the viewership, reach, and monetization of [the] videos."   SAC ¶ 118.

One way that YouTube allegedly exercises that discretion is through its "Restricted Mode," which works "much like a curtain" to "block[] access" by "younger, sensitive audiences to video content that contains certain specifically enumerated 'mature' aspects." SAC ¶ 77.   When a viewer turns on "Restricted Mode" for a personal account (or when it is activated by a parent or system administrator, such as one acting on behalf of a public library, school, or other work place) and lands on a video placed in "Restricted Mode," instead of showing the video, YouTube displays a warning, stating that the video is unavailable and that to view the video the viewer would "need to disable Restricted Mode."   SAC ¶¶ 77-79, 83, 343.  YouTube allegedly tells viewers who inquire that videos are placed in "Restricted Mode" when they include, among other things, "[o]verly detailed conversations about or depictions of sex or sexual activity," "inappropriate language, including profanity," or other sensitive

UNITED STATES'S MEMORANDUM OF LAW IN SUPPORT OF
CONSTITUTIONALITY OF 47 U.S.C. § 230(C) - 5 -
Case No. 5:19-cv-004749-VKD

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**1100 L Street, NW**
**Washington, DC 20530**
**Tel: (202) 616-8488**

content.  SAC ¶¶ 26, 85, 344, 345, 346.  "On average, 1.5–2% of users view YouTube through Restricted Mode."  *Prager Univ.*, 951 F.3d at 996.

YouTube has allegedly styled itself (including in testimony to Congress) as a "neutral public forum."  SAC ¶¶ 61, 287, 342.  But Plaintiffs allege that YouTube has used its "power over filtering" as a "censorship power to silence and crush Plaintiffs because they identify [as] LGBTQ+ and express LGBTQ+ viewpoints."  SAC ¶ 21.  In particular, Plaintiffs allege that YouTube placed some of their videos into "Restricted Mode," or rendered certain videos ineligible for generation of advertising revenue by "demonetizing" them, justified by YouTube's alleged false statements that the videos contained "inappropriate" or "otherwise objectionable" content.  SAC ¶¶ 3, 26, 151, 345-47.  According to Plaintiffs, the episodes of "Restricted Mode" and demonetization misuse they allege are not isolated; rather, YouTube purportedly has a "'company policy' of not selling ads to 'gay' content creators because the 'gay thing' render[s] [their] video[s] 'shocking' and sexually explicit regardless of the actual content of the video[s]."  SAC ¶ 20; *see* SAC ¶¶ 122, 134, 146; SAC Ex. A (transcript of communication with Google Support staff in Bangalore, India allegedly describing policy).

Plaintiffs seek a declaration that 47 U.S.C. § 230(c) violates the First and Fourteenth Amendments; they allege that applying the statute as a bar on their claims would be "both an unconstitutional restraint on Plaintiffs' First Amendment rights to freedom of petition and speech, and a violation of equal protection of law under the Fourteenth Amendment."  SAC ¶ 261; *see* SAC ¶¶ 280-82.  Plaintiffs also assert various claims against YouTube, including two federal statutory claims—one alleging that YouTube engaged in unconstitutional "[v]iewpoint-[b]ased [d]iscrimination" remediable under 42 U.S.C. § 1983 (SAC ¶¶ 283-303), and the other alleging that YouTube engaged in false advertising and false association in violation of the Lanham Act, 15 U.S.C. § 1125 *et seq.* (SAC ¶¶ 337-48).

This Court has not yet certified any constitutional question under 28 U.S.C. § 2403 and Rule 5.1.  On March 9, 2020, this Court endorsed a stipulation providing the United States until April 24, 2020 to determine whether to intervene and to file a brief, if any.  Doc.

UNITED STATES'S MEMORANDUM OF LAW IN SUPPORT OF
CONSTITUTIONALITY OF 47 U.S.C. § 230(C) - 6 -
Case No. 5:19-cv-004749-VKD

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**1100 L Street, NW**
**Washington, DC 20530**
**Tel: (202) 616-8488**

32.  On the Government's motion, the Court later enlarged the time for the United States to intervene to May 8, 2020.  Doc. 44.

## ARGUMENT

### I.  The Court Should First Decide The Potentially Dispositive Statutory Issues Because They May Obviate The Need To Address Plaintiffs' Constitutional Challenge

As an initial matter, this Court should not address the constitutionality of Section 230(c) unless it first determines that the pending motion to dismiss cannot be resolved on non-constitutional grounds.  "If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable."  *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 343 (1999) (quoting *Spector Motor Serv. v. McLaughlin*, 323 U.S. 101, 105 (1944)); *see id.*, 525 U.S. at 344 ("[I]f a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter") (quoting *Ashwander v. TVA*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring)).

This Court should adhere to that doctrine of constitutional avoidance here and decline to rule on the constitutionality of Section 230(c) unless the motion to dismiss cannot be resolved on other grounds.  The United States has intervened solely for the purpose of defending the constitutionality of Section 230(c) and therefore takes no position on the merits of the non-constitutional issues.  It is apparent, however, that the Court's resolution of those issues might obviate the need to consider Section 230(c)'s constitutionality.

Here is one example:  Plaintiffs assert a Section 1983 claim (SAC ¶¶ 283-303), and Lanham Act claims for false advertising and false association (SAC ¶¶ 337-48).  This Court might decide that Plaintiffs have not alleged the elements of either of those federal statutory claims in light of the Ninth Circuit's twin conclusions in *Prager University* that (1) YouTube is not a state actor constrained by the First Amendment (951 F.3d at 999), and (2) "YouTube's statements concerning its content moderation policies do not constitute 'commercial advertising or promotion'" within the meaning of the Lanham Act  (*id.* at 999-1000 (quoting

UNITED STATES'S MEMORANDUM OF LAW IN SUPPORT OF
CONSTITUTIONALITY OF 47 U.S.C. § 230(C) - 7 -
Case No. 5:19-cv-004749-VKD

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
Tel: (202) 616-8488

15 U.S.C. § 1125(a)(1)(B))).  And this Court might similarly decide that Plaintiffs have not alleged the elements of their state law claims.

Here is another example:  Plaintiffs contend that Section 230(c) does not apply to the misconduct alleged.  Rule 12(b)(6) Opp. 13-21.  If the Court were to conclude that YouTube's acts as alleged by Plaintiffs do not fit within the terms of either paragraph 230(c)(1) or (2), then the statute would not apply, and there would be no occasion for passing on the constitutionality of the statute.

In short, where "dispositive" statutory grounds may be available, it is "incumbent on" this Court to examine and decide the case on those grounds first.  *Cf. N.Y.C. Transit Auth. v. Beazer*, 440 U.S. 568, 582 (1979) ("Before deciding the constitutional question, it was incumbent on [lower courts] to consider whether the statutory grounds might be dispositive.").

## II. If The Court Reaches the Question, It Should Conclude That Section 230(c) Is Constitutional

If the Court were to reach the constitutional question, it should conclude that Plaintiffs' challenge fails on the merits.  Section 230(c) does not regulate or limit Plaintiffs' primary conduct, such as their expressive activities.  For example, Plaintiffs do not allege that Section 230(c) prevents them from creating videos or posting them on the Internet.  *Cf. Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002) (restriction on virtual child pornography challenged by creators of erotic and nudist works).  Instead, Section 230(c) establishes a substantive limitation on the liability of certain Internet companies for claims arising from certain specified conduct.  But Plaintiffs cannot show that Congress violated Plaintiffs' constitutional rights by making that affirmative defense available here to YouTube, because none of the clauses of the Constitution on which Plaintiffs rely confers on Plaintiffs any right to bring an underlying claim.

*First*, Plaintiffs do not identify any valid underlying First Amendment speech claim they could have brought against YouTube had Section 230(c) not been in force.  To the contrary, the Ninth Circuit explicitly held in *Prager University* that "YouTube is a private

UNITED STATES'S MEMORANDUM OF LAW IN SUPPORT OF
CONSTITUTIONALITY OF 47 U.S.C. § 230(C) - 8 -
Case No. 5:19-cv-004749-VKD

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
Tel: (202) 616-8488

entity" that is not a state actor subject to the constraints of the First Amendment.  *See* 951 F.3d at 996, 999.  The Ninth Circuit observed that "courts have uniformly concluded that digital internet platforms that open their property to user-generated content do not become state actors," and held that "the state action doctrine precludes constitutional scrutiny of YouTube's content moderation pursuant to its Terms of Service and Community Guidelines."  *See id.* at 997, 999.  The Ninth Circuit thus concluded that "YouTube may be a paradigmatic public square on the Internet, but it is 'not transformed' into a state actor solely by 'provid[ing] a forum for speech.'"  *Id.* at 997 (quoting *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1930, 1934 (2019)).

The Ninth Circuit relied on the "Supreme Court's state action precedent," including "its recent teaching in *Halleck*."  *Id.*  In that 2019 decision, the Supreme Court explained: "[W]hen a private entity provides a forum for speech, the private entity is not ordinarily constrained by the First Amendment because the private entity is not a state actor.  The private entity may thus exercise editorial discretion over the speech and speakers in the forum."  *Halleck*, 139 S. Ct. at 1930.  As one illustration, the Court commented:  "Benjamin Franklin did not have to operate his newspaper as 'a stagecoach, with seats for everyone.'"  *Halleck*, 139 S. Ct. at 1931 (quoting F. Mott, *American Journalism* 55 (3d ed. 1962)).  And the Supreme Court made clear that an "imprecise and overbroad phrase" in "passing dicta" in one of its prior decisions "should not be read to suggest that private property owners or private lessees are subject to First Amendment constraints whenever they dedicate their private property to public use or otherwise open their property for speech."  *See id.* at 1931 n.3 (discussing *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 801 (1985)).  No exception to that principle about private property owners applies to YouTube, as the Ninth Circuit reasoned.  *See Prager Univ.*, 951 F.3d at 997-99.

Because YouTube is not a state actor, its alleged misconduct toward Plaintiffs does not implicate Plaintiffs' freedom of speech.  And because YouTube's actions do not implicate the First Amendment, the liability protection Section 230(c) affords to YouTube likewise

UNITED STATES'S MEMORANDUM OF LAW IN SUPPORT OF
CONSTITUTIONALITY OF 47 U.S.C. § 230(C) - 9 -
Case No. 5:19-cv-004749-VKD

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
Tel: (202) 616-8488

does not implicate the First Amendment.  Or, put another way, Section 230(c) has not deprived Plaintiffs of any valid underlying Speech Clause claim.

*Second*, although Plaintiffs' Petition Clause argument lacks detailed explanation, they appear to contend that the Petition Clause requires Congress to allow them to proceed with their federal and state law claims even though the challenged statute provides an affirmative defense potentially foreclosing those claims.  *See* SAC ¶ 281 (alleging that unconstitutionality stems from "Google/YouTube's use of Section 230(c) as a shield to prevent Plaintiffs from *petitioning the courts for relief* to redress violations of their civil, consumer, and contractual rights, including rights which expressly protect Plaintiffs as a class from identity or viewpoint based discrimination and speech restrictions") (emphasis added); *see also* Rule 12(b)(6) Opp. 20-21 (contending that "the [Communications Decency Act] cannot be construed to preclude Plaintiffs from *petitioning the Courts* to redress discriminatory and unlawful restrictions their rights to free speech and equal benefits and protection of the law") (emphasis added).  That assertion mistakenly posits that the Petition Clause requires the Government to guarantee Plaintiffs the ability to continue to litigate the particular claims for relief they have alleged and to reach a particular outcome (here, denial of the Rule 12(b)(6) motion).  Tellingly, Plaintiffs have cited no precedents construing the Petition Clause as guaranteeing such an outcome in litigation.

To be sure, the Supreme Court has observed that its "precedents confirm that the Petition Clause protects the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes.  '[T]he right of access to courts for redress of wrongs is an aspect of the First Amendment right to petition the government.'" *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011) (quoting *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 896-97 (1984)).  "A petition," the Supreme Court has further explained, "conveys the special concerns of its author to the government and, in its usual form, requests action by the government to address those concerns." *Guarnieri*, 564 U.S. at 388-89 (citing *Sure-Tan*, 467 at 896-97).

UNITED STATES'S MEMORANDUM OF LAW IN SUPPORT OF
CONSTITUTIONALITY OF 47 U.S.C. § 230(C) - 10 -
Case No. 5:19-cv-004749-VKD

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
Tel: (202) 616-8488

But the requirements of the Petition Clause have already been fully satisfied in this case, given that, by commencing this action, Plaintiffs "convey[ed] [their] special concerns . . . to the government and . . . request[ed] action by the government to address those concerns." *See Guarnieri*, 564 U.S. at 388-89. And Plaintiffs remain free to urge Congress to amend the statute. The Petition Clause, however, does not mandate the substantive response to their petition that Plaintiffs desire—*i.e.*, a decision disregarding the affirmative defense set forth in Section 230(c).

Were it otherwise, every statute or precedent limiting or preempting previously-available legal remedies would violate the Petition Clause. To the contrary: As the Supreme Court explained in interpreting the Due Process Clause of the Fourteenth Amendment, a State (and, accordingly, the Federal Government) "remains free to create substantive defenses or immunities for use in adjudication—or to eliminate its statutorily created causes of action altogether . . . ." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 432-33 (1982).

Plaintiffs' Petition Clause argument resembles the Due Process Clause argument the Ninth Circuit rejected in *Ileto v. Glock, Inc.*, 565 F.3d 1126 (9th Cir. 2009). The plaintiffs there challenged a federal statute limiting the liability of firearms manufacturers in certain circumstances. In upholding the law, the Ninth Circuit concluded that Congress's "legislative determination" creating the liability protection "provides all the process that is due." *Id.* at 1141-42 (internal quotation marks omitted). The court also rejected the contention that the statutory liability limitation deprived the plaintiffs of a property right, reasoning that "a party's property right in any cause of action does not vest until a final unreviewable judgment is obtained." *See id.* at 1140-41 (quoting *Fields v. Legacy Health Sys.*, 413 F.3d 943, 956 (9th Cir. 2005)).

Although Plaintiffs have not explicitly invoked the Due Process Clause as a basis for their challenge here, they advance an interpretation of the Petition Clause that would effectively circumvent *Logan* and *Ileto*. At least where, as here, Plaintiffs did not obtain a "final unreviewable judgment" in their favor before Section 230(c) came into force, they have no entitlement to the particular legal theories they have alleged. *See Ileto*, 565 F.3d at 1140-

UNITED STATES'S MEMORANDUM OF LAW IN SUPPORT OF
CONSTITUTIONALITY OF 47 U.S.C. § 230(C) - 11 -
Case No. 5:19-cv-004749-VKD

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
Tel: (202) 616-8488

41. Congress therefore retained authority to impose limitations on those theories by enacting Section 230(c). *Logan* and *Ileto* thus provide additional confirmation that Plaintiffs' Petition Clause theory lacks merit.

*Third*, Plaintiffs' equal protection challenge fails for the same reasons as their First Amendment Speech and Petition claims, and does not require separate analysis under Ninth Circuit precedent. "It is generally unnecessary to analyze laws which burden the exercise of First Amendment rights by a class of persons under the equal protection guarantee, because the substantive guarantees of the Amendment serve as the strongest protection against the limitation of these rights." *Orin v. Barclay*, 272 F.3d 1207, 1213 n.3 (9th Cir. 2001) (quoting John E. Nowak, Ronald D. Rotunda & J. Nelson Young, *Handbook on Constitutional Law* (1978)). On that basis, the Ninth Circuit treated an "equal protection claim as subsumed by, and co-extensive with, [the Section 1983 plaintiff's] First Amendment claim." *Id.* This Court need go no further in rejecting Plaintiffs' equal protection theory.

## **CONCLUSION**

For the foregoing reasons, the Court should decide Defendants' Rule 12(b)(6) motion without reaching any constitutional question if possible. If the Court reaches Plaintiffs' challenge to the constitutionality of 47 U.S.C. § 230(c), it should reject it.

DATED:  May 8, 2020

Respectfully submitted,
JOSEPH H. HUNT
Assistant Attorney General

ERIC WOMACK
Assistant Branch Director

INDRANEEL SUR
Trial Attorney

By:  */s/ Indraneel Sur*
        INDRANEEL SUR

U.S. Department of Justice
Counsel for the United States of America

UNITED STATES'S MEMORANDUM OF LAW IN SUPPORT OF
CONSTITUTIONALITY OF 47 U.S.C. § 230(C) - 12 -
Case No. 5:19-cv-004749-VKD

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**1100 L Street, NW**
**Washington, DC 20530**
**Tel: (202) 616-8488**

# Exhibit "D"

EXECUTIVE ORDER
- - - - - - -
PREVENTING ONLINE CENSORSHIP

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

Section 1. Policy. Free speech is the bedrock of American democracy. Our Founding Fathers protected this sacred right with the First Amendment to the Constitution. The freedom to express and debate ideas is the foundation for all of our rights as a free people. In a country that has long cherished the freedom of expression, we cannot allow a limited number of online platforms to hand pick the speech that Americans may access and convey on the internet. This practice is fundamentally un-American and anti-democratic. When large, powerful social media companies censor opinions with which they disagree, they exercise a dangerous power. They cease functioning as passive bulletin boards, and ought to be viewed and treated as content creators.

The growth of online platforms in recent years raises important questions about applying the ideals of the First Amendment to modern communications technology. Today, many Americans follow the news, stay in touch with friends and family, and share their views on current events through social media and other online platforms. As a result, these platforms function in many ways as a 21st century equivalent of the public square.

Twitter, Facebook, Instagram, and YouTube wield immense, if not unprecedented, power to shape the interpretation of public events; to censor, delete, or disappear information; and to control what people see or do not see.

As President, I have made clear my commitment to free and open debate on the internet. Such debate is just as important online as it is in our universities, our town halls, and our homes. It is essential to sustaining our democracy.

Online platforms are engaging in selective censorship that is harming our national discourse. Tens of thousands of Americans have reported, among other troubling behaviors, online platforms "flagging" content as inappropriate, even though it does not violate any stated terms of service; making unannounced and unexplained changes to company policies that have the effect of disfavoring certain viewpoints; and deleting content and entire accounts with no warning, no rationale, and no recourse.

Twitter now selectively decides to place a warning label on certain tweets in a manner that clearly reflects political bias. As has been reported, Twitter seems never to have placed such a label on another politician's tweet. As recently as last week, Representative Adam Schiff was continuing to mislead his followers by peddling the long-disproved Russian Collusion Hoax, and Twitter did not flag those tweets. Unsurprisingly, its officer in charge of so-called "Site Integrity" has flaunted his political bias in his own tweets.

At the same time online platforms are invoking inconsistent, irrational, and groundless justifications to censor or otherwise restrict Americans' speech here at home, several online platforms are profiting from and promoting the aggression and disinformation spread by foreign governments like China. One United States company, for example, created a search engine for the Chinese Communist Party that would have blacklisted searches for "human rights," hid data unfavorable to the Chinese Communist Party, and tracked users determined appropriate for surveillance. It also established research partnerships in China that provide direct benefits to the Chinese military. Other companies have accepted advertisements paid for by the Chinese government that spread false information about China's mass imprisonment of religious minorities, thereby enabling these abuses of human rights. They have also amplified China's propaganda abroad, including by allowing Chinese

government officials to use their platforms to spread misinformation regarding the origins of the COVID-19 pandemic, and to undermine pro-democracy protests in Hong Kong. As a Nation, we must foster and protect diverse viewpoints in today's digital communications environment where all Americans can and should have a voice. We must seek transparency and accountability from online platforms, and encourage standards and tools to protect and preserve the integrity and openness of American discourse and freedom of expression.

Sec. 2. Protections Against Online Censorship. (a) It is the policy of the United States to foster clear ground rules promoting free and open debate on the internet. Prominent among the ground rules governing that debate is the immunity from liability created by section 230(c) of the Communications Decency Act (section 230(c)). 47 U.S.C. 230(c). It is the policy of the United States that the scope of that immunity should be clarified: the immunity should not extend beyond its text and purpose to provide protection for those who purport to provide users a forum for free and open speech, but in reality use their power over a vital means of communication to engage in deceptive or pretextual actions stifling free and open debate by censoring certain viewpoints.

Section 230(c) was designed to address early court decisions holding that, if an online platform restricted access to some content posted by others, it would thereby become a "publisher" of all the content posted on its site for purposes of torts such as defamation. As the title of section 230(c) makes clear, the provision provides limited liability "protection" to a provider of an interactive computer service (such as an online platform) that engages in "'Good Samaritan' blocking" of harmful content. In particular, the Congress sought to provide protections for online platforms that attempted to protect minors from harmful content and intended to ensure that such providers would not be discouraged from taking down harmful material. The provision was also intended to further the express vision of the Congress that the internet is a "forum for a true diversity of political discourse." 47 U.S.C. 230(a)(3). The limited protections provided by the statute should be construed with these purposes in mind.

In particular, subparagraph (c)(2) expressly addresses protections from "civil liability" and specifies that an interactive computer service provider may not be made liable "on account of" its decision in "good faith" to restrict access to content that it considers to be "obscene, lewd, lascivious, filthy, excessively violent, harassing or otherwise objectionable." It is the policy of the United States to ensure that, to the maximum extent permissible under the law, this provision is not distorted to provide liability protection for online platforms that -- far from acting in "good faith" to remove objectionable content -- instead engage in deceptive or pretextual actions (often contrary to their stated terms of service) to stifle viewpoints with which they disagree. Section 230 was not intended to allow a handful of companies to grow into titans controlling vital avenues for our national discourse under the guise of promoting open forums for debate, and then to provide those behemoths blanket immunity when they use their power to censor content and silence viewpoints that they dislike. When an interactive computer service provider removes or restricts access to content and its actions do not meet the criteria of subparagraph (c)(2)(A), it is engaged in editorial conduct. It is the policy of the United States that such a provider should properly lose the limited liability shield of subparagraph (c)(2)(A) and be exposed to liability like any traditional editor and publisher that is not an online provider.

(b) To advance the policy described in subsection (a) of this section, all executive departments and agencies should ensure that their application of section 230(c) properly reflects the narrow purpose of the section and take all appropriate actions in this regard. In addition, within 60 days of the date of this order, the Secretary of Commerce (Secretary), in

consultation with the Attorney General, and acting through the National Telecommunications and Information Administration (NTIA), shall file a petition for rulemaking with the Federal Communications Commission (FCC) requesting that the FCC expeditiously propose regulations to clarify:

(i) the interaction between subparagraphs (c)(1) and (c)(2) of section 230, in particular to clarify and determine the circumstances under which a provider of an interactive computer service that restricts access to content in a manner not specifically protected by subparagraph (c)(2)(A) may also not be able to claim protection under subparagraph (c)(1), which merely states that a provider shall not be treated as a publisher or speaker for making third-party content available and does not address the provider's responsibility for its own editorial decisions;

(ii) the conditions under which an action restricting access to or availability of material is not "taken in good faith" within the meaning of subparagraph (c)(2)(A) of section 230, particularly whether actions can be "taken in good faith" if they are:

(A) deceptive, pretextual, or inconsistent with a provider's terms of service; or

(B) taken after failing to provide adequate notice, reasoned explanation, or a meaningful opportunity to be heard; and

(iii) any other proposed regulations that the NTIA concludes may be appropriate to advance the policy described in subsection (a) of this section.

Sec. 3. Protecting Federal Taxpayer Dollars from Financing Online Platforms That Restrict Free Speech. (a) The head of each executive department and agency (agency) shall review its agency's Federal spending on advertising and marketing paid to online platforms. Such review shall include the amount of money spent, the online platforms that receive Federal dollars, and the statutory authorities available to restrict their receipt of advertising dollars.

(b) Within 30 days of the date of this order, the head of each agency shall report its findings to the Director of the Office of Management and Budget.

(c) The Department of Justice shall review the viewpoint-based speech restrictions imposed by each online platform identified in the report described in subsection (b) of this section and assess whether any online platforms are problematic vehicles for government speech due to viewpoint discrimination, deception to consumers, or other bad practices.

Sec. 4. Federal Review of Unfair or Deceptive Acts or Practices. (a) It is the policy of the United States that large online platforms, such as Twitter and Facebook, as the critical means of promoting the free flow of speech and ideas today, should not restrict protected speech. The Supreme Court has noted that social media sites, as the modern public square, "can provide perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard." Packingham v. North Carolina, 137 S. Ct. 1730, 1737 (2017). Communication through these channels has become important for meaningful participation in American democracy, including to petition elected leaders. These sites are providing an important forum to the public for others to engage in free expression and debate. Cf. PruneYard Shopping Center v. Robins, 447 U.S. 74, 85-89 (1980).

(b) In May of 2019, the White House launched a Tech Bias Reporting tool to allow Americans to report incidents of online censorship. In just weeks, the White House received over 16,000 complaints of online platforms censoring or otherwise taking action against users based on their political viewpoints. The White House will submit such complaints received to the Department of Justice and the Federal Trade Commission (FTC).

(c) The FTC shall consider taking action, as appropriate and consistent with applicable law, to prohibit unfair or deceptive acts or practices in or affecting commerce, pursuant to section 45 of title 15, United States Code. Such unfair or deceptive acts or practice may include

practices by entities covered by section 230 that restrict speech in ways that do not align with those entities' public representations about those practices.

(d) For large online platforms that are vast arenas for public debate, including the social media platform Twitter, the FTC shall also, consistent with its legal authority, consider whether complaints allege violations of law that implicate the policies set forth in section 4(a) of this order. The FTC shall consider developing a report describing such complaints and making the report publicly available, consistent with applicable law.

Sec. 5. State Review of Unfair or Deceptive Acts or Practices and Anti-Discrimination Laws.

(a) The Attorney General shall establish a working group regarding the potential enforcement of State statutes that prohibit online platforms from engaging in unfair or deceptive acts or practices. The working group shall also develop model legislation for consideration by legislatures in States where existing statutes do not protect Americans from such unfair and deceptive acts and practices. The working group shall invite State Attorneys General for discussion and consultation, as appropriate and consistent with applicable law.

(b) Complaints described in section 4(b) of this order will be shared with the working group, consistent with applicable law. The working group shall also collect publicly available information regarding the following:

(i) increased scrutiny of users based on the other users they choose to follow, or their interactions with other users;

(ii) algorithms to suppress content or users based on indications of political alignment or viewpoint;

(iii) differential policies allowing for otherwise impermissible behavior, when committed by accounts associated with the Chinese Communist Party or other anti-democratic associations or governments;

(iv) reliance on third-party entities, including contractors, media organizations, and individuals, with indicia of bias to review content; and

(v) acts that limit the ability of users with particular viewpoints to earn money on the platform compared with other users similarly situated.

Sec. 6. Legislation. The Attorney General shall develop a proposal for Federal legislation that would be useful to promote the policy objectives of this order.

Sec. 7. Definition. For purposes of this order, the term "online platform" means any website or application that allows users to create and share content or engage in social networking, or any general search engine.

Sec. 8. General Provisions. (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

DONALD J. TRUMP

THE WHITE HOUSE,

May 28, 2020.

# EXHIBIT "E"

```
 1                    UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF CALIFORNIA
 2                         SAN JOSE DIVISION

 3        DIVINO GROUP LLC, ET AL.,

 4              PLAINTIFFS,              CASE NO. CV-19-4749-VKD

 5           VS.                         SAN JOSE, CALIFORNIA

 6        GOOGLE LLC, ET AL.,            JUNE 2, 2020

 7              DEFENDANT.               PAGES 1 - 51

 8
                       TRANSCRIPT OF ZOOM PROCEEDINGS
 9            BEFORE THE HONORABLE VIRGINIA K. DEMARCHI
                       UNITED STATES DISTRICT JUDGE
10
                  A-P-P-E-A-R-A-N-C-E-S BY ZOOM
11
          FOR THE PLAINTIFFS:   BROWNE GEORGE ROSS LLP
12                              BY:  PETER OBSTLER
                                44 MONTGOMERY STREET
13                              SUITE 1280
                                SAN FRANCISCO, CALIFORNIA 94104
14
                                BY:  DEBI ANN RAMOS
15                              801 S. FIGUEROA ST., SUITE 2000
                                LOS ANGELES, CALIFORNIA 90067
16

17        FOR THE DEFENDANTS:   WILSON SONSINI GOODRICH & ROSATI
                                BY:  BRIAN M. WILLEN
18                              1301 AVENUE OF THE AMERICA, 40TH
                                FLOOR
19                              NEW YORK, NEW YORK 10019-6022

20                              BY:  LAUREN G. WHITE
                                650 PAGE MILL ROAD
21                              PALO ALTO, CALIFORNIA 94304-1050

22            (APPEARANCES CONTINUED ON THE NEXT PAGE.)

23        OFFICIAL COURT REPORTER:    IRENE L. RODRIGUEZ, CSR, RMR, CRR
                                       CERTIFICATE NUMBER 8074
24
              PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY,
25        TRANSCRIPT PRODUCED WITH COMPUTER.
```

EXHIBIT "E"

1        A P P E A R A N C E S BY ZOOM: (CONT'D)

2        FOR INTERESTED PARTY:
                                  US DEPARTMENT OF JUSTICE
3                                 CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
                                  BY:  INDRANEEL SUR
4                                 1100 L ST.
                                  RM. 12010
5                                 WASHINGTON, DC 20530

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    SAN JOSE, CALIFORNIA                    JUNE 2, 2020

 2                    P R O C E E D I N G S

 3        (COURT CONVENED AT 10:24 A.M.)

 4            THE CLERK:  THE NEXT MATTER IS DIVINO GROUP VERSUS

 5    GOOGLE, CASE NUMBER 19-CV-4749.

 6            THE COURT:  GOOD MORNING.  I'M WAITING FOR THE PRIOR

 7    MATTER AND ALSO WITH OUR TECHNOLOGY.

 8        WHO WILL BE SPEAKING ON BEHALF OF DIVINO GROUP TODAY?

 9        MR. OBSTLER, YOU'RE ON MUTE.

10            MR. OBSTLER:  SORRY ABOUT THAT, YOUR HONOR.  THIS IS

11    THE MOST NERVE-RACKING PART OF THE WHOLE HEARING IS TRYING TO

12    GET THIS THING TO WORK.

13        (LAUGHTER.)

14            MR. OBSTLER:  PETER OBSTLER, MYSELF, WILL BE

15    SPEAKING ON BEHALF OF THE DIVINO PLAINTIFFS, YOUR HONOR.

16            THE COURT:  OKAY.  WHO WILL BE SPEAKING ON BEHALF OF

17    GOOGLE TODAY?

18            MR. WILLEN:  GOOD MORNING, YOUR HONOR.  THIS IS

19    BRIAN WILLEN.  ME AND MY COLLEAGUE, MS. WHITE, WILL BOTH BE

20    SPEAKING FOR GOOGLE.

21        I WILL BE ADDRESSING ANY ISSUES RELATED TO SECTION 230,

22    AND MS. WHITE WILL BE ADDRESSING ANY ISSUES RELATED TO THE

23    UNDERLYING CAUSES OF ACTION.

24            THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.

25        AND I DO HAVE MR. SUR ON BEHALF OF THE UNITED STATES.
```

10:25AM 1     ALL RIGHT.  SO WE ARE HERE ON THE DEFENDANTS' MOTION TO

10:25AM 2     DISMISS THE SECOND AMENDED COMPLAINT.

10:25AM 3     I WILL HEAR FROM ALL PARTIES, BUT I WOULD LIKE TO START

10:25AM 4     JUST BY IDENTIFYING THE ISSUES THAT I AM MOST INTERESTED IN

10:25AM 5     HEARING ABOUT, AND THEN I'LL LET YOU MAKE YOUR ARGUMENTS, AND I

10:25AM 6     HAVE SOME VERY SPECIFIC QUESTIONS.

10:25AM 7     SO PLAINTIFFS HAVE EIGHT CLAIMS FOR RELIEF, REALLY SEVEN

10:25AM 8     CLAIMS FOR RELIEF SINCE THE EIGHTH ONE IS A REQUEST FOR

10:25AM 9     DECLARATORY RELIEF AND MORE OF A REQUEST FOR A REMEDY.

10:25AM 10    MY PRINCIPAL CONCERN IS THE PRAGER DECISION.  IT DOES SEEM

10:25AM 11    THAT THE NINTH CIRCUIT'S DECISION IN PRAGER IS DISPOSITIVE WITH

10:25AM 12    RESPECT TO THE FEDERAL CLAIMS AND PERHAPS THE CALIFORNIA

10:25AM 13    CONSTITUTION CLAIM BECAUSE OF THE FINDING THAT THE

10:25AM 14    NINTH CIRCUIT MADE THAT GOOGLE AND YOUTUBE ARE NOT STATE

10:25AM 15    ACTORS.  THAT CONCLUSION SEEMS TO ELIMINATE THOSE CLAIMS.

10:25AM 16    THE CALIFORNIA CONSTITUTION CLAIMS ARE ALSO PREMISED ON

10:26AM 17    THE IDEA THAT GOOGLE AND YOUTUBE ARE STATE ACTORS, SO THAT ONE

10:26AM 18    ALSO SEEMS TO BE ELIMINATED BY THIS DECISION.

10:26AM 19    AND THEN WITH RESPECT TO THE LANHAM ACT CLAIM, THE FINDING

10:26AM 20    THAT THE TERMS OF SERVICE AND COMMUNITY GUIDELINES ARE NOT

10:26AM 21    COMMERCIAL ADVERTISING OR PROMOTION AND THAT THE OTHER

10:26AM 22    STATEMENTS THAT ARE CONTAINED -- THAT ARE HIGHLIGHTED IN THE

10:26AM 23    SECOND AMENDED COMPLAINT ARE OPERATIONAL OR PUFFERY MEANS THAT

10:26AM 24    THE PLAINTIFFS COULD NOT PREVAIL ON THE LANHAM ACT CLAIM.

10:26AM 25    SO I WOULD LIKE TO UNDERSTAND THE PARTIES' VIEWS ON THE

10:26AM 1    SIGNIFICANCE OF PRAGER.  THAT'S THE FIRST THING.

10:26AM 2         AND THE SECOND ITEM THAT CAUGHT MY ATTENTION WAS THE

10:26AM 3    UNRAH ACT CLAIM WHICH DOESN'T HAVE -- DOESN'T GIVE MUCH

10:26AM 4    DISCUSSION IN THE PARTIES' PAPERS, BUT HERE'S MY QUESTION ABOUT

10:26AM 5    THE UNRAH ACT CLAIM, OR QUESTIONS.

10:26AM 6         DOES IT ACTUALLY APPLY TO THE GOOGLE YOUTUBE PLATFORM?

10:26AM 7    AND IF SO, UNDER WHAT SPECIFIC THEORY?

10:26AM 8         IF I CONSTRUE THE SECOND AMENDED COMPLAINT AS ALLEGING AN

10:27AM 9    UNWRITTEN POLICY TO DISCRIMINATE AGAINST THE LGBTQ CONTENT

10:27AM 10   CREATORS, IS THAT REALLY WITHIN THE SCOPE OF PUBLISHING

10:27AM 11   ACTIVITY UNDER SECTION 230(C)(1) OR (C)(2), WHICH HAS A GOOD

10:27AM 12   FAITH REQUIREMENT?

10:27AM 13        IS THAT KIND OF AN UNWRITTEN POLICY SUFFICIENT TO STATE A

10:27AM 14   CLAIM EVEN IF GOOGLE AND YOUTUBE'S OFFICIAL WRITTEN POLICY IS

10:27AM 15   VIEWPOINT NEUTRAL?

10:27AM 16        SO I HAVE SOME QUESTIONS AROUND THE UNRAH ACT CLAIM THAT I

10:27AM 17   WOULD LIKE THE PARTIES TO FOCUS ON.

10:27AM 18        AND THEN FINALLY I DID SEE THAT THE PLAINTIFFS DID FILE

10:27AM 19   YESTERDAY A REQUEST FOR JUDICIAL NOTICE ABOUT THE RECENT

10:27AM 20   EXECUTIVE ORDER, AND I'LL PERMIT THE PARTIES TO ADDRESS THAT,

10:27AM 21   ALTHOUGH I DO NOT SEE HOW THAT HAS ANY BEARING ON THE MOTION TO

10:27AM 22   DISMISS.

10:27AM 23        BUT THOSE ARE MY HIGH-LEVEL OBSERVATIONS AND FLAGGING

10:27AM 24   THOSE ISSUES FOR YOUR CONSIDERATION, BUT I WILL LET YOU ARGUE

10:28AM 25   HOWEVER YOU WOULD LIKE TO ARGUE.

10:28AM 1     AND SINCE IT'S THE DEFENDANTS' MOTION, I WILL GO AHEAD AND

10:28AM 2   LET GOOGLE START.

10:28AM 3     SO MR. WILLEN.

10:28AM 4       MR. WILLEN:  YES.  THANK YOU, YOUR HONOR.

10:28AM 5     I THINK I SHOULD PROBABLY TAKE YOUR FIRST SET OF QUESTIONS

10:28AM 6   FIRST WHICH HAS TO DO WITH THE IMPACT OF THE NINTH CIRCUIT'S

10:28AM 7   DECISION IN PRAGER, AND SINCE I THINK THAT RELATES TO THE

10:28AM 8   MERITS OF THE CAUSES OF ACTION RATHER THAN SECTION 230, I WILL

10:28AM 9   LET MY COLLEAGUE, MS. WHITE, ADDRESS THAT IN THE FIRST

10:28AM 10  INSTANCE.

10:28AM 11      THE COURT:  ALL RIGHT.  VERY WELL.

10:28AM 12      MS. WHITE:  THANK YOU, YOUR HONOR.

10:28AM 13    TAKING YOUR QUESTIONS IN ORDER, I'LL BEGIN WITH THE FIRST

10:28AM 14  AMENDMENT.  WE ABSOLUTELY AGREE WITH YOUR SUGGESTION THAT THE

10:28AM 15  NINTH CIRCUIT'S DECISION FORECLOSES PLAINTIFFS' FIRST AMENDMENT

10:28AM 16  CLAIM.

10:28AM 17    THEIR CLAIM IS PREDICATED ON AN INFRINGEMENT OF THEIR OWN

10:28AM 18  FIRST AMENDMENT RIGHTS, AND OF COURSE THE CASE LAW IS EXTREMELY

10:29AM 19  CLEAR FOLLOWING THE SUPREME COURT'S DECISION IN HALLECK AND NOW

10:29AM 20  THE NINTH CIRCUIT'S DECISION IN PRAGER, WHICH WAS BROUGHT BY

10:29AM 21  COUNSEL FOR PLAINTIFFS HERE AND ASSERTED CLAIMS BASED ON THE

10:29AM 22  SAME PRODUCTS AND SERVICES ON YOUTUBE'S PLATFORM THAT ARE AT

10:29AM 23  ISSUE IN THIS CASE.

10:29AM 24    THERE'S SIMPLY NO PATH FORWARD IN LIGHT OF THE COURT'S

10:29AM 25  HOLDING TO -- FOR THE COURT TO CONCLUDE THAT YOUTUBE IS A STATE

10:29AM 1     ACTOR.

10:29AM 2          AND PLAINTIFFS HAVE FILED A SURREPLY ADDRESSING THAT

10:29AM 3     DECISION, ALTHOUGH THEY DID NOT ADDRESS JUDGE KOH'S UNDERLYING

10:29AM 4     DECISION THAT THE NINTH CIRCUIT AFFIRMED IN THEIR OPPOSITION

10:29AM 5     BRIEF.

10:29AM 6          AND IN THEIR SURREPLY THEY CLAIM THAT THIS CASE IS

10:30AM 7     DIFFERENT BECAUSE THEY HAVE ARTICULATED A DIFFERENT STATE

10:30AM 8     ACTION THEORY UNDER THE SO-CALLED ENDORSEMENT TEST UNDER THE

10:30AM 9     SUPREME COURT SKINNER DECISION.

10:30AM 10         BUT WHETHER THE COURT CONSIDERS THE ENDORSEMENT TEST OR

10:30AM 11    THE PUBLIC FUNCTION TEST THAT WAS ARGUED IN PRAGER, THE

10:30AM 12    PARTY -- THE PLAINTIFFS MUST SHOW THAT IN ORDER TO SHOW STATE

10:30AM 13    ACTION, THAT THE CONDUCT THAT ALLEGEDLY DEPRIVED THEM OF THEIR

10:30AM 14    RIGHTS CAN FAIRLY BE ATTRIBUTED TO THE STATE OR THE GOVERNMENT.

10:30AM 15         AND THERE IS NO BASIS TO ARGUE THAT YOUTUBE, IN MONITORING

10:30AM 16    ITS SERVICE AND MODERATING CONTENT ON ITS SERVICE WAS SOMEHOW

10:30AM 17    ACTING WITH THE GOVERNMENT'S ENDORSEMENT.  AND SECTION 230 BY

10:30AM 18    ITS EXPRESS TERMS, AND THE LEGISLATIVE HISTORY CONFIRMS, THAT

10:31AM 19    THE GOVERNMENT WAS, IN FACT, SEEKING TO TAKE ITSELF OUT OF THE

10:31AM 20    PROCESS OF CONTENT MODERATION ONLINE.  SO THERE IS NO BASIS FOR

10:31AM 21    THE COURT TO CONCLUDE THAT SECTION 230 SOMEHOW PUTS A THUMB ON

10:31AM 22    THE SCALE IN FAVOR OF THE CONTENT MODERATION DECISIONS THAT

10:31AM 23    YOUTUBE MADE WITH RESPECT TO THE PLAINTIFFS' CONTENT HERE.

10:31AM 24         THE COURT:  IT SEEMS ALMOST LIKE AN ABSENCE OF

10:31AM 25    ENDORSEMENT, SORT OF AN EXPLICIT NON-ENDORSEMENT OF ANY

10:31AM 1    PARTICULAR MONITORING OR POLICING OR CENSORSHIP OR RESTRICTION.

10:31AM 2    IT'S LEAVING IT UP TO THE PLATFORM OR THE SERVICE PROVIDER IN

10:31AM 3    THIS CASE.

10:31AM 4         SO I TAKE YOUR POINT ABOUT THE ENDORSEMENT THEORY.  IT

10:31AM 5    DOESN'T SEEM TO FIT, BUT I WILL HEAR FROM THE PLAINTIFFS ON

10:31AM 6    THAT.

10:31AM 7         OKAY.  SO IN YOUR VIEW -- IN DEFENDANTS' VIEW DOES THE

10:32AM 8    PRAGER DECISION TAKE CARE OF THE FIRST AMENDMENT CLAIM AS WELL

10:32AM 9    AS THE CALIFORNIA CONSTITUTION CLAIM?

10:32AM 10        I MEAN, IT DOESN'T SPECIFICALLY ADDRESS THE CALIFORNIA

10:32AM 11   CONSTITUTION, THE NINTH CIRCUIT DOES NOT.  THAT WAS THE

10:32AM 12   PRAGER II DECISION.

10:32AM 13             MR. WILLEN:  THAT'S RIGHT, YOUR HONOR.  WE THINK IT

10:32AM 14   DOES.  CALIFORNIA STATE COURTS HAVE MADE CLEAR THAT THE

10:32AM 15   CALIFORNIA CONSTITUTION HAS A STATE ACTION REQUIREMENT JUST

10:32AM 16   LIKE THE FIRST AMENDMENT.

10:32AM 17        AND AS THE NINTH CIRCUIT IN PRAGER HELD, THAT TO FIND A

10:32AM 18   PRIVATE PLATFORM INVOLVED IN HOSTING EXPRESSIVE CONDUCT A STATE

10:32AM 19   ACTOR WOULD ESSENTIALLY BE A PARADIGM SHIFT AND THAT HOLDING

10:32AM 20   BEARS ON THE CALIFORNIA CONSTITUTION CLAIM AS WELL.

10:32AM 21        NOW, PLAINTIFFS HAVE INVOKED THIS NARROW AND 40-YEAR-OLD

10:33AM 22   EXCEPTION ARTICULATED BY THE CALIFORNIA SUPREME COURT IN

10:33AM 23   ROBINS VERSUS PRUNEYARD, BUT THAT DECISION WAS APPLIED TO REAL

10:33AM 24   PROPERTY GIVEN THE NATURE OF REAL PROPERTY AND HAS NEVER BEEN

10:33AM 25   EXTENDED BEYOND THE SCOPE OF REAL PROPERTY.

10:33AM  1      AND, IN FACT, EVERY CASE THAT HAS CONSIDERED SIMILAR

10:33AM  2  EFFORTS TO EXPAND ITS SCOPE TO ONLINE SERVICES HAS REJECTED

10:33AM  3  THOSE EFFORTS.  IN ADDITION TO PRAGER II THERE WAS THE DOMEN

10:33AM  4  CASE IN THE SOUTHERN DISTRICT OF NEW YORK AND JUDGE CHEN IN THE

10:33AM  5  HIQ DECISION.

10:33AM  6          THE COURT:  ALL RIGHT.  THANK YOU.

10:33AM  7      AND THE LANHAM ACT ISSUE?

10:33AM  8          MS. WHITE:  YES.  ON THAT, YOUR HONOR, I DON'T

10:33AM  9  ENTIRELY UNDERSTAND PLAINTIFFS' ARGUMENTS IN THEIR SURREPLY FOR

10:33AM 10  ATTEMPTING TO DISTINGUISH THE LANHAM ACT, BUT THERE'S

10:33AM 11  ESSENTIALLY FOUR CATEGORIES OF STATEMENTS AT ISSUE IN THEIR

10:34AM 12  CLAIM, AND THEY ALL RELATE TO STATEMENTS THAT THE NINTH CIRCUIT

10:34AM 13  CONSIDERED IN PRAGER, THOSE DEALING WITH THE TERMS OF SERVICE

10:34AM 14  DESCRIPTIONS OF RESTRICTED MODE AND SOME IMPLICIT STATEMENT BUT

10:34AM 15  NO ACTUAL STATEMENT REGARDING THE DECISION TO MAKE CERTAIN OF

10:34AM 16  PLAINTIFFS' VIDEOS UNAVAILABLE IN RESTRICTED MODE.

10:34AM 17      THE NINTH CIRCUIT ADDRESSED EACH OF THOSE CATEGORIES OF

10:34AM 18  STATEMENTS AND CLEARLY HELD THAT NO LANHAM ACT CLAIM COULD

10:34AM 19  PROCEED ON THE BASIS OF ANY OF THEM.  THEY ARE NOT MADE IN

10:34AM 20  COMMERCIAL OR PROMOTIONAL CONTEXTS AND THEY, WITH RESPECT TO

10:34AM 21  YOUTUBE'S PROMOTIONAL STATEMENTS AND MISSION STATEMENTS, ARE

10:34AM 22  NOT -- ARE ESSENTIALLY NONACTIONABLE PUFFERY.

10:34AM 23          THE COURT:  AND IF GOOGLE WERE TO ACT OR HAVE AN

10:34AM 24  INTERNAL UNWRITTEN POLICY THAT WAS INCONSISTENT WITH THOSE

10:34AM 25  PUBLIC STATEMENTS, WOULD THE ANSWER STILL BE THE SAME UNDER THE

10:35AM 1  LANHAM ACT?  DOES IT MATTER?  THOSE ARE -- THE STATEMENTS THAT

10:35AM 2  ARE PUBLIC FACING AND DESCRIBE THE PLATFORM AS BEING VIEWPOINT

10:35AM 3  NEUTRAL, THAT'S NOT ADVERTISING, THAT'S NOT PROMOTION, SO IT

10:35AM 4  DOESN'T MATTER IF, IN FACT, THAT'S NOT THE WAY IT WORKS AND

10:35AM 5  THERE'S SOME UNWRITTEN POLICY THAT DISCRIMINATES AGAINST THE

10:35AM 6  LGBT CONTENT CREATORS AND STILL NOT ACTIONABLE UNDER THE

10:35AM 7  LANHAM ACT WOULD BE YOUR VIEW?

10:35AM 8       MS. WHITE:  THAT'S RIGHT, YOUR HONOR.  TO STATE A

10:35AM 9  CLAIM UNDER THE LANHAM ACT FOR FALSE ADVERTISING, WHICH IS WHAT

10:35AM 10  I UNDERSTAND THE PLAINTIFFS CLAIM TO BE HERE, THEY HAVE TO TIE

10:35AM 11  THE CLAIM TO SOME ACTUAL STATEMENT.

10:35AM 12       SO IMPLICIT OR ABSTRACT MOTIVE IS NOT SUFFICIENT TO STATE

10:35AM 13  A CLAIM UNDER THE LANHAM ACT.

10:35AM 14       THE COURT:  ALL RIGHT.  SO I DID HAVE A QUESTION

10:35AM 15  ABOUT TRYING TO FOCUS IN ON THIS ISSUE OF PLAINTIFFS ALLEGE

10:36AM 16  DISCRIMINATION BASED ON THEIR IDENTITY AS OPPOSED TO CONTENT.

10:36AM 17       AND I DON'T KNOW IF THIS IS A QUESTION FOR YOU OR

10:36AM 18  MR. WILLEN BECAUSE IT REALLY DOES GET INTO THE QUESTION OF WHAT

10:36AM 19  IS IMMUNIZED AND WHAT IS NOT.

10:36AM 20       PLAINTIFFS SAY IN THEIR COMPLAINT THAT THEIR CONTENT IS

10:36AM 21  BLOCKED OR RESTRICTED IN SOME WAY NOT BECAUSE OF THE CONTENT

10:36AM 22  ITSELF BUT BECAUSE THE CREATORS OF THE CONTENT ARE GAY OR ARE

10:36AM 23  SEEKING TO HAVE THEIR CONTENT VIEWED BY THE LGBT COMMUNITY, SO

10:36AM 24  THEY'RE TARGETING CONTENT TO THE LGBT COMMUNITY.

10:36AM 25       SO THAT MAKES ME WONDER WHETHER THAT KIND OF CONDUCT IS,

10:36AM 1    AS I ASKED FROM THE BEGINNING, SO IF I CREDIT THAT AS AN

10:36AM 2    ALLEGATION THAT I MUST ACCEPT AS TRUE THAT IT'S A

10:36AM 3    DISCRIMINATION BASED ON IDENTITY, IS THAT WITHIN THE SCOPE OF

10:36AM 4    THE PUBLISHING ACTIVITIES UNDER SECTION (C)(1)?

10:37AM 5        AND THE SECOND PART IS IF YOU HAVE TO SHOW GOOD FAITH

10:37AM 6    UNDER (C)(2), IS THAT KIND OF DISCRIMINATION, IS THERE A

10:37AM 7    QUESTION WHETHER THAT KIND OF DISCRIMINATION IS NOT GOOD FAITH

10:37AM 8    UNDER (C)(2)?

10:37AM 9        SO THOSE ARE QUESTIONS FOR MR. WILLEN.

10:37AM 10           MR. WILLEN:  SURE.  I'D BE HAPPY TO ADDRESS THOSE,

10:37AM 11   YOUR HONOR.

10:37AM 12       SO WITH RESPECT TO (C)(1), THE COURT IS NOT WRITING ON A

10:37AM 13   BLANK SLATE HERE.  WE'VE HAD A SERIES OF DECISIONS, AT LEAST

10:37AM 14   SIX CASES IN THE LAST TWO OR THREE YEARS ALL OF WHICH HAVE

10:37AM 15   APPLIED SECTION 230(C)(1) TO CLAIMS UNDER VARIOUS

10:37AM 16   DISCRIMINATION LAWS, INCLUDING THE UNRAH ACT.

10:37AM 17       SO, FOR EXAMPLE, THE DOMEN CASE THAT MS. WHITE MENTIONED

10:37AM 18   IN THE SOUTHERN DISTRICT OF NEW YORK WAS A CLAIM OF THE

10:37AM 19   UNRAH ACT SPECIFICALLY HELD THAT THE STATE, YOU KNOW,

10:37AM 20   DISCRIMINATION LAWS AND CLAIMS ARISING UNDER THEM ARE WITHIN

10:37AM 21   THE SCOPE OF PUBLISHING ACTIVITY AT LEAST IN CERTAIN CONTEXTS

10:38AM 22   UNDER (C)(1).

10:38AM 23       WE HAVE THE SIKHS FOR JUSTICE CASE, JUDGE KOH'S DECISION,

10:38AM 24   WHICH HELD THE SAME THING AS DID TITLE II OF THE FEDERAL CIVIL

10:38AM 25   RIGHTS ACT, AND THAT DECISION WAS AFFIRMED IN AN UNPUBLISHED

10:38AM 1    DECISION BY THE NINTH CIRCUIT, WHICH SPECIFICALLY SAID THERE'S

10:38AM 2    NO, THERE'S NO REASON TO EXEMPT THIS CLAIM FROM SECTION 230.

10:38AM 3         PRAGER HELD THE SAME THING.  SIKHS VERSUS FACEBOOK, THE

10:38AM 4    FEDERAL NEWS AGENCY CASE, ALSO A JUDGE KOH DECISION.  SO

10:38AM 5    THERE'S A LONG SERIES OF CASES THAT HAVE HELD THIS.

10:38AM 6         AND WHAT THAT REFLECTS IS THAT I THINK YOU HAVE TO LOOK IN

10:38AM 7    A CASE LIKE THIS, AS THOSE COURTS DID, AT THE NATURE OF THE

10:38AM 8    ACTIVITY THAT IS GIVING RISE TO THE CLAIM.

10:38AM 9         HERE PRIMARILY WHAT THE PLAINTIFFS ARE ALLEGING IS A

10:38AM 10   CHALLENGE TO TWO THINGS:

10:38AM 11        ONE IS THE DECISIONS THAT YOUTUBE MADE WITH RESPECT TO

10:38AM 12   RESTRICTED MODE, AND THAT'S THE EXCLUSION OF CERTAIN VIDEOS

10:38AM 13   FROM BEING ELIGIBLE TO BEING SHOWN IN YOUTUBE'S RESTRICTED

10:38AM 14   MODE;

10:39AM 15        AND THE SECOND IS THE DECISION TO DEMONETIZE SOME VIDEOS,

10:39AM 16   ALTHOUGH NOT ALL OF THE VIDEOS.

10:39AM 17        SO MS. WHITE CAN CERTAINLY ADDRESS WHETHER THOSE

10:39AM 18   ALLEGATIONS EVEN STATE A CLAIM UNDER THE UNRAH ACT, BUT

10:39AM 19   ASSUMING THAT THEY DID, THAT CHALLENGE, THE SPECIFIC ISSUES AT

10:39AM 20   ISSUE HERE, PLAINLY QUALIFY AS PUBLISHING ACTIVITY AS IT'S BEEN

10:39AM 21   DEFINED BY THE NINTH CIRCUIT AND THE SERIES OF NORTHERN

10:39AM 22   DISTRICT OF CALIFORNIA AND OTHER CASES THAT I MENTIONED.

10:39AM 23        SO WITH RESPECT TO RESTRICTED MODE, THAT WAS THE EXPRESS

10:39AM 24   HOLDING OF THE PRAGER II STATE COURT DECISION CHALLENGED THE

10:39AM 25   RESTRICTED MODE CLEARLY COMES UNDER SECTION 230(C)(2) AS

10:39AM 1   PUBLISHING CONDUCT, EXCUSE ME, AND LIKEWISE THE SAME THING WITH

10:39AM 2   RESPECT TO DEMONETIZATION, AND THAT WAS CONFIRMED EVEN MORE

10:39AM 3   RECENTLY BY JUDGE KIM'S DECISION IN THE LEWIS CASE WHICH WE

10:39AM 4   SUBMITTED AS SUPPLEMENTAL AUTHORITY.  AND THAT WAS A CASE

10:40AM 5   INVOLVING DEMONETIZATION, AND THE COURT THERE EXPLAINED VERY

10:40AM 6   CLEARLY I THINK THAT DEMONETIZATION IS A FORM OF PUBLISHER

10:40AM 7   ACTIVITY.

10:40AM 8        THE COURT:  LET ME PAUSE YOU RIGHT THERE,

10:40AM 9   MR. WILLEN, BECAUSE I GET THE POINT THAT OTHER CASES HAVE HELD

10:40AM 10   THAT PUBLISHING ACTIVITY ENCOMPASSES QUITE A BROAD SWATH OF

10:40AM 11   ACTIVITY, I UNDERSTAND THAT POINT.

10:40AM 12        BUT TO PUT A REALLY FINE POINT ON IT HERE, WHAT I'M

10:40AM 13   CONCERNED ABOUT IS IF, IF THE ALLEGATION IS, AND I KNOW THAT

10:40AM 14   GOOGLE DISPUTES THAT THIS IS REALLY WHAT IS ALLEGED, BUT IF THE

10:40AM 15   ALLEGATION IS THAT, A, SOMEONE WHO DOES ALL OF THOSE PUBLISHING

10:40AM 16   ACTIVITIES IS NEVERTHELESS DISCRIMINATING ON THE BASIS OF THE

10:40AM 17   AUTHOR'S IDENTITY, THE CONTENT CREATOR'S IDENTITY, REGARDLESS

10:40AM 18   OF WHAT IT IS THAT THE CONTENT HAS IN IT, IF THAT'S THE

10:40AM 19   ALLEGATION, ARE YOU SAYING THAT THAT IS PUBLISHING ACTIVITY,

10:40AM 20   DISCRIMINATION ON THE BASIS OF, LET'S JUST SAY SEXUAL

10:41AM 21   ORIENTATION OF THE CONTENT CREATOR, THAT'S WITHIN PUBLISHING

10:41AM 22   ACTIVITY UNDER (C)(1)?

10:41AM 23        MR. WILLEN:  WELL, I WOULD SAY TWO THINGS.  SO,

10:41AM 24   FIRST OF ALL, I THINK IT'S ACTUALLY CLEAR FROM THE FACTS

10:41AM 25   ALLEGED IN THE COMPLAINT AS OPPOSED TO KIND OF RHETORIC IN THE

10:41AM 1  COMPLAINT THAT THAT'S NOT WHAT IS PLAUSIBLY ALLEGED HERE.

10:41AM 2      YOU KNOW, WE KNOW, FOR EXAMPLE, THAT ALL OF THE -- NONE OF

10:41AM 3  THE PLAINTIFFS HERE HAVE HAD ALL OF THEIR VIDEOS EXCLUDED FROM

10:41AM 4  RESTRICTED MODE, NONE OF THEM HAVE ALL OF THEIR VIDEOS NOT

10:41AM 5  ELIGIBLE FOR MONETIZATION.

10:41AM 6      SO CLEARLY IF YOU ACTUALLY LOOK AT WHAT IS GOING ON IN

10:41AM 7  THIS CASE, IT'S VERY HARD TO SAY THAT THERE IS ANY SORT OF

10:41AM 8  IDENTITY OR USER BASE DISCRIMINATION.  SO I THINK THAT'S AN

10:41AM 9  IMPORTANT POINT.

10:41AM 10     BUT AGAIN, WITH RESPECT TO SORT OF THE LEGAL QUESTION

10:41AM 11 UNDER SECTION 230, I MEAN I THINK IT DOES FOLLOW, AND THERE MAY

10:41AM 12 BE SOME CASES WHERE THIS COULD NOT BE THE CASE DEPENDING ON THE

10:41AM 13 PARTICULAR CIRCUMSTANCES.

10:41AM 14     BUT THE NINTH CIRCUIT HAS BEEN VERY CLEAR THAT SECTION

10:42AM 15 230(C)(1) APPLIES WITHOUT REGARD TO THE NATURE OF THE CAUSE OF

10:42AM 16 ACTION.

10:42AM 17     THE THING THAT YOU'RE LOOKING AT IS WHAT IS THE DUTY THAT

10:42AM 18 THE CAUSE OF ACTION IMPOSES AND WHERE THAT DUTY TAKES THE FORM

10:42AM 19 OF A COMMAND EITHER TO PUBLISH OR NOT TO PUBLISH.  THAT IS

10:42AM 20 PRECISELY WHAT SECTION 230(C)(1) PROTECTS AGAINST.  SO

10:42AM 21 WITHDRAWING CONTENT FROM PUBLICATION, CLEAR PUBLIC ACTIVITY.

10:42AM 22     SO WHERE A DISCRIMINATION CLAIM TAKES THE FORM OF SEEKING

10:42AM 23 TO IMPOSE A DUTY ON THE PLATFORM TO EITHER PUBLISH OR NOT TO

10:42AM 24 WITHDRAW FROM PUBLICATION A PARTICULAR PIECE OF CONTENT OR A

10:42AM 25 PARTICULAR USER'S CONTENT, THAT I THINK JUST UNDER THE

10:42AM 1   ESTABLISHED LAW APPLIES AND KICKS THE IMMUNITY IN.

10:42AM 2           THE COURT:  THAT'S WHY I WAS ASKING THIS QUESTION IN

10:42AM 3   THE CONTEXT OF THE UNRAH ACT BECAUSE THAT TO ME SEEMED LIKE THE

10:42AM 4   ONLY -- IT'S NOT -- IT CAN'T BE A FIRST AMENDMENT ISSUE.  WE

10:43AM 5   KNOW THAT FROM PRAGER.

10:43AM 6           MR. WILLEN:  YEAH.

10:43AM 7           THE COURT:  I DIDN'T REALLY SEE HOW . THERE'S A 14TH

10:43AM 8   AMENDMENT ISSUE.  IT'S NOT REALLY PLED THAT WAY.

10:43AM 9       IT'S MORE OF AS A RESPONSE TO THE AFFIRMATIVE RESPONSE

10:43AM 10  UNDER 230(C).  SO THAT'S WHY I WAS FOCUSSING ON THE UNRAH ACT

10:43AM 11  BECAUSE IMAGINE THAT A PUBLISHER WAS DISCRIMINATING AGAINST A

10:43AM 12  CONTENT CREATOR BASED ON RACE, AND JUST MAKE IT REAL

10:43AM 13  STRAIGHTFORWARD, AND THAT WAS THE ALLEGATION.

10:43AM 14      SO LET'S JUST REMOVE IT FROM THE ACTUAL CASE HERE, BECAUSE

10:43AM 15  I KNOW THAT GOOGLE HAS A DIFFERENT VIEW OF WHAT ACTUALLY IS

10:43AM 16  PLED AND WHAT WAS PLAUSIBLY PLED, AND I JUST WANTED TO AVOID

10:43AM 17  THAT ISSUE.

10:43AM 18      I'M ASKING YOU A HYPOTHETICAL QUESTION.  A PUBLISHER IS

10:43AM 19  DISCRIMINATING AGAINST A CONTENT CREATOR ON THE BASIS OF RACE,

10:43AM 20  NOT ON CONTENT, IS THAT PUBLISHING ACTIVITY UNDER (C)(1) AND IS

10:43AM 21  IT IMMUNIZED -- WOULD IT ALSO BE IMMUNIZED UNDER (C)(2)?

10:43AM 22          MR. WILLEN:  YEAH.  SO I THINK THE (C)(2) QUESTION

10:43AM 23  IS A DIFFICULT ONE BECAUSE OF THE GOOD FAITH LANGUAGE.

10:44AM 24      OBVIOUSLY WE HAVE NOT SPECIFICALLY RAISED (C)(2) IN

10:44AM 25  CONNECTION WITH THIS MOTION.  I THINK THIS ISSUE HAS NOT

10:44AM  1    SPECIFICALLY COME UP IN THE (C)(2) CONTEXT.  I CAN IMAGINE SOME

10:44AM  2    COURTS TAKING THE POSITION THAT A PROPERLY PLEADED CLAIM OF THE

10:44AM  3    SORT THAT YOU DESCRIBE AS SORT OF FACIAL RACE DISCRIMINATION

10:44AM  4    CLAIM MAY NOT BE GOOD FAITH UNDER (C)(2), I CAN IMAGINE A COURT

10:44AM  5    TAKING THAT POSITION.

10:44AM  6         I THINK AGAIN, THOUGH, (C)(1) DOES NOT HAVE A GOOD FAITH

10:44AM  7    PROVISION, AND IT APPLIES WITH CIRCUMSTANCES AND APPLIES

10:44AM  8    DIFFERENTLY.

10:44AM  9         I THINK WE HAVE TO LOOK AT THE CARVE-OUTS THAT DO EXIST

10:44AM  10   UNDER (C)(1).  WE HAVE PARTICULAR STATUTES THAT CONGRESS CHOSE

10:44AM  11   TO EXEMPT, INTELLECTUAL PROPERTY, FEDERAL INTELLECTUAL PROPERTY

10:44AM  12   CLAIMS, CRIMINAL PROSECUTIONS, CLAIMS UNDER THE STORED

10:44AM  13   COMMUNICATIONS AND ELECTRONIC COMMUNICATIONS PRIVACY ACT.

10:45AM  14   DISCRIMINATION CLAIMS OBVIOUSLY ARE NOT, NOT THERE.

10:45AM  15        I THINK THERE COULD BE SOME STARK CASES WHERE A COURT

10:45AM  16   MIGHT FIND UNDER A PARTICULAR SET OF CIRCUMSTANCES THAT SOME

10:45AM  17   ALLEGED DISCRIMINATION DIDN'T TAKE THE FORM OF A PUBLISHER OF

10:45AM  18   ACTUALLY TARGETING PUBLISHER CONDUCT, AND, THEREFORE, DIDN'T

10:45AM  19   COME WITHIN (C)(1).

10:45AM  20        I THINK THIS CASE, WHICH IS THE CASE THAT WE HAVE TO LOOK

10:45AM  21   AT, IS I THINK CLEARLY ON THE OTHER SIDE OF THE LAW GIVEN THE

10:45AM  22   NATURE OF THE ALLEGATIONS FOCUSSED SPECIFICALLY ON RESTRICTED

10:45AM  23   MODE, FOCUSSED ON DEMONETIZATION.

10:45AM  24        WE KNOW FROM THE CASES THAT THOSE ARE CORE PUBLISHER

10:45AM  25   ACTIVITIES, AND WE KNOW FROM THE CASES THAT THE DISCRIMINATION

10:45AM 1    CLAIMS THAT ARE TARGETING THOSE KINDS OF ACTIVITIES HAVE BEEN

10:45AM 2    REPEATEDLY PRECLUDED BY SECTION 230(C)(1).

10:45AM 3        SO I DON'T THINK THERE'S ANY BASIS IN THIS CASE, GIVEN

10:45AM 4    THESE ALLEGATIONS, TO DEPART FROM THAT CONSENSUS.

10:45AM 5            THE COURT:  ALL RIGHT.  LET ME JUST ASK, DOES ANYONE

10:46AM 6    ON BEHALF OF GOOGLE WISH TO ADDRESS THE REQUEST FOR UNUSUAL

10:46AM 7    NOTICE?

10:46AM 8            MR. WILLEN:  SURE.  I'D BE HAPPY TO TALK ABOUT THAT

10:46AM 9    AS WELL.  YEAH, I THINK WE SHARE YOUR SENSE, YOUR HONOR, THAT

10:46AM 10   THE EXECUTIVE ORDER REALLY HAS NOTHING TO DO WITH THE ISSUES ON

10:46AM 11   THIS MOTION.

10:46AM 12       THE EXECUTIVE ORDER SEEMS TO US, AT LEAST THE ONLY

10:46AM 13   PROVISION OF IT THAT PURPORTS TO HAVE ANY ACTUAL PRESENT

10:46AM 14   EFFECT, WHICH IS PARAGRAPH 2, IS ADDRESSED TO AN INTERPRETATION

10:46AM 15   OF SECTION 230(C)(2)(A), WHICH SEEMS TO REDUCE TO IF YOU DON'T

10:46AM 16   QUALIFY FOR PROTECTION UNDER 230(C)(2)(A), YOU'RE NOT PROTECTED

10:46AM 17   BY SECTION 230(C)(2)(A).

10:46AM 18       SO I DON'T THINK THAT HAS ANY BEARING ON THIS MOTION WHICH

10:46AM 19   DOESN'T RELY ON SECTION 230(C)(2) AT ALL.

10:46AM 20       EVERYTHING ELSE IN THE ORDER IS SORT OF DIRECTED TO THINGS

10:46AM 21   THAT MIGHT HAPPEN IN THE FUTURE AND DIRECTIVES FOR RULE MAKING,

10:47AM 22   ET CETERA.

10:47AM 23       SO I DON'T THINK THERE'S ANYTHING TO DO WITH IT.  I DON'T

10:47AM 24   THINK IT HAS ANY BEARING ON THESE ISSUES, AND CERTAINLY IT

10:47AM 25   DOESN'T DISPLACE AND IT'S REALLY NOT CAPABLE OF DISPLACING

10:47AM 1    EITHER THE TEXT OF THE STATUTE OR THE LAW THAT HAS BEEN

10:47AM 2    ESTABLISHED WITH RESPECT TO (C)(1).

10:47AM 3              THE COURT:  ALL RIGHT.  THANK YOU FOR THAT.

10:47AM 4        IS THERE ANYTHING ELSE THAT YOU WOULD LIKE TO ARGUE IN

10:47AM 5    SUPPORT OF YOUR MOTION THAT I HAVEN'T FOCUSSED ON IN PARTICULAR

10:47AM 6    OR THAT YOU THINK NEEDS FURTHER ELABORATION AT THIS TIME?

10:47AM 7              MR. WILLEN:  I THINK THE ONLY THING, AND OBVIOUSLY I

10:47AM 8    WANT TO HEAR FROM THE PLAINTIFFS AND RESPOND TO WHAT THEY MIGHT

10:47AM 9    SAY, BUT I DO THINK THAT THE QUESTION OF THE CONSTITUTION, THE

10:47AM 10   CONSTITUTIONAL CHALLENGE TO SECTION 230 THAT THEY HAVE RAISED I

10:47AM 11   THINK, AS THE COURT RECOGNIZED, THE FINDING OF NO STATE ACTION

10:47AM 12   IN THE PRAGER CASE MAKING CLEAR THAT YOUTUBE IS A PRIVATE FORUM

10:48AM 13   AND NOT A GOVERNMENT ACTOR, I THINK THAT FINDING EQUALLY BARS

10:48AM 14   NOT JUST THE FIRST AMENDMENT CLAIM BUT ALSO ANY CHALLENGE TO

10:48AM 15   CONSTITUTIONALITY OF SECTION 230.

10:48AM 16       I THINK THE DECISION THAT IS PROBABLY MOST DIRECTLY ON

10:48AM 17   POINT IN EXPLAINING WHY THAT CHALLENGE FAILS IS THE

10:48AM 18   NINTH CIRCUIT'S DECISION IN ROBERTS VERSUS AT&T MOBILITY WHICH

10:48AM 19   WAS NOT A CASE THAT WE WERE ABLE TO CITE IN OUR PAPERS BECAUSE

10:48AM 20   IT RELATES TO AN ARGUMENT THAT THE PLAINTIFFS MADE IN THEIR

10:48AM 21   SURREPLY AND IN THEIR RESPONSE TO THE GOVERNMENT, BUT I THINK

10:48AM 22   THAT CASE WAS VERY HELPFUL.

10:48AM 23              THE COURT:  ALL RIGHT.  THANK YOU.  THANK YOU VERY

10:48AM 24   MUCH.

10:48AM 25        MR. OBSTLER, I WOULD LIKE FOR YOU TO HAVE IN MIND THE

10:48AM  1    QUESTIONS THAT THE COURT ASKED AT THE BEGINNING, SO JUST TO

10:48AM  2    REVIEW THE SIGNIFICANCE OF THE PRAGER DECISION ON YOUR FEDERAL

10:48AM  3    CLAIMS AND POSSIBLY THE CALIFORNIA CONSTITUTION CLAIM AS WELL;

10:48AM  4        THE QUESTIONS THAT THE COURT HAD ABOUT THE APPLICATION OF

10:49AM  5    230(C)(1) AND (2) AND THE CONTEXT OF THE INTENTIONAL

10:49AM  6    DISCRIMINATION, AND I FRAMED IT AS A QUESTION UNDER THE

10:49AM  7    UNRAH ACT, BUT YOU MAY THINK OF IT DIFFERENTLY, AND THEN I'LL

10:49AM  8    ALSO GIVE YOU AN OPPORTUNITY TO -- I WOULD LIKE YOU TO ADDRESS

10:49AM  9    YOUR REQUEST FOR JUDICIAL NOTICE AND LET ME KNOW WHY YOU THINK

10:49AM  10   IT MATTERS TO THE MOTION TO DISMISS.  AND MAYBE IT'S JUST

10:49AM  11   SPECIFICALLY TO THE GOVERNMENT'S POSITION ON THE MOTION TO

10:49AM  12   INTERVENE, BUT I'D LIKE TO JUST UNDERSTAND THAT, AND ANYTHING

10:49AM  13   ELSE THAT YOU WOULD LIKE TO ARGUE.  ALL RIGHT.

10:49AM  14        MR. OBSTLER:  THANK YOU SO MUCH, YOUR HONOR.

10:49AM  15     I REALLY APPRECIATE AN OPPORTUNITY TO GET A HEARING ON

10:49AM  16   THIS CASE BECAUSE I THINK THERE ARE A LOT OF MISCONCEPTIONS

10:49AM  17   ABOUT WHAT WE HAVE ALLEGED IN 126 PAGES AND 354 PARAGRAPHS.

10:49AM  18     I'M GOING TO ANSWER ALL OF YOUR QUESTIONS, BUT I'M GOING

10:49AM  19   TO REFER VERY CLOSELY TO THE COMPLAINT IN DOING THAT BECAUSE I

10:49AM  20   THINK A LOT OF WHAT THEY'RE REALLY ARGUING WHEN YOU PEEL BACK

10:50AM  21   THE ONION IS FACT BASED.  IF THEY'RE DISCRIMINATING, THESE

10:50AM  22   ARGUMENTS FALL APART.

10:50AM  23     I'LL START WITH THE PRAGER CASE.  I THINK WAY TOO MUCH

10:50AM  24   TIME -- AND I BEAR A LOT OF RESPONSIBILITY FOR THIS BECAUSE I

10:50AM  25   LITIGATED THE PRAGER CASE -- IS BEING SPENT ON STATE ACTION.

10:50AM 1    I'M GOING TO SUBMIT HERE ON STATE ACTION.  I DON'T WANT TO

10:50AM 2    WASTE ANY MORE TIME ON IT.  I THINK YOUR HONOR HAS HER VIEWS.

10:50AM 3         MY ONLY ISSUE WITH THE STATE ACTION DECISIONS THAT HAVE

10:50AM 4    COME DOWN SO FAR IS THAT THERE IS NOT A CLEAR PLEADING STANDARD

10:50AM 5    ON WHAT YOU WOULD HAVE TO PLEAD TO PLEAD PUBLIC FUNCTION OR TO

10:50AM 6    PLEAD ENDORSEMENT.

10:50AM 7         SO IF I COULD KNOW THAT, I COULD THEN MAKE A GOOD FAITH

10:50AM 8    DECISION AS TO WHETHER OR NOT I CAN ALLEGE THOSE TYPES OF

10:50AM 9    FACTS.  I WOULD LIKE TO HOLD, THOUGH, UNLESS THE COURT REALLY

10:50AM 10   WANTS TO HEAR FROM ME NOW ON THAT ISSUE, I WOULD REALLY LIKE TO

10:50AM 11   HOLD THAT TO THE END BECAUSE, FRANKLY, I'M PRETTY MUCH PREPARED

10:50AM 12   TO SUBMIT ON THAT.  WE'RE GOING TO HAVE TO GO UP ON THIS, AND

10:50AM 13   IT MAY BE THAT PRAGER AND HALLECK ENDS EVERYTHING.  I

10:50AM 14   UNDERSTAND THAT.  OKAY.  I DON'T THINK THAT'S THE KEY ISSUE IN

10:50AM 15   MY CASE AT THIS POINT.

10:50AM 16        THE COURT:  THE STATE ACTION ISSUE MAKES YOUR FIRST

10:51AM 17   AMENDMENT CLAIM YOUR WEAKEST CLAIM.

10:51AM 18        MR. OBSTLER:  I WOULD ABSOLUTELY AGREE WITH THAT,

10:51AM 19   YOUR HONOR.  I THINK SKINNER AND THE CONSTITUTIONALITY -- AND

10:51AM 20   SO SKINNER IS SORT OF UPSIDE-DOWN ON THE CONSTITUTIONALITY

10:51AM 21   ARGUMENT, BUT I WOULD AGREE THAT THAT, OF ALL OF THE CLAIMS IN

10:51AM 22   THIS CASE AT THIS POINT, DEPENDING ON WHAT THE STANDARD IS, IF

10:51AM 23   THAT'S THE WEAKEST CLAIM IN THIS CASE.

10:51AM 24        NOW, I WILL SAY THEY HAVE MERGED THEIR TERMS OF SERVICE

10:51AM 25   RECENTLY SO A VIOLATION ON YOUTUBE CAN ALSO LEAD TO THEM TAKING

10:51AM  1    ANDROID DEVICES AWAY, CAN LEAD TO THEM SHUTTING DOWN ALL SORTS

10:51AM  2    OF GOOGLE SERVICES.  THEY'RE VERY INVOLVED IN ELECTIONS.  WE

10:51AM  3    KNOW THAT FOR WHAT WENT ON IN THE DISASTER THAT HAPPENED IN THE

10:51AM  4    CAUCUSES.

10:51AM  5             THE COURT:  I WOULD RATHER NOT GET INTO THINGS THAT

10:51AM  6    ARE NOT ALLEGED IN YOUR COMPLAINT.

10:51AM  7             MR. OBSTLER:  YOUR HONOR, WE HAVE ALLEGED THAT THEY

10:51AM  8    ARE INVOLVED IN THESE FUNCTIONS.  WE HAVE ALLEGED THAT.  IF I

10:51AM  9    NEED TO ALLEGE MORE SPECIFICITY BECAUSE I'VE GOT SOME VERY

10:51AM 10    STRINGENT PLEADING REQUIREMENTS HERE, WE CAN TAKE A LOOK AT

10:52AM 11    THAT.

10:52AM 12        SO MY ONLY REQUEST ON THAT IS THAT THE COURT ARTICULATE

10:52AM 13    THE STANDARD WHY WE FAIL AND GIVE US LEAVE TO CONSIDER WHETHER

10:52AM 14    WE CAN AMEND, BUT OTHERWISE WE'RE PREPARED TO GO UP ON THAT

10:52AM 15    ISSUE, YOUR HONOR.

10:52AM 16             THE COURT:  ALL RIGHT.  LET'S HEAR ABOUT YOUR

10:52AM 17    ARGUMENTS THAT DON'T RELY ON STATE ACTION.

10:52AM 18             MR. OBSTLER:  OKAY.  LET'S START WITH LANHAM.  THEY

10:52AM 19    SEEM TO BE FOCUSSED VERY MUCH ON THE STATEMENTS ABOUT FREEDOM

10:52AM 20    OF EXPRESSION AND ALL THIS TYPE OF STUFF.  THAT'S NOT THE BASIS

10:52AM 21    FOR A LANHAM CLAIM.

10:52AM 22        THE BASIS FOR A LANHAM CLAIM IS THEY WEAR TWO HATS.

10:52AM 23    THEY'RE ONE OF THE LARGEST CONTENT CREATORS ON THE YOUTUBE

10:52AM 24    PLATFORM.  THEY HAVE PREFERRED CONTENT DEALS WITH MAJOR, MAJOR

10:52AM 25    MAINSTREAM PUBLISHERS.  SO THEY'RE WEARING TWO HATS.

```
10:52AM    1            AND WHAT THEY'RE DOING, YOUR HONOR, AND I HOPE YOU CAN SEE

10:52AM    2     THIS, THIS IS WHAT APPEARS --

10:52AM    3            THE COURT:  THAT'S OKAY.  I HAVE THE COMPLAINT.  YOU

10:52AM    4     DON'T NEED TO PUT IT ON THE VIDEO.

10:52AM    5            MR. OBSTLER:  YEAH.  THEY ARE SAYING TO ALL SORTS OF

10:52AM    6     VIEWERS AND AUDIENCES AROUND THE COUNTRY THAT MY CLIENT'S

10:52AM    7     VIDEOS ARE INAPPROPRIATE BECAUSE THEY CONTAIN SHOCKING CONTENT,

10:53AM    8     SEXUAL OR NUDITY, DRUGS, VIOLENCE, ET CETERA.  THAT'S WHAT THEY

10:53AM    9     ARE TELLING THE AUDIENCES WHEN THEY RESTRICT THOSE VIDEOS.

10:53AM   10          THIS CASE, BY THE WAY, IS NOT JUST ABOUT RESTRICTED MODE.

10:53AM   11     IT'S ABOUT EVERY SINGLE SERVICE THAT GOOGLE AND YOUTUBE OFFER

10:53AM   12     WHERE THE TRIGGER TO OBTAIN THE SERVICE IS BASED ON A CONTENT

10:53AM   13     BASED REVIEW OR CONTENT BASED PROCEDURE.

10:53AM   14          SO MY ARGUMENT IN LANHAM IS THAT THEY'RE USING THEIR ROLE

10:53AM   15     AS CONTENT REGULATORS TO BRAND OUR CONTENT AS INAPPROPRIATE, SO

10:53AM   16     WHEN THE READER LOOKS TO SEE WHAT IS ON RESTRICTED MODE, THEY

10:53AM   17     HAVE A LIST AND THAT IS AN AFFIRMATIVE STATEMENT THAT THEY HAVE

10:53AM   18     REVIEWED THE CONTENT AND THAT THEY HAVE FOUND THE CONTENT TO

10:53AM   19     VIOLATE THAT RULE.

10:53AM   20            THE COURT:  SO LET ME PAUSE YOU THERE FOR A MOMENT

10:53AM   21     AND LET ME MAKE SURE THAT I UNDERSTAND WHAT YOU'RE SAYING THE

10:53AM   22     LANHAM ACT CLAIM IS.

10:53AM   23          IS IT A FALSE ADVERTISING CLAIM UNDER 1125(A)(1)(B)?

10:54AM   24            MR. OBSTLER:  YES, YES.

10:54AM   25            THE COURT:  OKAY.  SO THEN YOU HAVE TO GO THROUGH
```

10:54AM  1      THE ELEMENTS.

10:54AM  2          SO IF YOU HAD TO TELL ME AN ANSWER TO THIS QUESTION, WHAT

10:54AM  3      IS THE FALSE OR MISLEADING STATEMENT?

10:54AM  4              MR. OBSTLER:  THE FALSE OR MISLEADING STATEMENT THAT

10:54AM  5      THEY'RE MAKING IS THAT MY CLIENT'S VIDEOS ARE INAPPROPRIATE

10:54AM  6      SEXUALLY, CONTAIN SEXUAL NUDITY OR MATERIAL, CONTAIN VIOLENCE,

10:54AM  7      WHEN, IN FACT, THAT IS NOT TRUE BECAUSE THEY'RE NOT EVEN

10:54AM  8      LOOKING AT THE CONTENT.

10:54AM  9              THE COURT:  AND YOU'RE SAYING THAT THE STATEMENT IS

10:54AM  10     IMPLICIT BECAUSE A SCREEN DISPLAY THAT INDICATES TO THE VIEWER

10:54AM  11     THAT THAT IS BLOCKED, OR NOT AVAILABLE IN RESTRICTED MODE,

10:54AM  12     IMPLIES THAT IT MUST MEET ONE OF THOSE CATEGORIES OF CONTENT

10:54AM  13     THAT GOOGLE WILL NOT PERMIT TO BE SHOWN IN THAT MODE.

10:54AM  14         IS THAT THE THEORY?

10:54AM  15             MR. OBSTLER:  THAT IS CORRECT, YOUR HONOR.

10:54AM  16         BUT IT GOES A LITTLE DEEPER THAN THAT, OKAY?  BECAUSE IT

10:54AM  17     ALSO -- AND THIS OVERLAPS WITH THE (C)(1)(A) ISSUE, AND WE'VE

10:55AM  18     ALLEGED THIS AND THE FROSCH DECLARATION CONTAINS IT, TOO.

10:55AM  19         THEY'RE NOT ONLY USING DISCRIMINATORY ALGORITHMS TO DO

10:55AM  20     THIS.  THEY'RE ACTUALLY EMBEDDING METADATA INTO MY CLIENT'S

10:55AM  21     VIDEOS THAT ALLOW THE ALGORITHM TO DO THE PROFILE.

10:55AM  22         AGAIN, UNTIL WE DO DISCOVERY, THIS IS GOING TO BE A VERY

10:55AM  23     COMPLICATED CASE, AND WE'RE SAYING SHOW US THE CODE AND SHOW US

10:55AM  24     HOW THIS WORKS.

10:55AM  25         BUT WE DID A TEA VIDEO, AS YOUR HONOR KNOWS, WHERE WE

24

10:55AM  1    ALLEGED AND WHERE WE PUT IN BOTH TAG LINES AND THEN WE PUT IT

10:55AM  2    IN WITHOUT THE TAG LINES AND ALL IT SAYS IS WE LIKE TEA.  IT

10:55AM  3    GOT RESTRICTED.

10:55AM  4         AND AS MS. FROSCH WAS TOLD AT THE MEETINGS, HOW COULD THAT

10:55AM  5    HAVE HAPPENED UNLESS SOMEBODY PUT SOME METADATA IN THERE THAT

10:55AM  6    ALLOWED THAT ALGORITHM TO FIND YOU.

10:55AM  7         AND SO WHAT WE'RE SAYING IS THAT BECAUSE THEY'RE SUCH

10:56AM  8    LARGE CONTENT CREATORS, AND THEY'RE USING THEIR ROLE AS CONTENT

10:56AM  9    REGULATORS TO ALSO FALSELY BRAND CONTENT THAT IS ABSOLUTELY

10:56AM 10    APPROPRIATE AS INAPPROPRIATE, AND THAT BLOCKS OUR REACH, AND

10:56AM 11    THAT'S HOW THEY'RE COMPETING WITH US.

10:56AM 12         THE COURT:  RIGHT.  SO THAT DOESN'T SOUND SO MUCH

10:56AM 13    LIKE FALSE ADVERTISING, AND SO THAT'S WHY I WAS ASKING YOU, IS

10:56AM 14    IT A FALSE ADVERTISING CLAIM OR IS IT SOMETHING ELSE?

10:56AM 15         MR. OBSTLER:  WHEN YOU SAY THAT THAT DOESN'T SOUND

10:56AM 16    LIKE FALSE ADVERTISING --

10:56AM 17         THE COURT:  YOU'RE SAYING -- SO YOU'RE FALSELY

10:56AM 18    BRANDING -- YOUR THEORY IS THAT GOOGLE AND YOUTUBE ARE FALSELY

10:56AM 19    BRANDING YOUR CLIENT'S CONTENT?

10:56AM 20         MR. OBSTLER:  THAT'S CORRECT, BUT THEY'RE DOING IT

10:56AM 21    BY SHOWING EVERY VIEWER WHO GOES THERE (INDICATING).

10:56AM 22         MY WIFE THE OTHER DAY ACTUALLY GOT A RESTRICTED MODE

10:56AM 23    NOTICE ON HER FACEBOOK PAGE.  SO THE RESTRICTED MODE IS NOW

10:56AM 24    GOING ACROSS PLATFORM.  AND SHE LOOKED IT UP AND SHE SAID WHAT

10:56AM 25    IS GOING ON HERE?

10:56AM  1        THE POINT IS -- I'M SORRY, THE POINT IS --

10:57AM  2            THE COURT:  AGAIN, I'M JUST TRYING TO FIGURE OUT HOW

10:57AM  3    YOUR CLAIM FITS THE CLAIM THAT YOU'VE ALLEGED UNDER THE

10:57AM  4    LANHAM ACT, HOW YOUR FACTS FIT THAT CLAIM.  I'M STILL

10:57AM  5    STRUGGLING A LITTLE BIT WITH ALL OF THE ELEMENTS THAT YOU HAVE

10:57AM  6    TO SHOW FOR THE LANHAM ACT.

10:57AM  7        THE QUESTION THAT THE NINTH CIRCUIT FOCUSSED ON WAS THAT

10:57AM  8    THE STATEMENTS, AND THE SAME ARGUMENTS WERE MADE IN THAT CASE

10:57AM  9    AS FAR AS I CAN TELL, THE STATEMENTS WERE NOT MADE IN

10:57AM  10   COMMERCIAL ADVERTISING OR PROMOTION.

10:57AM  11           MR. OBSTLER:  YEP.

10:57AM  12           THE COURT:  THE FALSE STATEMENTS.

10:57AM  13       RATHER, THE STATEMENTS THAT WERE MADE WERE DESCRIBING

10:57AM  14   TRUTHFULLY WHAT HAD HAPPENED AS IN THIS GOT FLAGGED AS

10:57AM  15   SOMETHING THAT WOULD BE EXCLUDED FROM RESTRICTED MODE.

10:57AM  16       SO -- AND THE IMPLEMENTATION OF THAT, THE GUIDELINES THAT

10:57AM  17   RESULTED IN THAT DISPLAY BEING AS YOU DESCRIBE WERE NOT

10:58AM  18   ADVERTISING OR PROMOTION.

10:58AM  19       SO IN LIGHT OF PRAGER, HOW DO YOU AVOID THE CONCLUSIONS

10:58AM  20   THAT THAT COURT REACHED?  HOW DO YOU AVOID THOSE AND

10:58AM  21   EFFECTIVELY HAVE A CLAIM IN THIS CASE THAT DOESN'T HIT THOSE

10:58AM  22   SAME BARRIERS?

10:58AM  23           MR. OBSTLER:  BECAUSE THE COURT IN PRAGER MADE AN

10:58AM  24   INAPPROPRIATE FACTUAL FINDING.

10:58AM  25           THE COURT:  OKAY.  SO WHAT IS THE INAPPROPRIATE

10:58AM  1    FACTUAL FINDING?

10:58AM  2          MR. OBSTLER:  YEAH.  IT SAID THERE WAS NO

10:58AM  3    RELATIONSHIP BETWEEN THE STATEMENT THAT IS RESTRICTED IN ANY

10:58AM  4    ADVERTISING OR STATEMENT ABOUT THE QUALITY OF THE VIDEO.  THAT

10:58AM  5    WAS PLED IN THE COMPLAINT.

10:58AM  6          I ADMIT IT SHOULD HAVE BEEN MORE CLEARER.  WE EXPRESSLY

10:58AM  7    PLED THAT HERE, AND IT IS BY IMPLICATION AS YOU POINTED OUT

10:58AM  8    UNDER THE GRUBBS DECISION OR WHATEVER.

10:58AM  9          I MEAN, THIS IS THE INTERNET AND THEY'RE USING -- THEY'RE

10:58AM  10   RESTRICTING THE VIDEO.  THE PERSON LOOKED AT THAT RESTRICTION

10:58AM  11   AND WHAT IS IT -- WHY WOULD THEY RESTRICT THE VIDEO?  THERE HAS

10:58AM  12   TO BE SOMETHING WRONG WITH THAT VIDEO AND PEOPLE SEE THAT.

10:59AM  13         AND I THINK THAT IT IS A FACTUAL ISSUE AS TO WHETHER OR

10:59AM  14   NOT THERE IS A CONNECTION BETWEEN THIS STATEMENT OF FACT "MY

10:59AM  15   VIDEO IS RESTRICTED" AND A STATEMENT OF FACT ABOUT WHETHER OR

10:59AM  16   NOT THAT VIDEO CONTAINS INAPPROPRIATE MATERIAL, SHOCKING AND

10:59AM  17   SEXUALLY EXPLICIT, OR AS THE FLOOR MANAGER FOR GOOGLE SAID

10:59AM  18   "BECAUSE YOU'RE GAY" AND PUTTING THAT OUT ON THE NETWORK TO

10:59AM  19   EVERYBODY.

10:59AM  20         SECOND OF ALL, IF I WOULD GET LEAVE TO AMEND BECAUSE WE

10:59AM  21   JUST LEARNED THIS, RESTRICTED MODE SWEEPS BROADER THAN WHAT

10:59AM  22   THEY'VE TOLD US AND WHAT THEY'VE REPRESENTED TO THE COURT.  WE

10:59AM  23   NOW HAVE EVIDENCE THAT RESTRICTED MODE IS GOING TO PEOPLE WHO

10:59AM  24   DON'T EVEN HAVE IT ON, AND IT'S GOING ACROSS THE PLATFORM.

10:59AM  25         I'M SORRY, I LEARNED THAT RECENTLY.  THIS CASE HAS BEEN

10:59AM 1    EVOLVING.  WE HAVEN'T GOTTEN A SINGLE LICK OF DISCOVERY ON THIS

10:59AM 2    TO DATE, YOUR HONOR.

10:59AM 3         THE COURT:  RIGHT.  IT'S NOT UNUSUAL THAT AT THE

10:59AM 4    PLEADING STAGE YOU WOULDN'T HAVE HAD DISCOVERY.

10:59AM 5         MR. OBSTLER:  FAIR ENOUGH.

11:00AM 6         THE COURT:  THAT'S WHY WE'RE AT THE PLEADING STAGE.

11:00AM 7         MR. OBSTLER:  YEAH.

11:00AM 8         THE COURT:  SO THE ISSUE I STILL THINK IS

11:00AM 9    CHALLENGING FOR YOU IS CHARACTERIZING THESE STATEMENTS AS

11:00AM 10   ADVERTISING OR PROMOTION.  I THINK THAT'S STILL A CHALLENGING

11:00AM 11   POINT.

11:00AM 12       AND EVEN IF YOU HAD DISCOVERY ABOUT HOW RESTRICTED MODE IS

11:00AM 13   BEING APPLIED OR MISAPPLIED IN YOUR VIEW, OR OVERINCLUSIVE OR

11:00AM 14   UNDERINCLUSIVE, HOW IS THAT ADVERTISING OR PROMOTION IF WHAT

11:00AM 15   APPLE -- I'M SORRY, APPLE -- IF WHAT GOOGLE AND YOUTUBE ARE

11:00AM 16   DOING ARE SIMPLY SAYING THIS IS THE RESULT OF WHATEVER IT IS

11:00AM 17   BEHIND THE SCENES THAT RESULTED IN AN EXCLUSION FROM RESTRICTED

11:00AM 18   MODE, WHETHER IT'S A HUMAN DOING IT OR AN ALGORITHM DOING IT OR

11:00AM 19   A COMMUNITY FLAG, OR WHATEVER THE MECHANISM IS, THEY'RE

11:00AM 20   REPORTING ON THAT BLACK SCREEN THAT THAT PARTICULAR CONTENT IS

11:00AM 21   SUBJECT TO RESTRICTED MODE.

11:00AM 22       THAT'S A FACTUAL STATEMENT.

11:01AM 23        MR. OBSTLER:  CORRECT, YOUR HONOR.

11:01AM 24        THE COURT:  AND SO -- YOU KNOW, IT'S A LITTLE BIT --

11:01AM 25   WE CAN GET TO THE QUESTION OF WHETHER, YOU KNOW, WHAT THE

| | | |
|---|---|---|
| 11:01AM | 1 | INTERSECT IS WITH SECTION 230, BUT JUST FOCUSSING ON JUST THE |
| 11:01AM | 2 | LANHAM ACT CLAIM ITSELF AND WHETHER YOU MEET THE ELEMENTS, I'M |
| 11:01AM | 3 | STILL HAVING TROUBLE WITH THE ALLEGATION THAT THAT IS REALLY |
| 11:01AM | 4 | COMMERCIAL ADVERTISING OR PROMOTION. |
| 11:01AM | 5 | MR. OBSTLER:  BUT THAT IS EXACTLY WHAT THE COURT |
| 11:01AM | 6 | STRUGGLED WITH IN GRUBBS.  THAT IS EXACTLY WHAT THE COURT |
| 11:01AM | 7 | STRUGGLED WITH IN THE DECISIONS THAT ARE CITED IN PRAGER AND |
| 11:01AM | 8 | EVERY SINGLE ONE OF THEM WAS DONE ON A FACTUAL RECORD.  THERE |
| 11:01AM | 9 | ISN'T A MOTION TO DISMISS IN ANY OF THOSE CASES. |
| 11:01AM | 10 | NOW, I HAD TO MAKE A STRATEGIC DECISION OBVIOUSLY, AS TO |
| 11:01AM | 11 | WHETHER WE WERE GOING TO MOVE FOR RECONSIDERATION WITH THE |
| 11:01AM | 12 | NINTH CIRCUIT IN PRAGER.  WE CHOSE NOT TO DO SO.  THAT'S NOT |
| 11:01AM | 13 | THIS CASE.  IT SHOULDN'T BE HERE, BUT YOU WERE ASKING ABOUT THE |
| 11:01AM | 14 | CONSEQUENCES OF PRAGER. |
| 11:01AM | 15 | FOR PRAGER PURPOSES WE CAN HAVE A LEGITIMATE DISPUTE, BUT |
| 11:01AM | 16 | I THINK HERE WE ARE EXPRESSING ALLEGING THAT THESE ARE |
| 11:02AM | 17 | STATEMENTS OF FACT THAT ARE BRANDING OUR VIDEOS AS |
| 11:02AM | 18 | INAPPROPRIATE AT THE SAME TIME THAT THEY ARE NOT RESTRICTING |
| 11:02AM | 19 | THEIR VIDEOS AND PUTTING THAT STUFF ON THEIR STUFF AND THAT TO |
| 11:02AM | 20 | ME IS IMPLICIT FALSE ADVERTISING UNDER GRUBBS AND UNDER THE |
| 11:02AM | 21 | OTHER CASES. |
| 11:02AM | 22 | AND IF WE DEVELOP A RECORD, AND IT'S PRETTY CLEAR THAT |
| 11:02AM | 23 | THIS IS NOT EVEN IN THE BALLPARK, YOUR HONOR, I'LL DISMISS THE |
| 11:02AM | 24 | CLAIM.  BUT I THINK WE SHOULD GET AN OPPORTUNITY TO DO SOME |
| 11:02AM | 25 | DISCOVERY ON THAT CLAIM.  I THINK THIS IS COMMERCIAL |

| | | |
|---|---|---|
| 11:02AM | 1 | ADVERTISING AS ALLEGED, AND I BELIEVE THAT BASED ON DISCOVERY |
| 11:02AM | 2 | AND IF YOU LOOK AT THE CASES AND IF YOU LOOK AT WHAT THEY |
| 11:02AM | 3 | CONSIDERED IN THOSE CASES, THIS IS NOT A ONE SIZE FITS ALL. |
| 11:02AM | 4 | THIS CASE IS EXTREMELY DIFFERENT AND ESPECIALLY GIVEN THE |
| 11:02AM | 5 | NATURE OF MY CLIENTS AND WHAT THAT STATEMENT MEANS ON THEIR |
| 11:02AM | 6 | VIDEOS. |
| 11:02AM | 7 | THE COURT:  ALL RIGHT.  LET ME JUST ASK BECAUSE |
| 11:02AM | 8 | THERE SEEMS TO BE SOME AMBIGUITY ABOUT THIS IN THE BRIEFING. |
| 11:02AM | 9 | DO THE PLAINTIFFS ALSO ALLEGE AN 1125(A)(1)(A) FALSE |
| 11:02AM | 10 | ASSOCIATION CLAIM OR ARE YOU LIMITING YOUR CLAIM UNDER THE |
| 11:02AM | 11 | LANHAM ACT TO FALSE ADVERTISING? |
| 11:03AM | 12 | MR. OBSTLER:  AT THIS POINT WE'RE LIMITING UNDER |
| 11:03AM | 13 | FALSE ADVERTISING. |
| 11:03AM | 14 | THE COURT:  OKAY. |
| 11:03AM | 15 | MR. OBSTLER:  I HAVEN'T THOUGHT ABOUT THE FALSE |
| 11:03AM | 16 | ASSOCIATION CLAIM TO BE HONEST, YOUR HONOR. |
| 11:03AM | 17 | THE COURT:  OKAY. |
| 11:03AM | 18 | MR. OBSTLER:  THE CONCERN IS, AND IT GOES TO THE |
| 11:03AM | 19 | THEORY IN THE WHOLE CASE, IS THAT WE THINK THAT THE WEARING OF |
| 11:03AM | 20 | THE TWO HATS AND THE USE OF THE COMPUTERS, BECAUSE THEY CAN'T |
| 11:03AM | 21 | HAVE HUMANS DO THIS STUFF, HAS GOTTEN TO THE POINT WHERE IT HAS |
| 11:03AM | 22 | GOTTEN ANTICOMPETITIVE. |
| 11:03AM | 23 | I UNDERSTAND THE LIMITS OF A LANHAM ACT CLAIM AS OPPOSED |
| 11:03AM | 24 | TO AN ANTITRUST OR A UCL CLAIM, AND I RESPECT THAT.  I |
| 11:03AM | 25 | UNDERSTAND THE ISSUE HERE IS COMMERCIAL ADVERTISING.  I |

11:03AM  1    UNDERSTAND THAT IT IS VERY LEGITIMATE FOR YOUR HONOR TO SAY,

11:03AM  2    BOY, IT'S A FACT -- IT'S SAYING YOU'RE RESTRICTED.

11:03AM  3         BUT THE QUESTION IS, YOUR HONOR, DON'T YOU ASK YOURSELF

11:03AM  4    WHY WHEN YOU SEE THAT?  ISN'T IT REASONABLE TO SUGGEST THAT

11:03AM  5    PEOPLE ARE SAYING WHY?

11:03AM  6         AND FURTHERMORE, IF THE VIDEO ISN'T CONTAINING THAT

11:03AM  7    MATERIAL, WHY IS IT BEING RESTRICTED?  THAT IN AND OF ITSELF IS

11:04AM  8    A FALSE STATEMENT.  IT MAY NOT BE FALSE ADVERTISING.

11:04AM  9         THE COURT:  I UNDERSTAND YOUR THESIS FOR THE LANHAM

11:04AM  10   ACT CLAIM.

11:04AM  11        SO LET ME ASK YOU TO ADDRESS THE QUESTION THAT I HAD

11:04AM  12   RAISED AND THAT MR. WILLEN AND I SPENT SOME TIME DISCUSSING,

11:04AM  13   WHICH IS THAT WHETHER THERE IS IMMUNITY UNDER 230(C)(1) AND (2)

11:04AM  14   IN THE CONTEXT OF A CLAIM FOR INTENTIONAL DISCRIMINATION BASED

11:04AM  15   ON IDENTITY.

11:04AM  16        MR. OBSTLER:  YES, YOUR HONOR.  THIS IS PROBABLY THE

11:04AM  17   MOST IMPORTANT ISSUE IN THIS CASE, ABSOLUTELY THE MOST

11:04AM  18   IMPORTANT ISSUE IN THIS CASE AND ONE OF THE MOST IMPORTANT

11:04AM  19   ISSUES FOR THE INTERNET.

11:04AM  20        IT'S DIFFICULT FOR ME TO BELIEVE, AND I START WITH THIS

11:04AM  21   PREMISE THAT CONGRESS ENACTED THE LAW IN WHICH IT ALLOWED

11:04AM  22   INTERNET COMPANIES, EVEN IF THEY WANTED, TO SELF-REGULATE TO DO

11:04AM  23   SO BY FILTERING PEOPLE AND NOT CONTENT.

11:04AM  24        THERE IS NOTHING IN THE LANGUAGE OF (C)(1) OR (C)(2) THAT

11:04AM  25   PERMITS THIS TYPE OF BEHAVIOR.  NOTHING.  IT SAYS MATERIAL, IT

11:05AM 1    DOESN'T SAY PEOPLE.

11:05AM 2        OUR ALLEGATION IN THIS CASE IS THEY'RE FILTERING PEOPLE.

11:05AM 3    THEY'RE NOT FILTERING -- SO GOING TO (C)(1), LET ME MAKE ONE

11:05AM 4    POINT BEFORE WE GET INTO THE STATUTORY CONSTRUCTION OF THE

11:05AM 5    WHOLE THING.

11:05AM 6        ON (C)(1), THE REASON THAT, THAT PRAGER II, JUDGE WALSH

11:05AM 7    DISMISSED THE CLAIM WAS THAT HE SAID THAT THERE WAS NO

11:05AM 8    ALLEGATION THAT GOOGLE ADDED ANYTHING TO THE CONTENT.

11:05AM 9        WE HAVE THAT ALLEGATION IN THIS CASE.

11:05AM 10        THE COURT:  I'M SORRY, NO ALLEGATION THAT GOOGLE

11:05AM 11   ADDED ANYTHING --

11:05AM 12        MR. OBSTLER:  ANYTHING TO MY CLIENT'S CONTENT.  HE'S

11:05AM 13   SAYING UNDER (C)(1), UNDER ROOMMATES, IF YOU'RE INVOLVED IN ANY

11:05AM 14   ASPECT OF WHAT THE CONTENT IS THAT IS BEING CENSORED, RIGHT,

11:05AM 15   THEN YOU DON'T GET IMMUNITY.  EVERYBODY AGREES IN ROOMMATES.

11:05AM 16   IN FACT, GOOGLE --

11:05AM 17        THE COURT:  ARE YOU REFERRING TO YOUR ALLEGATION

11:05AM 18   THAT GOOGLE OR YOUTUBE IS ADDING METADATA TO YOUR CLIENT'S

11:06AM 19   CONTENT.

11:06AM 20        MR. OBSTLER:  YES.  YES.

11:06AM 21        THE COURT:  AND THAT IS WHAT YOU'RE SAYING IS THE

11:06AM 22   ADDITION OF CONTENT AS WITH PUBLISHING OR MAKING DECISIONS

11:06AM 23   ABOUT PUBLISHING?

11:06AM 24        MR. OBSTLER:  YES, BECAUSE THE METADATA IS WHAT THE

11:06AM 25   ALGORITHM IS USING TO MAKE THE DECISION.

|        |    |                                                                  |
|--------|----|------------------------------------------------------------------|
| 11:06AM | 1 | THE COURT:  DOES A PUBLISHER NOT GET TO EDIT? |
| 11:06AM | 2 | MR. OBSTLER:  YES, BUT A PUBLISHER WHO HAS A |
| 11:06AM | 3 | CONTRACT WITH ITS AUTHOR THAT IT'S GOING TO BE VIEWPOINT |
| 11:06AM | 4 | NEUTRAL DOESN'T GET TO DISCRIMINATE. |
| 11:06AM | 5 | IN OTHER WORDS, IN OTHER WORDS, CAN THE -- CAN |
| 11:06AM | 6 | SIMON & SCHUSTER GET YOUR LICENSING RIGHTS BY YOU AGREEING TO A |
| 11:06AM | 7 | TERM OF SERVICE AND SAYING WE'RE GOING TO GIVE YOU VIEWPOINT |
| 11:06AM | 8 | NEUTRAL EDITING OF YOUR STUFF AND THEN TURN AROUND AND BREACH |
| 11:06AM | 9 | THAT? |
| 11:06AM | 10 | THE COURT:  SO THAT'S A DIFFERENT QUESTION.  IF |
| 11:06AM | 11 | YOU'RE SAYING THAT THERE'S A BREACH OF CONTRACT HERE BETWEEN A |
| 11:06AM | 12 | PUBLISHER AND AN AUTHOR, THAT WOULD BE ONE THING, BUT THAT'S |
| 11:06AM | 13 | NOT WHAT WE'RE FOCUSSING ON RIGHT NOW. |
| 11:06AM | 14 | WE'RE TALKING ABOUT WHAT IS ENCOMPASSED WITHIN (C)(1) IN |
| 11:07AM | 15 | TERMS PUBLISHING, AND I RAISED THIS QUESTION VERY DIRECTLY WITH |
| 11:07AM | 16 | GOOGLE'S LAWYERS, DOES PUBLISHING INCLUDE DISCRIMINATING BASED |
| 11:07AM | 17 | ON THE AUTHOR'S IDENTITY?  WHAT DOES THAT LOOK LIKE? |
| 11:07AM | 18 | AND IS THAT AMONG THE FUNCTIONS A PUBLISHER IS ALLOWED TO |
| 11:07AM | 19 | CONDUCT IN ITS ROLE AS A PUBLISHER AND THAT IS IMMUNIZED UNDER |
| 11:07AM | 20 | (C)(1)? |
| 11:07AM | 21 | (C)(2) HAS A GOOD FAITH REQUIREMENT.  (C)(1) DOES NOT. |
| 11:07AM | 22 | YOUR ARGUMENT MAY BE SUBSTANTIALLY STRONGER UNDER (C)(2), BUT |
| 11:07AM | 23 | UNDER (C)(1), IF THE PUBLISHER CAN CHOOSE WHAT TO PUBLISH AND |
| 11:07AM | 24 | HOW, IT'S A VERY DIFFICULT ARGUMENT TO MAKE, AND THAT'S WHY I |
| 11:07AM | 25 | WAS VERY INTERESTED IN THE QUESTION OF -- AND MR. WILLEN MADE |

11:07AM 1   THE POINT THAT THERE ARE CERTAIN KINDS OF CAUSES OF ACTION THAT

11:07AM 2   TAKE CONDUCT OUTSIDE OF THE SCOPE OF 230(C)(1), IS THAT -- IF I

11:08AM 3   WERE TO CONSTRUE YOUR CLAIM THIS WAY, AND THERE'S A DEBATE

11:08AM 4   ABOUT WHETHER IT'S APPROPRIATE TO CONSTRUE IT THIS WAY GIVEN

11:08AM 5   THE FACTS THAT ARE ALLEGED IN YOUR COMPLAINT, THAT THERE WAS

11:08AM 6   INTENTIONAL DISCRIMINATION BASED ON IDENTITY AS OPPOSED TO

11:08AM 7   CONTENT, WHAT IS YOUR BEST CASE FOR SAYING THAT 230(C)(1) DOES

11:08AM 8   NOT ENCOMPASS THAT?

11:08AM 9         MR. OBSTLER:  THE QUESTION IS DOES 230(C)(1)

11:08AM 10   IMMUNIZE THEM AS TO THE SPECIFIC CAUSES OF ACTION IN THE CASE;

11:08AM 11   RIGHT?

11:08AM 12         THE COURT:  YES.  YES.  SO THE UNRAH ACT IS THE ONLY

11:08AM 13   ONE THAT I THINK GIVES YOU A LEG TO STAND ON.

11:08AM 14         MR. OBSTLER:  WHAT ABOUT BREACH OF CONTRACT,

11:08AM 15   YOUR HONOR?

11:08AM 16         THE COURT:  I'M SORRY?

11:08AM 17         MR. OBSTLER:  WHAT ABOUT BREACH OF CONTRACT?

11:08AM 18         THE COURT:  SO YOU DON'T HAVE BREACH OF CONTRACT.

11:08AM 19   YOU HAVE BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR

11:08AM 20   DEALING, WHICH THAT'S A HARD ONE IN ANY CIRCUMSTANCE,

11:08AM 21   ESPECIALLY GIVEN THE ALLEGED CONTRACT TERMS THAT YOU CITE

11:08AM 22   SAYING THAT THERE WAS A BREACH OF THE IMPLIED COVENANT IS

11:09AM 23   REALLY DIFFICULT JUST ON A 12(B)(6) BASIS.

11:09AM 24     SO YOU DON'T HAVE A BREACH OF CONTRACT CLAIM.

11:09AM 25         MR. OBSTLER:  WELL, YOUR HONOR, WOULD YOU GIVE ME

11:09AM  1    LEAVE TO AMEND AND ADD IT?

11:09AM  2            THE COURT:  WELL, BEFORE WE GET TO THAT, I'M JUST

11:09AM  3    REALLY VERY INTERESTED IN THIS QUESTION.

11:09AM  4            MR. OBSTLER:  I AM, TOO, YOUR HONOR.  LET ME TAKE

11:09AM  5    ANOTHER SHOT AT IT, PLEASE, IF I COULD.

11:09AM  6            THE COURT:  SO WHAT IS THE BEST CASE THAT YOU HAVE?

11:09AM  7            MR. OBSTLER:  OKAY.  NUMBER ONE, THERE IS NO (C)(1)

11:09AM  8    COVERAGE HERE BECAUSE THEY'RE ADDING OUR CONTENT, SO JUST ON

11:09AM  9    THE FACE OF THE STATUTE.

11:09AM  10       NUMBER TWO, CAN CONGRESS ENACT A LAW THAT IMMUNIZES

11:09AM  11   PUBLISHERS FROM RACE DISCRIMINATION IN THE ACT OF PUBLISHING?

11:09AM  12   IS THAT LAW CONSTITUTIONAL?

11:09AM  13       I WOULD SAY THAT UNDER DENVER AREA IT IS NOT.  THAT'S MY

11:09AM  14   ARGUMENT.

11:09AM  15           THE COURT:  YOUR RESPONSE TO THE COURT'S QUESTION

11:09AM  16   WOULD BE IF (C)(1) DOES ALLOW IT, IT HAS TO BE

11:09AM  17   UNCONSTITUTIONAL?

11:09AM  18           MR. OBSTLER:  THAT'S CORRECT.

11:09AM  19           THE COURT:  IT DOES IMMUNIZE THAT KIND OF -- LET'S

11:09AM  20   CALL IT INTENTIONAL DISCRIMINATION BASED ON SOME PROTECTED

11:10AM  21   CHARACTERISTIC, THAT KIND OF STATUTE HAS TO BE

11:10AM  22   UNCONSTITUTIONAL?

11:10AM  23           MR. OBSTLER:  YES, YOUR HONOR.

11:10AM  24           THE COURT:  WHY?

11:10AM  25           MR. OBSTLER:  BECAUSE UNDER DENVER AREA THE COURT

1    SAID THAT A CONGRESSIONAL ACT THAT DOES PERMISSIVE SPEECH

2    REGULATION AND THE GRANTING OF IMMUNITY THAT THEY -- I MEAN, I

3    WOULD BE ABLE TO SUE THEM, RIGHT, BUT FOR THE CDA.

4        SO THEY ARE -- WHAT THE COURT SAID IN DENVER AREA, WHICH

5    HAS OFTEN BEEN CITED, AND IT'S WHY WE CAME TO THE GAME LATE IN

6    DENVER, AND I WANT TO APOLOGIZE ON THAT.  I HAVE TO ADMIT I

7    WITHDREW EARLY ON THAT ONE.

8        DENVER AREA WAS A FIGHT INITIALLY OVER WHETHER OR NOT,

9    EXACTLY WHAT THE GOVERNMENT AND MR. WILLEN ARE MAKING, WHETHER

10   OR NOT THEY'RE STATE ACTORS AND WHETHER STATE ACTORS -- AND THE

11   CABLE COMPANY SAID THEY'RE NOT STATE ACTORS.  HOW CAN THEIR

12   PERMISSION TO BLOCK THINGS THAT ARE INDECENT BE IN ANY WAY BE

13   SUBJECT TO THE FIRST AMENDMENT?

14       AND WHAT JUSTICE BREYER AND SIX JUDGES ON THE SUPREME

15   COURT SAID IS, YES, IT'S BEING DONE FOR A CONGRESSIONAL ACT,

16   BUT FOR THAT ACT YOU AND I ARE NOT HAVING THAT DISCUSSION.  WE

17   MAY BE HAVING A DISCUSSION ABOUT WHETHER I STATED A CLAIM, BUT

18   FOR CONGRESSIONAL LAW THAT ALLOWS THEM IMMUNITY ON THESE

19   CLAIMS, WE'RE NOT HAVING THIS DISCUSSION.

20       SO IF THEY'RE GETTING IMMUNITY UNDER THIS STATUTE, IT'S

21   NOT A STATE ACTION ISSUE, IT'S WHETHER THE STATUTE PASSES

22   MUSTER JUST LIKE SECTION 10(C) OF THE CABLE ACT UNDER

23   DENVER AREA.

24       WHAT DID THE COURT SAY?  THREE THINGS.

25       GOT TO BE VIEWPOINT NEUTRAL.  NOT VIEWPOINT NEUTRAL IN

11:11AM 1    THIS CASE.

11:11AM 2         GOT TO BE NARROWLY TAILORED SO THERE'S NO RISK OF AN

11:11AM 3    IMPROPER VETO.

11:11AM 4         AND MOST IMPORTANTLY, IT CANNOT INTERFERE WITH PREEXISTING

11:11AM 5    LEGAL RELATIONSHIPS.

11:11AM 6         THIS IS SPOT ON WITH DENVER, AND THIS STATUTE CANNOT

11:11AM 7    WITHSTAND SCRUTINY UNDER DENVER.  IT IS A PERMISSIVE SPEECH

11:12AM 8    STATUTE JUST LIKE SECTION 10(C) OF THE CABLE ACT.

11:12AM 9         THE COURT:  OKAY.  THAT SEEMS LIKE A STRETCH

11:12AM 10   HONESTLY, THAT THAT -- THAT THIS CASE FITS THE MOLD OF

11:12AM 11   PERMISSIVE REGULATION IN DENVER AREA.

11:12AM 12        I'LL LET THE GOOGLE FOLKS RESPOND ON THAT POINT, BUT LET

11:12AM 13   ME JUST MAKE SURE YOU DON'T HAVE ANYTHING FURTHER THAT YOU

11:12AM 14   WOULD LIKE TO MAKE SURE THAT THE COURT HEARS IN TERMS OF YOUR

11:12AM 15   ARGUMENT, ANYTHING YOU WOULD LIKE TO ADDRESS FURTHER IN SUPPORT

11:12AM 16   OF YOUR OPPOSITION.

11:12AM 17        MR. OBSTLER:  WELL, I WANTED TO TALK ABOUT THE

11:12AM 18   EXECUTIVE ORDER.

11:12AM 19        THE COURT:  OH, YES.

11:12AM 20        MR. OBSTLER:  BUT I WANT TO COME BACK TO THIS POINT,

11:12AM 21   YOUR HONOR, BECAUSE YOU SAY IT SOUNDS LIKE A STRETCH.  AND I'D

11:12AM 22   BE CURIOUS IN KNOWING WHY YOUR HONOR BELIEVES THAT BECAUSE I

11:12AM 23   DON'T UNDERSTAND THE DIFFERENCE BETWEEN A STATUTE THAT WAS

11:12AM 24   ENACTED TO REGULATE IN INDECENT MATERIAL ON CABLE TELEVISION

11:12AM 25   CHANNELS AND A STATUTE THAT WAS ENACTED OSTENSIBLY TO ALLOW

11:12AM 1    PRIVATE PARTIES TO REGULATE OFFENSIVE MATERIAL ON THE INTERNET.

11:13AM 2         THE COURT:  I THINK AT LEAST ONE OF THE KEY

11:13AM 3    DISTINCTIONS HERE IS THAT SECTION 230(C) PERMITS PRIVATE

11:13AM 4    PARTIES TO DO THEIR OWN SELF-REGULATION.  THERE'S NO MANDATE.

11:13AM 5    THERE'S NOTHING -- THERE'S NOTHING THAT IS REQUIRED.  THEY MAY

11:13AM 6    OR MAY NOT.  AND IF THEY DO, THEY'RE IMMUNIZED.

11:13AM 7         IT PROVIDES PROTECTION FROM LIABILITY.  THAT'S WHAT IT IS.

11:13AM 8    IT'S NOT A MANDATE TO REGULATE IN ANY WAY, SHAPE OR FORM.

11:13AM 9         MR. OBSTLER:  I AGREE WITH YOU.

11:13AM 10        THE COURT:  I THINK IT'S AN IMPORTANT DISTINCTION.

11:13AM 11        MR. OBSTLER:  THAT'S EXACTLY THE POINT THAT

11:13AM 12   JUSTICE BREYER MADE.  HE SAID THIS IS A PERMISSIVE PORTION.

11:13AM 13   THERE WAS A MANDATORY PORTION AND A PERMISSIVE PORTION.  10(C)

11:13AM 14   WAS THE PERMISSIVE PORTION.  IT DOESN'T REQUIRE THEM TO DO IT

11:13AM 15   BUT THEY'RE PERMITTED TO DO IT, AND THE COURT SAID THAT IS

11:13AM 16   UNCONSTITUTIONAL.

11:13AM 17        I COMPLETELY AGREE WITH THE DISTINCTION THAT YOUR HONOR IS

11:13AM 18   MAKING, AND I THINK THAT'S SQUARE WITH DENVER ON THE SECTION

11:14AM 19   10(C) CLAIM.

11:14AM 20        THE COURT:  WELL, I'LL HEAR FROM GOOGLE ON THAT

11:14AM 21   POINT, BUT LET ME GIVE YOU AN OPPORTUNITY TO ADDRESS THE OTHER

11:14AM 22   MATTERS THAT YOU SAID YOU WANTED TO ADDRESS, THE EXECUTIVE

11:14AM 23   ORDER.

11:14AM 24        MR. OBSTLER:  THE REASON WE CAME IN WITH THE

11:14AM 25   EXECUTIVE ORDER IS THAT WE JUST WEREN'T CLEAR REALLY ON WHAT

11:14AM 1    THE GOVERNMENT'S POSITION REALLY IS.

11:14AM 2         THE COURT:  ALL RIGHT.

11:14AM 3         MR. OBSTLER:  THEY FILED THIS BRIEF, RIGHT, AND THEY

11:14AM 4    SAY IT CAN APPLY TO THE VIEWPOINT, IT'S CONSTITUTIONAL, IT CAN

11:14AM 5    APPLY TO A VIEWPOINT, IT CAN APPLY TO DISCRIMINATION.

11:14AM 6         AND THEN I READ SECTION 2 OF THE EXECUTIVE ORDER SAYING

11:14AM 7    IT'S THE POLICY OF THE UNITED STATES AND THE DEPARTMENT OF

11:14AM 8    JUSTICE IS DIRECTED TO DO EVERYTHING THAT THEY ARE ALLEGING IN

11:14AM 9    THEIR BRIEF.

11:14AM 10        SO I ONLY BRING IT UP TO SAY IF THE ORDER IS ENFORCEABLE

11:14AM 11   AT SOME POINT THEN I DON'T KNOW IF WE HAVE A NEW ISSUE HERE OR

11:14AM 12   WHAT.  AND IF THE ORDER IS NOT ENFORCEABLE, THEN THEY'RE

11:14AM 13   ARGUING THAT THE EXECUTIVE ORDER IS JUST SIMPLY NOT

11:14AM 14   ENFORCEABLE.  I'M NOT GOING TO TAKE A VIEW ON THAT, AND I DON'T

11:14AM 15   REALLY CARE.  AND I AGREE WITH YOUR HONOR, I DON'T THINK IT

11:15AM 16   REALLY MATTERS BECAUSE I THINK AT THE END OF THE DAY I THINK

11:15AM 17   THE STATUTE ON ITS FACE DOESN'T APPLY, AND I THINK THE STATUTE

11:15AM 18   IS UNCONSTITUTIONAL.

11:15AM 19        BUT THE ONLY REASON I BROUGHT IT UP WAS JUST I COULD NOT

11:15AM 20   SQUARE THAT EXECUTIVE ORDER AND HIM DIRECTING THE DEPARTMENT OF

11:15AM 21   JUSTICE AND SITTING THERE WITH BILL BARR WHEN THEY ANNOUNCED

11:15AM 22   THE ORDER WITH WHAT WAS IN THEIR BRIEF.  THAT WAS THE ONLY

11:15AM 23   REASON WE WANTED TO.

11:15AM 24        THE COURT:  WELL, LET ME GIVE MR. SUR AN OPPORTUNITY

11:15AM 25   TO ADDRESS THE EXECUTIVE ORDER BUT ALSO ANY OTHER MATTERS

11:15AM 1    RAISED IN THE GOVERNMENT'S MEMORANDUM ON THE CONSTITUTIONALITY

11:15AM 2    QUESTION.

11:15AM 3         MR. SUR.

11:15AM 4            MR. SUR:  THANK YOU VERY MUCH.

11:15AM 5         SINCE THE EXECUTIVE ORDER HAS COME UP, I GUESS I WILL

11:15AM 6    START THERE BUT MAYBE JUST TRY TO REITERATE IN OUR BRIEF IN

11:15AM 7    POINT ONE WE SIMPLY ARE RELYING ON ONE OF SEVERAL DOCTRINES OF

11:15AM 8    CONSTITUTIONAL AVOIDANCE, THE DOCTRINE THAT SAYS DECIDE THE

11:15AM 9    STATUTORY QUESTIONS FIRST.

11:15AM 10        MUCH OF THE DISCUSSION TODAY WAS ABOUT THE POTENTIAL

11:16AM 11   NUANCES OF THE STATUTE AND, RECENTLY OR NOT, TAKING A POSITION

11:16AM 12   ON THAT.

11:16AM 13        BUT OF COURSE THE PARTIES ARE WELL VERSED ON THAT AND SO

11:16AM 14   YOUR HONOR HAS BEEN WELL FURNISHED, I THINK, BY THE OPPOSING

11:16AM 15   VIEWS ON THE STATUTORY QUESTION, SIMILARLY WITH THE STATE LAW

11:16AM 16   CLAIMS AS WELL.

11:16AM 17        POINT TWO SIMPLY ARGUES THAT IF THE COURT DOES REACH THE

11:16AM 18   CONSTITUTIONAL QUESTION, THAT THERE REALLY IS NO PRECEDENT THAT

11:16AM 19   WOULD SUPPORT HOLDING THE STATUTE TO BE UNCONSTITUTIONAL,

11:16AM 20   PRINCIPALLY FOR THE REASONS THAT HAVE ALREADY BEEN DISCUSSED ON

11:16AM 21   THAT.

11:16AM 22        BUT JUST THE ONE NOTE I WOULD ADD IS DENVER AREA DID NOT

11:16AM 23   TRANSFORM THE NOTION OF STATE ACTION.  JUDGE KOH IN THE OPINION

11:16AM 24   THAT THE COURT OF APPEALS AFFIRMED IN PRAGER UNIVERSITY,

11:16AM 25   ALTHOUGH THE COURT OF APPEALS OPINION DIDN'T ADDRESS

11:16AM 1     DENVER AREA, JUDGE KOH DID REJECT RELIANCE ON IT IN THE

11:16AM 2     UNPUBLISHED OPINION THAT THEN WENT UP TO THE NINTH CIRCUIT AND

11:17AM 3     SO I DO NOTE THAT.

11:17AM 4          AND AS HAS ALREADY BEEN MENTIONED, BUT I WILL REITERATE,

11:17AM 5     THE NINTH CIRCUIT'S OPINION IN ROBERTS VERSUS AT&T MOBILITY,

11:17AM 6     WHICH IS AT 877 F.3D 833, WAS REALLY A DETAILED ANALYSIS OF

11:17AM 7     THE, QUOTE, "SPLINTERED DECISION" IN DENVER AREA, AND REALLY

11:17AM 8     INFORMS ANY ATTEMPT TO APPLY IT CERTAINLY FOR THE COURTS WITHIN

11:17AM 9     THE NINTH CIRCUIT.

11:17AM 10         SO WE THINK THAT VERY HELPFULLY CLARIFIES THAT THE

11:17AM 11    DENVER AREA DOESN'T TRANSFORM THE NOTION OF THE STATE ACTION IN

11:17AM 12    A WAY THAT WOULD REALLY, REALLY CHANGE ANYTHING THAT WE HAVE

11:17AM 13    SAID IN THE BRIEF.

11:17AM 14         HAVING MADE THOSE POINTS, LET ME THEN TURN VERY BRIEFLY TO

11:17AM 15    THE EXECUTIVE ORDER.

11:17AM 16         I THINK IT IS HELPFUL TO CONSIDER THE TEXT OF THE ORDER AS

11:17AM 17    A WHOLE AND IN THAT RESPECT I DO THINK THAT IT IS NOT

11:17AM 18    INSIGNIFICANT THAT THE ORDER HAS A SET OF GENERAL PROVISIONS AT

11:18AM 19    THE END THAT APPLY TO ANY ATTEMPT TO READ THE ORDER ANYWHERE.

11:18AM 20         SO ONE OF THOSE GENERAL PROVISIONS, AND I REALIZE IT

11:18AM 21    BECAUSE THEY APPEAR OFTEN IN GENERAL PROVISIONS, MAYBE THEY

11:18AM 22    DON'T GET THAT MUCH ATTENTION, BUT IT DOES WARRANT SPECIAL

11:18AM 23    ATTENTION IN THE ATTEMPT TO RELY ON HERE.

11:18AM 24         SECTION 8, LETTER C SAYS THAT THE ORDER IS NOT INTENDED TO

11:18AM 25    AND DOES NOT CREATE ANY RIGHT OR BENEFIT, SUBSTANTIVE OR

11:18AM 1    PROCEDURAL, ENFORCEABLE AT LAW OR IN EQUITY BY ANY PARTY

11:18AM 2    AGAINST THE UNITED STATES, ITS DEPARTMENTS, AGENCIES OR

11:18AM 3    ENTITIES, ITS OFFICERS, EMPLOYEES OR AGENTS OR ANY OTHER

11:18AM 4    PERSON.  SO I THINK WE HAVE TO START THERE.

11:18AM 5        THEN EVEN IF ONE WERE TO ASSUME IN THE ALTERNATIVE THAT

11:18AM 6    SECTION 8(C) SOMEHOW DIDN'T APPLY, I DO THINK TAKING EACH

11:19AM 7    SECTION IN TURN, THE COURT WILL SEE THAT THESE ARE ABOUT POLICY

11:19AM 8    AND THEY MAY BE EXPRESSED AT LENGTH, BUT THEY ARE ALL POINTS

11:19AM 9    ABOUT POLICY AND ESSENTIALLY DIRECTING VARIOUS EXECUTIVE BRANCH

11:19AM 10   ACTORS TO DO VARIOUS THINGS BUT DON'T GO INTO ANY QUESTION OF

11:19AM 11   CONSTITUTIONALITY.

11:19AM 12       REALLY THE ONLY POINT I WOULD MAKE ABOUT POLICY IS THAT

11:19AM 13   REALLY WHAT IT BRINGS OUR ATTENTION BACK TO IS PAGE 999 OF THE

11:19AM 14   OPINION OF THE COURT OF APPEALS IN PRAGER WHERE BEFORE THEY

11:19AM 15   CONCLUDED THEIR DISCUSSION OF A FIRST AMENDMENT THEY SAID THAT

11:19AM 16   THE PARTIES IN PRAGER UNIVERSITY HAD PROVIDED EXTENSIVE

11:19AM 17   ARGUMENTS ABOUT WHAT MIGHT HAPPEN IF THE COURT RULED ONE WAY OR

11:19AM 18   ANOTHER AND WHILE THOSE POLICY CONCEPTS WERE, QUOTE,

11:19AM 19   "IMPORTANT," THE COURT OF APPEALS IN THE NINTH CIRCUIT FOCUSSED

11:19AM 20   ON THE FIRST AMENDMENT DOCTRINE.

11:19AM 21       I THINK A SIMILAR CONCLUSION IS APPROPRIATE HERE THAT AT

11:19AM 22   MOST THE EXECUTIVE ORDER INDICATES THAT THERE MAY BE IMPORTANT

11:19AM 23   POLICY ISSUES SOMEWHERE IN THE GENERAL REALM OF SECTION 230,

11:20AM 24   BUT THAT THOSE ARE NOT BEFORE THE COURT IN ASSESSING THE

11:20AM 25   CONSTITUTIONALITY OF THE STATUTE.

11:20AM  1      REALLY WITH THAT I WILL CONCLUDE, UNLESS THE COURT HAS ANY

11:20AM  2   FURTHER QUESTION.

11:20AM  3      THE COURT:  THANK YOU VERY MUCH, MR. SUR.  THAT WAS

11:20AM  4   VERY HELPFUL.  I APPRECIATE IT.

11:20AM  5      MR. SUR:  THANK YOU.

11:20AM  6      THE COURT:  ALL RIGHT.  SO I WOULD LIKE TO HEAR FROM

11:20AM  7   GOOGLE, YOUTUBE BUT -- WELL, ANYTHING THAT YOU WOULD LIKE TO

11:20AM  8   RESPOND TO FROM MY CONVERSATION WITH MR. OBSTLER, BUT I AM

11:20AM  9   INTERESTED IN THE -- IF YOU HAVE ANYTHING FURTHER TO ADD ON THE

11:20AM 10   DENVER AREA POINT AND ITS SIGNIFICANCE.

11:20AM 11      MR. WILLEN:  SURE.  SO WHY DON'T I START WITH THAT

11:20AM 12   AND TALK ABOUT A COUPLE OF THINGS RELATED TO SECTION 230, AND I

11:20AM 13   CAN LET MS. WHITE TALK ABOUT THINGS RELATED TO THE UNRAH ACT

11:20AM 14   AND THE LANHAM ACT.

11:20AM 15      WITH RESPECT TO DENVER AREA, I THINK MR. OBSTLER HAS

11:20AM 16   RIGHTLY POINTED TO THE NINTH CIRCUIT'S DECISION IN ROBERTS

11:20AM 17   WHICH AT LENGTH EXPLAINS THE VERY, VERY LIMITED, IF ANY, IMPORT

11:21AM 18   OF DENVER AREA ON THE QUESTION OF STATE ACTION.

11:21AM 19      SO ROBERTS POINTS OUT, FIRST OF ALL, THAT THERE'S NO

11:21AM 20   MAJORITY OPINION IN THE DENVER AREA CASE.  THE OPINION THAT

11:21AM 21   MR. OBSTLER IS RELYING ON IS JUSTICE BREYER'S OPINION FOR FOUR

11:21AM 22   JUSTICES THAT DOES NOT SPEAK FOR THE COURT.  JUSTICE KENNEDY

11:21AM 23   AND JUSTICE GINSBERG SUPPLIED TWO ADDITIONAL VOTES BUT ON A

11:21AM 24   VERY, VERY DIFFERENT THEORY.

11:21AM 25      SO JUSTICE BREYER'S OPINION DOESN'T BY ITS OWN TERMS SAY

11:21AM 1   THAT PERMISSIVE SPEECH REGULATION IS SUBJECT TO SOME BRAND NEW

11:21AM 2   FIRST AMENDMENT SCRUTINY.  IT CONSTRUES A VERY, VERY SPECIFIC

11:21AM 3   PROVISION OF THE CABLE ACT, AND I THINK THE MOST IMPORTANT

11:21AM 4   POINT ABOUT THAT IS THAT IN ALLOWING THE CABLE COMPANIES TO

11:21AM 5   CENSOR, IT ALLOWED THEM TO CENSOR ONLY A PARTICULAR CONTENT

11:21AM 6   BASED SET OF MATERIALS, WHICH WAS SEXUALLY EXPLICIT CONTENT, SO

11:22AM 7   IT WAS VERY LIMITED IN THAT RESPECT, AND THE STATUTE WAS

11:22AM 8   ENACTED AGAINST A BACKDROP THAT THE CASE INVOLVED PUBLIC ACCESS

11:22AM 9   CHANNELS AND ACCESS CHANNELS ON CABLE NETWORK AND THE VERY

11:22AM 10   SPECIFIC CONTEXT.

11:22AM 11       ONE, THESE CHANNELS WERE HEAVILY REGULATED AND THE COURT

11:22AM 12   AND JUSTICE BREYER'S OPINION NOTED AND RELIED ON.

11:22AM 13       SECONDLY, AND I THINK EVEN MORE IMPORTANTLY, PRIOR TO THE

11:22AM 14   ENACTMENT OF THE STATUTE IN QUESTION, THE LAW FORBAD THE CABLE

11:22AM 15   COMPANIES FROM ENGAGING IN ANY CONTENT BASED OR ANY REAL

11:22AM 16   EDITORIAL DISCRETION WITH RESPECT TO THESE CHANNELS.

11:22AM 17       SO IT COMPLETELY CHANGED THE BACKGROUND LEGAL PRINCIPLES

11:22AM 18   WITH RESPECT TO THE RIGHT OF THE CABLE COMPANIES TO ENGAGE IN

11:22AM 19   CONTENT RESTRICTION.

11:22AM 20       THAT'S COMPLETELY DIFFERENT FROM WHAT WE HAVE HERE.  WE

11:22AM 21   HAVE A STATUTE THAT IS NOT CONTENT BASED.  SECTION 230(C)(1),

11:22AM 22   AS I THINK THE COURT POINTED OUT, SIMPLY SAYS THAT YOU CANNOT

11:22AM 23   BE TREATED AS A PUBLISHER FOR ANY SPEECH, SO WHETHER YOU ARE

11:23AM 24   RESTRICTING ACCESS TO CONTENT, WHETHER YOU ARE NOT RESTRICTING

11:23AM 25   ACCESS TO CONTENT, AND CERTAINLY NOT WITH RESPECT TO ANY GIVEN

11:23AM  1    CATEGORY OF CONTENT, SECTION 230(C) WILL PROTECT YOU.  SO IT'S

11:23AM  2    NOT EVEN CLOSE TO CONTENT BASED AND VIEWPOINT BASED.

11:23AM  3         AND THEN SECONDLY, AND JUST AS IMPORTANTLY, THE BACKGROUND

11:23AM  4    PRIOR TO SECTION 230 WAS THAT ONLINE PLATFORMS, PARTICULARLY

11:23AM  5    PLATFORMS, THE PROGENITORS OF WHAT WE HAVE NOW, GOOGLES AND

11:23AM  6    TWITTERS, HAD FULL DISCRETION, COMPLETE EDITORIAL DISCRETION

11:23AM  7    AND INDEED A FIRST AMENDMENT RIGHT TO MAKE EDITORIAL

11:23AM  8    DETERMINATIONS ABOUT WHAT SPEECH APPEARS ON THEIR PLATFORM.

11:23AM  9         SO SECTION 230 WASN'T CREATING SOME NEW EDITORIAL RIGHT

11:23AM 10    THAT DIDN'T EXIST BEFORE WHEREAS DENVER AREA VERY MUCH WAS.  SO

11:23AM 11    THAT'S THE FIRST GENERAL POINT.

11:23AM 12         THE SECOND POINT IS WITH RESPECT TO JUSTICE KENNEDY'S

11:23AM 13    OPINION WHICH SUPPLIED THE SORT OF DECISIVE VOTES FOR THE

11:23AM 14    PROPOSITION THAT AT LEAST THE ONE PROVISION WAS

11:24AM 15    UNCONSTITUTIONAL, THAT WHOLE DECISION WAS BASED ON THE

11:24AM 16    PROPOSITION THAT AT LEAST IN PUBLIC ACCESS CHANNELS WERE A

11:24AM 17    PUBLIC FORUM UNDER THE CONSTITUTION BECAUSE IT WAS SO HEAVILY

11:24AM 18    REGULATED AND WHAT I JUST MENTIONED.

11:24AM 19         JUSTICE BREYER'S OPINION DIDN'T GET INTO THAT, BUT THAT'S

11:24AM 20    REALLY IMPORTANT HERE BECAUSE WE KNOW -- THE THING WE KNOW FROM

11:24AM 21    PRAGER IS THAT YOUTUBE IS NOT A CONSTITUTIONAL PUBLIC FORUM.

11:24AM 22    SO GIVEN THAT, IT'S A COMPLETELY DIFFERENT CASE.

11:24AM 23         AND I THINK IT'S QUITE TELLING THAT IN THE HALLECK CASE,

11:24AM 24    OF COURSE THE SUPREME COURT'S MOST RECENT DISCUSSION OF STATE

11:24AM 25    ACTION, THE ONE REFERENCE TO DENVER AREA THAT IS MOST --

11:24AM  1          THE OPERATOR:  THE RECORDING HAS STOPPED.

11:24AM  2          MR. WILLEN:  EXCUSE ME.  CITING DENVER AREA, AND

11:24AM  3   THIS IS A QUOTE FOR THE PROPOSITION THAT THE FREE SPEECH DOES

11:24AM  4   NOT PROHIBIT PRIOR ABRIDGEMENT OF SPEECH.

11:24AM  5          SO THE SUPREME COURT HAS SPOKEN TO THIS.  TO THE EXTENT

11:25AM  6   THAT DENVER AREA HAS ANY SIGNIFICANCE, IT'S SIMPLY LIMITED TO

11:25AM  7   ITS UNIQUE FACTS AND DOESN'T APPLY HERE.  SO THAT IS

11:25AM  8   DENVER AREA.

11:25AM  9          THE OTHER COUPLE THINGS I WOULD WANT TO SAY IN RESPONSE TO

11:25AM  10  MR. OBSTLER, WE DIDN'T GET A CHANCE TO TALK ABOUT SECTION

11:25AM  11  230(C)(2)(D).  WE SPENT MOST OF OUR TIME TALKING ABOUT SECTION

11:25AM  12  230(C)(1).

11:25AM  13         AS WE ARGUED, SECTION 230(C)(2)(B) IS SORT OF A SEPARATE

11:25AM  14  IMMUNITY THAT CLEARLY APPLIES, AS WE KNOW FROM THE

11:25AM  15  PRAGER DECISION, WITH RESPECT TO ANY CLAIM ARISING FROM

11:25AM  16  RESTRICTED MODE.  AND I THINK FOR THE REASONS SET OUT IN

11:25AM  17  JUDGE DAVILA'S RECENT OPINION IN ASURVIO VERSUS MALWAREBYTES

11:25AM  18  CASE, THE ALLEGATIONS HERE THAT THERE IS SOME SORT OF

11:25AM  19  COMPETITIVE RELATIONSHIP JUST AREN'T ENOUGH TO GET PLAINTIFFS

11:25AM  20  OUTSIDE OF SECTION 230(C)(2)(B), SO THE COURT HAS ANOTHER PATH

11:25AM  21  AT LEAST WITH RESPECT TO A LOT OF THE CLAIMS HERE.

11:26AM  22         AND THEN I GUESS THE ONLY OTHER POINT I WOULD MAKE IS THAT

11:26AM  23  MR. OBSTLER WAS, TELLINGLY, NOT ABLE TO CITE ANY CASE THAT

11:26AM  24  HELPED HIM ON THE PROPOSITION THAT SECTION 230(C)(1) WOULDN'T

11:26AM  25  APPLY TO A CLAIM UNDER THE UNRAH ACTS UNDER THE CIRCUMSTANCES

11:26AM  1    THAT WE HAVE HERE, AND THAT'S WHY HE RESORTED TO THE ARGUMENT

11:26AM  2    THAT THE STATUTE WOULD BE UNCONSTITUTIONAL IF APPLIED THAT WAY,

11:26AM  3    AND I DON'T THINK IT WOULD.  AND I DON'T THINK THERE'S ANY

11:26AM  4    SERIOUS ARGUMENT THAT IT WOULD, BUT HIS INABILITY TO POINT TO

11:26AM  5    ANY CASE LAW THAT HELPS HIM ON THE APPLICATION OF THE --

11:26AM  6         THE OPERATOR:  THIS MEETING IS BEING RECORDED.

11:26AM  7         MR. WILLEN:  -- I THINK IS VERY TELLING.

11:26AM  8    SO WITH THAT I WILL TURN IT OVER TO MS. WHITE AND LET HER

11:26AM  9    TALK ABOUT THE LANHAM ACT AND ANYTHING ELSE THAT SHE WANTS TO

11:26AM 10    SAY IN RESPONSE TO WHAT WE HAVE HEARD.

11:26AM 11         THE COURT:  THANK YOU, MR. WILLEN.

11:26AM 12    MS. WHITE.

11:26AM 13         MS. WHITE:  THANK YOU.

11:26AM 14    I'LL BEGIN JUST BRIEFLY ON THE LANHAM ACT QUESTION.  AS

11:27AM 15    YOUR HONOR CORRECTLY RECOGNIZED, TO STATE A CLAIM UNDER THAT

11:27AM 16    STATUTE PLAINTIFFS HAVE TO ALLEGE THAT YOUTUBE MADE A FALSE OR

11:27AM 17    MISLEADING STATEMENT IN COMMERCIAL ADVERTISING, AND THEY

11:27AM 18    HAVEN'T DONE THAT.  THEY REFER TO STATEMENTS ABOUT WHAT

11:27AM 19    RESTRICTED MODE DOES AND WHAT RESTRICTED GUIDELINES ARE, BUT

11:27AM 20    THOSE STATEMENTS ARE WHAT THE NINTH CIRCUIT HELD WERE NOT

11:27AM 21    COMMERCIAL ADVERTISING IN PRAGER.

11:27AM 22    THEY ALSO SUGGEST THAT THE DESIGNATION OF SOME OF

11:27AM 23    PLAINTIFFS' VIDEOS, AND I'LL NOTE THAT I THINK ONLY FOUR OF THE

11:27AM 24    NAMED PLAINTIFFS SPECIFICALLY ALLEGE THAT ANY OF THEIR VIDEOS

11:27AM 25    HAVE BEEN MADE UNAVAILABLE IN UNRESTRICTED MODE, BUT WITH

11:27AM  1    RESPECT TO THOSE, THEY ARGUE THAT THAT DESIGNATION SOMEHOW

11:27AM  2    BRANDS THEM IN A NEGATIVE LIGHT, BUT THE NINTH CIRCUIT

11:27AM  3    ADDRESSED THAT ARGUMENT DIRECTLY AS WELL AND HELD THAT THAT

11:27AM  4    DESIGNATION IS NOT MADE IN COMMERCIAL ADVERTISING PROMOTION AND

11:28AM  5    THAT'S ON PAGE 1,000 OF THE COURT'S OPINION.

11:28AM  6        FINALLY, ANY IMPLICIT STATEMENT ABOUT THE REASON FOR WHY

11:28AM  7    PLAINTIFFS' VIDEOS WERE MADE UNAVAILABLE IN RESTRICTED MODE,

11:28AM  8    ONE, THOSE REASONS WERE NOT MADE PUBLIC, AND, TWO, THOSE

11:28AM  9    REASONS WOULD BE A MATTER OF OPINION WHICH WOULD NOT BE

11:28AM  10   ACTIONABLE AS A FALSE STATEMENT, AND, AGAIN, NOT A STATEMENT

11:28AM  11   MADE IN FURTHERANCE OF COMMERCIAL ADVERTISING OR PROMOTION.

11:28AM  12       SO UNLESS YOUR HONOR HAS ANY FURTHER QUESTIONS ABOUT THE

11:28AM  13   LANHAM ACT, I'LL JUST CONCLUDE BY ADDRESSING THE QUESTIONS

11:28AM  14   ABOUT THE UNRAH ACT CLAIM.

11:28AM  15       AS MY COLLEAGUE EXPLAINED, WE DO THINK THERE'S NO REASON

11:28AM  16   WHY SECTION 230(C)(1) AND (C)(2)(B) SHOULD NOT APPLY WITH

11:28AM  17   RESPECT TO PLAINTIFFS' CLAIM UNDER THE UNRAH ACT BUT IN

11:29AM  18   ADDITION TO THAT THE PLAINTIFFS HAVE NOT COME CLOSE TO STATING

11:29AM  19   A CLAIM.

11:29AM  20       THE UNRAH ACT, WHEN PLED HERE AS SEPARATE FROM AN ADA

11:29AM  21   VIOLATION, IS AN INTENTIONAL DISCRIMINATION STATUTE.

11:29AM  22   CALIFORNIA COURTS HAVE CLEARLY HELD THAT FACIALLY NEUTRAL

11:29AM  23   POLICIES ARE NOT ACTIONABLE AND THAT ALLEGATIONS OF DISPARATE

11:29AM  24   IMPACT ARE NOT ENOUGH.

11:29AM  25           THE COURT:  OKAY.  SO LET'S PAUSE THERE.  THAT WAS

11:29AM   1    THE ARGUMENT YOU MADE IN YOUR BRIEF.  THEIR ARGUMENT IS NOT

11:29AM   2    THERE'S A DISPARATE IMPACT, BUT THAT THERE'S AN ACTUAL POLICY

11:29AM   3    OF DISCRIMINATION AGAINST LGBT CONTENT CREATORS.

11:29AM   4        SO I KNOW YOU DON'T THINK THAT THAT'S ACTUALLY WHAT THEY

11:29AM   5    HAVE ALLEGED.  BUT IF THAT'S THE ALLEGATION, DO YOU ALSO HAVE A

11:29AM   6    12(B)(6) ARGUMENT AGAINST -- FOR THE FAILURE TO STATE A CLAIM

11:29AM   7    UNDER THE UNRAH ACT ISSUE?

11:29AM   8            MS. WHITE:  IF THERE WERE AN ALLEGATION THAT THERE

11:29AM   9    WERE AN ACTUAL AFFIRMATIVE POLICY TO DISCRIMINATE THAT MAY

11:29AM  10    STATE A CLAIM FOR THE UNRAH ACT, BUT THERE'S NOTHING CLOSE TO

11:30AM  11    THAT HERE.  AND THERE'S A LOT OF RHETORIC.  THE COMPLAINT IS --

11:30AM  12            THE COURT:  RIGHT.  WELL, HERE'S THE QUESTION THAT

11:30AM  13    NOBODY WAS TALKING ABOUT IN THEIR PAPERS, BUT I JUST WONDERED,

11:30AM  14    THE UNRAH ACT, YOU KNOW, IN THE ADA CONTEXT YOU HAVE TO HAVE A

11:30AM  15    PUBLIC ACCOMMODATION AND YOU WOULD HAVE TO HAVE A BUSINESS.

11:30AM  16        DOES THIS PLATFORM QUALIFY FOR -- IN THAT CONTEXT UNDER

11:30AM  17    THE LANGUAGE OF THE STATUTE?

11:30AM  18            MS. WHITE:  SO THE UNRAH ACT APPLIES TO ALL BUSINESS

11:30AM  19    SERVICES AND THE CALIFORNIA COURTS HAVE HELD THAT THEY DIDN'T

11:30AM  20    APPLY TO WEBSITES.

11:30AM  21        I THINK THERE IS SOME AMBIGUITY IN PLAINTIFFS' CLAIMS

11:30AM  22    ABOUT EXACTLY WHAT -- WHO IS BEING DISCRIMINATED AGAINST AND ON

11:30AM  23    WHAT BASIS THAT THEY REFER TO MAINLY LGBTQ IDENTITIES.  THEY

11:30AM  24    ALSO REFER TO VIEWPOINTS.

11:30AM  25        I THINK WHILE THE UNRAH ACT IS INTENDED TO BE CONSTRUED

| | |
|---|---|
| 11:31AM | 1 |
| 11:31AM | 2 |
| 11:31AM | 3 |
| 11:31AM | 4 |
| 11:31AM | 5 |

11:31AM  1    BROADLY, THERE MAY BE SOME CATEGORIES OF PERSONS TO WHOM IT

11:31AM  2    WOULDN'T APPLY, BUT GIVEN THEIR FAILURE TO ALLEGE THAT THERE IS

11:31AM  3    IN FACT A POLICY OF DISCRIMINATION OR THAT THESE PLAINTIFFS

11:31AM  4    DISCRIMINATED AGAINST BASED ON THEIR SEXUAL IDENTITIES, THE

11:31AM  5    COURT DOESN'T NEED TO REACH THOSE QUESTIONS IN THIS CASE.

11:31AM  6         THE COURT:  ALL RIGHT.  THANK YOU.

11:31AM  7       MR. OBSTLER, I'LL GIVE YOU A VERY BRIEF RESPONSE.  I DON'T

11:31AM  8    WANT TO HEAR ANYTHING YOU HAVE TOLD ME BEFORE, BUT IF THERE'S A

11:31AM  9    VERY BRIEF RESPONSE YOU WOULD LIKE TO MAKE, I'LL LET YOU HAVE

11:31AM  10   THE LAST WORD.

11:31AM  11        MR. OBSTLER:  THANK YOU SO MUCH, YOUR HONOR.  AGAIN,

11:31AM  12   I REALLY APPRECIATE IT.  AND YOUR QUESTIONS ARE DEAD ON ON

11:31AM  13   THIS.

11:31AM  14       FIRST OF ALL, ON DENVER AREA, IT WAS A SIX TO THREE

11:31AM  15   DECISION ON THE 10(C) PART OF THE OPINION AND PLEASE READ THE

11:31AM  16   OPINION.

11:31AM  17        THE COURT:  I WILL MAKE SURE THAT I AM WELL VERSED

11:31AM  18   ON THE EXACT HOLDINGS OF --

11:31AM  19        THE OPERATOR:  THE RECORDING HAS STOPPED.

11:32AM  20        MR. OBSTLER:  ON THE UNRAH ACT ISSUE --

11:32AM  21        THE OPERATOR:  THIS MEETING IS BEING RECORDED.

11:32AM  22        MR. OBSTLER:  ON THE UNRAH ACT ISSUE, THE THING THAT

11:32AM  23   REALLY BOTHERS ME HERE IS THAT I FEEL LIKE I'M ARGUING A

11:32AM  24   FACTUAL ISSUE ON A 12(B)(6) MOTION.

11:32AM  25       WE HAVE ALLEGED THAT WE HAD A CLIENT WHO, OR WE WILL

| | | |
|---|---|---|
| 11:32AM | 1 | ALLEGE IF YOU TAKE THE DECLARATION, WHO WENT TO A MEETING ON |
| 11:32AM | 2 | 2017 AND WAS TOLD TO HER FACE FOUR TIMES THAT THE ALGORITHM |
| 11:32AM | 3 | IS -- |
| 11:32AM | 4 | THE COURT:  YOU KNOW, I WILL READ -- I WILL MAKE |
| 11:32AM | 5 | SURE THAT I LOOK AT ALL OF THE MANY, MANY ALLEGATIONS IN YOUR |
| 11:32AM | 6 | COMPLAINT.  SO I DON'T NEED YOU TO ARGUE AGAIN ABOUT WHETHER |
| 11:32AM | 7 | THERE IS A POLICY OF DISCRIMINATION ALLEGED OR NOT. |
| 11:32AM | 8 | I THINK I AM -- I HAVE THE COMPLAINT, AND I'M GOING TO |
| 11:32AM | 9 | RELY ON THE COMPLAINT.  THE PARTIES BRIEFED THAT ISSUE |
| 11:32AM | 10 | EXTENSIVELY. |
| 11:32AM | 11 | I'M REALLY TRYING TO SORT OUT THE LEGAL ISSUES HERE. |
| 11:32AM | 12 | SO IS THERE SOMETHING FURTHER ON WHAT THE UNRAH ACT |
| 11:33AM | 13 | REQUIRES OR NOT, THAT IS WHAT I'M LOOKING FOR.  IF THERE'S |
| 11:33AM | 14 | NOTHING ELSE, YOU DON'T HAVE TO HAVE ANYTHING. |
| 11:33AM | 15 | MR. OBSTLER:  THERE IS ONE OTHER THING. |
| 11:33AM | 16 | THE COURT:  OKAY. |
| 11:33AM | 17 | MR. OBSTLER:  YOU DON'T HAVE TO PLEAD THERE'S A |
| 11:33AM | 18 | POLICY UNDER THE UNRAH ACT.  ALL I HAVE TO SHOW UNDER THE |
| 11:33AM | 19 | UNRAH ACT IS THAT THERE WAS AN ACT OF DISCRIMINATION, AND I |
| 11:33AM | 20 | THINK WE HAVE DONE THAT.  THAT WOULD BE MY LAST POINT. |
| 11:33AM | 21 | THERE DOESN'T HAVE TO BE A WRITTEN POLICY UNDER THE |
| 11:33AM | 22 | UNRAH ACT.  I DON'T THINK ANYBODY WOULD HAVE SUCH A POLICY. |
| 11:33AM | 23 | OKAY. |
| 11:33AM | 24 | THE COURT:  ALL RIGHT.  THANK YOU ALL VERY MUCH.  I |
| 11:33AM | 25 | APPRECIATE ALL OF THE PRESENTATIONS AND THE EXTENSIVE BRIEFING. |

11:33AM 1      AND I APPRECIATE YOU BEARING WITH OUR VERY FIRST ZOOM

11:33AM 2  WEBINAR.   I WILL TAKE THIS MATTER UNDER SUBMISSION, AND I'LL

11:33AM 3  ISSUE A WRITTEN ORDER.  ALL RIGHT.  THANK YOU VERY MUCH.

11:33AM 4           MR. WILLEN:  THANK YOU, YOUR HONOR.

11:33AM 5           MR. OBSTLER:  THANK YOU, YOUR HONOR.  WE APPRECIATE

11:33AM 6  YOUR TIME.

11:33AM 7           (ZOOM COURT CONCLUDED AT 11:33 A.M.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                       CERTIFICATE OF REPORTER

4

5

6

7          I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8     STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9     280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10    CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16         _____
           IRENE RODRIGUEZ, CSR, RMR, CRR
           CERTIFICATE NUMBER 8074
17

18

19              DATED:  JUNE 4, 2020

20

21

22

23

24

25