1  BROWNE GEORGE ROSS
   O'BRIEN ANNAGUEY & ELLIS LLP
2  Peter Obstler (State Bar No. 171623)
      pobstler@bgrfirm.com
3  44 Montgomery Street, Suite 1280
   San Francisco, California  94104
4  Telephone:  (415) 391-7100
   Facsimile:  (310 275-5697
5  Eric M. George (State Bar No. 166403)
      egeorge@bgrfirm.com
6  Dennis S. Ellis (State Bar No. 178196)
      dellis@bgrfirm.com
7  Debi A. Ramos (State Bar No. 135373)
      dramos@bgrfirm.com
8  Keith R. Lorenze (State Bar No. 326894)
      klorenze@bgrfirm.com
9  2121 Avenue of the Stars, Suite 2800
   Los Angeles, California 90067
10 Telephone: (310) 274-7100; Facsimile: (310) 275-5697

11 Attorneys for Plaintiffs Kimberly Carleste
   Newman, Lisa Cabrera, Catherine Jones, Denotra
12 Nicole Lewis, Andrew Hepkins, Harvey Stubbs,
   Khalif Muhammad, Keu Reyes and Osiris Ley

13

14                    UNITED STATES DISTRICT COURT

15          NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

16

17 Kimberly Carleste Newman, Lisa Cabrera,          Case No. 5:20-cv-04011 -LHK
   Catherine Jones, Denotra Nicole Lewis,
18 Andrew Hepkins, Harvey Stubbs, Khalif
   Muhammad, Keu Reyes and Osiris Ley.             REVISED SECOND THIRD AMENDED
19                                                  CLASS ACTION COMPLAINT FOR
                Plaintiffs,                         DECLARATORY JUDGMENT,
20                                                  RESTITUTION, ACCOUNTING
        vs.                                         AND CIVIL RIGHTS VIOLATIONS,
21                                                  FALSE ADVERTISING, BREACH OF
   Google LLC, YouTube LLC, Alphabet Inc.,          CONTRACT, DAMAGES AND
22 and DOES Does 1 through 100, inclusive,          EQUITABLE RELIEF

23              Defendants.

24

25                                                  Judge:    Hon. Judge Lucy H. Koh
                                                    Crtrm.:   8
26                                                  Trial Date:  None Set

27

28
   REVISED SECOND THIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT,
   RESTITUTION, ACCOUNTING AND CIVIL RIGHTS VIOLATIONS, FALSE ADVERTISING, BREACH OF CONTRACT,
   DAMAGES AND EQUITABLE RELIEF

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION AND PREFATORY STATEMENT OF THE CASE ...........................1

II.     PARTIES ................................................................................................................612

III.    JURISDICTION AND VENUE ..........................................................................1117

    A.     Diversity Jurisdiction: The Class Action Fairness Act, 28 U.S.C. §1332(d)
        ("CAFA") ............................................................................................................17

    B.     Federal Question Jurisdiction:  "Arising Under" Jurisdiction, 28 U.S.C. §1331
        ...............................................................................................................................18

    C.     Supplemental Jurisdiction: 28 U.S.C. §1367 ......................................................20

    D.     Venue: 28 U.S.C. §1391 ......................................................................................21

IV.    FACTS COMMON TO ALL CLAIMS ................................................................1221

    A.     Defendants' Operation Of YouTube ....................................................................13

    B.     The Governing Agreements .................................................................................23

        1.     The General Terms Of Use And Contract-Based Promises .........................25
        2

    B.     The Governing Agreements .................................................................................38

    C.     The LicenseRelevant Provisions 28 of the Agreement.............................................41
    C

    D.     Defendants' Interpretation of the Governing Agreements....................................44

    E.     Defendants' Material Misrepresentations .............................................................46

    F.     Defendants' Anti-Competitive, Unlawful, Deceptive And Unfair Business
        Practices ...............................................................................................................3049

    DG.    Defendants' Tool Kit For Unlawful Practices....................................................3352

        1.     Artificial Intelligence Algorithm Restrictions .........................................3352

        2.     Excluding Channels And Videos From Full Revenue Generation ..........3655
        3

        3.     Interfering With Individual Video Viewing .............................................56

        4.     Misapplying "Restricted Mode" .............................................3560

**TABLE OF CONTENTS**
(Continued)

Page

45. Shadow Banning Channels And Videos.................................................. 4266

56. Delegating Content Review And Regulation To Racists And White Supremacists ............................................................................................ 4367

6.  Interfering With Individual Video Viewing ........................................ 45
7

7.  Viewer Muzzling....................................................................................... 68

8.  Ad Bombing.............................................................................................. 4770

89. Excluding Videos From "Trending" And "Up Next" Video Recommendations ...................................................................................... 4771

910. "Up Next" Flooding ............................................................................... 4871

1011. Promoting And Profiting From Hate Speech........................................ 4972

1112. Interfering With, Obstructing, Ignoring And Delaying Appeals .............. 5174

EH. Defendants Have Violated And Continue To Violate The Rights Of Plaintiffs And The Race Discrimination Class.................................................... 5276

1.  Kimberly Carleste Newman ................................................................... 5276

2.  Lisa Cabrera ............................................................................................ 5881

3.  Catherine Jones ....................................................................................... 76101

4.  Denotra Nicole Lewis ............................................................................. 77101

5.  Andrew Hepkins ..................................................................................... 86110

6.  Harvey Stubbs......................................................................................... 98122

7.  Khalif Muhammad .................................................................................. 105129

8.  Keu Reyes ................................................................................................ 112136

9.  Osiris Ley ................................................................................................ 115139

V.   CLASS ALLEGATIONS ........................................................................... 122146

VI.  INDIVIDUAL CAUSES OF ACTION ...................................................... 126151

FIRST CAUSE OF ACTION Request For A Declaratory Relief Judgment that Section §230(c) Immunity Is Inapplicable to Discrimination Claims (On Behalf Of Individual Plaintiffs And The §1981Race Discrimination Class) ........................................ 126 151

REVISED SECONDTHIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES

# TABLE OF CONTENTS
### (Continued)

A

A.     Pertinent Provisions of 47 U.S.C. §230(c) ............................................................152

B.     Procedural ~~Background Facts.............126~~History Of This Case And Controversy 153

~~B~~C.    Justiciable Legal Controversies Currently Exist Regarding The Construction
And Constitutionality Of 47 U.S.C. § 230(c) 155

     1.     ~~134~~An Actual Controversy Exists As To Whether Defendants Have
Contracted Out Of §230(c) Immunity Under The TOS And Other
Agreements And Promises Made To Plaintiffs ...........................................156

     ~~1~~2.    An Actual Controversy Exist As To Whether The Provisions Of
~~Section §~~230(c) Immunize Defendants From Race, ~~Personal~~Ethnicity
Or Other Protected Identity, ~~or Viewpoint~~ Discrimination In Filtering
And Blocking ~~On-line~~Online Content And Access.............................~~134~~156

     ~~2~~3.    An Actual Controversy Exists As To Whether ~~Section §~~230(c)
Immunizes Defendants For Conduct That Violates~~134~~ Plaintiffs' Equal Protection R

     ~~3~~4.    The Provisions And/or Application Of Any Part Of ~~Section~~ 230(c)
To Claims Arising Out Of Race, Ethnicity Or Other Protected Identity,
~~Or Viewpoint~~ Discrimination Is Unconstitutional .................................~~135~~157

     ~~4.     The Executive Order Precludes The Government From Arguing Or
Enforcing Section 230(c) To Claims Based On Intentional Identity Or
Viewpoint Discrimination. .....................................................................135~~

~~C~~

D.     Plaintiffs Served Rule 5.1 Notice On The U.S. Attorney General ...................~~136~~158

SECOND CAUSE OF ACTION ~~Equitable Claim~~ For ~~An Accounting~~Freedom Of ~~Debts
Owed~~Speech Under ~~Contract~~  The First Amendment United States Constitution,
Amendment 1 (On Behalf Of Individual Plaintiffs And The ~~§1981~~Race
Discrimination Class) ............................................................................~~138~~160

A.     Procedural Background.....................................................................160

B.     Permissive Endorsement Allegations Of State Action ...........................163

C.     State Action Allegations Under The Public Function Test.......................167

D.     Defendants' Conduct Violates The First Amendment.............................168

THIRD CAUSE OF ACTION For ~~Conversion Of Plaintiffs Property~~Discrimination In
Contract In Violation Of 42 U.S.C. § 1981  (On Behalf Of Individual Plaintiffs And
The ~~§1981~~Race Discrimination Class~~)~~.............................................~~140~~170

~~1665102.1~~1911115.1                                    -iii-                         Case No. 5:20-cv-04011 LHK .

REVISED ~~SECOND~~THIRD AMENDED CLASS ACTION COMPLAINT ~~FOR DECLARATORY JUDGMENT,
RESTITUTION, ACCOUNTING AND DAMAGES~~

# TABLE OF CONTENTS
### (Continued)

**Page**

FOURTH CAUSE OF ACTION  For ~~Replevin~~ False Advertising In Violation Of The Lanham Act, U.S.C. §1125, *et seq.* (On Behalf Of Individual Plaintiffs And The ~~§1981~~Race Discrimination Class)................................................................ ~~142~~175

FIFTH CAUSE OF ACTION  For Breach of Contract (On Behalf Of Individual Plaintiffs And The ~~§1981~~Race Discrimination Class) ................................................ ~~144~~183

SIXTH CAUSE OF ACTION  For Breach Of The Implied Covenant ~~Of~~of Good Faith And Fair Dealing Or In The Alternative For Rescission And Restitution (On Behalf Of Individual Plaintiffs And The ~~§1981~~Race Discrimination Class) .............................. ~~145~~185

SEVENTH CAUSE OF ACTION  For Promissory Estoppel (On Behalf Of Individual Plaintiffs And The ~~§1981~~Race Discrimination Class) ............................................... ~~147~~189

~~EIGHTH CAUSE OF ACTION For Discrimination In Contract In Violation Of 42 U.S.C. § 1981  (On Behalf Of Individual Plaintiffs And The §1981 Class) .................................... 149~~

~~NINTH CAUSE OF ACTION  For Unlawful Discrimination In Violation Of The Unruh Civil Rights Act (On Behalf Of Individual Plaintiffs And The §1981 Class).................... 151~~

~~TENTH CAUSE OF ACTION  For False Advertising In Violation Of The Lanham Act, U.S.C. §1125, *et seq.* (On Behalf Of Individual Plaintiffs And The §1981 Class) ............ 153~~

~~ELEVENTH CAUSE OF ACTION For~~ Unlawful, Deceptive, And Unfair Business Practices Cal. Bus. & Profs. Code, §§§17200, *et seq.*  (On Behalf Of Individual Plaintiffs And The ~~§1981~~Race Discrimination Class)........................................................................ ~~155~~192

NINTH CAUSE OF ACTION Equitable Claim For An Accounting Of Debts Owed Under Contract  (On Behalf Of Individual Plaintiffs And The Race Discrimination Class).........193

TENTH CAUSE OF ACTION For Conversion Of Plaintiffs' Property  (On Behalf Of Individual Plaintiffs And The Race Discrimination Class) ................................................196

ELEVENTH CAUSE OF ACTION For Replevin  (On Behalf Of Individual Plaintiffs And The Race Discrimination Class) ..........................................................................198

TWELFTH CAUSE OF ACTION  For Unlawful Discrimination In Violation Of The Unruh Civil Rights Act (On Behalf Of Individual Plaintiffs And The Race Discrimination Class) ...........................................................................................................200

THIRTEENTH CAUSE OF ACTION  For Violation Of California Constitution Article I, Section 2 (On Behalf Of Individual Plaintiffs And The ~~§1981~~Race Discrimination Class) ........................................................................................ ~~157~~204

~~THIRTEENTH CAUSE OF ACTION For Freedom Of Speech Under The First Amendment United States Constitution, Amendment 1 (On Behalf Of Individual Plaintiffs And The §1981 Class)................................................................................................. 161~~

~~A.      Procedural Background ................................................................................. 161~~

~~REVISED SECOND~~THIRD AMENDED CLASS ACTION COMPLAINT ~~FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES~~

**TABLE OF CONTENTS**
(Continued)

                                                                    **Page**

B.      Permissive Endorsement Allegations Of State Action .......................... 164

C.      State Action Allegations Under The Public Function Test .................... 166

D.      Defendants' Conduct Violates The First Amendment ........................ 167

VII.   PRAYER FOR RELIEF ........................................................ ~~169~~208

VIII.  JURY TRIAL DEMAND ........................................................ ~~172~~212

1  Plaintiffs, Kimberly Carleste Newman, Lisa Cabrera, Catherine Jones, Denotra Nicole Lewis,

2  Andrew Hepkins, Harvey Stubbs, Khalif Muhammad, Keu Reyes and Osiris Ley bring this lawsuit

3  (the "Lawsuit"), individually and on behalf of a putative class of similarly situated persons, against

4  Defendant YouTube, LLC ("YouTube"), and its parent companies, Google LLC ("Google") and

5  Alphabet Inc. (collectively referred to as "Google/YouTube" or "Defendants," unless otherwise

6  specified).[1]

## I.  INTRODUCTION AND PREFATORY STATEMENT OF THE CASE

8  1.  ~~Plaintiffs are African American content creators, viewers, and consumers who~~

9  ~~use~~Defendants Google/YouTube are the largest Internet Service Providers ("ISPs") in the world.

10  Together, they operate the global ~~public~~video social media ~~platform~~site known as "YouTube."

11  2.  ~~Each Plaintiff brings this Lawsuit, on behalf of themselves individually, and as~~

12  ~~representatives of putative class of similarly situated persons (the "§1981 Class") to redress~~

13  ~~Google/YouTube's overt, intentional, and systematic use of their race, identity, viewpoint, and/or~~

14  ~~other personal characteristics, to deny them access and services on YouTube, in violation of their~~

15  ~~equitable and legal rights under contract, statutory, and common law.~~ Defendants obtain the license,

16  monetization, and other property rights to the content and data to 95% of the publicly available video

17  content in the world by entering into license agreements with more than 2 billion public internet users

18  who post, watch, engage, and communicate about video content on YouTube.  In return, Defendants

---

[1] Substantial overlap exists between the claims, allegations, putative classes and issues in this Lawsuit, with a case pending before this Court, *Divino Group, LLC et al., v. Google, LLC, et al*, Case No. 5:19-cv-004749 – VKD (N.D. Cal.) ("*Divino*").  After reviewing Civil L.R. 3-12 governing related cases, it is unclear whether this Lawsuit technically meets the specific criteria and elements required for formal relation of the two cases under Local Rule 3-12.  Specifically, this Lawsuit does not involve *all* of "the same parties," or the identical "property" owned by the same parties in *Divino*. It is also unclear whether the "transactions" are the same within the meaning of Local Rule 3-12, or whether the "events" consist of the identical unlawful conduct of restricting of access to the YouTube platform based on the profiling and discriminatory use of a consumer's personal identity or viewpoint in *Divino,* in contrast with the racial identity profiling and discrimination against Plaintiffs and the members of the Race Discrimination Class alleged in this Lawsuit.  Consequently, while Plaintiffs do not believe that all of the requirements for designating this ~~Lawsuit~~lawsuit and *Divino* "related" are satisfied under Local Rule 3-12, Plaintiffs are not opposed to having this ~~Lawsuit~~lawsuit related to, or coordinated with, the pending proceedings in *Divino*.

1  promise to provide each user with equal access to YouTube, and all of the benefits and services

2  offered in connection with the site, subject only to identity neutral, content based rules and terms of

3  services ("TOS") that are governed solely by the internal laws of California.

4        3.    ~~Defendants have been caught red handed using the race, gender, sexual orientation,~~

5  ~~identity, political viewpoints, an/or other personal characteristics of consumers, to restrict or deny~~

6  ~~access and/or services under the pretext of content based rules and terms of service that are supposed~~

7  ~~to apply equally to all consumers.  Instead of imposing access and service restrictions and/or denials~~

8  ~~based on a review of a consumer's videos, and a subsequent finding that the content violates~~

9  ~~YouTube's neutral content based rules and terms of service, Defendants use a consumer's race,~~

10 ~~identity, viewpoints, and/or other personal characteristics to impose access and service restrictions~~

11 ~~and denials on Plaintiffs and the §1981 Class, all of whom are persons who qualify as a "protected"~~

12 ~~group of Americans under the law.~~Defendants violated, and continue to violate those, and other

13 promises and legal obligations to Plaintiffs.  Defendants filter, curate, restricted and deny equal

14 access to Plaintiffs  and other similarly situated users based on the user's race, ethnicity, national

15 origin, or other protected identity characteristics.

16       4.    That is why experts and researchers in the field have accused Defendants of "digital

17 redlining."  According to experts, "the power of algorithms in the age of neoliberalism and the ways

18 those digital decisions reinforce oppressive social relationships and enact new modes of racial

19 profiling," which have been termed "technological redlining."  "The near-ubiquitous use of

20 algorithmically driven software, both visible and invisible to everyday people," results in the practice

21 of racial redlining by Defendants that has been traditionally associated with "real estate and banking

22 circles, creating and deepening inequalities by race, such that, for example, people of color are more

23 likely to pay higher interest rates or premiums just because they are Black or Latino."  Safiya Umoja

24 Noble, "Algorithms of Oppression." Apple Books;

25 https://books.apple.com/us/book/algorithms-of-oppression/id1327926683.

26       5.    Defendants use all of their aggregated data about the race, ethnicity, and national

27 origin of Plaintiffs to make decisions about access to the YouTube platform and services.  That

28 aggregated data is then "embedded in computer code and, increasingly, in artificial intelligence

1    technologies" that results in racial bias and discrimination by Defendants.  Safiya Umoja Noble,

2    "Algorithms of Oppression." Apple Books.

3    https://books.apple.com/us/book/algorithms-of-oppression/id1327926683.

4         6.    According to these researchers, "[r]acism is a standard protocol for organizing

5    behavior on the web" at Google/YouTube.  "[O]ppression operates in the same formats, runs the

6    same scripts over and over," and "is tweaked to be context specific.  But, "it's all the same source

7    code."  Excerpt From: Safiya Umoja Noble, "Algorithms of Oppression." Apple Books.

8    https://books.apple.com/us/book/algorithms-of-oppression/id1327926683.

9         7.    Researchers have also confirmed what Defendants admitted back in 2017;

10   Defendants' applications "track identity" in order to "surface targeted ads for users by analyzing

11   users' web traces."  "[N]ot only do search engines increasingly remember the digital traces of where

12   we have been and what links we have clicked in order to provide more custom content (a practice that

13   has begun to gather more public attention after Google announced it would use past search practices

14   and link them to users in its privacy policy change in 2012)," but that information is part of a larger

15   identity based data profile that Defendants use to filter, curate and restrict access to the YouTube

16   platform and services.  Excerpt From: Safiya Umoja Noble, "Algorithms of Oppression." Apple

17   Books.  https://books.apple.com/us/book/algorithms-of-oppression/id1327926683.

18        8.    Independent researchers are not the only ones to have found that Defendants are

19   engaged in digital redlining by using race and other protected identity characteristics of users to make

20   decisions regarding access to the YouTube platform and services.  When it comes to content filtering

21   and equal access for all on YouTube, African American, Hispanic, LGBTQ+, and other protected

22   YouTubers have been discriminated against and victimized by Defendants digital redlining and

23   identity legal transgression for years.

24        9.    Plaintiffs' core allegation here is that since at least 2017, Defendants admitted that

25   they have knowingly and systematically have profiled, filtered, and used information and aggregated

26   personal digital data about race, ethnicity, national origin, or other protected identity traits of users to

27   regulate, restrict, and deny access to YouTube and its services.  Defendants' use of race or other

28   protected identity classifications in any way to make access, service, and benefit decisions under a

**REVISED SECOND**THIRD **AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT,
RESTITUTION, ACCOUNTING AND DAMAGES**

1  contract is, and has been for decades, illegal in California and the United States.  Yet, Defendants
2  continue to engage in discrimination under contract and other unlawful actions because they
3  erroneously contend that, unlike other business operators, they are beyond the reach or prohibitions
4  of law, even when it comes to race discrimination under contract.  Researchers have confirmed with
5  empirical evidence and data that Plaintiffs and other members of the public have been subjected to
6  Defendants' digital redlining practice well before 2017.

7        10.     6. Defendants admit that they knowingly, intentionally, and systematically employ
8  artificial intelligence ("A.I."), algorithms, ~~and other computer and/or machine based filtering~~
9  ~~tools~~filters, facial recognition and automated systems to "target" Plaintiffs and the ~~§1981~~Race
10  Discrimination Class~~, by using~~ based on their race, ethnicity, origin, or other protected classification.
11  Defendants admit that the collection and use of aggregated data, cookies, and other information about
12  ~~their~~the users race~~, or protected~~ identity ~~and viewpoint to restrict or~~is used to "target" or single out
13  Plaintiffs and the Race Discrimination Class for purported "content based" restrictions and to deny
14  them full and equal access ~~and~~to services and revenue streams available to others on YouTube.

15        11.     7. Defendants also admit that they systematically profile consumers' personal
16  characteristics, including Plaintiffs' race, ~~to carry out a "policy" and to justify practices of restricting,~~
17  ~~denying~~and use identity based data to restrict, deny, and/or ~~interfering~~interfere with Plaintiffs' access
18  and services, based on whether the consumer is "black," ~~"gay,"~~or identifies with some other
19  protected persons under the law -- not because Plaintiffs' content (or accessing of YouTube) violates
20  Defendants' content based rules and ~~terms of service~~TOS.  Defendants use facial recognition, the
21  aggregation of personal identity based and other personal user data from Google and YouTube
22  Search, Google Adwords and Adsense, Google Docs, and a host of other online services, and racially
23  biased A.I. tools that "manipulate" results based on language and other personal traits.  All of this
24  personal racial and other identity based data is used by Defendants to filter, restrict, and deny
25  Plaintiffs "equal" access to YouTube in direct violation of Defendants promise of identity neutral,
26  content based rules that apply equally to all.

27        12.     The profiling and use of Plaintiffs' race, ethnicity, or other protected identity to make
28  what are supposed to be neutral content based access decisions is race discrimination under contract

REVISED ~~SECOND~~THIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES

that violates both California and federal anti-discrimination.  Defendants have known since 2017 that their filtering tools have been targeting users based on the racial identity of Plaintiffs, as well as other protected identity traits.  Defendants promised a "fix".

13.    The chart reviewing over 100 of Plaintiffs' videos and comparing them to the videos of white or preferred users shows the racial targeting of Plaintiffs and other protected users has not been fixed.  Indeed it shows Defendants practices and problems of racial bias and targeting have gotten worse as Defendants have sought to regulate the platform and its services in new ways that allow them to grow their financial interests and increase profits.  The result is digital redlining that profiles and denies Plaintiffs and the more than 50 million other protected users equal access to YouTube based, not on the material in the video content, but on the user's race, ethnicity, or other protected identity status.

# Video

## CLIENT - Khalif Muhammad
Dr.SYN Q's Effective Numbers Theory


## Similar YouTube videos not restricted
How Many People Does It Take to Start a Revolution?




## CLIENT - Harvey Stubbs
It's Just a Chicken Sandwich

1

2   **Similar YouTube videos not restricted**

3   Throwback Thursday: Racist Or Funny? | Gabriel Iglesias

4

5

6

7

8   **CLIENT - Nicole's View**

9   In Memory of

10

11

12   **Similar YouTube videos not restricted**

13   In Memory Of Sandy Hook Victims TRIBUTE (W/Pictures)

14

15

16

17

18   **CLIENT - Andrew  Hepkins**

19   Canelo Versus GGG | Who Wins And Why

20

21

22   **Similar YouTube videos not restricted**

23   Instant Karma in Boxing - Oleksandr Usyk

24

25

26

27   **CLIENT - T-K Reyes**

28

Fake News by Dino Archie

**Similar YouTube videos not restricted**

Kanye West Donald Trump Cold Open - SNL

**CLIENT - T-O Ley**

Como hacer cortadas o heridas falsas con maquillaje paso a paso

(How to make fake cuts or wounds with makeup step by step)

**Similar YouTube videos not restricted**

Easy Realistic Wound Halloween makeup tutorial

14.    The analysis in the full chart set forth at paragraph 107 further evidence of Defendants' digital redlining of over 100 videos.  This summary and the full chart at paragraph 107 was prepared by Alvarez & Marsal, one of the nation's preeminent consulting firms in the area of race discrimination and identity based redlining in the banking and financial industries.  The chart compares Plaintiffs' videos to similar videos of Defendants' preferred and sponsored creators who were not restricted or denied access despite having material in videos, that unlike Plaintiffs' videos, violated Defendants content based rules and restriction guidelines.  There is no neutral racial reason or explanation that can explain this disparate treatment, especially in light of Defendants admissions

REVISED SECONDTHIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES

1   that since 2017 their filtering systems and algorithms have been "targeting" users based on their race

2   and other protected identity.

3        15.    Defendants also admit that they "maintain[] internal review guidelines" which they do

4   not disclose to the public and utilize and then use those "internal review guidelines" to communicate

5   information about whether the video contains inappropriate at the request of and directly to their

6   preferred "content creators and advertisers" informing them, among other things, of whether

7   Defendants have determined that the videos contain:

8   ·       **Drugs and alcohol;**

9   ·       **Sexual situations;**

10  ·       **Graphic Violence;**

11  ·       **Mature subjects;**

12  ·       **Profane and mature language; and**

13  ·       **Incendiary and demeaning content.**

14      14.16.  According to Defendants, "[t]he classification of videos in connection with

15  YouTube's rating system is done using both an automated system and manual review.  Most ratings

16  are determined by the automated system, which constantly scans videos as they are uploaded or

17  updated.  This system examines various characteristics, including the video's title, metadata, a

18  transcription of the language used in the video, among other factors," to determine how the video

19  should be classified, what services it qualifies for and whether it contains content that Defendants

20  consider to be "mature" that is "inappropriate for younger and sensitive audiences. "Automated

21  classifications are constantly checked against manual reviews for accuracy as part of the quality and

22  improvement process of our classifiers."  Attached as Exhibit A is a true and correct copy of the

23  Declaration of Alice Wu, Senior Manager for Trust and Safety at YouTube LLC dated February 9,

24  2018, filed in *Prager University v. Google LLC, et al.*, Case no. 3:17-cv-06064, ECF 38.

25      15.17.  Using these automated systems, Defendants tell advertisers and viewers that Plaintiffs

26  videos contain "mature," "adult,"  or otherwise "inappropriate" content for younger and sensitive

27  audiences, when they do not.  And that false and racially biased classification of Plaintiffs' videos

28  have a huge and deep impact on the ability of Plaintiffs to compete with Defendants and other users

1  for viewers and advertising revenue on YouTube, especially given the amount of pornography and

2  other objectively "inappropriate" material that can be accessed on the internet and the reliance that

3  users place on Defendants to properly filter, curate, and restrict "adult" or "mature" content.

4      16.18.  Plaintiffs are African American, Hispanic and other protected persons under

5  California and federal law.  Each was and is a victim of Defendants' digital redlining.  Each has and

6  continues to be harmed by the unlawful profiling, filtering, and use of aggregated data about their

7  racial and protected identities that Defendants use to regulate, restrict, or deny them equal access,

8  services, and other benefits on YouTube.  Each brings this Lawsuit to obtain legal and equitable relief

9  to redress Defendants' discriminatory treatment under contract, and other unlawful actions, taken

10  against them, and a putative class of similarly situated persons (the "Race Discrimination Class").

11      17.19.  In bringing this Lawsuit, Plaintiffs also challenge Defendants' dangerous assertion

12  that the law provides no relief for race discrimination under contract and the other unlawful conduct

13  that arises from digital redlining, solely because Defendants engage in such discriminatory practices

14  to operate a business on the internet.  Thus, according to Defendants, they may engage in racial and

15  other identity based redline to regulate public speech and the monetization of that speech, while

16  banks, real estate agents, and other brick and mortar businesses may not.

17      18.20.  Without some legal and/or equitable relief to redress racial and other unlawful

18  identity based profiling, filtering, and content and access regulation and restrictions on YouTube

19  each Plaintiff and member of the Race Discrimination Class will continue suffer harm, including

20  substantial financial harm that results from Defendants unlawful diversion of billions of dollars of

21  revenues that belong to Plaintiffs and the Race Discrimination Class that flow from the express and

22  implied rights granted by Defendants to Plaintiffs under contract and other laws.

23      19.21.  Under digitally executed consumer form contracts that span thousands of pages and

24  contain hundreds of provisions that are embedded in hyperlinks, Defendants obtain the licensing and

25  monetization rights to Plaintiffs' content and their personal data and that of their followers and

26  audience members, as well as that of each member of the Race Discrimination Class.  In exchange for

27  granting Defendants licensing, monetization, and other data based property rights to the their video

28  channels, content, audiences, and data, Defendants promise and grant Plaintiffs the right to equal

1  access to the YouTube platform and all the services and monetization opportunities that are available

2  "equally to all." Defendants promise that "equal" access to YouTube and its services means the right

3  of each user to access and obtain the benefits of the services offered to the public as governed by and

4  subject only to "neutral" content based rules regarding material that actually appears in the video.

5  Defendants further promise that the "equal" application of those neutral content based rules apply

6  "equally to all" that are governed and applied "solely under and by the internal laws of California."

7      20.22.   For years, Defendants have breached these promises and violated the internal laws of

8  California by engaging in digital redlining.  Defendants track and use the race, ethnicity, national

9  origin, or other protected personal traits of Plaintiffs and Race Discrimination Class to filter,

10  regulate, restrict, deny and make other decisions about who gets what from YouTube.  That is overt,

11  intentional, and systematic identity based redlining and race discrimination that is prohibited under

12  the internal laws of both California, and the United States.  And whether Defendants' use of racial

13  profiling and filtering of internet users is motivated by racial bigotry and prejudice, political agendas,

14  or purely profit makes no difference.  Defendants' use of any racial or protected personal trait to

15  determine rights, obligations, and benefits, in any way, under a license and TOS contract is illegal

16  and expressly prohibited by law.

17      21.23.   8.  Defendants' conduct constitutes intentional, knowing, and systematic race

18  discrimination.  It violates Plaintiffs' contractual, commercial, and civil rights.  It is also inequitable,

19  unfair, and repugnant to any sense of justice under our legal system.

20      22.24.   9.  Defendants have unlawfully seized and continue to possess, use, and profit from the

21  property of Plaintiffs and the §1981Race Discrimination Class, without properly accounting for

22  royalties and/or other revenues that are owed to Plaintiffs and the §1981Race Discrimination Class

23  under the licensing agreement and other provisions of YouTube's terms of serviceTOS,[2] including

24  _____

25  [2] Here, "terms of service" referTOS" refers to all of the terms of service set forth in the YouTube
   license agreements executed by Plaintiffs and the members of the §1981Race Discrimination Class

26  or upon creating a YouTube account or a YouTube channel, which terms refer to and/or incorporate
   by reference the terms of serviceTOS set forth in other agreements with Defendants, such as the

27  terms of service for YouTube partnership, Google Search, Google gmailGmail, Google Adworks,
   and Google Adsense.

28

1  the provisions and agreements between Plaintiffs and Defendants for Google Adworks and/or

2  Google Adsense.

3      ~~10.    Regardless of whether Defendants are motivated by commercial gain, ideological~~

4  ~~animus, a practical inability to apply content based rules and access provisions, or merely because of~~

5  ~~incompetence, ignorance, negligence, arrogance, or a combination thereof, Defendants' conduct is~~

6  ~~not lawful.  Restricting or denying consumer access and services to YouTube based on racial or~~

7  ~~identity based profiling violates Plaintiffs' legal rights under: (i) contract; (ii) federal and state laws~~

8  ~~that prohibit race or other types of discrimination with respect to contract; (iii) unfair business~~

9  ~~practices, consumer protection, and false advertising laws; (iv) state and/or federal free speech~~

10  ~~protections; (iv) possession, misuse, and conversion of private property; and (v) equitable accounting~~

11  ~~principles and requirements.~~

12      ~~11.    Defendants do not deny that they are engaged in and have committed these unlawful~~

13  ~~practices, including racial discrimination under contract; nor can they deny it.  Indeed, Defendants~~

14  ~~admit that they have known that YouTube's content filtering and review tools and practices have~~

15  ~~been unlawfully "targeting" protected persons based on race, sexual or gender identity, and other~~

16  ~~personal characteristics since at least the spring of 2017.~~

17      ~~23.~~25.  **12.** ~~Instead~~Because Defendants cannot deny that they are engaged in digital redlining

18  based on race, ethnicity, national origin and other protected identities, Defendants now contend ~~only~~

19  that ~~Google/YouTube cannot be held~~they are not liable for these and other legal transgressions

20  because Congress granted Defendants absolute immunity under 47 U.S.C. § 230(c) ("~~Section~~

21  §230(c)" or the "Communications Decency Act"), including any and all of the unlawful conduct in

22  this case. ~~Thus, Defendants do not deny that they discriminate, breach their license agreements and~~

23  ~~contracts with Plaintiffs and the §1981 Class, or engage in unfair business practices, stealing and~~

24  ~~conversion of consumer property and licensing rights, or have failed to accurately account for or pay~~

25  ~~revenues earned and owed to Plaintiffs and to the §1981 Class under YouTube's terms of service.~~

26      ~~24.~~26.  **13.** ~~Section~~ Congress did not enact §230(c) ~~does not~~to place ~~these~~ Defendants

27  ~~absolutely and categorically~~ above the law.  ~~It does~~The specific provisions Congressional grant of

28  immunity do not apply, and cannot be applied, to immunize Defendants from liability, where, as

here, Plaintiffs have alleged with specificity, that Defendants are engaged in knowing and intentional race discrimination, breach of contract, unfair business practices, false advertising, the theft of Plaintiffs' property, and failure to account for revenue owed under contract.

25.27.  Furthermore, as part of their promise of equal access, Defendants have contracted out of §230(c) immunity when it comes to digital redlining or race based content filtering, restrictions, and access denials.  Specifically, Defendants expressly promise not only that all disputes are "solely governed by the internal laws of California," but discloses to Plaintiffs, the Race Discrimination Class, and all users that it applies §230(c) only to third party "defamation" claims.

26.28.  14. On its face, Section §230(c) operates as a "permissive" speech regulation law enacted by Congress, solely and expressly to allow private Internet Service Providers ("ISPs") to take steps to protect minors from being exposed to "offensive material" on the internet.  Therefore, at a minimum, Defendants' claim of immunity requires that Defendants must at least review the content in the video, and base any access and service restrictions and/or denials on the content for which services and access are sought.  The race, ethnicity or other protected identity, viewpoint, or personal characteristics of the Plaintiffs or members of the §1981Race Discrimination Class may never be considered.  Furthermore, identity based discrimination is never a lawful substitute or shortcut for actually reviewing content to determine if that content violates the rules and terms of serviceTOS.

27.29.  15. Furthermore, Section §230(c) does not and cannot immunize an ISP provider from liability that arises from express or implied breaches of duties or obligation agreed to under a contract with its users and consumers.  This is especially true here, where Google/YouTube have contracted with Plaintiffs and the §1981Race Discrimination Class to provide access and services to consumers that are subject only to restriction or denial of service under specific viewpoint neutral content based rules that apply equally to all.

28.30.  16. Nor does Section §230(c) immunize from liability an ISP who has unlawfully taken, possessed, used, and or converted for unlawful gain its users' property, and/or has otherwise failed to abide by, account for, or pay debts or monies owed to users under the applicable license agreement and other terms of serviceTOS provisions.

29.31.  17. Similarly, Section §230(c) does not immunize Defendants for directly engaging in unfair business practices, anti-competitive conduct, false advertising, or intentional and knowing race, gender, sexual orientation, political and other types of personal identity based discrimination against members of a protected class such as Plaintiffs or the members of the §1981Race Discrimination Class.

30.32.  18. To the extent that any court of competent jurisdiction were to construe Section §230(c) as immunizing the specific conduct and violations perpetrated by Google/YouTube against the Plaintiffs and members of the §1981Race Discrimination Class alleged in this Lawsuit, Section §230(c) could not survive constitutional scrutiny under the Supreme Court's 6-3 majority decision in *Denver Area Educational Telecommuns. Consortium, Inc. v. Federal Communications Comm'n*, 518 U.S. 727, 766-67 (1996).  In other words, if Section §230(c) were to be construed to immunize Defendants from the events, circumstances, and conduct alleged here, Section §230(c) would be unconstitutional because it (a) would not be viewpoint neutral, (b) was not narrowly tailored and reasonably related to a legitimate public purpose, including protecting minors from "offensive material" on the Internet, and (c) would interfere with established legal relationships, contract, rights, and obligations of the parties.  *Id.*

31.33.  19. Accordingly, Plaintiffs file this Lawsuit to hold Google/YouTube accountable for their unlawful and inequitable conduct under ten separate causes of action or claims for legal and equitable relief:

(i)  Declaratory judgment under 28 U.S.C. § 2001 *et seq.*, that Section §230(c) does not apply to the allegations and claims for relief in this Lawsuit because (a) Section §230(c) statutory language does not apply, and cannot be applied, to the prosecution of the allegations and claims in this Lawsuit; and/or (b) Section §230(c) is an unconstitutional "permissive" speech restriction law under *Denver Area* and progeny;

(ii)  Equitable accounting of revenue under California Common Law for amounts owed by Defendants as a result of inconsistent, inaccurate, incorrect and false reported view numbers, subscriber numbers, watch times and CPM which form the basis for calculating revenue earned by videos and channels;

1   (iii)  Equitable Conversion and Replevin under California Common Law for a Court Order

2   that Defendants return the videos taken down, removed and/or deleted from the YouTube

3   platform to the extent that Defendants still possess the electronic digital videos; and/or for

4   damages a Court award of damages for the value of the videos where Defendants no longer

5   possess the electronic digital videos;

6   (iv)  Breach of contract, implied breach of contract covenant, and promissory estoppel;

7   (v.)  Racial discrimination in contract in violation of federal law under 42 U.S.C. § 1981;

8   (vi.)  Racial discrimination in violation of the Unruh Civil Rights Act, Cal. Civ. Code § §§51,

9   *et seq.*;

10  (vii.)  Unlawful, deceptive, and unfair discriminatory business practices in violation of the

11  Unfair Competition Laws under California Business and Professions Code § §§17200, *et*

12  *seq.*;

13  (viii.)  False advertising and commercial disparagement in violation of the Lanham Act, 15

14  U.S.C. § §§1125, *et seq.*;

15  (ix.)  Discrimination in violation of the Liberty of Speech Clause under Article I, Section 2 of

16  the California Constitution; and

17  (x.)  Discrimination in speech in violation of First Amendment of the U.S. Constitution

18  arising from Defendants' use of Section §230(c) to immunize them from liability for

19  discrimination.

20  **II.      PARTIES**

21  32.34.  **20.** Plaintiff Kimberly Carleste Newman, also known as Kimberly Santana ("Plaintiff

22  Newman"), is an African American woman residing in the State of California who is the creator and

23  owner of "The True Royal Family," and "True Royal," two YouTube channels dedicated to

24  developing and posting videos that discuss and present information regarding issues and current

25  events which are important to the African American community.  Plaintiff Newman created "The

26  True Royal Family" channel in 2015, followed by "True Royal," in 2016.  Since its creation, Plaintiff

27  Newman's "The True Royal Family" channel has posted more than 1654 separate videos, only 954 of

28  which are still posted because Defendants removed 700 or more individual videos and have refused

to restore them; the "True Royal" channel has posted 209 videos.  "The True Royal Family" channel has generated a total of 4.4 million views since creation, and the "True Royal" channel has generated 583,000 views since creation.  Plaintiff Newman is a YouTube "partner," and has generated total revenue of $2,672.68 for videos posted on "The True Royal Family," and $123.96 for videos posted on "True Royal."

33.35.  21.  Plaintiff Lisa Cabrera ("Plaintiff Cabrera") is an African American woman residing in the State of New Jersey who is the creator and owner of "Lisa Cabrera" and "Lisa C," two YouTube channels dedicated to developing and posting videos that discuss and present information regarding issues and current events which are important to the African American community. Plaintiff Cabrera created the "Lisa Cabrera" channel in 2015.  Since creation, Plaintiff Cabrera's "Lisa Cabrera" channel has posted 4,423 videos (68 of which Defendants archived for unknown reasons and can no longer be viewed by anyone), which have garnered 20 million views.  Plaintiff Cabrera is a YouTube partner who has generated a total of $25,500 for videos posted on the "Lisa Cabrera" channel.

34.36.  22.  Plaintiff Catherine Jones ("Plaintiff Jones") is an African American woman residing in the State of VermontTennessee who is the creator and owner of "Cooking with Carmen Caboom," a YouTube cooking channel for African Americans, and "Carmen Caboom," and "Carmen Caboom Reloaded," two YouTube channels dedicated to developing and posting both parodies and serious videos that discuss and present information about issues and current events which are important to the African American community.  Plaintiff Jones created the "Carmen Caboom" channel in 2010, a backup "Carmen Caboom" channel in 2014, the "Cooking with Carmen Caboom" channel in 2015 and the "Carmen Caboom Reloaded," channel in 2018.  Defendants improperly removed the original "Carmen Caboom" channel for purported nudity when no video posted to the channel included any nudity.  Plaintiff Jones is a YouTube partner.  Since creation, Plaintiff Jones' 2014 "Carmen Caboom" channel has posted numerous videos, several of which Defendants improperly removed as hate speech, the remaining videos have garnered approximately 500-1,200500-1,200 views per video overall which have generated approximately $500 per year.

35.37.   23. Plaintiff Denotra Nicole Lewis ("Plaintiff Lewis") is an African American woman residing in the State of Texas who is the creator and owner of "Nicole's View," a YouTube channel dedicated to developing and posting videos that discuss and present information regarding issues and current events which are important to the African American community.  Plaintiff Lewis created the "Nicole's View" channel in 2006.  She became a YouTube partner sometime between 2016 and 2017.  "Nicole's View" has generated 11.3 million views and approximately $6,000 7,000 $7,000 in revenue per year, approximately $25,000 over the life of the channel.

36.38.   24. Plaintiff Andrew Hepkins ("Plaintiff Hepkins") is an African American freelance journalist, voice actor, and musician residing in the State of New York who is the creator and owner of "DruStory News," and "DruHepkins," YouTube channels.  "DruStory News" is dedicated to creating and posting videos that discuss and present information based on independent research regarding news items, issues and current events which are important to everyone, including members of the African American community.  Plaintiff Hepkins created the "DruStory News" channel in 2014.  "DruStory News" has generated 3.6 million views and 17,600 subscribers.

37.39.   25. Plaintiff Harvey Stubbs ("Plaintiff Stubbs") is an African American commentator residing in the State of Illinois who is the creator and owner of the YouTube channels "Your World Your View," "Harvey Superboy," "Harvey Superboy 1," "HARVEY SUPERBOY," and "J Jackson."  These channels all have uploaded videos consisting of commentary regarding events, social issues, politics, news, and people who are of interest to or affect the African American Community community in general, and the Chicago Area African American Community community in particular.  Plaintiff Stubbs is a veteran and life-long resident of the Chicago Area, who is active in his community and offers a unique perspective on current and historical events and people in the public eye.  Plaintiff Stubbs started his first YouTube channel in 2007 and has created a number of additional channels due to Defendants' repeated unwarranted flags and Community Guidelines strikes against his channels.  "Your World Your View," which was created in September of 2013, has generated 6.6 million views.

38.40.   26. Plaintiff Khalif Muhammad ("Plaintiff Muhammad") is an African American social commentator residing in the State of California who is the creator and owner of "Dr. Syn-Q," a

YouTube channel dedicated to developing and posting videos that discuss and present information regarding historic and current issues and events regarding racial inequality and redressing barriers to equality for the African American community generally and African Americans living in the Bay Area specifically.  Plaintiff Muhammad originally launched "Dr.Syn-Q" under the name "Counter Racism Now," in 2006.  Over the years, Plaintiff Muhammad has uploaded 273 videos to the "Dr.Syn-Q" channel.  As of August 11, 2020, only 159 videos are listed for the "Dr.Syn-Q" channel, Defendants having removed or archived approximately 114 videos.  Of these 159 videos, only 19 videos are listed with "Restricted Mode" enabled, however only 11 of those listed can actually be viewed with "Restricted Mode" enabled.  8 videos listed for the channel when "Restricted Mode" is enabled show a black screen with the legend, "This video is unavailable with "Restricted Mode" enabled.  To view this video, you will need to disable Restricted Mode."  In excess of 2,150 people have subscribed to the "Dr.Syn-Q" channel.  It is currently unknown how many views this channel has actually generated in the past 14 years:.  Prior to 2020, the channel reflected in excess of 980,000 views.  On June 26, 2020, the channel reflected 899,717 views.  On August 9, 2020, the channel reflected only 388,997 views.  On August 11, 2020, the channel reflected 643,790 views.

39.41.   27.  Plaintiff Fermin Saldana, also known as Keu Reyes  (hereafter "Plaintiff Reyes"), is an American man of Puerto Rican descent residing in the State of California.  He is the husband of Osiris Ley.  He is a professional writer, producer, videographer and filmmaker who creates both original material for the internet, television and commercial theater outlets;, as well as produces videos for other artists who require technical and artistic assistance to create material for the internet, television and commercial theater outlets.  Plaintiff Reyes is the creator and owner of Youtube.com/KeuReyes, Youtube.com/ClankTV, Youtube.com/randumbness, Youtube.com/LaOptima, Youtube.com/Multivision Network, Youtube.com/Soundication, and Youtube.com/Artistic Warfare.  These channels feature videos in English and Spanish.  Plaintiff Reyes, along with his wife Osiris Ley, are the co-creators and co-owners of Youtube.com/Osyley, https://Mundo.osyley.com, and https://www.osyley.com.  Keu Reyes was created in 2011.  In the past 9 years, the channel has acquired 47,200 subscribers and has generated in excess of 23 million views.  The channel features music and comedic content, consisting of 160 videos, which include

both animated and live action videos.  ClankTV was created in 2015, has acquired 4,980 subscribers and has generated 1.7 million views.  ClankTV features 61 entertainment videos and content relating to music, fashion, politics and conspiracies.  Randumbness was created in 2015 and featured approximately 10 edgy comedic videos.  Randumbness disappeared from the YouTube platform without notice within the past 2 years, along with the videos that were posted and listed to the channel.  La Optima was created in 2014, has 21 subscribers, and has generated 2,220 views.  La Optima features 45 videos.  Multivision Network was created in 2013, has acquired 9,590 subscribers and generated in excess of 3.7 million views.  Multivision Network has 133 entertainment, cooking and ~~bar tending~~bartending videos.  Soundication was created in 2012, has 231 subscribers and has generated 115,439 views.  Soundication is a music distribution channel for independent artists.  Soundication features 32 music and spoof videos.  Artistic Warfare was created on 2006, has acquired 590 subscribers, and has generated 1 million views.  Artistic Warfare has 50 videos listed, posted principally in the English language which discuss issues of the day, literature, and culture with a comedic ~~intention~~intent.

~~40.~~42.  **28.** Plaintiff Osiris Ley is the wife of Fermin Saldana ("Plaintiff Ley").  She is ~~an~~a naturalized American woman of Mexican descent residing in the State of California.  She is a professional makeup artist who works with artists in films, videos, commercials and on the stage~~;~~ ~~she.~~  She also teaches makeup classes to students seeking certification as makeup artists.  Plaintiff Ley ~~along with~~and her husband Plaintiff Reyes, are the co-creators and co-owners of Youtube.com/Osyley, https://www.Mundo.osyley.com and https://www.osyley.com.  The Osyley channel was created in 2012.  It is dedicated to informing and educating both the public at large and professional makeup artists regarding how better to apply and use beauty products to achieve professional results.  The channel has 158 Spanish language videos listed.  In the past 8 ~~and~~ ½ years Osyley has acquired 387,000 subscribers, and has generated in excess of 34 million views.

~~41.~~43.  **29.** Defendant YouTube, LLC is a for- profit limited liability corporation, wholly owned by Google LLC, and organized under the laws of the State of Delaware.  YouTube's principal place of business is Mountain View, California and it regularly conducts business throughout California, including Santa Clara County, California.  Defendant YouTube, LLC operates the largest

**REVISED ~~SECOND~~THIRD AMENDED CLASS ACTION COMPLAINT ~~FOR DECLARATORY JUDGMENT,~~**
**~~RESTITUTION, ACCOUNTING AND DAMAGES~~**

and most popular internet video viewer site, platform, and service in California, the United States, and the world, and holds itself out as one of the most important and largest public forums for the expression of ideas and exchange of speech available to the public.  Plaintiffs are informed and believe that at all relevant times Defendant YouTube, LLC acts as an agent of Defendant Google LLC and uses, relies on, and participates with Defendant Google LLC in restricting speech on the YouTube site, platform, or service.

42.44.  **30.** Defendant Google LLC is a for- profit, limited liability company organized under the laws of the State of Delaware, with its principal place of business in Mountain View, California; it.  It regularly conducts business throughout California, including Santa Clara County.  Plaintiffs are informed and believe, and thereon allege, that, at all relevant times, Defendant Google LLC has acted as an agent of Defendant YouTube, LLC, and controls or participates in censoring and restricting speech on the YouTube service or platform.

~~**31.**     Defendant Alphabet Inc. is a for-profit American multinational corporation conglomerate incorporated under the laws of the State of Delaware, with its principal place of business in Mountain View, California.  According to Defendants, Alphabet Inc. was created as part of a corporate restructuring of Defendants Google, YouTube, and other subsidiary or affiliate entities on October 2, 2015. At that time, Alphabet Inc. became the parent company of Google and other former Google subsidiary or affiliated entities, including Defendant YouTube.  Defendants also claim that the creation and establishment of Alphabet Inc. was prompted by the desire to make Defendants' core businesses "cleaner and more accountable" while allowing greater autonomy to group companies that operate in businesses other than internet services.~~

43.45.  **32.** The true names and capacities, whether individual, corporate, associate, or otherwise, of Defendants Does 1 through 100, inclusive, are presently unknown to Plaintiffs, and for that reason these Defendants are sued by such fictitious names.  Plaintiffs are informed and believe and thereon allege that each of the Doe Defendants is in some way legally responsible for the violations of law, injuries, and harm caused, as alleged herein.  If, and when appropriate, Plaintiffs will seek leave of the Court to amend this Complaint when the true names and capacities of said defendants are known.

III.    JURISDICTION AND VENUE

44.46.  Plaintiffs re-allege and incorporate herein by reference, as though set forth in full, each of the allegations set forth in paragraphs 1-41.

45.47.  33. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337 1332(d), 1367(a), and 2201.  The Complaint includes Federal questions, and the amount in controversy arising from the claims asserted on behalf of Plaintiffs and all other persons similarly situated exceeds $5 million, exclusive of interest and costs.  Plaintiffs and all other persons similarly situated also challenge the construction and constitutionality of 47 U.S.C. § 230(c)(1) and (2), and seek a declaratory judgment that this statute does not immunize Defendants for overt intentional and systematic racial discrimination on the YouTube platform.

**A.    Diversity Jurisdiction: The Class Action Fairness Act, 28 U.S.C. §1332(d) ("CAFA")**

46.48.  The Court has jurisdiction over all the claims in this case under CAFA, 28 U.S.C. §1332(d).

47.49.  Plaintiffs have filed a class or "mass action" that seeks relief on behalf of a putative class composed of millions of persons whose contractual, legal and equitable rights have been violated by Defendants' use of their race, ethnicity or other protected identities to filter, restrict, or deny equal access to YouTube in violation of Defendants' TOS and other related promises, federal and state anti-discrimination laws, federal false advertising laws, and state unlawful, unfair, deceptive practices, and federal and state public speech laws (the Race Discrimination Class).

48.50.  The matter in controversy exceeds the sum or value of Five Million Dollars ($5,000,000), exclusive of interest and costs.  Moreover, the claims for relief seek, among other things, statutory damages, compensatory damages, restitution, and other equitable relief that substantially exceed One Billion Dollars ($1,000,000,000) in value.

49.51.  More than half of the representative class of Plaintiffs are not citizens of California, the State in which the action was originally filed.  Five of the nine representative Plaintiffs for the Race Discrimination Class reside outside of California:  Andrew Hepkins (New York); Harvey

1   Stubbs (Illinois); D. Nicole Lewis (Texas); Lisa Cabrera (New Jersey); and Catherine Jones

2   (Tennessee).

3       50.52.   YouTube is the most used and "ubiquitous" social media platform in the U.S. and has

4   more users than other global social media sites like Facebook or Twitter.  It is estimated that 195

5   million Americans (195,000,000) used and continue to use YouTube during the relevant time period

6   of this Lawsuit.

7       51.53.   Between 41% and 49% of those users identify or are identified by Defendants as

8   non-white when it comes to race, ethnicity, or national origin.

9       52.54.   At least 50 million persons who reside in the United States are part of the Race

10   Discrimination Class.

11       53.55.   Each member of the Race Discrimination Class is a party to YouTube's TOS,

12   Community Guidelines, Google's Privacy Policy, the Safety Policy, Copyright Policies, and other

13   related agreements, including the choice of law and venue provisions set forth in Defendants' TOS.

14       54.56.   Substantially more than two-thirds of the persons who are members of the Race

15   Discrimination Class reside outside of California, in one of the other 50 states or territories of the

16   United States.  Between 75% and 85% (or approximately 42.5 million) of those putative class

17   members are not citizens of California, the State in which the action was originally filed and reside in

18   states or territories other than California.

19       **B.      Federal Question Jurisdiction:  "Arising Under" Jurisdiction, 28 U.S.C. §1331**

20       55.57.   The Court also has jurisdiction under 28 U.S.C. §1331 ("§1331").

21       56.58.   Plaintiffs allege three independent claims for relief under federal law:  race

22   discrimination under contract in violation of 42 U.S.C. §1981; false advertising in violation of the

23   Lanham Act, 15 U.S.C. §§1125, *et seq*.; and civil rights violations under the First Amendment of the

24   U.S. Constitution.

25       57.59.   In addition, Plaintiffs also assert a request for declaratory relief under 28 U.S.C.

26   §2201, alleging that the application of §230(c), 47 U.S.C. §230(c) is unconstitutional under the First

27   and Fourteenth Amendments, at least as applied in this case.

28

1     58.60.  While requests for declaratory relief under §2201 do not normally provide an

2  independent basis for federal question jurisdiction under §1331, Plaintiffs' request for such relief is

3  an independent federal claim for relief that arises under §1331 because it is based on and arises

4  entirely as a request for interpretation, construction, and scope of application of a federal statute in

5  this case that Defendants assert bars and preempts the prosecution of all claims for relief asserted in

6  this Lawsuit.

7     59.61.  Furthermore, to the extent that the Court interprets or construes this federal statute

8  preventing Plaintiffs from obtaining relief under some or all of the claims for relief asserted herein,

9  the federal statute is unconstitutional, at least as applied to these Plaintiffs, under the First and/or

10  Fourteenth Amendments of the U.S. Constitution.

11     60.62.  The resolution of the federal questions regarding the interpretation, construction,

12  application, and possibly the constitutionality of §230(c) is necessary and required to adjudicate all

13  of the other claims alleged in the TAC.

14     61.63.  The resolution of those questions will have substantial and profound implications for

15  the uniform application of federal law and the entire federal system as a whole, because whether

16  Congress enacted §230(c) to immunize an internet service provider for knowing, intentional, and

17  systematic discrimination against users based on their identity (e.g., their race, ethnicity or other

18  protected identity) and other personal traits, is a threshold issue and element to every claim in this

19  case, as well as the respective obligations and rights of every internet user and service provider who

20  operates within the laws and jurisdiction of the United States.

21     62.64.  These purely federal issues of law are essential to the adjudication of each and every

22  claim for relief, including federal constitutional issues, that are (1) necessarily raised, (2) actually

23  disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal

24  state balance approved by Congress.

25     63.65.  Furthermore, Congress expressly enacted §230(c) to preempt all claims and liability

26  that are inconsistent with its scope and application, whether those claims arise under federal law or

27  the particular law of one of the 50 states or territories of the U.S.  *See* 47 U.S.C. §230(e); *Domen v.*

28  *Vimeo, Inc.*, 6 F.4th 245, 249-53 & n.4 (2d Cir. 2021) (§230(c) preempts all state laws).

1    64.66.  Thus, Plaintiffs' request for declaratory relief under 28 U.S.C. §2201 that a federal

2    court interpret, construe, and determine the scope and application of §230(c) with respect to each and

3    every claim in this case are "special and exceptional" circumstances that arise under federal law

4    within the meaning of §1331.  *Grable & Sons Metal Prods. v. Darue Engineering. & Mfg.*, 545 U.S.

5    308, 314-316 (2005).  *see also Gunn v. Minton*, 568 U.S. 251, 258-259 (2013); *Sarauer v.*

6    *International Association of Machinists and Aerospace Workers, District No. 10*, 966 F.3d 661,

7    673-675 (7th Cir. 2020); *Noatex Corp. v. King Construction of Houston LLC*, 74 F.Supp.3d 764,

8    772-774 (N.D. Miss., 2014) (applying *Grable* and holding that federal constitutional due process

9    challenge to state "Stop Notice" law presents a federal question that creates federal jurisdiction under

10   declaratory judgment act) (citing *Martinez v. State of California*, 444 U.S. 277, 279 (1980)).

11       **C.    Supplemental Jurisdiction: 28 U.S.C. §1367**

12       65.67.  The Court also has supplemental jurisdiction over all of the state claims in this case

13   because they arise from the same nucleus of facts and are so related to the federal claims in the action

14   that form part of the same case or controversy under Article III of the United States Constitution.

15       66.68.  The district court should not decline to exercise supplemental jurisdiction over the

16   state law claims, at least until the application and constitutionality of §230(c) is decided:  (a) the

17   scope and application of that federal law predominates the adjudication of those claims; (b) the

18   interests of comity, efficiency, and fairness are not furthered, but are impeded, by sending threshold

19   federal questions of national importance to state courts to interpret, apply, and scrutinize the federal

20   constitutionality of the law as applied to Plaintiffs who are protected persons based on their race,

21   ethnicity, and national origin under federal law; and (c) to the extent that some of the claims in this

22   case also present novel or complex issues of California law, including the application of the Liberty

23   of Speech Clause and/or the Unruh Act to unlawful sex, gender, or other identity based

24   discrimination by a global and ubiquitous internet service provider, the Court of Appeals can decide

25   any such discreet legal issues to the California Supreme Court for resolution if necessary, once it has

26   decided the threshold federal question as to which, if any, of these claims are barred by federal law

27   under §230(c).

28

1    67.69.  Thus, each and every claim for relief under California law is "inextricably tied" to the

2    interpretation, construction, application, and constitutionality of §230(c) and the "right to relief

3    necessarily depends on resolution of a substantial question of federal law."  *City of Chicago v. Int'l*

4    *Coll. of Surgeons*, 522 U.S. 156, 173 (1997) ("*Surgeons*"); *see also*, *New Mexico v. General Elec.*

5    *Co.*, 335 F.Supp.2d 1157, 1176-79 (D. N.M. 2004) (*aff'd* 467 F.3d 1223 (10th Cir. 2006)).

6        68.70.  A jurisdictional based dismissal will not conserve, but require the unnecessary

7    expenditure of judicial resources.

8        69.71.  It requires the litigants in this and other §230(c) cases to seek rulings from different

9    state courts on novel questions of federal law.

10        70.72.  Requiring state courts to rule on the threshold federal immunity issues under §230(c)

11    creates a state by state, non-uniform body of law on purely federal statutory construction and

12    constitutional issues that prevents the uniformity of federal law and upsets the balance between it and

13    the laws of the other 50 states and local territories of the U.S.

14        71.73.  At some juncture, the federal courts will have to rule on the construction and

15    application of §230(c) to the claims in this case, as well as the claims of other internet consumers who

16    are being systematically discriminated against by Defendants because of their race, sex, or other

17    personal identities.

18        72.74.  All of these factors weigh in favor of and expressly allow the Court to retain

19    supplemental jurisdiction of the state law claims under 28 U.S.C. §1367.

20    **D.    Venue: 28 U.S.C. §1391**

21        73.75.  34. Venue is proper in the Northern District of California (San Jose Division) under

22    28 U.S.C. § 1391.

23        74.76.  Defendants reside and/or transact business in the County of Santa Clara, and are

24    within the jurisdiction of this Court for purposes of service of process.

25        75.77.  Defendants' TOS requireexpressly provide that Plaintiffs and all other persons

26    similarly situated file this' Lawsuit must be filed in a court of competent jurisdiction located within

27    Santa Clara County.

28    1665102.1 1911115.1                                 -24-                    Case No. 5:20-cv-04011 LHK .

1    **IV.     FACTS COMMON TO ALL CLAIMS**

2         76.78.  Plaintiffs re-allege and incorporate herein by reference, as though set forth in full,

3    each of the allegations set forth in paragraphs 1 through 68 above.

4         77.79.  35.  On June 2, 2020, this Court held a hearing on Defendants' Motion to Dismiss in

5    *Divino*.  At the hearing, the Court asked Defendants if they were claiming immunity from liability for

6    denying access to YouTube based on the user's race.  In response, Defendants' counsel conceded that

7    a case involving intentional race discrimination by an ISP may not be covered by ~~Section~~ §230(c):

8              I THINK THERE COULD BE SOME STARK CASES WHERE A COURT MIGHT FIND

9              UNDER A PARTICULAR SET OF CIRCUMSTANCES THAT SOME ALLEGED

10             DISCRIMINATION DIDN'T TAKE THE FORM OF A PUBLISHER OF ACTUALLY

11             TARGETING PUBLISHER CONDUCT, AND, THEREFORE, DIDN'T COME WITHIN

12             (C)(1).

13             *   *   *   *

14             I CAN IMAGINE SOME COURTS TAKING THE POSITION THAT A PROPERLY

15             PLEADED CLAIM OF THE SORT THAT YOU DESCRIBE AS SORT OF FACIAL

16             RACE DISCRIMINATION CLAIM MAY NOT BE GOOD FAITH UNDER (C)(2), I CAN

17             IMAGINE A COURT TAKING THAT POSITION.

18   Attached as Exhibit ~~E~~B is a true and correct copy of the June 2, 2020 Transcript of Oral Argument

19   before the Hon. Virginia DeMarchi; Exhibit ~~E~~B, at ~~10:45 15-22~~10:45 - 15-22.

20        78.80.  36. This Lawsuit is that "stark case."  Defendants are engaged in intentional digital

21   redlining and race discrimination against Plaintiffs and ~~other persons similarly situated~~members of

22   the Race Discrimination Class, that violates Defendants' contractual promises not to discriminate,

23   and also violates long established laws that prohibit racism for profit.

24        ~~37.       The central allegation in this Lawsuit is that Defendants engage in identity and~~

25   ~~viewpoint based filtering, and the imposition service access restrictions or denials, that utilize and are~~

26   ~~based, in part or in whole, on Plaintiffs' race, identity, viewpoints, or other personal characteristics;~~

27   ~~rather than solely based on a review of whether the video complies with the content based and other~~

28   ~~viewpoint neutral rules that apply equally to all YouTube users.~~

79.81.  Defendants employ automated systems that use personal data to identify users based on race, ethnicity, national origin and other protected identities to make decisions regarding access to the YouTube platform and services; rather than using neutral content based filters, as Defendants promise under the TOS and related agreements.

80.82.  38. Defendants digitally redline, profile, use, and consider Plaintiffs' race, personal identity, or viewpointsother protected identities, in order to interfere with, restrict, or block video uploading, viewing, promotion, advertising, engagement, and/or monetization services because Plaintiffs are African American, Hispanic or other protected identities and/or possess personal characteristics or viewpoints that Defendants dislike.  This is race and identity based discrimination.  ThatThis conduct is unlawful and cannot be immunized by Congress.

81.83.  39. Defendants' profiling, review, use, and consideration of  Plaintiffs' race, ethnicity, religion, political affiliations or personal identity or viewpoints or other protected identities is prohibited not only under Defendants' TOS and other related agreements with Plaintiffs, but it also violates laws dating back to the Civil War which prohibit racial discrimination in contract and business relationships.

A.      Defendants' Operation Of YouTube

82.84.  40. Defendants Google/YouTube are members of the largest public or private business enterprise, in the world.

83.85.  41. Through this enterprise, Defendants exercise complete, absolute, and "unfettered" control over access to approximately 95% of all video content that is available to the public world-wide.  This includes absolute control over any and all posting, viewing, engagement, advertising, personal data, and revenue monetization for the rights of the 2.3 billion consumers who access and use YouTube.

84.86.  42. Defendants are also the largest creators, promoters, and sponsors of video content on YouTube.  Thus, in addition to hosting and regulating video content and services on YouTube, Defendants compete directly with Plaintiffs and their video content for the same access, audiences, viewership, advertising, marketing, and revenue based services on the YouTube platform.

85.87. 43. In exercising these unprecedented powers, Defendants contract with Plaintiffs and all persons similarly situated members of the Race Discrimination Class to provide them equal access to YouTube and all of its related services, subject only to viewpoint neutral, content based rules and criteria that apply equally to all.

86.88. 44. In reality, Defendants' access restrictions and denials are not the result of an identity and viewpoint blind review or the application of the rules to actual video content. Instead, Defendants have an irreconcilable commercial conflict of interest: on. On the one hand, Defendants act as content creators or sponsors of video content, competing directly with Plaintiffs and all persons similarly situated members of the Race Discrimination Class for the same services, audiences, advertisers, and revenue streams on the YouTube platform; on. On the other hand, Defendants act as absolute regulators and monetizers of all YouTube content and services, and exercise unfettered authority to determine viewer and service access by enforcing their Community Guidelines and Terms of Service (the "TOS") against their competitors, based on the race, ethnicity or other protected identities and/or viewpoints of Plaintiffs and all other persons similarly situated members of the Race Discrimination Class.

87.89. 45. Under the pretext of honest content and service regulation, Defendants rig the game for profit, by using their power to restrict and block Plaintiffs and other similarly situated competitors members of the Race Discrimination Class , based on racial identity or viewpoint discrimination. Defendants also abuse their power by not subjecting videos they creator create or which their preferred partners make, to the same Community Guidelines and TOS which that they apply to all other YouTube users. As a result, Defendants are not subject to filtering or blocking restrictions, even where Defendants' videos contain content that violates their own rules.

88.90. Defendants employ A.I., algorithms, filters, and automated systems that utilize personal data about Plaintiffs' race, ethnicity, or other protected identity to make what are supposed to be purely "neutral" content based decisions regarding filtering, restrictions, and user access. These automated systems are embedded with racially biased source code that aggregates the unprecedented amount of personal digital data that Defendants collect through Google Search, Gmail, Google Adwords, Google Documents, AdServe, facial recognition software, and other

REVISED SECOND THIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES

1   services and applications to create a digital racial profile of the user that is then used to make

2   decisions about viewer reach, monetization, advertising, and other services on YouTube that

3   Defendants promise are available "equally to all."

4           89.91.   **46.** Among the many abuses that Defendants have perpetrated against Plaintiffs and

5   all other persons similarly situated, Defendants also allow racist hate speech and doxing to go

6   unregulated on Plaintiffs' YouTube channels, resulting in lost subscribers and viewership, and the

7   surreptitious "bugging" of Plaintiffs' videos by the insertion, attachment, appending, or embedding

8   of metadata and other signals that allow Defendants' filtering tools to target Plaintiffs and all other

9   persons similarly situatedmembers of the Race Discrimination Class, based on the video creator's

10  race, ethnicity or other protected identity and/or the viewpoint, as well as those of hertheir channel

11  subscribers, and viewers.

12          90.92.   **47.** This intentional and systematic racial discrimination violates Defendants' legal

13  obligations under the contract(s), and is unlawful under federal and state antidiscrimination laws,

14  false advertising, unlawful business practices, and free speech laws.  It is unlawful regardless of

15  whether it is done for profit, or out of ideological animus.

16          91.93.   **48.** Interfering with the contractual and legal rights of Plaintiffs and all persons

17  similarly situatedmembers of the Race Discrimination Class with respect to YouTube access and use

18  that is based in whole or in part on race, ethnicity or other protected identity or viewpoint, violates

19  YouTube's TOS and is unlawful under the strict prohibitions against racial discrimination in contract

20  and business practices enshrined in federal and California law.  It is racism, overt intentional and

21  systematic.

22          92.94.   **49.** Under the pretext of finding that videos violate some vague, ambiguous, and

23  non-specific rule, Defendants use computer driven racial digital redlining, identity and viewpoint

24  profiling and filtering tools to restrict, censor, and denigrate Plaintiffs and all persons similarly

25  situatedmembers of the Race Discrimination Class on YouTube, wholly or in part, because they are

26  African American, black,Hispanic, or members of a protected racial classificationidentity under the

27  law, or identify as such, or with a related viewpoint.

93.95. 50. Since 2017 at least, Defendants' filtering and review tools and procedures have been embedded with computer code or other machineautomated system based "triggers" that digitally redline and profile the personal racialrace, ethnicity or other protected identity or viewpoint of the YouTube users.  Defendants admit that their filtering tools use information about the identity of YouTube creators, subscribers and viewers to "target" members of protected racial classifications under the law and impose access restrictions on them that are not neutral with respect to race, ethnicity or other protected identity or viewpoint; nor are they based on, or supported by actual material in the videosuploaded content.  Defendants treat such videos as if they in fact violate Defendants' Community Guidelines and TOS, by denying full YouTube platform access and related services.

94.96. 51. On March 19, 2017, Defendants publicly admitted that they improperly censored videos using their "Restricted Mode" filtering that were posted or produced by members of the LGBTQ+ Community, using "Restricted Mode" filtering based upon the identity and orientation of the speaker, rather than upon the content of the video.  Defendants also promised to remove all restricted filtering on videos posted or produced by LGBTQ+ members and groups, and change their filtering algorithm, and manual review policies and practices to address the risk that videos posted by LGBTQ+ vloggers were being censored because of the race, ethnicity or other protected identity or viewpoint of the speaker.

95.97. 52. On April 27, 2017, Johanna Wright, Vice President of Product Management for Google/YouTube, took to the airwaves and news media to promise the global "YouTube Community," that Defendants would ensure that "Restricted Mode" would not "filter out content belonging to individuals or groups based on certain attributes like gender, gender identity, political viewpoints, race, religion or sexual orientation."  While Ms. Wright conceded that "Restricted Mode will never be perfect, [Google/YouTube] hope to build on [their] progress so far to continue making [their] systems more accurate and the overall "Restricted Mode" experience better over time."

96.98. 53. On September 14, 2017, Defendants invitedheld an event that lasted two hours, by invitation only, for independent YouTubers and content creators to address concerns that the YouTube platform's video review algorithm and practices discriminated against certain groups

including ~~LGBTQ+,~~ African American~~,~~ and other users of color or vulnerable minorities.  ~~At the meeting,~~ Defendants provided lunch to a group of 12 to 20 creators.  After lunch, Defendants had each creator sign a non-disclosure agreement.  One of the participants was YouTube creator, Stephanie Frosch.  Ms. Frosch executed a declaration under penalty of perjury regarding what Defendants ~~admitted~~ expressly told her at that ~~their content filtering and review tools were "targeting" African American, LGBTQ+, and other "minority" users.  Defendants further admitted that this resulted in the application of erroneous or unwarranted blocking restrictions and access denials for users that were based, at least in part, on the user's racial or sexual identity or viewpoints, rather than based on a content violation of Defendants' Community Guidelines or TOS.~~event.  Attached as Exhibit C is a true and correct copy of the Declaration of Stephanie Frosch filed in the companion case to this Lawsuit.

~~97.~~99.  Around noon on September 14, 2017, YouTube's employees discussed the company's problems with the inherent racial bias and classification of video content filtering based on identity with respect to Defendants' decisions regarding monetization, payments for clicks per minute ("CPM") advertising, and applying "Restricted Mode":

a.  The YouTube employees admitted that there are too many videos on the YouTube platform to be reviewed manually by human beings.

b.  The YouTube employees admitted that their advertisers want demographic information, including race, so that they can identify and target specific audiences based on demographic information about the video creators and their viewers.

c.  The YouTube employees admitted that YouTube was using an artificial intelligence and other algorithms and automated systems to get the information that advertisers want.  These automated tools gather and analyze information about creators and viewers based on their identifying information, including race, sexual identity and other protected identities.  YouTube then uses that information to make decisions about viewing restrictions and monetization that are based on who the creators and viewers are; rather than based only on the video content.

1        d.  The YouTube employees admitted that the YouTube algorithm discriminates when

2   making decisions regarding which videos to monetize, pay CPM, and apply "Restricted

3   Mode" to, based on the identities of the video creators and their viewers.

4   **54.**   At that time, Defendants also stated that they were working on a "fix," and that neither

5   user identity nor viewpoint has any role in the application of YouTube's content based access rules

6   and restrictions, or should otherwise interfere with a user's right to access the myriad of services that

7   Defendants offer to users.[2]

8        e.  The YouTube employees specifically admitted in response to questions from the

9   event participants that the algorithm was looking at and profiling the sexual identities, races,

10   disabilities, religious and political affiliations of creators, intended audiences and viewers.

11        f.  One YouTube employee discussed how the algorithm worked by discussing a

12   YouTube creator with a chef's channel who posted cooking videos.   If the creator identified

13   as gay or had many subscribers or viewers who accessed a lot of LGBTQ related videos, the

14   videos would be tagged as gay for purposes of "Restricted Mode" and monetization –

15   regardless of the content of the videos on the channel.

16        g.    The same is true with respect to Defendants' targeting of African American,

17   Hispanic and other protected identities.[3]

---

18

19  [2] One of the persons who attended the meeting is Stephanie Frosch, a prominent and popular LGBTQ+ content creator on YouTube. Ms. Frosch is a named plaintiff in *Divino*.  In that case, Ms.

20  Frosch declared under oath the she and the other attendees were required to execute multiple non-disclosure agreements (the "NDAs") before and at the event.  The NDAs prevented her, and any

21  anyone else who attended the meeting, from disclosing any information about the meeting.  On March 23, 2020, after Plaintiffs threatened to move to set aside the NDAs as void and unenforceable,

22  Defendants agreed to release Ms. Frosch from her obligations under the NDAs.  *See* Declaration of Stephanie Frosch Submitted in Support of Plaintiffs' Application to File a Sur Reply to Address New

23  Authority.  A true and correct copy of the Declaration of Stephanie Frosch (Dkt. #40) is attached as Exhibit A. [3] "The math-powered applications powering the data economy were based on choices

24  made by fallible human beings. Some of these choices were no doubt made with the best intentions.

25  Nevertheless, many of these models encoded human prejudice, misunderstanding, and bias into the software systems that increasingly managed our lives. Like gods, these mathematical models were

26  opaque, their "workings invisible to all but the highest priests in their domain: mathematicians and computer scientists. Their verdicts, even when wrong or harmful, were beyond dispute or appeal.

27  And they tended to punish the poor and the oppressed in our society, while making the rich richer."

28

**REVISED SECOND THIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

1    ~~55.      Despite Defendants attempts to reassure YouTube users, Defendants have increased~~

2    ~~the racial profiling and "targeting" of African American and members of other protected~~

3    ~~racial classifications under the law who use YouTube.~~

4    ~~98.~~100.      When asked what YouTube was doing to fix the problems with the algorithm

5    that the creators had identified, the YouTube employees said that they could not answer the question.

6    When asked when YouTube would be done fixing the problem, the YouTube employees said that

7    they could not answer that question either.

8    ~~99.~~101.      Defendants did not fix the problem with the algorithm and have continued to

9    use the algorithm to make automated decisions about video monetization, CPM and "Restricted

10   Mode" based at least in part on the identities of the creators and viewers of videos.

11   ~~100.~~102.      ~~56.~~ In January 2018, Defendants got caught:  During a recorded call between a

12   YouTube user and a Google supervisor (someone who Defendants now identify as the "Floor

13   Manager" for their customer service advertising services center in Bangalore, India), Defendants

14   represented to the user that its "holiday special" video was not eligible for advertising services

15   because the filtering tools had identified the user as being involved with the "gay thing."  Under what

16   the manager expressly stated was "company policy," the filtering algorithm determined that the

17   video contained "shocking" or "sexually explicit" content, not because of any actual material in the

18   video, but because the "company" considered video content created by a "gay" user, or content that

19   discussed the "gay thing," as ineligible for advertising or promotion.  Defendants considered content

20   created or viewed by "gay" persons to be "shocking" or "sexually explicit."

21   ~~101.~~103.      The same is true for African Americans, Hispanics, and members of other

22   protected identities.  Empirical evidence show that "Google applications such as Gmail or Google

23   Docs" and Defendants' other social media sites and applications "track identity and previous

24   searches in order to surface targeted ads for users by analyzing users' web traces."  Thus, not only do

25   the automated systems, including search engines, "increasingly remember the digital traces of where

26   _____

27   Excerpt From: Safiya Umoja Noble. "Algorithms of Oppression." Apple Books.
     https://books.apple.com/us/book/algorithms-of-oppression/id1327926683.

28

REVISED ~~SECOND~~THIRD AMENDED CLASS ACTION COMPLAINT ~~FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES~~

[Plaintiffs] have been and what links [they] have clicked" in order to aggregate personal data identifying the race, ethnicity or other protected identity, and to use that information to make decisions about whether videos contain content that is "mature" or otherwise inappropriate for younger or more sensitive audiences.  Thus, Defendants use aggregated personal data about Plaintiffs' race, ethnicity or other protected identity to apply age restrictions, "Restricted Mode," demonetization, or other restrictions to Plaintiffs' content which Defendants promise are subject only to neutral "content based" rules.  The evidence further shows that these practices began "after Google announced it would use past search practices and link them to users in its privacy policy change in 2012."  Safiya Umoja Noble, "Algorithms of Oppression," Apple Books; https://books.apple.com/us/book/algorithms-of-oppression/id1327926683.

102.104.   57. This pattern, practice or "policy" of denying users equal access to YouTube based on their race, sexual orientation,ethnicity or other individual identities or viewpointsprotected identifies occurred on at least five other occasions to the same user after the January 2018 call with Defendants.

103.105.   The Plaintiffs in this Lawsuit face the same overt, intentional, and systemic discrimination, but with one important difference:  Defendants discriminate against Plaintiffs because they identify as African American, Hispanic or with other protected identities under the law.

104.106.   With respect to the Race Discrimination Class, this pattern and practice has become so pervasive that Plaintiffs, and many prominent and quality content creators who are members of the Race Discrimination Class, have lost more than 90% of their viewers, advertisers, revenue, and other access rights in the last 24 months, solely because they are identified as African American, LGBTQ+Hispanic or members of other protected racial classificationsidentities under the law.

58.   The Plaintiffs in this Lawsuit face the same overt, intentional, and systemic identity and viewpoint discrimination, but, with one important difference:  Defendants do not discriminate against Plaintiffs only because of sex based identity or viewpoint profiling, but primarily because they identify as African American, or with other protected racial classifications under the law.

1        105.107.        The evidence of Defendants' pattern and practice of digital redlining and

2    discriminating against Plaintiffs based on their race is set forth in detail in the comparative chart

3    demonstrating that Defendants' filtering, curation and restrictions are arbitrary, capricious and

4    entirely unrelated to content, so that Plaintiffs are treated differently than Defendants' white and

5    other preferred creators on the platforms.

6    ## Video

7    **CLIENT - Khalif Muhammad**

8    Dr. SYNQ:  Is Someone at YouTube Subverting the Constitution?

9

10

11

12    **Similar YouTube videos not restricted**

13    YouTube Support - How To Contact YouTube

14

15

16    Youtube Censorship Has Become Nightmarish, US Senators Rand Paul Has Floo

17

18

19    Speech PURGED

20

21

22    Dr.SYNQ: NCOBRA Responds to ADOS

23

24

25    **Similar YouTube videos not restricted**

26    Comedy Crib: Bottled | Reparations | IFC

27

28

UN Human Rights Chief Calls for Reparations Over Racism

Reparations | Real Time with Bill Maher (HBO)

Dr.SYN Q's Effective Numbers Theory

**Similar YouTube videos not restricted**

How Many People Does It Take to Start a Revolution?

Dr.SYNQ: With Little Loca Tariq Nasheed Neely Fuller Jr Dr Francis Cress W

Renegade

**Similar YouTube videos not restricted**

Understanding White Supremacy (And How to Defeat It)

REVISED SECOND THIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT,
RESTITUTION, ACCOUNTING AND DAMAGES

1

2

**CLIENT - Harvey Stubbs**

3

Terry Terry Terry

4

5

6

**Similar YouTube videos not restricted**

7

School asks white parents to become "white traitors", articulates "the 8 white

8

9

10

identities"

11

12

13

Megyn Kelly on Race in Education | Real Time with Bill Maher (HBO)

14

15

16

17

John Boyega And The Directors Who Would Work With Him

18

19

20

21

**Similar YouTube videos not restricted**

22

John Boyega Is Cancelled! Deletes Twitter History, Loses Verification What Is

23

24

25

Happening?

26

27

28

1

John Legend Silent

2

3

4

**Similar YouTube videos not restricted**

5

Powerful celebrity quotes on Black Lives Matter and racism | Cosmopolitan UK

6

7

8

Democratic candidates debate: Addressing country's racism l ABC News

9

10

11

Real Time with Bill Maher: Denying Racism is a Form of Racism (HBO)

12

13

14

15

16

Conspiracy Theories

17

18

19

**Similar YouTube videos not restricted**

20

Jesse Jackson: FBI involved in MLK's murder

21

22

23

24

Zoe Is Just Like Her Mother

25

26

27

**Similar YouTube videos not restricted**

28

1

Why YOU Should Dress Modestly || Get the attention you deserve!

2

3

4

5

# Video

6

Look at the Support They Get

7

8

9

10

**Similar YouTube videos not restricted**

11

Candace Cameron Bure Says She 'Prays' For Lori Loughlin in Wake of Scandal

12

13

14

15

16

They Picked Him for a Reason

17

18

19

**Similar YouTube videos not restricted**

20

David Bowie Criticizes MTV for Not Playing Videos by Black Artists | MTV News

21

22

23

24

25

Racism at Buffalo Wild Wings

26

27

28

-38-                    Case No. 5:20-cv-04011 LHK .

1

**Similar YouTube videos not restricted**

2

The Discrimination You've Never Heard Of | Alan Raskin |

3

4

5

TEDxAllendaleColumbiaSchool

6

7

8

It's Just a Chicken Sandwich

9

10

11

**Similar YouTube videos not restricted**

12

Throwback Thursday: Racist Or Funny? | Gabriel Iglesias

13

14

15

Harvard Sailing Team - Boys Will Be Girls

16

17

18

19

Boycott Oprah

20

21

22

23

**Similar YouTube videos not restricted**

24

Chick-fil-A is being bullied

25

26

27

Chick-Fil-A-Bigotry

28

1
2
3
4

Karma for Wendy

5
6
7

**Similar YouTube videos not restricted**

8

Beyonce and the Black Panthers | Final Thoughts with Tomi Lahren

9
10
11
12
13
14

Walmart Getting Rid of Greeters

15
16
17

**Similar YouTube videos not restricted**

18

Trump mocks reporter with disability

19
20
21

Walmart's Anti-Union Message

22
23
24
25

Spike Lee and the Oscars

26
27
28

1

**Similar YouTube videos not restricted**

2

Why BlackKklansman" Lost Oscar to "Green Book"

3

4

5

6

**CLIENT - Nicole's View**

7

In Memory of

8

9

10

**Similar YouTube videos not restricted**

11

The faces of N.J. victims of September 11

12

13

14

In Memory Of Sandy Hook Victims TRIBUTE (W/Pictures)

15

16

17

18

19

20

**Video**

21

They Never Cared About Us

22

23

24

25

**Similar YouTube videos not restricted**

26

Tribute to Prince Philip || Heal

27

28

1

2    Stan Lee " try not to cry "

3

4

5    Police Radio Chatter Sound Effect [Extended]

6

7

8

9

10   Say What!?: Billy Dee Williams Comes Out As "Gender Fluid"

11

12

13   **Similar YouTube videos not restricted**

14   "Gender Fluid" Person Confuses Everyone.

15

16

17   Gender Identity: Can a 5'9, White Guy Be a 6'5, Chinese Woman?

18

19

20

21   7 Reasons Why I Love Men - Masculinity Is Not Toxic

22

23

24   5 Stars!: Why Dave Chappelle's New Netflix Special Came Right On Time

25

26

27   **Similar YouTube videos not restricted**

28

10 Celebs Who Defended Johnny Depp Against Amber Heard! (Emilia Clarke, El

Musk, Jason Momoa)

Alyssa Milano explains silence on Joe Biden allegation

Halle Bailey & The New Little Mermaid Casting "Controversy"

**Similar YouTube videos not restricted**

Halle Bailey's casting as Ariel prompts conversation about race l Nightline

George Carlin on the "Seven Dirty Words" - EMMYTVLEGENDS.ORG

I'M TRAPPED IN A HOLIDAY NIGHTMARE!! | Helliday Limbo (MicroHorrorArcad

**CLIENT - Andrew  Hepkins**

New Years Message to the Light Workers

1

2

3   **Similar YouTube videos not restricted**

4   Johnny Depp's Friends Reveal How Amber Heard Destroyed Johnny Depp

5

6

7   Fake News. It's Your Fault. | Christina Nicholson | TEDxBocaRaton

8

9

10   Real Time with Bill Maher: The Cosby Controversy (HBO)

11

12

13   Sean Penn Talks His TV Debut, Criticizes #MeToo Movement | TODAY

14

15

16   Michael Jackson Accusers' Stories Questioned

17

18

19

20

21   Anthony Joshua's Redemption | The Responsibility of Success

22

23

24   **Similar YouTube videos not restricted**

25       American Delante 'Tiger' Johnson roars into welterweight quarters | Toky

26

27

28

NBC Sports

10-Year-Old Female Boxing PRODIGY

1665102.1 1911115.1

REVISED SECONDTHIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES

| Video | Date Reviewed | Link | Channel |
|---|---|---|---|
| Dear Gillette & America: "Toxic Masculinity" Doesn't Exist | 9/29/2021 | https://www.youtube.com/watch?v=N0xz-h10A-I | Dru Story News |
| **Similar YouTube videos not restricted** | | | |
| Jordan Peterson- Masculinity is Not Toxic Stop Blaming Men for Everything | 9/29/2021 | https://www.youtube.com/watch?v=n6ZRu6Fbfcc | BEND REALITY |
| Jordan Peterson Debates A Woman On Toxic Masculinity | 9/29/2021 | https://www.youtube.com/watch?v=XOlMOxhIb7w | Crysta |
| Masculinity Is Not Toxic. It's Necessary. | 9/29/2021 | https://www.youtube.com/watch?v=vXeMsWHPZHA | Turning Point USA |
| Canelo Versus GGG \| Who Wins And Why | 9/24/2021 | https://www.youtube.com/watch?v=bb84LElBrQU | Dru Story News |
| **Similar YouTube videos not restricted** | | | |
| Instant Karma in Boxing - Oleksandr Usyk | 9/24/2021 | https://www.youtube.com/watch?v=7l-TaLMZzZA | The World of Boxing! |
| Democratic Dilemma: Are Black Americans Ready to #WalkAway? | 9/29/2021 | https://www.youtube.com/watch?v=R1i08ILkzQk | Dru Story News |
| **Similar YouTube videos not restricted** | | | |
| Should the U.S. Get Rid of Political Parties? | 9/29/2021 | https://www.youtube.com/watch?v=AmTBhClgiW8 | The Atlantic |
| You're being manipulated and don't even know it \| Nate Pressner \| TEDxYouth@Basel | 9/29/2021 | https://www.youtube.com/watch?v=oKMTVRu5Guk | TEDx Talks |
| The Facts about Fact Checking: Crash Course Navigating Digital Information #2 | 9/29/2021 | https://www.youtube.com/watch?v=EZsaA0w_0z0 | CrashCourse |
| **CLIENT - T-K Reyes** | | | |
| Best Denzel Washington Impression Ever - The Keu Reyes Project | 10/1/2021 | https://www.youtube.com/watch?v=EZhX_wt4JR8 | Keu Reyes |
| **Similar YouTube videos not restricted** | | | |
| Warning live tandem breastfeeding! Breastfeeding blooper how much caffeine can I safely drink? | 10/1/2021 | https://www.youtube.com/watch?v=QbZwHMi8DjO | The Famous Mommy |
| We Breastfeed Each Other's Kids | 10/1/2021 | https://www.youtube.com/watch?v=4Kopequ5pe4 | truly |
| Denzel Impression | 10/1/2021 | https://www.youtube.com/watch?v=IW9euORKiz0 | Mishka Thebaud |
| Fake News by Dino Archie | 10/1/2021 | https://www.youtube.com/watch?v=GWMxmADmhX0 | Keu Reyes |
| **Similar YouTube videos not restricted** | | | |
| Kanye West Donald Trump Cold Open - SNL | 10/1/2021 | https://www.youtube.com/watch?v=4sO5-t3iEYY | Saturday Night Live |
| Trump Tweets at Jimmy | 10/1/2021 | https://www.youtube.com/watch?v=Ud_-wBFe9bE | The Tonight Show Starring Jimmy Fallon |
| Free Lunch - "Lick My Balls" - Music Video - Hot New Hip Hop Rap Song 2018 | 10/1/2021 | https://www.youtube.com/watch?v=VBMQ7a7Opis | Keu Reyes |
| **Similar YouTube videos not restricted** | | | |
| Sucking On Chef's Chocolate Salty Balls - SOUTH PARK | 10/1/2021 | https://www.youtube.com/watch?v=zgqlMoFpOlg | South Park Studios |
| [South Park] 'Suck my balls!' - Sparta GYA CTE V2 Remix | 10/1/2021 | https://www.youtube.com/watch?v=59Qfwefd02U | AGK89 |
| Lick lick my balls - Rick and morty | 10/1/2021 | https://www.youtube.com/watch?v=fiKwHjRv1a4 | R1ck M0rty |
| **CLIENT - T-O Ley** | | | |
| Como hacer cortadas o heridas falsas con maquillaje paso a paso  (How to make fake cuts or wounds with makeup step by step) | 10/1/2021 | https://www.youtube.com/watch?v=6O-BXCg0p7I | Osyley |
| Halloween Torn out FAKE eye makeup tutorial | 10/1/2021 | https://www.youtube.com/watch?v=pRhQix-8VeA | ellimacs sfx makeup |
| Easy Realistic Wound Halloween makeup tutorial | 10/1/2021 | https://www.youtube.com/watch?v=44nhQ48au5Q | ellimacs sfx makeup |

REVISED SECOND THIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES

## Video



Como Hacer Sangre Falsa con Ingredientes Caseros Para Halloween

(How to make fake blood with homemade ingredients for halloween)

**Similar YouTube videos not restricted**

↻HOW TO MAKE FAKE BLOOD      ↺ | HALLOWEEN TUTORIAL | WE ANSW

42 | SMELLYBELLYTV

How to make fake blood for Halloween

DONALD TRUMP Makeup Tutorial      ♡   Como Ser Donald Trump      ♡ Tutor

**Similar YouTube videos not restricted**

DONALD TRUMP MAKEUP TUTORIAL!

Donald Trump Makeup Tutorial

1

2

3        108.    On January 17, 2018, Defendants testified to Congress under oath that access to all

4   services offered by Defendants in connection with YouTube are available to Plaintiffs, and all users,

5   subject only to viewpoint neutral, content based rules that apply equally to all users:

6        Senator Cruz: Thank you Mr. Chairman.  Welcome to each of the witnesses.  I'd like to start

7        by asking each of the company representatives a simple question, which is: do you consider

8        your companies to be neutral public fora?

9        * * * *

10        Senator Cruz: I'm just looking for a yes or no whether you consider yourself to be a neutral

11        public forum.

12        Senator Cruz: Ms. Downs?

13        Ms. Downs: Yes, our goal is to design products for everyone, subject to our policies and the

14        limitations they impose on the types of content that people may share on our products.

15        Senator Cruz: So, you're saying you do consider YouTube to be a neutral public forum?

16        Ms. Downs: Correct. We enforce our policies in a politically neutral way.  Certain things are

17        prohibited by our Community Guidelines, which are spelled out and provided publicly to all

18        of our users.

19        * * * *

20        Ms. Downs: As I mentioned, we enforce our policies in a politically neutral way.  In terms of

21        the specifics of Prager University, it's a subject of ongoing litigation so I'm not free to

22        comment on the specifics of that case.

23        106.109.    59. Beginning in 2019, YouTube's CEO, Susan Wojcicki, YouTube's

24   CEO, has taken to the airwaves over the past three years to repeatedly and unequivocally deny

25   that Defendants discriminate against anyone when it comes to content or access restrictions to

26   YouTube, all the while  insisting that all decisions, wrong or right, are the product of good faith,

27   viewpoint neutral, and identity blind content reviews and decisions.

28
REVISED SECONDTHIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT,
RESTITUTION, ACCOUNTING AND DAMAGES

107.110.    60.    Defendants do not disagree. Ms. Wojcicki has taken to the airwaves over the last three years to repeatedly and unequivocally deny that Defendants discriminate against anyone when it comes to content or access restrictions to YouTube, while insisting that all decisions, wrong or right, are the product of good faith, viewpoint neutral, and identity blind content reviews and decisions.

108.111.    61. **On or about June 14, 2020, Ms. Wojcicki publicly announced that** in conjunction with Defendant Alphabet, YouTube was starting a $100 million fund ""dedicated to amplifying and developing the voices of Black creators and artists and their stories.""  In a blog post Wojcicki said, ""At YouTube, we believe Black lives matter and we all need to do more to dismantle systemic racism." *See* https://www.marketwatch.com/story/youtube-is-starting-a-100-million-fund-for-black-creators-artists-2020-06-11.

109.112.    62. Ms. Wojcicki's self- serving assurances notwithstanding, Defendants' conduct constitutes unlawful race discrimination.  Unlike any other form of prohibited discrimination, race discrimination has been outlawed in the United States since 1865, when Congress enacted §1981 and other civil rights statutes intended to wipe out, prohibit, and render unlawful any and all racial discrimination in contracts and business.

110.113.    63. Defendants know and admit that they discriminate.  They have admitted that since at least 2017, they use content based filtering and access review tools, systems, and practices that "target" African Americans and other members of protected racial classifications under the law.

111.114.    64. Nonetheless, Defendants repeatedly have failed to "fix" the discriminatory defects in their A.I., algorithm and other filtering tool systems or to stop the "targeting" as promised.  Defendants continue to knowingly, intentionally, and systematically block, demonetize, and deny Plaintiffs and other persons similarly situated, members of the Race Discrimination Class their contractual and other legal rights to access the YouTube platform based on the color of their skin or other protected racial traits, rather than based on the material in videos.

112.115.      Plaintiffs are not the first to accuse Defendants of race or identity based discrimination.  In addition to independent researchers, Defendants' former chief A.I. Ethicist, Dr. Timnet Gebru, resigned after co-authoring research papers regarding the implicit racial and gender biases in Defendants' A.I.  Dr. Gebru warned that Defendants collect all the data they can from the internet, so there's a risk that racist, sexist, and otherwise abusive language ends up in the training data and creates an inherent racial and gender bias in Defendants' A.I.  According to Dr. Gebru, an A.I. model trained on vast swaths of the internet won't be attuned to the nuances of vocabulary and won't produce or interpret language in line with new or developing cultural norms.  The A.I. will also fail to capture the language and the norms of countries and peoples with less internet access, and produce a smaller linguistic online footprint. The resulting A.I. generated language is homogenized and reflects a narrow slice of the world.

113.116.      In response to Dr. Gebru's findings, concerns, and subsequent resignation, Defendants called Dr. Gebru an "angry black woman."  But Dr. Gebru's concerns have been confirmed time and time again.

114.117.      65. Defendants also abuse their dual roles as content reviewers and content creators on YouTube.  Specifically, under the pretext of unfettered "discretion" to serve as sole "censors" of content, Defendants use racial profiling to restrict the reach and access of Plaintiffs and of other third party users who compete directly with Defendants and their sponsored video content for click per minute ("CPM"), advertising, and other revenue stream and services on the YouTube platform.

115.118.      66. Instead of "fixing" the digital racismredlining and racial discrimination that pervades on the YouTube platform, Defendants have decided to doubledoubled down and continuecontinued their racist and identity based practices because they are profitable.  By utilizing unilateral control over 95% of the world's public video content, Defendants unlawfully misappropriate viewers, CPM, advertising, and other revenues that rightfully belong to, or would otherwise be available to, Plaintiffs and all other persons similarly situatedmembers of the Race Discrimination Class, by using discriminatory restrictions that unlawfully restrict and block Plaintiffs' content and access on the YouTube platform.

67. Defendants have some serious explaining to do when it comes to the Plaintiffs and all other persons similarly situated using YouTube. Plaintiffs would prefer that Defendants spend their money to stop the racist practices that now pervade the YouTube platform, including:

a. **Abusing Artificial Intelligence Programs, Algorithms and Other Filtering Tools** to digitally profile, redline, and target Plaintiffs and all persons similarly situated on the YouTube platform, for access restrictions, blocking, demonetization, suspensions and removals from the platform based on the racial identity or viewpoint of the video creator, her subscribers, and/or the viewers of her videos by inserting or appending to individual videos race, identity or viewpoint based metadata, thereby forcing Plaintiffs to self-censor and refrain from posting videos regarding issues and current events which are important to the African American community, such as requiring Plaintiffs to avoid or hide references to abbreviations like "BLM," "KKK;" terms such as "Black," "White," "Racism," "Boogaloo," "White Supremacy," "Racial Profiling," "Police Shootings," "Police Brutality," "Black Lives Matter;" names of individuals such as those killed by law enforcement, "Bill Cosby," "Louis Farrakhan;" names of organizations such as "Ku Klux Klan," "Nazi," "Neo-Nazi," "Aryan Brotherhood," and/or other euphemisms that are known and particular to the African American community, despite the fact that the videos involved do not contain any hate speech, profanity, or nudity, and at most, contain very short references or quotations from recognized news sources, which are properly attributed.

b. **Preventing Full Revenue Generation** for videos of Plaintiffs and all persons similarly situated who are not afforded full monetization, Channel Membership and Livestream donations for videos that are otherwise eligible under Defendants' rules, but have been demonetized or limited in monetization because of Defendants' addition of metadata and use of algorithms and filtering tools that profile creators, subscribers and viewers based on their race or viewpoint, rather than on the actual content of the video.

c. **Misapplying "Restricted Mode"** to the videos of Plaintiffs and all persons similarly situated, which address or discuss issues of importance to their communities, merely because the videos have titles or tags which include "abbreviations like "BLM," "KKK;" terms such as "Black," "White," "Racism," "Boogaloo," "White Supremacy," "Racial Profiling," "Police

REVISED SECOND THIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES

Shootings," "Police Brutality," "Black Lives Matter;" names of individuals such as those killed by law enforcement, "Bill Cosby," "Louis Farrakhan;" names of organizations such as "Ku Klux Klan," "Nazi," "Neo-Nazi," "Aryan Brotherhood," and/or other euphemisms that are known and particular to the African American community, despite the fact that the videos do not contain materials which discuss drug use or the abuse or drinking of alcohol; overly detailed conversations about or depictions of sexual activity; graphic depictions of violence, violent acts; natural disasters or tragedies or violence in the news; specific details about events related to terrorism, war, crime and political conflicts that resulted in death or serious injury, even if no graphic imagery is shown; inappropriate language, including profanity, or content that is gratuitously incendiary, inflammatory, or demeaning toward an individual or group.

        **d.**      **Shadow Banning Entire Channels And Individual Videos** of Plaintiffs and all persons similarly situated on the YouTube platform based on the race, identity or viewpoint of the video creator, her subscribers, and/or the viewers of her videos, so that the channel and/or individual videos do not appear in searches using the YouTube search application, and viewers cannot locate new videos which discuss issues and current events that are important to the communities of African Americans and members of other protected racial classifications under the law.

        **e.**      **Deputizing Other YouTube Users To Flag Channels And Videos** on the YouTube platform in order to restrict, block, and/or censor the videos of Plaintiffs and all persons similarly situated, and then, in acting on false or unconfirmed complaints of purported rule violations, Defendants remove, restrict, and/or demonetize, individual videos and/or suspend the channels without first verifying that the flagged video contains material that violates a specific Community Guideline or Term of Service.

        **f.**      **Interfering With Livestream Broadcasts And Viewer Video Watching** for Plaintiffs and all persons similarly situated by inserting new voice content and/or visual images into the video, unrelated to the topic; throttling, pixelating, interrupting or cutting off the Livestream video broadcast while in progress, or disrupting audio and/or pixelating, blacking out, or rendering blurry visual displays while viewers watch individual videos; deleting positive viewer comments; and promoting, sponsoring, allowing and/or inserting offensive, misogynistic, racist, or obscene

**REVISED SECONDTHIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

1  comments or engagement in direct violation of YouTube's Community Guidelines based on the race
2  of the creators, channel subscribers and/or viewers, or their viewpoints.

3  **g.    Ad Bombing** the videos of Plaintiffs and all persons similarly situated by
4  interrupting new videos as viewers watch them with multiple and repeated streaming and banner ads
5  played at intervals of every 2, 3, or 4 minutes, without authorization of the YouTube creator, so that
6  the viewer is annoyed, irritated or discouraged from watching the entire video or leaves the channel
7  entirely.

8  **h.    Excluding From "Trending" And "Up Next" YouTube Video**
9  **Recommendations** the videos of Plaintiffs and all persons similarly situated which, even though
10  they comply with Defendants' Community Guidelines and TOS.  These videos are excluded from
11  Defendants' promotional applications based on the race, identities, and viewpoints of the creators,
12  channel subscribers and/or viewers.  Defendants' practices muffle the voices of Plaintiffs and all
13  persons similarly situated on the YouTube platform and reduce the racial diversity of the opinions
14  and information posted on the platform.

15  **i.    "Up Next" Flooding With Hostile, Irrelevant Or Extraneous YouTube**
16  **Video Recommendations** that Defendants publish.  Defendants post video recommendations which
17  appear on the screens of viewers watching the videos of Plaintiffs and all persons similarly situated
18  for videos that contain content bears no relation to the video being watched, the channels to which the
19  viewer has subscribed, or the viewer's video watching history, which contains content that criticizes,
20  disparages, bullies, threatens, or offends individual members of the African American Community or
21  the Community as a whole.

22  **j.    Promoting And Profiting From Hate Speech** by allowing racist and
23  misogynist hate speech videos that target Plaintiffs and all persons similarly situated on the YouTube
24  platform in direct violation of Defendants' Community Guidelines and TOS, and affording such
25  videos monetization, despite the fact that such videos have been flagged by Plaintiffs and/or their
26  subscribers as violating Defendants' standards, and despite having received repeated complaints
27  regarding those videos.

28

1   ~~k.      Interfering With, Obstructing, Delaying And Ignoring Appeals to prevent~~

2   ~~Plaintiffs and all persons similarly situated from obtaining a timely manual review of video content~~

3   ~~and reversal of Defendants' erroneous decisions to suspend their channels and to remove, restrict~~

4   ~~monetization, or restrict access to videos deprives them of their rights to communicate with their~~

5   ~~intended audience and/or to earn revenue, unless and until, Defendants lift the adverse action and/or~~

6   ~~restriction, if ever.~~

7   ~~116.~~119.      ~~68.~~ Regardless of Defendants' subjective motivations, Defendants are not

8   above the law.  Neither the scale, size, or "ubiquity" of Defendants' operations or their influence

9   entitle Defendants to "self-regulate" by ignoring or refusing to comply with the law, including the

10   long established prohibition on race discrimination in contract.

11   ~~117.~~120.      ~~69.~~ Until such time as Defendants make good on their promises,

12   representations, and obligations to "fix" this racism and compensate Plaintiffs and ~~all other persons~~

13   ~~similarly situated~~members of the Race Discrimination Class who are victims of Defendants'

14   unlawful and repugnant discriminatory conduct, Defendants will continue to engage in intentional

15   race discrimination that violates their agreements with Plaintiffs, as well as established federal and

16   state laws that govern the relationship between the parties.

17   ~~118.~~121.      ~~70.~~ Plaintiffs can wait no longer for Defendants to "fix" the problems as they

18   promised years ago.  Nor should they have to.  The Defendants' knowing use of a consumer's, race,

19   ~~skin color~~ethnicity or other protected identity or some other immutable personal trait ~~or viewpoint~~ to

20   filter and deny access to YouTube, is illegal digital racial profiling, redlining, and discrimination.

21   ~~119.~~122.      ~~71.~~ The time has come for Ms. Wojcicki, and Defendants' other senior

22   officers, to put up or shut up.  If Defendants truly believe that they are engaged in good faith,

23   viewpoint neutral content regulation on YouTube, then Defendants should produce the computer

24   code and permit an expert review of that code to examine the "triggers" for review and restriction of

25   content.  Defendants can then, under oath in deposition and other sworn testimony, and through other

26   discovery, explain to Plaintiffs, the Court, and the public why their prior admissions and other

27   evidence of "targeting" African Americans and members of other protected racial classifications

28   under the law, are not true.

120.123.      72. Defendants' unsupported denials, or assertions that demonstrably discriminatory conduct is "mistakes" or the result of a "he said, she said" misunderstanding between its employees and officers, are not lawful rationales to deny Plaintiffs their day in court.

121.124.      73. Despite a whole lot of "telling," Defendants have made no attempt to "show" that they do not discriminate based on the race, ethnicity or other protected identity or viewpoint of Plaintiffs or the hundreds of millions of all other persons similarly situatedRace Discrimination Class members who fall victim to discrimination by Defendants.

122.125.      74. Defendants' refusal to show they do not discriminate is mystifying, if not damning.  The computer code and information about how Defendants' A.I., algorithms, filters and other machine-based filtering toolsautomated systems operate, developed and have changed substantially since Defendants purchased YouTube in 2007.  Evidence regarding those changes will determine the extent to which Defendants use A.I, algorithms, or other filtering tools to profile and discriminate against YouTube users based on their race, ethnicity or other protected identity or viewpoints.

123.126.      75. Each time that Plaintiffs (or any other member of the public) access the YouTube user interface, Plaintiffs and Defendants execute binding contract(s) that govern the parties' respective rights and obligations on YouTube, including the TOS.

**B.      The Governing Agreements**

124.127.      Defendants' acquisition of the licensing rights to 95% of the world's public video content, along with the personal and financial information data of the 2.3 billion users who post or view the content is not free or a gift to the largest and most powerful tech enterprise in the history of the world.  Rather, the license rights are obtained through for tangible and valuable consideration: the right of the licensor or user to equal access to the YouTube platform and all of its services, subject to and limited only by the viewpoint neutral application of YouTube's content-based rules.

125.128.      The contract between Plaintiffs and YouTube consists of a series of digital webpages and include the TOS, which expressly incorporates by reference the YouTube Community Guidelines and Google's Privacy Policy.  Defendants' TOS designates YouTube as a "passive website," that is open to the public.  Each person who "uses or visits" the YouTube website or any of

YouTube's Services, agrees to be governed by the TOS, Community Guidelines and Google's Privacy Policy.  Defendants' agreement is a "take it or leave it" standardized digital consumer form contract that is not subject to negotiation.

126.129.   To access the YouTube TOS, the Community Guidelines, and Google's Privacy Policy, each user must navigate a labyrinth of layers of digital webpages and websites starting with the YouTube website.  By clicking on a hyperlink to the TOS, the user arrives at the YouTube TOS webpage.  Once on the TOS webpage, the user must then click on the hyperlink to the Community Guidelines and Google's Privacy Policy (or for the 2021 TOS, the Policy, Safety and Copyright Policies").

a.   Each of those Community Guidelines includes hyperlinks which leads to other webpages consisting of  a series of "policies," "FAQs," "Q&As," and "articles;" as well as, additional hyperlinks to other webpages.  Identifying all of the contract terms requires a deep dive into the nested layers of hyperlinked webpages.

b.   The "Policy, Safety and Copyright Policies" webpage also includes hyperlinks which leads to other webpages consisting of  a series of "policies," "FAQs," "Q&As," and "articles;" as well as, additional hyperlinks to other webpages.

127.130.   76. EachEvery time that Plaintiffs (or any other member of the public) accessa user accesses the YouTube user interface, Plaintiffsthe user and Defendants execute a binding contract (sincluding the TOS) that governgoverns the each partyParties's respective rights and obligations on YouTube, including the TOS.  To access all of YouTube's Services, users must create a YouTube account and expressly agree to the TOS, Community Guidelines and Google Privacy Policy (or for the 2021 TOS, the Policy, Safety and Copyright Policies").  Defendants do not provide a copy of the contract that the user executed electronically.  Nor do they provide a receipt or digital notice on the dates a new binding contract is entered by the user.

77.   The provisions in the TOS and other agreements are part of a uniform consumer contract that every one of YouTube's 2.3 billion users must execute and agree to upon accessing the website.

78.   The TOS and other agreement(s) are governed by California law.

79. Under the agreement(s), Defendants designate YouTube as a "passive website," that is open to the public, provided that any person who "uses or visits" the YouTube website or "any YouTube products software, data feeds, and services provided" consents and legally agrees to YouTube's "TOS," "Google's Privacy Policy," and "Community Guidelines," as "incorporated by reference" and are further clarified or modified by Defendants "without notice" (collectively the "Agreement").

128.131. Defendants do not provide users with access to individual downloadable versions of the contract documents, much less a printable version of the entire agreement.  To obtain a copy of the contract, users can (a) take screenshots by accessing and scrolling through each operative contract document; (b) scroll through each operative contract documents and use the Microsoft copy function, then paste the text of each operative document into a new document; or (c) save the webpages electronically, which results in the creation of multiple files for each webpage consisting of text, load files and image files.  This latter method, though faster at the front end, generates files that include multiple duplicates of some webpages.  The files then must have duplicates removed and be converted to .pdf, resulting in a current agreement of 2,528 pages.  Exhibit D.

129.132. Defendants have the right to unilaterally change the TOS and documents incorporated by reference into the agreements without warning or advance notice and have exercised that right.  Since 2010, YouTube has changed its TOS alone four times.  By accessing the current TOS on the YouTube website, users can find a hyperlink to the 2020 archived version of the TOS (Exhibit E); the 2019 archived version of the TOS (Exhibit F); and the 2018 archived version of the TOS (Exhibit G).  The 2010 archived version of the TOS is not available on the YouTube website; however, it can be found on The Wayback Machine website (Exhibit H).

130.133. Defendants also reserve the right to unilaterally change the Community Guidelines and other policies without warning or advance notice; however, the archived TOS versions for 2020, 2019 and 2018 contain hyperlinks to the current 2021 versions of the Community Guidelines webpages.  Prior versions of the Community Guidelines and other hyperlinked webpages

REVISED SECONDTHIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES

1    that are contemporaneous with the 2020, 2019, 2018 or 2010 archived TOS are not available on

2    Defendants' websites or on The Wayback Machine website.

3    131.134.    As a result of Defendants' use of labyrinthine online digital agreements,

4    which change frequently, and incorporate by reference layers of hyperlinked webpages to

5    Community Guidelines and Policies which also change frequently (but which are not available

6    online), it is virtually impossible for users to figure out what agreements and provisions govern their

7    conduct and content for any prior date, much less for the entire period from 2010 to present.  Only

8    Defendants have electronic records that reflect the dates each user executed the operative TOS,

9    which documents were incorporated by reference by that TOS and constitutes the whole integrated

10   agreement, and what Defendants' Community Guidelines, policies, and practices were at the time.

11   Users neither have access to a complete set of the operative agreement documents; nor could they

12   reasonably obtain a copy when they executed the agreement, or at any time thereafter.

13   132.135.    80. The contract(s) allowagreement allows Defendants to not only collect,

14   store, analyze, and organize the personal, financial, political, and other digital data for each of the

15   YouTube Platform usersuser, but allows Defendants alsoto use and sell that digital data to third

16   parties on the Defendants' platforms and on the open market.

17   81.    In 2018, Defendants' authorized representatives testified under oath to Congress and

18   confirmed that YouTube is "a neutral public forum" in which Defendants "enforce [their] policies in

19   a politically neutral way."

20   133.136.    The Defendants' use of multiple contract documents consisting of layers of

21   webpages displaying "articles" containing "policies," videos, "FAQs," "Q&As," and examples,

22   many of which must be clicked on to expand so that the text is visible, results in a set of confusing,

23   ambiguous, vague, interconnected, overlapping and sometimes inconsistent or even contradictory

24   contract provisions which purportedly govern the Parties' respective rights and obligations.  Such

25   agreements are not functionally available to the users.  The users are left alone to figure out which of

26   Defendants' "policies," "FAQs," "Q&As" and "articles" govern specific conduct and content, and

27   what are the operative terms of the agreements are for any given date.

28

C.     **The Relevant Provisions of the Agreement**

~~134.~~137.     The TOS, Community Guidelines and Google's Privacy Policy form a uniform consumer service contract that every one of YouTube's 2.3 billion users must execute and agree to upon accessing the website.  Each of the relevant agreements for the period 2010 to present contain:

a.     YouTube's California choice of law clause.

b.     YouTube's integration clause that identifies the operative agreement between the Parties.  Until 2021, the operative agreements included only the TOS, Community Guidelines and Google's Privacy Policy.  The 2021 TOS now defines the agreement between YouTube and the users as the TOS, Community Guidelines and "the Policy, Safety and Copyright Policies which may be updated from time to time."  In 2021, YouTube also added language to include "Advertising on YouTube Policies" for users which "provide advertising or sponsorships to the Service or incorporate paid promotions in [their] content."  For the first time in 2021, YouTube expressly stated that "other links or references provided in these terms are for informational use only and are not part of the Agreement."

c.     YouTube's license provisions that grant Defendants "a worldwide, non-exclusive, royalty-free, sublicenseable and transferable license to use, reproduce, distribute, prepare derivative works of, display and perform" any Content the user uploads "in connection with the Service and YouTube's business," including YouTube's right to "retain, but not display, distribute, or perform, server copies of [users'] videos that have been removed or deleted."  The licenses are "perpetual and irrevocable."

1.     The license includes a grant to other YouTube "users" a "non-exclusive, royalty-free license to access" content, to "reproduce, distribute, prepare derivative works, display, and perform it . . . as enabled by a feature of the Service."

2.     This license also includes the right to post and monetize Plaintiffs' "[c]ontent or other material" that makes Plaintiffs (i) "solely responsible for" the content and its "consequences," including (ii) all intellectual property rights and

restrictions on the video content, and (iii) not posting content or seeking access to services in a manner that is "contrary to the YouTube Community Guidelines."

        d.     YouTube's requirement that users comply with all applicable "local, national and international laws and regulations."

        e.     YouTube's requirement that users agree to Google's Privacy Policy and give Defendants access to their personal digital data.

        f.     YouTube's prohibition against the use of "third party copyrighted material, or material that is subject to other third party proprietary rights," unless users have permission or "are otherwise legally entitled to post the material."  Users' accounts can be terminated for copyright infringement.  Each of the relevant TOS also expressly refers to and relies upon United States copyright law and specifies a procedure for notifying Defendants of Content that constitutes a copyright violation and a procedure for appealing YouTube's removal of or limitations imposed on Content on grounds of copyright violation.

        g.     YouTube's requirement that all Content uploaded to the platform conform with the TOS and Community Guidelines.

        h.     YouTube's reservation of "the right to decide whether Content violates these TOS for reasons other than copyright infringement," including, "but not limited to, pornography, obscenity, or excessive lengthy," and that YouTube "may at any time, without prior notice and in its sole discretion, remove such Content and/or terminate a user's account for submitting such material in violation of these Terms of Service."

        i.     YouTube's reservation of the "right to discontinue any aspect of the Service at any time;" including the right to "suspend or stop a Service altogether;" and the "right to refuse or limit [users'] access" to ads, ad accounts and to withhold ad revenue "at any time, without providing a warning or prior notice."

        j.     YouTube's right to "modify or revise" the TOS and incorporated agreements "at any time" in its "sole discretion" without paying any additional consideration; including the right to "update" or "modify" the Community Guidelines.

1       k.    YouTube's express disclaimer pf any warranty, and a statement that use of the

2  Services "shall be at your sole risk, to the fullest extent permitted by law;" and further states that

3  YouTube "assumes no liability or responsibility" for "personal injury or property damage, of any

4  nature whatsoever, resulting from your access to and use of our services."

5       l.    YouTube's "limitation of liability" clause exempting YouTube from "direct,

6  indirect, incidental, special, punitive, or consequential damages" related to use of the Services.

7       135.138.    None of the operative TOS includes:

8       a.    A clause authorizing Defendants to employ A.I., algorithms, filters, or

9  automated systems that use or take into consideration information regarding personal identity (e.g.,

10  race, ethnicity or other protected identity) to filter, restrict or curate users' accounts, channels or

11  content based on the identity of the user, creator of the or subscriber to the channel, or the viewer of

12  the content.

13       b.    A clause immunizing Defendants from Lawsuit for any conduct, violation of a

14  statute of California or federal law, or identity based discrimination in providing services on

15  Defendants' platforms.

16       c.    A clause that mentions immunity under the Communications Decency Act 47

17  U.S.C. §230(c),[4] much less one that authorizes Defendants to filter, restrict, or curate YouTube

18  accounts, channels or Content based on the identity of the user, the channel subscriber, or the Content

19  viewer.

20       d.    A clause that authorizes Defendants to assert on its own behalf a right to free

21  speech, or to refrain from speech under the First Amendment to the United States Constitution or the

22  California State Constitution Liberty of Speech Clause in connection with granting or denying

23  services on Defendants' platforms or removing content that complies with Defendants' Community

24  Guidelines and policies.

---

[4] The current agreement contains two references to the Communications Decency Act, 47 U.S.C. §230(c) solely with respect to Content that a user views as defamatory. In two places, the agreement advises users that YouTube will not make any determination regarding material that is defamatory or remove such Content.

**D.      Defendants' Interpretation of the Governing Agreements**

~~136.~~139.      The TOS, including the 2021 TOS offers users access to the YouTube platform and services so long as the users "comply with this Agreement and applicable law." According to the express TOS, users "may view or listen to Content for your personal, non-commercial use;" and "may also show YouTube videos through the embeddable YouTube player."  Nonetheless, after years of asserting that YouTube users could access Defendants' services subject only to viewpoint neutral, content based rules that apply equally to all, in the past two years, Defendants have begun to assert that they have authority under the agreement with users to deny services, remove content, channels and accounts of users which have fully complied with the TOS, Community Guidelines, policies and rules.  Faced with litigation over the denial of services, removal of content and channels of various members of protected groups, Defendants have asserted that regardless of whether content and channels comply with applicable Guidelines and policies, "the parties' agreements allow YouTube to exclude videos from "Restricted Mode," to decline to pair videos with advertising, and to remove content from its service at its discretion."  Case No. 5:20-cv-04011-LHK ECF 29 at 19:23-28.

      a.      "YouTube is under no obligation to host or serve Content;" and "If we reasonably believe that any Content is in breach of this Agreement or may cause harm to YouTube, our users, or third parties, we may remove or take down that Content in our discretion."  ECF 29 at 1:26-18.  "The Terms of Service expressly state that YouTube reserves the right to remove content from its platform in its discretion."  ECF 29 at 33:5-12.

      b.      The TOS "reserve[s] to YouTube the right to exclude videos from "Restricted Mode" and to deem videos ineligible for monetization," regardless of whether the videos fully comply with all applicable Guidelines and policies; and authorizes them to "delete[] custom thumbnails," "delete[] subscriptions," exclude videos "from appearing in search results," and to "review, filter and restrict Plaintiffs' access to YouTube" based on Plaintiffs' race and other personal identifying characteristics.  *See* ECF 29 at 33:5-12.

      c.      "YouTube is not obligated to display any advertisements alongside your videos and may determine the type and format of ads available on the YouTube Service;" and

1   "reserve[s] 'the right to refuse or limit your access to [Adsense] Services,' as well as 'the right, at

2   [YouTube's] discretion, to not show ads on videos and watch pages.'"  ECF 29 at 33:5-12.

3          d.     Defendants also suggest that the TOS authorize them to use "automated

4   software to identify content as inappropriate for advertising."  *See* ECF 29 at 35-12.

5          137.140.     The TOS expressly states that Defendants may "discontinue or make material

6   changes to [the] Service," but that when Defendants make such changes without notice, it is because

7   they "need to take action to improve the security and operability of [their] Service, prevent abuse, or

8   comply with legal requirements."  Any reasonable user reading the TOS, or the full agreement's

9   2,500+ pages of rules regarding prohibited conduct and content, would conclude that under the

10  agreement the user was promising to follow those rules and giving Defendants a license to the user's

11  original content and permission to collect, aggregate and sell the user's personal digital data, and in

12  exchange, Defendants were giving the user access to Defendants' platforms and services, subject

13  only to Defendants' legitimate needs to improve security and operability, prevent abuse and comply

14  with the law.  No reasonable user who read the TOS, much less the full agreement's hyperlinked

15  webpages, would conclude that Defendants could take the user's license and data, and then deny

16  access to some or all of the Services unless the user violated Defendants' express rules, much less

17  deny access for reasons entirely unrelated to the users' conduct or content, such as the user's race.

18         138.141.     In direct contravention to Defendants' testimony before congress, and

19  repeated public statements to the contrary, Defendants have asserted in this Lawsuit and others, that

20  regardless of whether users fully comply with the applicable rules, under the agreement Defendants

21  can unilaterally deny access to the platform, prevent them from uploading content, prevent viewers

22  from subscribing to their channels, exclude them from earning revenue from or advertising that

23  content.

24         139.142.     If Defendants are correct in their interpretation of the agreements which they

25  alone wrote, modified, revised, and designed so as to discourage (if not render entirely impracticable)

26  the user from reviewing and saving a full copy of the expanded agreement, then Defendants'

27  agreement with billions of users is void under California law because in exchange for valuable

28  license rights and data, Defendants promise nothing and are obligated to give users nothing at all

**E.    Defendants' Material Misrepresentations**

~~140.~~143.    ~~82. Among other statements,~~ Defendants ~~affirmatively represent~~have represented generally to the public and specifically to YouTube users that all ~~access~~ rules and restrictions apply equally to all users without consideration of the race, personal identity~~, or~~ ~~viewpoint~~ of the user, and that YouTube is a "forum" where the public can engage in "freedom of expression," to communicate and interact with other users, subject only to viewpoint neutral content based filtering guidelines and ~~regulations~~rules that apply equally to all.

~~141.~~144.    On January 17, 2018, Defendants testified to Congress under oath that access to all services offered by Defendants in connection with YouTube are available to Plaintiffs, and all users, subject only to viewpoint neutral, content based rules that apply equally to all users, affirming that Defendants are "neutral public fora" that "enforce [their] policies in a politically neutral way".

~~142.~~145.    ~~83. As of the filing date of this lawsuit~~Through 2019, YouTube's CEO and ~~other~~Defendants' senior officers ~~of Defendants continue~~continued to represent and insist to the public that YouTube's filtering, curation, regulation and restriction of ~~access to its~~services is ~~undertaken~~achieved solely by "viewpoint neutral" application of specific content based rules ~~limited~~applicable to actual video content and that Defendants does not use, consider, or take into account the user's race, sexual identity, political or religious association, or any other personal identity trait or viewpoint of the user.

~~84.    Based on Plaintiffs' experience, and the experience of other YouTube users who are members of other protected racial classifications under the law, that is a lie.  And Defendants have admitted as much on multiple occasions dating back to at least 2017.~~

~~1.    The General Terms Of Use And Contract-Based Promises~~

~~85.    As with many large public consumer businesses, Defendants contract with users through the use of an online, consumer form service contract(s).~~

~~86.    Like many other consumer service contracts, the TOS and other related agreement(s) that govern the consumer's respective obligations and rights is not a beacon of clarity.  Specifically, Defendants utilize a myriad of confusing, ambiguous, vague, overbroad, overlapping, interconnected, and inconsistent provisions to govern the parties' respective rights and obligations,~~

~~REVISED SECOND~~THIRD AMENDED CLASS ACTION COMPLAINT ~~FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES~~

1   including integrating or incorporating service and access provisions that are not specific to the

2   YouTube platform, but apply to any service or product that Defendant Google provides or markets to

3   the public.

4         87.      In or about December 2019, Defendant Google merged its general terms of service for

5   its products and services with that of YouTube's TOS for all purposes.  Consequently, access actions,

6   restrictions, or blocking that occur on YouTube may also be used by Defendants to review, restrict,

7   block, or deny any service that either entity provides, including Android devices and use, personal

8   email, publisher advertising, confidential health record data storage and access, all applications sold

9   in Google's Android App store, election monitoring services, public health and law enforcement

10  services search, and any and all other communication or information services that Google, YouTube,

11  or their affiliates provide to consumers or the public.

12        88.      The result is a complex and indecipherable web of service provisions that are not

13  readily available to users and require each user to locate and navigate as part of a convoluted,

14  confusing and complicated disclosure process, which may not be functionally accessible to the user.

15        89.      The user is also required to figure out what agreements and provisions govern what

16  conduct and restrictions, and which agreements are in place at the time to govern the specific

17  conduct.

18        90.      This is virtually impossible, because as is the case here, Defendants routinely change

19  or amend the provisions of these agreements and do so unilaterally, without adequate notice to users.

20        91.      Because each Plaintiff executed a new TOS agreement every time they access

21  YouTube on their internet browsers, only Defendants know what versions of the agreements and

22  policies apply to the conduct at issue during the period of time governing the claims in this Lawsuit.

23        92.      The TOS and other agreement(s) exist as electronic, on line documents.  The

24  agreements are executed electronically from drop down menus.  Consequently, users often do not

25  have access to or understand the TOS or agreement(s), let alone which version of the TOS and other

26  agreement(s) may govern a particular action or conduct that occurs on a particular date.

27        93.      One fundamental provision of the TOS and agreement(s), however, has not changed.

28  In every TOS or agreement during the relative period of this Lawsuit, Defendants promise users

1  equal and full access to all YouTube services, subject only to viewpoint neutral content-based rules

2  that apply equally to all.

3       94.   On January 17, 2018, Defendants testified to Congress under oath that access to all

4  services offered by Defendants in connection with YouTube are available to Plaintiffs, and all users,

5  subject only to viewpoint neutral content-based rules that apply equally to all users:

6       **Senator Cruz**: Thank you Mr. Chairman.  Welcome to each of the witnesses.  I'd like to start

7       by asking each of the company representatives a simple question, which is: do you consider

8       your companies to be neutral public fora?

9       * * * *

10      **Senator Cruz**: I'm just looking for a yes or no whether you consider yourself to be a neutral

11      public forum.

12      **Senator Cruz**: Ms. Downs?

13      **Ms. Downs**: Yes, our goal is to design products for everyone, subject to our policies and the

14      limitations they impose on the types of content that people may share on our products.

15      **Senator Cruz**: So, you're saying you do consider YouTube to be a neutral public forum?

16      **Ms. Downs**: *Correct.*  We enforce our policies in a politically neutral way.  Certain things are

17      prohibited by our Community Guidelines, which are spelled out and provided publicly to all

18      of our users.

19      * * * *

20      **Ms. Downs**: *As I mentioned, we enforce our policies in a politically neutral way.*  In terms

21      of the specifics of Prager University, it's a subject of ongoing litigation so I'm not free to

22      comment on the specifics of that case.

23  See

24  https://www.c-span.org/video/?439849-1/facebook-twitter-youtube-officials-testify-combating-extr

25  emism and

26  https://www.c-span.org/video/?448566-1/house-judiciary-committee-examines-social-media-filteri

27  ng-practices at 02:34:28 – 02:35:29 of the full hearing recording (emphasis added).

28
**REVISED SECOND THIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

143.146.    95. Before and after that date, up toIn the timesummer of the filing of this lawsuit2019, YouTube's CEO Susan Wojcicki and other senior officers of Defendants have repeatedly publicly reaffirmed and maintained that all of accessYouTube's decisions regarding access to services on the platform are based on viewpoint neutral application of theYouTube's content based rules governing the service that apply equally to all.

144.147.    96. Thus, whateverregardless of any ambiguity exists in theirthe operative agreements with Plaintiffs, Defendants admit that all of the agreements, Community Guidelines and Policies, and the application of thethose provisions in those agreements, are governed by a core and fundamental promise: to users:  That access to the YouTube platform and all services is open and available to any member of the public who uses YouTube, subject only to viewpoint neutral, content based rules that apply equally to all.

145.148.    97. ThatDefendants' promise governs all of a user's content based rights and obligations associated with YouTube and all services.  It applies not only to Plaintiffs and to all public users, but also to Defendants, who sponsor video content that competes directly with Plaintiffs and other public users for CPMs, viewer reach and expansion, promotion and advertising, and monetization of revenue generated by each video that is posted on the YouTube platform and/or is available through viewer subscription services.

98.

146.149.    In or about December 2019, Defendant Google LLC merged its Terms of Service for Google products and services with that of YouTube LLC for all purposes.  Consequently, any actions, restrictions, blocking or removals that occur on YouTube may also be used extended by Defendants to services provided by Google on other platforms, including without limitation, Android devices, personal Gmail, publisher advertising, confidential health record data storage and access, all applications sold in Google's Android App store, election monitoring services, public health and law enforcement services search, and any and all other communication or information services that Google, YouTube, or their affiliates provide to consumers or the public.

147.150.    Defendants' core, fundamental promise of ensuring equal access to YouTube, under neutral content-based rules is illusory, false, and unenforceable.

1    ~~148.~~151.    **99.    Defendants exercise "unfettered discretion" when applying**

2    ~~YouTube's content-based service rules and provisions and determining what access to give each~~

3    ~~user.  Defendants admit that at least since 2016, the exercise of this "unfettered discretion" by~~

4    ~~Defendants is not viewpoint or identity neutral.~~representations, that access to services on the

5    platform are based on viewpoint neutral content based rules that apply equally to all are patently false

6    given the admissions of Defendants' own employees, studies of Defendants' conduct on the

7    YouTube platform, and experience to the contrary of YouTube users who are members of other

8    protected racial classifications under the law.

9    ~~149.~~152.    **100. Since**As set forth infra, since at least 2017, Defendants have grudgingly

10   admitted that they "target" and deny access or services to Plaintiffs based, not on the video content

11   posted by a Plaintiff, but "for any reason, or no reason," including the race, ~~personal~~ethnicity or other

12   protected identity~~, or personal viewpoint,~~ of YouTube content creators, viewers, and users.

13   ~~150.~~153.    **101.** The practice of using its "discretion" to deny access to any Plaintiffs, or

14   any user, based on race, ethnicity or other protected identity, ~~or viewpoint,~~ rather than ~~video~~materials

15   in the content, violates and breaches the express and implied promises set forth in YouTube's TOS

16   and other service or access agreements, because those agreements are governed in their entirety by

17   California law~~,~~ and expressly limit the exercise of Defendants' "discretion" to that "permitted" by

18   law.

19   ~~151.~~154.    **102.** Thus, Defendants' admissions that they are engaged in identity and

20   viewpoint based access denials and targeting, breach the express and implied promises that

21   discretionary access ~~decision~~decisions must be viewpoint neutral in application and comply with all

22   federal and state laws prohibiting discrimination in contract, including 42 U.S.C. § 1981, the Unruh

23   Act, and §§17200, *et seq.* of the California Business & Professions Code.

24                    2.    **The License Provisions**

25        **103.    The current (and/or prior versions) of YouTube's TOS at issue in this discrimination**

26   ~~case require Plaintiffs to "grant" Defendants a renewable, "irrevocable" and "perpetual" license to~~

27   ~~any and all video content or communication that occurs on YouTube.  This includes, but is not~~

28   ~~limited to, the property rights for all personal data and other revenue streams that Plaintiffs hold an~~

1   interest in or otherwise derive from the posting, viewing, advertising, or monetization of their videos

2   on YouTube.

3        104.    Under the TOS, Plaintiffs "grant" Defendants a "worldwide, non-exclusive,

4   royalty-free, sub licensable and transferable license to use that Content . . . in connection with the

5   Service and YouTube's . . . . business . . . ."

6        105.    The TOS also grant other YouTube "users" a "non-exclusive, royalty-free license to

7   access" content, "reproduce, distribute, prepare derivative works, display, and perform it . . . as

8   enabled by a feature of the Service."

9        106.    This license includes the right of Defendants and other users to post and monetize

10  Plaintiffs' "[c]ontent or other material" that makes Plaintiffs (i) "solely responsible for" the content

11  and its "consequences," including (ii) all intellectual property rights and restrictions on the video

12  content, and (iii) not posting content or seeking access to services in a manner that is "contrary to the

13  YouTube Community Guidelines."

14       107.    In applying these provisions, Defendants reserve "the right to decide whether Content

15  violates these Terms," including, "but not limited to, pornography, obscenity, or excessive length,"

16  and, "in so doing, remove such Content and/or terminate a user's account" if, "in its sole discretion .

17  . . submitting such material is determined to be "in violation of these Terms."

18       108.    Defendants' acquisition of the licensing rights to 95% of the world's public video

19  content along with the personal and financial information data that belongs to the 2.3 billion users

20  who post or view the content is not free or a gift to the largest and most powerful tech enterprise in

21  the history of the world.  Rather, the license rights are obtained through for tangible and valuable

22  consideration: the right of the licensor or user to equal access to the YouTube platform and all of its

23  services, subject to and limited only by the viewpoint neutral application of YouTube's

24  content-based rules.

25       109.    Thus, under the TOS, Defendants' license agreement binds and requires them to apply

26  and impose access restrictions for viewpoint neutral content based violations of a third party's

27  intellectual property rights, Defendants' Community Guidelines, and other content-based terms of

28  YouTube's service, and to do so in a manner "permitted" by the law.

152.155. 110. Defendants' past, present, and continuing violations of the TOS isare a fundamental and material breach of the trillion dollar licensing provisions by which Defendants obtained perpetual" and "irrevocable" right to use, display, and monetize 95% of the public's video content that exists or has ever existed in the world, as well as the personal and proprietary data of the 2.3 billion people who use or access the site.

153.156. 111. In addition, Plaintiffs also seek a declaratory judgment either that: (a) the plain language of Section §230(c) does not apply to racial profiling and discriminatory access restrictions which are based on a person's race, ethnicity or other protected identity, or viewpoints, rather than based on the "on lineonline material" that actually appears on YouTube; or (b) if Section §230(c) is construed to permit on lineonline racial, identity or viewpoint based discrimination restrictions against YouTube users, Section §230(c) is unconstitutional because it violates the First Amendment's limits on permissive private party speech regulation.

154.157. 112. Under the First Amendment, the United States Supreme Court in *Denver Area Educational Telecommuns. Consortium, Inc. v. Federal Communications Comm'n*, 518 U.S. 727, 766-67 (1996), confirmed the obvious: a congressional law that permits a private party to regulate speech is unlawful and unconstitutional unless the law (a) is applied in a viewpoint neutral manner, (b) is narrowly tailored so as not to create a risk of an erroneous private veto over speech, and (c) does not interfere with or otherwise alter or obstruct the parties' existing legal relationship, obligations, and rights or the enforcement of those rights and obligations in a court of law.

155.158. 113. Defendants' assertion that Section §230(c) permits them to use a person's race, ethnicity or other protected identity or viewpoint to block access to YouTube is unconstitutional because, at least as applied to this Lawsuit, Section §230(c) is neither (a) viewpoint neutral, (b) narrowly tailored to prevent against an erroneous veto of speech by Defendants under its rules, and/or (c) it interferes with and eviscerates Defendants' preexisting legal obligations to Plaintiffs under state and federal law, including antidiscrimination, false advertising, consumer protection, and the express and implied promises set forth in Defendants' operative contract(s) with Plaintiffs.

REVISED SECONDTHIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES

**F.** ~~C.~~ **Defendants' Anti-Competitive, Unlawful, Deceptive And Unfair Business Practices**

~~156.~~159.        ~~114.~~ Defendants shuffle between three conflicting and irreconcilable roles in connection with YouTube:

a.       When Defendants put on their "ISP" hat, Defendants host, review, curate, and monetize the video content of third party users who license their content, and the personal data property rights of these users, in return for providing equal access to YouTube content and services, subject only to viewpoint neutral rules that apply equally to all.

b.       When Defendants put on their "creator" hat, Defendants create videos and partner with hand‑ picked creators to sponsor their content, and both operate and act as the largest and most powerful of YouTube users to compete directly and aggressively with Plaintiffs and other third party users for views, reach, engagements, CPM revenue, advertisers, and a host of other user based revenue streams on YouTube.

c.       When Defendants put on their "advertiser" hat, Defendants review, categorize, and classify the video content of third party users for purposes of selling advertisements on the YouTube platform in connection with individual videos and/or YouTube channels, based on demographic information in the form of Defendants' metadata that they generate for individual videos which is gleaned from video titles and tags (posted by Plaintiffs when the individual videos are posted to the platform)~~,;~~ Plaintiffs' channel profiles (which were input when the channels were first created)~~,;~~ the profiles of Plaintiffs' subscribers (which individual subscribers input when they first registered with Defendants) and the subscribers' video viewing histories (which Defendants gather, analyze and summarize in the form of metadata), as well as the profiles of other users who view Plaintiffs' videos (which were input when they first registered with Defendants) and the viewers' video viewing histories (which Defendants also gather, analyze and summarize in the form of metadata).  Using the enormous wealth of ~~information~~aggregated data Defendants have about the Plaintiffs, their subscribers and ~~the~~ viewers ~~of their videos~~, Defendants can identify, price and sell advertising space on the YouTube platform for specific targeted audiences in connection with individual videos ~~posted, based on the demographics of the channel subscribers and video viewers.~~

1   In this way, Defendants can identify, market and sell advertising based on the race, ethnicity or other

2   protected identity and viewpoints of the YouTube users and generate revenue for Defendants, their

3   affiliated creators, and affluent white YouTube creators, without ever reviewing any of the millions

4   of individual videos posted on the YouTube platform.  In short, Defendants divvy up the video

5   content on the platform by race, ethnicity or other protected identity and viewpoint in order to sell

6   advertisements to third parties without regard to the actual content of videos; moreover.  Moreover,

7   Defendants fully monetize those creators whose subscribers and viewers fit the "right demographic,"

8   paying them collectively millions of dollars each month regardless of whether their individual videos

9   comply with Defendants' own Community Guidelines and TOS.

10      157.160.      115. Defendants' multiple roles create platform wide conflicts of interest, in

11   which Defendants utilize their unfettered authority to curate third party content on YouTube as a

12   pretext to impose access and content restrictions on Plaintiffs and all other persons similarly

13   situatedmembers of the Race Discrimination Class , that are not imposed on content posted or

14   sponsored directly or derivatively by Defendants or other parties with whom they contract with for

15   sponsorship.

16      158.161.      116. In the last four years, Defendants have invested in and expanded their

17   business to become the largest a production and media company in the world.  *See*

18   https://www.feedough.com/youtube-business-model-how-does-youtube-make-money/.

19      159.162.      117. Among other things, Defendants announced that "[t]he company has

20   partnered with its top content creators who wanted to charge a subscription rental or purchase fees for

21   their content and made their uploaded content as paid content which requires users to pay for a

22   subscription or purchase fees to access the content of the channel."  Furthermore, Defendants decided

23   to partner with "affiliates" whose "related product" advertisements are placed with some videos on

24   YouTube. These products link to the affiliate partners, whichwho pay a commission to Defendants if

25   their products are purchased.

26      160.163.      118. Defendants understand that the YouTube Platformplatform has

27   effectively surpassed its user saturation point, and that monetizing and profiting from YouTube by

28

1  merely hosting content on the platform is no longer financially feasible to satisfy Defendants'

2  insatiable lust for revenue and profits.

3      ~~161.~~164.      ~~119.~~ Thus, in addition to hosting their own video channels on YouTube,

4  Defendants have entered into lucrative preferred provider production deals with other global media

5  companies, including PBS, MSNBC, HBO, Fox News, Breitbart, and other media and entertainment

6  conglomerates.

7      ~~162.~~165.      ~~120.~~ Defendants have also entered the digital TV market with the advent of

8  YouTube TV.  Defendants use their control over third party user content~~,~~ on~~,~~ and access to~~,~~ the

9  YouTube platform to induce consumers to purchase their TV and entertainment services by using the

10  YouTube hosting platform, user interface to that platform, and content curation powers to induce

11  consumers to use YouTube for all digital based TV or video content, including movies, music, sports,

12  and entertainment.

13      ~~163.~~166.      ~~121.~~ Defendants compete for that public audience or viewership unfairly and

14  unlawfully, in a manner which gives their "preferred content" a competitive advantage~~,~~ by~~,~~ among

15  other things, using their filtering tools and criteria to restrict the access and reach of the smaller third~~-~~

16  party users it hosts on YouTube.  Thus, under the pretext of making the site safe for their users,

17  Defendants arbitrarily, capriciously, and deceptively restrict access and audience reach to the videos

18  of their competitors on the platform, like Plaintiffs, while at the same time allowing their own content

19  to avoid those same restrictions and restraints -- even when that content violates their own guidelines.

20  In so doing, Defendants effectively clear space on the platform for content which they, or their

21  preferred users supply~~,~~ to better reach the ~~sites~~platform's 2.3 billion users, by censoring the content

22  of their competitors.

23      **G.**   ~~D.~~ **Defendants' Tool Kit For Unlawful Practices**

24      ~~164.~~167.      ~~122.~~ Defendants utilize a series of discriminatory, anticompetitive and

25  unlawful suppression practices and conduct to grow their profits, financial~~,~~ interests, and

26  unprecedented consolidation and control over information, speech, advertising, expression, and

27  internet viewership.

28

### 1. Artificial Intelligence Algorithm Restrictions

165.168.    123. The central mechanism used by Defendants to achieve these objectives areDefendants use and abuse aggregated personal data about users' race, ethnicity, national origin and other protected identifies that is collected by and incorporated into artificial intelligence ("A.I."), algorithms, filters and automated systems to make decisions regarding the users' access to Defendants; platforms and services.  Defendants apply their A.I. based, algorithms ("A.I."), and computer driven filtering tools that, filters and automated systems, to profile, filter, curate, regulate, restrict, flag, and block creator content and access to services on YouTube.  Defendants surreptitiously collect and aggregate personal information regardingabout the identities of Plaintiffs and all other persons similarly situatedmembers of the Race Discrimination Class, their subscribers, and the viewers of their videos, and then generate metadata that is either embedded into, appended to or associated with individual videos to facilitate Defendants' unlawful discriminatory and anticompetitive filtering and review tools to restrict or block the video content andand channels to effectively digitally redline videos, channels, and users by race, ethnicity, national origin and other protected identities in order to generate demographic information for advertisers, provide a competitive advantage to Defendants' own original content and that of its favored or sponsored creators, and to provide a cheap automated filter for "younger or more sensitive viewers" that avoids the costs of examining the materials in individual videos uploaded to the platform.  Defendants' digital redlining allows them to classify videos and channels in a way that segregates the videos and channels of African American, Hispanic and other users with protected identities into isolated internet ghettoes where these creators, subscribers and viewers enjoy only limited access to the YouTube platform by Plaintiffs and all other persons similarly situated, both as YouTube creators and as viewers's audiences, and cannot enjoy Defendants' services such as monetization, advertising, searchability, custom thumbnail tiles, copyright protection, effective appeals, protection from hate speech and doxing, participation in "Trending," "Up Next" or "Featured" video applications, or accurate characterizations of the material in their video content.

166.169.    124. Defendants *claim* that thesetheir A.I., algorithms, filters and automated systems are viewpoint and identity neutral, and that they ensure that the "same standards apply

equally to all" when it comes to the content regulation of speech on YouTube.  Defendants also claim that their employees conduct "manual reviews" to supplement the ~~electronic~~automated filtering, curation, restriction and regulation of video content.

~~167.~~170.       ~~125. But the evidence, including statements by Defendants' employees familiar with both electronic and manual filtering and regulation of speech that takes place on the YouTube Platform, suggests that Defendants' representations of neutral viewpoint and identity-based content regulation are *also* false. The A.I. and algorithmic filtering tools are embedded with code that regulates content based on purely subjective, viewpoint, topic, and identity animus, and other unlawful criteria.~~ Even before October 2016, Defendants' engineers began making changes to the ~~code and operations of the~~A.I., algorithms, filters and ~~filtering tools~~automated systems in order to ensure that Defendants could filter, curate and restrict videos and regulate access to video content based upon ~~overt discrimination based on race, sexual or gender orientation, ethnic, political or religious~~race, ethnicity, national origin or other protected identities for reasons of animus, as well as for financial gain and/or anticompetitive purposes.

~~168.~~171.       ~~126.~~ Similarly, ~~Defendants' viewpoint~~ bias, animus, and discrimination towards the user's race, ethnicity or other protected identity ~~or viewpoint is~~are institutionally and culturally rampant in Defendants' ~~work place~~workplace and employment practices.  Among other things, Defendants operate and administer the automated systems that generate Copyright flags, "Restricted Mode," ~~through~~and monetization decisions using employees, including engineers ~~and,~~ content reviewers, and independent contractors.  These people work in what has been widely reported and acknowledged as a dysfunctional work environment and often work outside of the United States in countries and cultural settings where discrimination against Plaintiffs and ~~all other persons similarly situated~~members of the Race Discrimination Class is not only condoned but is deeply embedded in their social mores.

~~169.~~172.       ~~127.~~ Internal emails by and between Defendants' employees show that many employees are routinely subjected to harassment, threats, blacklisting, discipline, and hazing based on their race, ethnicity or ~~political or religious viewpoints~~other protected identity.  The dysfunction and ~~viewpoint~~ bias emanate from, and are enforced at, the highest ranks of Defendants' upper

1    management, and drive the actions of employee supervisors, co-workers, third- party affiliates, and

2    advertisers.

3    170.173.      128. Consequently, even when Plaintiffs and members of the Race

4    Discrimination Class are afforded a manual employee reviewsreview of video content are used to

5    check and audit restrictions on videos generated from the digital algorithms or from flagging by other

6    YouTube users, Defendants apply "Restricted Mode"" employees and othercontractors use

7    discretionary and vague content based criteria, to restrict access during the review, resulting in

8    restrictions to Plaintiffs' videos usingbased on vague and undefined terms such as "mature" or

9    "sensitive" for certain audiences, solely because the video discusses a topic involving abbreviations

10   like "BLM," "KKK";" terms such as "Black," "White," "Racism," "Boogaloo," "White Supremacy,"

11   "Racial Profiling," "Police Shootings," "Police Brutality," "Black Lives Matter";" names of

12   individuals such as those killed by law enforcement, "Bill Cosby," "Louis Farrakhan";" names of

13   organizations such as "Ku Klux Klan," "Nazi," "Neo-Nazi," "Aryan Brotherhood," and/or other

14   euphemisms that are known and particular to the African American Communitycommunity, or the

15   video's title or tag words includesinclude these trigger words. Defendants are restricting Plaintiffs'

16   content about issues of importance to all Americans, purportedly to protect "younger" and "sensitive

17   viewers," despite the fact that the videos involved contain no hate speech, nudity, excessive

18   profanity, drugs, alcohol, graphic violence or depictions of dangerous activities, simply because the

19   videos discuss issues important to African American and Hispanic communities.

20   171.174.      129. Defendants' conduct createsdigital redlining constitutes censorship,

21   restraint of speech, and discrimination based on the race, ethnicity or other protected identity, and/or

22   viewpoint of Plaintiffs and all other persons similarly situatedmembers of the Race Discrimination

23   Class, not based upon videomaterial in uploaded content which might violate a narrow, neutral,

24   objective, and specifically verifiable criteria that furthers a compelling and legitimate public interest.

25   172.175.      130. Defendants' conduct also forces Plaintiffs and all other persons similarly

26   situatedmembers of the Race Discrimination Class to self- censor and to avoid not only using

27   abbreviations like "BLM," "KKK";", terms such as "Black," "White," "Racism," "Boogaloo,"

28   "White Supremacy," "Racial Profiling," "Police Shootings," "Police Brutality," "Black Lives

1   Matter~~;~~~~,~~ names of individuals such as those killed by law enforcement, "Bill Cosby," "Louis

2   Farrakhan~~;~~~~,~~ names of organizations such as "Ku Klux Klan," "Nazi," "Neo-Nazi," "Aryan

3   Brotherhood," and/or other euphemisms that are known and particular to the African American

4   ~~Community~~community in video titles and tag words, but to avoid ~~mentioning~~any mention of these in

5   the video ~~content~~, in order to avoid having Defendants remove videos or issue a "strike" against the

6   channel, purportedly for posting "hate speech" or violating one or more of Defendants'

7   ~~unidentified~~TOS, or their innumerable Community Guidelines, policies, and ~~TOS~~rules.

8        ~~173.~~176.        ~~131.~~Defendants' A.I. ~~tools and practices~~, algorithms, filters and automated

9   systems that incorporate aggregated personal digital data reflecting users' race, ethnicity, national

10  original or other protected identifies effectively silence the voices of Plaintiffs and ~~all other persons~~

11  ~~similarly situated~~members of the Race Discrimination Class concerning some of the most important

12  issues and current events affecting their communities by limiting access both to the available content,

13  and by limiting subscriber and viewer participation and support of the African American and

14  Hispanic channels and content.

15       ~~174.~~177.        ~~132.~~Because Defendants' A.I. ~~tools and practices~~, algorithms, filters and

16  automated systems single out the videos of Plaintiffs and ~~all other persons similarly situated~~members

17  of the Race Discrimination Class for adverse treatment (e.g., removal, restricted access if any, and/or

18  limited or no monetization), the Plaintiffs and ~~class~~ members of the Race Discrimination Class

19  cannot generate sufficient viewers or subscribers to grow their channels so as to qualify for all of the

20  Defendants' special programs and perks, such as YouTube partnership, Channel Membership,

21  mobile Livestreaming, or SuperChat applications, resulting in the creation of a ghetto tier of

22  YouTube creators based on their race, ethnicity, national origin or other protected identity ~~and/or~~

23  ~~viewpoints~~, who are doomed to create videos for very limited audiences for little to no money.

                    **2.        Excluding Channels And Videos From Full Revenue Generation**

25       ~~175.~~178.        ~~133. In addition to creating and using metadata to racially profile Plaintiffs~~

26  ~~and all other persons similarly situated, as well as their subscribers and viewers, for purposes of~~

27  ~~restricting access to the YouTube platform, Defendants use the same or similar metadata~~The

28  aggregated personal data profiles reflecting race, ethnicity, national origin and other protected

1   identities are also used and relied on by Defendants' A.I., algorithms, filters and automated systems

2   to limit the revenue which can be generated from Plaintiffs' channels and individual videos.

3   Defendants use A.I., algorithms, and filtering tools and practicesfilters and automated systems

4   incorporating aggregated personal digital data of users in conjunction with the metadata theywhich

5   Defendants create, and embed into, append to or associate with channels and videos, in order to

6   prevent Plaintiffs and other persons similarly situatedmembers of the Race Discrimination Class

7   from earning money from videos merely because the channel/video metadata reflects the video title

8   and/or tags includeincludes material like the abbreviations like "BLM," "KKK;", terms such as

9   "Black," "White," "Racism," "Boogaloo," "White Supremacy," "Racial Profiling," "Police

10  Shootings," "Police Brutality," "Black Lives Matter;", names of individuals such as those killed by

11  law enforcement, "Bill Cosby," "Louis Farrakhan;", names of organizations such as "Ku Klux

12  Klan," "Nazi," "Neo-Nazi," "Aryan Brotherhood," and/or other euphemisms that are known and

13  particular to the African American Communityand Hispanic communities.  Defendants do not

14  monetize Plaintiffs' channels and videos that feature content with such material.  Defendants also use

15  the same aggregated personal digital data or similar metadata to limit or prevent revenue generation

16  fromfor videos posted by Plaintiffs or other persons similarly situated members of the Race

17  Discrimination Class, simply because the videos were created by PlaintiffsAfrican Americans,

18  Hispanics or members of other races, or by other similar communities, or by those sharing the same

19  viewpoints, or because the videos were posted on channels that are popular with members of

20  Plaintiffs' communities, or are widely viewed by viewersthose who share Plaintiffs' race, identity,

21  and/ethnicity or viewpointsother protected identities.

22       176.179.      134. Because Defendants use aggregated personal digital data reflecting

23  users' race, ethnicity, national origin and/or other protected identities to generate metadata based on

24  that aggregated data, as well as the video titles and tags to flag videos for limited, and limit or prevent

25  monetization or demonetization of videos and channels based on that aggregated data and metadata,

26  Plaintiffs and other persons similarly situatedmembers of the Race Discrimination Class self- censor

27  and either avoid posting videos regarding issues and current events that are important to their

28  communitycommunities (e.g., videos regarding the deaths of unarmed African Americans at the

hands of law enforcement, healthcare providers' refusals to test or treat African Americans for the Covid-19 virus, the disparate infection, death and unemployment rates experienced by African Americans and Hispanics as a result of the Covid-19 pandemic), or they misspell key words like "Black," "White," "Race," "Racist," and "Racism," or they rely on euphemisms known only to the African American community and Hispanic communities.

177.180.          135. Defendants' conduct and digital redlining practices that are based on information about race, ethnicity, national origin or other protected identities cause Plaintiffs and other persons similarly situated members of the Race Discrimination Class to lose revenue which their fully compliant videos and channels would otherwise have generated, as well as to lose subscribers and viewers, and the opportunity to grow their channels and to qualify for full access to all of the perks that Defendants offer others white creators and Defendants' preferred or sponsored creators.

### 3.    Interfering With Individual Video Viewing

178.181.          Defendants hire individuals as employees and independent contracts who "moonlight" and offer their personal services to YouTube creators as "technical consultants," "channel consultants," or "managers."

      a.    The Defendants' moonlighting workers use their access to Defendants' platform, resources, and services to promote videos and channels belonging to the individual users who pay.  Defendants' moonlighting workers improperly work to enhance the reach, monetization, and revenues of their part time masters by promoting content over the platform; removing age gate and "Restricted Mode" restrictions on videos; removing Copyright flags or complaints for videos and channels; and removing Community Guideline and Policy violation strikes for channels.

      b.    The Defendants' moonlighting workers also can be hired to target channels and videos of other YouTube users to either hobble channel competitors, or to prevent videos and channels from acquiring viewers by applying age gate and "Restricted Mode" restrictions to videos that do not qualify under Defendants' agreement; issuing strikes for Copyright, Community Guidelines or Policy violations against videos and channels that fully comply with Defendants' agreement; adding metadata to videos or channels so that Defendants' artificial algorithm determines

that the content does not qualify for monetization or viewing by all audiences; rendering videos and channels unsearchable and/or invisible to viewers; removing viewer comments from videos; removing videos from channels; reducing the numbers of views and view times for individual videos and channels; and using bots to populate the comments section of videos with unfavorable, derogatory or incomprehensible language and hyperlinks to other content.

c.      Users have complained to the Defendants that their employees and contractors are using their position and access to the platform to enhance visibility and revenue for some channels and target other channels.  Defendants have received multiple complaints about videos and channels that fully comply with Defendants' agreements, but nevertheless were removed, restricted, or rendered unsearchable or not viewable, where Defendants themselves had no record that such actions had been taken, could not explain the restrictions on the videos and channels, and ultimately confirmed that the videos and channels should be fully viewable and available without restriction.

d.      The Defendants have also received complaints that bots are being used to enhance view numbers for specific channels, to interfere with other channels.

e.      Despite repeated multiple requests, Defendants have not stopped the practice of moonlighting by their employees, workers, and contractors; nor have they limited access to the Defendants' platform to prevent moonlighting workers from using their access to the platform and services for personal gain at the expense of vulnerable users.

179.182.      Defendants' employees and/or independent contractors who are not moonlighting as consultants or managers also interfere with Plaintiffs' posted videos.  They  (a) interrupt the video, forcing the viewer to restart the video, resulting in lost viewers, low watch times and irritated subscribers; (b) throttle the video as the viewer watches which distorts or interrupts the audio feed, and disrupts or interrupts the visual images that the viewer sees; (c) insert new audio content (e.g., noises, static, sounds such as honks, beeps, bumps, and barks) and/or visual images into the video which are entirely unrelated to the decisions and choices of the channel creator, give the impression that the video has low production values, and are annoying, irritating or confusing to the viewers; and/or (d) prevent viewers from "liking" the video.  Defendants' interference causes viewers to shorten their watch times, refrain from subscribing to Plaintiffs' channels, and watch

1  fewer of Plaintiffs' videos; which in turn prevent Plaintiffs from qualifying for all of the benefits

2  which Defendants offer on the YouTube platform, and reduce revenue generated by Plaintiffs'

3  videos and channels.

4  ~~180.~~183.   Defendants' employees and/or independent contractors who are not

5  moonlighting as consultants or managers also interfere with Plaintiffs' Livestream broadcasts.

6  Livestreams are videos that are posted in a streaming live format which are controlled exclusively by

7  creators or by the moderators designated and authorized by individual creators to review, edit, and

8  remove viewer comments which appear as the video progresses over time.  Livestream broadcasts

9  allow real time viewer participation in discussions on YouTube channels and often involve hundreds

10  of people all making comments regarding important issues, current events, or topics.  YouTube's

11  Livestream broadcast application allows the video creator and her designated moderators to control

12  the content of the broadcast.  They control the viewer participation in the comments section of the

13  screen while the Livestream is played.

14     a.   Defendants routinely restrict viewer access to and revenue generation from

15  videos posted by Plaintiffs and members of the Race Discrimination Class, thereby depressing

16  subscriber and viewer numbers.  Many African American channels do not generate significant

17  income from advertising or channel membership.  They must rely on other applications to generate

18  revenue, such as Defendants' SuperChat, and Livestream or Patreon donations.  As a result,

19  Livestream broadcasts are a primary revenue generator for Plaintiffs.

20     b.   Defendants regularly interfere with the Livestream broadcasts by Plaintiffs

21  and  members of the Race Discrimination Class, using either YouTube employees or independent

22  contractors that Defendants hire.  Defendants' Livestream interference includes such tactics as:  (a)

23  stopping Livestream broadcasts, and forcing the creator to restart the broadcast, resulting in lost

24  viewers, low watch times and irritated subscribers; (b) throttling (intentionally slowing) broadcasting

25  speeds during Livestream which distorts or interrupts the audio feed, and disrupts or interrupts

26  viewer comments being input to the video on Plaintiffs' channel; (c) inserting new voice content

27  and/or visual images into the video which are entirely unrelated to the decisions and choices of the

28  channel creator and her chosen moderators, and are offensive, threatening, bullying, misogynistic,

racist, and/or obscene; (d) removing positive comments from viewers; and (e) disconnecting individual viewers who are in the process of leaving positive comments, thereby silencing viewers who would otherwise support the video or make monetary donations on the Livestream broadcast.

c.   Until stay at home orders for nonessential businesses were imposed in the Bay Area in March of 2020, Defendants' Livestream broadcast interference was relentless, causing Plaintiffs either to suspend Livestream broadcasts, to self censor and refrain from discussing issues or current events of interest to the African American community, or to conduct them at odd hours without prior announcements.  Defendants' conduct in interfering with Livestream broadcasts has reduced subscriber and viewer numbers for the channels of Plaintiffs and  members of the Race Discrimination Class, has reduced revenue generated from Livestream broadcasts and from the channels overall, and has prevented the African American community from receiving information about and discussing issues and current events which are important to members of that community.

181.184.   Notably, while stay at home orders were in place for the Bay Area, Plaintiffs were able to conduct Livestream broadcasts unmolested.  However, Defendants' interference has recommenced with the lifting of stay at home orders.  Defendants' interference is now ongoing.

**4.   3. Misapplying "Restricted Mode"**

182.185.   **136.** Defendants also use the same or similar aggregated personal digital data and metadata reflecting race, ethnicity, national origin and other protected identities to restrict access to the full YouTube platform and related benefits by misapplying "Restricted Mode" to the ~~videos of~~ Plaintiffs ~~and all persons similarly situated.  "Restricted Mode" is one of Defendants' primary tools for platform control and curation~~' videos that address or discuss issues of importance to the African American or Hispanic communities, merely because the videos have material associated with African Americans or Hispanics.  By incorporating aggregated personal digital data reflecting race along with the metadata for individual channels and videos, Defendants apply "Restricted Mode" to tamp down the voices of African Americans and Hispanics so that they do not YouTube's full audience.  As Defendants' automated systems filter channels and content, the tools encounter metadata regarding race, ethnicity, national origin and/or other protected identities which triggers the application of "Restricted Mode."  Regardless of whether the videos fully comply with all of

1  Defendants' Community Guidelines and policies, "Restricted Mode" removes videos addressing

2  issues of importance to the African American and Hispanic communities so that they never reach

3  "younger" or "sensitive" viewers.  Thus, children with parents who desire to avoid exposure to drugs,

4  alcohol, sexual content, excessive profanity, nudity or graphic violence pornography, are deprived of

5  access to videos discussing police abuses, white supremacists and efforts to combat the Ku Klux

6  Klan.  "Restricted Mode" affects tens of millions of such YouTube users every single day.

7  ~~183.~~186.     ~~137.~~ According to Alice Wu, a Senior Manager of Trust & Safety at YouTube,

8  LLC, about 1.5 percent of YouTube's daily views (or approximately 75 million of the nearly 5 billion

9  views every single day) come from people who have activated Defendants' "Restricted Mode."

10 Defendants restrict and demonetize Plaintiffs' videos, despite the fact that the videos do not contain

11 material that violates the TOS, Community Guidelines, the Policy, Copyright and Safety Policies,

12 and related agreements.  Defendants admit that they use flawed automated systems to apply

13 "Restricted Mode" and other restrictions because of the enormous volume of new content being

14 uploaded to Defendants' platforms.  *See* Exhibit A, Wu Dec. ¶¶6-10.

15 ~~184.~~187.     ~~138.~~ According to Defendants, "Restricted Mode" is supposed to function

16 much like a curtain that blocks access to the hardcore pornography section at the corner video rental

17 shop, limiting viewer access by younger, sensitive audiences to video content that contains certain

18 specifically enumerated "mature" aspects.

19 ~~185.~~188.     ~~139.~~ Defendants assert that "Restricted Mode" is a tool "to help institutions

20 like schools as well as people who wanted to better control the content they see on YouTube with an

21 option to choose an intentionally limited YouTube experience."  "Restricted Mode" also can be

22 activated by system administrators to restrict all access on computer networks to all users and

23 electronic devices connected to the network, including viewers who seek to access video content in

24 public libraries, schools, and other public institutions or private workplaces.

25 ~~186.~~189.     ~~140.~~ While Defendants claim that viewers control the use of "Restricted

26 Mode," and can choose to turn on "Restricted Mode" for their personal accounts, there is growing

27 evidence that it sweeps more broadly.  In certain instances, for viewers who do not have YouTube

28 accounts and seek to view videos posted on YouTube by Plaintiffs and ~~other persons similarly~~

~~1665102.1~~1911115.1                    -83-                    Case No. 5:20-cv-04011 LHK .

~~REVISED SECOND~~THIRD AMENDED CLASS ACTION COMPLAINT ~~FOR DECLARATORY JUDGMENT,~~
~~RESTITUTION, ACCOUNTING AND DAMAGES~~

1   ~~situated~~ members of the Race Discrimination Class, Defendants have applied "Restricted Mode" to

2   prevent those viewers from accessing videos through links posted on other social media platforms

3   that are not owned or controlled by Defendants, as well as to prevent YouTube users who have not

4   activated "Restricted Mode" from accessing those videos.

5       ~~187.~~190.   **~~141.~~** According to Defendants, "Restricted Mode" can be applied to videos in

6   three ways.

7           a.      First, Defendants examine certain "signals" like the video's metadata, title,

8   and tag words associated with the video.  When creators post videos, Defendants invite them to

9   include certain information in the title or to input "tag" words which are purportedly designed to help

10  viewers find videos in which they are interested, such as a title reflecting the subject of the video, and

11  tag words indicating the video's themes or content.  Plaintiffs and ~~other persons similarly~~

12  ~~situated~~members of the Race Discrimination Class unwittingly provide Defendants with such titles

13  and tag words along with their posted videos.  Defendants then generate metadata which is additional

14  content that they insert into, append to, or associate with the videos that are posted, which allows

15  Defendants to apply A.I., algorithms and other filtering tools to profile Plaintiffs, their subscribers

16  and viewers, as well as ~~other persons similarly situated~~ members of the Race Discrimination Class,

17  and to sort them by race, ethnicity or other protected identity ~~and viewpoints~~.  Defendants ultimately

18  apply "Restricted Mode" to the otherwise compliant videos posted by Plaintiffs and ~~other persons~~

19  ~~similarly situated~~ members of the Race Discrimination Class, because the videos have titles or tag

20  words that reflect issues of importance to African ~~American~~Americans or other racial communities,

21  and to those who simply watch videos popular in such communities – essentially relegating these

22  videos to a limited audience which excludes white, conservative and/or "more sensitive viewers,"

23  simply because the videos were made by or for members of protected racial classifications under the

24  law.

25          b.      Second, Defendants claim that such metadata "signals" identify videos which

26  violate Defendants' Community Guidelines or TOS.  However, these "signals" are used by

27  Defendants as a pretext to segregate disfavored content using "Restricted Mode," regardless of

28  whether the video contains material which is unsuitable for children, younger audiences or more

sensitive viewers.  Defendants themselves create all such metadata and insert, embed or associate that metadata which reflects demographic information regarding the race, ethnicity and other protected identities of video creators, channel subscribers and viewers, along with individual videos to create more "signals" for A.I., algorithms, filters and filtering tools automated systems to utilize. Thus, in certain cases, videos that would otherwise pass through the filtering process without incident, are flagged for restrictions by Defendants;, not because of anything in the video content, but because of metadata or other "signal" information that Defendants themselves have inserted, embedded or associated with the video.  These signals include information reflect aggregated personal digital data about the race, ethnicity or other protected identity and/or individual viewpoint of the video creator, her subscribers, and her viewers.

c.       Third, Defendants also purportedly use "Restricted Mode" to passively restrict a video if it is "flagged" as "inappropriate" by anyone in the "community" of YouTube users. According to Defendants, the so- called "flagged" videos are subsequently reviewed by a "team" of human reviewers for "violations" of Community Guidelines and/or TOS.  But flagged videos are subject to Defendants' own internal review procedures that are race, ethnicity or other protected identity and viewpoint based, so that many flagged videos posted by Plaintiffs and other persons similarly situated members of the Race Discrimination Class may never receive an independent content review by a human being, much less a YouTube employee.

188.191.       142. As shown below, when a network administrator or an individual viewer activates "Restricted Mode," each video subject to "Restricted Mode" appears with Defendant's Defendants' custom stamp of disapproval, including a red face including a red square bearing a foreboding facial expression, together with text showing "This video is unavailable with Restricted Mode enabled. To view this video, you will need to disable Restricted Mode."

189.192.       143. Defendants' stamp of disapproval thus makes a specific and falsifiable misrepresentation to viewers of videos posted by Plaintiffs and other persons similarly situated members of the Race Discrimination Class, that the specific video that they have attempted to access contains content that is so inappropriate, shocking and outrageous, that the viewer must be protected

from that content and that the ~~YouTuber~~ creator who has posted that content is responsible for having

created and uploaded such inappropriate, shocking, and outrageous content.

190.193.      **144.** These specific and falsifiable factual representations are by no means

limited to Defendants' "Restricted Mode" stamp of disapproval.  Viewers who attempt to ascertain

why a particular video has been subjected to "Restricted Mode" are told by Defendants that videos

are eliminated ~~from~~by "Restricted Mode" when they include specific pieces of content, including

content (1) talking about drug use or abuse, or drinking alcohol in videos; (2) overly detailed

conversations about or depictions of sex or sexual activity; (3) graphic descriptions of violence,

violent acts, natural disasters and tragedies, or even violence in the news; (4) videos that cover

specific details about events related to terrorism, war, crime, and political conflicts that resulted in

death or serious injury, even if no graphic imagery is shown; (5) inappropriate language, including

profanity; and (6) video content that is gratuitously incendiary, inflammatory, or demeaning towards

an individual or group.

191.194.      **145.** In reality Defendants' definition of "Restricted Mode" is applied in a

significantly over inclusive and under inclusive manner, which has caused significant damage to

Plaintiffs and ~~other persons similarly situated~~ members of the Race Discrimination Class.  Even the

most simple examination of Plaintiffs' videos subject to "Restricted Mode" shows that Defendants

are not only dead wrong in their representations to the public concerning African American videos

that Defendants subject to the "Restricted Mode" stamp of disapproval, but Defendants are hiding

from the public valuable content and are doing so in bad faith.

192.195.      **146.** To the extent that videos which have titles or tags which include

"abbreviations like "BLM," "KKK"," terms such as "Black," "White," "Racism," "Boogaloo,"

"White Supremacy," "Racial Profiling," "Police Shootings," "Police Brutality," "Black Lives

Matter"," names of individuals such as those killed by law enforcement, "Bill Cosby," "Louis

Farrakhan"," names of organizations such as "Ku Klux Klan," "Nazi," "Neo-Nazi," "Aryan

Brotherhood," and/or other euphemisms that are known and particular to the African American

~~Community~~community," Defendants apply the "Restricted Mode" filter to these videos and limit

viewer access to many compliant videos posted by Plaintiffs and ~~other persons similarly situated~~

**REVISED SECONDTHIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

members of the Race Discrimination Class, which contain content of interest to the African American community.  Defendants do so, despite the fact that the videos do not contain materials which discuss drug use or abuse or drinking alcohol; overly detailed conversations about or depictions of sexual activity; graphic depictions of violence, violent acts; natural disasters or tragedies or violence in the news; specific details about events related to terrorism, war, crime and political conflicts that resulted in death or serious injury even if no graphic imagery is shown; inappropriate language, including profanity, or content that is gratuitously incendiary, inflammatory, or demeaning toward an individual or group.

193.196.    147. Defendants effectively use "Restricted Mode" as a damper to quiet the voices of Plaintiffs and other persons similarly situated members of the Race Discrimination Class, from being heard by all YouTube users and to limit Plaintiffs' reach, thereby preventing them from growing their channels, increasing subscribers and viewers, generating revenue, and meeting minimum participation standards to qualify for Defendants' other benefits such as YouTube partnership, Channel Membership, Mobile Streaming channel membership, mobile streaming and SuperChat.

194.197.    148. Once Defendants apply "Restricted Mode" to a video, Plaintiffs and other persons similarly situated members of the Race Discrimination Class are then forced to spend time and effort to appeal Defendants' decision and persuade a human being to actually look at the content of the video.  Even when the appeal is won, Plaintiffs and other persons similarly situated members of the Race Discrimination Class lose the opportunity to generate interest in and revenue from the new video for a period of weeks to months, and to thereby grow their channel during the period that the video is restricted.  Defendants never compensate for the erroneous application of "Restricted Mode," regardless of the length of time it takes for Defendants to actually review the restricted video content.

195.198.    149. Defendants impose these restrictions to justify anticompetitive and unlawful actions intended to gain a competitive advantage for their own video content and/or to ensure that their sponsored creators, content partners, and advertisers have an unfair competitive advantage in the YouTube video market.  By placing no restrictions on the monetization of their own

REVISED SECOND THIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES

videos or those of Defendants' sponsored creators, content partners and preferred advertisers, Defendants gain a competitive advantage by restricting the financial reach of Plaintiffs and other disfavored users, while simultaneously ensuring that their own video content (and those of their sponsored creators, content partners and preferred advertisers) are not subjected to the same (or any) Advertising Restrictionsadvertising restrictions.

196.199.      150. Defendants also impose these restrictions to facilitate their advertising practices, whereby they profile videos by the race, identity and viewpointethnicity or other protected identities of creators, subscribers and viewers so as to identify the videos with the most valuable demographics which command the highest prices from most advertisers, without regard to whether there are any advertisers whichthat are willing to purchase spots associated with videos posted by Plaintiffs and other persons similarly situated members of the Race Discrimination Class.

197.200.      Whether Defendants are using identity based A.I., algorithms, filters and automated systems that reflect race, for profit in order to save money on curation and filtering costs, or to appease racist advertisers and preferred content creators, make no difference.  Defendants' use of race to determine access and service restrictions violates the TOS, as well as long standing rules and law that prohibit disparate treatment of Plaintiffs and members of the Race Discrimination Class, based on race, ethnicity or other protected identities.  *See* Wu Dec. para. 9-16.

198.201.      151. Defendants' actual practices unlawfully provide Defendants with monopoly power over the video posting and viewership market, the video advertising market, and the ability to manipulate, bully, and falsely denigrate legitimate YouTube users, like Plaintiffs and other persons similarly situated members of the Race Discrimination Class, by subjectively designating their speech as "inappropriate," because Defendants do not like or agree with the speakers' race, identity or point of view;, or because Defendants are too cheap to actually review the videos posted to the platform, and desire to rely on inexpensive A.I., algorithms, and other filtering tools for purposes of selling advertisements and curating videos on YouTube.

     **5.**      4. **Shadow Banning Channels And Videos**

199.202.      152. Defendants treat videos that present or discuss serious issues and current events that are important to the communities of the Plaintiffs and all other persons similarly

1  ~~situated~~members of the Race Discrimination Class as "not family friendly," and as if they are

2  inappropriate for all audiences simply because they were uploaded by creators whose ~~races~~race,

3  ~~identities, and/~~ethnicity or ~~viewpoints are~~other protected identity is disfavored by Defendants.

4  Defendants are not merely removing, restricting access to or limiting monetization for videos posted

5  by Plaintiffs and ~~all other persons similarly situated~~a members of the Race Discrimination Class,

6  Defendants are making those videos, and some channels invisible on the YouTube ~~Platform~~platform,

7  despite the fact that the videos comply with all of Defendants' Community Guidelines and TOS.

8       ~~200.~~203.        ~~153.~~In shadow banning videos, Defendants effectively prevent Plaintiffs'

9  subscribers and potential viewers from locating new videos which discuss issues and current events

10 that are followed by the African American community~~; by~~.  By excluding such videos from the

11 YouTube search function on the platform, Defendants are preventing creators like Plaintiffs and ~~all~~

12 ~~other persons similarly situated~~members of the Race Discrimination Class from growing their

13 channels by securing the necessary subscriber and viewer numbers required to qualify for

14 Defendants' special programs and perks, such as YouTube partnership, channel membership, mobile

15 Livestreaming, or SuperChat applications, and are preventing them from generating revenue from

16 their videos.

17       ~~201.~~204.        ~~154.~~Defendants also shadow ban entire channels belonging to Plaintiffs and

18 ~~other similarly situated persons,~~members of the Race Discrimination Class by making the channels

19 unsearchable on the platform.  Without a link to Plaintiffs' channels, subscribers and viewers cannot

20 access Plaintiffs' videos.  As a result of shadow banning of channels, many Plaintiffs and ~~other~~

21 ~~persons similarly situated~~members of the Race Discrimination Class can only attract new subscribers

22 or viewers by "word of mouth," and referrals from other members of their community, or from other

23 social media platforms where links to Plaintiffs' YouTube channels are posted.

24       ~~202.~~205.        ~~155.~~Defendants' shadow bans not only impair the growth of channels

25 belonging to, and revenue generated from videos posted by, Plaintiffs and ~~other persons similarly~~

26 ~~situated~~ members of the Race Discrimination Class, Defendants' conduct both effectively reduces

27 the audience for videos posted by Plaintiffs and muffles their voices across the platform, making it

28 impossible for new YouTube viewers to locate video content that is important to their specific

1    communities.  As a result, Plaintiffs, as African American creators, and ~~other persons similarly~~

2    ~~situated~~ members of the Race Discrimination Class, cannot expand subscriber and viewer numbers

3    sufficient to grow their channels and fully enjoy full access to the YouTube platform and all of the

4    benefits Defendants offer others.

5              **6.     ~~5.~~ Delegating Content Review And Regulation To Racists And White**
               **Supremacists**

6

7    ~~203.~~206.     ~~156.~~ Defendants have configured the YouTube platform to allow any user to

8    "report" or "flag" videos which they believe violate the Google/YouTube Community Guidelines or

9    TOS, e.g., video content which contains hate speech, nudity, profanity, graphic depictions of

10   sexuality or violence, disparaging remarks, content which violates existing copyrights or trademarks

11   held by persons other than the creator posting the video, or descriptions of violent events and scenes

12   which may disturb younger or more sensitive viewers.  Defendants not only allow users to "report" or

13   "flag" videos posted by Plaintiffs and ~~other persons similarly situated~~members of the Race

14   Discrimination Class, Defendants take action based on those third- party reports and flags and

15   proceed to remove, restrict, and/or demonetize individual videos; issue community "strikes~~;~~"; and to

16   suspend, and/or remove whole channels of Plaintiffs and ~~other persons similarly situated~~members of

17   the Race Discrimination Class.  Defendants do so without first verifying that the flagged video

18   violates a specific Community Guideline or Term of Service.  In effect, Defendants deputize

19   YouTube users, including racists, sexists, white supremacists, Neo-Nazis, and other hate speech

20   trolls.  These delegated and affiliated users~~,~~ exercise censorship powers on YouTube, including

21   reporting, flagging, bullying and threatening creators whenever Plaintiffs and ~~other persons similarly~~

22   ~~situated~~members of the Race Discrimination Class post content with which Defendants' racist agents

23   disagree.

24   ~~204.~~207.     ~~157.~~ In allowing third parties to wield the power to report or flag a video as

25   violating the applicable Community Guidelines and TOS, Defendants have deprived Plaintiffs and

26   ~~other persons similarly situated,~~members of the Race Discrimination Class of equal access to the

27   YouTube platform and all of the services Defendants make available to others by creating the

28   presumption that any flagged video does in fact contain content which violates the Community

1  Guidelines and/or TOS.  After being flagged by a third party, Plaintiffs and ~~other persons similarly~~

2  ~~situated~~members of the Race Discrimination Class are forced to spend substantial time and effort to

3  appeal the flag in order to restore the channel/video, remove the restriction, or obtain full

4  monetization for channel/video, which, but for the flag, would have reached a wide audience and

5  would have generated substantial revenue.

6  ~~205.~~208.    ~~158.~~ Because of Defendants' conduct and practices, trolls regularly appear on

7  the channels of Plaintiffs and ~~other persons similarly situated~~members of the Race Discrimination

8  Class, threaten to shut down the channels – and within a few days, the trolls succeed in getting

9  Defendants to suspend the channels.  As a result, Plaintiffs and ~~other persons similarly~~

10  ~~situated~~members of the Race Discrimination Class engage in self- censorship and avoid posting

11  videos that address issues of historical, political, cultural, and educational significance to their

12  communities.  Recently, Plaintiffs and ~~other persons similarly situated~~members of the Race

13  Discrimination Class have avoided timely topics such as the denial of Covid-19 testing and treatment

14  to African American healthcare workers, the inability of African American businesses to apply for

15  CARE loans, and the disparate enforcement of stay at home orders against African American

16  communities.  Defendants' conduct therefore encourages and enables the agendas of racists, white

17  supremacists, and Neo-Nazis on YouTube, by silencing the voices of Plaintiffs and ~~other persons~~

18  ~~similarly situated~~members of the Race Discrimination Class.

19  ~~6.    Interfering With Individual Video Viewing~~

20  ~~159.    Livestream broadcasts are videos that are posted in a streaming live format which are~~

21  ~~controlled exclusively by creators or by the moderators designated and authorized by individual~~

22  ~~creators to review, edit, and remove viewer comments which appear as the video progresses over~~

23  ~~time.  Livestream broadcasts allow real time viewer participation in discussions on YouTube~~

24  ~~channels and often involve hundreds of people all making comments regarding important issues,~~

25  ~~current events, or topics.  YouTube's Livestream broadcast application allows the video creator and~~

26  ~~her designated moderators to control the content of the broadcast.  They control the viewer~~

27  ~~participation in the comments section of the screen while the Livestream is played.~~

28

160.   Defendants routinely restrict viewer access to and revenue generation from videos posted by Plaintiffs and other persons similarly situated, depressing subscriber and viewer numbers. Many African American channels do not generate significant income from advertising or Channel Membership.  They must rely on other applications to generate revenue, such as Defendants' SuperChat, and Livestream or Patreon Donations.  As a result, Livestream broadcasts are a primary revenue generator for Plaintiffs.

161.   Defendants regularly interfere with the Livestream broadcasts by Plaintiffs and all persons similarly situated, using either YouTube employees or independent contractors which Defendants hire.  Defendants' Livestream interference includes such tactics as:  (a) stopping Livestream broadcasts, and forcing the creator to restart the broadcast, resulting in lost viewers, low watch times and irritated subscribers; (b) throttling (intentionally slowing ) broadcasting speeds during Livestream which distorts or interrupts the audio feed, and disrupts or interrupts viewer comments being input to the video on Plaintiffs' channel; (c) inserting new voice content and/or visual images into the video which are entirely unrelated to the decisions and choices of the channel creator and her chosen moderators, and are offensive, threatening, bullying, misogynistic, racist, and/or obscene; (d) removing positive comments from viewers; and (e) disconnecting individual viewers who are in the process of leaving positive comments, thereby silencing viewers who would otherwise support the video or make monetary donations on the Livestream broadcast.

162.   For the past two years, until stay at home orders for nonessential businesses were imposed in the Bay Area in March of this year, Defendants' Livestream broadcast interference was relentless, causing Plaintiffs either to suspend Livestream broadcasts, to self-censor and refrain from discussing issues or current events of interest to the African American community, or to conduct them at odd hours without prior announcements.  Defendants' conduct in interfering with Livestream broadcasts has reduced subscriber and viewer numbers for the channels of Plaintiffs and other persons similarly situated, has reduced revenue generated from Livestream broadcasts and from the channels overall, and has prevented the African American community from receiving information about and discussing issues and current events which are important to members of that community.

1    163.    Notably, for the weeks while stay at home orders were in place for the Bay Area,

2    Plaintiffs were able to conduct Livestream broadcasts unmolested.  However, Defendants'

3    interference has recommenced with the lifting of stay at home orders.  Defendants' interference is

4    now ongoing.

5    164.    Similarly, for the videos uploaded to Plaintiffs' channels that can be watched at any

6    time, through YouTube employees or independent contractors which Defendants hire, Defendants

7    (a) interrupt the video, and forcing the viewer to restart the video, resulting in lost viewers, low watch

8    times and irritated subscribers; (b) throttle the video as the viewer watches which distorts or

9    interrupts the audio feed, and disrupts or interrupts the visual images that the viewer sees; (c) insert

10   new audio content (e.g., noises, static, sounds such as honks, beeps, bumps, and barks) and/or visual

11   images into the video which are entirely unrelated to the decisions and choices of the channel creator,

12   give the impression that the video has low production values, and are annoying, irritating or

13   confusing to the viewers; and/or (d) prevent viewers from "liking" the video.  Defendants'

14   interference causes viewers to shorten their watch times, refrain from subscribing to Plaintiffs'

15   channels, and watch fewer of Plaintiffs videos; which in turn prevents Plaintiffs from qualifying for

16   all of the benefits which Defendants offer on the YouTube platform, and reduces revenue generated

17   by Plaintiffs' videos and channels.

18          **7.    Viewer Muzzling**

19          206.209.    Defendants also use aggregated personal data and other identity based

20   classification to target African American and Hispanic viewers in order to discourage viewer

21   engagement, video reach and the likelihood of new content going viral on the platform.  Because

22   Defendants' aggregate personal data across their platforms and use that personal data to identify

23   users by race, as well as other personal identifying characteristics, Defendants can and do target

24   viewers by race and interfere with their engagement with creators.

25          207.210.    Rather than allowing creators to moderate the viewer comments to videos on

26   their channels, for viewers who are African American and Hispanic, Plaintiffs have observed

27   Defendants removing individual comments to videos in real time while the viewers are inputting

28   them in the comments section on the screen, before the comments are complete.  Defendants also

1   prevent some African American and Hispanic viewers from making comments at all.  Plaintiffs have

2   received emails and complaints from their subscribers stating that when they attempt to input

3   comments to Plaintiffs' new videos, no comments appear, though Defendants have not notified these

4   subscribers that their access to comments has been suspended or terminated,  for specific channels

5   and videos on the platform.

6        208.211.        In addition to unsubscribing viewers who have subscribed to the channels of

7   African American and Hispanic creators, Defendants unsubscribe African American and Hispanic

8   viewers who subscribe to the channels of other creators, so that they no longer receive notification

9   when new content is posted to their chosen channels.

10        209.212.        To the extent that individual viewers have requested email notifications when

11   new content is posted to their chosen subscribed channels, when African American and Hispanic

12   channel subscribers use Google's Gmail, subscribers do not receive email notifications at all:  The

13   email notices from YouTube creators to African American and Hispanic subscribers are either

14   automatically delivered to the delete folder or to the SPAM or junk email folder.  African American

15   and Hispanic channel subscribers are unable to change their Gmail settings to authorize delivery of

16   their YouTube channel email notifications regarding recently posted content.

17        210.213.        Because Defendants' artificial intelligence algorithm, filters and automated

18   systems determine that Plaintiffs' channels and individual videos are not "advertiser-friendly," and

19   do not generate revenue, Plaintiffs have turned to third party sources to generate funds on

20   Defendants' platform, such as Patreon.  Plaintiffs have received communications from African

21   American and Hispanic viewers confirming that payments were made and supplying screenshots

22   demonstrating that viewers had made payments to Plaintiffs which either were delayed weeks before

23   the funds were deposited into Plaintiffs' accounts or were never deposited.

24        211.214.        Defendants' efforts to silence African American and Hispanic viewers, and to

25   keep them from making comments on YouTube channels, prevent them from supporting and

26   watching new content on their favorite subscribed channels, and to prevent them from financially

27   supporting their favorite channels effectively discourages viewers from generally participating on

28   Defendants' platform, thereby dampening the strength, vigor and diversity of opinions from the

1  African American and Hispanic communities on YouTube; but it also specifically discourages those

2  viewers from supporting African American and Hispanic content and channels that reflect the

3  viewers' own values, culture and beliefs.  Defendants' silencing tools isolate minority subscribers

4  and creators, creating poor digital ghettoes on the platform where African Americans and Hispanics

5  must struggle to communicate with and support one another.  .  *See* Safiya Umoja Noble,

6  "Algorithms of Oppression," Apple Books;

7  https://books.apple.com/us/book/algorithms-of-oppression/id1327926683.

8          **8.**   7. **Ad Bombing**

9      212.215.    **165.** Because Defendants demonetize or limit monetization for many, if not

10  most, of the videos which are uploaded by Plaintiffs and all persons similarly situated, videos which

11  Defendants fully monetize constitute a rare opportunity for generating revenue.  When Plaintiffs

12  upload new videos of substantial interest to the African American Communitycommunity and/or

13  other English or Spanish speakers throughout the world, there is a limited window of opportunity for

14  the video to generate a large number of views and go "viral."  Defendants have a new tool to dampen

15  and reduce views for new fully monetized videos:  Defendants repeatedly play multiple streaming

16  and banner ads which run at intervals of every 2, 3, 4 or 5 minutes, without authorization from the

17  YouTube creator.  For a video that is between 5 and 20 minutes, the constant interruption of the video

18  flow makes it difficult to watch.  Defendants are inserting anywhere from 3 to 10 streaming ads, and

19  corresponding banner ads which pop up on viewers' screens for videos under 20 minutes long.

20  Sometimes the ads are playing for a significant portion of the video's total watching time.  Ad

21  bombing annoys, irritates and alienates viewers watching videos and gives a false impression that

22  Plaintiffs are greedy and using their videos and channels to make money at the expense of their

23  subscribers and viewers.  Ad bombing results in viewers exiting from videos without watching them

24  to the end, viewers who are dissatisfied with the video and do not "like" the video or subscribe to

25  Plaintiffs' channels; which in turn prevents new videos from going viral and causes lower reported

26  view numbers for the videos and Plaintiffs' channels, lower reported watch times, lower reported

27  subscribers, lower revenue and fewer YouTube creators who qualify for all of the benefits that

28  Defendants offer on the platform.

**9.** 8. **Excluding Videos From "Trending" And "Up Next" Video Recommendations**

213.216.     166. Defendants routinely exclude videos posted by Plaintiffs and all persons similarly situated from YouTube's "Trending" and "Up Next" Recommendations which appear on users' screens when they watch videos on YouTube.  While Defendants exclude the videos of Plaintiffs and other persons similarly situated members of the Race Discrimination Class, they include in the "Trending" and "Up Next" applications both reaction videos which copy, pirate, or parody the videos of Plaintiffs, and videos which violate Defendants' Community Guidelines and/or TOS in so far insofar as the videos contain hate speech, obscene, misogynistic, violent, threatening, or disparaging content which is directed specifically at Plaintiffs and other persons similarly situated members of the Race Discrimination Class.  Defendants have continued to include these videos posted by third parties over the repeated flags, written objections, and complaints by Plaintiffs and their subscribers, and they have fully monetized many such videos despite having received flags, objections and complaints that the videos violate Defendants' Community Guidelines and TOS.

**10.** 9. **"Up Next" Flooding**

214.217.     167. Defendants publish on the YouTube channels of Plaintiffs and all persons similarly situated "Up Next" video recommendations that appear on viewers' screens as they watch videos on YouTube.  The recommendations appear in the form of a list of video thumbnails with the video titles and names of the channels where they are uploaded.  A viewer can watch the videos that Defendants recommend simply by clicking on the thumbnail or by setting YouTube to automatically play the recommended videos.

215.218.     168. Defendants claim that the "Up Next" video recommendations are (a) similar or related to the video which is being watched; (b) from channels to which the viewer has subscribed; (c) are from channels which post videos that are similar to videos posted by other channels to which the viewer has subscribed,; or (d) are similar to other videos which the viewer has historically watched on YouTube.

216.219.     169. For Plaintiffs and all persons similarly situated, Defendants regularly publish long "Up Next" lists featuring numerous individual videos that are entirely unrelated to the

1  video being watched, are not from subscribed channels or similar ones, are dissimilar to anything

2  watched previously by the viewer, and/or are annoying, irritating or offensive to the viewer.

3  Defendants regularly publish "Up Next" lists recommending videos that are (a) uploaded to channels

4  which the viewer has previously indicated that she does not want to see; (b) associated with channels

5  of creators who make racist, derogatory and/or abusive content directed at the African American

6  ~~Community~~community; and/or (c) racist, derogatory, bullying, threatening and/or abusive to the

7  African American ~~Community~~community.

8       ~~217.~~220.    ~~170.~~ Defendants often publish "Up Next" video recommendations for the

9  channels of Defendants' preferred partners such as Fox News and its affiliates, or Defendants' own

10  channels such as YouTube Movies, in essence transforming "Up Next" into free advertising for

11  Defendants and their preferred partners at the expense of irritating, offending, and alienating the

12  subscribers and viewers of Plaintiffs and all persons similarly situated~~.~~.

13       ~~218.~~221.    ~~171.~~ Plaintiffs' subscribers and viewers have left numerous comments

14  complaining about Defendants' "Up Next" practices.

15       ~~219.~~222.    ~~172.~~ Defendants' "Up Next" flooding causes Plaintiffs' subscribers to stop

16  watching videos, refrain from watching videos uploaded to Plaintiffs' channels, to refrain from

17  subscribing to Plaintiffs' channels, and even to "unsubscribe" from Plaintiffs' channels.  "Up Next"

18  flooding causes lower reported views for videos and channels, lower watch times, lower reported

19  subscriber numbers and ultimately, lower revenue paid to Plaintiffs.

20          **11.**   ~~10.~~ **Promoting And Profiting From Hate Speech**

21       ~~220.~~223.    ~~173.~~ Defendants regularly promote and monetize hate speech targeting

22  Plaintiffs and all persons similarly situated on the YouTube platform in direct violation of

23  Defendants' Community Guidelines and TOS, and ignore repeated flags, reports and complaints

24  regarding those videos.

25       ~~221.~~224.    ~~174.~~ Many hate speech videos targeting the African American community on

26  YouTube include identifying information regarding Plaintiffs and ~~other persons similarly~~

27  ~~situated~~members of the Race Discrimination Class, including without limitation their telephone

28  numbers, residential addresses, registered trademarks, original copyrighted material, or personal

likenesses, in direct violation of Defendants' Community Guidelines and TOS.  Plaintiffs and other persons similarly targeted on the YouTube platform have followed Defendants' published procedures to remove the hate speech, including flagging the videos, reporting the violations of Defendants' Community Guidelines and Terms of Use by email, and sending follow up emails complaining of both the videos and the channels on which the videos are posted.  The subscribers of Plaintiffs have reported that they too have flagged, reported and written follow up emails to Defendants complaining of the hate speech videos and their related channels.

222.225.        175.  Despite having received repeated, multiple flags, reports and written complaints over a period of months concerning specific hate speech videos posted by Defendants' favored partners, Defendants have refused to do anything to enforce their own published Community Guidelines and TOS and have not removed the videos or suspended the channels posting such videos. To this day, many hate speech videos remain posted without restriction, and remain fully monetized to generate revenue for their creators, despite having content that is patently false, racist, and/or sexist, violent, abusive or obscene.  Some of the hate speech videos include threats of bodily harm or death specifically directed at the Plaintiffs and other persons similarly situatedmembers of the Race Discrimination Class.  Some hate speech videos are posted in a way that falsely indicates that it was posted by Plaintiffs.

223.226.        176.  Among the many YouTube channels which Defendants insulate forfrom enforcement of Community Guidelines and TOS, the channels of Tommy Sotomayor and Candace Owens particularly stand out for their hateful, racist, and misogynist video content.  Tommy Sotomayor regularly posts videos which promote violence against members of the African American community.  Candace Owens regularly posts videos disparaging male members of the African American community.  Though Plaintiffs, their subscribers and other persons similarly situated repeatedmembers of the Race Discrimination Class repeatedly flagged, reported and complained about these two channels and their posted videos, as wellswell as their trolls who engage in abusive, bullying conduct directed to YouTube users who mention Sotomayor or Owens, Defendants nonetheless regularly include videos posted by Sotomayor and by Owens in the "Trending," and "Up

Next" recommendation applications on the screens of African American viewers.  Defendants have rendered "flag proof" the channels of Sotomayor and Owens, and videos posted there.

224.227.     177. Defendants' refusal to enforce their own Community Guidelines and TOS equally to all YouTube users to eliminate hate speech videos; Defendants' continued promotion of hate speech videos by including them in the "Trending," and "Up Next" applications; and Defendants' continued monetization of hate speech videos and profiting from the sale of advertisements in connection with such videos have substantially reduced racial diversity on the YouTube platform and have endangered YouTube users like Plaintiffs and other persons similarly situatedmembers of the Race Discrimination Class.  Defendants' conduct has stifled the voices of Plaintiffs and other persons similarly situatedmembers of the Race Discrimination Class, who are unable to reach their intended audiences or to post videos which address or discuss issues and current events of concern to the African American community because, while Plaintiffs' compliant videos are wrongly removed, restricted and demonetized as "hate speech," Defendants protect, promote and profit from vile, vicious, hate speech, and personal attacks on Plaintiffs and other persons similarly situatedmembers of the Race Discrimination Class.  Plaintiffs have received harassing telephone calls and written communications, forcing them to change their telephone numbers and to move from their homes.  They have also lost subscribers, viewers and revenue as a result of Defendants' failure and refusal to enforce their own Community Guidelines and TOS equally on all YouTube users.

### 12.     11. Interfering With, Obstructing, Ignoring And Delaying Appeals

225.228.     178. Following Defendants' actions to limit monetization or demonetize a video, or to remove or restrict a video, or to issue a strike against or to suspend a channel, Plaintiffs and other persons similarly situatedmembers of the Race Discrimination Class are forced to spend time and effort to appeal Defendants' decision and to persuade a human being to actually look at the otherwise compliant video(s) in question.  Often, appeals by Plaintiffs and other persons similarly situatedmembers of the Race Discrimination Class drag on for months before Defendants respond to the appeal, but .  Defendants often do not even respond to Plaintiffs' appeals and either ignore them entirely or confirm the action out of hand, without having a human being review the video content

1   that was the basis for Defendants' actions.  In reality, Plaintiffs and ~~other persons similarly~~

2   ~~situated~~members of the Race Discrimination Class often have no real appeal at all.

3   226.229.          179. On those rare events when an appeal filed by Plaintiffs or ~~other persons~~

4   ~~similarly situated are~~members of the Race Discrimination Class is successful, after a human being

5   actually ~~review~~reviews the video content in question and concludes that Defendants' action was

6   wrongly imposed, Defendants do not reimburse the creator for lost revenue from the video(s) or the

7   channel during the appeal process.  Defendants therefore have a perverse incentive built in to their

8   platform regulation, filtering and curation process:  by automating the application of "Restricted

9   Mode," the monetization limitation process, and authorizing members of the YouTube community to

10  flag videos and channels, following, which Defendants automatically rely and act on those flags

11  without first verifying videos/channels are in violation of Community Guidelines or TOS,.

12  Defendants don't have to pay the affected creators for the use of their video content, and can

13  withhold payment unless and until a ~~success~~successful appeal occurs.  At each step of the appeal

14  process, Defendants continue to withhold payment of revenue generated by the affected videos,

15  profiting from their own improper decisions.  Defendants absolutely control the process:  they can

16  ignore an appeal, delay the process by weeks, months or even years, or simply confirm the adverse

17  action without ever examining the offending video content—there. There is no oversight, no higher

18  authority, no way to force Defendants to follow their own Community Guidelines or TOS.

19  227.230.          180. Defendants routinely exclude videos posted by Plaintiffs and all persons

20  similarly situated from YouTube's "Trending" and "Up Next" ~~Recommendations~~recommendations

21  which appear on users' screens when they watch videos on YouTube.  While Defendants exclude the

22  videos of Plaintiffs and ~~other persons similarly situated~~members of the Race Discrimination Class,

23  they include in the "Trending" and "Up Next" applications both reaction videos which copy, pirate,

24  or parody the videos of Plaintiffs, and videos which violate Defendants' Community Guidelines

25  and/or TOS ~~in so far~~insofar as the videos contain hate speech, obscene, misogynistic, violent,

26  threatening, or disparaging content which is directed specifically at Plaintiffs and ~~other persons~~

27  ~~similarly situated~~members of the Race Discrimination Class.  Defendants have continued to include

28  these videos posted by third parties over the repeated flags, written objections, and complaints by

1   Plaintiffs and their subscribers, and they have fully monetized many such videos despite having

2   received flags, objections and complaints that the videos violate Defendants' Community Guidelines

3   and TOS.

4           **H.**   ~~E.~~ **Defendants Have Violated And Continue To Violate The Rights Of Plaintiffs**
    **And The Race Discrimination Class**

5

6           **1.**   **Kimberly Carleste Newman**

7   ~~228.~~231.   ~~181.~~ Plaintiff Newman has been a registered YouTube user since 2015,

    creating and posting approximately 1,654 videos on her "The True Royal Family" YouTube channel;

8   and, since 2016, creating and posting 209 videos on her "True Royal" YouTube channel.  Plaintiff

9   Newman is an African American woman who identifies as such.

10

11  ~~229.~~232.   ~~182.~~ Plaintiff Newman makes and posts videos that discuss and present

    information regarding issues and current events which are important to the African American

12  community, from a Black perspective.  While her videos are pro- Black, they are not intended solely

13  to inform and entertain the African American ~~Community~~community; they are suitable for members

14  of other communities who are sympathetic to or curious about issues and current events as perceived

15  from a Black perspective.  "The True Royal Family" channel has generated approximately 1 million

16  views annually.  The "True Royal" channel has generated approximately 200,000 views annually.

17  Notwithstanding the substantial annual viewer numbers generated by her channels, Plaintiff

18  Newman has only generated total revenues of $2,672.68 for videos posted on "The True Royal

19  Family," and $123.96 for videos posted on the "True Royal" channel.

20

21  ~~230.~~233.   ~~183.~~ Plaintiff Newman is informed and believes that Defendants have

    gathered extensive information in order to generate metadata and then insert, embed, append, or

22  associate such metadata with the videos posted to "The True Royal Family," and "True Royal."

23  Defendants gathered information regarding her race (Defendants know that Plaintiff Newman is an

24  African American woman); that she makes and posts videos which have as a subject, relate to or

25  discuss issues and current events that are important to members of the African American community;

26  her subscribers either self-identify as members of the African American community or watch many

27  videos posted by other creators who have self- identified as members of the African American

28

**~~REVISED SECOND~~THIRD AMENDED CLASS ACTION COMPLAINT ~~FOR DECLARATORY JUDGMENT,~~**
**~~RESTITUTION, ACCOUNTING AND DAMAGES~~**

1   community; and many of those who view her videos either self- identify as members of the African

2   American community or watch videos posted by other creators who have self-identified as members

3   of the African American community.

4   231.234.        184. Plaintiff Newman is informed and believes that Defendants have applied

5   "Restricted Mode" and have limited monetization for videos she posted to "The True Royal Family"

6   and "True Royal" because Defendants have a policy and practice of using A.I., algorithms, and other

7   filtering tools to classify, curate, censor, and sell advertisements for YouTube videos based on

8   metadata Defendants create from information regarding the race, ethnicity or other protected identity

9   and viewpoint of creators, subscribers and viewers, rather than the content of the videos posted to the

10  YouTube platform.

11      232.235.        185. Defendants have applied "Restricted Mode" and have limited

12  monetization to nearly all of the videos which remain visible to viewers on "The True Royal Family,"

13  and to nearly all of the videos posted to "True Royal," despite the fact that each of the videos fully

14  complies with all of Defendants' Community Guidelines and TOS, and contain no nudity, sexualized

15  scenes or language, graphic depictions of sex or violence, drug abuse, or alcohol consumption.

16  Defendants have applied "Restricted Mode" to most of the videos posted, and have allowed only very

17  limited monetization for some videos, without any explanation or rationale for doing so.  Plaintiff

18  Newman is informed and believes that the sole reason that Defendants have acted in this fashion is

19  that Defendants discriminate against Plaintiffs and other persons similarly situatedmembers of the

20  Race Discrimination Class based on race, e.g., the videos were created by an African American; the

21  videos relate to issues and events of concern to the African American community, and the videos are

22  viewed by large numbers of members of the African American community.

23      233.236.        186. For various periods, off and on, throughout the past five years,

24  Defendants have shadow banned both individual videos posted by Plaintiff Newman, and her

25  channels, "The True Royal Family," and "True Royal."  Viewers have informed Plaintiff Newman

26  that they were unable to locate individual videos using YouTube search applications and terms such

27  as "Kimberly Santana," "The True Royal Family," "True Royal," or using as search terms the names

28  of individual videos posted by Plaintiff Newman.  Viewers have further informed Plaintiff Newman

1   that when they searched for "African American" video content, YouTube search applications

2   produced videos posted by Tommy Sotomayor consisting of hate speech and content which

3   disparages members of the African American ~~Community~~community.

4       ~~234.~~237.        ~~187.~~ Defendants do not provide any receipt or record of any kind when

5   YouTubers "flag," report, or complain about videos posted by other YouTube creators.  Because of

6   Defendants' practices regarding such YouTube users' efforts to obtain redress for violations of their

7   rights, individual creators like Plaintiffs and ~~other persons similarly situated~~members of the Race

8   Discrimination Class are not able to prove that they, in fact, flagged any individual video or channel.

9   For those users whom Defendants disfavor, the videos and channels are not automatically removed,

10  restricted or demonetized, and the injured YouTube user cannot prove that she flagged the

11  noncompliant or infringing video or channel.  Rather, disfavored users like Plaintiffs and ~~other~~

12  ~~persons similarly situated~~members of the Race Discrimination Class are left to make repeated written

13  reports and complaints regarding the noncompliant or infringing video or channel, often, to no effect

14  whatsoever.  Defendants merely ignore those written reports and complaints too.

15      ~~235.~~238.        ~~188.~~ Defendants flagged a video posted by Plaintiff Newman in which she

16  personally sings acapella a song written by Stevie Wonder on grounds that she was infringing the

17  copyright for the song.  Plaintiff's channel was suspended for two weeks for the purported

18  infringement.

19      ~~236.~~239.        ~~189.~~ In September 2019, a third party hacked "The True Royal Family"

20  channel and removed over 600 of Plaintiff Newman's videos so that neither the public nor Plaintiff

21  Newman could view, access, or download any of the videos or portions thereof.  Plaintiff Newman

22  promptly applied to Defendants, asking that they restore the videos to "The True Royal Family"

23  channel.  Defendants agreed to return the videos, but ~~has~~have not done so.

24      ~~237.~~240.        ~~190.~~ Months later, in 2020, rather than restoring the original 600+ videos,

25  Defendants removed another group of videos from the channel totaling more than 100 individual

26  videos.  Plaintiff Newman again appealed to Defendants to restore or return all of the 700+ missing

27  videos removed from "The True Royal Family," but Defendants have failed and refused to do so

28

~~REVISED SECOND~~THIRD AMENDED CLASS ACTION COMPLAINT ~~FOR DECLARATORY JUDGMENT,~~
~~RESTITUTION, ACCOUNTING AND DAMAGES~~

1  without any explanation as to why the original 600+ videos have not been restored, why the

2  additional 100+ videos were removed, or why they have not been restored or returned.

3  238.241.    191. Plaintiff Newman has been deprived of subscribers, viewers and revenue

4  from the 700+ missing videos for more than nine months.  Plaintiff Newman has followed

5  Defendants' online appeals process seeking the return of the missing videos as a whole, and

6  appealing the removal of numerous individual videos.  Plaintiff Newman has also filed repeat

7  appeals for the same videos.  However Defendants have not responded to her requests that they return

8  the missing videos to her channel and have done nothing to address her ongoing injury or lost

9  revenue.

10  239.242.    192. Defendants have used A.I., algorithms, and filtering tools to restrict the

11  reach of her videos and to prevent her from increasing subscriber and viewer numbers to grow her

12  channels and generate revenue.  For the past several years, the analytics page reflecting subscriber

13  and viewer numbers for "The True Royal Family" channel have remained steady, varying little from

14  month to month regardless of the number of new videos posted or the Livestream broadcasts.  To

15  avoid the impact of Defendant' A.I., algorithms and filtering tools on Defendants' metadata

16  generated from video titles and tags, Plaintiff Newman intentionally self-censors:  (a) she avoids

17  using controversial video titles; (b) she avoids using abbreviations like "BLM," "KKK";" terms such

18  as "Black," "White," "Racism," "Boogaloo," "White Supremacy," "Racial Profiling," "Police

19  Shootings," "Police Brutality," "Black Lives Matter;" names, such as those of individuals such as

20  those killed by law enforcement, "Bill Cosby," "Louis Farrakhan";" names of organizations such as

21  "Ku Klux Klan," "Nazi," "Neo-Nazi," "Aryan Brotherhood," and euphemisms that are known and

22  particular to the African American Community;community; and (c) she intentionally misspells terms

23  such as "Black," "White," "Race," "Racism," and "Racial Profiling," because Defendants routinely

24  flags such terms.

25  193.   Despite her efforts to self-censor and avoid the reach of Defendants' A.I., algorithms,

26  and filtering tools, most of the videos posted on "The True Royal Family" and "True Royal" have

27  only limited monetization, if any, and produce next to no revenue

28

240.243.      194. Despite her efforts to self-censor and avoid the reach of Defendants' A.I., algorithms, and filtering tools, most of the videos posted on "The True Royal Family" and "True Royal" have only limited monetization, if any, and produce next to no revenue.

241.244.      195. Plaintiff Newman has increasingly turned to Livestream broadcasts to generate revenue from her video content.  Viewers can make monetary donations to YouTube creators like Plaintiffs using SuperChat during Livestream broadcasts.  However, for the past two years, Defendants have been interfering with Livestream broadcasts on "The True Royal Family." Subscribers to "The True Royal Family" have informed Plaintiff Newman that their favorable comments have been interrupted or removed, they have been booted off of the Livestream or prevented from posting comments, and they have been prevented from making donations during Livestream broadcasts.  The subscribers' experiences, as related to Plaintiff Newman, involve conduct which is the exclusive province of the channel owner or their designated moderator(s). Plaintiff Newman had not designated any moderator for the Livestream broadcasts which were the subjects of subscriber complaints.  Defendants also have been throttling, interrupting and even cutting off Livestream video broadcasts in the middle of the event.  Additionally, Defendants have been inserting voice and visual content which blocks out that which Plaintiff Newman is posting live.

242.245.      196. Defendants' conduct during "The True Royal Family" Livestream broadcasts have reduced subscriber participation and interest in such events, have reduced new viewer participation, and have reduced the number and size of viewer donations to "The True Royal Family" channel depriving Plaintiff Newman of new subscribers and revenue.

243.246.      197. Plaintiff Newman has also experienced significant and extended bullying, harassment, disparaging remarks and threats of physical violence on YouTube, both in the form of trolls leaving comments on "The True Royal Family" channel, and in the form of abusive and threating videos posted by other YouTube creators.  Videos bearing Plaintiff Newman's name, and containing profanity and obscene content have been posted on the YouTube platform.  A video threating to kill her was also posted on the platform.  Such videos violate Defendants' Community Guidelines and TOS, and should be removed as such.  However, Defendants' A.I., algorithm, and other filtering tools not only failed to identify these violations of the applicable rules, but Defendants

1  failed and refused to respond to efforts by Plaintiff and her subscribers to flag the videos, or to written

2  reports and complaints regarding the disparaging and threatening videos, much less to enforce

3  Defendants' own public standards and remove the videos or suspend the channels responsible for

4  posting the videos.

5      244.247.      198. As a direct and proximate result of Defendants' racial discrimination and

6  wrongful conduct, "The True Royal Family" and "True Royal" have not substantially increased their

7  respective subscriber and viewer numbers in recent years.  Plaintiff Newman has suffered, and

8  continues to suffer from the loss of 700+ individual videos, improper application of Defendants' A.I.,

9  algorithms, and other filtering tools resulting in the shadow banning of her videos and her channels,

10  the misapplication of "Restricted Mode," the improper limitations on monetization for most of her

11  videos, violations of her intellectual property rights and personal disparagement and threats to her

12  person.  Defendants' conduct is willful, intentional and unlawful in discriminating against Plaintiff

13  based on her race, ethnicity or other protected identity and viewpoints, and those of her subscribers

14  and viewers in limiting access to the YouTube platform, related benefits, and opportunities to

15  generate revenue.

16      245.248.      199. For the past three years, Plaintiff Newman has observed that the view

17  numbers for individual videos and the channels, "The True Royal Family" and "True Royal," have

18  varied by 100-200 per month.  The subscribers rise and fall by 100-200 per month.  Given the

19  variations in the numbers of videos Plaintiff Newman posts from month to month, and the large

20  number of events and issues which have arisen in certain months that generate enormous interest in

21  the African American YouTube Communitycommunity, Plaintiff Newman is informed and believes

22  that the information which Defendants have reported on numbers of views and subscribers are

23  inaccurate and undercount the actual number of times viewers watch videos, and subscribe to "The

24  True Royal Family," and "True Royal."

25      246.249.      200. As a result of the Defendants' inaccurate reports of views and

26  subscribers, Plaintiff Newman is informed and believes that Defendants owe additional revenue to

27  her under the TOS.  Plaintiff Newman cannot determine the amount that Defendants in fact owe to

28  her based on the extremely limited data reported by Defendants.

## 2.    Lisa Cabrera

247.250.    201. Plaintiff Cabrera has been a registered YouTube creator since 2015 when she created the "Lisa Cabrera" channel.  Plaintiff Cabrera registered "Lisa Cabrera" as a trademark in connection with her YouTube channel.  4,423 individual videos have been posted to the "Lisa Cabrera" channel, 68 of those videos were archived by Defendants.  In the past two years alone, Plaintiff Cabrera has uploaded for public viewing in excess of 3,000 videos.  The "Lisa Cabrera" videos have generated more than 20 million views, with 830,000 views in just the past 28 days.

248.251.    202. Plaintiff Cabrera is a YouTube partner.  She creates and posts videos about current events and news on her channels, displaying pictures and news clips in her videos with original voice over commentary and narration accompanying the visual images.  Despite the substantial number of total and monthly views generated by the "Lisa Cabrera" channel, Plaintiff Cabrera has received only $25,500 total revenue from YouTube.

249.252.    203. Plaintiff Cabrera has long suspected that Defendants' reported views for the "Lisa Cabrera" channel, individual videos published on the channel, and revenue generated by the channel are inaccurate and underreported.  For the past three years, Plaintiff Cabrera has observed that the view numbers for individual videos and the channels, "Lisa Cabrera" and "Lisa C," have varied by 100-200 per month.  The subscribers rise and fall by 100-200 per month.  Given the variations in the numbers of videos Plaintiff Cabrera posts from month to month, and the number of significant events and issues regarding civil rights violations, law enforcement abuses, and disputes affecting the African American Communitycommunity, Plaintiff Cabrera is informed and believes that the information which Defendants have reported on numbers of views and subscribers are inaccurate and undercount the actual number of times viewers watch videos, and subscribe to "Lisa Cabrera," and "Lisa C."

250.253.    204. Recently, Plaintiff Cabrera observed additional inaccuracies in Defendants' reported views for a specific video.  On August 9, 2020, Plaintiff Cabrera uploaded and

marked as "unpublished"⁴⁵ a video entitled "White Americans Are More Comfortable with Getting A Covid -19 Vaccine ." She did not view the video after uploading or provide a link to the video for someone else.  Shortly after uploading the video, Defendants reported that the video had been viewed 4four times.

As of 6:09 a.m. on August 10, 2020, Defendants had reported 9 views for this "unpublished" video.



⁴⁵ "Un... on the Y... of the vi... status the vi... searching for the video on the YouTube platform.

REVISED SECONDTHIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES

Later that day, Defendants reported 9 views.



REVISED SECONDTHIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES

251. 254.          205. The video remains uploaded but "unlisted unpublished," and not available to the public.  To the extent that the video is "unlisted," Defendants' report of more than "0 views" is inaccurate.  Furthermore, if the Defendants' reported 10 views were accurate, and somehow people were watching the "unpublished" video, later reporting 9 views suggests that the earlier reported 10 views was wrong.  Based on these reports, Plaintiff Cabrera is informed and believes that Defendants' reports regarding numbers of views, subscribers and hours of viewing time are wrong.

252. 255.          206. Recently, Plaintiff Cabrera has noticed that Defendants' reported subscriber and viewer number numbers for "Lisa Cabrera" have markedly fallen.

      a.  In June, Defendants reported that "Lisa Cabrera" added more than 5,000 subscribers and 1.7 million views.



      b.  In July, Defendants reported that "Lisa Cabrera" added more than 8,000 subscribers and 1.7 million views.



1

2

3          c.          However, in August, for the first two weeks of the month, Defendants are

4   reporting that "Lisa Cabrera" added only 392 subscribers and 513,000 views.

5

6

7

8

9



19

20   253.256.          207. Based on the number of new videos added to "Lisa Cabrera" in August

21   and the numbers of new subscribers and viewers which "Lisa Cabrera" has generated historically,

22   Plaintiff Cabrera is informed and believes that Defendants' reporterreported subscriber and viewer

23   numbers for August are inaccurate at best and intentionally reduced or falsified at worst.  Given the

24   channel's historical performance and recent trends, by mid- August, the channel should have no

25   fewer than 4,000 new subscribers and 800,000 new views.

26   254.257.          208. Plaintiff Cabrera is informed and believes that the revenue for the

27   channel which Defendants have reported in August is inaccurate because it is based on inaccurate

28   subscriber and view numbers.  Defendants solely control access to the data upon which they calculate

subscriber numbers, view numbers and "watch time" for "Lisa Cabrera."  Without access to this data, Plaintiff Cabrera cannot calculate how much additional revenue Defendants owe to her.

255.258.       209. Defendants have deemed that most of the videos posted to "Lisa Cabrera" and "Lisa C" are inappropriate for most of the YouTube advertisers.  As a result, the vast majority of Plaintiff Cabrera's videos have no monetization or limited monetization; the videos produce little to no revenue, no matter how many views or CPM the individual videos generate. Defendants further reduce Plaintiff Cabrera's revenue from her channels by discouraging viewers from watching even those few monetized videos using a tool called "ad bombing," (loading multiple ads that repeatedly interrupt the flow of the video).  By way of example only, Defendants have "ad bombed" the following "Lisa Cabrera" videos in the past month:

a.     https://www.Youtube.com/watch?v=MNFjH67mW78, a video entitled "Ex-Minneapolis Officer Tou Thao Released," which is under 6six minutes long:  Defendants played a streaming ad and banner ad at the beginning of the video, and **interrupted the video 3three times to play 4four different streaming and banner ads**, and played 2two more streaming ads at the conclusion of the video—.  In all, Defendants played 7seven streaming ads in connection with this very short video;

b.     https://www.Youtube.com/watch?v=Y1l9U6PKuOk, a video entitled "Congress Plans to Move HR 40 with No Direct Payments," which is 10 minutes long:  Defendants interrupted the video at 2 minutes, 4 minutes, 6 minutes and 8 minutes by playing streaming and banner ads, as well as playing another 2 streaming and banner ads at the conclusion of the video – In all, Defendants played 6 ads in connection with this 10 minute video; and

c.  c. https://www.Youtube.com/watch?v=UlU0O66RWvw, a video entitled "50K+ New Covid-19 Cases 3 Days in a Row Trump Says," which is 16 minutes long:  Defendants interrupted the video at 3three minutes, 7seven minutes, 10 minutes and 13 minutes by playing streaming and banner ads every 3three minutes, as well as playing another two streaming and banner ads at the end of the video – In all, Defendants played 6six separate streaming ads in connection with this 16 minute video.

256.259.       Such repeated interruptions of new videos with streaming ads played at 2, 3 or 4 minute intervals throughout a relatively short video discourages viewers from watching videos to

1   the end and reduces Plaintiffs' reach and ability to generate buzz for their new videos, resulting in

2   shorter viewing hours, lower view numbers, reduced subscriptions for their channels, and prevents

3   new videos from going viral or earning full potential revenue from both ads and CPM.

4   257.260.      210. Another way that Defendants put a damper on Plaintiffs' new videos is to

5   delay access to new videos for hours after Subscribers receive notification that the new video has

6   posted.  Subscribers to "Lisa Cabrera" often have difficulty viewing new videos published by

7   Plaintiff Cabrera and must wait upwards of 12 hours for new videos to become available for viewing.

8   Plaintiff Cabrera's subscribers have posted comments like:  "Why are your videos saying you

9   uploaded 5+ hours ago or sometimes 11 and 12 hours ago. . .  But I get em as if you just uploaded like

10   two hours ago or way later.  This happens often lately . . . ."

11   258.261.      211. Defendants also use the "Up Next" recommendations which appear to the

12   right of Plaintiffs' videos when viewed to reduce interest in Plaintiffs' videos.  For African American

13   Plaintiffs, often the Defendants recommend in the "Up Next" column content that is entirely

14   unrelated to either the specific video being viewed on Plaintiffs' channels, unrelated or antithetical to

15   the Plaintiffs' African American YouTube community, or is Defendants' own product or produced

16   by one of Defendants' preferred content partners.  Plaintiff Cabrera's subscribers have posted

17   comments on "Lisa Cabrera," such as:

18   259.262.      212. "I am one of your Youtube subscribers and recently I was watching the

19   story about bubba [sic] Wallace finding a noose in his stall on Mainstream Media, anyways, then

20   youtube started to line my feed with unknown content creators that I am NOT subscribed to [sic]

21   these creators were basically making derogatory remarks about bubba and the noose incident . . . . .

22   So I was surprised that youtube did this type of practice in what appears to be intentional.  [sic] I get

23   many suggestions when I am looking for new videos to watch on yoga, etc [sic] Youtube often does

24   not suggest any African Americans. . . .  I am an avid watcher of youtube [sic]  I can attest that they

25   put out feed suggestions often that are not African Americans and even put out recommendations of

26   creators that I requested not to watch, oftentimes these creators either have derogatory comments

27   about African Americans or the creator is NOT African American. . . ."

28

260.263.         213. Defendants' practice of flooding "Up Next" with recommendations that undermine Plaintiff Cabrera's content, belittle the African American ~~Community~~community, or irritate African American subscribers to "Lisa Cabrera" irritates and even alienates channel subscribers, reduces viewing time, prevents viewers from leaving favorable comments and/or subscribing and prevents new videos from becoming viral and maximizing viewership and revenue.

261.264.         214. Defendants' video playing services are also substandard for African American channels like "Lisa Cabrera."  Often subscribers to "Lisa Cabrera" play videos that appear defective with flickering images, pixelated photos, and/or slashes through text.





LHK .

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





1665102.1

R

HK .

1

2

3

4

5    262.265.       215.  Often, subscribers to "Lisa Cabrera" ~~live stream~~Livestream videos see

6    videos that appear in slow motion, are interrupted with pauses not programmed by Plaintiff Cabrera

7    or are cut off entirely.  Sometimes subscribers' comments disappear as they are being typed on the

8    viewer's screen; other times, entire strings of comments disappear from ~~live stream~~Livestream

9    videos without Plaintiff Cabrera removing them.  Such substandard video services give viewers the

10   impression that Plaintiff Cabrera's videos are substandard and/or recorded with defective equipment;

11   alternatively, viewers may believe that Plaintiff Cabrera is deleting their comments because of some

12   personal animosity resulting in lower viewing times, less audience participation, fewer new

13   subscriptions and even cancellation of existing subscriptions to the channel.

14   263.266.       216. Plaintiff Cabrera is informed and believes that Defendants have gathered

15   extensive information in order to generate metadata and then insert, embed, append, or associate such

16   metadata with the videos posted to "Lisa Cabrera," and "Lisa C."  Defendants gathered information

17   regarding her race (Defendants know that Plaintiff Cabrera is an African American woman); that she

18   makes and posts videos which have as a subject, relate to or discuss news and current events that are

19   important to members of the African American community; her subscribers either self-identify as

20   members of the African American community or watch many videos posted by other creators who

21   have self- identified as members of the African American community; and many of those who view

22   her videos either self-identify as members of the African American community or watch videos

23   posted by other creators who have self- identified as members of the African American community.

24   264.267.       217. Plaintiff Cabrera is informed and believes that Defendants have applied

25   "Restricted Mode" and have limited monetization for videos she posted to "Lisa Cabrera" and "Lisa

26   C" because Defendants have a policy and practice of using A.I., algorithms, and other filtering tools

27   to classify, curate, censor, and sell advertisements for YouTube videos based on metadata

28   Defendants create from information regarding the race, ethnicity or other protected identity and

1  ~~viewpoint~~ of creators, subscribers and viewers, rather than the content of the videos posted to the

2  YouTube platform.

3       ~~265.~~268.       **218.** Defendants have applied "Restricted Mode" and have limited

4  monetization to most of the videos on "Lisa Cabrera," despite the fact that each of the videos fully

5  complies with all of Defendants' Community Guidelines and TOS, and contains no nudity,

6  sexualized scenes or language, graphic depictions of sex or violence, drug abuse, or alcohol

7  consumption.  Defendants have applied "Restricted Mode" to most of the videos posted, and have

8  allowed only very limited monetization for some videos, without any explanation or rationale for

9  doing so.  By way of example, as of August 12, 2020, the following videos uploaded to "Lisa

10 Cabrera" are no longer available for viewing with "Restricted Mode" enabled:

11          a.     https://www.Youtube.com/watch?v=OG4rq7QYWBg, a video entitled

12 "Record Breaking Background Checks in the US," with 11,997 views;

13          b.     https://www.Youtube.com/watch?v=nANzWSJxEn8, a video entitled

14 "Melinda Gates Vaccines for the Black Community Comment," with 1,059 views;

15          c.     https://www.Youtube.com/watch?v=m0yEkU73wDk, a video entitled "Black

16 Voices are Growing on Social Media," with 1,597 views; and

17          d.     https://www.Youtube.com/watch?v=RXOLwL41kNM, a video entitled

18 "Blacks and Hispanics now make up majority of people under age 16," with 705 views.

19      ~~266.~~269.       **219.** None of these videos violate any Community Guideline or TOS.  Each

20 includes properly cited news sources and original commentary regarding events and information of

21 significant interest to the African American ~~Community~~community.  Until very recently, "Blacks

22 and Hispanics now make up majority of people under age 16~~,~~," was both unrestricted and at least

23 partially monetized.

24      ~~267.~~270.       **220.** Defendants have applied "Restricted Mode" to all of the comments to

25 each of Plaintiff Cabrera's videos.  They did so without notice or explanation to Plaintiff Cabrera.  As

26 a result of this practice, viewers who rely on internet access supplied by public libraries, schools,

27 employers or commercial establishments which enable "Restricted Mode" for their networks, will

28 see Defendants' automatically generated message: "Restricted Mode has hidden comments for this

1  video."  Viewers accessing Plaintiff Cabrera's videos on a network which has enabled "Restricted
2  Mode," will not be able to comment on these videos or to view the comments of anyone else.  This
3  practice deprives viewers of the YouTube interactive community experience and discourages
4  viewers from actively participating in Plaintiff Cabrera's YouTube community, from subscribing to
5  Plaintiff Cabrera's videos, and from watching videos through to the end, resulting in reduced viewing
6  times, number of views and revenue for channels..

7      268.271.      221. Defendants have not applied the same Community Guidelines, TOS and
8  standards for "Restricted Mode" to white creators during the past two years.  For example,
9  Defendants recently came under fire for its their failure to apply its their Community Guidelines, TOS
10  and standards to YouTube channels "PewDiePie" or "Shane."

11         a.    PewDiePie is a YouTube channel created in 2010, with 106 million
12  subscribers, and nearly 26 billion views.  Much Many, but not all, of PewDiePie's videos relate to
13  gaming.  https://www.Youtube.com/watch?v=KGO99JWnZBs, a video entitled "Streamers Who
14  Have Said the N Word," featuring features a series of video clips of different video gamers saying
15  "nigger" and using profanity.  This YouTube video has generated 1.6 million views.  The video clips
16  also include ads for products.  The creation and posting of such a video, which highlights the word
17  "nigger" and profanity coming out of the mouths of PewDiePie and other gamers, is gratuitous and
18  serves no purpose other than to be provocative.  While the video is not viewable with "Restricted
19  Mode" enabled, it remains uploaded to the channel, generating views for PewDiePie and fueling the
20  channel's growth.

21         b.    Shane Dawson, who owns the YouTube channel "Shane."  "Shane" was
22  created in 2005 and has in excess of 21 million subscribers, having generated in excess of 4.4 billion
23  views by uploading vulgar, racist, sexually explicit and exploitative videos.   Had Defendants
24  monitored the content of "Shane" videos, they would have known as of 2015 that "Shane" had
25  offensive racist videos featuring black face on the channel because Shane Dawson published to the
26  channel his https://www.Youtube.com/watch?v=3jZDt5zQWsE video, entitled "My Apology
27  (Blackface & Offensive Videos)," which generated 1.8 million views.

28

1              i.      Unsurprisingly, "Shane" was not removed from the platform or

2    demonetized as a channel.  Rather, it was not until more than four years later, in the past two months,

3    that Defendants took any action regarding the videos uploaded on "Shane," and demonetized the

4    channel, after Shane Dawson posted a second apology, his

5    https://www.Youtube.com/watch?v=ardRp2x0D_E video, entitled "Taking Accountability," during

6    which he apologizes for posting videos that are offensive, racist, inappropriate and featuring

7    children.  This second so- called apology posted on June 26, 2020, generated 16.7 million views.

8    Interestingly, the video is not available with "Restricted Mode" enabled, so many of those offended

9    by "Shane" videos will not be able to view the detailed apology.

10             ii.      While many, but not all, such offensive, racist, inappropriate videos

11   were removed by Shane Dawson, most of the videos, or snippets from the videos, were reposted by

12   other YouTube creators and can be easily viewed.  By way of example only (Plaintiffs have not

13   undertaken to identify all or even most of such reposted videos), the following Shane Dawson videos

14   or snippets remain for viewing on Defendants' platform:

15                  (1)      https://youtu.be/gbU1uJnw0Oc, a video entitled "Shane

16   Dawson Black Face, N Word," which generated 618,328 views and can be viewed with "Restricted

17   Mode" enabled;

18                  (2)      https://youtu.be/_cPt-Hp2uyU, a video entitled "Shane

19   Dawson Jacking off to Willow Smith," featuring a video clip of Shane Dawson feigning

20   masturbation while looking at a poster of 11 year old Willow Smith, which can be viewed with

21   "Restricted Mode" enabled.;

22                  (3)      https://youtu.be/0wd-_ZdQyQI, a video entitled "Shane

23   Dawson N word compilation," which can be viewed but not with Restricted Mode enabled; and

24                  (4)      https:///Youtube.com/watc?v+qGS8BTUGeYI#action=share,

25   a video entitled YouTube CEO Susan Wojcicki's Favorite Youtuber RACIST Shane Dawson

26   sexually harassing young girls," featuring video clips of Shane Dawson discussing "dick rings," with

27   underage girls, and asking them to eat cocktail wieners more slowly for the "pedophiles" watching

28   the video, which cannot be viewed with "Restricted Mode" enabled.

269.272.     222. These videos not only remain on the platform, but like "Shane,"
Defendants have not removed the videos or shut down the channels upon which they are uploaded.

          i.   "Shane's" otherOther videos which remained viewable on "Shane" as
of August 12, 2020 so long as restricted"Restricted" Mode" was not enabled include:

      (1)   https://www.Youtube.com/watch?v=-A1HXBj7myU, a video
entitled "Blowjob Prank," which generated 1.3 million views and features Shane Dawson feigning
fellatio on a number of friends at a dark filling station;

      (2)   https://www.Youtube.com/watch?v=eDZrGk2F6c0, a video
entitled "Sex Position Challenge," which generated 3.1 million views and includes explicit profanity
laced descriptions of a sexual position;

      (3)   https://www.Youtube.com/watch?v=0QQ4Y19wJyE, a video
entitled "Biggest WTF Moments of 2015," which generated 1.7 million views and features profanity
and images of a nude Justin Bieber with very small black out boxes, a product called a "vajankle"
which appears to be an anatomically correct model of female genitalia appended onto a severed
ankle, and a Caucasian wearing a sombrero doing an impression of a Hispanic man;

      (4)   https://www.Youtube.com/watch?v=uk5s3DXL2EY, a video
entitled "Man with a Robot Penis," which generated 1.3 million views and includes a Caucasian
doing a profanity laced impression of an Indian man;

      (5)   https://www.Youtube.com/watch?v=6FLUNQB41wM, a
video entitled "Reacting to Lemon Party," which generated 1.3 million views and features profanity
laced voice over commentary accompanying video clips of young girls who appear to be pre-teens or
early teens watching pornographic clips of elderly people.

270.273.     223. It remains to be seen as to whether Shane Dawson earned advertising
revenue from these videos, or whether he earned CPM revenue.  Regardless, Shane Dawson grew his
channel, by generating millions of views over the years, by creating and posting these videos.
Something which; something African American creators are unablenot allowed to do.

271.274.     224. Plaintiff Cabrera is informed and believes that the sole reason that
Defendants have chosen to specially enforce the Community Guidelines and TOS against African

American creators is because Defendants discriminate against Plaintiffs and ~~other persons similarly situated~~members of the Race Discrimination Class based on race~~, e.g.,~~  Defendants do not restrict videos because of their content; they restrict the videos because of the identity of the creators: Defendants remove videos, apply "Restricted Mode" to videos, and demonetize videos because they are created by an African ~~American that~~Americans, relate to issues and events of concern to the African American community, or are viewed by large numbers of members of the African American community.

~~272.~~275.        ~~225.~~ In addition to the Defendants' efforts to reduce Plaintiff Cabrera's reach by misapplication of "Restricted Mode," for various periods, off and on, throughout the past five years, Defendants have shadow banned ~~both~~ individual videos posted by Plaintiff Cabrera~~,~~ and her channels, "Lisa Cabrera~~,~~" and "Lisa C," in their entirety.  Viewers have informed Plaintiff that they were unable to locate individual videos using YouTube search applications and terms such as "Lisa Cabrera," "Lisa C," or using as search terms the names of individual videos posted by Plaintiff Cabrera.

~~273.~~276.        ~~226.~~ Because Defendants single out Plaintiffs and ~~other persons similarly situated~~members of the Race Discrimination Class for rigorous enforcement of Defendants' Community Guidelines and TOS, to avoid receiving a "strike" for copyright infringement and related channel suspension, Plaintiff Cabrera is careful about complying with ~~"~~"fair use~~"~~" rules when using clips from someone else's videos:  she keeps news clips short, averaging 1-4 minutes in length; she does not alter the original material in any way; she always gives full credit in the video to the source of the original material of others.

~~274.~~277.        ~~227.~~ Sometimes, Plaintiff Cabrera posts identical videos both on the "Lisa Cabrera" channel and the "Lisa C" back up channel to see if they generate similar viewer numbers and are treated the same by Defendants' A.I., algorithms and other filtering tools.  Sometimes, the identical videos posted on the "Lisa C" channel generate more viewers and revenue than those posted on the "Lisa Cabrera" channel.  On six different occasions, Defendants flagged the "Lisa C" channel for posting "100% of the video of another YouTube creator, despite the fact that the video was created by Plaintiff Cabrera, registered owner of both channels, and despite Plaintiff Cabrera's

1   written communications to ~~Plaintiffs~~Defendants notifying them that she had given permission to

2   "Lisa C" to repost each of the videos.  Ultimately, Plaintiff was forced to archive each of the six

3   videos that Defendants had flagged on the "Lisa C" channel simply because Defendants claimed that

4   she was violating her own copyright on her own channel.

5          ~~275.~~278.        **228.** Plaintiff Cabrera registered her "Lisa Cabrera" name and an associated

6   image as trademarks.  As part of the channel creation process, Defendants ask YouTube creators if

7   they are using marks which have been registered as a trademark.  When she created the "Lisa

8   Cabrera" channel, Plaintiff Cabrera informed Defendants that she had registered her channel name

9   and a specific image used with thumbnail tiles as trademarks.  Nonetheless, Defendants refused to

10  remove videos using Plaintiff Cabrera's registered trademark image from the channels of other

11  YouTube creators in response to Plaintiff's repeatedly flagging such videos, reporting the trademark

12  infringement for the mark by the channel, and repeated unauthorized uses of the "Lisa Cabrera"

13  name.  For a period of years, Defendants have ignored Plaintiff Cabrera's complaints and allowed

14  other YouTube users to infringe on her trademarks with impunity, in violation of Defendants' own

15  Community Guidelines and TOS.

16         ~~276.~~279.        **229.** While Defendants refuse to protect the intellectual property of Plaintiffs

17  and ~~other persons similarly situated~~members of the Race Discrimination Class, Defendants routinely

18  flag or remove videos, and suspend channels for violating the intellectual property of others.

19         ~~277.~~280.        **230.** Defendants removed 68 of Plaintiff Cabrera's videos without notice,

20  explanation or justification other than suggesting the videos involved copyright infringements.

21  Though she promptly appealed each removal, she was unable to have Defendants resolve the

22  removal of the videos.  Defendants permanently archived those 68 videos.  Now they cannot be

23  viewed, accessed or copied by anyone.  They are simply "lost" to Plaintiff Cabrera.  Defendants

24  never informed Plaintiff whether someone had flagged any of these videos; who, if anyone, asserted

25  a copyright interest in any content of any individual video; what, if anything, in the video triggered

26  the Defendants' conduct.  Without such information, Plaintiff Cabrera could neither understand the

27  Defendants' strike against any one video nor attempt to resolve the strike for any video.

28

278.281.        231. Defendants wrongly suspended the "Lisa Cabrera" channel for "hate speech" in connection with a video Plaintiff posted commenting on a report by NBC regarding the purchase of illicit narcotics on the dark web.  Plaintiff Cabrera promptly appealed the suspension. Defendants rejected the appeal and refused to actually watch the video.  It was only after Plaintiff Cabrera filed a case against Defendants in small claims court that Defendants finally contacted Plaintiff Cabrera and informed her that the suspension was erroneous.  In all, "Lisa Cabrera" was suspended and fully demonetized for six weeks due to Defendants' error.

279.282.        232. Following the lifting of the suspension for the "Lisa Cabrera" channel, the channel remained demonetized, without the SuperChat application, and with 0 subscribers listed for the channel.  Defendants waited two additional weeks to restore monetization for individual videos, SuperChat and the prior existing subscribers for the channel.  In all, Plaintiff Cabrera lost 8 weeks of revenue due to Defendants' wrongful conduct and refusal to even look at the video content that they had improperly flagged as "hate speech."  Defendants never offered to compensate her for the lost revenue they caused.

280.283.        233. Defendants demonetized many videos on the "Lisa Cabrera" channel without notice or explanation, even when the videos fully comply with Community Guidelines and TOS.  For example, Defendants demonetized the following "Lisa Cabrera" fully compliant videos:

> a.    https://youtu.be/LbT3ZAPj_AA, a video entitled "A Heatwave Hits Western Europe";

> b.    https://youtu.be/TE_Z1Y0P7Rg, a video entitled "US Birth Rates Are At A 32 Year Low";

> c.    https://youtu.be/9i41xbByk2g; a video entitled "Documentary:  China's One Child Policy and Propaganda";

> d.    https://youtu.be/GFPbYHEgTqA, a video entitled "The Spanish Flu 1918 See The Similarities in Pictures"; and

> e.    https://youtu.be/pcHDdad4CIw, a video entitled "Trump's Tariffs Are Contributing to More Farmer Tragedies."

281.284.        234. Defendants also deputize YouTube users (those who are not members of
disfavored groups like those to which Plaintiffs and other persons similarly situatedmembers of the
Race Discrimination Class belong) to flag videos and channels that purportedly violate Defendants'
Community Guidelines and TOS, and then automatically remove, restrict, or demonetize flagged
videos, and suspend or remove flagged channels, without verifying that the videos or channels in
question actually violate any published standard.  As a result of Defendants' abdication to
anonymous YouTubers of responsibility for enforcing applicable standards, Plaintiffs and other
persons similarly situatedmembers of the Race Discrimination Class are subjected to racist,
misogynistmisogynistic, abusive trolls who target Plaintiffs' videos and channels for adverse action
by Defendants.

282.285.        235. In January of this year, Defendants again suspended  all monetization for
videos posted to "Lisa Cabrera" following a threat made by YouTube user, Oxyman, during a
Livestream broadcast on his channel where he vowed, "I'm gonna make sure [Lisa Cabrera's]
channel gets demonetized."  Plaintiff Cabrera is informed and believes that Oxyman flagged her
channel purportedly for violating Defendants' Community Guidelines or TOS.  Without taking any
steps to verify the flag or reported violation, Defendants then demonetized the "Lisa Cabrera"
channel in January of this year without any prior notification or explanation given to Plaintiff.

283.286.        236. Thereafter, Plaintiff Cabrera promptly appealed the Defendants' action.
Defendants informed her that she could reapply for access to monetization only after waiting 30 days.

284.287.        237. After 60 days, Defendants restored monetization for the "Lisa Cabrera"
channel videos without any explanation as to why they had demonetized the channel to begin with.
Defendants never offered to compensate her for the lost revenue they caused by blindly assuming the
validity of Oxyman's flag on the "Lisa Cabrera" channel.

285.288.        238. To compound the financial injury to Plaintiff Cabrera, during this same
period, Defendants were running advertisements for the World Health Organization regarding
Covid-19 prevention, and receiving advertising revenue at the same time that "Lisa Cabrera" was
completely demonetized.

1    286.289.        239. Plaintiff Cabrera has also been the subject of improper posts by YouTube

2    creator, Michael Anderson, a known white supremacist.  Michael Anderson posted a false video

3    which had as a subject Plaintiff Cabrera and disparaged her personally.  Mr. Anderson also posted

4    Plaintiff's name and residential address in the comments section of his video.  After recording an

5    image of the video displaying Lisa Cabrera's name and address in the comments section; Mr.

6    Anderson then removed the video and reposted it without Lisa Cabrera's address.

7        287.290.        240. Following Mr. Anderson's posting of the video and Plaintiff Cabrera's

8    residential address, numerous additional copies of the video with the address in the comments section

9    appeared on multiple additional YouTube channels.

10        288.291.        241. Plaintiff Cabrera used Defendants' reporting tool, which sent links to the

11    video to Defendants.  Defendants never responded to Plaintiff.  Approximately fifty of the

12    subscribers to the "Lisa Cabrera" channel informed Plaintiff that they too had reported links to the

13    video to Defendants using the reporting tool.  Defendants took no apparent steps to remove the

14    disparaging video featuring Plaintiff Cabrera's name and false information regarding her, despite the

15    fact that the video clearly violated Defendants' Community Guidelines and TOS, while ignoring

16    dozens of reports with links flagging the Michael Anderson video.

17        289.292.        242. On another occasion, Michael Anderson made and posted another video

18    which had Plaintiff Cabrera as the subject, and "Lisa Cabrera" in the video's title.  This video

19    featured an image of Mr. Anderson in a car brandishing a revolver and talking about Plaintiff

20    Cabrera.  Again, Plaintiff Cabrera used Defendants' reporting tool and sent to Defendants a link to

21    the video which communicated a clear threat of violence by Mr. Anderson against Plaintiff Cabrera.

22    Again multiple subscribers to "Lisa Cabrera" communicated to Plaintiff that they too had flagged the

23    video using Defendants' reporting tool.  And again, Defendants did absolutely nothing to remove the

24    video, or to suspend or remove Michael Anderson's channel for violating Defendants' Community

25    Guidelines or TOS.

26        290.293.        243. As a direct and proximate result of Defendants' blatant and overt racial

27    discrimination and wrongful conduct, "Lisa Cabrera" has not grown in subscriber numbers, viewer

28    numbers or view times as the channel would have otherwise grown absent Defendants' conduct .

1   Plaintiff Cabrera has been subjected to public disparagement, racist and ~~misogynist~~misogynistic

2   abuse, public posting of her private contact information and overt threats of physical violence – all of

3   which has occurred with the tacit, if not overt, approval of Defendants who have repeatedly refused

4   to enforce their own Community Guidelines and TOS.  Plaintiff Cabrera has suffered lost revenue

5   directly due to Defendants' racist profiling, A.I., algorithms and other filtering tools, while her

6   channel was demonetized, while her channel was suspended, and while Defendants have held her 68

7   videos in "archive," and Defendants continue to misapply "Restricted Mode" and limited

8   monetization to individual videos she has posted.

9        ~~291.~~294.        ~~244.~~ As a result of the Defendants' inaccurate reports of views and

10  subscribers, Plaintiff Cabrera is further informed and believes that Defendants owe additional

11  revenue to her under the TOS.  Plaintiff Cabrera cannot determine the amount that Defendants in fact

12  owe to her based on the extremely limited data reported by Defendants.

13              **3.      Catherine Jones**

14       ~~292.~~295.        ~~245.~~ Plaintiff Catherine Jones ("Plaintiff Jones") is an African American

15  woman residing in the State of Vermont who is the creator and owner of "Cooking with Carmen

16  Caboom," a YouTube cooking channel for African Americans, and "Carmen Caboom," and

17  "Carmen Caboom Reloaded," two YouTube channels dedicated to developing and posting both

18  parodies and serious videos ~~which~~that discuss and present information regarding issues and current

19  events which are important to the African American community.

20       ~~293.~~296.        ~~246.~~ Plaintiff Jones created the "Carmen Caboom" channel in 2010, a backup

21  "Carmen Caboom" channel in 2014, the "Cooking with Carmen Caboom" channel in 2015, and the

22  "Carmen Caboom Reloaded," channel in 2018.  Defendants improperly removed the original

23  "Carmen Caboom" channel for purported nudity when no video posted to the channel included any

24  nudity.

25       ~~294.~~297.        ~~247.~~ Plaintiff Jones has followed the online appeals process YouTube

26  provides when it gives notice of channel suspensions and terminations in an attempt to recover the

27  improperly removed channels and videos that were uploaded to the channels.  Plaintiff Jones has also

28

1  written emails and attempted to leave messages for Defendants, requesting that the removed channels

2  and videos be restored.  Defendants have not responded or returned the videos.

3  ~~295.~~298.      ~~248.~~ Plaintiff Jones is also a YouTube partner.  Since creation, Plaintiff

4  Jones~~"~~" 2014 "Carmen Caboom" channel has posted many videos, several of which Defendants

5  improperly removed as hate speech~~, the~~.  The remaining videos have garnered approximately ~~500~~

6  ~~1,200~~500-1,200 views per video overall ~~which~~and have generated approximately $500 per year.

7            **4.    Denotra Nicole Lewis**

8  ~~296.~~299.      ~~249.~~ Plaintiff Lewis has been a registered YouTube user since 2006 and has

9  posted her own videos on her YouTube channel, "Nicole's View" since 2016.  Plaintiff Lewis

10  presently has 178 videos which are viewable on "Nicole's View," 169 of which are listed when

11  "Restricted Mode" is enabled.

12  ~~297.~~300.      ~~250.~~ When Plaintiff Lewis registered "Nicole's View," Plaintiff Lewis

13  answered Defendants' online questionnaire and self- identified as African American or Black.  Had

14  Defendants not requested that she provide personal information about herself for her profile, Plaintiff

15  Lewis would not have done so.  When she provided this information, she had no idea that Defendants

16  would use information about her race to generate metadata about her, the videos she watches, and the

17  videos she posts, or that Defendants would insert, embed or associate such metadata with videos she

18  ~~post~~posts; or that Defendants would insert, embed or associate the metadata of her subscribers or her

19  viewers based on race, ethnicity or other protected identity ~~or viewpoint~~; or that Defendants would

20  filter, censor or restrict her videos based on information regarding ~~her~~ race, ethnicity or other

21  protected identity ~~or viewpoint~~.

22  ~~298.~~301.      ~~251.~~ Plaintiff Lewis creates and posts videos to inform and entertain the

23  African American ~~Community~~community with respect to current events and issues of import to

24  Black Americans.  To date, she has posted 748 videos to her channel, some of which Defendants

25  have removed from the platform, leaving 731 which can be watched by the public when "Restricted

26  Mode" is not engaged.  While "Nicole's View" has generated in excess of 10.6 million views since

27  2016, she has only generated approximately $25,000 from those views.

28

299.302.      252. Plaintiff Lewis is informed and believes that Defendants have gathered extensive information in order to generate metadata based on that information, and then insert, embed, append, or associate such metadata with videos posted on "Nicole's View."  Defendants gathered information regarding her race (Defendants know that Plaintiff Lewis is an African American woman); that she makes and posts videos which have as a subject, relate to or discuss issues and current events that are important to members of the African American community; her subscribers either self-identify as members of the African American community or watch many videos posted by other creators who have self- identified as members of the African American community; and many of those who view her videos either self-identify as members of the African American community or watch videos posted by other creators who have self- identified as members of the African American community.

300.303.      253. Plaintiff Lewis is informed and believes that Defendants have applied "Restricted Mode" and have limited monetization for the videos she posted to "Nicole's View" because Defendants have a policy and practice of using A.I., algorithms, and other filtering tools to classify, curate, censor, and sell advertisements for YouTube videos based metadata Defendants create from information regarding the race, identity and viewpointethnicity or other protected identities of creators, subscribers and viewers, rather than the content of the videos.

301.304.      254. Defendants routinely limit viewer access by wrongly applying "Restricted Mode" and by limiting monetization to most of the videos posted on the "Nicole's View" channel, despite the fact that the videos fully comply with all of Defendants' Community Guidelines and TOS, and contain no nudity, sexualized scenes or language, graphic depictions of sex or violence, drug abuse, or alcohol consumption.

302.305.      255. Plaintiff Lewis has uploaded 748 videos to the "Nicole's View" channel, 17 of which Defendants wrongly removed or archived for unknown reasons.

303.306.      256. Of the remaining uploaded videos, only 178 are listed under "Nicole's View."  167 of those are listed with "Restricted Mode" enabled.  Only 84 of those videos listed can in fact be viewed with "Restricted Mode" enabled.  For example, Defendants have misapplied "Restricted Mode" to the following compliant videos:

1        a.        https://www.Youtube.com/watch?v=qZIrfp1VDRw, "Bill Cosby Granted

2  Appeal Hearing";[22]

3        b.        https://www.Youtube.com/watch?v=l-75B5Z7Uek, "Nicole's View Live:

4  Special Guest Jenny Winings from the Hit Documentary Film 'Square One;'";

5        c.        https://www.Youtube.com/watch?v=Z6l6esoTOqM, "Joe Jackson's

6  Granddaughter Yasmine Jackson & What People are NOT Talking About;"

7        d.        https://www.Youtube.com/watch?v=iYECpBVdz9w, "They Never Cared

8  About Us";[22]

9        e.        https://www.Youtube.com/watch?v=M1l9hdXXs2w, "Special Guests

10  Dennae Wright & Marvelous";[22]

11        f.        https://www.Youtube.com/watch?v=oUXnC6CL20I, "5 Stars:  Why Dave

12  Chappelle's New Netflix . . . .";

13        g.        https://www.Youtube.com/watch?v=x7qNjfBN5AQ, "Disgustingly Racist:

14  Leaving Neverland";[22]

15        h.        https://www.Youtube.com/watch?v=f6Mfpy2HYMQ, "Controlling the

16  Narrative:  Michael Jackson Fans Sue";[22]

17        i.        https://www.Youtube.com/watch?v=iTsgfpOC7JM, "Halle Bailey & The

18  New Little Mermaid";[22]

19        j.        https://www.Youtube.com/watch?v=bxL98GrCnRI, "The Truth Shall Set

20  You Free:  Robert W. Lee IV";[22]

21        k.        https://www.Youtube.com/watch?v=_dBWUTyTyPk, "News Story Update:

22  The Latest with Bill Cosby";[22]

23        l.        https://www.Youtube.com/watch?v=FlySprQjLCA, "Livestream:  Chatting

24  with Author Cavis Adams";[22]

25        m.        https://www.Youtube.com/watch?v=7HcM8fWr4gU, "Typical Move:

26  ~~why~~Why Jussie Somollett's Court ~~documents~~Documents";[22] and

27        n.        https://www.Youtube.com/watch?v=xIvOvLNaGFI&feature=youtu.be,

28  "SHOCKING:  Here's Why You Got One Side of The Allegations against Bill Cosby." Plaintiff

1  Lewis paid an advertising company to promote this documentary style video.  The advertising

2  expenses were wasted after Defendants applied "Restricted Mode," to this video.  Consequently, the

3  video has generated only 8,139 views to date.

4  304.307.        257. When viewers attempt to watch these videos with "Restricted Mode"

5  enabled, they usually see this notice from Defendants:



22  305.308.        258. However, occasionally they see a different notice from Defendants -- a

23  black screen with a legend:  "This video is not available," with no explanation as to why the video

24  cannot be viewed.  Defendants have neither explained why they post two different notices for the

25  same videos, or why they would notify viewers that a video was not available when it could in fact be

26  watched simply by disabling "Restricted Mode," or viewing it on a computer network which has not

27  enabled "Restricted Mode."

28

306.309.        259. With respect to the balance of 84 videos which can be viewed with "Restricted Mode," enabled, neither subscribers nor viewers can comment on any of these videos or review the comments of others.  When the videos are watched in "Restricted Mode," each video is accompanied by a notice posted by Defendants where the comments usually appear, stating: "Restricted Mode enabled.  To view this video, you will need to disable Restricted Mode." Defendants' application of "Restricted Mode" to compliant videos, and prohibition on leaving or reading viewer comments effectively discourage new viewers from participating in the "Nicole's View" channel, and prevents prevent them from actively participating in the African American YouTube Community community generally.  New viewers cannot actively engage with other members of the African American YouTube Community community by exchanging comments.  As a result, they spend less time watching videos and are less likely to subscribe, resulting in lower numbers of views for the video and the channel, and less revenue for Plaintiff Lewis.

307.310.        260. Defendants have allowed only limited monetization to a fraction of "Nicole's View" videos, without any explanation or rationale other than to indicate that the "content identified is unsuitable for most advertisers."  Plaintiff Lewis is informed and believes that the sole reason that Defendants find the content is "unsuitable for most advertisers," is because Defendants discriminate against Plaintiffs and other persons similarly situated members of the Race Discrimination Class based on race, e.g., the content was created by an African American, relates to issues and events of concern to the African American community, and/or is viewed by many members of the African American community.

308.311.        261. For certain periods over the past four years, Defendants have shadow banned certain individual compliant videos posted by Plaintiff Lewis on "Nicole's View."  During various periods of time, those videos did not appear in YouTube searches using the terms "Nicole Lewis," or "Nicole's View," or in searches using individual video titles as search terms.

309.312.        262. "Nicole's View" video content consists roughly of 75% pre-recorded videos and 25% Livestream broadcasts.  For Livestream broadcasts, Plaintiff Lewis sometimes has as many as 1000 viewers participating.  Plaintiff Lewis employs designated moderators to monitor,

1    control and censor viewer comments to ensure compliance with Defendants' Community Guidelines

2    and TOS, promptly removing any non-compliant comments and blocking offending participants.

3        ~~310.~~313.        ~~263.~~ For the past two years, Defendants have used A.I., algorithms, and

4    filtering tools to restrict the reach of videos posted on "Nicole's View," resulting in stagnant

5    subscriber and viewer numbers.  "Nicole's View" is no longer growing.  The channel's analytics

6    page from month to month reflects only minor changes to the numbers of subscribers, viewers, and

7    view times.  To avoid the impact of ~~Defendant~~Defendants' A.I., algorithms and filtering tools on

8    Defendants' metadata generated from video titles and tags, Plaintiff Lewis intentionally self-censors:

9    (a) she avoids using controversial video titles; (b) she avoids using abbreviations like "BLM,"

10   "KKK~~;~~"~~,~~; terms such as "Black," "White," "Racism," "Boogaloo," "White Supremacy," "Racial

11   Profiling," "Police Shootings," "Police Brutality," "Black Lives Matter~~;~~"~~,~~; names, such as those of

12   individuals such as those killed by law enforcement, "Bill Cosby," "Louis Farrakhan~~;~~"~~,~~; names of

13   organizations such as "Ku Klux Klan," "Nazi," "Neo-Nazi," "Aryan Brotherhood," and euphemisms

14   that are known and particular to the African American ~~Community~~community; she intentionally

15   misspells terms such as "Black," "White," "Race," "Racism," and "Racial Profiling~~,~~" because

16   Defendants routinely flag videos which have such terms as tags or which have titles that include such

17   terms.

18       ~~311.~~314.        ~~264.~~ Despite Plaintiff Lewis' efforts to self-censor and avoid the reach of

19   Defendants' A.I., algorithms, and filtering tools, most of the videos posted on "Nicole's View" have

20   only limited monetization, if any.

21       ~~312.~~315.        ~~265.~~ On February 11, 2020, Plaintiff Lewis received an email from

22   Defendants indicating that "SuperChat was disabled," purportedly because "Nicole's View" was

23   using the original content of other YouTubers.  However, after a week, it became apparent that

24   Defendants had not merely disabled SuperChat, but had completely demonetized the entire "Nicole's

25   View" channel.  Defendants did so without notice or explanation.  Plaintiff Lewis promptly filed an

26   appeal of the decision to disable SuperChat and to demonetize the entire channel.

27       ~~313.~~316.        ~~266.~~ Mindful of the stringent standards which Defendants have always

28   applied to the channels of Plaintiffs and ~~other persons similarly situated~~members of the Race

1   Discrimination Class, Plaintiff Lewis has always followed Defendants' Community Guidelines, and

2   TOS.  Whenever she uses a news clip, she limits the clip to several minutes and generates her own

3   original commentary as video content to accompany the clip.  The originators of all news clips

4   incorporated into videos posted by Plaintiff Lewis are always accorded full and proper and credit in

5   the video so that there is no possibility of viewers confusing the news clip with her original

6   commentary or content.

7           314.317.       267. Defendants did not respond to Plaintiff Lewis' appeal.  On or about June

8   7, 2020, she suddenly noticed that Defendants had resumed placing advertisements on "Nicole's

9   View" videos.  When she checked the channel's analytics pages, it reflected that her monetized

10  videos were again generating revenue and her Livestream broadcasts were generating donations.

11  Defendants have neither explained why the channel was fully demonetized for nearly two months,

12  nor, why it was remonetized; nor have they offered compensation for the revenue which the channel

13  lost during that period.

14          315.318.       268. Recently Defendants have begun to interfere with Livestream broadcasts

15  on "Nicole's View."  On the evening of August 14, 2020, Plaintiff Lewis conducted a Livestream

16  broadcast of https://www.Youtube.com/watch?v=vtPeu6SCq0g, "The Destructive Agenda of

17  Feminism with Elizabeth Mell."  Roughly half wayhalfway through the one hour thirty-five minute

18  broadcast, the broadcast was interrupted by repeated audio interruptions which Plaintiff Lewis could

19  hear, rendering her unable to hear Elizabeth Mell.  The noises and audio interruptions continued

20  intermittently.  Plaintiff Lewis confirmed that the noises and disruptions were not caused by her

21  equipment or by background noise at her location.  Elizabeth Mell informed Plaintiff Lewis that the

22  noises and disruptions were not being generated from her microphone or from ambient noise at her

23  location.  Following the substantially ruined Livestream broadcast, Defendants applied "Restricted

24  Mode" to the video.



166510?

LHK .

1

2

3

4

5

6

7

8

9

10      316.319.          269. Defendants also post inappropriate videos in the "Up Next"

11  recommendations that appear to the right of videos which viewers watch on "Nicole's View."  For

12  example, regardless of those channels to which the viewer has subscribed, Defendants regularly

13  populate the "Up Next" recommendations with video recommendations from other creators, often

14  recommending videos whichthat are entirely unrelated to the video playing on "Nicole's View," with

15  content that is critical of or derogatory to individual African Americans or the African American

16  Communitycommunity as a whole;, or with content from white creators and/or commentators with

17  racist views.

18      317.320.          270. Often, Defendants flood the "Up Next" recommendations on "Nicole's

19  View" with videos of Defendants' commercial partners such as Fox News and its affiliates.  Set forth

20  below are just a few of the "Nicole's View" videos for which Defendants have repeatedly

21  recommended Fox News videos in "Up Next:"

22              a.          https://www.Youtube.com/watch?v=G9un5z6sPoE (a video thanking

23  subscribers for their support of the channel) – 4four unrelated Fox News video

24  recommendationrecommendations;

25              b.          https://www.Youtube.com/watch?v=cjQ13mwjuIw (a video featuring

26  Andrew Wyatt) – 3three unrelated Fox News video recommendations;

27              c.          https://www.Youtube.com/watch?v=TzCjFLD-ddo (a video about Billy Dee

28  Williams) – 2two unrelated Fox News video recommendations;

1           d.       https://www.Youtube.com/watch?v=Xs-cmV44Rco (another video about

2    Billy Dee Williams) – ~~2~~two unrelated Fox News video recommendations;

3           e.       https://www.Youtube.com/watch?v=4mLbAYhCv6Y (a video discussing

4    White culture blaming the Black ~~Community~~community for social ills) – ~~2~~two unrelated Fox News

5    video recommendations;

6           f.       https://www.Youtube.com/watch?v=W6MjdZvlqXM (a video asking viewers

7    to sign a petition to investigate the Prosecutor pursuing criminal charges against Bill Cosby) – ~~5~~five

8    unrelated Fox Business video recommendation;

9           g.       https://www.Youtube.com/watch?v=jikt7ZrdEDY (a video discussing a

10   promotion on the channel) – ~~3~~three unrelated Fox News video recommendations;

11          h.       https://www.Youtube.com/watch?v=W6MjdZvlqXM (a video thanking

12   subscribers for their support) – ~~4~~four unrelated Fox News video recommendations;

13          i.       https://www.Youtube.com/watch?v=yO2ZEaaKRvQ (a video promoting

14   another Black YouTube creator) – ~~2~~two unrelated Fox News video recommendations; and

15          j.       https://www.Youtube.com/watch?v=G9un5z6sPoE (a video thanking viewers

16   for support) – ~~4~~four unrelated Fox News video recommendations.

17       ~~318.~~321.    In all, Defendants have recommended 78 individual videos from Fox News or

18   Fox Business in "Up Next" which have no relation to the video subject matter or the African

19   American ~~Community~~community, in connection with roughly half of "Nicole's View" videos

20   watched with "Restricted Mode" enabled.

21       ~~319.~~322.    ~~271.~~ Defendants have also shadow banned "Nicole's View."  When viewers

22   go to YouTube and input "Nicole's View" as a search term, the channel does not appear as a search

23   result; rather, a small list of individual videos uploaded to "Nicole's View" more than a year ago

24   appear as search results.  This means that when viewers actively search for Plaintiff Lewis' channel,

25   they cannot find it.  They find only old videos.  Seeing a small number of old videos, viewers might

26   well conclude that "Nicole's View" is no longer uploading new videos.  When viewers are unable to

27   find Plaintiff Lewis' channel, and new videos by searching on YouTube, Plaintiff Lewis loses views,

28   ad revenue and CPM revenue.

1    320.323.        272. As a direct and proximate result of Defendants' racial discrimination and

2    wrongful conduct, "Nicole's View" has not grown in subscriber numbers, viewer numbers or view

3    times and which it would have grown otherwise and Plaintiff Lewis has been deprived of significant

4    revenue from Defendants' sale of advertising, SuperChat and Livestream donations over the life of

5    her channel.  Plaintiff Lewis' videos were all fully demonetized between February 11, 2020 and June

6    7, 2020, during which period "Nicole's View" generated no income whatsoever.

7                    **5.    Andrew Hepkins**

8    321.324.        273. Plaintiff Hepkins has been uploading videos to "DruStory News," and

9    "DruHepkins," since 2014.  Plaintiff Hepkins is a serious journalist and conducts independent

10   research in connection with most of his videos.  As a serious journalist, Plaintiff Hepkins closely

11   follows Defendants' Community Guidelines and TOS by not using adult language, profanity,

12   vulgarity, presenting explicit sexual or violent content, or making disparaging remarks.  The

13   "DruStory News" videos present fact based content and encourage viewers to conduct their own

14   research and to engage in critical thinking in connection with both current events reported by

15   mainstream media and historical events.  Plaintiff Hepkins also enjoys the sport of boxing.  From

16   time to time, he uploads videos with critiques of specific boxers or boxing matches.  In all, 58 videos

17   have been uploaded to "DruStory News," which have generated a total of 3,565,753 views.

18   322.325.        274. Defendants informed Plaintiff Hepkins that they removed one of these

19   videos for "violating YouTube's policy on harassment and bullying."  However, since 2019,

20   "DruStory News" has not generated any revenue at all.

21   323.326.        275. For the past two years, Plaintiff Hepkins has observed numerous

22   inaccuracies in Defendants' reported view numbers for the "DruStory News" channel and individual

23   videos.  One example of inaccurate reported views concerns

24   https://www.Youtube.com/watch?v=dmmWoO2nd2Y, "The Michael Jackson Agenda EXPOSED"

25   that discusses the movie "Leaving Never Land," and facts which purportedly support civil plaintiffs'

26   allegations against Michael Jackson.  The video was posted March 22, 2019.  It was popular with

27   viewers.

28

REVISED SECOND THIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT,
RESTITUTION, ACCOUNTING AND DAMAGES

a.       Shortly after the video was uploaded to "DruStory News," viewers started posting comments, complaining that they could not "like"[56] the video when they watched it.  One viewer wrote:  "I tried to like this video but couldn't."

b.       Plaintiff Hepkins noticed that the number of views had slowed to under 35,000 despite the passing days.  Over time, he watched as Defendants' reported views for the video approached 32,000, and then fell to 31,000.  Days later, Defendants' reported views fell even lower to 29,000.  Over the days that followed, Defendants' reported number of views climbed beyond 32,000.  Again, several days thereafter, Plaintiff Hepkins saw that Defendants' reported view numbers were again under 30,000.

c.       Defendants did not notify Plaintiff Hepkins that they were reducing view numbers.  Nor have they given any explanation or rationale which would justify reducing view numbers under the TOS or the Adsense agreement.

324.327.       276. Frustrated by the Defendants' repeated downward adjustment of view numbers for the Michael Jackson video, Plaintiff Hepkins posted this comment on the video:

"Yes they are shaving the views. I've been watching all week. Every time it goes to 32K the views get shaved back down to 29-30. This has happened to me before."

On another occasion, Plaintiff Hepkins left another comment on the video:

"Here we go AGAIN with this. Every time the video hits past 31K, views disappear and it mysteriously goes back down to 29-30K. Smh. Still at it."

Ultimately, "The Michael Jackson Agenda EXPOSED" never went viral and generated only 70,000 views.

a.       On June 26, 2020, Plaintiff Hepkins uploaded https://www.Youtube.com/watch?v=KdVXcpBQOvs, "BIG NEWS Cosby Appeal is Granted," to

---

[56] By clicking on an icon which appears with individual videos, viewers can "like" a video.  The number of "likes" generated by a video increases the likelihood that the video will be recommended as "trending," and that Defendants will recommend it in the "Up Next," feature that appears on viewers' screens.  By generating a large number of "likes," the Michael Jackson video uploaded on "DruStory News" can go viral and generate millions of views.  Those views translate into revenue for the channel.

1  "DruStory News."  The video was popular and started generating views.  For June, Defendants

2  reported that the video had generated 6,943 views.



21  ~~325.~~ 328.        ~~277.~~ In July, Defendants reported that the video had only generated 4,913

22  views – 1,500 fewer views than were reported for the prior month, despite the 4 additional weeks

23  during which time viewers watched the video.

1

2

3

4

5   326.329.      278. Plaintiff Hepkins is informed and believes that the Defendants' practice

6  of reducing or shaving view numbers over time has reduced the revenue which Defendants report for

7  the "DruStory News" channel.  The number of views and number of subscribers are part of the

8  calculation which Defendants make each month in determining how much they owe to Plaintiff

9  Hepkins for the "DruStory News" videos.  Given Defendants' reduced view numbers over a period of

10  months, Plaintiff Hepkins is informed and believes that the Defendants' revenue calculations based

11  on those reported view numbers also are inaccurate and undercount revenues owed by Defendants to

12  Plaintiff Hepkins.

13   327.330.      279. Defendants alone control access to the data upon which the subscriber

14  numbers, viewer numbers and hours spent watching numbers are based.  Plaintiff Hepkins has no

15  way to calculate the correct additional amounts which Defendants owe to him without access to the

16  underlying data which reflects the number of subscribers, the number of viewers, and the hours spent

17  viewing videos per day for each of the "DruStory News" videos.

18   328.331.      280. Defendants have deemed nearly all of the "DruStory News" videos to be

19  unsuitable for most of the YouTube advertisers, resulting in limited monetization for the majority of

20  Plaintiff Hepkins' videos.  Defendants have fully monetized only 2 of the 54 videos uploaded to

21  "DruStory News."  Defendants have either limited the monetization for, or have completely

22  demonetized the other 52 "DruStory News" videos.

23   329.332.      281. Defendants have never given Plaintiff Hepkins any explanation as to why

24  "DruStory News" videos concerning water quality, veganism, internet scams or Jewish support for

25  Palestinians are unsuitable for most advertisers, much less advertisers who have posted ads on

26  channels belonging to Defendants' preferred YouTube partners such as PBS, CNN, or MSNBC.  Nor

27  have Defendants explained why Plaintiff Hepkins' boxing videos are unsuitable for advertisers who

28  post ads on sports channels with boxing related videos.

1      ~~330.~~333.      ~~282.~~ "DruStory News" uploaded "Fake News is REAL:  More Undeniable

2    Proof!" on December 29, 2016.  The video discusses inaccurate reports which have appeared in

3    mainstream media news outlets.  The video features a series of researched factual rebuttals to specific

4    news reports, demonstrating that some things that have been published as news are false or

5    fabricated.

6              a.      Defendants initially determined that the video was ineligible for monetization

7    and demonetized the video.

8              b.      Defendants then notified Plaintiff Hepkins that the video violated unspecified

9    "Community Guidelines~~,~~" and issued a "Community Guidelines strike or temporary penalty" to the

10   channel.  Defendants stated that the video constitutes a "personal attack," "predatory behavior,

11   stalking, threats, harassment, bullying, or intimidation."  Defendants added, "We remove comments,

12   videos, or posts where the main aim is to maliciously harass or attack another user."

13

14

15

16   

17

18

19

20

21

22

23              c.      Now, viewers who click on the thumbnail for the video see:

24

25

26   

27

28

1

2

3

4

5

6              d.      This video has been removed from the platform.



7

8

9

10

11

12

13

14

15

16

17

18

19              e.      The video cannot be viewed by anyone.

20      ~~331.~~~~334.~~      **~~283.~~** "Fake News is REAL:  More Undeniable Proof!" does not attack,

21  threaten, harass, intimidate, bully, insult, disparage or even discuss any individual in connection with

22  "Fake News."  Rather, the video discusses specific news reports which were in fact false or

23  erroneous, and presents facts disputing the original reports.  Defendants were wrong to find that the

24  video violated Community Guidelines, and were entirely off base in assessing a Community

25  Guidelines strike or penalty against "DruStory News" for the video~~;~~, and in removing the video from

26  the platform.

27      ~~332.~~~~335.~~      **~~284.~~** Plaintiff Hepkins appealed the Defendants' actions.  Defendants ignored

28  the appeal.

333.336.     285. Defendants also issued copyright violation flags for 7 different "DruStory News" videos, for nothing more than using short video or textual excerpts which included proper citations to the source materials.  In the face of legitimate fair use claims by "DruStory News," Defendants issued copyright flags for short video clips which appeared in "Anthony Joshua," "Why People Hate the Truth (Part 1)," "Eric Garner Death and Funeral – Full Unseen Coverage," "Chemtrails: Is This Real or Conspiracy?" "The Revival of Overt Racism (Part 1)," "The Truth About Wade Robson Exposed," and "BOMBSHELL Cosby News! (Finale) – What the Media Didn't Want You To See Part 3."  Defendants even issued a copyright flag for the short video clips of Neo from the movie "The Matrix."

334.337.     286. While Defendants quickly pursue copyright claims advanced against African American creators on YouTube, like Plaintiff Hepkins, they are slow and often refuse to enforce copyright claims when made by African American creators.  On at least two occasions, Plaintiff Hepkins flagged videos that reposted all or most of his original videos that are uploaded to "DruStory News."  Defendants ignored those complaints.  As a result of Defendants' inaction, the infringers continue to use Plaintiff Hepkins' original video content without consequence.

335.338.     287. Defendants have shadow banned "Dru Story News."  When "Restricted Mode" is enabled, searches for "DruStory News" on YouTube will produce a smattering of search results including several individual videos uploaded to the channel, but "DruStory News" does not appear as a search result.  Defendants' "Restricted Mode" renders the entire "DruStory News" channel invisible on the YouTube platform.

336.339.     288. When "Restricted Mode" is enabled, Google searches for the YouTube channel, "DruStory News," generate results which include:

   a.   Plaintiff Hepkins' websites https://www.drustorynews.com and https://www.druhepkins.com;

   b.   Plaintiff Hepkins' Twitter page https://twitter.com/drustorynews?lang=en;

   c.   Plaintiff Hepkins' Facebook page https://www.facebook.com/DruStoryNews;

1665102.1 1911115.1
REVISED SECOND THIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES

1          d.      Plaintiff Hepkins' Instagram page

2    https://www.instagram.com/drustorynews/?hl=en; and

3          e.      Plaintiff Hepkins' Patreon page https://www.patreon.com/Drustorynews.

4    The channel, https://www.Youtube.com/user/DruhepkinsBlogs, does not appear on Google searches

5    with "Restricted Mode" enabled on YouTube.

6          337.340.      289. Plaintiff Hepkins is informed and believes that Defendants have used

7    their artificial intelligence programs, algorithms and other filtering tools in misapplying "Restricted

8    Mode' to nearly all of the "DruStory News" videos in accordance with their policy and practice of

9    discriminating against African Americans on the YouTube platform.

10          a.      Defendants routinely misapply "Restricted Mode" to "DruStory News"

11   compliant videos.  During the months of June and July, the Defendants applied "Restricted Mode" to

12   more than 90% of the videos uploaded to "DruStory News."

13          b.      As of July 30, 2020, of the 53 videos which Defendants have listed for

14   "DruStory News," only 5 were listed when "Restricted Mode" was enabled.



26   Only 3three of those videos could actually be watched.

27          c.      By August 13, 2020, 54 videos were listed on "DruStory News" when

28   "Restricted Mode" was enabled.

-143-                          Case No. 5:20-cv-04011 LHK .

REVISED SECONDTHIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT,
RESTITUTION, ACCOUNTING AND DAMAGES



1

2

3

4

5

6

7

8

9

10

11

12

13                  d.      When "Restricted Mode" is enabled, for 51 of those 54 videos listed, viewers

14   on "DruStory News" see a black screen generated by Defendants with the notice:



27

1    338.341.          290. Among the videos which Defendants prevent viewers from watching

2    with "Restricted Mode" enabled are all of the boxing videos uploaded to "DruStory News" and a

3    number of general interest videos such as:

4              a.          https://www.Youtube.com/watch?v=wPOV8OZybyI, "What's in the

5    Water?";

6              b.          https://www.Youtube.com/watch?v=85z9CJXpyo0, "The Reason for Vegan:

7    Real Food for Thought";"

8              c.          https://www.Youtube.com/watch?v=xcTuhXdjjD8, "The Revival of Overt

9    American Racism (Part 1)";"

10             d.          https://www.Youtube.com/watch?v=8ULbXEKs0hg, "TRUTH:  Should

11   Fluoride Be in Our Water?";

12             e.          https://www.Youtube.com/watch?v=FtBUOc2rt_4, "Sellers:  Beware of

13   Paypal Charge Back Scammers!!!!!";

14             f.          https://www.Youtube.com/watch?v=ht67K-eqQok, "March for the Death of

15   Eric Garner in Staten Island";"

16             g.          https://www.Youtube.com/watch?v=P3mv65ZzLvY, "Are More Jews

17   Showing Support for Palestine (Part 1)";"

18             h.          https://www.Youtube.com/watch?v=PEHXa_5MYAc, "Eric Garner Death

19   and Funeral – Full Unseen . . . ."

20   None of these videos violate any of Defendants' Community Guidelines or TOS.

21        339.342.          291. The very same 3three videos that could be viewed when "Restricted

22   Mode" was enabled on July 30, 2020, are still the only 3three videos that could actually be watched

23   on August 13, 2020: (i)  https://www.Youtube.com/watch?v=MiAXR7JdbNU, a video entitled "The

24   Real TRUTH About the Cosby Deposition";. (ii)

25   https://www.Youtube.com/watch?v=orzkRhnVJp4, a video entitled "The Truth About Cereal:

26   Cereal is Bad . . . ";" and https://www.Youtube.com/watch?v=M4EWDVHZNIc, a video entitled

27   "Are More Jews Showing Support for Palestine (Part 2).  "

28

1          a.          However, even for these 3three videos, viewers cannot actively engage on the

2  "DruStory News" channel because they cannot leave comments or view comments while "Restricted

3  Mode" is enabled.

4          b.          Where viewer comments and Plaintiff Hepkins' responses would be, for these

5  3three videos, viewers see Defendants' legend:  "Restricted Mode has hidden comments for this

6  video."

7          340.343.          292. Plaintiff Hepkins is informed and believes that the "Up Next" feature

8  should display on the viewer's screen a list of quality videos that are by "DruStory News," relate to

9  content similar to the video being watched, be videos uploaded to channels to which the viewer

10 subscribes and/or be similar to other videos historically viewed previously by that viewer, so that the

11 viewer sees recommendations for more videos they want to watch.  However, Defendants rarely

12 display "Up Next" recommendations for "DruStory News" videos or for videos of other African

13 American YouTube creators.  Instead, Defendants have transformed "Up Next" into a billboard for

14 the videos of Defendants' preferred YouTube partners, forcing "DruStory Viewers" who are looking

15 African American creators' videos, or those regarding specific subjects to watch a stream of video

16 thumbnails with titles featuring Fox News videos and YouTube Movies.  Of course, "DruStory

17 News" does not receive any revenue for the "Up Next" advertising Defendants is supplying to Fox

18 News or YouTube Movies on the channel.

19         341.344.          293. Defendants have flooded "Up Next" video recommendations for the

20 following "DruStory News" videos:

21          a.          For https://www.Youtube.com/watch?v=KdVXcpBQOvs, "BIG NEWS

22 Cosby Appeal is Granted," Defendants posted video recommendations for 9nine Fox News videos

23 and 10 YouTube Movie videos;

24          b.          For https://www.Youtube.com/watch?v=BjgQVdsPTrU, "The Fear Agenda,"

25 Defendants posted video recommendations for 4four Fox News videos and 14 YouTube Movie

26 videos;

27

28

1          c.      For https://www.Youtube.com/watch?v=1H5ujVGqT6I, "New Year's

2 Message to the Light Workers," Defendants posted video recommendations for 6six Fox News

3 videos and 9nine YouTube Movie videos;

4          d.      For https://www.Youtube.com/watch?v=68lsRzaRb4Y, "Anthony Joshua's

5 Redemption," Defendants posted 5five YouTube Movie recommendations;

6          e.      For https://www.Youtube.com/watch?v=Z9pFztQ_WUY, "DRAMA Behind

7 the Scenes of Cosby Appeal Hearing," Defendants posted video recommendations for 5five Fox

8 News videos and 10 YouTube Movie videos; and

9          f.      For https://www.Youtube.com/watch?v=R1i08ILkzQk, "Democratic

10 Dilemma:  Are People of Color Ready . . .," Defendants posted video recommendations for 12 Fox

11 News videos and 3three YouTube Movie videos.

12    342.345.      294. Plaintiff Hepkins is also the creator and owner of the DruStory News

13 Blog, www.drustorynews.com.  Plaintiff Hepkins published an article entitled "Was Michael

14 Jackson Innocent or Guilty, the Final Verdict" on the Drustorynews.com blog.  The article was for a

15 short time highly sought after and widely read on the internet.  However, after several weeks, the

16 article was shadow banned and no longer appeared in Google searches for "Michael Jackson," or

17 "Michael Jackson Innocent."  The article could only be found on Google by inputting a link to the

18 article or by accessing the blog and searching for it there.

19    343.346.      295. Plaintiff Hepkins is informed and believes that Defendant Google's

20 removal of the "Was Michael Jackson Innocent or Guilty, the Final Verdict" article has caused

21 Plaintiff Hepkins to lose views on www.drustorynews.com, and to lose revenue for that website.

22    **6.**    **Harvey Stubbs**

23    344.347.      296. Plaintiff Stubbs is an African American YouTube commentator residing

24 in the State of Illinois who is the creator and owner of the YouTube channels "Your World Your

25 View," "Harvey Superboy," "Harvey Superboy 1," "HARVEY SUPERBOY," and "J Jackson."

26 Since 2007, Plaintiff Stubbs has been uploading videos principally consisting of commentary

27 regarding events, social issues, politics, news, celebrities and people who are of interest to or affect

28 the African American Communitycommunity in general, and the Chicago Area African American

1   ~~Community~~community in particular.  Plaintiff Stubbs is a military veteran and life-long resident of

2   the Chicago Area, who is active in his community and offers a unique perspective.

3       ~~345.~~348.       **297.** Plaintiff Stubbs was forced to create a number of additional YouTube

4   channels as a result of Defendants' repeated unwarranted flags and Community Guidelines strikes

5   against his channels.

6       ~~346.~~349.       **298.** "Your World Your View," which was created in September of 2013, has

7   generated 6.6 million views.

8       ~~347.~~350.       **299.** Plaintiff Stubbs long has observed issues with Defendants' reporting of

9   the number of views for individual new videos and for his YouTube channels over the years.  For

10  popular new videos, where many viewers were leaving comments, the numbers of views did not

11  appear to grow along with the number of new comments, the Defendants' reported view numbers

12  grew only very slowly over time -- regardless of the popularity of the video or the number of other

13  YouTube creators that recommended and posted links to the video.  Plaintiff Stubbs is informed and

14  believes that the Defendants' reported number of views for the videos, and corresponding views for

15  the channel on which those videos were posted were inaccurate, under reported, and caused

16  Defendants to calculate incorrect revenue amounts generated by the videos, resulting in an

17  underpayment of revenue based on views and CPM  for the videos and the channels.

18      ~~348.~~351.       **300.** Plaintiff Stubbs does not have access to the data upon which Defendants

19  calculate revenue for his "Limited" monetization videos or channels, such as daily subscriber

20  numbers, view numbers or watch times.  Defendants alone control access to the underlying data.

21  Without this information, Plaintiff Stubbs cannot calculate the additional revenue ~~which~~ Defendants

22  owe to him under the circumstances.

23      ~~349.~~352.       **301.** Plaintiff Stubbs also is informed and believes that Defendants have not

24  paid him for additional advertising revenue associated with demonetized videos and/or channels.

25  Though Defendants have restricted many, if not the vast majority, of all of the videos posted on the

26  YouTube platform by Plaintiff Stubbs.~~ Some,~~ some of these videos have "Limited" monetization

27  and produce an income stream.  Under the TOS and Adsense agreement, Defendants should be

28

1 reporting and paying Plaintiff Stubbs advertising based on the advertisements which Defendants

2 actually play or post on his videos and channels.

3      350.353.      302. Plaintiff Stubbs is further informed and believes that for some of those

4 videos which Defendants demonetized because they are "unsuitable" for its advertisers, for which

5 Plaintiff Stubbs receives no reported revenue, Defendants nonetheless have played or posted ads

6 before, during and/or after videos, and have been posting single ads in the "Up Next" column which

7 appears on the screens of viewers who access Plaintiff Stubbs' channels.

8      351.354.      303. Defendants have not paid to Plaintiff Stubbs any of the revenue generated

9 when Defendants stream or post ads on demonetized videos or on the channel.  Plaintiff Stubbs does

10 not have access to the underlying data used to calculate either the total number of ads played/posted

11 on or with his demonetized videos, the CPM, the watch times, or the money that Defendants owe to

12 him.  Defendants alone control the access to the data required to calculate how much additional ad

13 revenue Defendants owe to Plaintiff Stubbs.

14      352.355.      304. Since 2007, Defendants wrongly, repeatedly, and consistently flagged

15 Plaintiff Stubbs' videos for purported violations of Community Guidelines and TOS.  Plaintiff

16 Stubbs's videos contain no nudity, sexualized scenes or language, graphic depictions of sex or

17 violence, drug abuse, or alcohol consumption.  Additionally, when he uploads videos with adult

18 themes, Plaintiff Stubbs tags the video as suitable for age 18 or older, and often adds a specific verbal

19 and written warning at the beginning of the video stating that adult themes will be discussed and the

20 viewer should take steps to watch the video privately.

21      353.356.      305. Defendants have flagged and issued Community Guideline Strikes

22 against Plaintiff Stubbs' compliant videos countless times over the past 13 years.  Defendants have

23 even taken down Plaintiff Stubbs' channels "Harvey Superboy1," HARVEY SUPERBOY,"

24 "Harvey SuperBoy," "Mr Superboy 223," and "J Jackson:." these These channels cannot be located

25 on the YouTube platform using searches for those names.  Defendants also removed all of the videos

26 that were uploaded to these channels.

27      354.357.      306. Though Plaintiff Stubbs appealed many of the wrongful flags and

28 Community Guideline Strikesstrikes, Defendants ignored his appeals.  Plaintiff Stubbs has been

1    forced, time and time again to start new YouTube channels and renew efforts to obtain sufficient

2    subscribers, viewers and viewing hours to requalify for Defendants' benefits on the platform.

3         355.358.        307. Defendants routinely apply "Restricted Mode," to Plaintiff Stubbs'

4    videos that fully comply with Defendants' Community Guidelines and TOS, regardless of the

5    content of those videos.  As of July 29, 2020, "Your World Your View," had 1,121 videos uploaded

6    and listed on the channel.  When "Restricted Mode" was enabled, viewers could see 51 of those

7    videos listed but could watch only 16 of those 1,121 videos.  As of August 13, 2020, when

8    "Restricted Mode" was enabled, only 40 of the 1,121 videos were listed.  4 videos could be watched.

9    In other words, Defendants have now restricted access to all but 4 of 1,121 "Your World Your View"

10   videos.  Viewers cannot watch videos such as:

11            a.     https://www.Youtube.com/watch?v=1YW0Pb0o374, "Walmart Getting Rid

12   of Greeters," discussing the significant positive effect of employing "greeters" for the aged, the

13   disabled, and veterans; as well as, the costs which communities pay when Walmart opens its doors, in

14   terms of tax breaks given, lost and failed local businesses and low wage jobs—;

15            b.     https://www.Youtube.com/watch?v=Ulc5GmcH6qg, "Cosby Show

16   Residuals," discussing the disparity between television companies' pulling episodes of the Cosby

17   Show from circulation after Bill Cosby's conviction versus their handling of other shows where

18   serious issues arose concerning actors;

19            c.     https://www.Youtube.com/watch?v=2sQfK2XVIR, "Carol Channing Gone at

20   97," discussing Carol Channing as a Black artist who spent most of her career passing as a White

21   woman;

22            d.     https://www.Youtube.com/watch?v=sg-wt_M-F9I, "The Go Fund Me Liars,"

23   discussing a scam involving a White couple and a White homeless veteran who fabricated a story to

24   raise funds on social media to raise money for the veteran;

25            e.     https://www.Youtube.com/watch?v=egRC6uBwNd4, "New Vid Up,"

26   announcing a new video posted to a YouTube channel;

27            f.     https://www.Youtube.com/watch?v=zw7p4VHjBKY, "New Video at

28   Blackjunction 6," announcing a new video posted to a website; and

g.  https://www.Youtube.com/watch?v=sGAYU00Z0QE, "Aretha Franklin Gone at 76," discussing the career and legacy of Black artist Aretha Franklin.

356.359.      308. Plaintiff Stubbs also experienced repeated, consistent and regular interruptions and service quality issues regarding audio and visual aspects of videos posted to his channel.  Over the years, he has received numerous comments from viewers reporting problems listening to videos such as audio interruptions, and substandard audio quality.  In https://www.Youtube.com/watch?v=_DxcNH0BZ_E, "My Voice," Plaintiff Stubbs notes that he has "[r]eceived complaints about audio issues going on for years; this is games they play It happens every year; this crap is not me, every year around this time of year, get comments to change subjects, problems; range noises; as well as, reporting visual problems such as poor quality or distorted images."

357.360.      309. Plaintiff Stubbs documented the video quality issue in comments to videos, such as Plaintiff Stubbs uploaded two videos discussing the specific problems his viewers were experiencing:  https://www.Youtube.com/watch?v=GLWe4FJC--Y, "Sound of My Voice," and https://www.Youtube.com/watch?v=VJDuaSA-vtA, "Issues with Viewing."

358.361.      310. As of July 29, 2020, "Your World Your View" viewers experienced observable issues with each of the following videos:

a.  https://www.Youtube.com/watch?v=gOXHuz1w2b0, "Zoe is Just Like Her Mother," the audio cut out 5 minutes into the 11 minute video;

b.  https://www.Youtube.com/watch?v=jnZtybgx9-I, "Look at the Support They Get," several deep beeps played at 16 and 17 minutes into the video and were repeated later in the audio;

c.  https://www.Youtube.com/watch?v=Eq59sUu68Cc, "Racism at Buffalo Wild Wings," the audio was garbled at 2 minutes into the video;

d.  https://www.Youtube.com/watch?v=2b2pyNLuCps, "DL Talk Show Cancelled," the audio was garbled and disrupted at 3, 9 and 11 minutes into the 12 minute video; and

e.  https://www.Youtube.com/watch?v=_DxcNH0BZ_E, "My Voice," the audio was distorted intermittently throughout the video.

1   359.362.      311. For years, "Your World Your View," viewers have had audio issues with

2   videos regardless of how Plaintiff Stubbs recorded and uploaded the video, and despite his using

3   different or new recording technologies.  Plaintiff Stubs cannot replicate the problems when he plays

4   the videos.  Plaintiff Stubbs is informed and believes that the problems viewers have watching videos

5   his videos discourages discourage new viewers from watching videos on his YouTube channels,

6   annoys annoy viewers so that they do not watch full videos and damages damage his channel by

7   giving a false impression that the video videos have poor production values and/or that he does not

8   value his viewers enough to upload good quality videos.  Plaintiff Stubbs is also informed and

9   believes that the substandard audio and video experience about which his viewers complain

10  originates with Defendants, their employees and/or their independent contractors.

11  360.363.      312. Defendants also ad bomb those few "Your World Your View" videos

12  which have full or "Limited" monetization.  For example, on July 29, 2020, on

13  https://www.Youtube.com/watch?v=jUdMKEP9E2c, "It was Just a Matter of Time," Defendants

14  played 2 streaming ads and 2 banner ads at the beginning of the video, as well as, 1 streaming ad and

15  a banner ad at 2 minutes, 6 minutes and 10 minutes into the video, plus 2 streaming ads and 2 banner

16  ads at the conclusion of the video, as well as showing an ad at the top of "Up Next."

17  361.364.      313. Defendants also flood the "Up Next" column for "Your World Your

18  View" with extraneous video recommendations that bear no relation to the individual videos being

19  viewed.  On July 29, 2020, Defendants flooded the "Up Next" recommendations for the following

20  videos:

21         a.     https://www.Youtube.com/watch?v=jUdMKEP9E2c, "It was Just a Matter of

22  Time," 14 Fox News videos, 2 YouTube Movies videos appeared in "Up Next";

23         b.     https://www.Youtube.com/watch?v=9WfH9WTk138, "Open Your Eyes," 12

24  Fox News videos appeared in "Up Next";

25         c.     https://www.Youtube.com/watch?v=FWahxaWfftE, "Don't Ridicule People

26  with Mental Health Issues," 15 Fox news videos and 4 YouTube Movies videos appeared in "Up

27  Next";

28

REVISED SECOND THIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT,
RESTITUTION, ACCOUNTING AND DAMAGES

1          d.          https://www.Youtube.com/watch?v=oHAxDyW8uIg, "Jada Can't Pass

2   Judgement," 8 Fox News videos, 9 YouTube Movies videos appeared in "Up Next";" and

3          e.          https://www.Youtube.com/watch?v=obDvE2pOU6w, "Nothing to Connect,"

4   9 Fox News videos and 2 YouTube Movies videos appeared in "Up Next."

5          362.365.          314.   Over the years, Plaintiff Stubbs has uploaded many videos addressing

6   political subjects.  Since 2016, Plaintiff Stubbs also has posted a number of videos critically

7   appraising President Trump, his public statements, and his actions taken prior to becoming president

8   and as president.  Recently, Defendants have been streaming ads and posting banner ads on "Your

9   World Your View" soliciting support for President Trump's reelection:

10          a.          https://www.Youtube.com/watch?v=2b2pyNLuCps, "DL Talk Show

11   Cancelled," Defendants posted a banner ad on the video "Are you a Trump voter in 2020?" and an ad

12   in "Up Next," for "action.donaldjtrump.com;"

13          b.          https://www.Youtube.com/watch?v=obDvE2pOU6w, "Nothing to Connect,"

14   Defendants streamed an ad soliciting support for Republican candidates paid for by

15   "action.donaldjtrump.com," and posted a banner ad entitled "'Text  to Join' 88022 and stand with

16   President Trump";"

17          c.          https://www.Youtube.com/watch?v=jnZtybgx9-I, "Look at the Support They

18   Get," Defendants streamed an ad soliciting contributions and posted a banner ad for

19   "action.donaldjtrump.com;" and

20          d.          https://www.Youtube.com/watch?v=P5gUc1HLce4, "Your World Your

21   View," Defendants streamed an ad entitled ""Official Survey" and posted a banner ad for

22   "action.donaldjtrump.com;" as well as an ad in "Up Next" entitled ""Text 'JOIN' to 88022 and Stand

23   with President Trump!"

24          363.366.          315. Plaintiff Stubbs is informed and believes that Defendants have

25   intentionally placed these ads soliciting support for President Trump, a person who has made

26   numerous statements about African Americans that are racist, disparaging, untrue, and/or grossly

27   distorted, and about African Americans living in the Chicago Area, in order to irritate, annoy, and/or

28

1   discourage African American subscribers and viewers of "Your World Your View," and to reduce

2   view numbers and viewing hours for the individual videos affected, and the channel as a whole.

3        364.367.        316. Defendants' actions have damaged Plaintiff Stubbs and will continue to

4   cause him damage in the form of reduced revenue and reduced reach for his videos.  Defendants have

5   also injured the African American subscribers and viewers of "Your World Your View," by

6   providing substandard video services to them, and to the extent that they rely on public internet

7   services from libraries, public retailers, schools or places of employment, by applying "Restricted

8   Mode" to the videos.  Poor African American YouTube viewers who rely on free publicly available

9   internet services can only view less than 1% of the "Your World Your View" videos.

10              **7.      Khalif Muhammad**

11       365.368.        317. In 2006, Plaintiff Muhammad created his YouTube channel to publish

12  his personal video commentaries as a vehicle to combat historical pervasivelo racism in the United

13  States and to promote the United Independent Compensatory Code developed by Neely Fuller Jr.

14  Over the years, the channel has been renamed several times.  Plaintiff Muhammad's YouTube

15  channel is now called "Dr.Syn-Q."  In all, Plaintiff Muhammad has uploaded 273 videos to his

16  YouTube channel.

17       366.369.        318. At this point, Plaintiff Muhammad does not know how many views this

18  channel in fact has generated over the past 14 years:  For several years, Defendants reported that

19  "Dr.Syn-Q" had in excess of 900,000 views.  The channel view numbers invariably stayed just under

20  1 million views, regardless of the number of videos uploaded to the channel.  "Dr.Syn-Q" could

21  never reach the 1 million view milestone.  In 2020 Defendants' reported views inexplicably started to

22  decline.

23              a.       On June 26, 2020, Defendants reported 899,717 views for the channel.

24  Plaintiff Muhammad received no notice from Defendants regarding the decreased reported view

25  numbers.  Plaintiff Muhammad could not understand how the aggregate number of views for the

26  lifetime of the channel had decreased, particularly after Defendants reported view numbers in excess

27  of 900,000 for several years.

28

1    b.    On August 9, 2020, Defendants reported only 388,997 views for the channel.

2  "Dr.Syn-Q" had lost in excess of 500,000 views.

3    c.    On August 11, 2020, Defendants reported 643,790 views for the channel.



16  Defendants' current reported view number is approximately 300,000 fewer than the number

17  Defendants reported in 2019.

18    367.370.    319. Plaintiff Muhammad is informed and believes that Defendants' 2020

19  reports of the number of views for "DryDr.Syn-Q" are inaccurate and unreliable, that the

20  Defendants' reported subscriber numbers anand watch timetimes are also likely inaccurate given the

21  Defendants' fluctuating reported view numbers.  Plaintiff Muhammad also is informed and believes

22  that Defendants' TOS's which he signed doesdo not mention, much less authorize, Defendants to

23  unilaterally reduce the reported numbers of views (or numbers of subscribers or watch times) without

24  notice or an opportunity to object.  Plaintiff Muhammad is further informed and believes that

25  Defendants' reported lower view numbers for "Dr.Syn-Q" violate the TOS and the Adsense

26  agreement.

27    368.371.    320. Despite "Dr.Syn-Q" having generated nearly 1 million views by 2019,

28  Defendants now report a total watch time of 2,083 hours.  Plaintiff Muhammad is informed and

1  believes that the Defendants' reported watch time for the channel is inaccurate and undercounts

2  actual historical and current hours of "Dr.Syn-Q" videos viewed.  Plaintiff Muhammad is also

3  informed and believes that Defendants' inaccurate reports of view numbers, subscriber numbers and

4  watch times ~~has~~have prevented him from demonstrating that "Dr.Syn-Q" has qualified previously for

5  Defendants' benefits such as monetization of the channel.

6      ~~369.~~372.          ~~321.~~ Plaintiff Muhammad does not have access to the underlying data

7  regarding how many viewers subscribed to "Dr.Syn-Q," how many watched videos uploaded to

8  "Dr.Syn-Q," or the total hours viewers watched those videos at any time between 2006 and 2020.

9  Accordingly, Plaintiff Muhammad cannot accurately determine whether "Dr.Syn-Q" has qualified

10  for the benefits such as monetization~~,~~ and, if so, how much Defendants owe to him under the TOS

11  and Adsense.

12      ~~370.~~373.          ~~322.~~ Recently, Defendants removed https://youtube/D0&mM_OUEkg,

13  "Neely Fuller Jr:  MAXIMUM SOPHISTICATED CONFUSION," a 9 minute video posted in 2007

14  because of what Defendants assert is "inappropriate content."



1

2

3

4        a.      As of August 10, 2020, the video could not be viewed.  The video frankly

5 discusses social practices which exist and describes them as part of an intentional program to

6 preserve regional power in the hands of a white minority.  The video is academic, even tempered in

7 tone, and contains no nudity, sexualized scenes or language, graphic depictions of sex or violence,

8 drug abuse, or alcohol consumption.  While the video discusses "white supremacists," it does not

9 identify any individual, entity, or specific group, much less disparage, harass, threaten, or bully any

10 individual or group.  The video does not constitute hate speech or incite wrongful conduct.

11        b.      Plaintiff Muhammad, filed an appeal with Defendants.  Defendants did not

12 respond to Plaintiff Muhammad.

13        c.      Days after removing the video from "Dr.Syn-Q," Defendants restored

14 "MAXIMUM SOPHISTICATED CONFUSION" to the channel, and removed the prior "Restricted

15 Mode" designation.



16

17

18

19

20

21

22

23

24

25

26

27

28

K .

RESTITUTION, ACCOUNTING AND DAMAGES

d.      As of August 14, 2020, the video was listed, available and watchable on "Dr.Syn-Q."

371.374.      It is outrageous that Defendants removed this video after 13 years on the channel, particularly given the resurgence of White Supremacist organizations, increasing hate crimes against people of color, and the recent subversive activities of White Supremacists under the cover of Black Lives Matter protests.

372.375.      323. Defendants have also demonetized "Dr.Syn-Q" without giving any specific explanation or rationale.  For 13 years, Defendants have refused to accord even "Limited" monetization for a single compliant "Dr.Syn-Q" video.  Plaintiff Muhammad cannot understand why Defendants demonetized videos such as:

a.      https://www.Youtube.com/watch?v=4tiG9dtpnmg, "My Response to Racist Propaganda . . .";"

b.      https://www.Youtube.com/watch?v=P7wdO4GJojk, "My Existence:  Paying My Respects to Muhammad Ali!";"

c.      https://www.Youtube.com/watch?v=QIRowdf6x2k, "The Education of whiteWhite Supremacy . . .";" and

d.      https://www.Youtube.com/watch?v=clldd6sGpCI, "When We Were Slaves."

373.376.      324. For many years Defendants have employed their artificial intelligence, algorithm and other filtering tools to wrongfully apply "Restricted Mode," to many of Plaintiff Muhammad's videos.  Defendants' capricious application of artificial intelligence, algorithm and other filtering tools is arbitrary and entirely unrelated to the content of Plaintiff Muhammad's videos. From week to week, Defendants change the designations for individual videos, so that the number of videos whichthat can be watched with "Restricted Mode" is enabled likewise changes from week to week.  For example, of the 159 videos listed on "Dr.Syn-Q," as of August 8, 2020, only 19 videos were listed when "Restricted Mode" was enabled, and only 11 of those listed could be watched.

374.377.       325. Viewers who access "Dr.Syn-Q" from many public internet networks such as libraries, schools, commercial establishments offering free internet access, or places of employment where "Restricted Mode" is enabled,  cannot view most of the videos uploaded to the channel.  Defendants prevent these viewers from commenting on the videos that can be viewed, and prevent viewers from reading comments left by others.  For videos which can be viewed with "Restricted EnabledMode" enabled," viewers of "Dr.Syn-Q" see "Restricted Mode has hidden comments for this video" in the "comments" section of their screenscreens.

375.378.       326. Defendants prevent poor African American YouTube subscribers and viewers without internet connectivity at home from accessing "Dr.Syn-Q" videos.  Plaintiff Muhammad is informed and believes that manmany poor African Americans obtain YouTube access through publicly available free networks such as schools, libraries and retail businesses; and that such networks often enable "Restricted Mode" to prevent students and patrons from accessing pornography or otherwise inappropriate content.  Defendants' application of "Restricted Mode" to "Dr. Syn-Q" videos limits both Plaintiff Muhammad's reach on the YouTube platform because most of his videos cannot be watched by poor African Americans who rely on public free internet networks.  Plaintiff Muhammad also is informed and believes that Defendants' application of "Restricted Mode" also and silences African American YouTube subscribers and viewers because Defendants disable the comments on "Dr.Syn-Q," and no one can read, leave or respond to comments posted on "Dr.Syn-Q" videos when "Restricted Mode" is enabled.

376.379.       327. As of August 14, 2020, when "Restricted Mode" was enabled, all 159 "Dr.Syn-Q" videos were listed.  129 of those listed videos, when watched, displayed only a black screen with the legend, "This video is unavailable with Restricted Mode enabled.  To view this video, you will need to disable Restricted Mode," and could not be viewed.  30 of the remaining videos listed could be watched – 11 videos more than could be viewed on August 8, 2020.  The comments for these 30 videos were disabled and could not be read.

377.380.       328. Defendants' continued application of "Restricted Mode," to the following compliant videos defies any rational content based explanation:

1           a.      https://www.Youtube.com/watch?v=4tiG9dtpnmg, "My Response to Racist

2    Propaganda . . .," a discussion of a news article describing Black Friday protest in Chicago where

3    protesters successfully blocked shoppers from stores;

4           b.      https://www.Youtube.com/watch?v=Rytybtnwv30, "YouTube Flagged My

5    Video! Black Folks Guide . . . .," a composite, including Plaintiff Muhammad's statement of purpose

6    and commitment to the United Independent Compensatory Code and ads for African American

7    businesses, a discussion of his appeal of Defendants' "hate speech" flag and age restriction for "What

8    Should You Do When You're Called The 'N-Word,'" and a lengthy discussion of the electoral

9    college;

10           c.      https://www.Youtube.com/watch?v=P7wdO4GJojk, "My Existence:  Paying

11    My Respects to Muhammad Ali!," a series of video clips of historical public interviews of

12    Muhammad Ali by David Frost and William F. Buckley with Plaintiff Muhammad's personal tribute

13    to Muhammad Ali;

14           d.      https://www.Youtube.com/watch?v=9rryenTnblg, "Black Consciousness

15    Movement:  'Black' People. . . ," a statement in support of the United Independent Compensatory

16    Code, taking personal responsibility in the African American ~~Community~~community, and a rejection

17    of the cult of personality;

18           e.      https://www.Youtube.com/watch?v=QIRowdf6x2k, "The Education of

19    ~~white~~White Supremacy . . . .," a personal statement describing Plaintiff Muhammad's life journey,

20    rejection of a gang lifestyle, and commitment to fight ~~White Supremacy~~white supremacy, illustrated

21    with a collection of photographs of him as a child and a young man;

22           f.      https://www.Youtube.com/watch?v=P-OKdhEYeHs, "Is [King Noble] Black

23    Supremacy The Answer," a short reading from the United Independent Compensatory Code

24    notebook and commentary;

25           g.      https://www.Youtube.com/watch?v=gqPkW-npyRc, "My Weapon of

26    Choice,"  a short video which starts with a view of a gun barrel that turns into a camera;

~~1665102.1~~1911115.1        -161-        Case No. 5:20-cv-04011 LHK .

~~REVISED SECOND~~THIRD AMENDED CLASS ACTION COMPLAINT ~~FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES~~

1      h.      https://www.Youtube.com/watch?v=gB02GL_Ts5s, "The Religion of White

2   Supremacy," a short reading from "The United Independent Compensatory Code," by Neely Fuller

3   Jr., and a brief discussion of the text";[22]

4      i.      https://www.Youtube.com/watch?v=NSk5uPR562Y, "The Establishment of

5   Racism White Supremacy," a short reading from "The United Independent Compensatory Code," by

6   Neely Fuller Jr., and brief commentary; ~~and~~

7      j.      https://www.Youtube.com/watch?v=CBuTbCzB-M0, "These People Are

8   Victims of Racism," Plaintiff Muhammad's personal commentary regarding photographs of

9   "non-White" people throughout the world, the four principles of "The United Independent

10   Compensatory Code" along with his explanation of the terms and the politics of race; and

11      k.      https://www.Youtube.com/watch?v=clldd6sGpCI, "When We Were Slaves,"

12   a presentation of historic slave photographs with a short message exhorting people not to forget 400

13   years of slavery in the United States.

14   The content of these videos does not violate Defendants' Community Guidelines or TOS.  Rather, the

15   content includes accurate historical images, properly referenced readings of "The United

16   Independent Compensatory Code" with commentary, or Plaintiff Muhammad's personal

17   commentary regarding celebrities, historical figures or events and/or issues of the day.

18      ~~378.~~381.      ~~329.~~ Plaintiff Muhammad is informed and believes that Defendants have a

19   policy of identifying YouTube creators, subscribers and viewers by race; that Defendants are using

20   artificial intelligence, algorithm and other filtering tools to demonetize and restrict videos that are

21   created by or popular with people of color; and that Defendants have restricted most of the

22   "Dr.Syn-Q" videos because he is an African American.  Plaintiff Muhammad is further informed and

23   believes that Defendants' race based discriminatory conduct has hurt him personally by reducing his

24   reach on YouTube, has damaged "Dr.Syn-Q" by preventing revenue generation on the channel, and

25   has injured the "Dr.Syn-Q" subscribers and the viewers who have been unable to access "Dr.Syn-Q"

26   videos to which Defendants have applied "Restricted Mode."

27

28

8.     **Keu Reyes**

~~379.~~382.     ~~330.~~ Plaintiff Reyes is a professional writer, producer, videographer and filmmaker who works in television, film and online, creating original content~~,~~ and producing content for other music, comedic and dramatic artists.  When he works in collaboration with others, he retains the copyright for his work, or secures a permanent license to use the work.  Though Plaintiff Reyes works with many other artists, particularly with comics, producing online videos for multiple internet platforms, Defendants have shadow banned the name "Keu Reyes," on Google and YouTube for those who have "Restricted Mode" enabled.  A search using the words "Keu Reyes" on Google or YouTube will produce results which include only several individual videos created by Keu Reyes.  "Keu Reyes," the creator, does not appear in any search results when "Restricted Mode" is enabled.

~~380.~~383.     ~~331.~~ Plaintiff Reyes is the creator and owner of:

    a.     Youtube.com/Artistic Warfare, which was created in 2006, has acquired 590 subscribers and has generated 1 million views.  Artistic Warfare has 50 videos posted, principally in the English language, which discuss issues of the day, literature, and culture with a comedic intention.  Only 17 of these videos can be viewed with "Restricted Mode" enabled.  This channel has generated only $173.37 over the life of the channel.  This channel cannot be found on YouTube using a search for "Artistic Warfare," when "Restricted Mode" is enabled.

    b.     Youtube.com/Keu Reyes was created in 2011.  In the past 9 years, the channel has acquired 47,200 subscribers and has generated in excess of 23 million views.  Despite the number of views, this channel has generated only $29,725 over its lifetime.  The channel features music and comedic content, consisting of 160 videos, which include both animated and live action videos.  While 160 videos were uploaded and listed to this channel, only 53 can be viewed with "Restricted Mode" enabled.  This channel cannot be found on YouTube using a search for "Keu Reyes," when "Restricted Mode" is enabled.

    c.     Youtube.com/Soundication, which was created in 2012, has 231 subscribers and has generated 115,439 views.  Soundication is a music distribution channel for independent artists.  Soundication features 32 music and spoof videos in English and Spanish~~,~~; only 20 of these videos can be viewed with "Restricted Mode" enabled.  This channel has generated only $2.11 over

1  the course of its lifetime.  This channel cannot be found on YouTube using a search for

2  "Soundication," when "Restricted Mode" is enabled.

3           d.       Youtube.com/Multivision Network, which was created in 2013, has acquired

4  9,590 subscribers and generated in excess of 3.7 million views.  While Multivision Network has 133

5  Spanish language entertainment, cooking and ~~bar tending~~bartending videos~~,~~; only 69 of those can be

6  viewed with "Restricted Mode" enabled.  This channel has generated only $1,174.13 over its

7  lifetime.  This channel cannot be found on YouTube using a search for "Multivision Network," when

8  "Restricted Mode" is enabled.

9           e.       Youtube.com/La Optima, which was created in 2014, has 21 subscribers, and

10  has generated 2,220 views.  La Optima features 45 videos principally in the English language, only

11  27 of which can be viewed with "Restricted Mode" enabled.  This channel has generated only $0.17

12  over the course of its lifetime.  This channel cannot be found on YouTube using a search for "La

13  Optima," when "Restricted Mode" is enabled.

14           f.       Youtube.com/ClankTV, which was created in 2015, has acquired 4,980

15  subscribers and has generated 1.7 million views.  While ClankTV has 61 entertainment videos

16  uploaded and listed in the English language related to music, fashion, politics and conspiracies, only

17  18 of the videos can be viewed with "Restricted Mode" enabled.  This channel has generated only

18  $1,491.35 over the course of its lifetime.  This channel cannot be found on YouTube using a search

19  for "ClankTV," when "Restricted Mode" is enabled.

20  ~~381.~~384.       ~~332.~~  Over the years, Defendants have removed from YouTube two of Plaintiff

21  Reyes' monetized videos consisting of produced animated videos for purported copyright strikes.  As

22  Plaintiff Reyes had created the videos, and owned the rights to them, they should not have been

23  removed.  Defendants did not afford Plaintiff Reyes an opportunity to demonstrate that he owned the

24  copyrights to the two videos, or to appeal the Defendants' decision to remove the videos.

25  ~~382.~~385.       ~~333.~~Plaintiff Reyes has observed a pattern of Defendants removing

26  professionally prepared thumbnails from several of his channels.  Over time, as he noticed removed

27  thumbnails he has replaced them, only to find other thumbnails are subsequently removed.

28

1    383.386.        334. Often, though Plaintiff Reyes' videos have limited monetization or are

2    demonetized, identical videos he has created appear copied to the channels of other YouTube

3    creators, where they are fully monetized and generate more revenue for others who are violating

4    Plaintiff Reyes' copyright, than he, the creator and copyright holder, is generating.

5          384.387.        335. When it comes to YouTube studios, people of color are treated like

6    second class citizens.  Plaintiff Reyes has personally observed the Defendants' racially

7    discriminatory practices.  As a professional videographer and producer, both Defendants and his

8    clients have invited him to use the YouTube production studios.  Defendants claim that they allow

9    YouTube creators to reserve space and specific equipment on specified dates and times.  On more

10   than one occasion, after Plaintiff Reyes reserved the studio and equipment, he then appeared on the

11   reserved date and time.  Defendants claimed to have double booked the studio and resources; they

12   gave a white creator access to the studio, and access to the equipment that Plaintiff Reyes had

13   reserved.

14         385.388.        336. On one occasion, when Plaintiff Reyes appeared for a reservation at the

15   studio, Defendants denied him access to the studio and the equipment that he had reserved.

16   Defendants then penalized Plaintiff Reyes because the person Defendants gave Plaintiff Reyes'

17   reservation returned equipment late:  Defendants assessed a strike against Plaintiff Reyes' channel

18   for late return of equipment – equipment which he was never even allowed to borrow.  After several

19   additional broken reservations at Defendants' studios, Plaintiff Reyes stopped making reservations

20   and using the studio or equipment.

21         386.389.        337. As a direct and proximate result of Defendants' racial discrimination and

22   wrongful conduct, the channels of Plaintiff Reyes have been unable to grow views, subscribers, view

23   times, or revenue for his channels.  Plaintiffs Reyes has lost significant revenue due to Defendants'

24   discriminatory revenue practices over the life of his channels, and will continue to do so into the

25   future.

26         **9.      Osiris Ley**

27         387.390.        338. Since 2012, Plaintiffs Reyes and Ley have uploaded 158 Spanish

28   language beauty videos featuring Plaintiff Ley, a Mexican American makeup artist who operates a

1   beauty school in Los Angeles and teaches aspiring makeup artists.  As a professional makeup artist

2   and teacher, Plaintiff Ley closely follows Defendants' Community Guidelines and TOS by not using

3   adult language, profanity, vulgarity, presenting explicit sexual or violent content, or by making

4   bullying remarks.  Plaintiff Ley is also mindful of the enormous potential for using makeup to

5   improve the lives of those who suffer from unsightly scars, ~~birth marks~~birthmarks and recent injuries.

6   She has created a number of videos demonstrating how to cover and/or lessen the appearance of

7   scars, ~~birth marks~~birthmarks and injuries.  She has a series of "Malquillaje" videos which feature

8   women of color on the street who are given  makeovers on the fly to correct makeup application

9   mistakes.  Especially popular are Plaintiff Ley's Halloween makeup videos in which she

10   demonstrates how to use makeup to create the appearance of wounds or how to mimic the appearance

11   of celebrities.

12      ~~388.~~391.      ~~339.~~ The videos uploaded and listed to the channel "Osyley" are each

13   professionally recorded, lighted and edited by Plaintiff Reyes.  The videos are professional quality

14   videos, designed for a sophisticated Spanish speaking audience.  Using the YouTube ~~close~~closed

15   caption function, the videos may be accessible to non-Spanish speakers.

16      ~~389.~~392.      ~~340.~~ Despite all of her efforts to comply with applicable Community

17   Guidelines and TOS, of the 158 videos posted to "Osyley," only 134 of them can be viewed with

18   "Restricted Mode" enabled.   It is unfathomable that Defendants have applied "Restricted Mode" to

19   any of the following videos:

20         a.   https://www.Youtube.com/watch?v=llxszfQpuig, "Friends with Benefit"

21   New York ~~Maquillaje~~Malquillaje 911 Episodio 026, a video which features the makeup artist on a

22   subway in New York City remaking a rider's eyebrows between subway stops;

23         b.   https://www.Youtube.com/watch?v=nZKc7fjwzDo, "Envy Me, Beesh!"

24   ~~Maquillaje~~Malquillaje 911 Saint Valentine's Day Malquillaje Ep.023, a video which features the

25   makeup artist going to the home of a bereaved woman who was nominated for a makeover and free

26   dress for Valentine's ~~day~~Day by her best friend, and depicts the artist applying makeup and dressing

27   the hair of a young woman whose father died;

28

**REVISED SECOND~~THIRD~~ AMENDED CLASS ACTION COMPLAINT ~~FOR DECLARATORY JUDGMENT,~~
~~RESTITUTION, ACCOUNTING AND DAMAGES~~**

1             c.       https://www.Youtube.com/watch?v=xDg7bM_NrOY, "The Dangers of

2   Sleeping with Makeup," a video which features an elderly man who went to classes to learn to do his

3   wife's makeup when she could no longer manage putting it on; photos of the inside of the eyelid of a

4   woman who routinely slept without removing her makeup, leaving black encapsulated mascara

5   bumps on the inside of her inflamed eyelids; making up a dog, ending with a "who wore it better"

6   comparing a killer whale with Kim Kardashian in a black and white dress;

7             d.       https://www.Youtube.com/watch?v=YK-6iGigmQc, "Yucatan Peninsula

8   (Cancun)" #Maquillaje911 Episodio 014 Osyley, which features the makeup artist approaching a

9   woman on the street in Cancun, Mexico and offering to do her makeup and to correct her eyebrows,

10   plus a professional critique of the artist's own makeup application on the fly with cartoon effects;

11             e.       https://www.Youtube.com/watch?v=YPBJaahc7E, "Enough!  Real Stories of

12   Sexual ~~Harrasment~~Harassment Book," which is a short promotion for a collection of stories about

13   women's experiences being sexually ~~harrassed~~harassed;

14             f.       https://www.Youtube.com/watch?v=iAXVuA9XeoY, "A Personal Sexual

15   Harassment Story" Makeup Diaries~~;~~, which features the makeup artist telling her personal story of

16   being sexually harassed at age 17, and advising that employers be careful using ambiguous language,

17   and to avoid double entendres~~;~~ and advising women to focus on doing the best work they can in the

18   most professional manner to avoid misunderstandings;

19             g.       https://www.Youtube.com/watch?v=QP2JrodUMg4, "How to Prevent and

20   Get Rid of Stretch Marks During Pregnancy," which features photographs of pregnant bellies with

21   stretchmarks and a discussion of products to apply to minimize itchiness and to heal the scars caused

22   from pregnancy, with a demonstration of how to apply the products to the pregnant belly;

23             h.       https://www.Youtube.com/watch?v=biTcgjGeGuO, "What is a Babymoon?"

24   which features the pregnant makeup artist in a bikini explaining what a babymoon is, and how to

25   enjoy the last break before the arrival of a new baby;

26             i.       https://www.Youtube.com/watch?v=K9AUYRyjtlA, "Como Llegue a los 100

27   mil suscriptores en YouTube!?" which features the makeup artist thanking her subscribers, playing

28

~~1665102.1~~ 1911115.1                 -167-              Case No. 5:20-cv-04011 LHK .

REVISED ~~SECOND~~THIRD AMENDED CLASS ACTION COMPLAINT ~~FOR DECLARATORY JUDGMENT,
RESTITUTION, ACCOUNTING AND DAMAGES~~

1  excerpts from her first several videos posted, and discussing her tongue-in-cheek approach to

2  makeup;

3        j.    https://www.Youtube.com/watch?v=dyfBiw7W510; "Tips de Andrea Rincon

4  para Tener un Cuerpazo," which features a discussion between the makeup artist and Andrea Rincon,

5  a personal trainer, regarding diet and exercise for weight loss;

6        k.    https://www.Youtube.com/watch?v=iOuhlls3Yrk; "Como Ponerse Una

7  Peluca de Cabello Sintetico," which features the makeup artist wearing a synthetic grey wig in the

8  style of a music video, and then demonstrates how to trim the wig, put on the special hairnet, put on

9  and adjust the wig for a natural look, and place two sided tape to secure the wig;

10       l.    https://www.Youtube.com/watch?v=J3ck1dyTUe8; "Trucos Para Tomar Las

11 Mejores Selfies y Verse Delgada, Joven y Bonita en Las Fotos," which features the makeup artist

12 showing the best angles for taking selfies to accentuate breasts, buttocks, faces, and waistlines;

13       m.    https://www.Youtube.com/watch?v=PMU043YZd1k; "Osyley El Mejor

14 Canal de ~~Maquillaje~~Malquillaje y Tutoriales en Youtube," which is a promotional video for the

15 channel and features snippets from various previous videos; and

16       n.    https://www.Youtube.com/watch?v=60-BXg0p71; "Como Hacer Cortadas o

17 Heridas falsas con ~~Maquillaje~~Malquillaje paso a paso," which features the makeup artist sculpting a

18 fake wound on her forearm using scar wax, latex, latex remover, fake blood, and a metal spatula.

19       ~~390.~~393.    ~~341.~~ Not one of these videos violates any of Defendants' Community

20 Guidelines or TOS; rather, each of the videos presents images similar to those viewers can see on

21 many fashion or makeup tutorial channels; or on channels featuring information important to

22 pregnant women.

23       ~~391.~~394.    ~~342.~~ The last of these "Restricted Mode" videos, "Como Hacer Cortadas o

24 Heridas falsas con ~~Maquillaje~~Malquillaje paso a paso," is the most popular video on "Osyley",

25 having generated 3.3 million views.  In subjecting this video to "Restricted Mode," Defendants

26 stopped this viral video in its tracks, and substantially reduced further views and revenues.

27 

28

1

2

3

4

5

6

7

8

9

10

11

12   392.395.        343. YouTube has many other such tutorial videos featuring fake injuries and

13   wounds which (unlike "Osyley's" video) can be viewed with "Restricted Mode" enabled:

14              a.      https://www.Youtube.com/watch?v=0no7JKSegDE, "19 TV AND MOVIE

15   MAKEUP FOR YOUR SFX LOOK" has 55 million views;

16              b.      https://www.Youtube.com/watch?v=YgdpzgORzhU, "Fake Cuts Tutorial

17   (Super easy makeup)," has 676,000 views;

18              c.      https://www.Youtube.com/watch?v=FjXr5mVLEek, "3 Easy LATEX-FREE

19   DIY Halloween wounds // Last minute ideas," has 2.8 million views;

20              d.      https://www.Youtube.com/watch?v=ZVupsQ6aH0I, "26 MOVIE MAKEUP

21   FOR YOUR SFX LOOK," has 54 million views;

22              e.      https://www.Youtube.com/watch?v=1zvZq4KspQQ, "HOW TO MAKE

23   SPECIAL EFFECTS WOUND TUTORIAL FOR BEGINNERS: DIY SCAR WAX," has 2,395

24   views;

25              f.      https://www.Youtube.com/watch?v=usE-aYmvdtU, "Easy Special Effects

26   Wound tutorial - CRC Makeup," has 1 million views; and

27              g.      https://www.Youtube.com/watch?v=yWICp97qwl4, "DIY Fake Wounds

28   with toilette paper," has 1.4 million views.

393.396.          344. Nor can bloody images be the basis to apply "Restricted Mode" because there are many similar such gory images in fake wound videos to which Defendants have not applied "Restricted Mode", such as:

        a.     https://www.Youtube.com/watch?v=mHicjx-JoJw, "Bullet Hole Halloween Tutorial!";



        b.     How to make fake cut mark?" and,



1

2

3

4

5

6

7

8

9          c.      https://www.Youtube.com/watch?v=hZCcjLEtj4k, "Zombie Toilet Paper

10   Wounds Halloween Tutorial."

11

12



13

14

15

16

17

18

19

20

21

22

23

24      394.397.      345. For reasons known only to Defendants, Defendants have limited the

25   monetization for most of the videos posted to "Osyley".  For a number of videos which Defendants

26   entirely demonetized, Defendants have continued to play ads before, during and after many of those

27   demonetized videos, but pay no related revenue to Plaintiffs Ley and Reyes.

28

1    395.398.        346. While most of the videos uploaded and listed for "Osyley" are at least

2    partially monetized, and most viewers watching "Osyley" see English language advertisements for

3    products and services available in the United States, Plaintiffs Reyes and OsleyLey are informed and

4    believedbelieve that Defendants pay advertising and revenue for CPM, banner ads, streaming ads,

5    and channel ads that are substantially lower than what Defendants pay for English language video

6    content viewed in the United States.  Plaintiffs Ley and Reyes are also informed and believe that

7    Defendants pay to creators more for advertisements based on the device the viewer uses to watch

8    "Osyley" videos, e.g., Defendants pay more when an "Osyley" video is played on an expensive smart

9    phone or tablet, than when it is viewed on a desktop computer.  As a direct result of Defendants'

10   practices, "Osyley" generates far less revenue than channels which feature English video content,

11   which do not feature people of color throughout the video, or which are watched by viewers with

12   expensive technology that is not accessible to most YouTube viewers of color.

13   396.399.        347. As a direct and proximate result of Defendants' racial discrimination and

14   wrongful conduct, "Osyley" has earned only $20,406.70 after generating in excess of 34 million

15   views.  Defendants' abuse of the "Restricted Mode" has reduced the growth of the channel's

16   subscriber numbers, viewer numbers and/or view times which otherwise would have substantially

17   increased.  Plaintiffs Reyes and OsyleyLey have been deprived of significant revenue due to

18   Defendants' discriminatory revenue practices over the life of this channel.

19   **V.    CLASS ALLEGATIONS**

20   397.400.        348. Plaintiffs bring this action on behalf of themselves and a putative class of

21   similarly situated persons who use or have used YouTube or any of the services that Defendants offer

22   in connection with YouTube and who come within the definition or classification of a protected class

23   of persons under 42 U.S.C. §1981, i.e., (the "Race Discrimination Class").

24   398.401.        349. Each and every claim alleged in this case is also alleged on behalf of

25   every member of the Race Discrimination Class.

26   399.402.        350. The Race Discrimination Class seeks both monetary damages, and

27   restitution, and/or other injunctive relief on behalf of any persons who fall within the Class

28   Definition:

1    400.403.        351. All persons or entities in the United States who are or were:

2              (i) a person or entity defined or classified as a protected class or person

3              under 42 U.S.C. §1981; and

4              (ii) are members, users and or consumers of YouTube who uploaded,

5              posted, or viewed video content on YouTube subject to

6              Google/YouTube's TOS, Mission Statement, Community Guidelines,

7              and/or any other content- based filtering, monetization, distribution,

8              personal data use policies, advertising or regulation and practices and

9              any other regulations or practices that are related to the YouTube

10             Platformplatform on or after January 1, 2015 and continuing through

11             to June 16, 2020 (the "Class Period").

12             Excluded from the Class are Defendants and their employees,

13             affiliates, parents, subsidiaries, and co-conspirators, whether or not

14             named in this Complaint, and the United States government.

15   401.404.        352. Class certification for the Race Discrimination Class is authorized under

16   Federal Rule of Civil Procedure 23 and applies to both claims for injunctive and equitable relief,

17   including restitution, under Rule 23(b) (2) and for monetary damages under Rule 23(b)(3).

18   402.405.        353. There are at least 42 million members of the Race Discrimination Class.

19   403.406.        354. The number of persons who fall within the definitions of the Race

20   Discrimination Class are so numerous and geographically dispersed so as to make joinder of all

21   members of the Classclass or Subclasssubclass in their individual capacities impracticable,

22   inefficient, and unmanageable, and without class wide relief, each member of the Race

23   Discrimination Class would effectively be denied his, her, its, or their rights to prosecute and obtain

24   legal and equitable relief based on the claims and allegations averred in this Complaint.

25   404.407.        355. There are questions of law and fact common to the Race Discrimination

26   Class that relate to and/or are dispositive of the nature and allegations of unlawful conduct alleged in

27   the Complaint, and the nature, type and common pattern of injury and harm caused by that unlawful

28

REVISED SECONDTHIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT,
RESTITUTION, ACCOUNTING AND DAMAGES

conduct and sustained by the putative members of the ~~Class~~class and ~~Subclass~~subclass including, but not limited to:

a.     Whether Defendants must provide its users and consumers with an accounting for debts owed under contract(s), including their TOS.

b.     Whether Defendants concealed, misrepresented or omitted to disclose material policies and practices regarding the unlawful regulation of video content, advertising, distribution, monetization, contractual obligations, and characteristics of the YouTube ~~Platform~~platform to the members of the Race Discrimination Class;

c.     Whether Defendants use or have used unlawful, discriminatory, anticompetitive and fraudulent, deceptive, unfair, and/or bad faith filtering tools and practices, in the code and operation of their machine based, algorithmic, or A.I. filtering tools, and/or other practices and procedures to review, regulate, and restrict content, and/or regulate and restrict the advertising, monetization, distribution, and property rights of the Race Discrimination Class;

d.     Whether Defendants are or have engaged in discriminatory practices against the members of the Race Discrimination Class based on protected characteristics under 42 U.S.C § 1981 or the Unruh Civil Rights Act;

e.     Whether Defendants breached or are in breach of their ~~form~~standardized digital consumer ~~form~~ contracts and obligations to the Race Discrimination Class;

f.     Whether Defendants have or are engaged in unlawful, deceptive, unfair, or anticompetitive practices that violate federal or California law, and harmed and injured the Race Discrimination Class;

g.     Whether the conduct of Defendants, as alleged in this Complaint, caused injury to the business and property of Plaintiffs and the members of the Race Discrimination Class;

h.     Whether Defendants' alleged regulations, practices, and conduct have caused or threaten to cause irreparable harm to the speech of the Race Discrimination Class so as to warrant the issuing of temporary, preliminary and/or final injunctive relief and corresponding declaratory relief with respect to the legal rights of the Race Discrimination Class;

i.     The scope, nature, substance, and enforcement of injunctive and equitable relief sought by the Race Discrimination Class;

j.     Whether Defendants were unjustly enriched or obtained profits or ill- gotten financial gains as a result of the unlawful, discriminatory, deceptive, unfair, or anticompetitive practices perpetrated against the Race Discrimination Class;

k.     Whether Defendants breached or are in breach of their contractual obligations, implied duty of good faith and fair dealing, and /or other promises under the standardized digital consumer form contracts entered into with members of the Race Discrimination Class during the Class Period;

l.     Whether Defendants' "content- based" rules, regulations and filtering practices, on their face and/or as applied, violate the free speech rights of Plaintiffs and the Race Discrimination Class under California or federal law;

m.     Whether Defendants' "content based" rules, regulations and filtering practices, on their face and/or as applied, violate the free speech rights of Plaintiffs and the Race Discrimination Class under California or federal law;

n.     Whether Plaintiffs and the members of the §1981Race Discrimination Class are entitled to an equitable accounting of debts owed under contracts entered into with Defendants;

o.     Whether Defendants have converted stolen, unlawfully possessed, and/or unlawfully used and profited from the property of Plaintiffs and the members of the §1981Race Discrimination Class so as to entitle them to royalties, damages, replevin, and other legal or equitable relief; and

p.     Whether the Race Discrimination Class is entitled to declaratory and other relief based on Defendants' assertion of immunity from liability under the Communications Decency Act, 15 U.S.C. § 230 (c) (the "CDA"), with respect to any of the claims or allegations asserted by Plaintiffs and the Race Discrimination Class in this Lawsuit.

405.408.   356. Each of individualindividually named Plaintiffs is a person protected under 42 U.S.C. § 1981, and a member of the Race Discrimination Class.

406.409.      357. The claims of Plaintiffs are typical of and identical to those of the Race Discrimination Class.

407.410.      358. Plaintiffs will fairly and adequately protect the interests of the members of the Race Discrimination Class.

408.411.      359. Plaintiffs are represented by counsel who are competent and experienced in the prosecution and defense of similar claims and litigation, including class actions filed, prosecuted, defended, or litigated in under California and federal law, in California and federal courts, in connection with claims and certification of consumer and civil rights classes composed of members who reside in California and/or the United States.

409.412.      360. The prosecution of separate actions by individual members of the Race Discrimination Class would create a risk of inconsistent or varying adjudications.

410.413.      361. The questions of law and fact common to the members of the Race Discrimination Class predominate over any questions of law or fact affecting only individual members of the Classclass or Subclasssubclass, including legal and factual issues relating to liability and the nature of the harm caused by Defendants' unlawful actions.

411.414.      362. The questions of law and fact common to the members of the Race Discrimination Class also predominate over any questions of law or fact affecting only individual members of the Classclass because all claims in this Lawsuit are governed under California or controlling federal law, including legal and factual issues relating to liability and the nature of the harm caused by Defendants' unlawful actions.

412.415.      363. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without the duplication of effort and expense that numerous individual actions would engender.

413.416.      364. Certification of the Race Discrimination Class is also superior to other available methods for the fair and efficient adjudication of this controversy because any and all

claims in this Lawsuit must be brought and venued in a court of competent jurisdiction located in Santa Clara County.

414.417.     365. The Race Discrimination Class areis readily definable and are, as defined, constitute categories for which records should and do exist in the files of Defendants.

415.418.     366. The prosecution as a class action will also eliminate the possibility of repetitious litigation.

416.419.     367. Class treatment will also permit the adjudication of smaller claims by members of the Race Discrimination Class who otherwise could not afford to litigate or assert the claims asserted by Plaintiffs in this Lawsuit.

## VI.   INDIVIDUAL CAUSES OF ACTION

**FIRST CAUSE OF ACTION**
**Request For A Declaratory Relief Judgment that Section §230(c)**
**Immunity Is Inapplicable to Discrimination Claims**
**(On Behalf Of Individual Plaintiffs And The §1981Race Discrimination Class)**

417.420.     368. Plaintiffs re-allege and incorporate herein by reference, as though set forth in full, each of the allegations set forth in paragraphs 1 through 365411 above.

418.421.     Plaintiffs' request that this Court interpret, construe, and adjudicate whether §230(c) applies to any of Plaintiffs' other claims for relief alleged herein, and to the extent that the Court finds that the immunity applies to any of those claims, whether its application violates the First and/or Fourteenth Amendments of the U.S. Constitution.

419.422.     The adjudication of §230(c)'s application to each of the claims for relief alleged herein raises important federal questions of law that are a fundamental and threshold element regarding the legal sufficiency of each claim, whether they arise under state or federal law.

420.423.     The resolution of those questions will also ensure the uniform application of federal law regarding the extent to which Congress both intended and could immunize the largest ISP in the world for claims that arise from online, digital redlining whereby Defendants profile and use the race, ethnicity, national origin, sex, gender or other protected identity classification to make equal access decisions on the TOS and other promises and law that govern the parties' respective legal

1    obligations and rights, including the licensing, access, and monetization rights of Plaintiffs and the

2    other 50 million YouTubers in the U.S. who make up the Race Discrimination Class.

3        421.424.        The federal issues of law that arise from §230(c)'s application to Plaintiffs'

4    claims herein are essential to the adjudication of each and every claim for relief that is (1) necessarily

5    raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without

6    disrupting the federal-state balance approved by Congress.

7        422.425.        Plaintiffs request declaratory relief that this Court interpret, construe, and

8    determine the scope and application of §230(c) with respect to each and every claim in this case

9    arises under federal law within the meaning of §1331.  *Grable & Sons Metal Prods. v. Darue*

10   *Engineering. & Mfg.*, 545 U.S. 308, 314-316 (2005).  *See also Gunn v. Minton*, 568 U.S. 251,

11   258-259 (2013); *Sarauer v. International Association of Machinists and Aerospace Workers, District*

12   *No. 10*, 966 F.3d 661, 673-675 (7th Cir. 2020); *Noatex Corp. v. King Construction of Houston LLC*,

13   74 F.Supp.3d 764, 772-774 (N.D. Miss., 2014) (applying *Grable* and holding that federal

14   constitutional due process challenge to state "Stop Notice" law presents a federal question that

15   creates federal jurisdiction under declaratory judgment act) (citing *Martinez v. State of California*,

16   444 U.S. 277, 279 (1980)).

17       **A.**    ~~**Procedural Background Facts**~~**Pertinent Provisions of 47 U.S.C. §230(c)**

18       423.426.        ~~369.~~ The CDA provides "Protection for 'Good Samaritan' blocking and

19   screening of offensive material":[22]

20       (1) Treatment of publisher or speaker

21   No provider or user of an interactive computer service shall be treated as the publisher or

22   speaker of any information provided by another information content provider.

23       (2) Civil liability

24   No provider or user of an interactive computer service shall be held liable on account of —

25       (A) any action voluntarily taken in good faith to restrict access to or availability of

26   material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively

27   violent, harassing, or otherwise objectionable, whether or not such material is constitutionally

28   protected; or

(B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1). 47 U.S.C. § 230(c).

424.427.    Civil claims for relief that implicate intellectual property rights, such as licensing agreements, are expressly exempted from immunity under 47 U.S.C. §230(e)(2).

425.428.    With respect to any other legal claims for civil relief that are found to trigger the federal statutory grant of immunity, §230(c) preempts "any State or local law that is inconsistent with this section." 47 U.S.C. §230(e)(3); *see also Domen v. Vimeo, Inc.*, 6 F.4th 245, 249-53 & n.4 (2d Cir. 2021) (§230(c) (preempts all state laws).

426.429.    When it comes to immunity for civil liability, furthermore, §230(c) permits an ISP to contract out of some or all of §230(c)'s immunity provisions with users. *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1108-1109 (9th Cir. 2009) (§230(c)(1) merely "creates a baseline rule" of "no liability for publishing . . . the content of other information service providers," and "[i]nsofar as [Defendants] made a promise with the constructive intent that it be enforceable, it has implicitly agreed to an alteration in such baseline" rule).

**B.    Procedural History Of This Case And Controversy**

427.430.    ~~370.~~ On November 19, 2019, the Honorable Brian C. Walsh, Judge of the Superior Court of the County of Santa Clara (the "State Court"), ruled in *Prager University v. Google LLC*, Santa Clara County Superior Court Case No. 19CV340667,that 47 U.S.C. § 230(c) "immunizes service providers [such as Defendants] who endeavor to restrict access to material deemed objectionable," by employing filters to remove users' content from their platforms based on the ~~political, religious,~~race, ethnicity or other ~~personal~~protected identity ~~or viewpoint~~ of the user rather than the actual online content posted by the user on the platform. 2019 WL 8640569, at *7 (Cal. Super. Ct. Nov. 19, 2019).

428.431.    ~~371.~~ Furthermore, the State Court ruled that, notwithstanding the express good faith language in ~~Section~~ language in §230(c)(2)(A), the content filtering and restrictions that internet service providers like Defendants engage in are not subject to any good faith, objective judicial review of the underlying content, or the internet providers filtering or restriction practices,

1  but reside within and are left to the sole, unfettered discretion of the internet provider who acts to

2  filter and restrict content at its whim.  2019 WL 8640569, at *10-11.

3        429.432.        372. In *Prager*, therefore, at least one state trial court has construed Section

4  §230(c) as granting Defendants absolute immunity for any and all content curation decisions,

5  including decisions based not on the actual on-line online material, but on the race, sex, or other

6  identity and dismissing plaintiffs' claims without leave to amend despite detailed factual allegations,

7  evidence, and party admissions of identity and viewpoint based discrimination and animus in

8  regulating and filtering speech on YouTube).  2019 WL 8640569, at *10-12.

9        430.433.        373. A true and correct copy of the November 19, 2019 Order issued by the

10  Hon. Brian Walsh, granting Defendants' immunity and dismissing all of plaintiffs' claims for relief

11  without leave to amend is attached as Exhibit B I hereto.

12        431.434.        374. On December 19, 2019, plaintiff Plaintiffs timely filed a notice of appeal.

13  The notice of appeal rendered the state court decision uncitable and of no substantive precedential or

14  legal value unless and in that case or any other until such time as the California appellate courts affirm

15  the application of Section §230(c) to intentional discrimination and the federal courts, which are the

16  final authority on federal questions of law, concur in that decision.

17        375.    On May 18, 2020, the United States Department of Justice intervened in the *Divino*

18  case and filed a brief defending the application of Section 230(c) to ISP's who filter, review, restrict,

19  bock, or censor on line speech based on a user's racial, sexual, or other identity or viewpoint without

20  regard to whether the online speech of the user violated the content based rules of the internet site or

21  the provisions of Section 230(c).  A true and correct copy of the United States Department of

22  Justice's Notice of Intervention (Dkt.# 46) and Memorandum of Law in Support (Dkt.#47) are

23  attached as Exhibit C.

24        376.    On May 28, 2020 the President of The United States issued an Executive Order

25  repudiating both the State Court decisions in *Prager* and contradicting the United States' position

26  that Section 230(c) applies or can be applied to an ISP who engages in intentional race, sex or other

27  identity or viewpoint based discrimination alleged in this Lawsuit and *Divino*.

28

REVISED SECOND THIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT,
RESTITUTION, ACCOUNTING AND DAMAGES

377.   In the May 28 Order, the President directed the U.S. Department of Justice ("DOJ") and other Article 2 agencies or departments to enforce the "policy of the United States" that immunity law may not be applied or enforced with respect to any on line, publishing, filtering, blocking, or censorship conduct undertaken by an Internet Service Provider (ISP) that was based in any part on the user's race, sex, or other personal identity or viewpoint.

378.   The May 28 Executive Order states in pertinent part:

Section 2 Protections Against Online Censorship.

(a) It is the policy of the United States to foster clear ground rules promoting free and open debate on the internet. Prominent among the ground rules governing that debate is the immunity from liability created by section 230(c) of the Communications Decency Act (section 230(c)). 47 U.S.C. 230(c).  It is the policy of the United States that the scope of that immunity should be clarified: the immunity should not extend beyond its text and purpose to provide protection for those who purport to provide users a forum for free and open speech, but in reality use their power over a vital means of communication to engage in deceptive or pretextual actions stifling free and open debate by censoring certain viewpoints.  * * * *

379.   In particular, subparagraph (c)(2) expressly addresses protections from "civil liability" and specifies that an interactive computer service provider may not be made liable "on account of" its decision in "good faith" to restrict access to content that it considers to be "obscene, lewd, lascivious, filthy, excessively violent, harassing or otherwise objectionable."  It is the policy of the United States to ensure that, to the maximum extent permissible under the law, this provision is not distorted to provide liability protection for online platforms that -- far from acting in "good faith" to remove objectionable content -- instead engage in deceptive or pretextual actions (often contrary to their stated TOS) to stifle viewpoints with which they disagree. Section 230 was not intended to allow a handful of companies to grow into titans controlling vital avenues for our national discourse under the guise of promoting open forums for debate, and then to provide those behemoths blanket immunity when they use their power to censor content and silence viewpoints that they dislike. When an interactive computer service provider removes or restricts access to content and its actions

1   do not meet the criteria of subparagraph (c)(2)(A), it is engaged in editorial conduct.  It is the policy

2   of the United States that such a provider should properly lose the limited liability shield of

3   subparagraph (c)(2)(A) and be exposed to liability like any traditional editor and  publisher that is not

4   an online provider.

5   **(b)** To advance the policy described in subsection (a) of this section, all executive

6   departments and agencies should ensure that their application of section 230(c)

7   properly reflects the narrow purpose of the section and take all appropriate actions in

8   this regard.  In addition, within 60 days of the date of this order, the Secretary of

9   Commerce (Secretary), in Case 5:19-cv-04749-VKD Document 57 Filed 06/01/20

10  Page 6 of 8 consultation with the Attorney General, and acting through the National

11  Telecommunications and Information Administration (NTIA), shall file a petition for

12  rulemaking with the Federal Communications Commission (FCC) requesting that the

13  FCC expeditiously propose regulations to clarify:

14  (i) the interaction between subparagraphs (c)(1) and (c)(2) of section 230, in particular

15  to clarify and determine the circumstances under which a provider of an interactive

16  computer service that restricts access to content in a manner not specifically protected

17  by subparagraph (c)(2)(A) may also not be able to claim protection under

18  subparagraph (c)(1), which merely states that a provider shall not be treated as a

19  publisher or speaker for making third-party content available and does not address the

20  provider's responsibility for its own editorial decisions; (ii) the conditions under

21  which an action restricting access to or availability of material is not "taken in good

22  faith" within the meaning of subparagraph (c)(2)(A) of section 230, particularly

23  whether actions can be "taken in good faith" if they are:

24  **(A)** deceptive, pretextual, or inconsistent with a provider's terms of service; or **(B)**

25  taken after failing to provide adequate notice, reasoned explanation, or a meaningful

26  opportunity to be heard; and **(iii)** any other proposed regulations that the NTIA concludes

27  may be appropriate to advance the policy described in subsection (a) of this section. **(c)** The

28  Department of Justice shall review the viewpoint-based speech restrictions imposed by each

**REVISED SECONDTHIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

1  online platform identified in the report described in subsection (b) of this section and assess

2  whether any online platforms are problematic vehicles for government speech due to

3  viewpoint discrimination, deception to consumers, or other bad practices. * * * *

4  **Sec. 4. Federal Review of Unfair or Deceptive Acts or Practices.**

5  (a) It is the policy of the United States that large online platforms, such as Twitter and

6  Facebook, as the critical means of promoting the free flow of speech and ideas today,

7  should not restrict protected speech. The Supreme Court has noted that social media

8  sites, as the modern public square, "can provide perhaps the most powerful

9  mechanisms available to a private citizen to make his or her voice heard."

10 *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017).  Communication

11 through these channels has become important for meaningful participation in

12 American democracy, including to petition elected leaders.  These sites are providing

13 an important forum to the public for others to engage in free expression and debate.

14 *Cf. PruneYard Shopping Center v. Robins*, 447 U.S. 74, 85-89 (1980).  * * *Sec. 5.

15 State Review of Unfair or Deceptive Acts or Practices and Anti-Discrimination Laws.

16 (a) The Attorney General shall establish a working group regarding the potential enforcement

17 of State statutes that prohibit online platforms from engaging in unfair or deceptive acts or

18 practices.  The working group shall also develop model legislation for consideration by

19 legislatures in States where existing statutes do not protect Americans from such unfair and

20 deceptive acts and practices.  The working group shall invite State Attorneys General for

21 discussion and consultation, as appropriate and consistent with applicable

22 432.435.        California Superior Court's decision and the corresponding Notice of Appeal

23 in *Prager II* are alleged herein only to plead the current procedural status of the case and controversy

24 alleged herein and its implications for the uniform application of federal law.

25 (b) Complaints described in section 4(b) of this order will be shared with the working group,

26 consistent with applicable law.  The working group shall also collect publicly available

27 information regarding the following:

28

1     ~~(i) increased scrutiny of users based on the other users they choose to follow, or their~~

2     ~~interactions with other users;~~

3     ~~(ii) algorithms to suppress content or users based on indications of political alignment~~

4     ~~or viewpoint;~~

5     ~~(iii) differential policies allowing for otherwise impermissible behavior, when~~

6     ~~committed by accounts associated with the Chinese Communist Party or other~~

7     ~~anti-democratic associations or governments;~~

8     ~~(iv) reliance on third-party entities, including contractors, media organizations, and~~

9     ~~individuals, with indicia of bias to review content; and~~

10    ~~(v) acts that limit the ability of users with particular viewpoints to earn money on the~~

11    ~~platform compared with other users similarly situated.~~

12    ~~A true and correct copy of the President's Executive Order is attached as Exhibit D to this Complaint.~~

13    ~~433.~~436.        **~~380.~~** On August 13, 2019, 12 LGBTQ+ content creator and users filed a

14    lawsuit against these same Defendants asserting similar claims for relief to those asserted herein

15    entitled *Divino Group, LLC et al., v. Google LLC, et al*, Case No. 5:19-cv-004749 – VKD (N.D. Cal.)

16    ("*Divino*").  In *Divino*, the ~~"related" case to this Lawsuit, the~~ LGBTQ+ ~~plaintiffs asserted a~~

17    ~~claim~~Plaintiffs made a similar request for a declaratory judgment under 28 U.S.C. ~~§~~ §§2201, *et seq.*

18    ~~asking this Court to declare~~clarifying that ~~the~~§ 230(c) immunity ~~provision of Section 230(c) does not~~

19    ~~extend to intentional identity or viewpoint discrimination conduct by an ISP~~did not and could not

20    apply to these Defendants because they engage in identity based data profiling and then use that

21    aggregated data to filter, restrict, and deny content or access to LGBTQ+ users on YouTube based on

22    their gender, sex, sexual orientation, or other protected LGBTQ+ identity classifications, and, that if

23    not so construed, requesting that the Court declare the law ~~is~~unconstitutional,~~both~~ as applied to the

24    claims and ~~on its face,~~allegations under *Denver Area* and progeny.

25    **~~381.~~**  ~~On June 2, 2020, this Court held a hearing in the *Divino* case on, among other things,~~

26    ~~the extent to which Section 230(c) applies, if at all, to intentional identity or viewpoint based~~

27    ~~discrimination by Defendants.~~

28

382.   Defendants argued that Section 230(c)(1) immunizes them from identity and viewpoint based discrimination because such discrimination is "publishing conduct" that Congress enacted Section 230(c)(1) to protect.

383.   Defendants contended that Section 230(c)(1) grants absolute immunity to an ISP for "publishing conduct" that includes discriminating against user based on the person's racial or sexual identity to filter, review, or block the access of the online user or its content on a website that is otherwise open to the general public.

434.437.   On May 18, 2020, the United States Department of Justice ("DOJ") intervened in the *Divino* case and filed a brief defending the application of §230(c) to ISPs who filter, review, restrict, block, or censor online speech based on a user's race, ethnicity or other protected identity without regard to whether the online speech of the user violated the content based rules of the internet site or the provisions of §230(c).

435.438.   384. AlthoughThe Court held a hearing on that issue on June 2, 2020.  At the hearing, these same Defendants conceded at the oral argument that immunity might not be available in limited but unspecified "circumstances" involving race discrimination,.  But Defendants maintained the contradictory position, as they do in this case, that intentional and systematic discrimination used to profile, review, and block the access and content of LGBTQ+ users based on protected identity classifications, including race, ethnicity, national origin, sex, or gender identity, was a traditional publishing function that comes within the conduct that Congress intended to protect under Section 230(c)(1).

385.   The LGBTQ+ plaintiffs in *Divino* argued that Section 230(c)(1) does not prevent the enforcement of contractual promises and other preexisting legal relationships between an ISP and user, including contractual based promises that Defendants may only filter, review and impose access restrictions on users based on the content of the video under specific rules that apply equally to all without reference or consideration of the user's identity or viewpoint.

386.   The breaching of these legally enforceable promises and obligations, express or implied, in a contract and license agreements between a user and an the ISP, and the other obligations and rights codified in the state or federal laws that regulate businesses that prohibit discrimination

REVISED SECONDTHIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES

based on identity are neither specific or unique to publishers or traditional editorial function, and do not implicate liability for third party defamation or wrongs, but are legal obligations that apply to all business under contract and other legal obligations imposed on any business and its customer or consumer.

**387.** The *Divino* plaintiffs also argued, as the Plaintiffs and all persons similarly situated argue in this Lawsuit, that Section 230(c) applies only to the filtering, reviewing, restricting, or blocking of on line "material" not to or based upon a person's identity or viewpoint, because racial profiling and identity or viewpoint censorship has nothing to do with and does not further the express statutory purpose of protecting minors from "offensive material" on the internet.

436.439.     **388.** The extension of Section 230(c)(1) beyond a limited immunity for defamation and other liabilities that arise from the failure to block unlawful third party content also renders Section 230(c)(2) statutory limits prohibiting bad faith or discriminatory filtering and blocking of on line appropriate content unenforceable, meaningless, and pure statutory surplussage.encourage and permit by granting Defendants absolute and categorical immunity from civil liability based on violations of longstanding anti discrimination laws intended to protect Plaintiffs and the Race Discrimination Class from race based discrimination under contract.

**389.** Finally, as in *Divino*, the application of either Section 230(c)(1) or (2) to immunize an ISP that uses identity or viewpoint discrimination to regulate on line speech is an unconstitutional permissive speech regulation law violates the First Amendment under *Denver Area* and progeny.

**390.** The use of Section 230(c) to censor users based on their race, identity, or viewpoint is not viewpoint neutral, narrowly tailored to protect children from "offensive" material without creating a risk of erroneous private veto over otherwise appropriate speech, and eviscerates the pre-existing legal relationships, including the contractual and statutory obligations, and rights of the parties that would otherwise be enforceable in a court of law.

**391.** The Court has taken the arguments under submission.

**392.** A true and correct copy of the transcript of the Section 230(c) arguments recorded at the hearing in *Divino* is attached as Exhibit E to this complaint.

437.440.      On January 6, 2020, the Court, invoking the doctrine of "constitutional avoidance" declined to adjudicate the interpretation, construction, and application of § 230(c) to any of the claims in *Divino*, and dismissed all of the state law claims without prejudice for lack of jurisdiction to obviate the need to decide any of the immunity issues raised in that case.

438.441.      On June 25, 2021, this Court followed suit.  It sought to "avoid" or obviate the need to decide the construction, application, and constitutionality of §230(c) at this juncture by dismissing the federal claims with leave to amend, and the state law claims for lack of federal jurisdiction.  The Court invited Plaintiffs to replead allegations that address the Court's merits and jurisdictional issues that rendered unripe for decision the request for declaratory relief related to Defendants' assertion that Congress granted them complete immunity for race discrimination and other unlawful and deceptive conduct under contract.

439.442.      Plaintiffs have amended those and other allegations herein, and the interpretation, scope, applicability, and/or constitutionality of §230(c) presents a justiciable case and controversy that is ripe for declaratory relief under §2201.

**C.**      ~~B.~~ **Justiciable Legal Controversies Currently Exist Regarding The Construction And Constitutionality Of 47 U.S.C. § 230(c).**

440.443.      ~~393.~~ At least four actual controversies now exist between the parties regarding the proper construction, scope, application, and constitutionality of the CDA statutory immunity granted to internet service providers given the unique allegations and claims asserted against Defendants in this case.

441.444.      ~~394.~~ Each of the controversies arise from a dispute about the extent to which ~~Section~~ §230(c) immunizes an internet service provider that discriminates against users because of the user's race, ~~personal~~ethnicity or other protected identity ~~or viewpoints~~, including any profiling or consideration of Plaintiffs' race in making access decisions on YouTube.

442.445.      And each must be decided in order to resolve whether Plaintiffs have stated claims for relief, including each and every one of the state law claims under Rule 12(b)(6).

1

2

        **1.**     **An Actual Controversy Exists As To Whether Defendants Have Contracted Out Of §230(c) Immunity Under The TOS And Other Agreements And Promises Made To Plaintiffs**

3

~~443.~~446.     As alleged *supra*, a justiciable controversy exists as to whether Defendants

4

have contracted out of §230(c) immunity, and have contractually agreed that the grant of federal

5

immunity under §230(c) does not apply to any of the claims, defenses, and disputes between

6

Defendants and Plaintiffs alleged herein, other than certain claims for defamation arising from the

7

posting of third party content on YouTube.

8

~~444.~~447.     If, as the Ninth Circuit held, §230(c)(1) merely "creates a baseline rule" of

9

"no liability for publishing" and "[i]nsofar as [Defendants] made a promise with the constructive

10

intent that it be enforceable, [they have] implicitly agreed to an alteration in such baseline" rule.

11

Here, Defendants expressly contracted with and promised Plaintiffs that in exchange for granting

12

Defendants licensing and access to collect and monetize Plaintiffs' personal digital data, Defendants

13

promise equal access to the YouTube platform and services, subject only to Guidelines, rules and

14

policies that apply to all users and content.  In so doing, Defendants promise that §230(c) is

15

applicable only to defamation claims arising from content.

16

~~445.~~448.     Plaintiffs seek a declaratory judgment that such a promise exists and is

17

enforceable under the TOS and other promises made by Defendants to Plaintiffs.

18

19

        **2.**    ~~1.~~ **An Actual Controversy Exist As To Whether The Provisions Of ~~Section~~ §230(c) Immunize Defendants From Race, ~~Personal~~Ethnicity Or Other Protected Identity~~, or Viewpoint~~ Discrimination In Filtering And Blocking ~~On line~~Online Content And Access**

20

~~446.~~449.     ~~395.~~ A second justiciable controversy ~~exist~~exists as to whether ~~Section~~

21

§230(c)(1) or (2) grants immunity to an ISP that breaches ~~and~~an express or implied contractual

22

~~promises~~promise not to discriminate against users based on a person's race, ethnicity or other

23

protected identity~~, or viewpoint~~ when reviewing, restricting, or denying access to YouTube under

24

license and use agreements between the user and the ISP.

25

26

27

28

**3.**   2. An Actual Controversy Exists As To Whether ~~Section~~ §230(c) Immunizes Defendants For Conduct That Violates Plaintiffs' Equal Protection Rights Under Longstanding Antidiscrimination Laws

447.450.   396. A ~~second~~third justiciable controversy exists as to whether the provisions of ~~Section~~ §230(c)(1) or (2) permit Defendants to engage in unlawful conduct that uses a person's race, ethnicity or other protected identity, or viewpoint to restrict ~~on line~~online material and access in contravention of established federal and state laws prohibiting such discrimination in contract, 42 U.S.C. § 1981 and Unruh Civil Rights Act, Cal. Civ. Code §§51, *et seq.*, unlawful, deceptive or anticompetitive business practices, including conduct prohibited under ~~section~~ §1124 of the Lanham Act and ~~section~~ §17200 of the California Business and Professions Code, and discriminatory censorship in violation of the Liberty of Speech Clause enshrined in Article 1, Section 2 of the California Constitution.

**4.**   3. The Provisions And/or Application Of Any Part Of ~~Section~~ §230(c) To Claims Arising Out Of Race, Ethnicity Or Other Protected Identity, Or Viewpoint Discrimination Is Unconstitutional

448.451.   397. As a third A fourth justiciable controversy exists as to whether ~~Section~~ §230(c) is unconstitutional because it violates the First Amendment and/or Equal Protection ~~clause~~Clause of the U.S. Constitution on its face and/or as applied to this Lawsuit.

449.452.   398. Construing any provision of the "Good Samaritan Immunity For Blocking On line Material" under ~~Section~~ §230(c) as permitting an ISP to use a person's race, ethnicity or other protected identity, or viewpoint to filter, review, or block ~~on line~~online access or content is unconstitutional under the test governing the constitutionality of permissive private party speech laws.

450.453.   399. ~~Section~~ §230(c) (1) and (2) is congressional law that was enacted to permit a private party to regulate ~~on line~~online speech.  Consequently, under *Denver Area* and progeny, the law cannot be applied in a manner that is NOT identity or viewpoint neutral, must be narrowly tailored and applied to avoid the risk of erroneous private censorship, and may not be used to interfere or alter the pre-existing legal relationships between the parties.

4.   **The Executive Order Precludes The Government From Arguing Or Enforcing Section 230(c) To Claims Based On Intentional Identity Or Viewpoint Discrimination.**

**400.**   A fourth justiciable controversy exists as to legal effect of the President's Executive Order on the application of Section 230(c) to on line content and access regulation based on a user's identity and viewpoint, as is set forth in this Lawsuit.

**401.**   In the Order, the President declares that is the policy of the United States to ensure that Section 230(c) must be applied in a manner that is viewpoint neutral and does not permit ISPs to censor on line content or block on line user access based on the identity or viewpoint of the user.  If given full legal affect, the Executive Order mandates the obvious: Section 230(c) applies only to filtering and blocking "offensive material," not the persons who use the internet.

**402.**   The Executive Order provides that its application does not create a substantive legal right that did not exist before, or otherwise alter the parties' relationships.  But that language begs the question as to what rights and relationships already exist under Section 230(c) in this Lawsuit.  The Executive Order directs the United States to enforce the law and promulgate regulations that preclude what Defendants want to use its provisions for in this Lawsuit:  to discriminate against Plaintiffs based on their race, identity and viewpoints.

**403.**   Consequently, the Executive Order also creates a conflict of interest for the Department of Justice under Rule 5.1.  The Order specifically instructs DOJ to take all steps, including, but not limited to, promulgating regulations to ensure that Section 230(c) is not and will never be used to permit identity or viewpoint discrimination in the regulation of on line content.

**404.**   At the same time, DOJ has intervened and formally taken the opposite position before this Court regarding the application of Section 230(c) to the very identity and viewpoint discrimination that the President has instructed DOJ to prohibit.  That position effectively precludes DOJ or any agency of the United States from promulgating and enforcing the very regulations and other steps in the Order that preclude identity and viewpoint discrimination.

**405.**   Furthermore, because of the conflicting positions taken by DOJ in *Divino*, the United States may be judicially estopped from enforcing or giving any affect to the President's Executive Order.

451.454.    Furthermore, the application of §230(c) to preclude Plaintiffs and the Race Discrimination Class from asserting claims for discrimination under contract, false advertising, deceptive trade practices, unlawful regulation of public speech, and breach of contract, all of which arise from the core allegation that Defendants profile and use Plaintiffs' protected racial identities to filter, restrict, block content, and deny equal access to YouTube also violates the Fourteenth Amendment.  Plaintiffs' racial identities are protected under federal and state law from discrimination and only they and the Race Discrimination Class have standing to bring claims for discrimination or disparate treatment based on their protected racial status.

452.455.    Consequently, the application of §230(c) to bar Plaintiffs from asserting claims that arise from and are based on their protected status from racially disparate treatment or racial identity based classifications by definition singles them out and denies them equal protection under the laws of the United States and California.  Congress cannot enact, and the courts cannot apply, law that permits Defendants to treat Plaintiffs differently or otherwise denies them the benefits of their contractual and statutory rights because of their race or other protected identity or status.

**D.    C.  Plaintiffs Served Rule 5.1 Notice On The U.S. Attorney General**

453.456.    406.  In challenging the Constitutionality of the CDA, Plaintiffs must comply with Federal Rule of Civil Procedure 5.1 which requires that "[A] party . . . promptly [] file a notice of constitutional question stating the question and identifying the paper that raises," where "a federal statute is questioned and the parties do not include the United States, one of its agencies, or one of its officers or employees in an official capacity."  Fed. R. Civ. P. 5.1. Under Rule 5.1 "statute" means any congressional enactment that would qualify as an "Act of Congress."

454.457.    407.  Rule 5.1 requires more than the court certification provided by 28 U.S.C. § 2403; Rule 5.1 requires notice and certification to the United States Attorney General of any constitutional challenge to a federal statute, not merely to challenges of laws "affecting the public interest."  28 U.S.C. § 2403.

455.458.    408.  The CDA constitutes a federal statute under Rule 5.1.

456.459.    409.  Plaintiffs have served the Rule 5.1 Notice on the United States Attorney General stating that Plaintiffs are challenging the constitutionality of 47 U.S.C § 230(c), identifying

the CDA, and attaching a copy of this Complaint, and a copy of Judge Walsh's November 19, 2019 Order.

457.460.     410. Plaintiffs have served the Rule 5.1 Notice and attachments by certified mail and have sent a copy of the Notice and attachments to the United States Attorney General by overnight delivery service.

458.461.     411. 28 U.S.C. § 2403 also requires that the Court notify the United States Attorney General of Plaintiffs' First Cause of Action set forth in this Complaint:  "In any action, suit or proceeding in a court of the United States to which the United States or any agency, officer or employee thereof is not a party, wherein **the constitutionality of any Act of Congress affecting the public interest is drawn in question, the court shall certify such fact to the Attorney General**, and shall permit the United States to intervene for presentation of evidence, if evidence is otherwise admissible in the case, and for argument on the question of constitutionality.  The United States shall, subject to the applicable provisions of law, have all the rights of a party and be subject to all liabilities of a party as to court costs to the extent necessary for a proper presentation of the facts and law relating to the question of constitutionality."  28 U.S.C. § 2403(a) (emphasis added).

459.462.     412. Accordingly, Plaintiffs respectfully request that the Court certify to the United States Attorney General of the United States that 48 U.S.C. § 230(c), a federal statute, has been challenged by Plaintiffs on the grounds averred below.

413.    At this time, United States has a potentially unwaivable conflict of interest under the applicable law and ethics rules governing conflicts of interest and divided duty of loyalty.

460.463.     414. In complying with the notice requirements under Rule 5.1, Plaintiffs are not waiving but are expressly reserving their rights to assert that the United States has a conflict of interest that may preclude intervention under Rule 5.1, and/or to seek other appropriate relief, including disqualification, and oppose intervention, in this Lawsuit or any other proceeding that conflicts with the policy of the United States that Section §230(c) does not permit or immunize race, ethnicity or other protected identity or viewpoint discrimination.

**SECOND CAUSE OF ACTION**
**For Freedom Of Speech Under The First Amendment**
**United States Constitution, Amendment 1**
**(On Behalf Of Individual Plaintiffs And The Race Discrimination Class)**

461.464.    Plaintiffs re-allege and incorporate herein by reference, as though set forth in full, each of the allegations set forth in paragraphs 1 through 454 above.

A.    **Procedural Background**

462.465.    The First Amendment prohibits a party from engaging in "state action" that violates or harms a person's right to engage in speech, association, expression, or other activity protected by the Amendment.

463.466.    Since at least 1946, the U.S. Supreme Court has held that the First Amendment protects persons from private parties who engage in "state action" to restrict speech in ways that violate the First Amendment.

464.467.    Private parties can be state actors whose conduct is subject to judicial scrutiny and held to account under the U.S. Constitution in a number of different circumstances, including, but not limited to, a private party who (1) engages in a public function that has been traditionally reserved as the exclusive province of government, such as operating a company town or providing a service for the administration of a traditional government function like elections or law enforcement (the "Public Function Test"); and/or (2) is the beneficiary of a government law that endorses or permits the party to engage in conduct that interferes with a fundamental constitutional right in a manner that the government may not (the "Permissive Endorsement Test").

465.468.    The issue of when a private party is engaged in "state action" under either of these or other tests, is dependent on particular circumstances and has not been applied by the courts as a one size fits all.

466.469.    As a result, the extent to which circumstances may exist in which a private party engages in conduct that violates the First Amendment remains murky and unclear.

467.470.    In *Manhattan Cmty. Access Corp. v. Halleck*, --- U.S. --, 139 S. Ct. 1921 (2019), the Supreme Court held that and private owner-operator of a public access cable channel who regulates public speech on that channel does not become a state actor solely by the mere of making a

privately owned television channel available for as a forum for speech: "a private entity who provides a forum for speech is not transformed by that fact alone into a state actor." *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1930 (2019).

468.471.     In so doing, however, the Court in *Halleck* limited its 5-4 decision to the circumstances of that case and declined to overrule prior cases in which a private party who regulates speech or engages in conduct that is otherwise prohibited under the Constitution was found to be a "state actor" who was subject to constitutional scrutiny.

469.472.     Instead, the Court "stressed" that "very few" functions fall into that category of "state action," including, "for example, running elections and operating a company town. *Id.* at 1929, 204 (citing *Terry v. Adams*, 345 U.S. 461, 468–470 (1953) (elections); *Marsh v. Alabama*, 326 U.S. 501, 505–509 (1946) (company town); *Smith v. Allwright*, 321 U.S. 649, 662–666 (1944) (elections); *Nixon v. Condon*, 286 U.S. 73, 84–89 (1932) (elections).

470.473.     The Court also stated that "a variety of functions do not fall into that category, including, for example: running sports associations and leagues, administering insurance payments, operating nursing homes, providing special education, representing indigent criminal defendants, resolving private disputes, and supplying electricity." *Id.* (citing *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 55–57 (1999) (insurance payments); *National Collegiate Athletic Assn. v. Tarkanian*, 488 U.S. 179, 197, n. 18 (1988) (college sports); *San Francisco Arts & Athletics, Inc. v. United States Olympic Comm.*, 483 U.S. 522, 544–545 (1987) (amateur sports); *Blum*, 457 U.S. at 1011–1012 (nursing home); *Rendell-Baker*, 457 U.S. at 842 (special education); *Polk County v. Dodson*, 454 U.S. 312, 318–319 (1981) (public defender); *Flagg Bros.*, 436 U.S. at 157–163 (private dispute resolution); *Jackson*, 419 U.S. at 352–354 (electric service).

471.474.     Consequently, allegations that the relevant function in this case is only the operation of public access channels on a cable system, is not a "function [that is] traditionally and exclusively been performed by government to be establish "state action" under the Public Function Test. *Id.*

472.475.     Beyond those statements, however, the Court in *Halleck* did not specify what the pleading requirements are for establishing state action under one of the few "public functions"

**REVISED SECONDTHIRD** AMENDED CLASS ACTION COMPLAINT **FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

that would trigger constitutional scrutiny.  Nor was it presented with or had occasion to consider
whether the private parties conduct was undertaken under a government enacted law that permitted
unlawful conduct, including race discrimination, in contravention of fundamental constitutional
rights, so as to trigger a limited state action under the Permissive Endorsement Test set forth in
*Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 109 S. Ct. 1402, 1407 (1989).

473.476.       In *Prager University v. Google LLC*, the Ninth Circuit applied *Halleck* to hold
that YouTube does not "lose its private character merely because the public is generally invited to use
it for designated purposes" because "YouTube may be a paradigmatic public square on the Internet,
but it is 'not transformed' into a state actor solely by "provid[ing] a forum for speech." *Prager Univ.
v. Google LLC*, 951 F.3d 991, 997 (9th Cir. 2020) (citing *Halleck*, 139 S. Ct. at 1930, 1934).

474.477.       But like *Halleck*, *Prager* did not, nor could it, overrule or eliminate the Public
Function Test doctrine of state action nor did it specify what the pleading requirement were for
establishing one of "the few" functions that will trigger state action.  And it appears that the decision
may be in conflict with *Halleck* and earlier cases when it held that public forum designations are "not
a matter of election by a private entity" and "[we] decline to subscribe to Prager U's novel opt in
theory of the First Amendment. *Id.* at 999 (9th Cir. 2020) (citing *Cent. Hardware*, 407 U.S. at 547
(holding only that "[b]efore an owner of private property can be subjected to the commands of the
First and Fourteenth Amendments the privately owned property must assume to some significant
degree the functional attributes of public property devoted to public use").

475.478.       Furthermore, the Ninth Circuit did not mention, or consider in any manner, the
more limited theory of Permissive Endorsement "state action" based on Defendants' use of §230(c),
a congressional speech regulation law, to unlawfully restrict speech 95% of the world's video speech
based on race discrimination, and other protected identity classifications that conflict with Plaintiffs'
fundamental equal protection and speech rights under the Supreme Court's seminal case in *Skinner*.

476.479.       Consequently, no Court has ruled, nor could it, that Defendants can never
engage, under any circumstances, in "state action" that is subject to judicial scrutiny under the First
Amendment.  Nor has the pleading standards and requirement for such a claim been established,
other than Defendants must be engaged in one of the few public functions identified in *Halleck* or use

1  a congressional statute to do what they could not otherwise do under established law: discriminate

2  against Plaintiffs' speech based on their race, ethnicity or other protected identity.

3      **B.**     **Permissive Endorsement Allegations Of State Action**

4      477.480.     In *Skinner*, private railroad companies were preparing to implement suspicion

5  based breath and urine testing of their employees pursuant to recently enacted federal regulations

6  referred to in the case as "Subpart D." *Skinner*, 489 U.S. at 611. Like §230(c)(2) of the CDA,

7  Subpart D was "permissive"; it did not compel the testing, but rather left the decision to the railroads.

8  *Id.* Crucially, however, again like §230(c)(2), Subpart D conferred state-law immunity: it protected

9  railroads from being sued under state law if they chose to test. *Skinner*, 489 U.S. at 611, 614-15

10  (Subpart D "pre-empt[ed] state laws, rules or regulations covering the same subject matter" and thus

11  "removed all legal barriers to the testing"). In so doing, a unanimous Supreme Court held:

12      "[t]he fact that the Government has not compelled a private party to perform a search

13      does not, by itself, establish that the search is a private one. Here, specific features of

14      the regulations combine to convince us that the Government did more than adopt a

15      passive position toward the underlying private conduct.

16  *Id.* at 615.

17      478.481.     Under *Skinner*, the elements of a state action claim under the Permissive

18  Endorsement Test are: (1) reliance on a government law that removes all laws and legal barriers to

19  private conduct that would otherwise unlawful and does so in a way that impacts a fundamental

20  constitutional right; (2) a defendant uses the law to engage in that unlawful conduct; and (3) the

21  government shares in the fruits or benefits in some way from the unlawful conduct.

22      479.482.     Defendants rely on Congress' intent to protect children from offensive content

23  to justify discrimination against Plaintiffs and regulate their speech based, not on offensive materials

24  in content, but based on Plaintiffs' race, ethnicity, or other protected identity in violation of federal or

25  state law.

26      480.483.     Defendants use §230(c) to preempt state law and obtain complete immunity in

27  a manner that removes all legal barriers to the regulating, blocking, or restricting of content based on

28  Plaintiffs' race, ethnicity or other protected identity.

481.484.      The Communications Decency Act was, as the statute's name indicates, enacted by Congress to restrict access to "indecent" content on the Internet.  141 Cong. Rec. S8330 (daily ed. June 14, 1995) (statement of Sen. Exon).

482.485.      The express purpose of §230(c)(2) is to encourage Internet platforms like Google and YouTube to "restrict" "obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable" material.  47 U.S.C. §230(c)(2).

483.486.      "The intent of Congress in enacting §230(c)(2) was to encourage efforts by Internet service providers to eliminate such material." *Goddard v. Google*, No. C 08-2738 JF (PVT), 2008 WL 5245490, at *6 (N.D. Cal. Dec. 17, 2008) (emphasis added).

484.487.      §230(c) makes clear Congress' "strong preference" for regulating online speech based on race, ethnicity or other protected identity and for allowing Defendants to discriminate against Plaintiffs in violation of established federal and state law.

485.488.      The federal government has also made clear its "desire to share the fruits" of the unlawful and discriminatory conduct undertaken by Defendants with respect to regulating online speech, law enforcement, information gathering, and other government services.

486.489.      By way of one example only, in the six-month period from January to June 2017, when Defendants first admitted that they were knowingly and intentionally profiling and targeting users based on race, ethnicity, and other protected identities, Google received almost 17,000 requests from U.S. law enforcement to turn over information regarding users' content and searches.  See Cooperation or Resistance?: The Role of Tech Companies in Government Surveillance, 131 Harv. L. Rev. 1722, 1722 (2018).  Google provided information to the government in some 80% of those cases.

487.490.      While Congress does not "require" or mandate Defendants to discriminate or break the law under §230(c), according to Defendants, Congress has licensed Defendants to discriminate under contract, or violate any other civil law, when they choose to do so, while every other non- internet business provider may not.

488.491.      If Defendants are right, then they are state actors whose conduct is subject to scrutiny under federal law.  Indeed, if that were not the law, the First Amendment is effectively

1    meaningless because Congress need only license and immunize private parties to do what it cannot:

2    restrict speech to protect minors by allowing the private censor to use race, ethnicity or other

3    protected identities of the user, rather than the material in the content to restrict free speech.

4            489. 492.      That is certainly a Congressional endorsement, if not a mandate, for otherwise

5    unlawful race discrimination.  Indeed, if Congress can avoid constitutional scrutiny of

6    unconstitutional race discrimination under contract and identity based regulation of protected speech

7    simply by immunizing certain private parties from civil or criminal liability that the government

8    could not directly engage in or otherwise sponsor, then Congress can eviscerate any provision of the

9    Constitution simply by enacting immunity laws for the benefit of global ISPs.

10           490. 493.      According to the Ninth Circuit, a private party that invokes or relies on a

11   federal law to either target (1) speech that is vulnerable to private censorship "in a context where

12   content based discrimination is not otherwise permitted" or (2) persons who are protected from

13   discrimination under the Equal Protection Clause will trigger state action, especially where, as here,

14   the law is being used to deny African Americans, Hispanics, or other protected identities equal

15   benefits under contract and the law.  *See Roberts v. AT&T Mobility LLC*, 877 F.3d 833 (9th Cir.

16   2017), cert. denied, 138 S. Ct. 2653 (2018), *id.*, at 841 (citing and discussing *Denver Area* and

17   *Shelley v. Kraemer*, 334 U.S. 1 (1948)).

18           491. 494.      Defendants' invocation of §230(c) to allow the global internet cartels to

19   "target" and discriminate against African Americans, Hispanics and other users, based on their race,

20   ethnicity, or other protected identity -- is precisely such a case.  As noted in *Roberts*, the use of a

21   federal statute to permit selected private parties to engage in identity based race discrimination of

22   speech in violation of contract is not analogous to the right of all private parties to have a federal

23   court enforce a clearly established contractual right to arbitrate under the Federal Arbitration Act (the

24   "FAA").

25           492. 495.      Plaintiffs are not claiming that they have a right, let alone a constitutional one,

26   to avoid a contractual promise to arbitrate disputes.  Nor do they dispute Defendants' right to have

27   this Court enforce any valid contract provision against them under the FAA or any other

28   jurisdictional law.

493.496.        Rather, Defendants invoke §230(c) to "single out the sort of speech for vulnerability to private censorship in a context where content-based discrimination is not otherwise permitted" and do so by unlawfully discriminating against persons because of their race, ethnicity, or other protected status. gender, sexual orientation or personal identities.   Defendants admit that their filtering tools "target" the Plaintiffs by using aggregated personal data about their race, ethnicity or other protected identity.  And that the digital targeting or redlining is confirmed by Defendants' own admissions, empirical research studies and the chart comparing Defendants' treatment of Plaintiffs and their videos to those of other white or "preferred" content creators.

494.497.        Instead of proving that these allegations of intentional racial targeting and the disparity in content curation, restriction, and platform access are the result of a racially neutral reason, Defendants invoke §230(c) to legalize intentional illegal systemic digital redlining and race discrimination under contract.   Defendants assert that Congress expressly authorized them to protect children on the internet by targeting Plaintiffs and their content based on their race, ethnicity, or other protected identity.

495.498.        According to Defendants, Congress licensed them, and only them, to violate Plaintiffs contractual rights to equal access to YouTube without civil liability.  Thus, if Defendants ae correct that they, and they alone, were permitted by Congress to discriminate under contract and violate the law with impunity when it comes to African American, Hispanic, or other protected persons based on the racial identity of the speaker or use not the content of the speech posted on the internet, then Congress has endorsed that illegal conduct.

496.499.        There is no rational or possible reason that Defendants need to discriminate based on Plaintiffs racial identity to protect minors from offensive internet content by regulating on-line speech.  Thus, notwithstanding the "permissive" nature of a law that uses an immunity grant to "encourage" Defendants to regulate on line content to protect children and younger audiences from offensive conduct on the internet by regulating the racial identity of the speaker rather than actual speech, Defendants assertion that §230(c) allows them to discriminate against persons under contract because of race, if correct and constitutional, sufficient to make Defendants state actors,

1    endorsed and licensed by congress to engage in race discrimination in direct violation of the First

2    Amendment and Equal Protection rights of racially protected persons.

3    497.500.    Under Defendants' reading of §230(c), is Congress free to immunize private

4    groups for liability related to intimidating voters, intimidating women of color seeking health care, or

5    preventing people of color from enforcing hate crime laws all because the offender is a private party

6    and Congress sought to mitigate against election fraud or some other general public concern?

7    498.501.    According to Defendants, the answer would be "yes," because the offenders

8    are private parties that Congress merely permitted, but did not mandate, to threaten, interfere with,

9    and attack rights of racially protected persons and other protected classifications of Americans.  And,

10   according to Defendants, Congress granted them immunity for their actions no matter how arbitrary,

11   racist, unlawful, or unconstitutional.

12   499.502.    Defendants' use of §230(c) to engage in discrimination and other unlawful

13   conduct under state and federal law to regulate online "material" on the internet is government

14   endorsed of the unlawful conduct and renders that conduct "state action" under *Skinner* and the

15   Permissive Endorsement Test.

16   **C.    State Action Allegations Under The Public Function Test**

17   500.503.    Under *Halleck*  and *Prager,* the elements of state action under the Public

18   Function Test Appear to be: (1) Defendants are engaged in functions and conduct that fall into the

19   categories of "state action" that includes, but is not limited to, "running elections and operating a

20   company town."

21   501.504.    On or about December 2019, Defendants merged their different TOS into a

22   single contract whereby Defendants' discretion to find a violation YouTube's content based rules can

23   be used by Defendants to bar the user from using any or all services offered by Defendants in any

24   way including, the purchase and use of hand held smart phone, email, search engines, applications,

25   and information or other services that are essential for public health, safety, law enforcement,

26   election administration, taxation, and any other service performed by governments.

27

28

REVISED SECONDTHIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT,
RESTITUTION, ACCOUNTING AND DAMAGES

1    502.505.     Defendants also operate a "company town" in which they control essential

2    information and communication services without which local, state, or federal government agencies

3    cannot provide or otherwise administer essential services including elections.

4    503.506.     Until, if ever, the Supreme Court eliminates the Public Function Test for "state

5    action" in all cases as a matter of law, Defendants' use and regulation of speech and information

6    services on YouTube involves the "very few" functions that satisfy the Public Function Test for

7    "state action."

8         **D.     Defendants' Conduct Violates The First Amendment**

9    504.507.     Defendants continue to filter, restrict, block and/or interfere with Plaintiffs'

10   rights to access, use, and express themselves on YouTube.

11   505.508.     Defendants' filtering, restricting, and blocking on Plaintiffs' speech and

12   expressive conduct on YouTube violates Plaintiffs' First Amendment rights because the conduct is

13   not based on the platform's viewpoint neutral rules governing what content is and is not permissible,

14   but on Plaintiffs' race, ethnicity or other protected identity.

15   506.509.     Defendants' censorship and other speech regulation conduct harms and

16   violates Plaintiffs' speech rights on YouTube in direct contravention of the procedural and

17   substantive viewpoint neutral content based rules that Defendants created, published, and use to

18   regulate speech on YouTube.

19   507.510.     Furthermore, Defendants' rules, both as applied and on their face, are

20   subjective, vague, and overbroad criteria and proscription that Defendants use with unfettered and

21   unbridled discretion to censor speech for any reason, or no reason at all, no matter how arbitrary or

22   capricious in further violation of Plaintiffs' First Amendment Rights.

23   508.511.     Defendants also maliciously use and apply the Rules as a pretext to censor and

24   restrict Plaintiffs' speech for unlawful purposes including race and identity discrimination against

25   protected classes of users and to gain a competitive advantage over Plaintiffs and other users who

26   Defendants compete with in YouTube.

27   509.512.     Defendants' conduct, including the application of purportedly viewpoint

28   neutral rules, are arbitrary and capricious, and unlawfully restrains and harms Plaintiffs and all

**REVISED SECOND THIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

members of the Race Discrimination Class, based upon profiling of the speaker, by race, ethnicity or other protected identity -- rather than the actual material in the posted content.  Defendants' actions, therefore, also violate Plaintiffs' right to free association and assembly under the First Amendment.

510.513.       Defendants' actions violate Plaintiffs' right to free association and assembly because , by blocking viewers' access to videos and comments based on the race, ethnicity or other protected identity of the speakers or other materials featured in their content that do not violate YouTube's viewpoint neutral "content based" rules.

511.514.       No compelling, significant, or legitimate reason justifies any or all of Defendants' actions, including the purported interest claimed by Defendants for the need to protect minors or sensitive audiences from offensive content because Plaintiffs' content is not "offensive" or otherwise violates Defendants' purported viewpoint neutral rules.

512.515.       And even if such interests did exist to justify Defendants' restriction and demonetization rules in theory, the conduct and restrictions imposed on Plaintiffs' speech are unconstitutional because they are not narrowly or reasonably tailored to further such interests, but sweep within their ambit speech and expression that complies with the rules that Defendants use to purportedly protect minors and sensitive audiences and are applied by Defendants with unfettered power to censor speech based on race, ethnicity or other protected identity, or for any other discriminatory or unlawful reason or no reason at all.

513.516.       Given Defendants' monopolistic control over search results, online advertising, public video content, and the myriad of other information services that Defendants unilaterally control, Plaintiffs have no alternative affording them a reasonable opportunity to reach their full intended audience.

514.517.       Defendants' discriminatory policies and application of those policies are not viewpoint neutral, are unreasonable in time, place, and manner, and are unreasonable in relation to the nature, purpose, and use of the forum, but are unreasonable prior restraints on Plaintiffs' protected political speech, motivated by impermissible discrimination against Plaintiffs' race, ethnicity or other protected identities.

515.518.      Defendants' intentional and wrongful actions were taken with oppression, fraud, malice and/or are arbitrary and capricious, and as part of Defendants' normal course of business, effectuated through both algorithms, as well as through human agents.  Defendants' actions were done knowingly and intentionally to deprive Plaintiffs and their viewers of their rights under the California Constitution.

516.519.      As a direct and proximate result of Defendants' violations of clearly established law regarding constitutional speech regulation on YouTube, Plaintiffs have suffered, and continue to suffer, immediate and irreparable injury in fact to their right to Liberty of Speech, including, but not limited to financial harms of lost income, reduced viewership, and damage to brand, reputation, and goodwill, for which there exists no adequately complete remedy at law.

### THIRDTHIRD CAUSE OF ACTION
### For Discrimination In Contract In Violation Of 42 U.S.C. § 1981
### (On Behalf Of Individual Plaintiffs And The Race Discrimination Class)

517.520.      Plaintiffs re-allege and incorporate by reference in whole or in part the allegations alleged in paragraphs 1 through 510.

518.521.      Title 42, §1981 of the U.S. Code codifies the right of each individual member of a protected racial classification to "have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens."  42 U.S.C. §1981(a).

519.522.      The statute defines "make and enforce contracts" as including "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  *Id.* §1981(b).  The statutory protections apply to both "nongovernmental discrimination" and "impairment under color of State law."  *Id.* §1981(c).

520.523.      The elements of a claim for relief under 42 U.S.C. §1981 are: (1) Plaintiff is a member of a protected class; (2) impairment of a contractual relationship under which plaintiff has rights; (3) defendant impaired that relationship on account of racial discrimination (such that, but for

1   race, plaintiff would not have suffered the loss of a legally protected right); and (4) plaintiff was

2   deprived of such services while similarly situated persons outside the protected class were not.  *See*

3   *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020); *Astre v.*

4   *McQuaid*, 804 Fed. App'x 665, 666-67 (Mar. 25, 2020); *Lindsey v. SLT Los Angeles, LLC*, 447 F.3d

5   1138, 1145 (9th Cir. 2006).

6        521.524.     Plaintiffs are African Americans, Hispanics and/or members of the protected

7   class under §1981.

8        522.525.     Plaintiffs entered into binding and legally enforceable contracts with

9   Defendants including the TOS and related agreement(s) under California and controlling federal law.

10  *See* Exhibits D-H.

11       523.526.     The contractual relationship between each Plaintiff and Defendants was

12  impaired with respect to the TOS and each and every one of the related agreements in at least five

13  ways::

14          a.     Defendants' TOS, and any other agreements, under which they claim the right

15  to exercise "unfettered" discretion to impose content, use or services access restrictions based, in any

16  way, on Plaintiffs' race, ethnicity or other protected identities, violates and impairs the TOS, license

17  agreements, and other service agreement(s) on its face;

18          b.     Defendants continue to breach the TOS and other agreement(s), by exercising

19  their contractual discretion to profile, filter, restrict, and block Plaintiffs' content and access to

20  YouTube, based on Plaintiffs' race, ethnicity or other protected identities, in a manner that is not

21  permitted, but is expressly prohibited under California and federal law;

22          c.     Defendants breached and continue to breach their express and implied

23  promises under the TOS and other related agreement(s) that You Tube shall not profile, use, base, or

24  impose any restrictions on Plaintiffs' content or access to YouTube based, in any way, on a user's

25  race, ethnicity or other protected identity, and only review, filter, and restrict Plaintiffs' videos based

26  on online video material that runs afoul of YouTube's viewpoint neutral content based rules;

27          d.     Defendants' use of content filtering, review, restricting, and blocking tools

28  and procedures to profile and use Plaintiffs' race, ethnicity, or other protected identities with respect

REVISED SECONDTHIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT,
RESTITUTION, ACCOUNTING AND DAMAGES

1 to any provision in the TOS or related agreements, impairs each and every one of Plaintiffs' rights,

2 express or implied, that exist in the TOS or other related agreement(s) that Defendants entered into

3 with Plaintiffs; and

4          e.    Defendants impaired their contractual relationship with each Plaintiff because

5 of Defendants' intentional use of Plaintiffs' race, ethnicity, or other protected identities to review,

6 filter, regulate, restrict, and block Plaintiffs' videos and access to YouTube under the false pretext

7 that the material in the video was properly reviewed and found to violate one of YouTube's content

8 based rules governing user content and access to the platform.

9     524.527.    Defendants impaired their contractual relationship with each Plaintiff on

10 account of intentional racial discrimination.  Despite their promises of neutrality and a diversity of

11 voices on the YouTube platform, Defendants engage in a pattern and practice of intentional willful

12 and malicious discrimination in the provision of their services, including discriminating against and

13 censoring of Plaintiffs' speech, based not upon the content of speech, but on their race.  Through the

14 acts complained of herein, Defendants intentionally denied, and aided or incited in denying,

15 Plaintiffs full and equal accommodations, advantages, privileges, and services, by discriminating

16 against them in demonetizing Plaintiffs' content and by placing their videos in "Restricted Mode."

17 But for their race, Plaintiffs would not have been subjected to Defendants' filtering or the denial of

18 their contractual benefits under the Agreements.

19     525.528.    The Defendants' digital redlining and racial profiling is not a "mistake."

20 Rather, the evidence shows that Defendants are engaged in digital redlining and racial profiling

21 involving the knowing and intentional use of aggregated personal digital data about the Plaintiffs'

22 race, ethnicity, national origin, or other protected identities to make decisions regarding access to the

23 YouTube platform and Defendants' services.

24       a.    As stated in detail above, on September 14, 2017, Defendants told Stephanie

25 Frosch that their A.I., algorithms, filters and automated systems were "targeting" the YouTube

26 creators, subscribers and viewers  based on identity, including their race.

27       b.    As shown in detail in the video comparison chart above, Defendants not only

28 treat the Plaintiffs' videos differently than the videos of white and/or preferred content creators (by

1   applying "Restricted Mode," and limiting monetization), Defendants actually ignore their own

2   Community Guidelines and policies by allowing videos with materials that violate Defendants'

3   neutral "content based" rules to be viewed by all audiences, and to earn unlimited revenue.

4   Defendants' A.I., algorithms, filters and automated systems not only incorrectly flag Plaintiffs'

5   videos for nudity, hate speech, drug usage and sexual content; Defendants' automated tools simply

6   don't apply to the Defendants' original content and that of their preferred or sponsored creators.

7          c.      Defendants' computer programming codes that govern their automated

8   systems are driving the digital redlining and racial profiling on their platforms.  Only an examination

9   of Defendants' code will reveal the extent to which Defendants have discriminated, and continue to

10  discriminate on the basis of race, ethnicity, national origin and/or protected identities.  See Safiya

11  Umoja Noble, "Algorithms of Oppression," Apple Books;

12  https://books.apple.com/us/book/algorithms-of-oppression/id1327926683oble ("To be specific,

13  knowledge of the technical aspects of search and retrieval, in terms of critiquing the computer

14  programming code that underlies the systems, is absolutely necessary to have a profound impact on

15  these systems.")

16         d.      As Timnit Gebru has pointed out to Defendants, their A.I. has grown on a diet

17  of internet content, language and ideas chosen by Defendants' own engineers from Defendants'

18  platforms accessed by a narrow slice of the world, a slice that is predominantly white, wealthy and

19  homogenous.  That A.I., is biased both in favor of its sources, and against the multitudes have not

20  contributed to A.I. growth because they lack access.

21         526.529.      Given this evidence summarized briefly above, absent discrete evidence of a

22  racially neutral explanation for the disparities in Defendants' treatment of Plaintiffs' channels and

23  content, Defendants' conduct constitutes intentional discrimination in contract based on race because

24  Defendants have known since at least September 14, 2017 that the A.I., algorithms, filters and

25  automated systems that they designed and programmed have been targeting and continue to target

26  Plaintiffs based on race for profit.  See Safiya Umoja Noble, "Algorithms of Oppression," Apple

27  Books; https://books.apple.com/us/book/algorithms-of-oppression/id1327926683 (". . . Google

28

1  biases search to its own economic interests—for its profitability and to bolster its market dominance

2  at any expense.")

3     527.530.      The only way that this Court can be sure that the algorithm "problem" which

4  Defendants have acknowledge since 2017 has been "fixed," or is attributable to some other racially

5  neutral reason, is to inspect the source code and metadata for the A.I., algorithms, filters and

6  automated systems which Defendants use.  Defendants' targeting of Plaintiffs based on race can only

7  be a "mistake" where the Defendants' source code is entirely devoid of data regarding users' race,

8  ethnicity, national origin or other protected identities.  *See id.*, ("To be specific, knowledge of the

9  technical aspects of search and retrieval, in terms of critiquing the computer programming code that

10  underlies the systems, is absolutely necessary to have a profound impact on these systems.")  What

11  Defendants are doing, is no different than what the Government has prohibited the banking,

12  financial, real estate and other industries form doing for years – using race to make decisions about

13  services.

14     528.531.      If, as the evidence shows, Defendants have used or considered Plaintiffs' race

15  in any way, for any decision regarding Plaintiffs' access to the YouTube platform and Defendants'

16  services, then Defendants have violated §1981 with respect to each such decision, and every creator,

17  subscriber and viewer affected by that decision.

18     529.532.      Through the acts complained of herein, Defendants intentionally denied, and

19  aided or incited in denying, Plaintiffs full and equal accommodations, advantages, privileges, and

20  services, by discriminating against them in demonetizing Plaintiffs' content and by placing their

21  videos in "Restricted Mode."  But for their race, Plaintiffs would not have been subjected to

22  Defendants' filtering or the denial of their contractual benefits under the Agreements.

23     530.533.      While Defendants have impaired and denied, and continue to impair and deny,

24  Plaintiffs' contractual benefits under the TOS and related agreement(s), similarly situated persons

25  who are not protected under the Race Discrimination Class were not similarly treated, including

26  persons affiliated with or working for Defendants and/or their preferred users.  Such persons are not

27  being racially profiled and are not subject to the same content or access filtering, restrictions, or

28  blocking despite material in their videos that violates YouTube's content based rules.

531.534.     As a direct and proximate result of Defendants' unlawful discriminatory actions, Plaintiffs suffered, and continue to suffer, irreparable injury in fact, including, but not limited to: lower viewership, lost advertising opportunities otherwise available to other nonprofits, decreased ad revenue, and reputational damage, for which there exists no adequate remedy at law.

### FOURTHFOURTH CAUSE OF ACTION
### For False Advertising In Violation Of
### The Lanham Act, U.S.C. §1125, *et seq.*
### (On Behalf Of Individual Plaintiffs And The Race Discrimination Class)

532.535.     Plaintiffs re-allege and incorporate by reference in whole or in part the allegations alleged in paragraphs 1 through 520.

533.536.     "Time and again, the research shows that racial bias is perpetuated in the commercial information portals that the public relies on day in and day out." The prioritization and circulation of misrepresentative and even derogatory information about people "is an incredible site of profit for media platforms, including Google." Safiya Umoja Noble, "Algorithms of Oppression," Apple Books; https://books.apple.com/us/book/algorithms-of-oppression/id1327926683.

534.537.     As alleged, Defendants use and embed personal data about the race or other identity of Plaintiffs and the Race Discrimination Class into their filtering tools and algorithms. Those tools aggregate the personal data, including the search history and use Defendants other products such as Google Search, to profile and use race, ethnicity, national origin, sex, gender, or other protected identity classifications of third party users, including content creators, audiences, and advertisers, to advance their commercial interests, by falsely informing viewers and audiences, directly or by implication that a video is or is not "appropriate" for audiences and advertisers.

535.538.     Plaintiffs and the Race Discrimination Class have no control over the ways that Defendants aggregate and use that information to classify or index users based on personal data that Defendants use to advance their own commercial interests. Defendants use this absolute and unfettered power to further their own economic interests, profitability, and market dominance by using personal, racial, identity based data to determine what audiences and advertisers see and why. As a result, the pubic engages and must rely on Defendants "as the sole arbiter of truth" about

1  whether video content on YouTube is "appropriate" or is "not appropriate" for advertisers as well as

2  certain audiences or viewers.

3      536.539.      Google uses this information to bolster its market dominance, not merely

4  through the collection and sale of Plaintiffs' data, but to tell or advertise to the public about what

5  content is and is not "inappropriate" for sensitive viewers that promotes false information about

6  content to the viewer and audience market on YouTube that stigmatizes and promotes racial bias in

7  the market.  (Recent research on Google by Siva Vaidhyanathan, professor of media studies at the

8  University of Virginia, who has written one of the most important books on Google to date,

9  demonstrates its dominance over the information landscape.  And Frank Pasquale, a professor of law

10  at the University of Maryland, has warned of the increasing levels of control that algorithms have

11  over the many decisions made about us, from credit to dating options, and how difficult it is to

12  intervene in their discriminatory effects).  Safiya Umoja Noble, "Algorithms of Oppression," Apple

13  Books; https://books.apple.com/us/book/algorithms-of-oppression/id1327926683.

14      537.540.      While Defendants use of race, ethnic, origin, sex, gender orientation and other

15  protected identity information is unlawful in many ways, it is also used by Defendants as a pretext for

16  a global commercial advertising campaign that saturates the multibillion dollar market and

17  submarkets in which Plaintiffs and other third party content creators compete directly against

18  Defendants' sponsored and preferred video content for viewers and advertisers on YouTube.

19      538.541.      In its capacity as "the sole and final arbiter of truth" about what content is and

20  is not appropriate for viewers and advertisers, Defendants tell viewers and advertisers what channels

21  and videos are "appropriate" for certain audiences and what channels and content are not.

22      539.542.      Since at least 2017, Defendants have sent hundreds of millions of "notices" to

23  viewers and advertisers informing them that the video content and channels of third party users,

24  including Plaintiffs and the Race Discrimination Class, contain material that is Restricted or

25  Unavailable because the videos contain material that is "inappropriate" for younger and sensitive

26  audiences, and the advertisers who target those demographics of YouTube users.

27      540.543.      At the same time, Defendants are the largest market participant competing for

28  viewers and advertiser with Plaintiffs and other third party YouTubers.  Defendants create or

preferred content that they retain a preferred financial interest.  Defendants promote their own content to viewers and advertisers by using their authority as content reviewers and curators to communicate and tell audiences that Plaintiffs' videos and channels contain material that is inappropriate for younger and sensitive viewers when they do not and communicate that same false information to advertisers who want to reach younger and sensitive audiences.

541.544.     Defendants exempt their own content from the "internal" reviews and other filtering and restrictions on access to viewer audiences and advertising market participants.

542.545.     Because audiences and advertisers must rely on Defendants as the "sole arbiter of truth" as to the appropriateness of material is actually in Plaintiffs' videos and whether Plaintiffs' video content is or is not appropriate for the viewer and advertising markets, Defendants statements directly imply and inform viewers and audiences who rely on Defendants to curate content that Plaintiffs videos contain "nudity, vulgarity, violence, hate, shocking or sexually explicit material, or other "inappropriate" material, when they do not.

543.546.     Until sometime in the past year, Defendants routinely identified to viewers with "Restricted Mode" enabled those videos on a channel which could not be viewed while "Restricted Mode" was enabled.

            a.     Until the Spring of 2020, Defendants displayed this image to viewers when they enabled "Restricted Mode," accessed Plaintiffs' channels, and attempted to view any video which Defendants' flagged as unsuitable for "younger" and "sensitive" viewers:



b.      Commencing sometime late in 2020, Defendants stopped notifying viewers regarding Plaintiffs' videos which Defendants had flagged as unsuitable for "younger" and "sensitive" viewers.  Thereafter, the flagged videos simply no longer appeared on the Plaintiffs' channels when "Restricted Mode" was enabled, and viewers were unaware that additional videos had been posted but were not viewable with "Restricted Mode" enabled.



544.547.          Sometime after Plaintiffs filed their Second Amended Complaint in this Lawsuit, commencing sometime late in 2020 or early 2021, Defendants stopped giving viewers any information regarding Plaintiffs' videos which Defendants had flagged as unsuitable for "younger" and "sensitive" viewers.  Now videos flagged as inappropriate for "younger" and "sensitive" viewers are not visible in the queues of videos for Plaintiffs' channels when "Restricted Mode" is enabled. Viewers attempting to view Plaintiffs' videos from public libraries and schools see only Plaintiffs' videos which Defendants have not flagged for "Restricted Mode."  Most, if not the vast majority of Plaintiffs videos are now invisible to viewers when "Restricted Mode" is enabled.

545.548.          When viewers and advertisers become aware of such a notice they understand that Defendants have determined that the video content contains material that is inappropriate for younger and sensitive audiences because it contains nudity, vulgarity, violence, hate, shocking or sexually explicit material.

546.549.          Viewers and advertisers know this because Defendants expressly inform and represent to each of these YouTube consumer markets that videos and channels have been reviewed by an "automated system" that "checks signals like the video's metadata, title, and the language used in the video."

547.550.          Based on that "automated" review, Defendants tell advertisers and viewers that video was restricted because it contains "potentially adult content"  or other "inappropriate material" involving "Drugs and alcohol, Sexual situations involving "depictions of sex or sexual activity,"  "Violence: Graphic descriptions of violence, violent acts, natural disasters and tragedies, or even violence in the news," "Mature subjects," "about events related to terrorism, war, crime, and political conflicts that resulted in death or serious injury," "Profane and mature language" including "[i]nappropriate language"  and "profanity," [i]ncendiary and demeaning content that "is gratuitously incendiary, inflammatory, or demeaning toward an individual or group."

548.551.          As the comparative chart alleged in paragraph 102 shows, Defendants have sent millions of these notices directly to viewers and advertisers that Defendants compete with Plaintiffs for on YouTube that represent and state that Plaintiffs videos and channels contain potentially adult content, and contain material about drugs, graphic violence, sexually explicit

1  material and depictions of sexual acts, profanity and vulgar language, or other objectionable material

2  that violates Community Guidelines that are "inappropriate" for younger and sensitive YouTubers.

3  549.552.  Those representations and statements are false.  They are made to the viewers

4  and advertisers who compose a significant portion of the YouTube consumer market.

5  550.553.  As the comparative chart also shows, Defendants do not notify or make any

6  representations to those same viewers and advertisers regarding video content that Defendants

7  directly produce, sponsor, or have a direct financial production interest in.  Indeed, even a cursory

8  review of the videos in the comparative chart shows that preferred content creators who have

9  exclusive distribution deals with YouTube and YouTube TV, like Bill Maher, are saturated with

10  profanity, explicit drug use, sexual acts, and depictions of violence or other "mature" content.

11  551.554.  Furthermore, Defendants admit that they have internal review guideline

12  materials which they do not give to the public.  They have "content ratings Defendants' and use

13  automated systems to generate content ratings.  Defendants' review guideline materials and ratings

14  system, which is not disclosed to the public.  Defendants provide that and falsely represent to

15  advertisers that Plaintiffs' videos contain "mature" or "adult" content, when they do not.

16  Conversely, Defendants exempt their own content from that review and tell advertisers.  Exhibit A at

17  ¶8.

18  552.555.  Defendants notices and statements to YouTube consumers that Plaintiffs

19  videos contain inappropriate material when they do not are not only false and misleading, but so are

20  Defendants implied statement that Defendants' videos on the same subject are not.  And, when a

21  viewer sees Bill Maher or some other preferred creator use graphic violence, drug use, sex or

22  depictions of sexual activity, or profanity, the direct implication to viewers and advertisers is that

23  there is something really bad, vulgar, or dangerous about Plaintiffs videos.

24  553.556.  Defendants global campaign to falsely notify millions of consumers on

25  YouTube that (i) Plaintiffs video content is inappropriate for children and sensitive audiences when it

26  is not, and (ii) Defendants preferred video content is appropriate, when it is not, at least under

27  Defendants criteria, is false advertising.  Those statements deceive and steer market participants and

28  consumers who want or are looking for appropriate material for children and sensitive audiences

1  away from Plaintiffs content and channels and directs them content on the same subject that

2  Defendants have a commercial interest in promoting even where the content clearly violates

3  YouTube's "Restricted Mode" criteria.

4  554.557.    Children and sensitive audiences have become a key demographic for

5  YouTube and its efforts to compete and monetize viewers and advertisers on the video-sharing site.

6  In August, 2020, the digital-video analytics firm Tubular found that, "apart from music videos,

7  content aimed at children topped the month-end list for most viewed videos on YouTube."

8  https://www.lifewire.com/youtube-new-age-restriction-ai-worries-lgbtq-community-5079928.

9  555.558.    Defendants' notices to these market participants have caused Plaintiffs to lose

10  viewers, stifled their audience reach, and steered advertisers and advertising revenue away from

11  Plaintiffs and to Defendants' preferred content.

12  556.559.    The elements of a false advertising claim under the Lanham Act, 47 U.S.C.

13  §§1125, *et seq.*, are: (1) false statement of fact by defendant in a commercial advertisement about its

14  own or another's product; (2) the false statement actually deceived or has the tendency to deceive a

15  substantial segment of the YouTube consumers or users; (3) the false statement is material, in that it

16  is likely to influence the purchasing decision by a YouTube user; (4) the false statement entered

17  interstate commerce; and (5) Plaintiffs have been, and are likely, to be injured as a result of the false

18  statement.  *Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*, 758 F.3d 1069, 1071 (9th Cir. 2014).

19  557.560.    Defendants' statements that Plaintiffs or their videos are "Restricted" are false

20  about Plaintiffs' video products because only videos that are reviewed and found to contain material

21  that violates Plaintiffs' content based rules, including nudity, vulgarity, violence, hate, shocking or

22  sexually explicit material can be "Restricted" or subject to access restrictions when they do not,

23  558.561.    The statement that the video has been "Restricted" is not just an isolated

24  statement of fact that YouTube took action to restrict access to the video for no reason.  By definition,

25  under YouTube's express disclosures in its TOS to every user, a video that is "Restricted" contains

26  inappropriate "adult content" that depicts sexual activity, drug use, graphic violence, hate speech,

27  and other inappropriate material for younger and sensitive audiences.  Plaintiffs' videos do nothing

28  of the sort, while YouTube's videos are not designated by Defendants as restricted even though many

1   of the videos do contain sexual activity, drug use, graphic violence, hate speech, and other material

2   that Defendants have determined are inappropriate for younger and sensitive audiences.

3   559.562.   Defendants' statements are also false because they imply that unlike

4   Plaintiffs' videos, Defendants' videos on the same topic are available and do not contain any such

5   "Restricted Material" when they do.

6   560.563.   Defendants' statements are also false statements because Defendants do not

7   disclose to viewers and advertisers that the content review and determinations regarding the

8   suitability of content for children and younger audiences are not based solely on content but are the

9   result of an "automated system" that "checks signals like the video's metadata, title, and the language

10  used in the video" that relate to a Plaintiffs' racial, national, ethnic or other protected identity rather

11  than exclusively on the actual material in the video.

12  561.564.   Defendants' false statements are likely to deceive users and advertisers on

13  YouTube because they expressly and implicitly insinuate that there is something inappropriate,

14  offensive, improper, or prohibited under YouTube's viewpoint neutral rules.

15  562.565.   Defendants' false statements are also material.  They likely influence and

16  affect a user's and/or advertiser's viewing/purchasing decisions.  Users and/or advertisers are likely

17  deceived that the video contains offensive material that violates YouTube's rules after Defendants

18  reviewed the video for content violations under YouTube's Community Guidelines, Age

19  Restrictions, and "Restricted Mode" prohibitions, when the basis for the restriction was Plaintiffs'

20  race, ethnicity, or other protected identities and was not undertaken in compliance with YouTube's

21  rules.

22  563.566.   Defendants' false statements not only influence but categorically control

23  every user or advertiser's purchasing decisions because the statement results in the blocking of a

24  user's or advertiser's access to the video on YouTube and precludes the user or advertiser from ever

25  accessing, viewing and purchasing the video or purchasing and placing and ad for the video, or

26  otherwise making any purchasing decision contrary to that of Defendants.

27  564.567.   Defendants' false statements entered internet commerce and reached millions

28  of viewers who reside in all 50 States, U.S. Territories, and other users across the world

1    565.568.        Defendants' false statements are also "commercial advertising" because the

2    statements were made to penetrate the market of YouTube users by limiting the reach to audience and

3    advertiser market participants steering viewers away from Plaintiffs' channels and videos, to video

4    content, channels, or creators who are sponsored by Defendants and for which or whom Defendants

5    compete with Plaintiffs for viewers, advertising, monetization, and other revenue streams on

6    YouTube.  At least 3 million viewers use "Restricted Mode" on a daily basis.

7    566.569.        Furthermore, that number does not account for all the advertisers who

8    selectively use "Restricted Mode" to see what videos have been designated "inappropriate" when

9    making advertising decisions in the fastest growing demographic markets on YouTube, all of which

10   involve younger users, many of whom are under the age of 11.

11   567.570.        As of the third quarter of 2020, researchers, including the Pew Institute, found

12   that 80 percent of parents say that their children under the age of 11 use YouTube and 53 percent of

13   those parents say that their children 11 and under watch at least one YouTube video a day.  And the

14   largest demographic group of users on YouTube are young people between the ages of 15-25, 77

15   percent of whom are regular YouTube users.

16   568.571.        Given the subject matter of Plaintiffs' videos and their efforts to reach viewers

17   and advertisers in these robust and growing demographic markets, Plaintiffs are likely to be

18   financially harmed.  Indeed, as the viewership and revenue numbers and comparisons show,

19   Plaintiffs have, are, and continue to be financially harmed by the false statements, including losing

20   substantial amounts revenues for viewer CPMs, advertising, monetization, and other user or

21   advertiser revenue streams on YouTube in an amount to be determined at trial.

22                                **FIFTHFIFTH CAUSE OF ACTION**

                                         **For Breach of Contract**

23               **(On Behalf Of Individual Plaintiffs And The Race Discrimination Class)**

24   569.572.        Plaintiffs re-allege and incorporate by reference in whole or in part the

25   allegations alleged in paragraphs 1 through 555.

26   570.573.        The TOS and agreement(s) between Defendants and Plaintiffs governing

27   filtering, review and access to content and services on YouTube provide that the rights and

28   **REVISED SECONDTHIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT,
     RESTITUTION, ACCOUNTING AND DAMAGES**

1    obligations under those agreements are governed and subject to California law, including federal

2    laws that California is obligated to enforce under the supremacy clause of the U.S. Constitution.

3            571.574.        The elements of a breach of contract under California law are:  (1) existence of

4    a valid contract between Plaintiffs and Defendants; (2) Plaintiffs' performance (or excuse for non

5    performance) under the contract; (3) Defendants' breach of the contract; and (4) proof of harm or

6    financial injury as a result of the breach.

7            572.575.        Plaintiffs and Defendants have entered into agreements, including the TOS,

8    Community Guidelines, Policy, Safety and Copyright Policies, Google's Privacy Policy, and related

9    agreement(s) that are enforceable contract(s) governed by and under California law.

10           573.576.        Plaintiffs have performed their obligations under the TOS and/or other related

11   contracts, including complying with YouTube's viewpoint neutral content based access rules as

12   stated in the TOS, Community Guidelines, the Policy, Safety and Copyright Policies, and Google's

13   Privacy Policy, and granting Defendants a perpetual and irrevocable license to their video content

14   and all personal data and consumer information derived or used in connection with Plaintiffs' content

15   on or use of YouTube.

16           574.577.        Defendants have breached their promises to provide Plaintiffs' equal access to

17   YouTube and all related services that Defendants offer to other users, and which are subject only to

18   content based rules that are viewpoint neutral and apply equally to all.  Specifically, Defendants have

19   denied and interfered with Plaintiffs' right of equal access to YouTube and its related services by (a)

20   using A.I., algorithms, filtering and automated systems that aggregate data regarding the race,

21   ethnicity, or other protected identities of individual Plaintiffs across Defendants' platforms; (b)

22   making determinations regarding monetization, and full access to the YouTube audience, across the

23   platform and access to all services that Defendants offer in connection with the platform, based at

24   least in part on the race of individual Plaintiffs; (c) denying monetization and full unrestricted access

25   to Plaintiffs' videos posted to the YouTube platform which fully comply with Defendants' numerous

26   guidelines, rules and policies based at least in part on the race of the individual Plaintiffs, the race of

27   the subscribers to Plaintiffs' channels and the race of viewers of Plaintiffs' videos; (d) knowingly

28   allowing their employees and independent contractors who have access to Defendants' platform to

1  moonlight and use Defendants' resources to personally profit from discrimination on the platform by

2  enhancing the reach and revenue of select individual YouTube creators who pay for consulting or

3  management services, at the expense and to the detriment of Plaintiffs; (e) denying African American

4  and Hispanic viewers the opportunity to comment on videos, subscribe to channels and obtain

5  effective timely notices of new content when it is posted, and effectively support channels to which

6  they subscribe financially by making monetary contributions through third parties on the platform.

7  Defendants have also breached their promises to Plaintiffs by asserting that they are immune from

8  the discrimination as alleged under the Communications Decency Act, 47 U.S.C. §230(c), where the

9  TOS and related agreements specify that California law applies and do not so much as mention

10 immunity, much less expressly include an immunity clause based on federal law.

11 575.578.    As a direct and proximate result of Defendants' breach, Plaintiffs have

12 suffered monetary damages and other financial harms and losses in excess of $500.00 per year plus

13 other lost revenues, the total amount of which will be determined at trial.

14 576.579.    As a direct and proximate result of Defendants' breach, Plaintiffs have also

15 suffered irreparable harm to their contractual based rights of free speech and expression provided for

16 under the express and implied provisions of the TOS and other related contracts.

17 **SIXTHSIXTH CAUSE OF ACTION**
   **For Breach Of The Implied Covenant of Good Faith And Fair Dealing Or In The Alternative**
18 **For Rescission And Restitution**
   **(On Behalf Of Individual Plaintiffs And The Race Discrimination Class)**
19

20 577.580.    Plaintiffs re-allege and incorporate by reference in whole or in part the

21 allegations alleged in paragraphs 1 through 563.

22 578.581.    Under California law, every contract "imposes upon each party a duty of good

23 faith and fair dealing in its performance and its enforcement." *McClain v. Octagon Plaza, LLC*, 159

24 Cal.App.4th 784, 798 (2008) (quoting *Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 2

25 Cal.4th 342, 371–72 (1992)).

26 579.582.    The covenant "is based on general contract law and the long-standing rule that

27 neither party will do anything which will injure the right of the other to receive the benefits of the

28 agreement." *Waller v. Truck Ins. Exchange, Inc.*, 11 Cal.4th 1, 36 (1995). The covenant of good

faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another.  When a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing," and such discretion "must be exercised in good faith."  *Carma*, 2 Cal.4th at 372; *see also Perdue v. Crocker Nat'l Bank*, 38 Cal.3d 913, 923 (1985) ("where a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing").

580.583.   Breach of the implied covenant occurs "[w]here the terms of a contract are literally complied with but one party to the contract deliberately countervenes the intention and spirit of the contract."  *Hilton Hotels Corp. v. Butch Lewis Prod., Inc.*, 808 P.2d 919, 922–23 (Nev. 1991). "Establishing such a breach of the implied covenant depends upon the 'nature and purposes of the underlying contract and the legitimate expectations of the parties arising from the contract." *Integrated Storage Consulting Servs., Inc. v. NetApp, Inc.*, No. 5:12-CV-06209-EJD, 2013 WL 3974537, at *7 (N.D. Cal. July 31, 2013).

581.584.   Five factual elements are required to establish a breach of the covenant of good faith and fair dealing:  (1) the parties entered into a contract; (2) the plaintiff fulfilled his obligations under the contract; (3) any conditions precedent to the defendant's performance occurred; (4) the defendant unfairly interfered with the plaintiff's rights to receive the benefits of the contract; and (5) the plaintiff was harmed by the defendant's conduct.  Judicial Council of California Civil Jury Instruction 325.

582.585.   Plaintiffs and Defendants have entered into contracts, including the TOS, Community Guidelines, the Policy, Safety and Copyright Policies, Google's Privacy Policy, and other related agreements, in connection with Plaintiffs' use and access to YouTube and the related services which Defendants offer on the YouTube platform under those contracts.

583.586.   Plaintiffs have fulfilled their obligations under the TOS and related agreements, and fulfilled or performed the conditions precedent, if any, under those agreements, including complying with YouTube's Community Guidelines and policies which set forth viewpoint neutral content based access rules, and granting Defendants an irrevocable and perpetual license to

1  their video content and access to collect, aggregate and sell their personal digital information and

2  data; as well as paying Defendants other consideration for services and access on Defendants'

3  platform.

4  584.587.    Defendants have unfairly interfered with Plaintiffs' contractual rights by

5  employing AI, algorithms, filters and automated systems that aggregate Plaintiffs' personal data to

6  make determinations regarding Plaintiffs' access to the YouTube platform and services, including

7  without limitation Plaintiffs' ability to reach the full YouTube audience, to generate revenue from

8  their videos and channels, to purchase and display advertising, and to notify subscribers of new

9  content, based at least in part on computerized data about the race, gender, sexual orientation,

10  political affiliations and other personal identifying traits of the individual Plaintiffs resulting in

11  digital redlining across the Defendants' platforms.  Defendants' conduct in denying Plaintiffs' equal

12  access to YouTube and its related services based on the race of users is prohibited by and contrary to

13  California and federal law.

14  585.588.    As a direct and proximate result of Defendants' breach, Plaintiffs have

15  suffered monetary damages and other financial harms and losses in excess of $500.00 per year plus

16  other lost revenues, including the monetary value of unlawfully acquired property and license rights

17  to Plaintiffs' content and the personal data and information derived from Plaintiffs and their

18  subscribers and viewers, the total amount of which will be determined at trial.

19  586.589.    As a direct and proximate result of Defendants' breach, Plaintiffs have also

20  suffered irreparable harm to their contractual based speech rights and expression provided for subject

21  only to viewpoint neutral content based rules as set forth in the express and implied provisions of the

22  TOS and other related contracts.

23  587.590.    In the alternative, Plaintiffs seek to rescind the TOS, Google's Privacy Policy

24  and related agreements on grounds that the agreements are illusory and contrary to public policy

25  where Plaintiffs fully performed their promises to Defendants, but Defendants either retain full sole

26  and absolute discretion under the agreements to deny Plaintiffs access to the YouTube platform and

27  Defendants' services regardless of whether Plaintiffs have fully complied with the TOS, Community

28

1  Guidelines, Google's Privacy Policy and/or the Policy, Safety and Copyright Policies, and other

2  agreements.

3  588.591.  California Civil Code §§1689, *et seq*. governs claims for rescission of

4  contract.  It authorizes Plaintiffs to rescind a contract "[i]f the consideration for the obligation of the

5  rescinding party fails, in whole or in part, through the fault of the party as to whom he rescinds." Cal.

6  Civ. Code §1689(b)(2).  If the Court interprets the governing agreements as affording Defendants

7  sole unilateral discretion to deny Plaintiffs access to the YouTube platform and/or Defendants'

8  services as Defendants have asserted in this Lawsuit, then the Defendants' consideration will have

9  substantially failed, resulting in Plaintiffs receiving nothing from Defendants but minimal of access

10  to the platform and Defendants' services, in exchange for irrevocable licenses and 100% of

11  Plaintiffs' personal digital data.

12  589.592.  California Civil Code §1689(b)(5)-(6) further authorize Plaintiffs to rescind a

13  contract where the "contract is unlawful for causes which do not appear in its terms or conditions,

14  and the parties are not equally at fault;" and "[i]f the public interest will be prejudiced by permitting

15  the contract to stand."  Here, Plaintiffs allege that Defendants have employed AI, algorithms, filters

16  and automated systems that collect, aggregate, and use data regarding individual Plaintiffs' race,

17  gender, sexual orientation, political affiliation, and other personal identifying traits to make decisions

18  regarding the Plaintiffs' access to the YouTube platform and to determine which of Defendants'

19  services Plaintiffs can access, if any.  The operative agreements (TOS, Community Guidelines,

20  Google's Privacy Policy and the Policy, Safety and Copyright Policies) do not include express

21  language that authorizes Defendants to employ AI, algorithms, filters or automated systems at all,

22  much less to employ these tools for purposes of collecting, aggregating and using Plaintiffs' personal

23  data regarding race, for purposes of determining the Plaintiffs' access to the platform and/or which

24  services, if any, Plaintiffs can use.  As alleged supra, Plaintiffs bear no fault regarding Defendants'

25  vague, ambiguous, and inconsistent contract language; nor do Plaintiffs bear any fault regarding

26  Defendants' use the AI, algorithms, filters and automated systems commencing in 2017, which use

27  race and other personal identity information to discriminate against African American and Hispanic

28

1   Plaintiffs.  Defendants' use of such tools contravenes California and federal legal prohibitions

2   against discrimination in contract on the basis of race and is therefore against public policy.

3   590.593.      Accordingly, should the Court in interpreting the agreements as a matter of

4   law find that Defendants retain sole unilateral discretion to deny Plaintiffs access to the full YouTube

5   platform and Defendants' services despite Plaintiffs' full compliance with all of the TOS, and

6   applicable guidelines, and policies, Plaintiffs do hereby give notice of rescission to Defendants, and

7   hereby offer to restore to Defendants the little revenue which Plaintiffs have earned, along with

8   whatever value that the Court deems appropriate for the limited access to the YouTube platform

9   which Plaintiffs have actually enjoyed since opening their accounts with Defendants.

10   591.594.      California Civil Code §1692 provides that Plaintiffs "shall be awarded

11   complete relief, including restitution of benefits . . . conferred . . . as a result of the transaction and

12   any consequential damages to which he is entitled."  Cal. Civ. Code §1692.  Plaintiffs therefore also

13   request that the Court restore to them both their intellectual property, including the licenses granted

14   to Defendants under the TOS, and also their personal digital data which Defendants have collected,

15   aggregated, used, and sold; as well as the monetary value of that data which Defendants have

16   received from advertisers on the platform and from third parties.

17                          **SEVENTHSEVENTH CAUSE OF ACTION**
                               **For Promissory Estoppel**
18             **(On Behalf Of Individual Plaintiffs And The Race Discrimination Class)**

19   592.595.      Plaintiffs re-allege and incorporate by reference in whole or in part the

20   allegations alleged in paragraphs 1 through 578.

21   593.596.      "The elements of promissory estoppel are (1) a promise, (2) the promisor

22   should reasonably expect the promise to induce action or forbearance on the part of the promisee or a

23   third person, (3) the promise induces action or forbearance by the promise or a third person (which

24   we refer to as detrimental reliance), and (4) injustice can be avoided only by enforcement of the

25   promise."  *West v. JPMorgan Chase Bank, N.A.*, 214 Cal.App.4th 780, 803 (2013).

26   594.597.      Defendants have made at least 5 promises to Plaintiffs and other similarly

27   situated users:

28
     **REVISED SECONDTHIRD** AMENDED CLASS ACTION COMPLAINT **FOR DECLARATORY JUDGMENT,**
                      **RESTITUTION, ACCOUNTING AND DAMAGES**

a.      Defendants promise Plaintiffs equal access to YouTube subject only to viewpoint neutral content based rules that apply equally to all users;

b.      Defendants promise not to discriminate against Plaintiffs based on their race, ethnicity, other protected identities, or other personal identifying traits, except as permitted under California or controlling federal law;

c.      Defendants promise to allow Plaintiffs who follow the TOS, Community Guidelines, published policies and other related agreements access to the YouTube platform and all of Defendants' services, including the opportunity to view the content posted, to comment on content, to post original content that is searchable on the platform, that qualifies to earn revenue through advertising, the opportunity to have viewers subscribe to Plaintiffs' channels and receive notification when new content is posted, the opportunity to have videos featured in "Up Next" video recommendations, the use of custom thumbnail tiles, the opportunity to communicate and post content on a digital social media that is safe, free from doxing, threats and hate speech, the enforcement of Copyrights under federal law, subject to content based rules that are viewpoint neutral and apply to all content;

d.      Defendants promise to only use, appropriate, and/or derive revenue from Plaintiffs' content and data, and that of their viewers and subscribers, subject to Defendants' honoring and fulfilling their express and implied terms and obligations under the TOS, Community Guidelines, the Policy, Safety and Copyright Policies, Google's Privacy Policy, and other related agreements; and

e.      Defendants promise to operate YouTube as a public forum for freedom of expression that is subject only to narrowly tailored content based viewpoint neutral rules that apply equally to all users and all content.

595.598.    Defendants made these promises with the reasonable expectation and intent of inducing Plaintiffs to use the YouTube platform, upload videos, and to grant Defendants irrevocable license rights and other valuable consideration derived from Plaintiffs' use of YouTube.

596.599.    Defendants also made these promises with the intent of inducing Plaintiffs, as well as their viewers, subscribers, and followers, to access and use the YouTube platform and

Defendants' services so that Defendants can gather, aggregate, use and sell the users' personal digital data; as well as sell advertisements and profit from users' access to and use of the YouTube platform and Defendants' related services.

597.600.    By making these promises, Defendants induced Plaintiffs to grant Defendants irrevocable licenses, rights and other valuable consideration derived from Plaintiffs' use of YouTube.

598.601.    By making these promises, Defendants induced Plaintiffs, as well as their viewers and subscribers, to give Defendants access to gather, aggregate, use and sell the users' personal digital data, and to access and use the YouTube platform and services resulting in Defendants' gathering enormous quantities of detailed personal digital data for each Plaintiff, which Defendants used to determine the degree to which individual Plaintiffs could access the platform and Defendants' services, the reach of their individual channels and content posted to their channels, and the extent to which their subscribers and viewers could enjoy access to the platform and Defendants' services; moreover, Defendants have sold Plaintiffs' aggregated personal digital data to third parties who in turn have used that data to monetize, advertise, and profit from user access and use of the platform and Defendants' services.

599.602.    Enforcing Defendants' promises will avoid injustice, including stopping overt, intentional, discrimination based on race, gender, sexual orientation, political affiliation and other personal identifying traits that has occurred against Plaintiffs, prohibiting Defendants from further misappropriating Plaintiffs' content and data, and prohibiting Defendants from continued unjust enrichment and from continued enjoyment of the unfair, inequitable, and illegal benefits of those promises which Defendants have failed to honor, comply with, or enforce.

600.603.    As a proximate result of Defendants' failure to honor and fulfill each of their promises to Plaintiffs, Plaintiffs have suffered financial and monetary losses, including the loss of their intellectual and other property rights which Defendants have misappropriated for their own financial and unjust gain, and Plaintiffs have suffered irreparable harm to speech and expression which was promised by Defendants, in an amount to be determined at trial.

1

**EIGHTHEIGHTH CAUSE OF ACTION**
**For Unlawful, Deceptive, And Unfair Business Practices**
**Cal. Bus. & Profs. Code, §§17200, *et seq.***
**(On Behalf Of Individual Plaintiffs And The Race Discrimination Class)**

2

3

601.604.     Plaintiffs re-allege and incorporate by reference in whole or in part the

4

allegations alleged in paragraphs 1 through 587.

5

602.605.     Defendants have committed acts of unfair competition, as defined by

6

California Business and Professions Code §17200, by engaging in the practices described above.

7

603.606.     Defendants' profiling, filtering, restricting, and blocking Plaintiffs' content

8

and access on YouTube based on Plaintiffs' race, ethnicity, or other protected identities is an

9

unlawful business practice under §17200 because those practices, acts, and conduct violate 42 U.S.C.

10

§1981 and the Unruh Civil Rights Act.

11

604.607.     Defendants' profiling, filtering, restricting, and blocking Plaintiffs' content

12

and access on YouTube based on Plaintiffs' race, ethnicity, or other protected identities are also

13

deceptive business acts or practices as defined under §17200 because they are based on intentionally

14

false promises by Defendants to Plaintiffs, and other users, and advertisers that YouTube only

15

restricts or blocks content or access based on violations of YouTube's content based rules that apply

16

equally to all.  In fact, Defendants have knowingly and intentionally used Plaintiffs' race, ethnicity,

17

or other protected identities to block content and access to YouTube under the false pretext that the

18

video was reviewed like all videos on YouTube, including those sponsored by Defendants, and that

19

the review found that Plaintiffs' videos actually contain material that violates YouTube's viewpoint

20

neutral rules.

21

605.608.     Defendants' profiling, filtering, restricting, and blocking Plaintiffs' content

22

and access on YouTube based on Plaintiffs' race, ethnicity, or other protected identities are also

23

unfair business acts or practices as defined under §17200 because Defendants operate as both content

24

review curators and content sponsors on YouTube.  This conflict is on full display when Defendants

25

use their "unfettered" authority to restrict or block Plaintiffs' videos based on their race, ethnicity, or

26

other protected identities but permit their own content or that of their preferred or sponsored content

27

28

creators or channels to go without review, restriction, or blocking, even where the content violates YouTube's content based rules.

606.609.        This includes inserting metadata and other signals into Plaintiffs' videos that permit Defendants to profile and restrict or block content without reviewing the video and results in restrictions and blocking of Plaintiffs' content based on Defendants' embedding and creating the metadata, signals, or other racial profiling content that results in the restriction or blocking.

607.610.        There is no utility to the public for Defendants' actions, and the unlawful, deceptive and unfair practices and conduct do not further a legitimate interest in protecting users from offensive content.

608.611.        As a direct and proximate result of Defendants' unlawful, deceptive, and unfair practices, conduct, and acts, Plaintiffs have suffered, and continue to suffer, immediate and irreparable injury in fact, including lost income, reduced viewership, and damage to brand, reputation, and goodwill, for which there exists no adequate remedy at law.

609.612.        Furthermore, as a result of such practices, conduct, and acts, Defendants misappropriate and are unjustly enriched by taking consideration in the form of property rights to content and data, and revenue that belongs to Plaintiffs in an amount that exceeds $5 million.

610.613.        Plaintiffs are therefore entitled to restitution of that and other amounts, as well as other equitable relief to be determined at trial.

611.614.        At all times Defendants' wrongful actions were taken with oppression, fraud and/or malice.  Indeed, at least dating back to 2017, Defendants have admitted and known that they were targeting users like Plaintiffs, based on their race, ethnicity, or other protected identities, in violation of their promises and rules not to discriminate based on race, or any other identity.

### NINTHNINTH CAUSE OF ACTION
**Equitable Claim For An Accounting Of Debts Owed Under Contract**
**(On Behalf Of Individual Plaintiffs And The §1981Race Discrimination Class)**

612.615.        415.Plaintiffs re-allege and incorporate herein by reference, as though set forth in full, each of the allegations set forth in paragraphs 1 through 412581 above.

613.616.     416. A claim for accounting can be either a legal remedy or an equitable claim. *Hafiz v. Greenpoint Mortgage Funding, Inc*., 652 F. Supp. 2d 1039, 1043 (N.D. Cal. 2009).

614.617.     417. An equitable claim for an accounting "requires a showing that a relationship exists between the plaintiff and defendant that requires an accounting, and that some balance is due the plaintiff that can only be ascertained by an accounting." *Teselle v. McLoughlin*, 173 Cal.App.4th 156, 179 (2009).  All that is required is "some relationship" between the parties. *Id*.

615.618.     418. To state an equitable claim for an accounting, therefore, a plaintiff need only allege that:  (1) a contractual relationship exists between the Plaintiffs and Defendants under which monetary consideration is owed to the plaintiff; (2) the amount due and owing cannot be determined or ascertained without an examination of the debts and credits recorded and kept on the "books" of the defendant to determine what the precise amount is that is due and owing; (3) the defendant has engaged in misconduct; and (4) no adequate remedy at law exists. *Green Valley Landowners Assn. v. City of Vallejo*, 241 Cal.App.4th 425, 443 (2015)**;** *Prakashpalan v. Engstrom, Lipscomb & Lack*, 223 Cal.App.4th 1105, 1136–1137 (2014).

616.619.     419. A contractual relationship exists between Defendants and the putative §1981 Race Discrimination Class.  Each §1981 Race Discrimination Class member has entered into license agreements with YouTube and contracts with Adworks or Adsense with Google for services on YouTube and Google, under which Defendants have obtained specified rights to Plaintiffs' videos, personal data, and other property in exchange for monetary compensation to Plaintiffs based on viewership, advertising, CPM, and other metrics related to their video content, channels, and personal information and data.

617.620.     420. Under those licensing agreements and advertising contracts, Defendants have both promised to give to Plaintiffs and the members of the putative §1981 Race Discrimination Class specified benefits such as the ability to generate revenue from a YouTube channel and videos uploaded to the channel (i.e., monetization), mobile Livestreaming, Channel Membership, and SuperChat; and once qualified for monetization, monthly revenue based on the number of subscribers to the channel, the number of viewers for the channel and for individual videos, the total

1  monthly watch time spent by viewers watching videos uploaded to the channel, CPM, and the

2  number of advertisements appearing on or with individual videos and the channel.

3      618.621.      421. Over the past three year years, at different periods, Defendants have

4  frozen, altered, unilaterally reduced and/or shaved total numbers from (a) the monthly reported view

5  numbers for individual videos, (b) the total reported historical aggregate view numbers for channels,

6  (c) the total reported subscriber numbers for channels, (d) the monthly reported watch times for

7  individual videos, (e) the monthly and total reported watch times for channels, and (f) monthly

8  reported revenue payable to Plaintiffs and the members of the putative §1981 Race Discrimination

9  Class.  Defendants have changed reported numbers from week to week, month to month, and year to

10  year without affording notice, any explanation, or an opportunity to object or appeal to the Plaintiffs

11  and the members of the putative §1981 Race Discrimination Class.  Defendants have engaged in

12  misconduct in reporting inconsistent, inaccurate, varying, and incorrect information regarding

13  numbers of subscribers and views, and watch times that has resulted in and proximately caused

14  discrepancies and uncertainty about the precise amounts of compensation owed to Plaintiffs and the

15  members of the §1981 class Race Discrimination Class.  Defendants' inaccurate and false reports

16  have deprived Plaintiffs and members of the putative §1981 Race Discrimination Class of the

17  opportunity to qualify to receive revenue from YouTube channels, and have deprived them of

18  revenue for individual monetized videos and monetized channels which Defendants are obligated to

19  pay under the license agreements, the TOS and the Adworks and Adsense contracts.

20      619.622.      422. Defendants control the data from which they have calculated and

21  reported numbers of subscribers, numbers of views, watch times and revenue to Plaintiffs and

22  members of the putative §1981 Race Discrimination Class, who cannot review the Defendants' data

23  or ascertain the correct numbers which should have been reported.  Nor do Plaintiffs and members of

24  the putative §1981 Race Discrimination Class  have access to other data which would allow them to

25  calculate the true amounts which Defendants owe and should have paid under the license agreement,

26  the TOS and the Adworks and/or Adsense contracts.

27      620.623.      423. There is no adequate remedy at law by which Plaintiffs and the members

28  of the putative §1981 Race Discrimination Class can ascertain the precise amounts of compensation

1  that Defendants owe to the Plaintiffs and the members of the ~~class~~Class under the terms of the license

2  agreement, the TOS, and the Adworks and/or Adsense contracts.  Without an equitable accounting,

3  Plaintiffs and the members of the Class will be deprived of revenue and compensation that

4  Defendants owe each of them, and Plaintiffs and the members of the putative ~~§1981~~Race

5  Discrimination Class cannot determine or ascertain the precise amounts which Defendants owe.

6  <center>~~THIRD~~TENTHTENTH CAUSE OF ACTION<br>For Conversion Of Plaintiffs' Property<br>(On Behalf Of Individual Plaintiffs And The ~~§1981~~Race Discrimination Class)</center>

8  ~~621.~~624.        ~~424.~~Plaintiffs re-allege and incorporate herein by reference, as though set

9  forth in full, each of the allegations set forth in paragraphs 1 through ~~422~~590 above.

10  ~~622.~~625.        ~~425.~~Conversion is a strict liability tort.  The foundation of the action rests

11  neither in the knowledge nor the intent of the defendant.  Instead, the tort consists in the breach of an

12  absolute duty; the act of conversion itself is tortious.  Questions of the Defendants' good faith, lack of

13  knowledge, and/or motive are immaterial.

14  ~~623.~~626.        ~~426.~~A claim for conversion therefore rests solely upon the Defendants'

15  unwarranted interference with the Plaintiffs' "'dominion over the property" that causes an injury or

16  harm to Plaintiffs.  Neither good nor bad faith, care nor negligence, knowledge, nor ignorance, are

17  material to the action.  *Los Angeles Fed. Credit Union v. Madatyan*, 209 Cal.App.4th 1383, 1387

18  (2012).

19  ~~624.~~627.        ~~427.~~The elements of a claim for conversion are:  (1) Plaintiffs' ownership or

20  right to possession of specified property; (2) the Defendants' conversion by a wrongful act that

21  results in harm or disposition of the property and/or Plaintiffs' rights to that property; and (3) harm or

22  disposition that results in financial harm or damages to Plaintiffs.  *Hester v. Public Storage*, 49

23  Cal.App.5th 668, at *7 (May 28, 2020); *Hodges v. County of Placer*, 41 Cal.App.5th 537, 551

24  (2019).

25  ~~625.~~628.        ~~428.~~Since 2006, Plaintiffs and members of the putative ~~§1981~~Race

26  Discrimination Class have created and uploaded thousands of original videos to channels established

27  on the YouTube platform.  These videos were created and uploaded at the sole expense and by the

28

efforts of Plaintiffs and members of the putative §1981 Race Discrimination Class.  Defendants contributed nothing to the creation of these original videos.  For many Plaintiffs and members of the putative §1981 Race Discrimination Class, the uploaded video constitutes the only existing copy of the video.

626.629.     429. Under the license agreement and the TOS, (among other things), Plaintiffs grant a nonexclusive license to Defendants to display, use, copy, repost, and promote those original videos which are uploaded to the YouTube platform.  Plaintiffs and members of the putative §1981Race Discrimination Class have not granted Defendants an exclusive right to use uploaded videos, and they retain all of the intellectual property rights to the videos after the videos are uploaded.

627.630.     430. Though Defendants only have a nonexclusive license to the uploaded videos, over the past 14 years, Defendants have, without advanced notice, wrongfully unilaterally removed thousands of Plaintiffs' original individual videos from the YouTube platform, terminated access to the YouTube platform, and/or removed channels and all of the videos uploaded to the channels without affording an opportunity to create a copy of the videos which were uploaded by Plaintiffs and members of the putative §1981 Race Discrimination Class.  Defendants have done so without affording Plaintiffs and members of the putative §1981Race Discrimination Class an effective opportunity to appeal the decision to remove videos, terminate access to the platform, or remove channels; or to make a copy of the video and electronic data associated with the video.

628.631.     431. Defendants often removed the videos, terminated access, or removed channels without any explanation or rationale for having done so.  On occasion, when Defendants did give written notice, the notice indicated the adverse action had been taken because the video violated one of Defendants' numerous vague Community Guidelines or TOS, and but did not actually specify what about the video content was problematic or prohibited.  Appeals sent to Defendants from Plaintiffs and members of the putative §1981Race Discrimination Class often are ignored by Defendants or summarily affirmed without explanation or specifying the video content that violated Defendants' rules.

629.632.     432. For many Plaintiffs and members of the putative §1981 Race Discrimination Class, Defendants still retain videos in the form of electronic data, and could return to Plaintiffs and members of the putative §1981Race Discrimination Class copies of the videos uploaded but now removed from the YouTube platform.  However, Defendants ignore the calls, messages, letters, emails and even judgments issued by small claims courts from Plaintiffs and members of the putative §1981Race Discrimination Class.  Defendants have not returned the videos of Plaintiffs and members of the putative §1981Race Discrimination Class which have been wrongfully removed, or for which platform access has been terminated or denied.

630.633.     433. In removing videos, terminating access to the platform and/or removing channels wholesale, Defendants have interfered with the dominion by Plaintiffs and members of the putative §1981Race Discrimination Class over their videos; Defendants have deprived them entirely of the use of the videos, as well as the money spent to create the videos.  Defendants have deprived Plaintiffs and members of the putative §1981Race Discrimination Class of future revenue that could be earned from the videos, because Plaintiffs and members of the putative §1981Race Discrimination Class cannot post their videos on the platform of one of Defendants' social media competitors where the videos could generate revenue, or upload the videos to a pay– per– view internet website where the videos could generate revenue.

**FOURTHELEVENTHELEVENTH CAUSE OF ACTION**
**For Replevin**
**(On Behalf Of Individual Plaintiffs And The §1981Race Discrimination Class)**

631.634.     434. Plaintiffs re-allege and incorporate herein by reference, as though set forth in full, each of the allegations set forth in paragraphs 1 through 431617 above.

632.635.     435. Plaintiffs and members of the putative §1981Race Discrimination Class acknowledge that Courtcourts often treat Conversionconversion and Replevinreplevin interchangeably, or treat Replevinreplevin as a remedy for Conversion.  Plaintiffconversion.  Plaintiffs plead Conversionconversion and Replevinreplevin separately out of an abundance of caution, so as to ensure that they preserve the right to recover money in the event that copies of the videos Defendants have removed cannot be obtained.

**REVISED SECONDTHIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

633.636.       436. Replevin is a common law remedy that permits the prevailing party to recover both personal property and incidental damages from a defendant who unlawfully possesses the property.

634.637.       437. When the claim is asserted in a federal court proceeding, Replevinreplevin is a remedy specifically approved by rule, as governed by the appropriate state law.

635.638.       438. In California, a claim for Replevinreplevin is the functional equivalent of the common law writ for recovery of specific personal property.  California courts, therefore, refer to Replevinreplevin as a cause of action for "claim and delivery" that permits the plaintiff to recover both personal property and incidental damages from an unlawful possessor.  *Adler v. Taylor*, 2005 WL 4658511, at *3 (C.D. Cal. Feb. 2, 2005), aff'd sub nom., *Orkin v. Taylor,* 487 F.3d 734 (9th Cir. 2007).

636.639.       439. The gist of common law Replevinreplevin is simple:  Defendants' unlawful possession of Plaintiffs' property.  With respect to an equitable claim or remedy for Replevinreplevin in connection with a claim for conversion, the additional elements are:  (a) Defendants' actual possession of Plaintiffs' property; (b) Plaintiffs;' demand for possession of the property; and (c) Defendants' refusal to deliver the property.  See *Stockton Morris Plan Co. v. Mariposa Cnty.*, 99 Cal.App.2d 210, 213 (1950);  *Penske Truck Leasing Co. v. I-10 Towing and Recovery, Inc.*,  No. EDCV 18-2547 JGB (SPx), 2019 WL 6736905, at *3 (C.D. Cal. Mar. 11, 2019).

637.640.       440. Plaintiffs and members of the putative §1981Race Discrimination Class uploaded their videos to the YouTube platform.  Defendants maintain servers which electronically record the videos which are uploaded to the YouTube platform.

638.641.       441. Following Defendants' removal of individual videos, termination of access to the platform or removal of whole channels preventing Plaintiffs and members of the putative §1981Race Discrimination Class from accessing the videos which they uploaded to the YouTube platform, Plaintiffs and members of the putative §1981Race Discrimination Class undertook multiple and varied efforts to obtain the return of the videos.  When Defendants gave written notice after the fact of removal or termination of access, Plaintiffs and members of the putative §1981Race Discrimination Class pursued appeals seeking to recover the videos by accessing

1  Defendants' appeal sites on the YouTube platform.  Usually, Defendants did not give written notice

2  of the removal or termination of access, and Plaintiffs and members of the putative ~~§1981~~Race

3  Discrimination Class telephoned published help numbers for YouTube help and left voicemail

4  messages demanding that the videos be returned~~; they~~.  They wrote emails and letters to YouTube

5  seeking the return of the videos and inquiring how and when the videos would be returned~~; some~~.

6  Some even filed ~~law suits~~lawsuits in small claims courts and obtained judgments for the videos.

7  However, Defendants either ignored the demands for videos made by Plaintiffs and members of the

8  putative ~~§1981~~Race Discrimination Class or affirmed the removal or termination of access without

9  further communication.

10  ~~FIFTH CAUSE OF ACTION~~
   ~~For Breach of Contract~~
11  ~~(On Behalf Of Individual Plaintiffs And The §1981 Class)~~

12  ~~442.   Plaintiffs re-allege and incorporate by reference in whole or in part the allegations~~

13  ~~alleged in paragraphs 1 through 439.~~

14  ~~443.   The TOS and agreement(s) between Defendants and Plaintiffs governing filtering,~~

15  ~~review and access to content and services on YouTube provide that the right and obligations under~~

16  ~~those agreements are governed and subject to California law, including federal law that California is~~

17  ~~obligated to enforce under the supremacy clause of the U.S. Constitution.~~

18  ~~444.   The elements of a breach of contract under California law are: (1) existence of a valid~~

19  ~~contract between Plaintiffs and Defendants; (2) Plaintiffs' performance (or excuse for~~

20  ~~non-performance) under the contract; (3) Defendants' breach of the contract; and (4) proof of harm~~

21  ~~or financial injury as a result of the breach.~~

22  ~~445.   Plaintiffs and Defendants have entered into agreement, including the TOS and related~~

23  ~~agreement(s) that are enforceable contract(s) governed by and under California law;~~

24  ~~446.   Plaintiffs have performed their obligations under the TOS and/or other contract(s),~~

25  ~~including complying with YouTube's viewpoint neutral content based access rules and granting~~

26  ~~Defendants a perpetual and irrevocable license to their video content and all personal data and~~

27  ~~consumer information derived or used in connection with Plaintiffs' content on or use of YouTube.~~

28  ~~1665102.1~~ 1911115.1                    -233-                    Case No. 5:20-cv-04011 LHK .

447.   Defendants have breached their promises to provide Plaintiffs' equal access to YouTube and all related services that Defendants offer to other users, and are subject only to content based rules that are viewpoint neutral and apply equally to all.   Specifically, Defendants have denied and interfered with Plaintiffs' right of equal access to YouTube and its related services by profiling and using Plaintiffs' race, identity or viewpoints, not merely the material in the video content, to review, filter and restrict Plaintiffs' access to YouTube in a manner that is not permitted by federal and California law.

448.   As a direct and proximate result of Defendants' breach, Plaintiffs have suffered monetary damages and other financial harms and losses in excess of $500.00 per year plus other lost revenues, the total amount of which will be determined at trial.

449.   As a direct and proximate result of Defendants' breach, Plaintiffs have also suffered irreparable harm to their contractual based rights of free speech and expression provided for under the express and implied provisions of the TOS and other contract(s).

**SIXTH CAUSE OF ACTION**
**For Breach Of The Implied Covenant**
**Of Good Faith And Fair Dealing**
**(On Behalf Of Individual Plaintiffs And The §1981 Class)**

450.   Plaintiffs re-allege and incorporate by reference in whole or in part the allegations alleged in paragraphs 1 through 448.

451.   Under California law, every contract "imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." *McClain v. Octagon Plaza, LLC,* 159 Cal.App.4th 784, 798 (2008) (quoting *Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal.4th 342, 371–72 (1992)).

452.   The covenant "is based on general contract law and the long-standing rule that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." *Waller v. Truck Ins. Exchange, Inc.*, 11 Cal.4th 1, 36 (1995).   The covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another.   When a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance

**REVISED SECONDTHIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

1   with fair dealing" and such discretion "must be exercised in good faith." *Carma*, 2 Cal.4th at 372;

2   *see also Perdue v. Crocker Nat'l Bank*, 38 Cal.3d 913, 923 (1985) ("'where a contract confers on one

3   party a discretionary power affecting the rights of the other, a duty is imposed to exercise that

4   discretion in good faith and in accordance with fair dealing").)

5       **453.**   Breach of the implied covenant occurs "[w]here the terms of a contract are literally

6   complied with but one party to the contract deliberately countervenes the intention and spirit of the

7   contract." *Hilton Hotels Corp. v. Butch Lewis Prod., Inc.*, 808 P.2d 919, 922–23 (Nev. 1991).

8   "Establishing such a breach of the implied covenant depends upon the 'nature and purposes of the

9   underlying contract and the legitimate expectations of the parties arising from the contract."

10  *Integrated Storage Consulting Servs., Inc. v. NetApp, Inc.*, No. 5:12-CV-06209-EJD, 2013 WL

11  3974537, at *7 (N.D. Cal. July 31, 2013).

12      **454.**   Five factual elements are required to establish a breach of the covenant of good faith

13  and fair dealing: (1) the parties entered into a contract; (2) the plaintiff fulfilled his obligations under

14  the contract; (3) any conditions precedent to the defendant's performance occurred; (4) the defendant

15  unfairly interfered with the plaintiff's rights to receive the benefits of the contract; and (5) the

16  plaintiff was harmed by the defendant's conduct.  Judicial Council of California Civil Jury

17  Instruction 325.

18      **455.**   Plaintiffs and Defendants have entered into contracts, including the TOS, in

19  connection with Plaintiffs' use and access to YouTube and the related services Defendants offer

20  under those contracts.

21      **456.**   Plaintiffs have fulfilled their obligations under the TOS and other agreement(s) and

22  fulfilled or performed the conditions precedent, if any, under those agreement(s), including

23  complying with YouTube's viewpoint neutral content based access rules and granting Defendants an

24  irrevocable and perpetual license to their video content and any personal information and data

25  derived from Plaintiffs' use or content on YouTube, and paying Defendants other consideration for

26  services and access.

27

28

457.   Defendants unfairly interfered with Plaintiffs' rights by profiling and using their race, personal identity or viewpoint to deny them equal access to YouTube and its related services based on conduct that that is prohibited by and not permitted under California or federal law.

458.   As a direct and proximate result of Defendants' breach, Plaintiffs have suffered monetary damages and other financial harms and losses in excess of $500.00 per year plus other lost revenues, including the monetary value of unlawfully acquired property and license rights to Plaintiffs' content and the personal data and information derived from Plaintiffs and their subscribers and viewers, the total amount of which will be determined at trial.

459.   As a direct and proximate result of Defendants' breach, Plaintiffs have also suffered irreparable harm to their contractual based speech rights and expression provided for subject to only to viewpoint neutral content based rules as set forth in the express and implied provisions of the TOS and other contract(s).

**SEVENTH CAUSE OF ACTION**
**For Promissory Estoppel**
**(On Behalf Of Individual Plaintiffs And The §1981 Class)**

460.   Plaintiffs re-allege and incorporate by reference in whole or in part the allegations alleged in paragraphs 1 through 457.

461.   "The elements of promissory estoppel are (1) a promise, (2) the promisor should reasonably expect the promise to induce action or forbearance on the part of the promisee or a third person, (3) the promise induces action or forbearance by the promise or a third person (which we refer to as detrimental reliance), and (4) injustice can be avoided only by enforcement of the promise. *West v. JPMorgan Chase Bank, N.A.*, 214 Cal.App.4th 780, 803 (2013).

462.   Defendants have made at least 5 promises to Plaintiffs and other similarly situated users:

a.   Defendants promise Plaintiffs equal access to YouTube subject only to viewpoint neutral content-based rules that apply equally to all users;

b.      Defendants promise not to discriminate against Plaintiffs based on their race, sexual identity, commercial status or identity, or the personal viewpoints except as permitted under California or controlling federal law;

c.      Defendants promise to provide viewer and audience reach, advertising, subscription, monetization, and content curation services to Plaintiffs and other users who comply with YouTube's viewpoint neutral content-based rules;

d.      Defendants promise only to use, appropriate, or derive revenue from Plaintiffs' content and data, and that of their viewers and subscribers subject to Defendants' honoring and fulfilling their express and implied terms and obligations under the TOS and other agreement(s); and

e.      Defendants promise to operate YouTube as a public forum for freedom of expression that is subject only to narrowly tailored, viewpoint neutral content based rules.

463.    Defendants made these promises with the reasonable expectation and intent of inducing Plaintiffs to grant Defendants an irrevocable license rights and other valuable consideration derived from Plaintiffs' use of YouTube.

464.    Defendants also made these promises with the intent of inducing Plaintiffs, as well as their viewers, subscribers, and followers, to access and use YouTube so that Defendants can monetize, advertise, and profit from user access and use of YouTube and the related services that Defendants offer.

465.    Defendants, through these promises, induced Plaintiffs to grant Defendants an irrevocable license, rights and other valuable consideration derived from Plaintiffs' use of YouTube.

466.    Defendants, through these promises, induced Plaintiffs, as well as their viewers, subscribers, and followers, to access and use YouTube so that Defendants can monetize, advertise, and profit from user access and use of YouTube and the related services that Defendants offer.

467.    Enforcing Defendants' promises will avoid injustices, including stopping overt, intentional, and race and sex discrimination against Plaintiffs, prohibiting from misappropriating Plaintiffs' content and data, and prohibiting Defendants to become unjustly enriched and unfairly,

1  inequitably, and illegally obtain the benefits of promises that Defendants have failed to honor,

2  comply with, or enforce.

3      468.   As a proximate result of Defendants' failure to honor and fulfill each of their

4  promises, Plaintiffs have suffered financial and monetary losses, had their intellectual and other

5  property rights unjustly misappropriated by Defendants' own personal financial and unjust gain, and

6  have suffered irreparable harm to speech and expression promised by Defendants, in an amount to be

7  determined at trial.

8                    **EIGHTH CAUSE OF ACTION**
                    **ForTWELFTH CAUSE OF ACTION**
9                   **For Unlawful Discrimination In Contract**
                   **In Violation Of 42 U.S.C. § 1981 The Unruh Civil Rights Act**
10          **(On Behalf Of Individual Plaintiffs And The §1981Race Discrimination Class)**

11      639.642.       469. Plaintiffs re-allege and incorporate by reference in whole or in part the

12  allegations alleged in paragraphs 1 through 468.625.

13      470.   Title 42, Section 1981 of the U.S. Code codifies the right of each individual member

14  of a protected racial classification to "have the same right in every State and Territory to make and

15  enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and

16  proceedings for the security of persons and property as is enjoyed by white citizens."  42 U.S.C. §

17  1981(a).

18      471.   The statute defines "make and enforce contracts" as including "the making,

19  performance, modification, and termination of contracts, and the enjoyment of all benefits,

20  privileges, terms, and conditions of the contractual relationship." *Id.* § 1981(b).  The statutory

21  protections apply to both "nongovernmental discrimination" and "impairment under color of State

22  law." *Id.* § 1981(c).

23      472.   The elements of a claim for relief under 42 U.S.C. § 1981 are: (1) Plaintiff is a

24  member of a protected class; (2) impairment of a contractual relationship under which plaintiff has

25  rights; (3) defendant impaired that relationship on account of racial discrimination (such that, but for

26  race, plaintiff would not have suffered the loss of a legally protected right); and (4) plaintiff was

27  deprived of such services while similarly situated persons outside the protected class were not.  *See*

28

1  *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020); *Astre v.*

2  *McQuaid*, 804 Fed. App'x 665, 666-67 (Mar. 25, 2020); *Lindsey v. SLT Los Angeles, LLC*, 447 F.3d

3  1138, 1145 (9th Cir. 2006).

4       **473.**   Plaintiff are African Americans and are members of the protected class under section

5  1981.

6       **474.**   Plaintiffs entered into binding and legally enforceable contracts with Defendants

7  including the TOS and related agreement(s) under California and controlling federal law.

8       **475.**   The contractual relationship between each Plaintiff and Defendants was impaired

9  with respect to the TOS and each and every one of the related agreement(s) in at least five ways:

10          **a.**   Defendants' TOS and, any other agreements, under which they claim the right

11  to exercise "unfettered" discretion to impose content, use or services access restrictions based, in any

12  way, on Plaintiffs' racial identity or viewpoint, violates and impairs the TOS, license agreements,

13  and other service agreement(s) on its face;

14          **b.**   Defendants continue to breach the TOS and other agreement(s), by exercising

15  their contractual discretion to profile, filter, restrict, and block Plaintiffs' content and access to

16  YouTube, based on Plaintiffs' racial identity and viewpoint, in a manner that is not permitted, but is

17  expressly prohibited under California and federal law;

18          **c.**   Defendants breached and continue to breach their express and implied

19  promises under the TOS and other related agreement(s) that, YouTube shall not profile, use, base, or

20  impose any restrictions on Plaintiffs' content or access to YouTube based, in any way, on a user's

21  racial identity or viewpoint, and only review, filter, and restrict Plaintiffs' videos based on online

22  video material that runs afoul of YouTube's viewpoint neutral content based rules;

23          **d.**   Defendants' use of content filtering, review, restricting, and blocking tools

24  and procedures to profile and use Plaintiffs' racial identity and viewpoint with respect to any

25  provision in the TOS or related agreements, impairs each and every one of Plaintiffs' rights, express

26  or implied, that exist in the TOS or other related agreement(s) that Defendants entered into with

27  Plaintiffs; and

28

1     c.     Defendants impaired their contractual relationship with each Plaintiff because
2  of Defendants' intentional use of Plaintiffs' racial identity or viewpoint to review, filter, regulate,
3  restrict, and block Plaintiffs' videos and access to YouTube under the false pretext that the material
4  in the video was properly reviewed and found to violate one of YouTube's content based rules
5  governing user content and access to the platform.

6     **476.**  Defendants impaired their contractual relationship with each Plaintiff on account of
7  intentional racial discrimination.  Despite their promises of neutrality and a diversity of viewpoints,
8  Defendants engage in a pattern and practice of intentional willful and malicious discrimination in the
9  provision of their services, including discriminating against and censoring of Plaintiffs' speech,
10  based not upon the content of speech, but on their race.  Through the acts complained of herein,
11  Defendants intentionally denied, and aided or incited in denying, Plaintiffs full and equal
12  accommodations, advantages, privileges, and services, by discriminating against them in
13  demonetizing Plaintiffs' content and by placing their videos in "Restricted Mode."  But for their race,
14  Plaintiffs would not have been subjected to Defendants' filtering or the denial of their contractual
15  benefits under the Agreements.

16     **477.**  While Defendants have impaired and denied, and continue to impair and deny,
17  Plaintiffs' contractual benefits under the TOS and related agreement(s), similarly situated persons
18  who are not protected under the section 1981 protected class were not similarly treated, including
19  persons affiliated with or working for Defendants and/or their preferred users.  Such persons are not
20  being racially profiled and are not subject to the same content or access filtering, restrictions, or
21  blocking despite material in their videos that violates YouTube's content based rules.

22     **478.**  As a direct and proximate result of Defendants' unlawful discriminatory actions,
23  Plaintiffs suffered, and continue to suffer, irreparable injury in fact, including, but not limited to:
24  lower viewership, lost advertising opportunities otherwise available to other nonprofits, decreased ad
25  revenue, and reputational damage, for which there exists no adequate remedy at law.

26
27
28

NINTH CAUSE OF ACTION
For Unlawful Discrimination
In Violation Of The Unruh Civil Rights Act
(On Behalf Of Individual Plaintiffs And The §1981 Class)

479.   Plaintiffs re-allege and incorporate by reference in whole or in part the allegations alleged in paragraphs 1 through 476.

640.643.   480. The elements of a claim for discrimination under the Unruh Civil Rights Act, California Civil The elements of a claim for discrimination under the Unruh Civil Rights Act, California Civil Code §§ §51, *et seq*. are:  (1) Defendants denied, aided or incited a denial of full and equal accommodations or services to Plaintiffs; (2) that a motivating reason for Defendants' conduct was Plaintiffs' race or national origin; (3) that Plaintiffs were harmed and (4) that Defendants' conduct was a substantial factor in causing that harm.  *Nkwuo v. Metro PCS, Inc*., No. 5:14–cv–05027–PSG, 2015 WL 4999978, at *2 (N.D. Cal. Aug. 21, 2015).

641.644.   481. Defendants Google and YouTube host business establishment(s)establishments that solicit, induce, provide, and grant members of the public like Plaintiffs the right to access and the use YouTube platform and itsDefendants' services, subject only to viewpoint neutral "content based" rules that apply equally to all. and to all content.

642.645.   482. Defendants grant members of the public like Plaintiffs the right to use and access the YouTube platform and Defendants' services for commercial reasons and consideration, including obtainingsecuring a perpetual and irrevocable license to content and personal digital data of Plaintiffs' and members of the other public users' content and dataRace Discrimination Class, including the right to appropriate and aggregate that content and personal digital data for sale and other forms of monetization, including advertising, data information sales and services, and other revenue and profit stream on YouTubestreams through contract and business transactions including the TOsTOS and related agreement(s)agreements.

643.646.   483. AOne substantial motivating reason for Defendants' conduct isdigital redlining and racial profiling based on Defendants' use of aggregated personal digital data reflecting the racial identity, viewpoints, andrace, ethnicity, national origin or other protected racial classifications under the law ofidentities Plaintiffs and other persons similarly situated tomembers of

REVISED SECONDTHIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES

1  the Race Discrimination Class is to allow Defendants to cheaply impose restrictions on their video
2  content.484.  using A.I., algorithms, filters and automated systems.  Defendants rely on manual
3  (human being) review and automated tools to filter, curate, restrict and remove content uploaded to
4  the YouTube platform.  *See* Exhibit A at ¶¶9-10.  Using automated tools to classify content allows
5  Defendants to cheaply handle the enormous volumes of new data uploaded daily to Defendants'
6  conductplatforms.  *See* Exhibit A at ¶¶, 17-18, 24-25.
7       644.647.      Defendants' digital redlining and racial profiling is the result of arbitrary,
8  capricious, invidious, and pretext- based discrimination against Plaintiffs'- political and religious
9  identity and based on personal digital data reflecting race, color and/orethnicity, national origin and
10  viewpoints, or other protected identities.
11       645.648.      485.Defendants' use of Plaintiffs' racialrace, ethnicity, national origin or
12  other protected identities to restrict their right to equalmade decisions about the scope of Plaintiffs'
13  access to the YouTube platform and Defendants' services is unlawful and fails to further any lawful,
14  legitimate business interest, including ensuring compliance with YouTube's "content based rules or
15  protecting " Community Guidelines, policies and rules which Defendants put in place to protect
16  "younger" and "sensitive" audiences.  viewers.  See Exhibit A at ¶¶15-16.
17       646.649.      486.Defendants have censored and treated, and continue to censor and treat,
18  Plaintiffs and, their channels and videos differently from the content of Defendants and that of
19  Defendants' ownsponsored or preferred contentcreators, solely because of discriminatory animus
20  towards Plaintiffs' race, ethnicity, national origin, and/or other protected identities and views..
21       647.650.      487.Specifically, Defendants use AI, Algorithmalgorithms, filters and other
22  filtering machines, procedures, and systemsautomated systems which are based upon and/or
23  incorporate aggregated personal digital information about YouTube's creators, subscribers and
24  viewers to knowingly and intentionally engage in and effectuate a pattern and practice of digital
25  redlining, racial profiling and racial discrimination for profit by reviewing, filtering, restricting, and
26  blockingmaking automated determinations regarding Plaintiffs' content and access to the YouTube
27  platform and Defendants services based on Plaintiffs' racial or other identity or viewpoints and other
28  traits or viewpoint that discriminate against Plaintiffsrace, ethnicity, national origin and/or other

1   protected identities.  The use of information about users' race, ethnicity, national origin and other

2   protected identifies to impose limitations on Plaintiffs' access to the platform and services constitutes

3   discrimination based on classifications that are protected under the Unruh Act, namely race, color

4   and/or national origin.  It is unlawful.

5   648.651.   488. Defendants' digital redlining, racial profiling and other wrongful actions

6   were knowing and intentional.  Since September 14, 2017 at the latest, Defendants knew that the

7   A.I., algorithms, filters and automated systems that they engineered, employed, and relied upon were

8   targeting YouTube creators, subscribers and viewers based on identity, including their race,

9   ethnicity, national origin and other protected identities.  Defendants have continued to use these

10  tools, knowing that they harmed Plaintiffs individually by depriving Plaintiffs of the same rights

11  enjoyed by white creators and Defendants' sponsored or preferred creators, and knowing that they

12  harmed the African American and Hispanic communities by silencing the voices of creators,

13  subscribers and viewers alike, particularly with respect to subjects that are important to these

14  communities.  Defendants' wrongful actions were taken with oppression, fraud and/or malice, and

15  effectuated through A.I., algorithms, machines,filters, automated systems and human

16  reviewsreviewers that use Plaintiffs' racial identity and viewpointsrace, ethnicity, or other protected

17  classificationsidentities, as the basis to interfere with and block Plaintiffs' content and access on

18  YouTubeto the platform and Defendants' services under the pretextual promise that everyone has

19  equal access to YouTube subject only to viewpoint t neutral "content based" Community Guidelines,

20  policies and rules that apply equally to all users and all content.

21  649.652.   The Defendants' digital redlining and racial profiling is not a "mistake."

22  Rather, Defendants have undertaken this course of action to enhance profits by classifying YouTube

23  channels and videos so that it appeals to advertisers seeking demographic information about

24  YouTube audiences.

25          a.   By classifying channels and videos according to race, ethnicity, national

26  origin and other protected identities, Defendants are able to sell targeted and lucrative advertising

27  spots based on the demographics of viewers.

28

1         b.     Defendants' digital redlining and racial profiling is a cheap substitute for

2  manual reviewing of the more than 500,000 hours per day of content uploaded to YouTube daily.

3  *See* Exhibit A at ¶¶9-10.

4         c.     Defendants' use of automated tools to filter, curate and restrict content also

5  facilitates Defendants' efforts to increase the reach and revenue for Defendants' own original content

6  and that of their sponsored or preferred creators, further increasing Defendants' revenues while

7  pushing Plaintiffs off of the platform freeing up audiences and space for even more content from

8  sponsored and preferred creators.

9      650.653.     Since September 14, 2017, when Defendants first told Stephanie Frosch that

10  their A.I., algorithms, filters and automated systems were "targeting" the YouTube creators,

11  subscribers and viewers  based on identity, including their race, Defendants have failed to "fix" the

12  "problem" and have increasingly relied on their automated tools.

13      651.654.     Defendants' reliance of automated tools for filtering, curating and restricting

14  content clearly has an adverse disparate impact on Plaintiffs videos, as illustrated in the video

15  comparison chart showing 100 of Plaintiffs' videos which Defendants have restricted and limited in

16  monetization, and how they compare with videos of white or Defendants' sponsored or preferred

17  creators.  Defendants clearly treat the Plaintiffs' videos differently.  Moreover, examination of the

18  comparison videos reveals that Defendants do not apply the Community Guidelines and policies to

19  videos of white or sponsored or preferred creators, and allow videos with materials that violate

20  Defendants' neutral "content based" rules to be viewed by all audiences, and to earn unlimited

21  revenue.

22      652.655.     The Defendants' disparate treatment goes beyond restrictions on individual

23  videos.  Defendants also remove entire channels with hundreds of videos belonging to Plaintiffs and

24  other members of the Race Discrimination Class.  According to Defendants, in 2017, Defendants

25  "expanded" "enforcement guidelines regarding child endangerment and implemented new

26  age-restriction Policies to restrict access" resulting in "the termination of over 50 channels and the

27  removal of thousands of videos."  Exhibit A at ¶16.  Unsurprisingly, Defendants also took down the

28  channel of Catherine Jones and multiple channels of Harvey Stubbs, along with hundreds of videos.

653.656.     Before dismissing Plaintiffs' detailed factual allegations set forth in the Complaint, this Court should examine the Defendants' code underpinning the A.I., algorithms, filters and automated systems which Defendants use.  Defendants' targeting of Plaintiffs based on race can only be a "mistake" where the Defendants' source code is entirely devoid of data regarding users' race, ethnicity, national origin or other protected identities.

654.657.     If there is any linking or leakage of data from the aggregated individual personal digital data files of Plaintiffs with Defendants' A.I., algorithms, filters and automated systems used to classify channels and videos, then Defendants have violated the Unruh Act with respect to each such decision, and every creator, subscriber and viewer affected by that decision.

655.658.     489. As a direct and proximate result of Defendants' unlawful discriminatory actions, Plaintiffs suffered, and continue to suffer, irreparable injury in fact, for which there is no complete adequate remedy at law, including, but not limited to harm and injury to contract based speech rights, and lost financial and business opportunities including viewership, advertising, monetization, and other opportunities and rights to gain popularity and revenues that are otherwise available to other users who are not profiled and regulated on YouTube based on their racial identity or viewpointsrace, ethnicity, or other protected identities.

656.659.     490. As a direct and proximate result of Defendants' discriminatory acts and practices, Plaintiffs have also suffered monetary damages in an amount to be determined at trial.

657.660.     491. Defendants' violations of the Unruh Act further entitle Plaintiffs to recover statutory damages of up to three times the amount of actual damages in an amount to be proven at trial, or a minimum of $4,000 per violation.

**TENTH CAUSE OF ACTION**
**For False Advertising In Violation Of**
**The Lanham Act, U.S.C. §1125, *et seq.***
**(On Behalf Of Individual Plaintiffs And The §1981 Class)**

492.     Plaintiffs re-allege and incorporate by reference in whole or in part the allegations alleged in paragraphs 1 through 489.

493.     The elements of a false advertising claim under the Lanham Act, 47 U.S.C. § 1125, *et seq.*, are: (1) false statement of fact by defendant in a commercial advertisement about its own or

1   another's product; (2) the false statement actually deceived or has the tendency to deceive a

2   substantial segment of the YouTube consumers or users; (3) the false statement is material, in that it

3   is likely to influence the purchasing decision by a YouTube user; (4) the false statement entered

4   interstate commerce; and (5) Plaintiffs have been, and are likely, to be injured as a result of the false

5   statement. *Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*, 758 F.3d 1069, 1071 (9th Cir. 2014).

6       **494.**   Defendants' statements that Plaintiffs or their videos are "Restricted" is false because

7   only videos that are reviewed and found to contain material that violates Plaintiffs' content based

8   rules, including nudity, vulgarity, violence, hate, shocking or sexually explicit material are can be

9   "Restricted." Plaintiffs' videos do not contain such "Restricted Material."

10      **495.**   Defendants' statements are further false because Defendants used Plaintiffs' race,

11  identity or viewpoint to restrict the video rather than any material that based on a review of the video

12  violated YouTube's rules.

13      **496.**   Defendants' false statements are also "commercial advertising" because the

14  statements were made to penetrate the market of YouTube users and have the effect of limiting or

15  steering viewers away from Plaintiffs' channels and videos, to video content, channels, or creators

16  who are sponsored by Defendants and for which or whom Defendants compete with Plaintiffs for

17  viewers, advertising, monetization, and other revenue streams on YouTube.

18      **497.**   Defendants' false statements are likely to deceive users and advertisers on YouTube

19  because the expressly and implicitly insinuate that there is something inappropriate, offensive,

20  improper, or prohibited under YouTube's viewpoint neutral rules.

21      **498.**   Defendants' false statements are also material. They likely influence and affect a

22  user's and/or advertiser's viewing/purchasing decisions. Users and/or advertisers are likely deceived

23  that the video contains offensive material that violates YouTube's rules after Defendants reviewed

24  the video for content violations under YouTube's Community Guidelines, Age Restrictions, and

25  "Restricted Mode" prohibitions, when the basis for the restriction was Plaintiffs' race, identity or

26  viewpoint and was not undertaken in compliance with YouTube's rules.

27      **499.**   Defendants' false statements not only influence but categorically control every user or

28  advertiser's purchasing decisions because the statement results blocking of a user or advertisers

**REVISED SECONDTHIRD** AMENDED CLASS ACTION COMPLAINT **FOR DECLARATORY JUDGMENT,
RESTITUTION, ACCOUNTING AND DAMAGES**

access to the video on YouTube and precludes the user or advertiser from ever accessing, viewing and purchasing the video or purchasing and placing and ad for the video, or otherwise making any purchasing decision contrary to that of Defendants.

500.    Defendants' false statements entered internet commerce and reached millions of viewers who reside in all 50 States, U.S. Territories, and other users across the world.

501.    Plaintiffs are and are likely to continue to be financially harmed by the false statements, including losing substantial amounts revenues for viewer CPMs, advertising, monetization, and other user or advertiser revenue streams on YouTube in an amount to be determined at trial.

**ELEVENTH CAUSE OF ACTION**
**For Unlawful, Deceptive, And Unfair Business Practices**
**Cal. Bus. & Profs. Code, §17200, *et seq*.**
**(On Behalf Of Individual Plaintiffs And The §1981 Class)**

502.    Plaintiffs re-allege and incorporate by reference in whole or in part the allegations alleged in paragraphs 1 through 499.

503.    Defendants have committed acts of unfair competition, as defined by California Business and Professions Code § 17200, by engaging in the practices described above.

504.    Defendants' profiling, filtering, restricting, and blocking Plaintiffs' content and access on YouTube based on Plaintiffs' race, identity, or viewpoint is an unlawful business practice under section 17200 because those practices, acts, and conduct violates 42 U.S.C. § 1981 and the Unruh Civil Rights Act.

505.    Defendants' profiling, filtering, restricting, and blocking Plaintiffs' content and access on YouTube based on Plaintiffs' race, identity, or viewpoint are also deceptive business acts or practices as defined under section 17200 because they are based on intentionally false promises by Defendants to Plaintiffs, and other users, and advertisers that YouTube only restricts or blocks content or access based on violations of YouTube's content based rules that apply equally to all.  In fact, Defendants have knowingly and intentionally use Plaintiffs' racial or other identity or viewpoint to block content and access to YouTube under the false pretext that the video was reviewed like all

1   videos on YouTube, including those sponsored by Defendants, and that the review found that
2   Plaintiffs' videos actually contain material that violates YouTube's viewpoint neutral rules.

3   506.   Defendants' profiling, filtering, restricting, and blocking Plaintiffs' content and access
4   on YouTube based on Plaintiffs' race, identity, or viewpoint are also unfair business acts or practices
5   as defined under section 17200 because Defendants operate as both content review curators and
6   content sponsors on YouTube.  This conflict is on full display when Defendants use their
7   "unfettered" authority to restrict or block Plaintiffs' videos based on their race, identity, or viewpoint
8   but permit their own content or that of their preferred or sponsored content creators or channels to go
9   without review, restriction, or blocking even where the content violates YouTube's content based
10  rules.

11  507.   This includes inserting metadata and other signals into Plaintiffs' videos that permit
12  Defendants to profile and restrict or block content without reviewing the video and results in
13  restrictions and blocking of Plaintiffs' content based on Defendants' embedding and creating the
14  metadata, signals, or other racial profiling content that results in the restriction or blocking.

15  508.   There is no utility to the public for Defendants' actions, and the unlawful, deceptive
16  and unfair practices and conduct do not further a legitimate interest in protecting users from offensive
17  content.

18  509.   As a direct and proximate result of Defendants' unlawful, deceptive, and unfair
19  practices, conduct, and acts, Plaintiffs have suffered, and continue to suffer, immediate and
20  irreparable injury in fact, including lost income, reduced viewership, and damage to brand,
21  reputation, and goodwill, for which there exists no adequate remedy at law.

22  510.   Furthermore, as a result of such practices, conduct, and acts, Defendants
23  misappropriate and are unjustly enriched by taking consideration in the form of property rights to
24  content and data, and revenue that belongs to Plaintiffs in an amount that exceeds $5 million.

25  511.   Plaintiffs are therefore entitled to restitution of that and other amounts, as well as
26  other equitable relief to be determined at trial.

27  512.   At all times Defendants' wrongful actions were taken with oppression, fraud and/or
28  malice.  Indeed, at least dating back to 2017, Defendants have admitted and known that they were

1  targeting users like Plaintiffs, based on their race, identity, or viewpoint, in violation of their

2  promises and rules not to discriminate based on race, or any other identity or viewpoint.

3  **TWELFTHTHIRTEENTHTHIRTEENTH CAUSE OF ACTION**
   **For Violation Of California Constitution Article I, Section 2**

4  **(On Behalf Of Individual Plaintiffs And The §1981Race Discrimination Class)**

5  658.661.        513. Plaintiffs re-allege and incorporate herein by reference, as though set

6  forth in full, each of the allegations set forth in paragraphs 1 through 510638 above.

7  659.662.        514. Article I, section 2 of the California Constitution enshrines the right to

8  liberty of speech:  "Every person may freely speak, write and publish his or her sentiments on all

9  subjects, being responsible for the abuse of this right." Cal. Const., art. I, § 2, subd. (a).

10  660.663.        515. The Liberty of Speech Clause is broader and more protective than the

11  federal First Amendment. *Los Angeles Alliance for Survival v. City of Los Angeles,* 22 Cal.4th 352,

12  366-367 (2000).

13  661.664.        516. The Liberty of Speech provision "grants broader rights to free expression

14  than does the First Amendment to the United States Constitution" because it enshrines the

15  fundamental "idea that private property can constitute a public forum for free speech if it is open to

16  the public in a manner similar to that of public streets and sidewalks." *Fashion Valley Mall, LLC v.*

17  *Nat'l Labor Relations Bd.,* 42 Cal.4th 850, 857-58 (2007).

18  662.665.        517. Under the California Constitution, a person's Liberty of Speech enjoys

19  full constitutional protection when it occurs on any private property that is used or designated by the

20  owner or operator as a place similar to areas that have already been determined to be public forums.

21  That includes privately owned internet sites.

22  663.666.        518. Consequently, the California Constitution protects the right to free

23  speech on private property even in cases when the federal Constitution may not.

24  664.667.        519. The threshold element of a claim under the Liberty of Speech Clause is

25  that the defendant property owner has so opened up his or her property for public use as to make it the

26  functional equivalent of a traditional public forum based on three factors: (1) the nature, purpose, and

27  primary use of the property; (2) the extent and nature of the public invitation to use the property; and

28

1   (3) the relationship between the ideas sought to be presented and the purpose of the property's

2   occupants." *Albertson's, Inc. v. Young*, 107 Cal. App. 4th 106, 119 (2003); 73 Op. Cal. Atty. Gen.

3   213, 222– 223 (1990).

4       665.668.    520. Defendants operate YouTube for the express purpose of inviting the

5   public to use the platform as a for profit "public forum" where the public is invited to engage in

6   "freedom of expression," where everyone's voice may be heard, subject only to viewpoint neutral

7   rules that apply equally to all and Defendants' right to monetize and profit from the expression,

8   speech, or material that appears on YouTube through the property based license rights that the user

9   must grant Defendants as the price of admission to the forum.

10       666.669.    521. According to Defendants, the purpose, use, nature, invitation to use the

11   forum, and relationship between that purpose and invitation, on the one hand, and the ideas sought to

12   be presented the public, on the other, is that Defendants offer public internet service "that enables

13   more than a billion users around the world to upload" videos, where users are urged to "Broadcast

14   Yourself," "promote yourself" or "do the broadcasting yourself."

15       667.670.    522. Under the TOS, Defendants also represent that YouTube is open to

16   everyone for free expression and communication, regardless of race, identityethnicity, or

17   viewpointother protected identities, as long as the video material complies with viewpoint neutral

18   rules that apply equally to all.

19       668.671.    523. Based on these and other representations, Defendants have induced or

20   attracted 2.3 billion people to use YouTube and Defendants currently use the YouTube "public

21   forum" control and regulate 95% of the global public video content that has currently or has ever

22   existed in the world.

23       669.672.    524. Under California law, Defendants' regulation of speech on the YouTube

24   platform is state action because Defendants perform an exclusively and traditionally public function:

25   the regulation of 95% of the world's public video based speech content by designating and operating

26   YouTube as a viewpoint neutral public forum for freedom of expression under California law.

27       670.673.    525. Accordingly, Defendants are prohibited from arbitrarily, unreasonably,

28   or discriminatorily excluding, regulating, or restricting videos or user access to services on YouTube

on the basis of ~~viewpoint or identity of the speaker~~race, ethnicity, or other protected identities.  And

any such exclusions, restrictions, or regulations must comply with protections afforded Plaintiffs'

free speech and expression under the Liberty of Speech Clause, and the established jurisprudence

that such protections apply to private parties who use their property for purposes similar to the use of

a government owned and operated public forum.

~~671.~~674.        ~~526.~~ Plaintiffs' video content and access services constitute expressive speech

and activity that is protected by Article I, section 2 of the California Constitution.

~~672.~~675.        ~~527.~~ Defendants have filtered, restricted, blocked or interfered with Plaintiffs'

rights to access, use, and express themselves on YouTube.

~~673.~~676.        ~~528.~~ Defendants' filtering, restricting, and blocking on Plaintiffs' speech and

expressive conduct on YouTube violates Plaintiffs' Liberty of Speech because they are not based on

the platform's viewpoint neutral rules governing what content is and is not permissible, but on the

race, ~~identity~~ethnicity, or ~~viewpoint~~other protected identities of Plaintiffs.

~~674.~~677.        ~~529.~~ Defendants' censorship and other speech regulation conduct harms and

violates Plaintiffs' Liberty of Speech rights on YouTube in direct contravention of the procedural and

substantive rules that Defendants created, published, and use to regulate that speech on YouTube.

~~675.~~678.        ~~530.~~ Furthermore Defendants' rules, both as applied and on their face, are

subjective, vague, and overbroad criteria and proscription that Defendants use with unfettered and

unbridled discretion to censor speech for any reason, or no reason at all, no matter how arbitrary or

capricious in further violation of Plaintiffs' Liberty of Speech rights.

~~676.~~679.        ~~531.~~ Defendants also maliciously use and apply the rules as a pretext to censor

and restrict Plaintiffs' speech for unlawful purposes including race and identity discrimination

against protected classes of users and to gain a competitive advantage over Plaintiffs and other users

who Defendants compete with in YouTube.

~~677.~~680.        ~~532.~~ Defendants' conduct, including the application of purportedly viewpoint

neutral rules, are arbitrary and capricious, and unlawfully restrains and harms Plaintiffs by digitally

redlining and profiling the speaker based ~~upon racial, political, religious~~on race, ethnicity, or other

~~identity or viewpoint profiling the speaker~~protected identities, rather than ~~based on~~the actual content

of the speakers words or expression.  Defendants' actions, therefore, also violate Plaintiffs' right to free association and assembly under the Liberty of Speech Clause.

678.681.    533. Defendants' actions violate Plaintiffs' right to free association and assembly because , by blocking viewers' access to videos and comments based on the identity or viewpoint of the speakers or their opinions or other content featured in their videos that do not violate YouTube's viewpoint neutral content based rules race, ethnicity, or other protected identities of the creator, subscriber or viewer, Defendants prevent Plaintiffs from effectively communicating with and interacting with members of their respective communities about issues of shared importance.

679.682.    534. No compelling, significant, or legitimate reason justifies any or all of Defendants' actions, including the purported interest claimed by Defendants for the need to protect minors or sensitive audiences from offensive content because Plaintiffs' content is not "offensive" or otherwise violates Defendants' purported viewpoint neutral rules.

680.683.    535. And even if such interests did exist to justify Defendants' restriction and demonetization rules in theory, the conduct and restrictions imposed on Plaintiffs' speech are unconstitutional because they are not narrowly or reasonably tailored to further such interests, but sweep within their ambit speech and expression that complies with the rules that Defendants use to purportedly protect minors and sensitive audiences and are applied by Defendants with unfettered power to censor speech based inon race, identityethnicity, or viewpointother protected identities or for any other discriminatory or unlawful reason or no reason at all.

681.684.    536. Given Defendants' monopolistic control over search results, on lineonline advertising, public video content, and the myriad of other information services that Defendants unilaterally control, Plaintiffs have no alternative affording it a reasonable opportunity to reach their full intended audience.

682.685.    537. Defendants' discriminatory policies and application of those policies are not viewpoint- neutral, are unreasonable in time, place, and manner, and are unreasonable in relation to the nature, purpose, and use of the forum, but are unreasonable prior restraints on Plaintiffs' protected political speech, motivated by impermissible discrimination against Plaintiffs' racial identity and viewpointrace, ethnicity, or other protected identities.

683.686.     538. Defendants' intentional and wrongful actions were taken with oppression, fraud, malice and/or are arbitrary and capricious, and as part of Defendants' normal course of business, effectuated through both algorithms, as well as through human agents. Additionally, Defendants' actions were done knowingly and intentionally to deprive Plaintiffs and their viewers of their rights under the California Constitution.

684.687.     539. As a direct and proximate result of Defendants' violations of clearly established law regarding public fora, Plaintiffs and all other persons similarly situated members of the Race Discrimination Class have suffered, and continue to suffer, immediate and irreparable injury in fact to their right to Liberty of Speech, including, but not limited to financial harms of lost income, reduced viewership, and damage to brand, reputation, and goodwill, for which there exists no adequately complete remedy at law..

**THIRTEENTH CAUSE OF ACTION**
**For Freedom Of Speech Under The First Amendment**
**United States Constitution, Amendment 1**
**(On Behalf Of Individual Plaintiffs And The §1981 Class)**

540.   Plaintiffs re-allege and incorporate herein by reference, as though set forth in full, each of the allegations set forth in paragraphs 1 through 538 above.

A.   Procedural Background

541.   The First Amendment prohibits a party from engaging in "state action" that violates or harms a person's right to engage in speech, association, expression, or other activity protected by the Amendment.

542.   Since at least 1946, the U.S. Supreme Court has held that the First Amendment protects persons from private parties who engage in "state action" to restrict speech in ways that violate the First Amendment.

543.   Private parties can be state actors whose conduct is subject to judicial scrutiny and held to account under the U.S. Constitution in a number of different circumstances, including, but not limited to, a private party who (1) engages in a public function that has been traditionally reserved as the exclusive province of government, such as operating a company town or providing a service for the administration of a traditional government function like elections or law enforcement (the

1    "Public Function Test"); and/or (2) is the beneficiary of a government law that endorses or permits

2    the party to engage in conduct that interferes with a fundamental constitutional right in a manner that

3    the government may not (the "Permissive Endorsement Test").

4        **544.**    The issue of when a private party is engaged in "state action" under either of these or

5    other tests, is dependent on particular circumstances and has not been applied by the courts as a one

6    size fits all.

7        **545.**    As a result, the extent to which circumstances may exist in which a private party

8    engages in conduct that violates the First Amendment remains murky and unclear.

9        **546.**    In *Manhattan Cmty. Access Corp. v. Halleck,* --- U.S. --- , --- , 139 S. Ct. 1921 (2019),

10   the Supreme Court held that and private owner-operator of a public access cable channel who

11   regulates public speech on that channel does not become a state actor solely by the mere of making a

12   privately owned television channel available for as a forum for speech: "a private entity who

13   provides a forum for speech is not transformed by that fact alone into a state actor."  *Manhattan*

14   *Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1930, 204 L. Ed. 2d 405 (2019).

15       **547.**    In so doing, however, the Court in *Halleck* limited its 5-4 decision to the

16   circumstances of that case and declined to overrule prior cases in which a private party who regulates

17   speech or engages in conduct that is otherwise prohibited under the Constitution was found to be a

18   "state actor" who was subject to constitutional scrutiny.

19       **548.**    Instead, the Court "stressed" that "very few" functions fall into that category of "state

20   action," including, "for example, running elections and operating a company town.  *Id.* at 1929, 204

21   (citing *Terry v. Adams*, 345 U.S. 461, 468-470, 73 S. Ct. 809, 97 L. Ed. 1152 (1953) (elections);

22   *Marsh v. Alabama*, 326 U.S. 501, 505-509, 66 S. Ct. 276, 90 L. Ed. 265 (1946) (company town);

23   *Smith v. Allwright*, 321 U.S. 649, 662-666, 64 S. Ct. 757, 88 L. Ed. 987 (1944) (elections); *Nixon v.*

24   *Condon*, 286 U.S. 73, 84-89, 52 S. Ct. 484, 76 L. Ed. 984 (1932) (elections).

25       **549.**    The Court also stated that "a variety of functions do not fall into that category,

26   including, for example: running sports associations and leagues, administering insurance payments,

27   operating nursing homes, providing special education, representing indigent criminal defendants,

28   resolving private disputes, and supplying electricity."  *Id.* (citing *American Mfrs. Mut. Ins. Co. v.*

1   *Sullivan*, 526 U.S. 40, 55–57, 119 S. Ct. 977, 143 L.Ed.2d 130 (1999) (insurance payments);

2   *National Collegiate Athletic Assn. v. Tarkanian*, 488 U.S. 179, 197, n. 18, 109 S. Ct. 454, 102 L.

3   Ed.2d 469 (1988) (college sports); *San Francisco Arts & Athletics, Inc. v. United States Olympic*

4   *Comm.*, 483 U.S. 522, 544–545, 107 S. Ct. 2971, 97 L.Ed.2d 427 (1987) (amateur sports); *Blum*, 457

5   U.S. at 1011–1012, 102 S. Ct. 2777 (nursing home); *Rendell-Baker*, 457 U.S. at 842, 102 S. Ct. 2764

6   (special education); *Polk County v. Dodson*, 454 U.S. 312, 318–319, 102 S. Ct. 445, 70 L. Ed.2d 509

7   (1981) (public defender); *Flagg Bros.*, 436 U.S. at 157–163, 98 S. Ct. 1729 (private dispute

8   resolution); *Jackson*, 419 U.S. at 352–354, 95 S. Ct. 449 (electric service).

9       **550.**   Consequently, allegations that the relevant function in this case is only the operation

10   of public access channels on a cable system, is not a "function [that is] traditionally and exclusively

11   been performed by government to be establish "state action" under the Public Function Test. *Id.*

12       **551.**   Beyond those statements, however, the Court in *Halleck* did not specify what the

13   pleading requirements are for establishing state action under one of the few "public functions" that

14   would trigger constitutional scrutiny. Nor was it presented with or had occasion to consider whether

15   the private parties conduct was undertaken under a government enacted law that permitted unlawful

16   conduct, including race discrimination, in contravention of fundamental constitutional rights, so as to

17   trigger a limited state action under the Permissive Endorsement Test set forth in *Skinner v. Ry. Labor*

18   *Executives' Ass'n*, 489 U.S. 602, 109 S. Ct. 1402, 1407, 103 L. Ed. 2d 639 (1989).

19       **552.**   In *Prager University v. Google LLC*, the Ninth Circuit applied *Halleck* to hold that

20   YouTube does not "lose its private character merely because the public is generally invited to use it

21   for designated purposes" because "YouTube may be a paradigmatic public square on the Internet, but

22   it is 'not transformed' into a state actor solely by "provid[ing] a forum for speech." *Prager Univ. v.*

23   *Google LLC*, 951 F.3d 991, 997 (9th Cir. 2020) (citing *Halleck*, 139 S. Ct. at 1930, 1934).

24       **553.**   But like *Halleck*, *Prager* did not, nor could it, overrule or eliminate the Public

25   Function Test doctrine of state action nor did it specify what the pleading requirement were for

26   establishing one of "the few" functions that will trigger state action. And it appears that the decision

27   may be in conflict with *Halleck* and earlier cases when it held that public forum designations are "not

28   a matter of election by a private entity" and "[we] decline to subscribe to Prager U's novel opt-in

**REVISED SECOND**THIRD **AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT,**
**RESTITUTION, ACCOUNTING AND DAMAGES**

1  theory of the First Amendment. *Id.* at 999 (9th Cir. 2020) (citing *Cent. Hardware*, 407 U.S. at 547, 92

2  S. Ct. 2238 (holding only that "[b]efore an owner of private property can be subjected to the

3  commands of the First and Fourteenth Amendments the privately owned property must assume to

4  some significant degree the functional attributes of public property devoted to public use").

5      554.   Furthermore, the Ninth Circuit did not mention, or consider in any manner, the more

6  limited theory of Permissive Endorsement "state action" based on Defendants' use of Section 230(c),

7  a congressional speech regulation law, to unlawfully restrict speech 95% of the world's video speech

8  based on race discrimination  and other protected identity classifications or viewpoints that conflict

9  with Plaintiffs' fundamental equal protection and speech rights under the Supreme Court's seminal

10  case in *Skinner*.

11      555.   Consequently, no Court has ruled, nor could it, that Defendants can never engage,

12  under any circumstances, in "state action" that is subject to judicial scrutiny under the First

13  Amendment.  Nor has the pleading standards and requirement for such a claim been established,

14  other than Defendants must be engaged in one of the few public functions identified in *Halleck* or use

15  a congressional statute to do what they could not otherwise do under established law: discriminate

16  against Plaintiffs' speech based on their race, identity or viewpoint.

17      B.   **Permissive Endorsement Allegations Of State Action**

18      556.   In *Skinner*, private railroad companies were preparing to implement suspicion-based

19  breath and urine testing of their employees pursuant to recently enacted federal regulations referred

20  to in the case as "Subpart D." *Skinner*, 489 U.S. at 611.  Like Section 230(c)(2) of the CDA, Subpart

21  D was "permissive"; it did not compel the testing, but rather left the decision to the railroads.  *Id.*

22  Crucially, however, again like Section 230(c)(2), Subpart D conferred state-law immunity: it

23  protected railroads from being sued under state law if they chose to test.  *Skinner*, 489 U.S. at 611,

24  614-15 (Subpart D "pre-empt[ed] state laws, rules or regulations covering the same subject matter"

25  and thus "removed all legal barriers to the testing").  In so doing, a unanimous Supreme Court held:

26      "[t]he fact that the Government has not compelled a private party to perform a search

27      does not, by itself, establish that the search is a private one.  Here, specific features of

28

1    the regulations combine to convince us that the Government did more than adopt a

2    passive position toward the underlying private conduct.

3    *Id.* at 615.

4    **557.**   Under *Skinner*, the elements of a state action claim under the Permissive Endorsement

5    Test are: (1) reliance on a government law that removes all laws and legal barriers to private conduct

6    that would otherwise unlawful and does so in a way that impacts a fundamental constitutional right;

7    (2) a defendant uses the law to engage in that unlawful conduct; and (3) the government shares in the

8    fruits or benefits in some way from the unlawful conduct.

9    **558.**   Defendants rely on Section 230 to unlawfully discriminate against Plaintiffs and

10   regulate their speech based on race, identity, viewpoints or in some other manner that violates federal

11   or state law.

12   **559.**   Defendants use Section 230(c) to pre-empt state law and obtain complete immunity in

13   a manner that  removes all legal barriers to the regulating, blocking, or restricting of content based on

14   Plaintiffs' race, identity, or viewpoint.

15   **560.**   Plaintiffs are forced to submit to race discrimination and other violations of their

16   legal rights when they use YouTube.

17   **561.**   The Communications Decency Act was, as the statute's name indicates, enacted by

18   Congress to restrict access to "indecent" content on the Internet.  141 Cong. Rec. S8330 (daily ed.

19   June 14, 1995) (statement of Sen. Exon).

20   **562.**   The express purpose of Section 230(c)(2) is to encourage Internet platforms like

21   Google and YouTube to "restrict" "obscene, lewd, lascivious, filthy, excessively violent, harassing,

22   or otherwise objectionable" material.  47 U.S.C. § 230(c)(2).

23   **563.**   "The intent of Congress in enacting § 230(c)(2) was *to encourage efforts by Internet*

24   *service providers to eliminate such material.*"  *Goddard v. Google*, No. C 08-2738 JF (PVT), 2008

25   WL 5245490, at *6 (N.D. Cal. Dec. 17, 2008) (emphasis added).

26   **564.**   Section 230(c) makes clear Congress' "strong preference" for regulating on line

27   speech based on race, identity or viewpoint and for allowing Defendants to discriminate against

28   Plaintiffs in violation of established federal and state law.

565. The federal government has also made clear its "desire to share the fruits" of the unlawful and discriminatory conduct undertaken by Defendants with respect to regulating on line speech, law enforcement, information gathering, and other government services.

566. By way of one example only, in the six-month period from January to June 2017, when Defendants first admitted that they were knowingly and intentionally profiling and targeting users based on race, identity, and viewpoint, Google received almost 17,000 requests from U.S. law enforcement to turn over information regarding users' content and searches. *See Cooperation or Resistance?: The Role of Tech Companies in Government Surveillance*, 131 Harv. L. Rev. 1722, 1722 (2018). Google provided information to the government in some 80% of those cases.

567. Under Section 230(c), Congress allows and affirmatively endorses the unlawful discrimination and other conduct by Defendants.

568. Defendants' use of Section 230(c) to engage in discrimination and other unlawful conduct under state and federal law to regulate online " material" on the internet is government endorsed of the unlawful conduct and renders that conduct "state action" under *Skinner* and the Permissive Endorsement Test.

C.   **State Action Allegations Under The Public Function Test**

569. Under *Halleck* and *Prager*, the elements of state action under the Public Function Test Appear to be: (1) Defendants are engaged in functions and conduct that fall into that categories of "state action" that includes, but is not limited to, "running elections and operating a company town."

570. On or about December 2019, Defendants merged their different TOS into a single contract whereby Defendants' discretion to find a violation YouTube's content based rules can be used by Defendants to bar the user from using any or all services offered by Defendants in any way including, the purchase and use of hand held smart phone, email, search engines, applications, and information or other services that are essential for public health, safety, law enforcement, election administration, taxation, and any other service performed by governments.

571.    Defendants also operate a "company town" in which they control essential information and communication services without which local, state, or federal government agencies cannot provide or otherwise administer essential services including elections.

572.    Until, if ever, the Supreme Court eliminates the Public Function Test for "state action" in all cases as a matter of law, Defendants' use and regulation of speech and information services on YouTube involves the "very few" functions that satisfy the Public Function Test for "state action."

D.    **Defendants' Conduct Violates The First Amendment**

573.    Defendants continue to filter, restrict, block and/or interfere with Plaintiffs' rights to access, use, and express themselves on YouTube.

574.    Defendants' filtering, restricting, and blocking on Plaintiffs' speech and expressive conduct on YouTube violates Plaintiffs' First Amendment rights because the conduct is not based on the platform's viewpoint neutral rules governing what content is and is not permissible, but on the race, identity or viewpoint of Plaintiffs.

575.    Defendants' censorship and other speech regulation conduct harms and violates Plaintiffs' speech rights on YouTube in direct contravention of the procedural and substantive viewpoint neutral content based rules that Defendants created, published, and use to regulate speech on YouTube.

576.    Furthermore Defendants' rules, both as applied and on their face, are subjective, vague, and overbroad criteria and proscription that Defendants use with unfettered and unbridled discretion to censor speech for any reason, or no reason at all, no matter how arbitrary or capricious in further violation of Plaintiffs' First Amendment Rights.

577.    Defendants also maliciously use and apply the Rules as a pretext to censor and restrict Plaintiffs' speech for unlawful purposes including race and identity discrimination against protected classes of users and to gain a competitive advantage over Plaintiffs and other users who Defendants compete with in YouTube.

578.    Defendants' conduct, including the application of purportedly viewpoint neutral rules, are arbitrary and capricious, and unlawfully restrains and harms Plaintiffs and all other persons

**REVISED SECONDTHIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES**

1  similarly situated, based upon racial, political, religious, or other identity or viewpoint profiling of

2  the speaker, rather than the actual content of the speaker's words or expression.  Defendants' actions,

3  therefore, also violate Plaintiffs' right to free association and assembly under the First Amendment.

4  579. Defendants' actions violate Plaintiffs' right to free association and assembly because,

5  by blocking viewers' access to videos and comments based on the identity or viewpoint of the

6  speakers or their opinions or other content featured in their videos that do not violate YouTube's

7  viewpoint neutral content based rules

8  580. No compelling, significant, or legitimate reason justifies any or all of Defendants'

9  actions, including the purported interest claimed by Defendants for the need to protect minors or

10  sensitive audiences from offensive content because Plaintiffs' content is not "offensive" or otherwise

11  violates Defendants' purported viewpoint neutral rules.

12  581. And even if such interests did exist to justify Defendants' restriction and

13  demonetization rules in theory, the conduct and restrictions imposed on Plaintiffs' speech are

14  unconstitutional because they are not narrowly or reasonably tailored to further such interests, but

15  sweep within their ambit speech and expression that complies with the rules that Defendants use to

16  purportedly protect minors and sensitive audiences and are applied by Defendants with unfettered

17  power to censor speech based in race, identity, or viewpoint or for any other discriminatory or

18  unlawful reason or no reason at all.

19  582. Given Defendants' monopolistic control over search results, online advertising,

20  public video content, and the myriad of other information services that Defendants unilaterally

21  control, Plaintiffs have no alternative affording them a reasonable opportunity to reach their full

22  intended audience.

23  583. Defendants' discriminatory policies and application of those policies are not

24  viewpoint-neutral, are unreasonable in time, place, and manner, and are unreasonable in relation to

25  the nature, purpose, and use of the forum, but are unreasonable prior restraints on Plaintiffs'

26  protected political speech, motivated by impermissible discrimination against Plaintiffs' identity and

27  viewpoint.

REVISED SECOND THIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, RESTITUTION, ACCOUNTING AND DAMAGES

1    584.   Defendants' intentional and wrongful actions were taken with oppression, fraud,

2  malice and/or are arbitrary and capricious, and as part of Defendants' normal course of business,

3  effectuated through both algorithms, as well as through human agents.  Defendants' actions were

4  done knowingly and intentionally to deprive Plaintiffs and their viewers of their rights under the

5  California Constitution.

6    585.   As a direct and proximate result of Defendants' violations of clearly established law

7  regarding constitutional speech regulation on YouTube, Plaintiffs have suffered, and continue to

8  suffer, immediate and irreparable injury in fact to their right to Liberty of Speech, including, but not

9  limited to financial harms of lost income, reduced viewership, and damage to brand, reputation, and

10  goodwill, for which there exists no adequately complete remedy at law.

11  **VII.    PRAYER FOR RELIEF**

12    WHEREFORE, Plaintiffs and all other persons similarly situatedmembers of the Race

13  Discrimination Class request that the Court grant the following relief:

14    1.    A declaratory judgment remedy under 28 U.S.C. § §§2201, *et seq*., for Plaintiffs' First

15  Cause of Action challenging the construction, application, and constitutionality of Section §230(c) of

16  the Communications Decency Act, 47 USCU.S.C. § 230(c), that Section §230(c) does not grant

17  immunity to Defendants, or otherwise apply to claims and allegations that arise from, relate to, or are

18  based on, Defendants Google/YouTube's unlawful racial profiling and use of the userusers's race,

19  ethnicity, or other identity or viewpointprotected identities to filter, restrict, or block content, or

20  otherwise deny Plaintiffs' access to or use of anyDefendants' services offered by Google/YouTube

21  in connection with Plaintiffs' use of YouTube on the grounds that:

22    a.    The plain language of sections §§230(c)(1) and/or (2) only immunizes andan

23  ISP for filtering and blocking "offensive material," and does not immunize the regulating, restricting

24  or blocking of material based on the racialrace, ethnicity, or other identity or viewpointprotected

25  identities of the user posting or viewing the video;

26    b.    Sections §§230(c)(1) or (c)(2) does not immunize an ISP who engages in race

27  based identity or viewpoint discrimination under contracts and other business conduct that violates

28  42 U.S.C. § 1981 or the Unruh Civil Rights Act;

1    c.    The application of ~~Section~~ §230(c) to in any way to permit and immunize

2    digital redlining and profiling based on race, ~~sex~~ethnicity, or other ~~identity or viewpoint based~~

3    ~~profiling and~~protected identities with respect to the regulation of content and access on YouTube is

4    unconstitutional and violates the First Amendment under Denver Area 518 U.S. 727, 766-67; and/or~~,~~

5    ~~d.    The President's Executive Order date May 28, 2020, prohibits the application~~

6    ~~of Section 230(c) immunity to the content and access filtering, restricting, and blocking decisions and~~

7    ~~requires the Department of Justice to clarify and enforce the law in accordance with identity and~~

8    ~~viewpoint neutrality.~~

9    2.    A declaratory judgment remedy under ~~section~~ §2201that Defendants have violated

10   and continue to violate the agreements with Plaintiffs' rights to free speech and ~~expression subject~~

11   ~~only to viewpoint neutral content based rules that apply equally to all~~the members of the Race

12   Discrimination Class, or in the alternative, that the agreements with Plaintiffs and the members of the

13   Race Discrimination Class are void because either (a) they are illusory where Defendants retain sole

14   and absolute discretion regarding whether they will provide access to internet platforms and services

15   under the agreements, or (b) they are unenforceable standardized form consumer contracts of

16   adhesion which defeat the reasonable expectations of Plaintiffs ~~Second through Sixth, and Eighth~~

17   ~~through Tenth Causes of Action~~and the members of the Race Discrimination Class;

18   ~~3.    A Court Order requiring Defendants to provide an equitable accounting of all revenue~~

19   ~~owed to Plaintiffs and the members of the putative §1981 Class under California Common Law for~~

20   ~~each of their uploaded monetized video, total subscribers, CPM, views and advertisements played or~~

21   ~~posted on each of their channels on a monthly basis,  including the following underlying data~~

22   ~~regarding::~~

23   ~~a.    The day-to-day number of views for each monetized video uploaded to each~~

24   ~~channel;~~

25   ~~b.    The day-to-day number of subscribers for each monetized channel;~~

26   ~~c.    The day-to-day watch time for each video uploaded to each channel;~~

27   ~~d.    The day-to-day number of ads played or posted on each video, along with the~~

28   ~~rates charged by Defendants for the ads, and the revenue actually collected for the ads; and~~

1      e.  The names of the creators of the videos which Defendants list in the "Up

2  Next" column for each video on a day-to-day basis, a statement of all revenues which Defendants

3  have obtained in connection with the "Up Next" video recommendations, along with the titles of the

4  videos and an indication as to whether the creator is one of Defendants' preferred partners.

5      4.  A Court Order requiring Defendants:

6      a.  To the extent that Defendants still have the electronic digital version of the

7  video, to deliver to Plaintiffs and members of the putative §1981 Class an electronic digital copy of

8  (i) each video that was uploaded and subsequently removed by Defendants from the YouTube

9  platform, and (ii) each video which Plaintiffs and members of the putative §1981 Class were unable

10  to obtain a copy of because Defendants either terminated access to the YouTube platform or removed

11  the channel where the video was uploaded.

12      b.  To the extent that Defendants do not have the electronic digital version of the

13  video, to pay to Plaintiffs and members of the putative §1981 Class the reasonable value of copy of

14  (i) each video that was uploaded and subsequently removed by Defendants from the YouTube

15  platform, and (ii) each video which Plaintiffs and members of the putative §1981 Class were unable

16  to obtain a copy of because Defendants either terminated access to the YouTube platform or removed

17  the channel where the video was uploaded

18     3.  5. A Court Order requiring Defendants to:

19      a.  Cease and desist from capriciously restricting, demonetizing, or otherwise

20  censoring any content of videos uploaded to the YouTube based on Plaintiffs' race, ethnicity, or

21  other identity or viewpoint protected identities in violation of federal and California law; and.

22      b.  Cease and desist from censoring, restricting, restraining, or regulating speech

23  based on the discretionary use or application of discriminatory, animus-based, arbitrary, capricious,

24  vague, unspecified, or subjective criteria, rules, guidelines, and/or practices;

25      c.  Cease and desist from employing, using, or applying AI, algorithms, filters

26  and automated systems that include the users' aggregated personal digital data reflecting race,

27  ethnicity or other protected identities to make decisions regarding access to the Defendants'

28  platforms and services;

1   4.   A Court Order requiring Defendants to:

2   a.   Cease and desist from capriciously restricting, demonetizing, or otherwise

3   censoring any content of videos uploaded to the YouTube based on Plaintiffs' race, ethnicity, or

4   other protected identities in violation of federal and California law; and

5   b.   Cease and desist from censoring, restricting, restraining, or regulating speech

6   based on the discretionary use or application of discriminatory, animus-based, arbitrary, capricious,

7   vague, unspecified, or subjective criteria, rules, guidelines, and/or practices;

8   5.   6. Compensatory, special, and statutory damages in an amount to be proven at trial,

9   including statutory damages pursuant to, inter alia, 15 U.S.C. §1117, 42 U.S.C. §§1981, 1983, Civil

10   Code § §§51, 51.5, 52, Civil Procedure Code § 1021.5, 15 U.S.C. § 1117, 42 U.S.C. §§ 1981, 1983.;

11   6.   7. A civil penalty of $2,500 for each violation pursuant to Business and Professions

12   Code §§ 17200, 17206, and 17536;

13   7.   8.   Punitive damages and exemplary damages in an amount to be proven at trial;

14   8.   9. Restitution of Plaintiffs' licenses to original content, their aggregated personal

15   digital data, the value of the sale of their personal digital data for the period since each Plaintiff first

16   entered into a contract with Defendants; financial losses or harm caused by Defendants' conduct and

17   ill- gotten gains, and disgorgement of profit profits Defendants obtained from all unlawful conduct in

18   an amount to be proven at trial;

19   9.   Punitive damages and exemplary damages in an amount to be proven at trial;

20   a.   The day to day number of views for each monetized video uploaded to each

21   channel;

22   b.   The day to day number of subscribers for each monetized channel;

23   c.   The day to day watch time for each video uploaded to each channel;

24   d.   The day to day number of ads played or posted on each video, along with the

25   rates charged by Defendants for the ads, and the revenue actually collected for the ads; and

26   e.   The names of the creators of the videos which Defendants list in the "Up

27   Next" column for each video on a day to day basis, a statement of all revenues which Defendants

28

1  have obtained in connection with the "Up Next" video recommendations, along with the titles of the

2  videos and an indication as to whether the creator is one of Defendants' preferred partners.

3      10.    A Court Order requiring Defendants:

4      a.    To the extent that Defendants still have the electronic digital version of the

5  Plaintiffs' videos that were removed, to deliver to Plaintiffs and members of the putative Race

6  Discrimination Class an electronic digital copy of (i) each video that was uploaded and subsequently

7  removed by Defendants from the YouTube platform, and (ii) each video which Plaintiffs and

8  members of the putative Race Discrimination Class were unable to copy of because Defendants

9  either terminated access to the YouTube platform or removed the channel where the video was

10  uploaded; and

11      b.    To the extent that Defendants do not have the electronic digital version of the

12  video, to pay to Plaintiffs and members of the putative Race Discrimination Class the reasonable

13  value of a copy of (i) each video that was uploaded and subsequently removed by Defendants from

14  the YouTube platform, and (ii) each video which Plaintiffs and members of the putative Race

15  Discrimination Class were unable to copy of because Defendants either terminated access to the

16  YouTube platform or removed the channel where the video was uploaded;

17      11.    Attorneys' fees and costs of suit;

18      12.    Prejudgment and post-judgment interest; and

19      13.    Any and all other relief that the Court deems just and proper.

**VIII.   JURY TRIAL DEMAND**

Plaintiffs Kimberly Carleste Newman, Lisa Cabrera, Catherine Jones, Denotra Nicole Lewis, Andrew Hepkins, Harvey Stubbs, Khalif Muhammad, Keu Reyes and Osiris Ley demand trial by jury on all issues of law so triable.

DATED:   ~~September~~October ~~21, 2020~~5, 2021

Respectfully submitted,

BROWNE GEORGE ROSS LLP
    Peter Obstler
    Eric M. George
    Dennis S. Ellis
    Debi A. Ramos
    Keith R. Lorenze


By:      /s/ Peter Obstler
            Peter Obstler

Attorneys for Plaintiffs Kimberly Carleste Newman, Lisa Cabrera, Catherine Jones, Denotra Nicole Lewis, Andrew Hepkins, Harvey Stubbs, Khalif Muhammad, Keu Reyes and Osiris Ley