BROWNE GEORGE ROSS
O'BRIEN ANNAGUEY & ELLIS LLP
Peter Obstler (State Bar No. 171623)
    pobstler@bgrfirm.com
Eric M. George (State Bar No. 166403)
    egeorge@bgrfirm.com
Dennis S. Ellis (State Bar No. 178196)
    dellis@bgrfirm.com
Debi A. Ramos (State Bar No. 135373)
    dramos@bgrfirm.com
2121 Avenue of the Stars, Suite 2800
Los Angeles, California 90067
(310) 274-7100; Facsimile: (310) 275-5697

Attorneys for Kimberly Carleste Newman, Lisa
Cabrera, Catherine Jones, Denotra Nicole Lewis,
Andrew Hepkins, Harvey Stubbs, Khalif
Muhammad, Keu Reyes and Osiris Ley

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| Kimberly Carleste Newman, Lisa Cabrera, Catherine Jones, Denotra Nicole Lewis, Andrew Hepkins, Harvey Stubbs, Khalif Muhammad, Keu Reyes and Osiris Ley<br><br>Plaintiffs,<br><br>vs.<br><br>Google LLC, YouTube LLC, Alphabet Inc. and Does 1 through 100, inclusive,<br><br>Defendants. | Case No. 5:20-cv-04011-LHK<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THIRD AMENDED CLASS ACTION COMPLAINT**<br><br>Judge:    Hon. Lucy H. Koh<br>Date:     March 3, 2022<br>Time:     1:30 p.m.<br>Crtrm.:   8<br><br>Trial Date:  None Set |

1735083.1

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ...................................................................................................1

II. ARGUMENT ........................................................................................................3

    A.  The Court Has Subject Matter Jurisdiction Over All Plaintiffs' Claims And Requests For Relief ...........................................................................3

        1.  CAFA Jurisdiction §1332(d) ...............................................................3

        2.  "Arising Under" Federal Question Jurisdiction §1331 ...................4

        3.  Supplemental Federal Jurisdiction §1367 .........................................5

    B.  Plaintiffs Allege Discrimination Claims Under §1981(b) And The Unruh Act ...........................................................................................................6

        1.  Race Discrimination Under Contract Violates §1981(b) .............6

        2.  Discrimination Violates The Unruh Civil Rights Act ....................8

    C.  Plaintiffs Allege Breach of Contract Claims ................................................9

        1.  The Contracts ........................................................................................9

        2.  Defendants' Discretion Is Limited By Contract..............................10

        3.  Defendants Do Not Have Discretion To Breach The Contracts .................12

        4.  Defendants' Violate The Covenant of Good Faith and Fair Dealing..........13

    D.  Plaintiffs Allege Equitable Claims .............................................................15

        1.  Accounting ..........................................................................................15

        2.  Conversion/Replevin ..........................................................................15

    E.  Plaintiffs Allege UCL Violations ...............................................................15

    F.  Plaintiffs Allege A Claim For Liberty Of Speech ....................................16

    G.  Plaintiffs Allege Claims For False Advertising ........................................19

        1.  The Statements Are Not Identical ....................................................19

        2.  The Statements Are False, Misleading, And Deceptive................20

        3.  Defendants' False Statements Penetrate The Market....................21

    H.  Defendants Are Not Entitled To Immunity under § 230(c) ....................21

        1.  Congress Enacted §230(c) To Moderate Content Not People ....................22

1

**TABLE OF CONTENTS**
(Continued)

2

Page

3

2. §230(c)(1) and (2) Are Not Interchangeable ...................................................23

4

3. Defendants Are Not Entitled To §230(c)(2) Immunity ...............................23

5

4. Defendants Are Not Entitled To Immunity Under §230(c)(1) ....................25

6

a. Defendants Have Contracted Out Of §230(c)(1) ...........................25

7

b. §230 Exempts Intellectual Property Disputes ................................26

8

c. Defendants Are "Content Information Providers" Under §230 ...................................................................................................27

9

5. The Trial Court's §230(c) Finding Is Unconstitutional ..............................27

10

I. Plaintiffs Have Stated Claims For Violations Of First Amendment .......................29

11

III. CONCLUSION .................................................................................................................30

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page**

**Cases**

*Albertson's, Inc. v. Young,*
   107 Cal.App.4th 106 (2003) ............................................................................................... 17

*Automatic Vending Co. v. Wisdom,*
   182 Cal. App. 2d 354 (1960) .............................................................................................. 12

*Barnes v. Yahoo!, Inc.*
   570 F.3d 1096 (9th Cir. 2009) ..................................................................................... 25, 27

*Boschma v. Home Loan Ctr., Inc.,*
   198 Cal.App.4th 230, 251 (2011) ...................................................................................... 15

*Brant v. California Dairies,*
   4 Cal.2d 128, 133 (1935) ................................................................................................... 10

*Brown v. Google LLC,*
   525 F. Supp. 3d 1049 (N.D. Cal. 2021) ............................................................... 1, 2, 6, 7, 8

*California FAIR Plan Assn. v. Garnes,*
   11 Cal.App.5th 1276 (2017) .............................................................................................. 11

*California Shock Trauma Air Rescue v. State Comp. Ins. Fund,*
   636 F.3d 538 (9th Cir. 2011) .............................................................................................. 4

*Careau & Co. v. Security Pacific Business Credit, Inc.,*
   222 Cal.App.3d 1371 (1990) ............................................................................................. 14

*Carma Devs. (Cal.), Inc. v. Marathon Dev. Cal., Inc.,*
   2 Cal.4th 342 (1992) ................................................................................................... 13, 14

*City of Chicago v. Int'l Coll. of Surgeons,*
   522 U.S. 156 (1997) ........................................................................................................... 6

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.,*
   173 F.3d 725 (9th Cir. 1999) ...................................................................................... 20, 21

*Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media,*
   140 S. Ct. 1009 (2020) ................................................................................................... 6, 8

*Dart Cherokee Basin Operating Co., LLC v. Owens,*
   574 U.S. 81 (2014) ............................................................................................................. 3

*Denver Area Educ. Telecommunications Consortium, Inc. v. F.C.C.,*
   518 U.S. 727 (1996) .................................................................................................... 27, 28

**TABLE OF AUTHORITIES**
(Continued)

Page

*E.S. Bills, Inc. v. Tzucanow,*
   38 Cal.3d 824(1985) ...................................................................................................... 11

*Enigma v. Malwarebytes, Inc.,*
   946 F.3d 1040 (2019) ............................................................................................... *passim*

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC,*
   521 F.3d. 1157 (9th Cir. 2008) ................................................................................. 22, 27

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.,*
   314 F.3d 48 (2d Cir. 2002) ........................................................................................... 20

*Fashion Valley Mall v. NLRB,*
   42 Cal.4th 850 ............................................................................................................... 17

*Federal Agency of News LLC v. Facebook, Inc.,*
   395 F.Supp.3d 1295 (N.D. Cal. 2019) .......................................................................... 26

*Gonzalez v. Google LLC,*
   2 F.4th 871 (9th Cir. 2021) ..................................................................................... 25, 27

*Grable & Sons Metal Prods. v. Darue Engineering. & Mfg.,*
   545 U.S. 308 (2005) ........................................................................................................ 4

*Grubbs v Sheakley Group, Inc.,*
   807 F.3d (6th Cir. 2015) ............................................................................................... 21

*Gully v. First Nat'l Bank,*
   299 U.S. 109 (1936) ........................................................................................................ 4

*Gunn v. Minton,*
   568 U.S. 251 (2013) .................................................................................................... 4, 5

*Hankins v. El Torito Restaurants, Inc.,*
   63 Cal. App. 4th 510 (1998) ..................................................................................... 2, 7, 9

*Harris v. Capital Growth Inv'rs XIV,*
   52 Cal. 3d 1142 (1991) ................................................................................................ 8, 9

*hiQ Labs, Inc. v. LinkedIn Corporation,*
   273 F.Supp.3d. 1099, 1116 (N.D. Cal. 2017) .............................................................. 18

*In re Facebook, Inc. Internet Tracking Litig.,*
   956 F.3d 589 (9th Cir. 2020) ......................................................................................... 1

# TABLE OF AUTHORITIES
### (Continued)

**Page**

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.,*
No. 16-MD-02752-LHK, 2017 WL 3727318, *24 (N.D. Cal. Aug. 30, 2017) ..................... 16

*In re Zoom Video Commc'ns Inc. Priv. Litig.,*
525 F. Supp. 3d 1017, 1046–1048 (N.D. Cal. 2021) ............................................ 16

*Keum v. Virgin Am. Inc.,*
781 F. Supp. 2d 944 (N.D. Cal. 2011) ...................................................................... 6

*Kowal v. Day,*
20 Cal. App. 3d 720 (1971).......................................................................................... 11

*Levitt v. Yelp! Inc.,*
No. C-10-1321 EMC, 2011 WL 5079526 (N.D. Cal. Oct. 26, 2011), *aff'd,* 765
F.3d 1123 (9th Cir. 2014)............................................................................................. 26

*Manhattan Community Access Corp. v Halleck,*
139 S. Ct. 1921 (2019) .................................................................................................. 29

*Marina Tenants Ass'n v. Deauville Marina Develop. Co.,*
181 Cal.App.3d 122 (1986) .......................................................................................... 11

*Marsh v. State of Ala.,*
326 U.S. 501 (1946) ...................................................................................................... 29

*McClain v. Octagon Plaza, LLC,*
159 Cal.App.4th 784 (2008) ........................................................................................ 13

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning,*
578 U.S. 901 (2016) ........................................................................................................ 4

*Metro. Life Ins. Co. v. Taylor,*
481 U.S. 58, 63 (1987) ................................................................................................... 4

*New Mexico v. General Elec. Co,*
335 F.Supp.2d 1157 (2003)........................................................................................ 5, 6

*Newcal Indus., Inc. v. Ikon Office Sol.,*
513 F.3d 1038 (9th Cir. 2008)................................................................................. 20, 21

*Noatex Corp. v. King Construction of Houston LLC,*
74 F.Supp.3d 764 (N.D. Miss., 2014) ...................................................................... 4, 5

*Packingham v. North Carolina,*
137 S.Ct. 1730, 198 L.Ed. 2d 273 (2017) ................................................................... 18

1

## TABLE OF AUTHORITIES
### (Continued)

2
**Page**

3   *Perdue v. Crocker Nat'l Bank,*
       38 Cal.3d 913 (1985).................................................................................. 14
4

5   *Ponder v. Blue Cross of S. California,*
       145 Cal.App.3d 709 (1983)........................................................................ 11
6
   *Postal Instant Press, Inc. v. Sealy,*
7       43 Cal.App.4th 1704 (1996)....................................................................... 11

8   *Prager Univ. v. Google LLC*
       (2019 Cal. Super. LEXIS 2034 (Super. Ct. Cal. Nov. 19, 2019) ................ 5
9

10  *Prager Univ. v. Google LLC*
       43 Cal.App.4th 1704 (1996)....................................................................... 11
11
   *Prager Univ. v. Google LLC,*
12      951 F.3d 991 (9th Cir. 2020) ......................................................... 19, 20, 29

13  *Racine & Laramie, Ltd. v. Department of Parks & Recreation,*
       11 Cal.App.4th 1026 (1992)....................................................................... 13
14
   *Ralphs Grocery Co. v. Victory Consultants, Inc.,*
15      17 Cal.App.5th at 259 (2017) ........................................................ 17, 18, 19

16  *Reno v. ACLU,*
       521 U.S. 844 (1997) ....................................................................... 18, 19, 22
17
   *Roberts v. AT&T Mobility LLC,*
18      877 F.3d. 833 (9th Cir. 2017)*, cert. denied*, 138 S. Ct. 2653 (2018) ............... 28, 29
19
   *Sandford v. R.L. Coleman Realty Co., Inc.,*
20      573 F.2d 173 (4th Cir. 1978)................................................................ 2, 7, 8

21  *Sarauer v. International Association of Machinists and Aerospace Workers,*
       *District No. 10,*
22      966 F.3d 661 (7th Cir. 2020)..................................................................... 4, 5

23  *Sherman v. Yahoo! Inc.,*
       997 F. Supp.2d 1129 (S.D. Cal. 2014) ...................................................... 23
24

25  *Signature Transportation Grp. v Jacobs,*
       2020 WL 1663124 (N.D. Ill. 2020)........................................................... 21
26
   *Sikhs for Justice "NU", Inc. v. Facebook, Inc.,*
27      144 F.Supp.3d. 1088 (N.D. Cal. 2015) .............................................. 23, 26

28

1

## TABLE OF AUTHORITIES
### (Continued)

2

Page

3  *Skinner v. Ry. Labor Executives' Ass'n,*
      489 U.S. 602 (1989) ................................................................................ 28, 29
4

5  *Standard Fire Ins. Co. v. Knowles,*
      568 U.S. 588 (2013) ...................................................................................... 3

6  *Steven v. Fidelity & Cas. Co. of New York,*
      58 Cal.2d 862 (1962) ................................................................................... 12
7

8  *Storek & Storek, Inc. v. Citicorp Real Est., Inc.,*
      100 Cal.App.4th 44 (2002) ......................................................................... 14
9

10  *Third Story Music, Inc. v. Waits,*
      41 Cal.App.4th 798 (1995) ......................................................................... 14

11  *Trader Joe's Co. v. Progressive Campaigns,*
      73 Cal.App.4th 425 (1999) ............................................................. 17, 18, 19
12

13  *United Indus. Corp. v. Clorox Co.,*
      140 F.3d 1175 (8th Cir. 1998) ..................................................................... 20
14

15  *United States v. Wenner,*
      351 F.3d 969 (9th Cir. 2003) ....................................................................... 23

16  *Waller v. Truck Ins. Exchange, Inc.,*
      11 Cal.4th 1 (1995) ...................................................................................... 13
17

18  *Wilson v. Sup. Ct.,*
      13 Cal.3d 652 (1975) ................................................................................... 16
19

**Statutes**
20
28 U.S.C. §1331 ................................................................................................. 4
21
28 U.S.C. §1332(d)(3)-(5) ................................................................................. 3
22
42 U.S.C. §1981 ..................................................................................... 6, 8. 16
23
42 U.S.C. §1981(b) ............................................................................................ 6
24
47 U.S.C. §230(c) ..................................................................................... *passim*
25
47 U.S.C. §230(b) ............................................................................................ *22*
26
47 U.S.C. §230(c)(1) ............................................................... 22, 23, 25, 27
27

28

1

## TABLE OF AUTHORITIES
### (Continued)

2

<u>Page</u>

3   47 U.S.C. §230(c)(2) ............................................................................... 22, 23, 24

4   47 U.S.C. §230(e)(2) ................................................................................... 26, 27

5   47 U.S.C. §230(e)(3) ........................................................................................ 5

6   47 U.S.C. §230(f)(3) .................................................................................... 22, 27

7   Cal. Bus. & Prof Code §17200 .......................................................................... 15

8   Cal. Civ. Code §51 ................................................................................... *passim*

9   Cal. Civ. Code §1636 ...................................................................................... 10

10  Cal. Civ. Code §1641 ................................................................................. 10, 11

11  Cal. Civ. Code §1642 ................................................................................. 10, 13

12  Cal. Civ. Code §1643 ...................................................................................... 10

13  Cal. Civ. Code §1644 ...................................................................................... 11

14  Cal. Civ. Code §1650 ...................................................................................... 11

15  Cal. Civ. Code §3523 ...................................................................................... 15

16  Cal. Code Civ. Prod. §1858 ......................................................................... 10, 11

17  **Other Authorities**

18  First Amendment ...................................................................... 16, 22, 27, 29

19  Fourteenth Amendment ............................................................................... 22, 27

20  13D C. Wright, A. Miller, E. Cooper & R. Freer, Federal Practice and Procedure
    §3562 (3d ed. 2008) ...................................................................................... 4,

21  Cal. Const. Article I, §2(a) ............................................................................... 16

18

19

20

21

22

23

24

25

26

27

28

1        Plaintiffs Kimberly Carleste Newman, Lisa Cabrera, Catherine Jones, Denotra Nicole

2   Lewis, Andrew Hepkins, Harvey Stubbs, Khalif Muhammad, Keu Reyes and Osiris Ley, on behalf

3   of themselves individually, and other persons similarly situated, (collectively the "Plaintiffs"),

4   respectfully submit their Opposition to Defendants' "Motion to Dismiss Third Amended Class

5   Action Complaint," ECF80 (the "MTD").

6   **I.**   **INTRODUCTION**

7        The core allegation in this case is that Defendants filter and block people, not content,

8   under and in violation of contract. Specifically, Defendants use Plaintiffs' personal data, including

9   their race, ethnicity, sex, gender, religious, political, and commercial identity (collectively

10  "Protected Identity") to make what they promise are identity and viewpoint neutral decisions

11  about filtering and blocking Plaintiffs' videos and service access on the global social media

12  platform YouTube. Third Amended Complaint ("TAC"), ¶¶5, 9, 10, 18, 103, 107, 113-125, 157,

13  166, 174, 176-78, 183, 207, 434, 493, 517-531, 591, 598, 601-611, 643, 647, 654. Defendant

14  Google's personal data tracking and profiling of users occurs, "no matter how sensitive" or

15  personal the user's browsing history, and is "compiled and updated" into a database of users and

16  then correlated into "a cradle-to-grave profile" of the user that includes "a user's employment

17  history and political and religious affiliations," as well as "the sexual interests and/or orientation,"

18  and other Protected Identity. *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 598–99

19  (9th Cir. 2020), *cited with approval in Brown v. Google LLC*, 525 F. Supp.3d 1049, 1077–78

20  (N.D. Cal. 2021) (allegations of personal data tracking and profiling of users against Defendant

21  Google "are arguably even stronger in the instant case than in Facebook Tracking"). Here,

22  Defendants use that same information to violate Plaintiffs' contractual and statutory rights to use

23  and access YouTube subject only to "neutral" content based filtering and blocking rules, under

24  and in violation of YouTube's Terms of Service ("TOS") and the AdSense Contract (collectively

25  the "Contracts").

26       On June 25, 2021, this Court found that Plaintiffs' prior allegations were insufficient as a

27  matter of law to warrant any relief and/or establish jurisdiction over claims for relief under federal

28  and state law. *See,* ECF68 (the "Order"). The Court granted Plaintiffs leave to amend to clarify or

1  address identified pleading and jurisdictional issues. *Id.*, ¶¶2:8-19; 15:6-9; 18:12-14; 22:16-20;

2  23:25-24:1; 28:14-21. The TAC addresses those issues and includes specific allegations of racial

3  profiling and discrimination: (i) Defendants use aggregated data profiles that identify and embed

4  information about Plaintiffs' Protected Identity. TAC ¶¶5, 9, 10, 18, 103, 107, 113-125, 157, 166,

5  174, 176-78, 183, 207, 434, 493, 517-531, 591, 598, 601-611, 643, 647, 654. (ii) Since at least

6  September 2017, YouTube employees admitted that the YouTube algorithm discriminates when

7  making decisions regarding which videos to monetize, pay CPM, and apply "Restricted Mode,"

8  based on users' Protected Identities. *Id.*, ¶¶99-101, 107, 113-125. (iii) Defendants pay less to

9  Plaintiffs and other racial minorities for videos than they pay others for similar videos. *Id.*, ¶396.

10  (iv) Defendants exempt "preferred" users from filtering and blocking. *Id.*, ¶¶269-270. And (v)

11  YouTube employees assist "preferred" users to racially harass, slander, and dox Plaintiffs. *Id.*,

12  ¶179 (a)-(d)). That is race discrimination, under and in violation of contract.

13      Defendants may deny that their filtering and blocking consider race, and provide a "race

14  neutral" explanation for their decisions since 2017 (*see, e.g.*, MTD 13:5-15:2); but they cannot

15  do so under Rule 12(b)(6). *Compare Sandford v. R.L. Coleman Realty Co., Inc.*, 573 F.2d 173,

16  178–179 (4th Cir. 1978); *Hankins v. El Torito Restaurants, Inc.*, 63 Cal.App.4th 510, 518

17  (1998), *with* MTD 13:5-19 & n.5. Nor can they use this litigation, after the fact, to rationalize

18  discriminatory filtering and blocking. *Id.* The truth of the discrimination allegations will turn on

19  an inspection of computer code, the architecture, and logic of the automated systems, deposition

20  testimony of those who admitted to "targeting" users, or who are engaged in the alleged conduct,

21  and evidence regarding the design, function, and workings of filtering and blocking tools as

22  applied to users. That discovery will establish whether Defendants are engaged in digital

23  redlining based in part, or in full, on users' Protected Identity. If Defendants are using the same

24  aggregated data profiling and information that this Court and the Third Circuit found in *Brown*,

25  then Defendants are engaged in intentional racial profiling and discrimination of Plaintiffs under,

26  and in violation of contract. TAC ¶¶5, 9, 10, 18, 107, 112, 113-125; 157, 166, 174, 176-78, 183,

27  207, 434, 493, 517-531, 591, 598, 601-611, 643, 647, 654.

28

II.      **ARGUMENT**

A.      **The Court Has Subject Matter Jurisdiction Over All Plaintiffs' Claims And Requests For Relief**

The Court dismissed the Complaint with leave to amend. *See,* Order, 22:22-25:23. Plaintiffs filed the TAC to establish federal jurisdiction over all claims, including the core state law claims and request for Declaratory Judgment Relief, on three separate grounds. TAC ¶¶46-77.

1.      **CAFA Jurisdiction §1332(d)**

CAFA provides that "[t]he district courts shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which - (A) any member of a class of plaintiffs is a citizen of a State different from any defendant; (B) any member of a class of plaintiffs is a foreign state or a citizen or subject of a foreign state and any defendant is a citizen of a State; or (C) any member of a class of plaintiffs is a citizen of a State and any defendant is a foreign state or a citizen or subject of a foreign state." *See also, Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 84–85 (2014); *Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 592 (2013).

Plaintiffs allege facts that establish federal jurisdiction under CAFA. TAC ¶¶48-56; Prayer For Relief 5-8. Five of the nine representative Plaintiffs reside outside of California (Andrew Hepkins (New York); Harvey Stubbs (Illinois); D. Nicole Lewis (Texas); Lisa Cabrera (New Jersey); and Catherine Jones (Tennessee)). TAC ¶¶34-42. The Race Discrimination Class contains at least 40 million persons, more than two-thirds of whom are alleged to reside outside of California, in the 49 "foreign" states and territories. *Id.*, ¶¶53-56, 403. The matter in controversy exceeds five million dollars, including statutory damages, disgorgement, restitution, and equitable relief for each violation of law under the Unruh Act, the UCL, and breaches of and discrimination under Defendants' Contracts. *Id.*, ¶¶50, 609; Prayer For Relief 5-8. None of the limited exceptions to CAFA jurisdiction apply, because more than two-thirds of the class reside outside of California, and Defendants are not government entities for whom "the district court may be foreclosed from ordering relief." 28 U.S.C. §1332(d)(3)-(5).

1

**2.     "Arising Under" Federal Question Jurisdiction §1331**

2   The Court found that the request for Declaratory Judgment Relief regarding the

3   construction, application, and constitutionality of §230(c) was insufficient to create an

4   independent ground for federal jurisdiction under 28 U.S.C. §1331. *See,* Order 24:8-25:19.

5   Plaintiffs allege facts clarifying that Defendants' assertion of §230(c) immunity to bar this lawsuit

6   "arises under" federal law for purposes of §1331. *See, Grable & Sons Metal Prods. v. Darue*

7   *Engineering. & Mfg.*, 545 U.S. 308, 314-316 (2005); *Gunn v. Minton*, 568 U.S. 251, 258-259

8   (2013); *Sarauer v. International Association of Machinists and Aerospace Workers, District No.*

9   *10*, 966 F.3d 661, 673-675 (7th Cir. 2020); *Noatex Corp. v. King Construction of Houston LLC*, 74

10   F.Supp.3d 764, 772-774 (N.D. Miss., 2014) .

11   "[T]he basic principle marking the boundaries of the federal question jurisdiction of the

12   federal district courts" is "the well-pleaded complaint rule." *California Shock Trauma Air Rescue*

13   *v. State Comp. Ins. Fund*, 636 F.3d 538, 541 (9th Cir. 2011) (citing *Metro. Life Ins. Co. v. Taylor*,

14   481 U.S. 58, 63 (1987)). The Court determines whether "a right or immunity created by the

15   Constitution or laws of the United States must be an element, and an essential one, of the

16   plaintiff's cause of action." *Id.*, (citing *Gully v. First Nat'l Bank*, 299 U.S. 109, 112 (1936)). With

17   respect to state law claims, "there is 'a special and small category of cases in which arising under

18   jurisdiction still lies.'" *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 578 U.S. 901,

19   1569, 1570 (2016) (citing and quoting *Gunn*, 258). "Federal jurisdiction over a state law claim

20   will lie, therefore, if the federal issue is: (1) necessarily raised, (2) actually disputed, (3)

21   substantial, and (4) capable of resolution in federal court without disrupting the federal-state

22   balance approved by Congress." *Grable*, 313-314; *see also,* 13D C. Wright, A. Miller, E. Cooper

23   & R. Freer, Federal Practice and Procedure ("W.M.") §3562, pp. 175-176 (3d ed. 2008).

24   Construction and application of §230(c) is a threshold issue raised by all parties and

25   defines the extent and contours of every state law claim. TAC ¶¶420-423, 440-452; 428-438. The

26   legal issues that arise from the dispute are "substantial" threshold issues fundamental to

27   determining whether Plaintiffs have a remedy at law for Defendants' unlawful use of their

28   Protected Identity in violation of contract and the "internal laws" of California that govern the

1    parties. TAC ¶¶440-452; 428-438.

2           In addition to being "substantial," Defendants argue that §230(c) preempts all Plaintiffs'

3    claims for relief under state law. MTD 22:10-23:19. The construction and application of §230 as

4    "preempting" all relief under state law, creates a "second path" to federal question jurisdiction.

5    *Sarauer*, 673 (two paths may support "arising under" federal jurisdiction over such claims here:

6    so-called "complete" preemption and an "embedded" federal question); W.M. §3722.2 (4th ed.,

7    1998 & Supp. 2020); *see also,* §230(e)(3); *Enigma v. Malwarebytes, Inc.*, 946 F.3d 1040, 1046-

8    1047 (2019). In enacting §230(c), "Congress has 'federalized' state law as it relates to recovery for

9    injuries caused by" patently unlawful discrimination, but for immunity. *Id.* Determining what state

10   law claims, if any, are preempted is an issue that solely "arises under" federal law. *Sarauer*, 673;

11   *Noatex Corp.*, 772-774; W.M. §3722.2 (4th ed. 1998 & Supp. 2020). Thus, the construction and

12   scope of §230(c) immunity is not only "capable of resolution in federal court without disrupting

13   the federal-state balance approved by Congress," but is necessary to preserve that balance and

14   ensure the uniformity of federal law in all 50 states and territories. *Gunn*, 258; *Noatex*, 772-774.

### 3.    Supplemental Federal Jurisdiction §1367

16          In its Order, the Court declined to exercise supplemental jurisdiction under §1367 because

17   "[t]his case is still at the pleading stage and federal judicial resources are conserved by dismissing

18   the state law claims at this stage;" it also "promotes comity as it enables California courts to

19   interpret questions of state law in areas involving complex and quickly changing social media

20   technologies." Order 23:17-23. As *Prager Univ. v. Google LLC* (2019 Cal. Super. LEXIS 2034

21   (Super. Ct. Cal. Nov. 19, 2019) ("*Prager II*") (now before the California Court of Appeal, Sixth

22   Appellate District)) demonstrates, dismissal of the Plaintiffs' state law claims and theories, at least

23   at this stage, will not conserve resources or promote comity. TAC ¶¶67-73; Declaration of Debi

24   Ramos ("Ramos Dec.") Ex. D.

25          The state law claims are "inextricably tied" to §230(c) and the "right to relief necessarily

26   depends on resolution of a substantial question of federal law." *See, e.g.*, *New Mexico v. General

27   Elec. Co*, 335 F.Supp.2d 1157, 1178 (D. N.M. 2004) (*aff'd* 467 F.3d 1223 (10th Cir. 2006)); MTD

28   22:10-25:18; Order 16:5-21. Consequently, the state law claims cannot predominate because the

1   federal statute determines whether those claims may proceed. *City of Chicago v. Int'l Coll. of*

2   *Surgeons*, 522 U.S. 156, 173 (1997) ("*Surgeons*"); *New Mexico,* 1176-1179. And it requires the

3   litigants and state courts to expend resources on litigating purely federal issues, including the

4   construction and constitutionality of §230(c). Accordingly, the federal courts should rule on those

5   issues to ensure the uniform application of §230(c) and preserve the balance with the laws of the

6   50 states. *New Mexico*, 1179 at n. 30 (citing *Surgeons*, 164)).

7         **B.**      **Plaintiffs Allege Discrimination Claims Under §1981(b) And The Unruh Act**

8         Defendants make filtering and blocking decisions based on Plaintiffs' Protected Identity,

9   including race. Defendants compile personal data profiles on Plaintiffs and others who use their

10  services. *See, Brown*, 1077–1078. The question here is whether Defendants use that same data to

11  filter and block Plaintiffs based on race, not video content. Assuming the truth of Plaintiffs'

12  allegations, to the extent permitted under Rule 12(b)(6), the plausible answer is, "yes." TAC ¶¶5,

13  9, 10, 18, 99-101, 103, 107, 113-116, 157, 166, 174, 176-178, 183, 207, 269-270, 396, 434, 493,

14  517-531, 591, 598, 601-611, 643, 647, 654.

15        **1.**      **Race Discrimination Under Contract Violates §1981(b)**

16        §1981 prohibits racial discrimination in the making and enforcement of contracts. 42

17  U.S.C. §1981. "To state a claim pursuant to §1981, a plaintiff must allege (1) the plaintiff is a

18  member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant;

19  and (3) the discrimination concerns one or more of the activities enumerated in the statute." *Keum*

20  *v. Virgin Am. Inc*., 781 F. Supp. 2d 944, 954 (N.D. Cal. 2011). "To prevail [on a motion to

21  dismiss], a plaintiff must initially plead…that, but for race, it would not have suffered the loss of a

22  legally protected right." *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S.Ct.

23  1009, 1015 (2020).

24        Defendants use aggregated data profiles that identify and embed information about

25  Plaintiffs' Protected Identity traits. TAC ¶¶5, 9, 10, 18, 99-101, 103, 107, 113-125, 157, 166, 174,

26  176-179 183, 207, 396, 434, 493, 517-531, 591, 598, 601-611, 643, 647, 654. Under the pretext

27  that the material in Plaintiffs' videos violates Defendants' so called identity "neutral" content

28  based rules, Defendants  filter and block Plaintiffs by accessing and using Protected Identity

information. But for unlawful racial profiling, Plaintiffs would not be blocked or denied the same "benefits, privileges, terms, and conditions" that Defendants afford "non-minority" users. *Id*. And even if Defendants racially profile everyone, as the Court found Defendant Google does in *Brown*, the use of Plaintiffs' race to filter and block content that otherwise complies with Defendants' neutral content rules is sufficient to create a plausible inference of intentional race discrimination. *Sandford*, (evidence of defendant realty company's "coding" of black applicants coupled with disparate treatment established clear and flagrant case of discrimination); *Hankins v. El Torito Restaurants, Inc.*, 63 Cal.App.4th 510, 518 (1998) (allegations of unlawful discrimination with Defendants' awareness of such suffices to plead *intentional* discrimination).

There is no race neutral explanation to negate the inference at this stage of the pleadings. "But for" Defendants' use of Plaintiffs' Protected Identities, all of Plaintiffs' videos that were removed, restricted, or denied monetization, would have been treated as those videos by "preferred" users, like PewDiePie and Shane Dawson, whose non-compliant videos were not restricted or demonetized. TAC ¶¶99-101, 107, 112, 113-125, 269-270, 396; *see,* ¶¶5, 9, 10, 18, 157, 166, 174, 176-78, 183, 207, 434, 493, 517-531, 591, 598, 601-611, 643, 647.

This is not a one-off "error" or mistake. *Cf.*, Order: 13:8-14. Since 2017, Defendants have known that their tools "target" Plaintiffs based on their ***"race and ethnicity"*** and continued to do so by utilizing aggregated personal data profiles reflecting Plaintiffs' Protected Identities. *Id.,* ¶¶99-101, 112-125, 179, 269-70, 366; *see,* ¶¶5, 9, 10, 18, 107, 157, 166, 174, 176-178, 183, 207, 434, 493, 517-531, 591, 598, 601-611, 643, 647, 654. Defendants' knowing and intentional programming, embedding, and use of aggregated data profiles to make decisions about who and what to filter and block is intentional race discrimination and digital redlining. *Sandford*, 178–179; *Hankins,* 518. According to this Court in *Brown* and the empirical evidence alleged in the TAC, racial profiling is not merely a "belief." Defendants admitted to using "artificial intelligence and other algorithms and automated systems to get the information that advertisers want," and that their "automated tools gather and analyze information about creators and viewers based on their identifying information, including race." TAC ¶¶ 99. YouTube then uses that information to make decisions based on who the creators and viewers are, rather than on the

video content. *Id.*, ¶¶5, 9, 10, 18, 99-101, 103, 107, 113-125, 157, 166, 169, 174, 176-179, 183, 207, 269, 396, 434, 493, 517-531, 591, 598, 601-611, 643, 647, 654; *Brown*, 1077–1078. Without such profiling, Defendants' decisions to filter and block Plaintiffs' videos would have been different, and would have been based only on the, neutral content based rules in the Contracts. *Id.* Furthermore, the TAC alleges other racial discrimination, including paying Plaintiffs less than "preferred" users for similar content. TAC ¶396.

Defendants' contention that Plaintiffs cannot allege that Defendants intend to racially discriminate, because YouTube's written policy does not, "by its terms, discriminate on the basis of race or ethnicity" misses the point. MTD 2:14-15; 10:27-11:5. Plaintiffs' §1981 claim is based on allegations that Defendants are using the same "clandestine" personal data profiling found in *Brown* to make filter and block based on Protected Identity under and in violation of their express contractual promises not to do so. TAC ¶¶5, 9, 10, 18, 107, 112, 113-125, 157, 166, 174, 176-178, 183, 207, 434, 493, 517-531, 591, 598, 601-611, 643, 647, 654. Plaintiffs have never contended that the TOS or written policies provided to consumers are discriminatory on their face. Indeed, Plaintiffs allege in detail how Defendants violate those race "neutral" policies and promises by filtering and blocking based on race. *Id.*

Defendants' other contention, that Plaintiffs' allegations constitute "disparate impact," ignores the allegations of data based identity profiling (like that found in *Brown*), including Defendants' own admissions that their filtering tools treat Plaintiffs differently because of that racial data. TAC ¶¶99-101, 179, 269-270, 396. Plaintiffs allege in detail that Defendants' use of Plaintiffs' racial data is knowing, intentional, and the "but for cause" for the "disparate impact." *See, Harris v. Capital Growth Inv'rs XIV*, 52 Cal.3d 1142, 1175 (1991) (noting that evidence of disparate impact may be probative of intentional discrimination); *Comcast Corp.*, 1015; *Sandford*, 178–179; TAC ¶¶5, 9, 10, 18, 99-101, 112, 113-125;157, 166, 174, 176-179, 183, 207, 269-70, 396, 434, 493, 517-531, 591, 598, 601-611, 643, 647, 654.

### 2.   <u>Discrimination Violates The Unruh Civil Rights Act</u>

The Unruh Act also prohibits intentional discrimination based on race, as well as other Protected Identities. Cal. Civ. Code §51, *et seq.* The TAC alleges sufficient facts to support a

1    reasonable inference that Defendants do what they admit - filter and block Plaintiffs' content

2    based on their Protected Identities. TAC ¶¶99-101, 179, 269-70, 296; *see*, ¶¶5, 9, 10, 18, 107, 112,

3    113-125, 157, 166, 174, 176-178, 183, 207, 434, 493, 517-531, 591, 598, 601-611, 643, 647, 654;

4    *Harris*, 1175. Defendants' filtering and blocking based on race, the "gay thing," or any other

5    Protected Identity is antithetical to the Unruh Act's aim "to create and preserve a

6    nondiscriminatory environment in California business establishments by 'banishing' or

7    'eradicating' arbitrary, invidious discrimination." *Harris*, 1149; *Hankins*, 518.

8           **C.    Plaintiffs Allege Breach of Contract Claims**

9           Plaintiffs allege that Defendants breach their contractual promises by limiting Plaintiffs'

10    reach and access to services in violation of specific neutral content based provisions set forth in

11    more than 2000 pages and hyperlinks of adhesive digital contract terms that Defendants change on

12    a daily basis without notice. TAC 2956-2961, 2942-2954, 2923-2940, 2898-2916, 321-339, Ex. A

13    2. Defendants counter that because they reserve a general, catch-all discretionary right to refuse to

14    post content, post ads, and monetize any content, there can be no breach of any of the specific

15    provisions, including specific express and implied promises that all users are entitled to use

16    YouTube to post, advertise, and monetize videos, subject to specific viewpoint neutral rules that

17    apply equally to all. MTD 2:23-25, 16:21-17:7. Consequently, the threshold pleading issue to be

18    decided under Rule 12(b)(6) is whether Defendants' reservation of absolute, unfettered discretion

19    renders all of their specific promises unenforceable and meaningless, as a matter of California

20    contract law.

21           **1.    The Contracts**

22           Every YouTuber must agree to the TOS[1] which Defendants drafted without negotiation.

23    *See*, TAC 2956-2961, 2942-2954, 2923-2940, 2898-2916, 321-339, Ex. A 2. To upload content,

24    users also must create an account and use it. TAC 2956 ¶3.A, 2943 ¶3.A, 2926, 2901, 324, Ex. A

25

26    _____
      [1] The TAC attaches the TOS dated June 9, 2010 (*id.*, 2956-2961); May 25, 2018 (*id.*, 2942-2954);
      December 10, 2019 (*id.*, 2923-2940); November 18, 2020 (*id.*, 2898-2916); and March 17, 2021

27    (*id.*, 321-339). Plaintiffs ask the Court to take judicial notice of the TOS dated June 1, 2021. *See*,
      Ex. A. For brevity, Plaintiffs only cite to the two earliest versions of the TOS, unless another

28    version reflects significant relevant modification.

4-5. The TOS incorporates digital Community Guidelines ("Guidelines") and a myriad of "Policies." TAC 2956 ¶1.A, 2942 ¶1.A. As long as Plaintiffs' content complies with the rules, Defendants have no right to block Plaintiffs' audience reach. TAC 2956-2961, 2942-2954. The digital AdSense Contract prescribes monetizable videos. *See,* ECF80-5. It incorporates by reference "the AdSense Program Policies," and other technical agreements. ECF80-5, 2 ¶1, 4 ¶10. The AdSense Contract and related policies govern monetization only, and do not block reach.

To be monetized, content must comply with the Guidelines (TAC 423), Advertiser friendly guidelines (*id.*, 423), and not be subject to Restricted Mode. *Id.*, 423-424. The Defendants' Policies prohibit monetization of content with:(i) inappropriate language; (ii) violence; (iii) adult content; (iv) harmful or dangerous acts; (v) hateful content; (vi) incendiary and demeaning content; (vi) recreational drugs and drug-related content; (vii) tobacco-related content; (viii) firearms-related content; (ix) controversial issues and sensitive events; or (x) adult themes in family content. *Id*. Videos which do not include prohibited content are eligible for monetization.

Any reasonable user reading the full TOS' 2,500+ linked pages of contract language would conclude that if a user complies with the rules, gives a license to his content and access to his personal digital data, Defendants will give him access to the YouTube platform to post content and earn money. No reasonable user would conclude that after he fully complied, Defendants nevertheless could deny or limit reach and access to some or all of the services, much less do so on entirely unrelated grounds, such as race. *See,* TAC 2956-2961, 2942-2954.

## 2.   <u>Defendants' Discretion Is Limited By Contract</u>

Defendants' assertion of contractual contravenes applicable California law: Specific contract terms are interpreted "to give effect to the mutual intention of the parties" by examining the text to determine intent, in accordance with statutory rules of interpretation. Cal. Civ. Code §§1636, 1642 *see also, Brant v. California Dairies,* 4 Cal.2d 128, 133 (1935). Contracts are construed to the fullest extent possible to be "lawful, operative, definite, and reasonable." Cal. Civ. Code §1643. Discretionary contract rights are considered in light of "the whole of a contract" and must be "taken together, so as to give effect to every part." Cal. Civ. Code §1641; Cal. Civ. Proc. §1858.

1   Defendants' general contractual discretion is no exception. Defendants' "discretion" is cabined by

2   roughly 1,000 webpages prescribing content that can be posted and monetized. *See,* TAC 341-

3   1365. Assertions of unfettered discretion render those 1,000 webpages mere surplusage, in

4   violation of Code of Civil Procedure §1858 (the Court cannot "omit what has been inserted"), and

5   frustrate the parties' general intent. *See,* TAC 341-1365; Cal. Civ. Code §1650 ("Particular clauses

6   … are subordinate to its general intent"); Cal. Civ. Code §1644 (words "are to be understood in

7   their ordinary and popular sense"). As Defendants testified to Congress in 2018 (TAC ¶108), the

8   general intent of the Contracts is that everyone must comply with Defendants' viewpoint neutral

9   content based rules -- regardless of Defendants' general reservation of discretion to refuse to post

10  or monetize content. Furthermore, even if the Court were to find that the general discretion

11  language conflicts with the specific terms governing content and monetization, the Court must

12  harmonize all of the terms for maximum effect (Cal. Civ. Code §1641), and construe the Contracts

13  "most strongly against the [Defendants] who caused the uncertainty to exist." *Marina Tenants*

14  *Ass'n v. Deauville Marina Develop. Co*., 181 Cal.App.3d 122, 128 (1986). That is particularly true

15  for these adhesion Contracts[2] which users "must 'take or leave,'" without bargaining. *Ponder v.*

16  *Blue Cross of S. California,* 145 Cal.App.3d 709, 718–19 (1983). Defendants drafted them, with

17  layers of hyperlinked webpages making it very difficult to review. TAC 2956-2961, 2942-2954.

18  Accordingly, the Contracts must be carefully scrutinized "to avoid injury to the public." *California*

19  *FAIR Plan Assn. v. Garnes,* 11 Cal.App.5th 1276, 1306 (2017).

20      Defendants' interpretation of these Contracts must be rejected; it renders them "so one-

21  sided," that they are not legally enforceable. *Postal Instant Press, Inc. v. Sealy*, 43 Cal.App.4th

22  1704, 1716–117 (1996) (citing *E.S. Bills, Inc. v. Tzucanow,* 38 Cal.3d 824, 835–836 (1985)).

23  Moreover, Defendants' assertion of absolute discretion over Plaintiffs' access and services renders

24  the Contracts illusory and unenforceable, where Defendants can refuse access and services, despite

25  Plaintiffs' full performance. *See, Kowal v. Day*, 20 Cal.App.3d 720, 724 (1971) ("Where a

26  contract imposes no definite obligation on one party to perform" "no enforceable obligation

27  _____

28  [2] TAC ¶127; 2924, 2899.

exists"); *accord Automatic Vending Co. v. Wisdom*, 182 Cal.App.2d 354, 357–58 (1960); *Steven v. Fidelity & Cas. Co. of New York*, 58 Cal.2d 862, 878 (1962).

### 3.   Defendants Do Not Have Discretion To Breach The Contracts

Applying these basic rules, Defendants clearly do not have discretion to ignore and breach their promises to provide viewpoint neutral filtering and blocking of content and access on YouTube. *First*, both Contracts are integrated and identify specific documents that are incorporated by reference. TAC 2961 ¶14, 2954 ¶14; ECF80-5, 5 ¶15. Restricted Mode and advertising policies constitute **_additional_** considerations for monetization under the AdSense Contract; however, Restricted Mode is not part of the TOS. *See,* ECF80-7 ("https://support.google.com/youtube/answer"). Given that the integration clause excludes linked pages not expressly incorporated by reference, [3] the articles "are not part of the Agreement." *See,* TAC 2924. Defendants are not authorized to use Restricted Mode to limit Plaintiffs' reach under the TOS.

     **Second**, assuming *arguendo* that the Contracts authorize Defendants' use of Restricted Mode, Defendants apply Restricted Mode in violation of their own rules (TAC ¶¶3-7, 9, 183, 191-193), and in violation of the TOS which limits  use of automated systems to "analyze your Content to help detect infringement and abuse, such as spam, malware, and illegal content." *See,* TAC 2930, 2905; ECF80-4; ECF80-3, Ex. E). Defendants nevertheless restrict the vast majority of Plaintiffs' content using automated systems that target Blacks and Hispanics in order to sell ads reflecting viewer demographics. *See, e.g., id.*, ¶¶7-10, 14, 98-99, 157, 166, 188, 197, 207, 233, 266-267, 304, 338-340, 356, 374, 390-393. They apply "Restricted Mode" whenever Plaintiffs discuss subjects important to minorities, like: Black Lives Matter, the KKK, Aryan Brotherhood, Neo-Nazi, Nazi, Boogaloo, White supremacy, Racism, Racial Profiling, Police Shootings, Bill Cosby, and Louis Farrakhan. The use of these words will trigger Restricted Mode - regardless of

---

[3] Significantly, the 2019 TOS modified the original integration clause at ¶14 to exclude from the contract "other links or references provided in these terms" which "are not part of the Agreement" (TAC 2924), and authorized Defendants to "use automated systems that analyze your Content to help detect infringement and abuse, such as spam, malware, and illegal content." *Id.*, 2930. Those changes appear in subsequent TOS. *Id.*, 2898-2916; Ex. A 3-15

content. *Id.*, ¶¶193, 311. Such blanket restrictions violate Defendants' rules and their "Mission" statement. *See, id.*, ¶191; Ex. C.

*Third*, Defendants' Contracts include detailed copyright and "fair use" rules. TAC 608-626, 1251-1268. Defendants repeatedly find Plaintiffs violated copyright rules, despite following "fair use" rules. TAC 608-616, 1251-1267. They even flagged Plaintiffs' own videos which appear on back up channels. *Id.*, ¶¶274-275. By abusing copyright strikes, Defendants wrongly suspend and demonetize Plaintiffs' channels for months. *Id.*, ¶¶313-315, 334-335.

*Fourth*, Defendants violate provisions prohibiting bullying, harassment, doxing, and publication of personal user identification information. TAC 341-343, 529-536,746-748, 751-762, 900-903. Defendants wrongly restrict, suspend and demonetize Plaintiffs' channels, while allowing "preferred" users, like Tommy Sotomayor and Candace Owens, to denigrate, harass, and target Blacks (*id.*, ¶234; ¶¶91, 221-225, 269-270), and ignore threats by white creators. *Id.*, ¶¶91, 221-224, 233, 234, 279-280, 284-290, 296.

*Fifth*, in violation of their own copyright policies, Defendants limited the reach and monetization of most of Plaintiff Reyes' videos, while allowing other favored users to post full copies, without restriction, so that they earn money from his content. *Id.*, ¶¶382-384. That is not only a breach of the copyright provisions, it is outright theft and conversion, in violation of the TOS license content and data licensing provisions. TAC 2958 ¶6.B-C, 2947 ¶6.B-C.

### 4.   Defendants' Violate The Covenant of Good Faith and Fair Dealing

"[E]very contract 'imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.'" *McClain v. Octagon Plaza, LLC,* 159 Cal.App.4th 784, 798 (2008) (quoting *Carma Devs. (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal.4th 342, 371-372 (1992)). The covenant prevents Defendants from engaging in conduct which frustrates Plaintiffs' rights to the benefits of the Contracts, while not technically violating express terms. *See, Racine & Laramie, Ltd. v. Department of Parks & Recreation*, 11 Cal.App.4th 1026, 1031-1032 (1992). The covenant 'is based on…the long-standing rule that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." *Waller v. Truck Ins. Exchange, Inc.*, 11 Cal.4th 1, 36 (1995). It is particularly applicable because Defendants have "discretionary

1    power affecting the rights of [Plaintiffs]. Such power must be exercised in good faith." *See,*

2    *Carma*, 372; *Perdue v. Crocker Nat'l Bank*, 38 Cal.3d 913, 923 (1985).

3        The TAC allegations satisfy the requirements for pleading the violation of the covenant.

4    *Careau & Co. v. Security Pacific Business Credit, Inc.,* 222 Cal.App.3d 1371, 1395 (1990). The

5    Court should apply the covenant here "to limit [Defendants'] discretion in order to create a

6    binding contract and avoid a finding that the promise is illusory." *Storek & Storek, Inc. v. Citicorp*

7    *Real Est., Inc.*, 100 Cal.App.4th 44, 57 (2002) (citing *Third Story Music, Inc. v. Waits*, 41

8    Cal.App.4th 798, 808 (1995)).

9        **First**, Defendants do not apply the Contracts' rules to their own content or to that of

10   "preferred" partners. TAC ¶¶15-17, 89, 116, 151, 178, 269-270. They share with "preferred" users

11   secret internal content review guidelines for limiting video reach, affording them an inside track as

12   to how to avoid restrictions and monetization limitations, while Plaintiffs' content is repeatedly

13   restricted and limited. *See, id.*, ¶¶14-17, 151-157. Defendants also selectively enforce their rules,

14   resulting in disparate treatment of Plaintiffs' content's reach and monetization. *Id.*, ¶¶13-14 (chart

15   comparing 107 of Plaintiffs' restricted videos with no/limited monetization with similar

16   unrestricted videos by others); ¶¶269-270 (hyperlinks to PewDiePie and Shane Dawson videos

17   which Defendants posted without restriction in violation of the Guidelines and policies).

18       **Second**, Defendants' employees and contractors discriminate based on race and other

19   Protected Identity. TAC ¶¶169-171, 179.c-d, 188. Defendants allow employees to moonlight, exert

20   control over filtering and blocking to promote some users while hobbling others for money, and

21   refuse to honor studio reservations, favoring whites without reservations. *Id.*, 179.a-b, 226-227,

22   235, 239, 283, 295, 333, 355, 385-386.

23       **Third**, Defendants interfere with the Plaintiffs' audience reach by discouraging viewing:

24   Defendants shadow ban videos and entire channels, rendering them invisible and unsearchable.

25   TAC ¶¶200-202, 234, 273, 309, 320, 336-337, 343. They interrupt video play. *Id.*, ¶¶242, 263.

26   They throttle video play. *Id.*, ¶¶242, 357-358. They insert extraneous images and sounds. *Id.*,

27   ¶¶263, 316, 358-360; 180-181. They play multiple ads every 2, 3, 4 or 5 minutes on the few

28   monetized videos. *Id.*, ¶¶213, 256-257, 361. They also display ads for offensive racist content in

the "Up Next" and "Trending" columns on Plaintiffs' channels. *Id*., ¶¶214-219, 259-261, 317-319, 341-342, 362-364. These practices discourage viewers, and reduce reach and revenue. *Id*., ¶¶219, 260, 364.

### D.   Plaintiffs Allege Equitable Claims

California law affords an equitable remedy "for every wrong." Cal. Civ. Code §3523. Plaintiffs have alleged equitable claims for an accounting and for conversion/replevin under California law. A careful review of the TAC allegations shows that Plaintiffs have exceeded Rule 12(b)(6) requirements for pleading equitable claims under California Law.

#### 1.   Accounting

Plaintiffs seek an accounting, alleging in detail that Defendants unilaterally and without notice or explanation repeatedly reduced the numbers of Plaintiffs' subscribers, channel views, and video views. TAC ¶¶246-247, 250, 246-247, 251-254, 324-325, 325-327, 348-350, 367-368. Regardless of §230(c) and Defendants' contractual discretion, Defendants owe Plaintiffs a duty to accurately record and report the numbers upon which they determine Plaintiffs' monetization eligibility and revenue. *See*, ECF80-3, 2; ECF80-5, ¶5; ECF80-6.

#### 2.   Conversion/Replevin

The TAC alleges that Defendants wrongly and permanently removed 10 of Plaintiffs' channels (including uploaded videos) (*id*., ¶¶294, 346, 353-354); as well as hundreds of Plaintiffs' individual videos (¶¶237-238, 291, 301-303, 331-334; *see also,* ¶344), without affording Plaintiffs an opportunity to copy the videos. Defendants agreed to restore some videos (*see id*., ¶238), but then failed to honor that promise. California law, therefore, authorizes an equitable remedy to redress and restore Plaintiffs' property. Cal. Civ. Code §3523.

### E.   Plaintiffs Allege UCL Violations

The California Unfair Competition Law (Cal. Bus. & Prof. Code §§17200, *et seq*.) ("UCL") "broadly prohibits 'any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising.'" *Boschma v. Home Loan Ctr., Inc.*, 198 Cal.App.4th 230, 251 (2011). An unlawful business practice under the UCL is "anything that can properly be called a business practice and that at the same time is forbidden by law." *Morgan v. AT&T*

1  *Wireless Servs., Inc.*, 177 Cal.App.4th 1235, 1254 (2009) (citations and internal quotes omitted).

2  Plaintiffs have pled that Defendants violate the UCL by engaging in (a) unlawful practices,

3  including violations of §1981, the Unruh Act, the Liberty of Speech Clause, and the Lanham Act,

4  15 U.S.C. §1127; (b) unfair practices which deprive Plaintiffs of the benefits of and under the

5  Contracts, as set forth above; and (c) deceptive and fraudulent practices. TAC ¶¶601-611.

6       With respect to unlawful practices, Defendants assume that §230(c) bars liability for all of

7  the alleged predicate violations of law. MTD 22:15-25:18. If Defendants are wrong, then a UCL

8  claim for unlawful practices will lie. *See, In re Zoom Video Commc'ns Inc. Priv. Litig.*, 525

9  F.Supp.3d 1017, 1046–1048 (N.D. Cal. 2021) (UCL claim stated where §230(c) does not apply to

10 false statements re privacy); *In re Yahoo! Inc. Customer Data Sec. Breach Litig.,* No. 16-MD-

11 02752-LHK, 2017 WL 3727318, *24 (N.D. Cal. Aug. 30, 2017) (UCL claim stated where test for

12 unfairness was met). As for unfair practices, Defendants assume that they retain unfettered

13 discretion to avoid their obligation to provide neutral content filtering and blocking. If, as set forth

14 above, Defendants do not have unfettered discretion to filter and block Plaintiffs based on

15 Protected Identity, rather than on posted video materials; and they do so in a manner that

16 diminishes the value of Plaintiffs' videos, depriving them of the right to earn revenue, then

17 Defendants are liable for unfair practices. TAC ¶¶382-384. With respect to the deceptive practices

18 prong, if Defendants are intentionally using discriminatory automated systems in violation of

19 express promises to apply viewpoint "neutral" content filtering and blocking and access to

20 services, that apply equally to all, then Defendants also violate the UCL's prohibition on

21 fraudulent and deceptive business practices TAC ¶¶95-104, 112-116, 149-152; *see,* TAC 341; Ex.

22 B-C.

23       **F.      Plaintiffs Allege A Claim For Liberty Of Speech**

24       The California Constitution gives every person an affirmative right to free speech,

25 expression, and association that is "more definitive and inclusive than the First Amendment."

26 *Wilson v. Sup. Ct.*, 13 Cal.3d. 652, 658(1975); Cal. Const. Article I, §2(a). The Supreme Court's

27 landmark holding in *Robins v Pruneyard Shopping Ctr.,* 23 Cal.3d 899, 907-908 (1979)  in which

28 the Court announced that the Liberty of Speech Clause protects public speech and association in

privately owned or quasi-public spaces, governs this dispute. *See, id.*; *Fashion Valley Mall v. NLRB*, 42 Cal.4th 850, 869.

Under Liberty of Speech, "state action" is based solely on whether a private property owner has opened his property to the public in a manner that subjects the property to scrutiny as a quasi-public forum. The test balances the interests of the public and the property owner under several functional factors: (i) the nature, purpose and primary use of the property; (ii) the extent and nature of the public invitation to use the property; (iii) the size and physical layout of the business for which the property is used; and (iv) the relationship between the ideas subject to restriction and the purpose of the property. *Albertson's, Inc. v. Young*, 107 Cal.App.4th 106, 114–115 (2003) ("*Albertson's*"). In short, "*Pruneyard* instructs [courts] to balance the competing interests of the property owner and of the society with respect to the particular property or type of property at issue to determine whether there is a state constitutional right to engage in the challenged activity." *Ralphs Grocery Co. v. Victory Consultants, Inc.*, 17 Cal.App.5th at 259 (2017) ("*Ralph's Grocery*") (citing *Trader Joe's Co. v. Progressive Campaigns*, 73 Cal.App.4th 425, 433 (1999) ("*Trader Joe's*")).

*Pruneyard* also expressly "recognized that the government's power to regulate property when the interests of the individual owner come in conflict with the interests of society is not static; property rights can and should be re-defined to accommodate the conditions of modern life." *Trader Joe's*, 431 (discussing and quoting *Pruneyard*, 906–907). In 1979, "the specific 'condition of modern life' that grabbed the Supreme Court's attention in *Pruneyard* 'was the evolution of the suburban shopping mall and its particular suitability as a forum for expressive activity.'" *Id*. Here, the "modern condition" is the evolution of the internet, especially global social media sites like YouTube. Thus, *Pruneyard* "did not hold that free speech and petitioning activity can be exercised only at large shopping centers or that such activities can be exercised on any property except for individual residences and modest retail establishments." *Albertson's*, 123. With respect to global sites like YouTube, the U.S. Supreme Court has remarked that global internet sites function as the "modern public square" that allows any person with an internet connection to "become a town crier with a voice that resonates farther than it could from any

1    soapbox." *Packingham v. North Carolina*, 137 S.Ct. 1730, 1737, 198 L.Ed.2d 273 (2017)

2    ("*Packingham*"); *Reno v. ACLU*, 521 U.S. 844, 870 (1997). A judicial balancing of the interests of

3    the public and Defendants under some level of constitutional scrutiny, therefore, is appropriate

4    under *Pruneyard*.

5        Defendants' concern that recognizing YouTube as a public forum would be a "'dramatic

6    expansion' of *Pruneyard*" is not supported by California law. MTD 8:17-9:5. In pointing out that

7    "[t]he analogy between a shopping mall and the Internet is imperfect, and there are a host of

8    potential 'slippery slope' problems that are likely to surface were [*Pruneyard*] to apply to the

9    Internet," it is unlikely that Judge Chen intended to exclude the entire internet from the Liberty of

10   Speech Clause. *Id.*, 8:10-17 (citing *hiQ Labs, Inc. v. LinkedIn Corporation*, 273 F.Supp.3d 1099,

11   1116 (N.D. Cal. 2017); *Ralphs Grocery*, 259; *Trader Joe's*, 433, 436. Furthermore, *Pruneyard* is

12   not limited to speech "exercised only at large shopping centers." *Id*. And the test can never be

13   "static" because "property rights can and should be re-defined to accommodate the conditions of

14   modern life." *Trader Joe's*, 433, 436. Like it or not, in the age of the internet most speech takes

15   place online. Like the evolution of the modern shopping center in the 1970's, the regulation of

16   speech on global social media sites merits scrutiny under *Pruneyard* and its progeny.

17       ***First,*** Defendants expressly invite the public to use YouTube as the largest forum for

18   public speech, expression, and discourse in the world. Ex. B. While Defendants do so for profit,

19   they also promise the public the right to use YouTube for exercising the "freedoms" of

20   "expression," "information," "opportunity," and "the right to belong" through the posting,

21   viewing, and discourse about content, material, ideas, and information communicated through

22   video based expression. Ex. C.

23       ***Second***, YouTube functions and operates as the cyber equivalent of a "modern public

24   square" under *Packingham* and *Reno*. YouTube is the largest public forum for speech and

25   communication in California. TAC ¶¶43, 84-86, 126, 665-669. YouTube stands in sharp contrast

26   to grocery stores and other modest businesses that merely invite the public to purchase goods or

27   services. *Cf.*, *Trader Joe's*, 431-433.

28       ***Third***, YouTube's dominance over video based speech is unparalleled. *See, e.g.*, TAC ¶¶

43, 85, 106, 117, 126, 153, 567, 665-669. That is why owners of global internet sites like YouTube do not function as providers of "scarce expressive commodity," but as a "dynamic, multifaceted category of communication that includes not only traditional print and news services, but also audio, video, and still images, as well as interactive, real-time dialogue" involving content and expression "as diverse as human thought." *Reno*, 870. This global communication "medium," deserves far more attention when it comes to freedom of speech and expression under the Liberty of Speech Clause. *Id.*, *Ralphs Grocery*, 259; *Trader Joe's*, 433.

### G.   Plaintiffs Allege Claims For False Advertising

In its Order, the Court found that "Plaintiffs' claim for false advertising under the Lanham Act has already been squarely rejected by the Ninth Circuit in *Prager Univ. v. Google LLC,* 951 F.3d 991 (9th Cir. 2020) ("*Prager III*"). The Court found that Plaintiffs' false advertising claims were foreclosed under that decision: (1) "'YouTube's statements concerning its content moderation practices are not "commercial advertising or promotion" because the "'statements about Restricted Mode were made to explain a user tool, not for a promotional purpose to 'penetrate the relevant market' of the viewing public;'" (2)"'designation of certain videos for Restricted Mode [was not] part of an advertising or promotion or a misrepresentation as to the videos'" because "'[t]he designation and the reason for tagging videos to be unavailable in Restricted Mode are not made available to the public;'" (3) "the fact that a video was unavailable under Restricted Mode did not imply a specific representation from YouTube regarding that video" because the only representation that a user sees when that user tries to view a video unavailable in Restricted Mode is a statement that the video is 'unavailable with Restricted Mode enabled.'" *Id.*, 19:22-20:19. Notwithstanding this "one size fits all" reading of *Prager III*, the Court granted Plaintiffs leave to amend. *id.*, 20:20-21; 22:17-20; TAC ¶¶532-568.

#### 1.   The Statements Are Not Identical

In *Prager University v. Google LLC* (No. 17-CV-06064-LHK) 2018 WL 1471939 (N.D. Cal. Mar. 26, 2018) ("*Prager I*"), the Lanham allegations focused on alleged misrepresentations about "the nature, characteristics, and qualities of YouTube's services and commercial activities as an equal and diverse public forum." *Prager I,* ECF1, 40:25-27. This Court found that those

1  statements were "puffery" that did not refer to "anything that YouTube said publicly about its

2  classification of [plaintiff's] videos." *Prager I,* ECF54, 10-11.

3       Here, Plaintiffs challenge Defendants' false statements disseminated not just to viewers ***but***

4  ***to advertisers*** to inform them that Plaintiffs videos are "restricted" and "unavailable" because they

5  contain content that Defendants have characterized as "inappropriate" for younger and sensitive

6  audiences, and for advertisers who want to market to those audiences. TAC ¶¶195-199, 544-555.

7  These statements alert advertisers that Plaintiffs' videos contain "inappropriate" content for

8  sensitive audiences, because they contains "drugs and alcohol, sexual situations, graphic violence,

9  mature subjects, profane and material language, and demeaning content" (collectively

10  "Inappropriate Material"). TAC ¶16; 220-224 (Declaration of Alice Wu, Senior Manager for Trust

11  and Safety at YouTube LLC). Indeed, Defendants warn advertisers and viewers about

12  Inappropriate Material, when Plaintiffs' videos contain none. *Id.*, ¶¶233-245, 265-268, 299-307,

13  316-317, 336-340, 356, 371-378, 380-381, 390-394. In reality, Defendants review and rate people

14  based on their Protected Identity, not video content. TAC ¶¶98-101. Consequently, these are not

15  neutral, factual statements explaining Defendants' filtering practices. They are misleading, and

16  deceptive warnings to millions of viewers and advertisers, directly and by implication, to stay

17  away because they falsely represent that Plaintiffs' videos are not appropriate for sensitive

18  audiences. *Id.*; *compare also, Prager III,* at 1000.

19       **2.    The Statements Are False, Misleading, And Deceptive**

20       "Statements that are literally true or ambiguous but which nevertheless have a tendency

21  to mislead or deceive the consumer are actionable." *United Indus. Corp. v. Clorox Co.*, 140

22  F.3d 1175, 1182 (8th Cir. 1998); *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1053–

23  104 (9th Cir. 2008). Thus, while "[n]ot all commercial speech is promotional," the commercial

24  nature and impact of these notices is, at a minimum, an issue that cannot be decided as a matter

25  of pure law under Rule 12(b)(6) before any discovery has commenced. *Fashion Boutique of*

26  *Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 57 (2d Cir. 2002) (motion for summary

27  judgment); *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 735 (9th Cir.

28  1999) (motion for new trial).

1    While it is true that when Defendants restrict a video it is "unavailable in restricted

2 mode," Defendants circulate millions of notices to advertisers and viewers that falsely inform

3 them that Plaintiffs' videos contain Inappropriate Material. That false information interferes

4 with Plaintiffs' ability to compete against Defendants for the same viewers and advertisers.

5 TAC ¶¶195-198, 534-539, 543-552; *Grubbs v Sheakley Group, Inc.*, 807 F.3d 785, 800-801

6 (6th Cir. 2015); *Signature Transportation Grp. v Jacobs*, 2020 WL 1663124, *3 (N.D. Ill.

7 2020).

8               **3.     Defendants' False Statements Penetrate The Market**

9    Defendants' misrepresentations about Plaintiffs' videos are made to influence viewers and

10 advertisers to watch Defendants' videos, instead of Plaintiffs' videos. *Compare* TAC ¶¶99-106,

11 109-112, 346-356, *with Prager I,* *9. And, whether the false information about Plaintiffs' videos is

12 express or implied, the statements are false because Plaintiffs' videos do not contain

13 "Inappropriate Material" as defined by Defendants' Contracts, Guidelines, Policies and rating

14 system. *Compare*, TAC ¶¶557-561, *with*, ¶¶232-237, 265-267, 297-307, 316, 336-340, 356, 371-

15 378, 381, 390-394.

16    These millions of direct and implied communications also limit Plaintiffs' right to

17 commercially compete with Defendants for audiences and advertisers under market rules that

18 apply to everyone. TAC ¶¶245, 291, 321, 365, 374-375, 384, 387, 397. In this way, Defendants

19 gain a competitive advantage for their own content, and that of "preferred" users, by ensuring

20 access to viewers, advertising, and revenue in the YouTube market which Plaintiffs are denied.

21 TAC ¶¶164-175, 508, 524, 529. And "[w]hether the relevant statements were 'disseminated

22 sufficiently to the relevant purchasing public,' [cite], may turn out to be true or false, but the

23 allegation suffices for purposes of stating a claim." *See, Newcal*, at 1054 (quoting *Coastal*

24 *Abstract*, 735); *see also, Grubbs*, at 800-801; *Signature Transportation Grp.*, 2020 WL 1663124.

25          **H.     Defendants Are Not Entitled To Immunity under § 230(c)**

26    The elephant in the room is Defendants' astounding and dangerous contention that §230(c)

27 operates as a license to engage in intentional, overt, and systematic anti-competitive redlining and

28 Protected Identity discrimination under and in violation of contract. MTD 22:10-25:18.

Defendants make this argument despite their contractual promises to filter and block based only on specific neutral content based rules that apply equally to all. *Id*., *see,* TAC 341. Defendants' blanket immunity argument is not supported by §230(c), runs afoul of case law limiting the application of this controversial statute, and if adopted, renders the statute constitutionally suspect under the First and Fourteenth Amendments.

### 1.   Congress Enacted §230(c) To Moderate Content Not People

Congress enacted §230(c) to permit and encourage ISPs to regulate, filter and restrict content based on offensive online material, not the personal identity of internet users. *Enigma,* 1047. Its purpose is clear: to protect minors from offensive, obscene, or other harmful online "material," while fostering free expression and competition on the internet. *Id*., (citing and discussing 141 Cong. Rec. 22,045 (1995), statement of Rep. Cox, 47 U.S.C. §230(c)(2)(A)–(B)). At the time, Congress understood that a direct government prohibition or regulation of content at the source raised serious constitutional problems with the First Amendment's prohibition on prior restraints of public speech. *Reno,* 877–879. Thus, Congress legislated around the prior restraint issues by enacting a permissive, private party speech regulation law that encouraged private parties to do what the government could not. *Enigma,* 1046-1047.

In so doing, "Congress took the rather unusual step of setting forth policy goals in the immediately preceding paragraph of the statute" including encouraging the development of technologies which maximize user control, "empower parents to restrict their children's access to objectionable or inappropriate online content," and "preserve the vibrant and competitive free market that presently exists for the internet and other interactive computer services." *Id.*; §230(b)(2)–(4)). To meet these two goals, Congress enacted two distinct provisions. §230(c)(1) "immunizes providers of interactive computer services against liability arising from content created by third parties," primarily aimed at claims for defamation. *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008); *see also,* 47 U.S.C. §230(f)(3). §230(c)(2) limits liability for actions taken (A) "in good faith" to filter and block "material that the provider or user considers to be obscene, lewd, lascivious, filthy,

excessively violent, harassing, or otherwise objectionable;" and (B) "to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (c)(1)." 47 U.S.C. §230(c)(2). On its face, §230(c) permits ISPs to regulate online "content" and "material" -- not people. It was never intended to protect unscrupulous, anti-competitive ISPs who filter and block, or deny access based on "malicious whims." *See, Enigma*, 1052, 1054; *Sherman v. Yahoo! Inc.*, 997 F.Supp.2d 1129, 1138 (S.D. Cal. 2014).

### 2.      §230(c)(1) and (2) Are Not Interchangeable

As a preliminary matter, Defendants' interchangeable and overlapping construction of §230 runs afoul of the "fundamental canon of statutory construction that a [federal] statute should not be construed so as to render any of its provisions mere surplusage." *United States v. Wenner*, 351 F.3d 969, 975 (9th Cir. 2003) ("*Wenner*"). By bootstrapping two distinct statutory provisions to cover the same conduct, Defendants urge the Court to adopt a dangerous expansion of §230(c) to immunize the type of unlawful anti-competitive, identity based filtering and blocking that the Ninth Circuit expressly prohibited in *Enigma*. *See,* MTD, 22-25.

Defendants' use of publishing immunity under §230(c)(1) to sanction the same anti-competitive filtering and blocking conduct expressly prohibited under §230(c)(2) renders the critical distinction between (c)(1)'s immunity for traditional publishing conduct, and (c)(2)'s immunity for "good faith" filtering and blocking, meaningless and circular. It results in legalizing under (c)(1), the same anti-competitive, discriminatory practices that the Ninth Circuit declared unlawful under (c)(2)(B), because "any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230[(c)(1)]." *Sikhs for Justice "NU", Inc. v. Facebook, Inc.*, 144 F.Supp.3d 1088, 1094 (N.D. Cal. 2015). Such a circular construction is especially problematic because it legalizes the same anti-competitive, discriminatory conduct that the Ninth Circuit found unlawful, simply by recasting that same conduct as that traditionally performed by a publisher. *Enigma*, at 1150-1152.

### 3.      Defendants Are Not Entitled To §230(c)(2) Immunity

In *Enigma*, the Ninth Circuit expressly rejected the trial court's finding that anti-

competitive, Protected Identity discrimination is lawful under §230(c)(2)'s specific content based

categories governing filtering and blocking. *Enigma,* 1050-1052. §230 "does not provide

immunity for blocking a competitor's program for anti-competitive reasons." "[I]f a provider's

basis for objecting to and seeking to block materials is because those materials benefit a

competitor, the objection would not fall within any category listed in the statute and the immunity

would not apply." *Id.* Defendants are not entitled to immunity for blocking "content for anti-

competitive purposes or merely at its malicious whims," including Protected Identity based

animus towards the user:

> We must today recognize that interpreting the statute to give providers unbridled discretion to block online content would, as Judge Fisher warned, enable and potentially motivate internet-service providers to act for their own, and not the public, benefit.  [Citation omitted.]  Immunity for filtering practices aimed at suppressing competition, rather than protecting internet users, would lessen user control over what information they receive, contrary to Congress's stated policy.  [Citation omitted.]  Indeed, users selecting a security software provider must trust that the provider will block material consistent with that user's desires.  Users would not reasonably anticipate providers blocking valuable online content in order to stifle competition.  Immunizing anti-competitive blocking would, therefore, be contrary to another of the statute's express policies: "removing disincentives for the utilization of blocking and filtering technologies."

*Id.*, 1051; *see also, id.,* 1173 (Rawlinson, J. dissenting).

    *Enigma* governs this case. Plaintiffs and Defendants compete directly in posting content

and securing views, monetization, and advertising. To interfere with Plaintiffs' ability to compete,

Defendants use Plaintiffs' Protected Identity, rather than content, to restrict videos, even though

Plaintiffs' videos do not contain material prohibited by any of Defendants' Contracts, Guidelines,

or Policies. At the same time, Defendants enter into commercial relationships and exempt their

"preferred" videos and partners from filtering or blocking restrictions, even where that content

violates Defendants' specific content rules. TAC ¶¶88, 116, 147, 157-59, 160-164. Furthermore,

Defendants permit "preferred" users to repost, use, and monetize Plaintiffs' restricted videos. TAC

¶¶382-384. Thus, whatever "objection" Defendants may have to Plaintiffs' Protected Identity, the

anti-competitive use of that identity to filter, block, and steal Plaintiffs' videos does "not fall

1   within any category listed in the statute and the immunity [does] not apply."[4] *Enigma,* at 1052.

2   ### 4.   Defendants Are Not Entitled To Immunity Under §230(c)(1)

3       The Ninth Circuit has never held that "machine-learning algorithms can never produce

4   content within the meaning of Section 230," or otherwise discriminate in violation of contract,

5   where, as here, Defendants use non-neutral, anti-competitive, discriminatory blocking and filtering

6   algorithms: "**we only reiterate that *a website's use of content-neutral algorithms, without more,***

7   **does not expose it to liability for content posted by a third-party.**" *Gonzalez v. Google LLC,* 2

8   F.4th 871, 896 (9th Cir. 2021) (emphasis added) ("*Gonzalez*"). Accordingly, Defendants'

9   argument, that §230(c)(1)'s publishing immunity applies to an ISP's use of dirty algorithms and

10  automated systems that profile the user's Protected to filter and block compliant content, fails.

11  ### a.   Defendants Have Contracted Out Of §230(c)(1)

12      Defendants contracted out of §230(c)(1) immunity under the Ninth Circuit's holding in

13  *Barnes v. Yahoo!, Inc.,* 570 F.3d 1096 (9th Cir. 2009), because they expressly promise to filter,

14  and block Plaintiffs' content and access only under neutral content based rules that apply

15  "equally" to all.[5] *Barnes,* at 1108-1109. "Liability for breach of promise is different from, and not

16  merely a rephrasing of, liability for negligent undertaking [by a publisher]." *Id*., at 1106. "Contract

17  liability," therefore "would come not from [Defendants'] publishing conduct, but from [their]

18  manifest intention to be legally obligated to do something." *Id.* Thus, while §230(c)(1) "creates a

19  baseline rule" of "no liability for publishing . . . the content of other information service providers

20  . . . [i]nsofar as [Defendants] made a promise with the constructive intent that it be enforceable, it

21  has implicitly agreed to an alteration in such baseline" rule. *Id.,* 1108-1109.

22

23  ---
    [4] Defendants' related contention that a user's "voluntary" decision to enable Restricted Mode does
24  not remove Defendants unilateral decision to filter and block content under §230(c)(2)(B). Indeed,
    it is further evidence that under *Enigma* Defendants defraud Plaintiffs and the millions of other
    YouTubers of their contractual rights to neutral filtering and blocking based on content, not the
25  competitive threat posed by the user. 946 F.3d, 1051-52.
    [5] *See,* TAC 341 ("We enforce these Community Guidelines … to everyone equally—regardless of
26  the subject or the creator's background, political viewpoint, position, or affiliation"): Ex. B ("[W]e
    Remove content that violates our policies, Reduce the spread of harmful misinformation and
27  borderline material"); Ex. C. ("[P]eople should be able to speak freely, share opinions, foster open
    dialogue").
28

1     Defendants' contractual promises to provide Plaintiffs with identity and viewpoint neutral

2     access to YouTube is no exception. *See, id.*, 1107. By contracting to perform their traditional

3     publishing functions, including editorial and distribution decisions, under specific neutral content

4     rules incorporated into the Contracts, Defendants cannot breach those obligations. Most of

5     Plaintiffs' claims arise from Defendants' use of systematic Protected Identity based discrimination

6     under and in violation of the promises in the Contracts. A claim that a business promises to do

7     something under a consumer contract is not unique to publishers, nor involves traditional editorial

8     publishing functions. Plaintiffs are no different than Salman Rushdie, who contracts with a

9     publisher for neutral content based editing, only to have that content filtered and blocked from

10    distribution because the publisher objects to Mr. Rushdie being of Indian descent. Since the Ninth

11    Circuit decided *Enigma*, §230(c) cannot immunize anticompetitive discrimination.[6] 946 F.3d,

12    1050-1052.

13          **b.     §230 Exempts Intellectual Property Disputes**

14          Plaintiffs' claims are also exempt from §230(c) immunity because they arise from

15    violations of licensing agreements involving intellectual property rights to their content and data.

16    Intellectual property disputes, particularly disputes that arise from the breach of a video and

17    personal data licensing agreements, are expressly exempted from §230(e): "**No effect on**

18    **intellectual property.** Nothing in this section shall be construed to limit or expand any law

19    pertaining to intellectual property." 47 U.S.C. §230(e)(2); *see also, Enigma*, 1053.

20          Defendants' Contracts contain self-executing license provisions that are triggered every

21    time a person visits or uses YouTube. TAC 2958 ¶6.C, 2947 ¶6.C; ECF80-5, ¶¶2, 9.They require

22

23

24    [6] The lower court cases cited by the trial court do not hold otherwise. None involved claims of
      anti-competitive, discrimination based on a user's Protected Identity. *See, e.g., Sikhs for Justice*
25    *Inc. v. Facebook, Inc.*, 144 F.Supp.3d. 1088, 1090 (N.D. Cal. 2015) (removal of content in India
      pursuant to order of Indian Government banning content supporting terrorist causes); *Federal*
26    *Agency of News LLC v. Facebook, Inc.*, 395 F.Supp.3d 1295, 1313–1314 (N.D. Cal. 2019)
      (immunity where ISP reviewed and removed material based on service violations for false user
27    profiles associated with Russian interference in elections); *Levitt v. Yelp! Inc.*, No. C-10-1321
      EMC, 2011 WL 5079526 (N.D. Cal. Oct. 26, 2011), *aff'd*, 765 F.3d 1123 (9th Cir. 2014)
28    (immunity for defamation liability for failure remove defamatory business reviews posted by third
      parties).

every user to grant Defendants an irrevocable and perpetual license to its content, personal data, and the revenue derived therefrom. *Id.,* 2958 ¶6.C, 2947 ¶6.C. In exchange for those rights, estimated to be worth $15 billion annually, Defendants promise identity and viewpoint neutral content filtering and blocking according to specific rules that apply to all. *Id.*, ¶¶87, 90, 108, 138; 341; Ex. B; Ex. C. Therefore, YouTube is not a free service, but a global licensing business under which Defendants license the rights to users' content, data and revenue derived therefrom; Defendants' refusal to honor their promises made in consideration for billions of dollars' worth of Plaintiffs' content, data, and related revenue, constitutes an IP licensing dispute that is expressly exempt from §230(e)(2) immunity.

### c.   Defendants Are "Content Information Providers" Under §230

§230(c)(1) immunity is also barred by the Ninth Circuit's decision in *Roommates* (1162, 1164, 1174-1175). ISPs that use non-neutral computer based filtering and blocking machines that infect, taint, alter, or contribute in any way to third party user content are not entitled to immunity "within the meaning of Section 230." *Id.; see also, Gonzalez,* 896. Where, Defendants are "content information providers," they cannot invoke §230(c)(1). *Roommates*, 1173-1174; §230(f)(3); *see also, id.*, *Barnes*, 1108-1109.

To effectuate their discriminatory practices, Defendants embed signals, metadata, external content flags, and other personal identification information about Protected Identities into Plaintiffs' content. This includes the use of automated systems and manual review tools embedded with discriminatory and anti-competitive animus-based code, that are used to filter and block content based on the identity, viewpoint, or topic of the user. TAC ¶¶4-17, 98-103, 526-527, 648-652. Embedding of this information into Plaintiffs' videos is what causes Defendants to flag the contents as "objectionable." That is precisely the conduct that makes Defendants "information content providers 'responsible,' in whole or in part, for the creation…of information provided through the Internet." *Roommates*, 1173-1174; §230(f)(3).

### 5.   The Trial Court's §230(c) Finding Is Unconstitutional

Defendants' application of §230(c) to immunize an ISP for systemic, computer based

discrimination using Protected Identity also raises important constitutional concerns under the First and Fourteenth Amendments. *Denver Area Educ. Telecommunications Consortium, Inc. v. F.C.C.*, 518 U.S. 727, 766-67 (1996); *Roberts v. AT&T Mobility LLC*, 877 F.3d 833, 842 (9th Cir. 2017*), cert. denied*, 138 S.Ct. 2653 (2018); *Skinner v. Ry. Labor Executives' Ass'n,* 489 U.S. 602, 615–616 (1989). Thus, to the extent that the Court accepts Defendants' unprecedented construction of §230(c) to immunize anticompetitive, discriminatory blocking and filtering based on race or other Protected Identity of the user, the Court cannot "avoid" the constitutional issues identified in *Denver Area*.

In *Denver Area*, six justices, on an otherwise divided Supreme Court, held that when Congress attempts to privatize otherwise unconstitutional conduct by authorizing a private party to do what government cannot, it does not remove the law from constitutional scrutiny. *Denver Area*, 763-766. In such cases, "close" and "careful" scrutiny is applied to determine the constitutionality of a permissive, private party speech laws. *Id.*

Defendants' construction of §230(c) cannot pass muster. It was enacted as a permissive speech regulation that authorized ISPs to regulate, filter, and block offensive online material to protect children and other sensitive audiences from pornography and other Inappropriate Material, not to target users based on identity. *Enigma*, 1046-1047. The application of §230(c) urged by Defendants is not (i) viewpoint neutral; (ii) sufficiently and narrowly tailored to serve the interest of protecting minors from "offensive" online content, while also eliminating the risk of an "erroneous veto;" and (iii) interferes with existing legal relationships based on contract and intellectual property law. *Denver Area,* 766. The application of §230(c) to anti-competitive, Protected Identity based profiling and redlining creates a risk of erroneous "veto" over compliant content in violation of Plaintiffs' rights under contract, and "radically changes" the scope of state and federal laws prohibiting discrimination and unlawful business practices. *Denver Area*, 763-766.

Finally, contrary to Defendants' contention, this case is not an attempt by Plaintiffs to challenge the enforcement of a contractual promise to arbitrate, but to redress Protected Identity discrimination under and in violation of Defendants' express contractual promises to filter and

block on YouTube based on neutral content based rules. *See*, MTD: 24:7-26. In *Roberts,* the Ninth Circuit makes a crucial distinction between the application of neutral laws to enforce an arbitration provision and those that "target" and discriminate against users based on Protected Identity. Consequently, constitutional scrutiny of a federal law that targets speech for "vulnerability to private censorship in a context where content-based discrimination is not otherwise permitted" or in "the context of discrimination claims under the Equal Protection Clause" is always warranted. *Roberts*, 841-842. §230(c) is no exception.

## I.      Plaintiffs Have Stated Claims For Violations Of First Amendment

The recent decisions in *Manhattan Community Access Corp. v Halleck*, 139 S. Ct. 1921 (2019) ("*Halleck*") and *Prager III* foreclose a First Amendment Claim based on the lone allegation that a private party declares or designates its property as a forum for speech. *Halleck,* 1930. But *Halleck*, and by extension *Prager III*, stop short of overruling *Marsh v. State of Ala.*, 326 U.S. 501 (1946), or eliminating the "public function" test for private state action. Accordingly, Plaintiffs seek to preserve their First Amendment Claim for adjudication, to allow the federal court to clarify the extent to which Defendants' "ubiquitous" services are essential, and part of functions that have historically been the exclusive province of the government, including the administration of elections. TAC ¶¶148, 464, 469, 474, 501-502.

In addition, neither *Halleck*, nor *Prager III*, considered the theory of whether Defendants' use of §230(c), a permissive speech regulation law, to engage in intentional and systematic Protected Identity based discrimination that would otherwise be unlawful, is sufficient to plead state action under the endorsement test set forth in *Skinner* (615–616). Defendants' discriminatory regulation of speech is "state action" under the "endorsement test," in which a private party invokes or applies a federal statute (in this case §230 immunity), to permit otherwise unlawful Protected Identity based discrimination. *Skinner,* 615–616 (encouragement under a federal regulation to engage in drug testing makes private parties state actors). Whether Defendants are engaged in state action by invoking §230(c) in such a way as to render the statute a non-neutral sanctioning of discriminatory or unconstitutional conduct, is an issue which no appellate court has *ever* considered.

III.     **CONCLUSION**

Defendants promised that Plaintiffs could post content and earn money on YouTube, subject to rules that "apply to all types of content" and "to everyone equally – regardless of the subject or the creator's background, political viewpoint, position, or affiliation." TAC 341; *see,* Ex. B-C. Plaintiffs allege with specificity that those promises are false:

Defendants are biased (TAC ¶169); they knowingly allow employees to interfere with Plaintiffs' access to services (*id.*, ¶179-182); and engage in digital redlining using automated systems based Plaintiffs' Protected Identity. *Id.*, ¶¶168-170. Defendants admit to using "algorithms and automated systems to get the [demographic] information that advertisers want." "These automated tools gather and analyze information about creators and viewers based on their identifying information, including race, sexual identity and other protected identities" and use "that information to make decisions about viewing restrictions and monetization that are based on who the creators and viewers are; rather than based only on the video content." TAC ¶¶99-99g. Given the TAC allegations and evidence in the form of screenshots, hyperlinked videos, and comparison chart, §230(c) cannot immunize Defendants' repeated contractual breaches or their use of automated systems employing Plaintiffs' Protected Identity information to filter and block Plaintiffs. The Plaintiffs satisfy Rule 12(b)(6) with respect to each claim for relief.

DATED:  November 22, 2021                     Respectfully submitted,

BROWNE GEORGE ROSS
O'BRIEN ANNAGUEY & ELLIS LLP
    Peter Obstler

By:   _____
            Peter Obstler
Attorneys for Plaintiffs Kimberly Carleste Newman,
Lisa Cabrera, Catherine Jones, Denotra Nicole Lewis,
Andrew Hepkins, Harvey Stubbs, Khalif Muhammad,
Keu Reyes and Osiris Ley